# EXHIBIT 12

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REYNA ARROYO,                    )

      Plaintiff,                 ) Case No: 21-cv-01148

v.                               )

CITY OF CHICAGO,                 )

      Defendant.                 )

_____

      REMOTE DEPOSITION of REYNA ARROYO, taken on
behalf of the defendant, on March 1, 2023, at
10:00 a.m., pursuant to Notice of Taking Deposition, via
Zoom, before Lakesha Jackson, Professional Court
Reporter, in and for the State of Chicago.

---

Reyna Arroyo
March 1, 2023

Page 2

1                    A P P E A R A N C E S

2

3

4        JANAAN HASHIM, Esquire

5            Amal Law Group, LLC
             161 N. Clark Street, Suite 1600
6            Chicago,  Illinois  60601
             Telephone: 312.882.4122
7            E-mail: jhashim@amallaw.com

8

             Counsel for the Plaintiff.
9

10       KRISTEN WOYTOWICZ, Esquire
         MATT SUHL, Esquire
11
             Assistant Corporation Counsel Supervisor
12           City of Chicago Department of Law
             Employment Litigation Division
13           2 North LaSalle Street, Suite 640
             Chicago, Illinois  60602
14           Telephone: 312.744.0428
             E-mail: Kristen.woytowicz@cityofchicago.org
15

16           Appearing for the City of Chicago.

17

18

19

20

21

22

23

24

25

Reyna Arroyo
March 1, 2023

Page 3

1                       I N D E X

2

3   WITNESSES:                              PAGE

4   REYNA ARROYO

5        Examination by Ms. Woytowicz................5

6        Examination by Ms. Hashim..................110

7        Examination by Ms. Woytowicz...............142

8        Examination by Ms. Hashim..................146

9

10

11                     E X H I B I T S

12   MARKED FOR IDENTIFICATION

13   Exhibit No. 1

14   Exhibit No. 2

15   Exhibit No. 3

16   Exhibit No. 4

17   Exhibit No. 5

18   Exhibit No. 6

19   Exhibit No. 7

20   Exhibit No. 8

21

22

23

24

25

Reyna Arroyo
March 1, 2023

Page 4

```
                        S T I P U L A T I O N
```

1
2          It was stipulated and agreed by and between

3    counsel for the respective parties and the witness that

4    the reading and signing of the deposition by the witness

5    be waived.

6                    THE REPORTER:  The reporter has a brief

7    read-on before the witness is sworn, and it reads as

8    follows:  The attorneys participating in this deposition

9    acknowledge that I am not physically present in the

10   deposition room and that I will be reporting this

11   deposition remotely.  They further acknowledge that in

12   lieu of an oath administered in person, I will

13   administer the oath remotely.  The parties further agree

14   that if the witness is testifying from a state where I

15   am not a notary, that the witness may be sworn in by an

16   out-of-state notary.

17                    If any party has any objections to this

18   manner of reporting, please state now.

19                    Hearing no objections, I will now swear in

20   the witness.

21                    (Witness sworn.)

22                            -  -  -

23                    REYNA ARROYO,

24   having been produced and first duly sworn as a witness,

25   testified as follows:

Reyna Arroyo
March 1, 2023

                                                    Page 5

1                         EXAMINATION

2    BY MS. WOYTOWICZ:

3        **Q.  Can you please state and spell your name for the**

4    **record?**

5        A.   Yes.  Reyna Arroyo.  R-E-Y-N-A, A-R-R-O-Y-O.

6        **Q.  Do you go by any other names?**

7        A.   I used to be married as Reyna Sansone,

8    S-A-N-S-O-N-E, but I got divorced.

9        **Q.  So, in other words, that's you're maiden name?**

10       A.   Yes.

11       **Q.  Okay.**

12              MS. WOYTOWICZ:  Let the record reflect this

13   is the deposition of Reyna Arroyo in the matter of Reyna

14   Arroyo versus City of Chicago 21CV1148, filed in the US

15   District Court for the Northern District of Illinois.

16              This deposition is subject to all applicable

17   federal and local rules.

18   BY MS. WOYTOWICZ:

19       **Q.  Officer Arroyo, I know we just briefly met, but I**

20   **am Kristen Woytowicz.  I'm an attorney representing the**

21   **City of Chicago in your lawsuit.  And before I ask you**

22   **some questions today, I want to make sure we are all on**

23   **the same page for the process of how depositions work.**

24       **So first things, speak loudly and clearly so the**

25   **court reporter can hear your answer, especially over**

Reyna Arroyo
March 1, 2023

Page 6

1  Zoom it's important so she can get everything down
2  correctly.  And try not to nod or answer with "uh-huh"
3  as it's also hard to get those down correctly as to what
4  you meant.
5       Does that make sense?
6  A.  Yes.
7  Q.  And then also try not to -- I will do the same,
8  but try not to speak over each other.  Let me ask a
9  question and finish and then give your answer, and I
10 will also try to let you finish before I answer my next
11 question so that the court reporter can take everything
12 down.
13      Does that make sense?
14 A.  Yes.
15 Q.  Okay.  If you can't hear me -- I tend to be a
16 quiet speaker.  I will try my best as well.  But if you
17 either can't hear me, or if the question is confusing
18 for you, just let me know, and I will try again.  And if
19 you answer, I'll just assume you heard and understood
20 me.
21      Is that fair?
22 A.  Yes.
23 Q.  And then the last thing, hopefully, today doesn't
24 go too long.  If you need a break at any time, just let
25 me know, and we can certainly do that as long as a

Reyna Arroyo
March 1, 2023

Page 7

1    **question is not pending.**

2         **Is that fair?**

3    A.   Yes.

4    **Q.   Is there any reason, whatsoever, either**

5    **medication, drugs, alcohol that you cannot give complete**

6    **and truthful testimony today?**

7    A.   Maybe incomplete.  I am hoping to go through

8    this.  I'm having chest pains, and I was hospitalized.

9    The doctor gave me some medication, so I'm still yet to

10   go get it from the pharmacy.

11   **Q.   So you have not --**

12   A.   I have not.  I just went to the doctor yesterday.

13   **Q.   Okay.**

14   A.   So that would be the only situation that if I was

15   to request stop the meeting today.  But I'm looking

16   forward to finish it.

17   **Q.   Okay.  So if I understand you correctly, just**

18   **letting us know that you might have some chest pain**

19   **issues.  If we need to stop, that's perfectly fine.  But**

20   **as far as, like, your ability to, like, recall or answer**

21   **truthfully, that you're not under any condition that**

22   **would impede your mental ability to give truthful**

23   **testimony today; is that correct?**

24   A.   That is correct.

25   **Q.   Okay.  Have you ever given a deposition before?**

Reyna Arroyo
March 1, 2023

Page 8

```
 1    A.  I have.
 2    Q.  And when was that?
 3    A.  I can't recall.  Maybe twice.
 4    Q.  Okay.  Do you recall what types of cases you were
 5  giving a deposition for?
 6    A.  I believe I did one for myself, and the other --
 7  the other, maybe two, for other officers.  I was
 8  subpoenaed as a witness officer.
 9    Q.  Starting with the one with yourself, what was
10  that lawsuit about?
11    A.  I believe it was regarding a handicapped person.
12  He stated that I mistreated him, but the -- officers
13  from the hospital and --
14    Q.  So they were -- is it fair to say that it was
15  like a lawsuit against, like, the City and you in your
16  capacity as like a police officer, like excessive force
17  types of cases?
18    A.  That was the case, yes.
19    Q.  Okay.
20    A.  It was not a lawsuit.  It was -- actually, yes, I
21  believe it was a lawsuit.  And it didn't go nowhere.
22    Q.  Okay.  Were you individually named in that
23  lawsuit?  Do you remember?
24    A.  It was my partner, myself and other assisting
25  officers.  I can't recall.  But I was in the lawsuit.
```

Reyna Arroyo
March 1, 2023

Page 9

1    **Q.  Okay.  And so just like in those depositions, you**
2    **understand you are under oath today, correct?**
3    A.  Yes.
4    **Q.  Did you do anything to prepare for your**
5    **deposition today?**
6    A.  Yes.  I went over my demand settlement and some
7    notes.
8    **Q.  What do you mean the "demand settlement"?**
9    A.  Well, my settlement that I signed to the City,
10    just to refresh my memory.
11    **Q.  Are you -- did you have a date of what that**
12    **settlement demand was that you're referring to?**
13    A.  Can you rephrase the question, please?
14    **Q.  Sure.**
15    **The settlement demand that you're referring to,**
16    **what was the date of that?**
17    A.  Yes.  The most recent one.
18    **Q.  So January 24th, 2023?**
19    A.  Give me a minute.
20    MS. HASHIM:  And, Kristen, for the record,
21    yesterday, I was asked by the witness to send her the
22    settlement demands that I sent to the City, and that's
23    simply what I sent to her.
24    MS. WOYTOWICZ:  Okay.  Is it to fair to say
25    it's the one we received on January 24th?

Reyna Arroyo
March 1, 2023

```
                                                        Page 10
 1              MS. HASHIM:  Correct.
 2              THE WITNESS:  That's correct.
 3    BY MS. WOYTOWICZ:
 4        Q.  And then you mentioned notes.
 5            Are those your personal notes?
 6        A.  Yes, those are my personal notes that I keep a
 7    log.  Every time I speak to someone, I try to make a
 8    notation of what the conversation transpired for a cop.
 9        Q.  When was the last time you input a personal note
10    regarding this matter?
11        A.  When I was -- out of my batch.
12        Q.  Was that about May 2021?
13        A.  No.  It would be June --
14        Q.  Or 2020?
15        A.  -- June 2nd or 4th 2020.
16        Q.  June 4th 2020.
17              MS. WOYTOWICZ:  Counsel, do you know if
18    those have been produced?
19              MS. ABRAHAM:  I believe they have.
20              MS. WOYTOWICZ:  Okay.
21              MS. HASHIM:  But for the record, we'll
22    double check to make sure they were, but I do have a
23    recollection of producing those.
24              MS. WOYTOWICZ:  Okay.  Thank you.  It kind
25    of rings a bell, but I can't remember.  Okay.
```

Reyna Arroyo
March 1, 2023

Page 11

1    BY MS. WOYTOWICZ:
2        Q.   Okay.   Other than -- the settlement demand from
3    your attorneys and your notes, did you review anything
4    else for today?
5        A.   No.
6        Q.   And besides your attorneys, did you speak with
7    anyone else to prepare for today's deposition?
8        A.   No.
9        Q.   Have you spoken with -- since filing this
10   lawsuit -- I know there was like a grievance, but have
11   you ever spoken with anyone at CPD about your deposition
12   today?
13       A.   No.
14       Q.   Okay.   And when I say "CPD," you understand I
15   mean the Chicago Police Department.
16            Is that fair?
17       A.   That's fair.
18       Q.   What about this lawsuit generally since it's been
19   filed?   Have you spoken with anyone at CPD?
20       A.   I spoke to the FOP, the lawyer, and that's it, I
21   believe.
22       Q.   Who did you speak with at the FOP?
23       A.   I spoke to -- at the time, it was my lawyer, the
24   FOP lawyer Kathryn Chapman (ph) and Andy Cantore.   I
25   e-mailed some e-mails to John Cantasara (ph), Mike

Reyna Arroyo
March 1, 2023

Page 12

```
 1   Mette, trying to get an update on the situation
 2   regarding the grievance and so forth.  I might have
 3   mentioned it to some of the CPD -- I think that's it.  I
 4   can't recall anyone else.
 5       Q.  I want to -- you said Kathryn Chapman, Andy
 6   Cantor; is that correct?
 7       A.  Yes.  Cantore, C-A-N-T-O-R-E, Michael Mette,
 8   M-E-T-T-E, John Cantasara.
 9       Q.  Okay.
10       A.  And that's, I believe that's -- there was -- no,
11   that's it because the other person retired.  He was not
12   aware of it.
13       Q.  Okay.  So when you spoke with Kathryn Chapman,
14   what did you discuss?
15       A.  I can't recall.
16       Q.  Was it about the lawsuit itself or about the
17   grievance that she was handling for you for the FOP?
18       A.  It was mostly the grievance.
19       Q.  Same with Andy Cantore.
20           Was it about this lawsuit, or was it about the
21   grievance with the FOP?
22       A.  It was mostly about the grievance, and I might
23   have mentioned something that I was going to start a
24   lawsuit.
25       Q.  How about the John Cantasara?  Was it similarly
```

Reyna Arroyo
March 1, 2023

Page 13

1    mostly about the grievance or also about the lawsuit?

2        A.  Mostly about the grievance.  And like I said, I

3    might have mentioned potentially a lawsuit pending.

4        Q.  And then the last one, Michael Mette.

5            Similar, it was probably mostly the grievance?

6        A.  It's the same, yes.

7        Q.  Okay.  And so I know you said you had been the

8    defendant in that one lawsuit before.

9            Any others?  I assume not.

10       A.  I can't recall the other one.  I was -- like I

11   said, I was probably a witness.

12           It could be two or three depositions, but I can't

13   recall the other one.

14       Q.  Okay.  The others I think you said you were just

15   a witness, you were not named in those, correct?

16       A.  Correct.

17       Q.  Have you ever been a plaintiff before other than

18   this case?

19       A.  Never.

20       Q.  Okay.  Now going back into some background, you

21   were previously married, you said, correct?

22       A.  That is correct.

23       Q.  When were you married?

24       A.  September 11th, 2009, I believe.

25       Q.  And when was your divorce filed?

Reyna Arroyo
March 1, 2023

Page 14

1    A.  Oh, it was filed, like, in 2014 or '15.  I can't
2  recall.  I can't recall the year.
3    Q.  Okay.  And then when did the divorce become
4  final?
5    A.  I believe 2017 -- '16 or '17.  I can't recall.
6    Q.  That's okay.  That's fair.
7        And how many -- do you have any children?
8    A.  I have one child, but not from my ex-husband.
9    Q.  Okay.  What was your ex-husband's name?  I assume
10  Sansone is his last name?
11    A.  Yes.  John J. Sansone, S-A-N-S-O-N-E.
12    Q.  And then what is -- you said one child.  What is
13  their name?
14    A.  Mateo, M-A-T-E-O.  The initial "O."  Arroyo like
15  my name, A-R-R-O-Y-O.
16    Q.  And how old is Mateo?
17    A.  He is currently 13.
18    Q.  And what is your highest level of education?
19    A.  High school with some work courses.
20    Q.  You mean some post-high school course work?
21    A.  Yes.  I went to a business college, yes.
22    Q.  What is --
23    A.  For a year.
24    Q.  Sorry.
25        You went for one year?

Reyna Arroyo
March 1, 2023

Page 15

1    A.  Yes.

2    **Q.  What business college did you attend for one**

3  **year?**

4    A.  Northwestern.  It was on Lawrence and Milwaukee

5  Avenue.

6    **Q.  Did you say Northwestern?**

7    A.  Yes.  It was Northwestern Business College.

8    **Q.  Okay.  And I know, obviously, your most recent**

9  **employment, I assume, is the CPD, correct?**

10    A.  That is correct.

11    **Q.  And you were appointed on March 16th, 1998; is**

12  **that right?**

13    A.  I'm sorry.  Can you repeat that?

14    **Q.  Sure.**

15      **You were appointed with CPD on March 16th, 1998.**

16      **Does that sound right?**

17    A.  Yes.

18    **Q.  Prior to your appointment with CPD, where did you**

19  **work?**

20    A.  I worked at the US Cellular Company for many

21  years as an accounts payable coordinator.  I also, at

22  the time, I believe I worked at the Home Depot on the

23  weekends.  I would work the Odyssey on and off on

24  weekends as a hostess.

25    **Q.  Like Odyssey Yacht?**

Reyna Arroyo
March 1, 2023

Page 16

```
 1      A.  Yes.
 2      Q.  And what were the years you worked at US Cellular
 3  doing accounts payable?
 4      A.  I can't recall, but maybe about -- maybe about
 5  five years or so.
 6      Q.  Okay.  What was the year that you took the class
 7  work at the business college?  I am trying to get like a
 8  frame of reference here.
 9      A.  Sure.  I graduated in 1988.  I believe '80 -- no.
10  I believe 2020.  '89 -- I'm sorry.  '89 or '90.
11      Q.  Okay.  So the US Cellular work would have been
12  somewhere in the '90s; is that fair?
13      A.  No.  After the '90s.  Between the '90s to '93,
14  '94, worked at Brewer Electric Company, in an accounts
15  payable position.  I also worked at the Home Depot as a
16  cashier on weekends.  From there, I had to quit because
17  I had to take care of my mom.  She had a serious injury
18  on her back.
19          Then I started working at MacNeal Hospital as an
20  accounts payable clerk.  Then I went back to US Cellular
21  -- I'm sorry.  After Brewer Electric, I started working
22  at the US Cellular.  I quit to take care of my mother.
23  I worked at MacNeal Hospital, then I went to US
24  Cellular, and then I came to the Chicago Police
25  Department.
```

Reyna Arroyo
March 1, 2023

Page 17

1    **Q.   Okay.  So I guess I'm trying to understand it.**
2         **You did business college in 1989 or '90, and you**
3    **started with CPD in 1998.**
4         **Did all of those accounts payable jobs happen**
5    **between that time or did you overlap with your work at**
6    **CPD at all?**
7    A.   No.  They went before the CPD job.
8    **Q.   Okay.  Got it.  Thank you.**
9         **Now, when you first started with CPD, you went**
10   **into the police academy; is that correct?**
11   A.   That's correct.
12   **Q.   Okay.  And what types of training, generally can**
13   **you describe, was in the police academy?**
14   A.   They taught me how to stop and fast, domestic
15   violence class.  Overall Illinois statute laws, regular
16   law and criminal and traffic law.
17   **Q.   Did they train you on use of force?**
18   A.   Yes, they did.
19   **Q.   Okay.  What about like effecting arrests and**
20   **takedown techniques?  That kind of thing?**
21   A.   They did, yes.
22   **Q.   Did you learn about the CPD directives?**
23   A.   I believe I did, yes, as much as I could.
24   **Q.   Okay.  And are you aware whether police officers**
25   **are required to be familiar with the directives?**

Reyna Arroyo
March 1, 2023

```
                                          Page 18
 1      A.  They are, yes.
 2      Q.  And would you agree it's also that CPD members
 3  are supposed to comply with the police directives; is
 4  that correct?
 5      A.  Yes.
 6      Q.  Okay.  And do you recall what date was your
 7  academy graduation approximately?
 8      A.  I believe in June.  June or July.
 9      Q.  Of 1998?
10      A.  Yes.
11      Q.  Okay.  And then after graduating police academy,
12  you were a probationary police officer; is that correct?
13      A.  Yes.
14      Q.  And do you recall that your probationary period
15  was extended?
16      A.  I don't recall.
17      Q.  Okay.  I'm going to share my screen.
18          Can you see that document?
19      A.  Yes.
20      Q.  Okay.  I'm going to scroll down so you can see
21  the whole thing, or I can try to make it bigger than
22  that.  That did not work at all.  Here we go.
23          Do you see that?
24      A.  Yes.
25      Q.  Okay.  Do you recognize it?
```

Reyna Arroyo
March 1, 2023

Page 19

```
 1    A.  I don't recall.
 2    Q.  Okay.  Do you see -- where is this --
 3            MS. WOYTOWICZ:  For the record, dated March
 4    17th, 1999, Bates Number ARROYO.Def.000328.
 5        (Exhibit 1 was marked for
 6        identification by the reporter
 7        and is attached hereto.)
 8  BY MS. WOYTOWICZ:
 9    Q.  Do you see on here your -- this is your name,
10    correct?
11    A.  Yes.  But that's not my employee number.
12    Q.  Okay.
13    A.  I don't believe that my probation was extended
14    less than a year.
15    Q.  This looks like it -- this is your correct hire
16    date, yes?
17    A.  Correct.
18    Q.  And you don't have any recollection of your
19    probation being extended due to absence?
20    A.  No.
21    Q.  Okay.  Do you like -- to your recollection, do
22    you remember when your probationary period expired?
23    A.  I don't remember, but I know it expired within
24    the same year as the other officers --
25    Q.  Okay.
```

Reyna Arroyo
March 1, 2023

Page 20

1    A.    -- I graduated.  There was an officer that was

2    injured, a colleague.  Maybe it was confused with her's.

3    **Q.  Okay.  So you don't think it was actually April**

4    **29th, 1999?**

5    A.  Correct.

6    **Q.  Okay.  Let's -- okay.  Then I'm just going to**

7    **show another document real quick.**

8         **Bear with me.  Sorry with the sharing.**

9              MS. HASHIM:  And for the record, this will

10   be Exhibit Number 2?

11             MS. WOYTOWICZ:  Yes.

12        (Exhibit 2 was marked for

13        identification by the reporter

14        and is attached hereto.)

15   BY MS. WOYTOWICZ:

16   **Q.  Do you see this document?  The first page is**

17   **marked ARROYO.Def.00193, and it goes -- I'll go quickly**

18   **then I'll go back -- .00195.**

19        **This is the first page.  Does this look familiar**

20   **at all?**

21   A.  I never saw this document.

22   **Q.  Okay.  Do you recognize your name is on this?**

23   A.  Yes.

24   **Q.  Okay.  If I represent to you that it's a work**

25   **history, it's date March 6th, 2021.  So it's a little**

Reyna Arroyo
March 1, 2023

Page 21

```
 1   old at this point.  Almost two years old at this point.
 2           But does this look correct as far as your
 3   appointment originally -- let me get to it.  It looks
 4   like it's in the warehouse history.  So this is your
 5   warehouse history.  This is your appointment, the new
 6   appointment to police officer.
 7           And it looks like you held police officer as the
 8   only title during your entire employment with the City
 9   of Chicago; is that fair?
10       A.  Yes.
11       Q.  Okay.  And under here, it looks like it says
12   "Fraternal Order of Place, Lodge 7."
13           Are you familiar with the Fraternal Order of
14   Place?
15       A.  Yes.
16       Q.  Okay.  And it's fair to say the FOP represents
17   your title as police officer; is that correct?
18       A.  Yes.
19       Q.  All right.  I'm next sharing -- I'm going to show
20   you what first identify as ARROYO.Def.000124, and it
21   goes through -128.
22           (Exhibit 3 was marked for
23           identification by the reporter
24           and is attached hereto.)
25   BY MS. WOYTOWICZ:
```

Reyna Arroyo
March 1, 2023

Page 22

1    Q.  Do you recognize this document?

2    A.  I don't recognize it.

3    Q.  Okay.  Would you just agree that it's a class

4    title of police officer?  Do you want me to scroll?

5    Sorry.

6    A.  Yes, I might have seen the document when I

7    applied for the Chicago Police Department.

8    Q.  So I'm going to scroll through slowly because I

9    want you to take a look at it and make sure you -- we're

10   on the same page, that you understand it to be, like,

11   the job description for the police officer, correct?

12   A.  Yes.

13   Q.  So let me know when I can scroll.

14   A.  You can scroll.

15   Q.  Okay.

16   A.  Okay.  Yes.

17   Q.  All right.  It's a long one.

18   A.  Yes.

19       Yes.

20       Yes.

21       Yes.

22   Q.  I think that's the end.

23   A.  Yes.

24   Q.  Okay.  So is it fair to say it's the job

25   description for the police officer title?

Reyna Arroyo
March 1, 2023

Page 23

```
1    A.   Absolutely, yes.
2    Q.   So going through it a little bit, just to kind of
3    compare to your experience, essential duties, obviously,
4    include, you know, monitor crime and crime conditions
5    assigned go your graphic area through the use of random
6    patrolman.
7         Is it fair to say throughout your career, you've
8    been assigned to districts to do that kind of work?
9    A.   Yes.
10   Q.   And in doing so, the second essential duty,
11   response to incidents either as assigned or observed.
12        Is that part of what you did as your police work
13   in districts?
14   A.   Yes.
15   Q.   Same with the next one, gathering relevant
16   information at an incident to help conduct preliminary
17   investigation.
18        Is that something you did throughout your police
19   work?
20   A.   Yes.
21   Q.   The next one, insures any personal property taken
22   into custody as properly document as secured.
23        Did you perform that as part of your work at
24   various districts?
25   A.   Yes.
```

Reyna Arroyo
March 1, 2023

Page 24

```
 1      Q.  Okay.  Seeks to apprehend suspected law violators
 2   through the use of physical arrest procedures or
 3   citation procedures.
 4          Is that something you performed at your various
 5   assignments in details at districts?
 6      A.  Yes.
 7      Q.  And the physical arrest procedures, that is what
 8   we previously discussed you were trained on at the
 9   academy; is that fair?
10      A.  Yes.
11      Q.  Okay.  And you did that regularly and, in fact,
12   you've been injured throughout your career doing that
13   type of work; is that fair?
14      A.  That's correct, yes.
15      Q.  Do you recall about how many times throughout
16   your career that you've been injured doing that kind of,
17   like, arrest work of -- I forget how this is -- I'll
18   call them perpetrators.  I don't know if that's the
19   correct term.  But of effecting --
20      A.  Offenders.
21      Q.  Offenders.  Thank you.
22      A.  Sure.  I have been injured about 28 injuries in
23   my career, which 27 have been approved by the medical
24   section of Chicago Police Department.
25      Q.  What do you mean by "approved"?
```

Reyna Arroyo
March 1, 2023

Page 25

```
 1      A.   Certified.
 2      Q.   Do you mean certified as on-duty injuries?
 3      A.   On-duty injuries, yes.
 4      Q.   And to your recollection, were those injuries you
 5    sustained effecting arrest of offenders?
 6      A.   Yes.
 7      Q.   Okay.  Can you kind of take me -- I'll take
 8    this -- well, I can take this down for a second.
 9           Can you take me through -- is that like some of
10    them, like how you sustained the injuries effecting
11    arrest of these offenders?
12      A.   I sustained -- most of those injuries would be on
13    my left shoulder, chest area.  One in 2007, my partner
14    and I receive a call about a person selling drugs in the
15    neighborhood.  We responded.  We met with a 6'4, 225
16    pounds or so male.  And as we approached, he pushed my
17    partner as I was trying to hold on to him and take him
18    into custody.  He threw me into the hood of the car,
19    slammed me down and then took off.
20           We chased him.  We got to him.  And he was
21    struggling, he was punching us.  We called for backup.
22    Backup came, and he was detained and taken into custody.
23    As a result, I injured my shoulder.  I was off for three
24    months.  Yes, so I did sustain punches on my chest and
25    injury on my left shoulder.
```

Reyna Arroyo
March 1, 2023

Page 26

```
 1      Q.  Is it fair to say, I mean, when you're trying to
 2   arrest an offender, if they are fighting you back so
 3   you're using your physical strength to either restrain
 4   them, handcuff them or chase them?  All of that kind of
 5   stuff?
 6      A.  Yes.
 7      Q.  Okay.  And after these injuries, you were either
 8   put on medical role; is that fair?
 9      A.  I was put on injury on duty medical role, yes.
10      Q.  Because you were unable to perform your regular
11   police duties; is that correct?
12      A.  Yes.
13              MS. HASHIM:  Objection; form.
14              You can answer.
15   BY MS. WOYTOWICZ:
16      Q.  Do you recall like some of the -- I know you said
17   there were lots of these injuries, but, like, after you
18   go on the injury on duty or the medical role for various
19   periods of time; is that fair?
20      A.  Only when I got injured at work.
21      Q.  No.  Yeah, the work injuries.
22          That all of these times effectuating arrests, you
23   go on either the medical role or IOD for various amounts
24   of time to recover from your injuries; is that fair?
25      A.  Recurring injuries or injury at work, yes.
```

Reyna Arroyo
March 1, 2023

Page 27

```
 1      Q.  And you would come back eventually when you were
 2   able to be full duty; is that right?
 3               MS. HASHIM:  Object to form.
 4               Go ahead and answer.  And, Reyna, please
 5   allow for me to just insert an objection and then you
 6   can answer; okay?
 7               THE WITNESS:  Okay.
 8               MS. WOYTOWICZ:  Unless she tells you not to
 9   answer.  Generally, she can object and you'll probably
10   have to answer anyway, unless she tells you not to.  So
11   just let her --
12               MS. HASHIM:  I just don't want the two of us
13   talking on top of each other.  I just want to make my
14   objection then you can go ahead and answer.
15               THE WITNESS:  I apologize.
16               MS. HASHIM:  No worries.
17   BY MS. WOYTOWICZ:
18      Q.  Can you repeat your answer?  I sorry I missed it.
19      A.  Can you rephrase the question again?
20      Q.  I don't remember it.
21               MS. WOYTOWICZ:  I'm sorry.  Ms. Court
22   Reporter, do you have my question?
23               THE REPORTER:  Sure.  Just one moment
24   please.
25               (The following record
```

Reyna Arroyo
March 1, 2023

Page 28

```
 1                  was read by the reporter:
 2                  "QUESTION:  And you would come back
 3                  eventually when you were able to be full
 4                  duty; is that right?")
 5                  THE DEFENSE:  I'm going to renew the
 6      objection.
 7                  Go ahead and answer.
 8                  THE WITNESS:  Yes.  Once cleared by the
 9      doctor, I would come back to work, either on limited
10      duty or full duty.
11      BY MS. WOYTOWICZ:
12         Q.  Okay.  Let's take both of those then.
13              So when you would come back in limited duty, what
14      would that look like?
15         A.  When I couldn't -- when I didn't have a hundred
16      percent motion of my body to complete effect the police
17      description.
18         Q.  So if you were not able to do the full duties of
19      the police officer description, you would come back as
20      limited duty; is that correct?
21                  MS. HASHIM:  Objection; form.
22                  Go ahead.
23                  THE WITNESS:  If -- when warranted, yes.
24      BY MS. WOYTOWICZ:
25         Q.  And when you would get those limited duty
```

Reyna Arroyo
March 1, 2023

Page 29

```
 1   returns, those were for a limited duration or -- is that
 2   fair to say?
 3       A.  Can you rephrase the question, please?
 4       Q.  Sure.  Sorry.  It was a messy question.
 5           When you came back from an injury as a limited
 6   duty position, or assignment, eventually would you
 7   return to full duty?
 8       A.  I still can't understand the question.  I'm
 9   sorry.
10       Q.  Sure.  We can go back through because I know
11   there was various injuries so there was a lot of
12   different changes, but you said you would either come
13   back full duty or you'd come back limited duty if you
14   couldn't do full duty.
15           So I'm trying to understand when you came back as
16   a limited duty, when, if ever, you would then become
17   full duty again?
18       A.  Yes.  Once my treatment would be completed and a
19   final doctor release was given.
20       Q.  Okay.  So once your doctor released you,
21   eventually you would leave the limited duty and go back
22   to full duty?
23       A.  Yes.
24       Q.  Okay.  Then going back to -- I'm going to share
25   the job description again.
```

Reyna Arroyo
March 1, 2023

Page 30

1          Going back to the job description we were looking

2     at, Exhibit 3.  This next line "Actively pursues

3     suspected lot by learning search and containment

4     methods."

5          Do you see that?

6     A.  Yes.

7     Q.  What are search and containment methods?

8     A.  In my opinion, I can't recall the exact

9     definition, but I would give information about the

10    subject and try to contain the situation without getting

11    anyone in harms -- in harm.

12    Q.  Okay.  So it's kind of part of like securing the

13    scene; is that fair?

14    A.  That is correct.

15              MS. HASHIM:  Objection; form.

16              You can answer.

17              THE WITNESS:  Yes.

18    BY MS. WOYTOWICZ:

19    Q.  Okay.  And did that, similarly, require, like was

20    that physical in nature like the arrest procedures or

21    are those different?

22    A.  I think you had to do both.

23    Q.  So kind of the same -- trying to effectuate an

24    arrest also trying to secure a scene using your physical

25    being; is that correct?

Reyna Arroyo
March 1, 2023

Page 31

```
 1       A.   Yes.  Depending on the situation as well.
 2       Q.   Okay.  Okay.  And then it goes on to describe
 3  processing through the use of arrest and booking
 4  procedures, the suspects -- the suspected law violators.
 5           Did you do that in your districts as well?
 6       A.   Yes.
 7       Q.   And enforces state and municipal laws through the
 8  use of physical arrest procedures and citation
 9  procedures.
10           Is it fair to say that's when you were arresting
11  people, you were enforcing the law; is that correct?
12       A.   Yes.
13       Q.   And you did that, obviously, in your districts,
14  correct?
15       A.   Yes.
16       Q.   Gathers information at traffic crash scenes to
17  conduct preliminary investigations.
18           Did you do that in your districts as well?
19       A.   Yes.
20       Q.   Uses hand signals to direct traffic as necessary
21  around accidents.
22           Did you ever do that in your districts?
23       A.   Yes.
24       Q.   Okay.  I assume that's just as basic as directing
25  traffic using your arms?
```

Reyna Arroyo
March 1, 2023

Page 32

```
 1      A.  Yes.
 2      Q.  Okay.  As long as I'm not missing anything beyond
 3   what I am envisioning in my head.
 4          Protects citizen from life threatening situations
 5   by use of movement or protective cover?
 6      A.  Yes.
 7      Q.  Do you understand what that means or what that
 8   entails?
 9      A.  Yes.
10      Q.  What do you understand that to mean?
11      A.  Removing a victim from receiving a life
12   threatening situations, both for the victim and myself.
13      Q.  So just, basically, like hide -- not hiding, but
14   getting the victim and yourself out of harm's way?
15      A.  That's correct.  Shielding.
16      Q.  Okay.  And then preparing written communications
17   in English in standardized forms.
18          Do you understand that to mean like completing
19   the reports and paperwork resulting from incidents?
20      A.  Yes.
21      Q.  Okay.  And I assume it's fair to say you did that
22   regularly at your districts as well?
23      A.  Yes.
24      Q.  And then the last few.  Complies with department
25   rules, regulations and policies, and all Federal, State
```

Reyna Arroyo
March 1, 2023

                                                    Page 33

1    and Municipal laws that govern the activities of police

2    officers.

3          Do you see that?

4    A.  Yes.

5    Q.  Okay.  I assume that is something you also did

6    regularly during your career at CPD?

7    A.  Yes.

8               MS. HASHIM:  Objection; form.

9               You can go ahead.

10   BY MS. WOYTOWICZ:

11   Q.  And then communicates either verbal or written

12   methods with persons either within or outside the

13   department to complete tasks.

14         It's fair to say you did that throughout your

15   career?

16   A.  Yes.

17   Q.  And then the last one, appears in court and

18   presents testimony.

19         Did you ever do that throughout your career?

20   A.  Yes.

21   Q.  And then beyond -- I know the prior discussion

22   about the lawsuits when you give depositions, did you --

23   how often did you appear in court to provide testimony?

24   A.  At the beginning of my career because I was

25   assigned to a mass transit robbery, burglary as a decoy

Reyna Arroyo
March 1, 2023

Page 34

```
 1   officer, I did many work testimonies.  I was also the
 2   tactical secretary in conjunction with Secrete Service
 3   for the fictitious IDs.  So I went to court many times.
 4        I was a domestic violence liaison.  I also went
 5   to testify on behalf -- well, with the victims
 6   situations.  And I was also a patrolman outside and I
 7   also -- and I did went to court many times.
 8   Q.   Okay.  Is it -- do you agree that these are the
 9   essential duties of a police officer?
10   A.   Yes, ma'am.
11   Q.   Okay.  And then going down.
12        Where did I -- okay.  Let's stop for a second.
13        So court duties of sworn officers with CPD.
14        Is it fair to say it's preserve order and peace
15   and enforce the laws and ordinances in the City of
16   Chicago?
17   A.   Yes.
18   Q.   Do you know or would you agree that performing
19   the police duties requires certain equipment to be worn
20   at all times?
21   A.   Can you please rephrase the question?
22   Q.   Sure.
23        So in performing the police duties, would you
24   agree that certain equipment, like the bulletproof vests
25   and your duty belt are, you're required to wear those
```

Reyna Arroyo
March 1, 2023

Page 35

1    items?

2        A.  Yes.

3        Q.  Okay.  And you know, obviously, there are

4    physical requirements to be becoming a police officer.

5    There is a physical test.

6            Do you recall having to undertake a physical

7    test?

8        A.  Yes.

9        Q.  And I stopped sharing too soon, but looking at

10   that document again real quick.  The bottom of this page

11   125, it lists physical requirements using muscular force

12   to lift, carry, drag, push or otherwise move objects

13   using strength in one's arms, hands, back, shoulders or

14   legs.

15           Do you see that?

16       A.  Yes.

17       Q.  And if I may assume, those types of physical

18   requirements are what you used to effectuate arrests

19   over the course of your career?

20       A.  Yes.

21       Q.  Would you agree that performing the physical

22   activities with skills being balanced efficiently and

23   with little wasted motion is essential physical

24   requirement to do the police work?

25       A.  Yes.

Reyna Arroyo
March 1, 2023

Page 36

```
 1      Q.  And same with using the necessary force -- and we
 2   just went over that -- to restrain a person when making
 3   an arrest is a physical requirement of the police work?
 4      A.  Yes.
 5      Q.  And same with the next one quickly, bending,
 6   stretching, twisting or reaching out with one arm --
 7   body, arms and/or legs.
 8          Would you agree that's also a physical
 9   requirement to perform the police duties?
10      A.  Yes.
11      Q.  Okay.  And then the last thing I wanted to touch
12   on.  I don't know what that is on there.
13          Do you recall if there are licensing and
14   certification requirements as well, correct?
15      A.  Yes.
16      Q.  Like the fire --
17              THE REPORTER:  Could you repeat the last
18   question, Counsel?
19   BY MS. WOYTOWICZ:
20      Q.  Would you agree that there are police directives
21   about wearing the bulletproof vest and the duty belt
22   while on patrol?
23          I believe that was my question, and I think you
24   said "yes."
25          Am I right?
```

Reyna Arroyo
March 1, 2023

Page 37

1      A.   Yes.

2      Q.   And I know we kind of touched on the FOP.

3           Are you familiar with the collective bargaining

4    agreement?

5      A.   I believe so.  I am.  I am just going so much.

6      Q.   Would you agree it governs the conditions of your

7    employment as a police officer with CPD?

8      A.   Yes.

9      Q.   Are you -- do you need to take a break?  Are you

10   okay?

11     A.   I'm okay.

12     Q.   Okay.  Let me know.  I don't want you to

13   struggle.

14          Okay.  So your first assignment once you're out

15   of the academy, you were assigned to the recruit

16   training section, the detailed --

17          Do you recall that?

18     A.   I graduated from the academy and then I was sent

19   to the 10th District police station, 23-something South

20   Damen.

21     Q.   And district out of the police academy, you said?

22     A.   Tenth District.  I was in training for the

23   remainder of my probation.

24     Q.   Okay.  Do you know were you assigned or were you

25   detailed at the 10th District?

Reyna Arroyo
March 1, 2023

Page 38

1      A.  I was detailed during my probation.  And once my

2  probation finished, I was detailed to the 10th District.

3      **Q.  You mean assigned after your probationary?**

4      A.  I'm sorry.  Assigned, yes.

5      **Q.  Do you understand the difference between an**

6  **assignment and a detail?**

7      A.  I do.  I am just -- sorry.

8      **Q.  That's fair.**

9          **And so some assignments require bidding in**

10  **seniority; is that correct?**

11      A.  Yes.

12      **Q.  But what is your understanding of how details**

13  **work as opposed to assignments?**

14      A.  Details, for example, I was detailed to mass

15  transit from 2000 to 2003.  I was just there as a guest,

16  not a permanent police position.

17      **Q.  So it's more of a temporary situation than your**

18  **assignment?**

19      A.  Yes.

20      **Q.  I'm going to show you the next document really**

21  **quickly.  I'll show you this.  It is marked as**

22  **ARROYO.Def.002641.**

23          **(Exhibit 4 was marked for**

24          **identification by the reporter**

25          **and is attached hereto.)**

Reyna Arroyo
March 1, 2023

Page 39

```
 1   BY MS. WOYTOWICZ:
 2       Q.  Do you see this document?
 3       A.  Yes.
 4       Q.  Do you recognize it to be your assignment detail
 5   history?
 6       A.  I never saw the document, but let me just review
 7   it really fast.
 8       Q.  Sure.  Take your time.
 9       A.  Between 2000 -- after mass transit the -- that I
10   went in 2003, I was also assigned to the juvenile center
11   intervention.
12               MS. HASHIM:  So, Counsel, I'm going to
13   object to this line of questioning.  She's not familiar
14   with this document.
15               MS. WOYTOWICZ:  Sure.  I am just want to ask
16   about what her recollection is about her assignments,
17   and sometimes there's a point of refreshing that is
18   helpful with these documents.  But to the extent she
19   doesn't agree or remember, we can obviously go from her
20   own testimony.
21               MS. HASHIM:  Sure.  What's the Bates number
22   on this one?
23               MS. WOYTOWICZ:  2641.
24   BY MS. WOYTOWICZ:
25       Q.  So, Officer Arroyo, I just want to make sure, if
```

Reyna Arroyo
March 1, 2023

Page 40

1    there's something incorrect on this, obviously, it

2    appears to be a printout from your history, but if

3    there's something you don't remember or that looks

4    incorrect to you, feel free to identify that.

5        A.   That is somehow correct.  Juvenile versus -- yes.

6        Q.   Okay.  So starting -- this looks like -- the

7    first one I'm highlighting is out of -- this was when

8    you were first appointed.

9             Is this when you were saying you were actually in

10   the 10th District?  Oh, no.  You said you were detailed

11   during this probationary time, correct?

12       A.   To the 10th District, not the Juvenile

13   intervention.  That was incorrect.

14       Q.   Okay.  So this isn't correct.

15            So this juvenile intervention center detail from

16   March 1998 to 1999 is incorrect?

17       A.   That is incorrect.  I was detailed some time

18   after 2003 and maybe about a year or so.

19       Q.   Okay.  So during this time, you were actually

20   detailed to the 10th District, correct?

21       A.   Yes.

22       Q.   Okay.  And then this reflects you were assigned

23   to the 10th District in March of 1999, and that is a

24   correct one, right?

25       A.   Yes.

Reyna Arroyo
March 1, 2023

Page 41

1    Q.  Okay.  So when you were assigned and detailed
2    prior to the 10th District, what did your work entail?
3    A.  When I was working in 10th District, a police
4    officer making arrests enforcing laws, criminal,
5    municipal and traffic laws.
6    Q.  Okay.  And then is it correct that your
7    assignment changed in 2000 to public transportation?
8    A.  Yes.
9    Q.  Okay.  Is it detailed to the JISC still reflect
10   where you were detailed, or is that incorrect still?
11   A.  So just juvenile intervention should have been a
12   little bit after mass transit 701.
13   Q.  So it looks like that should have, maybe, started
14   in 2002.  Like, this detail -- May 2002.
15       Does that look correct?
16   A.  No, that is incorrect.
17   Q.  Still incorrect; okay?
18   A.  Yeah.
19   Q.  So let's go back to your assignment in 2000 to
20   public transportation.
21       What did that entail?
22   A.  I was -- at first, I was a patrol officer in
23   uniform walking, enforcing criminal, municipal and
24   traffic law in the downtown area.  Then I was assigned
25   to burglary, commissioned as a decoy.

Reyna Arroyo
March 1, 2023

Page 42

1      Q.   Okay.

2      A.   I -- during that time, I was very close to

3  getting killed actually a couple of times, but wanted to

4  go back.  So I wanted to go back to the 10th District.

5  But at the time, they sent me to go to the juvenile

6  center, they asked as a beat (ph) because there were

7  openings.

8      Q.   Okay.  So after public transportation, you wanted

9  to go back to 10th, but you were -- is it fair to say

10  you were detailed for a bit to the JISC?

11      A.   Yes.

12      Q.   And then it looks like you were, eventually,

13  assigned back to the 10th District in 2002?

14      A.   Yes.

15      Q.   And then was your work in the 10th District,

16  again in 2002, similar to your prior, just patrol work,

17  enforcing laws, making arrests?  That kind of stuff?

18      A.   The time that I was in the 10th District included

19  many responsibilities.  That would be patrolman, police

20  in vest, duty officer, tactical officer, domestic

21  violence liaison, like I mentioned.  I was also

22  assistant senior CAPPS officer.  I was a duty watch

23  secretary duties and practical secretary duties.

24      Q.   Okay.  And during -- for about how long would you

25  perform, like, the those different duties?  I mean, as a

Reyna Arroyo
March 1, 2023

Page 43

1    tactical officer, domestic violence liaison, desk

2    duties, would it be for, you know, weeks, months?  What

3    kind of duration would those be?

4        A.  More than a year, I would say.

5        Q.  Okay.  So, for example, like the -- I forgot how

6    you described it -- the desk duties in the 10th

7    District?

8        A.  The desk duties -- I'm sorry.  For that one, I

9    probably alternate, maybe, about a few months and then

10   another officer and then another three or four months or

11   so.

12       Q.  Okay.  And were there ever a time -- I mean, how

13   did you come about to get the desk duties the 10th

14   District?

15       A.  I believe because I'm bilingual.  I speak only

16   Spanish.  We had a lot of Hispanic people walking in, so

17   Spanish speaking was a must.  And I also requested it

18   because I was one of the senior officers there.

19       Q.  Okay.  And then do you know why you would come

20   off the desk duties and be asked to do different work?

21       A.  We would alternate because sometimes I would

22   like -- I enjoy my job, working outside, helping people.

23       Q.  Okay.  To your knowledge, while you were, like,

24   doing these specific duties, like the secretary or the

25   desk duties or the DV liaison, if you were asked to be

Reyna Arroyo
March 1, 2023

Page 44

```
 1    deployed to the street, did you know -- did that ever
 2    happen?
 3        A.  Yes.
 4              MS. HASHIM:  Objection; incomplete
 5    hypothetical.
 6              Go ahead, you can answer.
 7    BY MS. WOYTOWICZ:
 8        Q.  In what instances would you be deployed to the
 9    street?
10              MS. HASHIM:  Objection; incomplete
11    hypothetical.
12    BY MS. WOYTOWICZ:
13        Q.  You can answer.
14        A.  Well, let me rephrase.  I was not completely
15    assigned to the watch secretary or the desk positions.
16    It was just temporary, but they would keep me for a
17    while.  They would send me out when they were short of
18    staff or I requested to go out.
19        Q.  Okay.  So I think I understand what you're
20    saying.
21              You were asked to do some desk duties, either as
22    a secretary or the district desk kind of depending on
23    the needs of the district; is that fair?
24              And also, obviously, your request to do some
25    desk work and your request to go out into the field?
```

Reyna Arroyo
March 1, 2023

Page 45

1    A.  Yes.

2    Q.  And there were instances that you recall where,

3   like, they needed you to leave the desk duties to go out

4   to do patrol work?

5    A.  Yes.

6    Q.  Okay.  I'm sorry.  Go ahead.

7    A.  There were so many females, they needed female

8   searches, so I would volunteer to go out for most of the

9   time.

10   Q.  Okay.  So in those instances, they would ask you

11  to come out to the field to do a search of, like, a

12  female offender?

13   A.  Yes.

14   Q.  Okay.  And then you would return to making

15  arrests, doing that other kind of police work; is that

16  fair?

17   A.  No.  They will either ask me to station once we

18  were there, but they would pull me out in the field

19  because they needed a female officer to be out there.

20   Q.  That's what I'm asking.

21       What would you do once you were out in the field

22  when they needed you?

23   A.  I would patrol the streets in response to my

24  progress calls or to enforce -- enforce criminal state,

25  municipal laws.

Reyna Arroyo
March 1, 2023

Page 46

```
 1      Q.  Okay.  So would that involve, you know, pursuing
 2   suspects?
 3      A.  Yes.  Assisting other officers to pursue or even
 4   for myself as well.
 5      Q.  Okay.  And in your time in the 10th District, is
 6   there -- I guess, we can stop sharing this unless you
 7   need this to recall any of your other assignments.  We
 8   can stop for now.  I'll bring it back if you need it.
 9          But during your time in the 10th District where
10   it looks like you spent the majority of your
11   assignments, could you quantify like what amount of your
12   time you were doing patrol work in the field?
13      A.  Like, in the quota timeframe, I think it was,
14   maybe, like 12 years altogether, I would say
15   approximately.
16      Q.  Okay.  And then if you need to go back up, let me
17   know, but otherwise, I was just going to ask you:  From
18   your recollection, do you recall being detailed to the
19   human resources division in -- it looks like 2002?
20      A.  No, I don't remember -- not in 2002.  It should
21   have been --
22      Q.  I'm sorry.
23          2015.  I'm like at the wrong date.
24      A.  Yes.
25      Q.  2015.  Okay.  Thank you.
```

Reyna Arroyo
March 1, 2023

Page 47

```
 1      A.   That I was assigned as performance management
 2   section in behavior intervention liaison.
 3      Q.   Do you know how that detail to human resources
 4   division came about?
 5      A.   No.  I went to the medical section.  I forgot his
 6   last name.  He interviewed me.  And he asked me if I
 7   wanted to work there, and I said yes.
 8      Q.   Was it your understanding that that was a
 9   limited-duty assignment?
10      A.   Yes, it was a limited duty --
11      Q.   Detail, if you will?
12      A.   I was detailed in that position, yes.
13      Q.   Okay.  And then it looks like after that detail
14   to the Human Resources Division in 2015, you kept your
15   assignment to the 10th District but you were, basically,
16   for the duration until you went on a leave of absence in
17   limited duty assignments or on medical role; is that
18   fair?
19      A.   No.  When I went to the human resources, I went
20   back to the street for duty.  And then in 2000 -- I
21   can't remember exactly, but I know that I was in the
22   human resources.  And then I went to the 10th District.
23   And then I got into got an injury on my left shoulder in
24   2014.  No.  I'm sorry.
25           It's in 2014, my injury.  Then I went to the
```

Reyna Arroyo
March 1, 2023

Page 48

```
 1    human resources.  Then I came back to the 10th District
 2    full duty.  And that's when I -- I got injured on my
 3    shoulder, and then I was assigned to the finance section
 4    as a detailed limited duty position.
 5       Q.  Okay.  And that -- we're talking about the
 6    October 2016 shoulder injury, correct?
 7       A.  Yes.
 8       Q.  So that was when you were back in your assignment
 9    in the 10th District doing patrol work in the field,
10    correct?
11       A.  Let me correct the date.  It was October 12th,
12    2016.  Yes, I was assigned to the finance section.
13       Q.  But I'm saying prior, like when your injury
14    happened, you were doing your patrol work in the 10th
15    District at that time in full duty; is that right?
16       A.  Yes.
17       Q.  And then after that injury is when you went on
18    limited duty assignment to the finance division,
19    correct?
20       A.  Yes.
21       Q.  Okay.  And during that time before your 2016
22    shoulder injury in the 10th District, you were doing
23    your regular police work pursuing suspects, arrests,
24    enforcing the laws, correct?
25       A.  Yes, ma'am.
```

Reyna Arroyo
March 1, 2023

Page 49

1    Q.  Okay.  Now is it fair to say you were familiar

2  with the IOD process, you've had a few of them over your

3  career, correct?

4    A.  Yes.

5    Q.  Okay.  Are you familiar with the distinction

6  between the IOD process and the medical role or what the

7  difference is between those?

8    A.  Yes.

9    Q.  Can you describe how the medical role works?

10   A.  Medical works -- so medical personal days that

11 you accrue as you work time.

12       Or what is your other question?

13   Q.  I'm just trying to have you describe how your

14 familiarity with the medical role.

15       Do you know, is that a part of the FOP's

16 collective bargaining agreement?

17            MS. HASHIM:  Objection; form.

18            You can answer.

19            THE WITNESS:  Yes.

20 BY MS. WOYTOWICZ:

21   Q.  Okay.  And does it sound, as I say, I think

22 it's -- you get 12 months of medical role every 24-month

23 period.

24       Does that sound correct?

25   A.  I can't recall.  Possibly.

L.A. Court Reporters, L.L.C.
312-419-9292

Reyna Arroyo
March 1, 2023

Page 50

```
 1      Q.  Okay.  And it is paid, though?
 2      A.  If you accrue them as you work, yes.
 3      Q.  Okay.  And then are you familiar with the
 4   difference between -- we keep saying -- IOD injury on
 5   duty versus non-IOD, noninjury on duty?
 6      A.  Yes.
 7      Q.  And do you know what that -- like, what that
 8   difference between the two, what those differences are?
 9      A.  To my best recollection, injury on duty is an
10   injury that you sustain during your performance of your
11   duties as a police officer, and any medical expenses or
12   time, the City will pay the officer -- will cover it.
13   I'm sorry.
14      Q.  Okay.  So if it's non-IOD, it's your
15   understanding that the City does not pay for the medical
16   treatment for the injury?
17      A.  Yes.
18      Q.  Are you aware of whether the collective
19   bargaining agreement with FOP discusses IODs and
20   non-Iods?
21      A.  Yes.
22      Q.  And are you familiar with the FOP collective
23   bargaining agreement regarding limited duty work on IOD?
24      A.  Yes.
25      Q.  Is it your understanding that if it's the injury
```

Reyna Arroyo
March 1, 2023

Page 51

1   on duty, as you described it, is an injury sustained

2   performing your duties, that you can have the limited

3   duty assignment until you are full duty or until you

4   retire?

5        A.  I believe so, yes.

6        Q.  So, basically, if it's IOD, the bargaining

7   agreement provides you to stay in that limited duty

8   effectively permanently; is that fair?

9        A.  I'm not sure if you're allowed to stay

10  permanently.

11       Q.  At least until you are full duty or retire?

12       A.  Yes.

13       Q.  Okay.  And is it your understanding that that

14  same limited duty until you are full duty or retired

15  does not apply if you are not IOD?

16               MS. HASHIM:  Objection; form.

17               You can answer.

18               THE WITNESS:  Yes.

19  BY MS. WOYTOWICZ:

20       Q.  Okay.  I'm going to show you another item.

21               MS. HASHIM:  What exhibit number are we up

22  to now?

23               MS. WOYTOWICZ:  Five.

24               MS. HASHIM:  That's what I have also.  Okay.

25               THE STATE:  For the record, the Bates Number

Reyna Arroyo
March 1, 2023

Page 52

1  is ARROYO.Def.000190 through -192 will be Exhibit 5.

2       (Exhibit 5 was marked for

3       identification by the reporter

4       and is attached hereto.)

5  BY MS. WOYTOWICZ:

6     **Q.  Officer Arroyo, take your time to look through**

7  **this.  I will scroll through the pages when you are**

8  **ready for me to flip through it in total.**

9       **Let me know if you need me to zoom in so you can**

10  **see it better.**

11     A.  Sure.

12       Okay.

13     **Q.  Let me give you a little easier reading.**

14     A.  Okay.

15       Okay.

16     **Q.  We are almost at the end.  There you go.**

17     A.  Okay.

18     **Q.  Okay.  Officer Arroyo, have you seen this**

19  **directive previously?**

20     A.  Yes, I've seen it in the past.

21     **Q.  Okay.**

22       MS. WOYTOWICZ:  And just for the record, it

23  will be marked as Exhibit 5.

24  BY MS. WOYTOWICZ:

25     **Q.  So it's the sworn limited duty program, employee**

Reyna Arroyo
March 1, 2023

Page 53

```
 1   resource EO30103.  And I'll direct to your attention
 2   specifically to this limited duty, Section 3B.
 3            So I think we've already kind of, basically, have
 4   gone over this.
 5            But as far as your understanding, sworn members
 6   who are injured in the line of duty and certified by the
 7   medical section as unable to perform limited -- excuse
 8   me -- certified by the medical section as being able to
 9   perform limited-duty assignments shall be given
10   available limited-duty assignments until they can
11   perform full-duty assignments or until they mandatorily
12   retired, whichever occurs first.
13            And that, we've discussed.  That's also in the
14   FOP agreement, that if you're IOD, you can have limited
15   duty until you are full duty or retire, correct?
16       A.  Yes.
17       Q.  And we already kind of heard this, Section 3B
18   does not apply to non-IOD, correct?
19       A.  Yes.  But there is a Section 8.
20       Q.  Did you say Section 8?
21       A.  I'm sorry.  B, that is correct.
22       Q.  For B, right.
23            So Section 3B does not apply to non-Iods,
24   correct?
25       A.  Yes.
```

Reyna Arroyo
March 1, 2023

Page 54

1    Q.  All right.  So then 3C, this is where I think --
2  would you agree this is where it's a non-IOD parameter
3  is discussed, correct?
4        It says, "Eligible sworn department members other
5  than a police officer, who are not injured in the line
6  of duty or who are ill and are certified by the medical
7  section as being able to perform limited-duty
8  assignments may be given available limited-duty
9  assignment subject to the needs of the Department for a
10 maximum of 730 days or until they can perform full-duty
11 assignments, whichever occurs first."
12       Do you see that?
13  A.  Yes.
14   Q.  And then beneath that, there are some language
15 about the 730 days shall be cumulative over the course
16 of the member's career after January 2012 and other day
17 count parameters in Section 2.
18       Do you see that?
19  A.  Yes.
20   Q.  So that -- was that your understanding that the
21 non-IOD limited-duty assignments are restricted to 730
22 days?
23  A.  Yes.
24   Q.  Okay.  I'm going to stop sharing that.  Sorry.
25 There's going to be a lot of reading documents.

Reyna Arroyo
March 1, 2023

```
                                                    Page 55
 1        I will share the next one.  I'm going to share
 2   the next document takes a few moments to review.
 3              MS. WOYTOWICZ:  For the record, it is
 4   ARROYO.Def.000395 through -399.  And I'll mark it as
 5   Exhibit 6.
 6          (Exhibit 6 was marked for
 7          identification by the reporter
 8          and is attached hereto.)
 9   BY MS. WOYTOWICZ:
10     Q.  And let me know when you want me to flip through
11   the pages.
12     A.  Yes.
13         Yes.
14         Yes.
15         Yes.
16         Yes.
17     Q.  That is the end, I'll represent to you.
18         So then going back to the top, have you ever seen
19   this before?
20     A.  Never.
21     Q.  Okay.  Do you recognize your name and employee
22   number -- I'll stop right there -- but name and employee
23   number at the top?
24     A.  Yes.
25              MS. HASHIM:  I'm going to object to lines of
```

Reyna Arroyo
March 1, 2023

Page 56

1   questioning because she's not really familiar with this
2   document.
3               MS. WOYTOWICZ:  Sure.  Just like the other.
4               MS. HASHIM:  If this is refreshing her
5   recollection, that's fine.
6               MS. WOYTOWICZ:  Right, right.
7   BY MS. WOYTOWICZ:
8       **Q.  Are you familiar with the Clear System that CPD**
9   **use?**
10      A.  I use it, but not for this particular -- I have
11  no access to it, only to supervisors or some officers.
12      **Q.  Sure.**
13          **Okay.  I'll represent to you it's a printout from**
14  **Clear.  So I'm not asking you to know about what the**
15  **printout is, but as far as, like, refreshing your dates**
16  **and times of injuries, just feel free to reference this.**
17  **And then I'll just ask you questions based on your**
18  **recollection.**
19          **Starting at the top, though, so this will be**
20  **exhibit six eventually.**
21          **The first -- if -- there is a column that says**
22  **"category injury on duty."**
23          **And the first one on this report for you, at**
24  **least, says it was a December 24th, 1998, to January**
25  **17th, 1999?**

Reyna Arroyo
March 1, 2023

Page 57

```
 1          Do you see that?
 2      A.  Yes.
 3      Q.  Do you recall that -- having an injury on duty
 4  during that timeframe?
 5      A.  I believe so, but I don't remember the specifics.
 6      Q.  Okay.  Does this -- the next column where it says
 7  nature of a sickness and injury, it says, "Back, lower."
 8          Does that refresh you recollection about that
 9  injury?
10      A.  I do remember falling on thin ice as persuing an
11  offender with drugs.
12      Q.  Okay.  And do you ever recall being out for that
13  time period?  Out of work?
14      A.  Possibly.  I can't recall.
15      Q.  Okay.  The next -- obviously, the rows of them.
16  What is -- the next one on here it looks like it's soon
17  after from January 30th, 1999, to February 21st, 1999.
18  It says, "Injured on duty, back, neck, MVA."
19          Do you recall a neck, back and motor vehicle
20  accident in January 1999?
21              MS. HASHIM:  Objection.
22              MS. WOYTOWICZ:  Is there a basis for the
23  objection?
24              MS. HASHIM:  Yeah.  MVA, there's no
25  foundation as to what "MVA" means.
```

Reyna Arroyo
March 1, 2023

Page 58

1    BY MS. WOYTOWICZ:

2       **Q.  Officer Arroyo, do you read MVA to indicate**

3    **anything to you about your injury, or if you had one in**

4    **January of 1999?**

5       A.  I might have had a motor vehicle accident maybe

6    twice, but I don't remember the dates.

7       **Q.  Right.**

8       A.  But I was in the performance of my duties as a

9    police officer.

10      **Q.  And to your recollection when you had the motor**

11   **vehicle accidents on duty, do you recall being off of**

12   **work from those injuries of the accidents?**

13      A.  Yes.

14      **Q.  And do you recall whether you were paid when you**

15   **were off work during the -- while you were recovering**

16   **from those accidents?**

17      A.  Yes.

18      **Q.  Okay.  And to the best of your recollection, we**

19   **can go through -- in your, I think you said, 27 of the**

20   **28 injuries you sustained on duty, do you recall when**

21   **you were not at work recovering from those injuries,**

22   **were you paid your salary during those periods?**

23      A.  While I was at home with my work injury, I did

24   get paid for those salaries, yes.

25      **Q.  Okay.  And I know you don't remember all of these**

L.A. Court Reporters, L.L.C.
312-419-9292

Reyna Arroyo
March 1, 2023

Page 59

```
1    offhand.  I know you said there were 27.  I guess we
2    could go through and count the total of these, but I
3    kind of want to just make sure this reflects the
4    injuries on duty that you recall, or if there are
5    others?
6              MS. HASHIM:  Objection.  Again, she's not
7    familiar with this document so she cannot rely on that
8    in making her answer.
9              MS. WOYTOWICZ:  Sure.
10   BY MS. WOYTOWICZ:
11     Q.  You've testified that you believe there were 27
12   incidents of injuries on duty certified with CPD,
13   correct?
14     A.  Yes.  Approximately 27 for sure.
15     Q.  Okay.  And I think you might have previously
16   testified, but correct me if I'm wrong.  But during
17   those certified injuries on duty when you took -- you
18   took various amounts of time off of work to recover,
19   correct?
20     A.  I'm sorry.  Can you repeat that question again?
21     Q.  Sure.
22         So during those 27 certified injuries on duty,
23   you took various amounts of time off of work to recover
24   from those injuries, correct?
25     A.  I don't recall exactly how much time, but it was
```

L.A. Court Reporters, L.L.C.
312-419-9292

Reyna Arroyo
March 1, 2023

Page 60

```
 1    time required by the physician according to my therapy.
 2        Q.  Right.
 3            So some of them -- let's take a different one.
 4            Do you recall a left -- spraining your left
 5    finger in 2007?
 6        A.  I believe I did.
 7        Q.  And do you recall whether that was certified as
 8    IOD?
 9        A.  I might have got caught up a couple of times, but
10    one in particular was I recorded it because the offender
11    had -- but I never went out on a medical leave.
12        Q.  So is it your testimony that you did not spend
13    116 days on medical from a left finger sprain in 2007?
14                MS. HASHIM:  Objection; form.
15    BY MS. WOYTOWICZ:
16        Q.  Let me know if I need to rephrase it for you.  I
17    don't want to cut you off.
18        A.  I can't recollect.  Like I explained, I had a
19    couple of injuries on my hands.
20        Q.  Okay.  If this report shows that you took 116
21    days for a sprained finger on your left hand, do you
22    have any reason to refute that?
23                MS. HASHIM:  Objection; foundation.  She's
24    not familiar with this form.
25                MS. WOYTOWICZ:  I'm asking if she has any
```

Reyna Arroyo
March 1, 2023

Page 61

1    basis to refute the information.

2              MS. HASHIM:  I renew my objection.

3              THE WITNESS:  Can I answer?

4              MS. HASHIM:  Yeah.

5    BY MS. WOYTOWICZ:

6        **Q.  Yes.**

7        A.  In 2007, I did sustain shoulder and finger injury

8    at least.  That's -- I also sustained strain neck, upper

9    back and upper chest.  On that incident, I also

10   sustained a slightly dislocated disc in February of

11   2007.  According to my notes.  Yes, that is it.

12             Left shoulder, upper arm, neck, back and upper

13   chest -- upper -- upper -- neck, upper and lower back,

14   upper chest, yes.  According to my note, yes.

15       **Q.  Okay.  And then jumping forward to 2014, do you**

16   **have a recollection of injuring your left shoulder in**

17   **2014?**

18       A.  Yes.

19       **Q.  And do you recall whether that injury to your**

20   **left shoulder in 2014 was certified as IOD?**

21       A.  Yes.

22       **Q.  And you spent some -- that's when you first went**

23   **to -- I think we said, human resources division for that**

24   **injury as a limited-duty assignment, correct?**

25       A.  I believe so, yes.

Reyna Arroyo
March 1, 2023

Page 62

1    Q.  Okay.  And that was because you had physical

2  restrictions from your left shoulder injury that

3  prohibited you from doing the police duties, correct?

4                MS. HASHIM:  Objection; form.

5                You can answer.

6                THE WITNESS:  It was a combination of my

7  shoulder, my arm, my neck, my lower back after

8  responding to a very violent domestic offender in

9  pursuit.  I was able to catch up to him and detain him

10  until more backup arrived.

11  BY MS. WOYTOWICZ:

12    Q.  Right.  Right.

13          So my question was more so:  As a result of that

14  injury to your neck and your back and your shoulder,

15  that your doctor limited your -- you had limited

16  restrictions?  Physical restrictions put on you that

17  prohibited you from doing full duty, correct?

18                MS. HASHIM:  Objection to form.

19                Go ahead.

20                THE WITNESS:  After treatment and physical

21  therapy, I was sent to limited-duty position, yes.

22  BY MS. WOYTOWICZ:

23    Q.  And do you recall how long you were in a

24  limited-duty assignment?

25    A.  I don't recall.

Reyna Arroyo
March 1, 2023

Page 63

1    Q.  Okay.  It looks -- my -- this report shows there
2    was a limited duty --  there was limited duty and
3    non-IOD.  And that one was -- do you recall your left
4    shoulder injury, that one happening in December 2014?
5                   MS. HASHIM:  Objection; foundation.
6                   You can answer.
7                   THE WITNESS:  I don't recall that date.  I
8    can't remember that date.
9                   My left shoulder injury -- I'm sorry.  I
10   want to retract the last testimony with my left finger.
11   It was for the narcotics.  I think it was February 1st,
12   2007.  That's what I have.  My neck, lower back and so
13   forth.
14                   As far as for the 2014 was July 23rd, 2014.
15   BY MS. WOYTOWICZ:
16   Q.  Okay.  I see that.  I follow you.
17        So when you first injured your shoulder in July
18   23rd, 2014, is it your recollection that you were in a
19   medical role?
20   A.  Yes, I went in the medical role for injury on
21   duty.
22   Q.  Okay.  And then you were returned to a
23   limited-duty assignment once you came back from medical
24   role, correct?
25   A.  I can't remember.  I believe so, yes.

Reyna Arroyo
March 1, 2023

Page 64

```
 1     Q.  Okay.

 2     A.  Yes.  And that was human resources.

 3     Q.  Okay.  And I think we already went over this.

 4         It looked like other than the time you went back

 5   to the 10th District in 2016, you were in human

 6   resources division on limited-duty status.  And then in

 7   finance division in limited-duty status, basically,

 8   since 2015, correct?

 9             MS. HASHIM:  Objection to form.

10             You can answer.

11             THE WITNESS:  I can't remember the exact

12   date.  But I know that I was in human resources, and

13   then I went to the 10th District for a couple of months.

14   And that's when I got injured on 2016.  I would have to

15   check my notes.

16   BY MS. WOYTOWICZ:

17     Q.  Yeah.  No.  I think we're on the same page.  I am

18   just trying to make sure we're on the same page.

19         So it was the shoulder injury from 2014.  You

20   were on medical role, and then limited duty in human

21   resources division.  And then you were returned to full

22   duty in the 10th District for a brief period of time in

23   about 2016, which is when you had your second left

24   shoulder injury, correct?

25     A.  Correct.  October 12th, yes.
```

Reyna Arroyo
March 1, 2023

Page 65

```
 1      Q.  Okay.  And then after that, you -- after that
 2  October 12th, 2016, injury, did you go on medical role
 3  again?
 4      A.  Yes.
 5      Q.  Okay.  And then after you were returned, you were
 6  again returned to a limited-duty assignment in 2017, I
 7  believe, correct?
 8              MS. HASHIM:  Objection; form.
 9              You can answer.
10              THE WITNESS:  I'm so sorry.  Can you repeat
11  the question again?
12  BY MS. WOYTOWICZ:
13      Q.  Sure.
14          After your October 12th, 2016, injury, you went
15  on medical role for a bit, and then you were returned to
16  a limited-duty assignment, I believe, in 2017?
17              MS. HASHIM:  I renew my objection.
18              Go ahead and answer.
19              THE WITNESS:  March 2017, I believe.
20  BY MS. WOYTOWICZ:
21      Q.  Okay.  And going to your October 12th, 2016,
22  injury, is it correct that your claim was having to --
23  something to do with lifting a backpack and holding open
24  the rear hatch of your police vehicle.
25          Is that generally what happened?
```

Reyna Arroyo
March 1, 2023

Page 66

```
1              MS. HASHIM:  Objection to form.
2              You can answer.
3              THE WITNESS:  That is correct.  I picked up
4    a green backpack, along with a briefcase and a rain
5    coat, yes.
6    BY MS. WOYTOWICZ:
7       Q.  Okay.  You were lifting equipment into the trunk
8    of the car and somehow you injured your shoulder?
9       A.  Yes.
10      Q.  Okay.  And the following day on October 13th,
11   2016, you went to the medical section, correct?
12             MS. HASHIM:  Objection; form.
13             You can answer.
14             THE WITNESS:  I contacted my near
15   supervisor.  And when she assigned me as a recurrent
16   injury, because I'm not a doctor, I couldn't determine
17   if it was an injury, a new injury or an injury related
18   to my past injury with straining my back.  So yes, I
19   went to the medical section the next day.
20   BY MS. WOYTOWICZ:
21      Q.  And I think you already said this, but it was
22   originally claimed as a recurrence injury from your
23   prior shoulder injury; is that correct?
24      A.  I explained it to my case manager.  Again, I'm
25   not a doctor.  It was new or old, so she filed it as --
```

Reyna Arroyo
March 1, 2023

Page 67

1    she filed it as a recurrence injury.

2        **Q.  And do you recall that recurrence claim being**

3    **denied by the medical section?**

4        A.  Yes.  Until December 22nd, I believe -- I -- to

5    the best of my recollection, I believe there was a phone

6    call, but I told them that I needed -- I contacted the

7    union, and I was informed to get it in writing.  And I

8    did not get it until January 4th.  The same day that I

9    received it, I went to the FOP.

10           If I may, once it was determined by the City

11   doctor that it was a new injury, the same date, I went

12   and filed a work injury, December 20 -- December

13   something.  Once that was submitted, I got a phone call

14   and I was told that I was denied.  And, of course, on

15   January 4th, I received a letter, and I filed for

16   grievance.

17       **Q.  Okay.  So let's break that down a little bit.**

18           **And correct me if I'm wrong, but my understanding**

19   **is so you -- it was initially submitted as a recurrence,**

20   **and that was denied by the medical section?**

21       A.  Yes.  Everything was done in a timely manner.

22       **Q.  Okay.  And then once it was denied, then it was**

23   **submitted as a new injury on duty in December 2016; is**

24   **that correct?**

25       A.  Yes.

Reyna Arroyo
March 1, 2023

Page 68

1    Q.  Okay.  And then it's your understanding that that

2  was also denied as far as -- well, it was not certified

3  as IOD, correct?

4    A.  Correct.

5    Q.  And then you filed -- your union filed a

6  grievance that, basically, your injury should have been

7  certified as an IOD rather than non-IOD, correct?

8    A.  Yes.

9    Q.  And that, obviously, took a while for the

10  arbitration to happen.

11       And the arbitration word, do you recall that

12  arbitration word eventually happening, I think it was

13  last June 2022?

14       Do you need a minute?

15    A.  Yes.  Yes.

16    Q.  Yeah.

17    A.  Yes, only to reject my rights, my injury.

18    Q.  So it was your understanding the arbitrator

19  decided the IOD was basically correctly denied as IOD?

20    A.  They denied it based that it was not a work

21  injury.

22    Q.  Right.

23    A.  But that was not the case.  When we had the

24  grievance hearing, according to the opening statements

25  by the City, it was denied because I did not submit my

Reyna Arroyo
March 1, 2023

Page 69

```
 1   paperwork in a timely manner.  How could I submit
 2   something that was never given to me or rejected until
 3   December -- late December 2000?  So I'm very upset when
 4   it comes to that.
 5      Q.  I just want to make sure I have it.
 6          Your understanding is that the arbitrator denied
 7   your grievance because it was not -- the IODs was not
 8   submitted in a timely manner?
 9      A.  Correct.
10      Q.  Okay.  And the affect of her denying your
11   grievance, is it your understanding that your left
12   shoulder injury from 2016 remains non-IOD?
13      A.  Yes.
14      Q.  Okay.  And as far as you're aware, CPD has only
15   considered your October 2016 injury as non-IOD, correct?
16      A.  Yes.
17      Q.  Now, during the settlement negotiations of that
18   grievance, are you aware of a discussion regarding -- it
19   looked like the left shoulder injury and a 2013 ankle
20   injury were being discussed.
21          Were you aware of that?
22      A.  Yes.
23      Q.  Were you aware of the discussion involving
24   certifying your ankle injury as IOD if you withdrew the
25   recurrence claim from your shoulder injury?
```

Reyna Arroyo
March 1, 2023

Page 70

 1     A.  That is correct.

 2     Q.  So was it your understanding the City was

 3  offering limited-duty status for the ankle injury?

 4     A.  Yes.

 5     Q.  Okay.  And as we discussed that ankle injury, if

 6  it was IOD, you would have been entitled to limited duty

 7  until you were full duty or retired?

 8     A.  Yes.

 9     Q.  Is there -- what is your understanding of why

10  that was not accepted?

11     A.  Well, frankly, my file was mishandled from the

12  very beginning, the officer in medical section.  And it

13  took her a day to reject my injury.  Then they said that

14  I should be more careful.  And then they also mentioned

15  that they were going to -- they were going to review the

16  injuries.  And then it said that I -- it was not work

17  related, but then it was established.

18        They subjected me to four medical independent --

19  four independent medical examiners.  All of them -- I'm

20  not sure, five or four, but three for sure -- you know,

21  say it was new injury.  The back could have gotten

22  damage -- but to that affect.

23        So then when I went to the grievance hearing, I

24  was told that it was rejected because of -- I did not

25  submit my injury in a time frame.  I did contact the

Reyna Arroyo
March 1, 2023

Page 71

1    Sergent within 24 hours of my injury.

2         And my -- my understanding is that, that's why it

3    was rejected.

4         **Q.  Sure.**

5         **My question was more -- I know we discussed the**

6    **negotiation of the grievance about the ankle injury**

7    **being IOD.**

8         **Was there a reason that you did not accept the**

9    **ankle injury as an IOD in exchange for the shoulder**

10   **issue?**

11        A.  I'm so sorry.  I misunderstood.

12        **Q.  That's okay.  I could have asked a terrible**

13   **question.  Let me know.**

14        A.  I rejected the ankle injury because my shoulder

15   injury was more serious.  I know that I had four

16   injuries, but I think that the whole time, my shoulder

17   was affected at least eight times.  And I rejected it

18   because I didn't know what was going to be the outcome,

19   you know, for future illnesses.  You know, my neck.  I

20   already had three disc dislocated from the 2007 injury.

21   So that was going to be more serious.

22        My ankle is serious, but I feel this is more.  So

23   I said I'm willing to drop the ankle settlement and

24   recognize my injury, and you don't have to pay me

25   anything, you know, just recognize it as a work injury.

Reyna Arroyo
March 1, 2023

Page 72

1      Q.  But I guess I'm just trying to understand.

2          So if the ankle could have been IOD that gave you

3   limited duty until you were full duty or retired, would

4   that not have also made you limited duty, basically,

5   effectively for your shoulder?

6      A.  I guess, but I didn't feel like that.  I was more

7   concerned for my left shoulder.  And mostly, I kind of

8   feel like I shouldn't have to be giving it up because I

9   was injured.  Both injuries where during the performance

10  of my duties.

11     Q.  Sure.  Sure.

12         Okay.  Now, at some point, obviously, CPD let you

13  know that you were running out of the non-IOD

14  limited-duty assignment time in 2019.

15         Do you recall that?

16     A.  Yes.

17     Q.  Okay.  And I will pull that up.  I'm going to

18  show you this document.

19             MS. WOYTOWICZ:  And for the record it's

20  marked ARROYO.Def.002012.  That will be Exhibit 7, I

21  believe.

22             MS. HASHIM:  Yes, it is Exhibit 7.

23         (Exhibit 7 was marked for

24         identification by the reporter

25         and is attached hereto.)

Reyna Arroyo
March 1, 2023

Page 73

1          MS. WOYTOWICZ:  Thank you.

2     BY MS. WOYTOWICZ:

3          Q.   Officer Arroyo, do you recognize this document?

4          A.   Yes.

5          Q.   And it's dated January 24th, 2019.

6               Do you recall receiving it?

7          A.   Yes.

8          Q.   Now, so it looks like it tells -- it says that

9     the medical section records indicate that as of

10    March 31st, 2019, you will exceed the maximum allowable

11    time in a limited-duty status for your nonduty related

12    condition.

13               And it goes on to state that if you're unable to

14    return to full duty by that date, you must chose one of

15    the following options:  You may use any available

16    medical role days.  You may retire or resign by

17    submitting a personal action request, parenthesis, par.

18    You may apply for an leave of absence in order to apply

19    for disability benefits.  If applicable, you may request

20    a reasonable accommodation as defined by the American

21    with Disabilities Act.  Or if applicable, you may

22    request leave under the Family Medical Leave Act.

23               And then it goes on to encourage to discuss your

24    medical condition, treatment options and potential

25    return to work in a full-duty status with your physician

Reyna Arroyo
March 1, 2023

Page 74

1   as soon as possible.  And it indicates you are required

2   to notify medical section by March 1st, 2019.

3          Did you request an accomodation at this point?

4      A.  Yes.  I was -- I had requested, but nobody

5   accommodate me.  And neither of their suggestions have

6   helped me to perform my job duties with the disabilities

7   division a police officer when getting paid?

8      Q.  Break it down a little bit.

9          Who, after receiving this, did you first contact

10  to request an accomodation?

11     A.  I can't remember the specific order.  I have to

12  go through my notes.  But I did mention it to Dr. Susan

13  Oshman (ph), Sergent Janet Camper in the medical

14  section.  I had brought it to my case manager Latoya

15  Smith.  I kind of mentioned it to Officer Bishop.  I

16  brought it up to Jay Ryan, and lawyer Kathryn Chapman.

17  And Jennifer Dunn as we were doing the -- what do you

18  call it? -- they were asking me to give up the ankle

19  injury for the shoulder.  I mean, to give up the

20  shoulder for the ankle.

21         They were aware.  Again, Jay Ryan, Kathryn

22  Chapman, she's the attorney, Jennifer Dunn of the CPD.

23  I also mentioned it to Nicole Brown.  I also -- Jamika

24  Jackson, telephone call, and also via e-mail.

25         Oh, yes.  At the time my supervisor, Michelle

Reyna Arroyo
March 1, 2023

Page 75

1   James and director Jonathan -- Jonathan Johnson.  I made

2   numerous requests and nothing.

3       **Q.  So when you spoke with these individuals, what**

4   **exactly were you asking for?**

5       A.  I was -- I would tell them that if they can help

6   me get a permanent position or extend the unlimited duty

7   until my grievance was settled because I had faith that

8   it was going to resolve, but it didn't.  It took

9   forever.

10      **Q.  So is it fair to say you were hoping for more**

11  **time in the limited-duty assignment in the event your**

12  **grievance was successful?**

13      A.  I was hoping they would assign me to a permanent

14  limited position because of my other injuries.  And even

15  in the beginning when they said no, I said at least, you

16  know, I'm looking for an extension until this whole

17  situation will resolve or I will get better or, you

18  know, I would have surgery on my shoulder.

19      **Q.  Okay.  But in some -- but you wanted to stay in**

20  **the limited-duty assignment?**

21      A.  Yes, until I will get better for my shoulder.

22      **Q.  Okay.**

23      A.  Or the grievance would resolve, whatever would

24  come first.

25      **Q.  And what about the limited-duty assignment that**

Reyna Arroyo
March 1, 2023

Page 76

1 **you had at the time?  Why did you -- why did you want to**

2 **stay in it?  What about it did you find helpful?**

3    A.  Well, I truly enjoy my supervisors.  Mr. Johnson,

4 Ms. James, Ms. Lee, they were very courteous.  The hours

5 worked fine.  It was very quiet.  Everybody respected

6 each other.  It can be very busy and because there

7 were -- I believe at the time were two or three

8 positions vacant.

9    **Q.  How did you understand that there were vacant**

10 **positions at the time?**

11    A.  One officer, because of health issues -- I don't

12 know if I'm allowed to mention last names or not, but

13 she was transferred to a -- one of them female officer

14 was sent to a -- the CAPPS program, domestic.  And then

15 the other one, there was problems between her and other

16 officers so she was sent to another unit.

17        So that's two positions.  And then I find out

18 that there were two civilian positions, Maria Ramirez

19 got ill, and she was forced to retire.  There was also

20 another position, officer -- there was an officer that

21 was on the medical.

22        So I know they were short at least three

23 positions, three or four positions altogether.

24    **Q.  Did you know the officers that transferred out,**

25 **whether they were full duty or limited duty?**

Reyna Arroyo
March 1, 2023

Page 77

1      A.  I do want to say that also Officer Derrick Moss,

2  he retired, and I believe he was -- I couldn't say.  But

3  the other officers that went to the CAPPS program, she

4  was an unlimited duty.  The other officer that left

5  because of the issues with another supervisor and

6  officers, she was also -- I can't recall.  But there

7  were two other officers, if I think about it, that they

8  were there full duty that had less time than me.

9      **Q.  So besides, and correct me if I'm wrong, there**

10 **were at least two, did you say, that were full-duty**

11 **officers that had been in the finance division?**

12     A.  Yes.  And they had less seniority than me, full

13 duty.

14     **Q.  And then there were at least two or three, you**

15 **weren't sure if they were full duty or limited duty; is**

16 **that fair?**

17     A.  That's fair.

18             MS. HASHIM:  Objection; mischaracterizes

19 evidence.  She did state which ones were on limited

20 duty.

21 BY MS. WOYTOWICZ:

22     **Q.  I know you said there was that -- at least one**

23 **that was limited duty, correct?**

24     A.  Yes.

25     **Q.  And then I thought you said there were, maybe,**

Reyna Arroyo
March 1, 2023

Page 78

1    two; you weren't sure?

2       A.  I'm sorry.  Officer Moss was on unlimited duty as

3    well.

4       Q.  So two were unlimited duty?

5       A.  Yes.  The other person, I can't remember.  I

6    believe that she was on limited duty.

7       Q.  For the ones on limited duty that you're aware

8    of, do you know whether they were IOD versus non-IOD?

9       A.  I don't know.  I can't recall.

10      Q.  Did you -- do you recall ever being aware of

11   that, or is it that you just don't remember as of today?

12      A.  I don't know if I'm allowed to speak names.  That

13   would be much better for me instead of going --

14      Q.  Yes, I mean, I think there were some that were

15   identified at various places.

16      A.  Okay.  Officer Rosenthal, she worked in accounts

17   payable.  She was on, I believe, limited duty or light

18   duty.

19      Q.  Do you recall whether -- sorry.  Go ahead.

20      A.  Then she went to domestic because she ended up

21   having cancer and she was accommodated upstairs.

22      Q.  Do you know whether Officer Rosenthal was IOD?

23      A.  No.  I believe she was on limited-duty positions

24   because she had just come from cancer surgery.

25      Q.  But as far as your -- do you have an

Reyna Arroyo
March 1, 2023

Page 79

1    understanding as to whether she was IOD or not?

2                    MS. HASHIM:  Objection; asked and answered.

3                    THE WITNESS:  I believe she was an unlimited

4    position.

5    BY MS. WOYTOWICZ:

6        Q.  My question was a little different.

7            Because I know we discussed there was IOD and

8    non-IOD certified.

9            Do you know whether her limited-duty assignment

10   was based on certified IOD?

11                   MS. HASHIM:  Objection; asked and answered.

12   She stated limited duty because she had cancer.

13                   MS. WOYTOWICZ:  That's not the same

14   question.  It's a little bit different.

15   BY MS. WOYTOWICZ:

16       Q.  I'm just trying to understand if you have

17   personal knowledge of her status being based on a

18   certified IOD?

19                   MS. HASHIM:  I still maintain the objection.

20                   You can answer.

21                   THE WITNESS:  My best recollection, I

22   believe she might have mentioned that she was there for

23   a non-work related injury but medical limited duty.

24   BY MS. WOYTOWICZ:

25       Q.  Okay.  And then the other officer that you

Reyna Arroyo
March 1, 2023

Page 80

```
 1  believed was on IOD -- very loud noises outside.  I
 2  apologize.
 3      A.  I believe there was Officer Derrick Moss, but he
 4  retired.
 5      Q.  And did you have an understanding of whether he
 6  was -- had a certified IOD injury?
 7      A.  I can't recall.
 8      Q.  Do you have a -- you don't recall as of today,
 9  like last minute or did you ever know whether his injury
10  was IOD versus non?
11      A.  No, I don't remember.
12      Q.  Okay.  And then was that it, or were there other
13  officers that you thought had IODs?
14      A.  There was an Officer Damian.  He got -- he was an
15  limited position, but I don't believe that it was work
16  related.  Damian O'Sullivan (ph).
17      Q.  Okay.
18      A.  But there were two officers, like I said, that
19  were full duty, less time than me.  Officer Ortega (ph)
20  Watkins and Sherrie (ph)-- I can't remember her last
21  name.
22          MS. HASHIM:  Kristen, do you think we can
23  take a five-minute break?  It's been a couple of hours.
24          MS. WOYTOWICZ:  Yeah.  I was thinking of
25  that as well, but I wanted to make sure if Officer
```

Reyna Arroyo
March 1, 2023

Page 81

1  Arroyo, she was thinking of the second one.  I don't

2  want to cut her off, but we can.

3              THE WITNESS:  I'm looking.

4  BY MS. WOYTOWICZ:

5      **Q.  As soon as you're finished, we can take a break.**

6      A.  There were other officers who were on the other

7  side of the finance section who were also full duty, you

8  know, but less time than me.  I'm sorry.  It was DeReese

9  Walker or Ortega Watkins, DeReese Walker (ph).

10     **Q.  Okay.**

11     A.  Were full duty and I could have got the position.

12             MS. WOYTOWICZ:  Do you want to take a

13  five-minute break?

14             THE WITNESS:  Sure.  Thank you.

15             MS. WOYTOWICZ:  We will come back.  Thanks.

16             (WHEREUPON a short recess was taken.)

17  BY MS. WOYTOWICZ:

18     **Q.  Officer Arroyo, we were talking about a couple of**

19  **people that were in your finance division, some**

20  **full-duty officers you identified.**

21         **Do you remember that?**

22     A.  Yes.

23     **Q.  And then you said there were others, I think you**

24  **said across the hall.**

25         **Is that what you said, in the finance that were**

Reyna Arroyo
March 1, 2023

Page 82

1    also full duty?

2        A.  I believe so, yes.

3        Q.  And obviously, when you were in the finance

4    division, you were not full duty?

5        A.  Correct.

6        Q.  Do you have an understanding of the full-duty

7    officers assigned -- assigned or detailed to finance

8    whether they could be deployed to the field?

9        A.  Yes.

10       Q.  And was it your understanding that they could be

11   deployed to the field?

12       A.  Yes.  Sometimes they would deploy to work on

13   certain situations or sometimes they either work

14   overtime.  Yeah.

15       Q.  Do you have a specific recollection of those

16   officers having to be deployed when you worked along

17   side them in the finance division?

18       A.  Maybe some protest.  Yes, some protest outside

19   the building.  I worked at the police headquarters 3510

20   South Michigan.  I will also hear these officers --

21   actually one particularly, she will work -- I forgot

22   what they call it.  When you go around districts to

23   working overtime patrolling the areas, high crime.

24   Special deployment, I think it's called.  I never worked

25   it.

Reyna Arroyo
March 1, 2023

Page 83

```
 1      Q.  And was it your understanding that in a limited
 2   duty in finance that you were in, you could not be
 3   deployed for a protest like the full-duty officers were,
 4   correct?
 5               MS. HASHIM:  Objection; form.
 6               You can answer.
 7               THE WITNESS:  Limited duty cannot be
 8   deployed, correct.
 9   BY MS. WOYTOWICZ:
10      Q.  Okay.  Could we take a bit just to -- your
11   shoulder injury generally.
12          So can you describe the extent of the shoulder
13   injury from October 2016?
14      A.  According to Dr. Forsyth (ph), which is the City
15   doctor, I had sustained a rotator cuff tear in which
16   requires surgery.
17      Q.  My understanding is that there were several
18   things you were physically restricted from doing because
19   of it, like lifting your arm above your shoulder; is
20   that right?
21      A.  Correct.
22      Q.  Do you recall what other physical restrictions
23   you had from the left shoulder injury in 2016?
24      A.  Yeah.  Bending, pushing, lifting no more than ten
25   pounds, not excessive standing or walking.
```

Reyna Arroyo
March 1, 2023

Page 84

```
 1              -- my shoulder.
 2      Q.   I'm sorry.  I didn't catch that.
 3           Can you repeat that last part?
 4      A.   Not wearing my police vest.
 5      Q.   Is it fair to say that those restrictions
 6   precluded you from being able to do those essential
 7   duties we went over earlier that were in the job
 8   description?
 9              MS. HASHIM:  Objection; form.
10              You can answer.
11              THE WITNESS:  Yes.
12   BY MS. WOYTOWICZ:
13      Q.   And since that injury happened in October 2016,
14   is it fair to say that you've not been able to do those
15   full-duty police officer tasks that we went over since
16   that time?
17              MS. HASHIM:  Objection; form.
18              You can answer.
19   BY MS. WOYTOWICZ:
20      Q.   Is that a "yes"?
21      A.   Yes.
22      Q.   Okay.  And I know, I think you said that you were
23   supposed to have surgery on the left shoulder.
24           Has that happened to date?
25      A.   Yes.  I didn't get the surgery right away because
```

Reyna Arroyo
March 1, 2023

Page 85

1    I was not clear from my doctor from all of the

2    illnesses.  But I did manage to get clear of them to

3    clear me, and I had surgery on June 2019.  But that

4    didn't work.  I require another surgery because I have

5    too much scar tissue.  I did everything in my power to

6    come back to work for November 17th, 2019.

7        **Q.  And did you -- since that June 2019 surgery, were**

8    **you able to have the second surgery?**

9        A.  It was scheduled for November 19th, 2019, but my

10   doctor, Dr. Datori (ph), did not clear me because I have

11   other illnesses, depression, sinusitis, headaches,

12   stress.

13       **Q.  So since that second surgery was scheduled for**

14   **November 2019, I assume it has not yet taken place; is**

15   **that correct?**

16       A.  No.

17       **Q.  Okay.  So what is the current status, if you**

18   **will, of your left shoulder injury?**

19       A.  My left shoulder requires another surgery.  I

20   have a lump on my stomach to show you.

21               MS. HASHIM:  It's okay, you don't need to

22   show us if that's okay with counsel.

23               MS. WOYTOWICZ:  Yeah, that's fine.

24   BY MS. WOYTOWICZ:

25       **Q.  I am just trying to -- specifically on the**

Reyna Arroyo
March 1, 2023

Page 86

1    shoulder injury, I'm trying to understand what, you

2    know, treatments or what is the diagnosis or plan that

3    you're aware of for your left shoulder injury to date?

4        A.   I cannot appear for another surgery until I stop

5    taking medication for depression.  If anything, my

6    health is getting worse.  I went to the emergency at

7    least three times for chest pains and abdominal pains

8    due to stress.  About three weeks ago, I went to the ER

9    for chest pains with irregular heart beats.

10           So I'm not able to get on surgery until this

11   whole situation clears.

12       Q.   And have you been told by your -- who is your

13   current physician?

14       A.   Dr. Sereneytsky.  She was supposed to give me a

15   letter, and it's going to take me a couple -- a while.

16   I saw her yesterday that she raised my prescription

17   medication for anxiety.

18       Q.   Sorry.  Go ahead.  I don't want to interrupt.  Go

19   ahead.

20       A.   But she's working on a letter to provide to my

21   attorney and you, I guess.

22       Q.   Could you spell her last name for me?  I didn't

23   quite catch it.

24       A.   Her name is Iryna, I-R-Y-N-A.  Her last name is

25   Sereneytsky, S-E-R-E-N-E-Y-T-S-K-Y.

Reyna Arroyo
March 1, 2023

Page 87

1      Q.   Thank you.

2      A.   I have her telephone number.

3      Q.   Sure.

4      A.   708-442-7174.

5      Q.   When did you start seeing Dr. Sereneytsky?

6      A.   Shortly after my -- Dr. Datori closed his office.

7    I can't remember the exact date, but it was last year.

8    And then I stopped seeing her because of the medical

9    session cut me off my medical benefits.  So I was with

10   no insurance for almost two, three months.  I had to

11   resort to public aid.  And then I reenlist with her back

12   in August -- September of last year.

13     Q.   Okay.

14          MS. HASHIM:  Counsel, for the record, this

15   is the first time we're hearing about this

16   Dr. Sereneytsky.

17          THE WITNESS:  Yeah.  I'm sorry.  I forgot to

18   mention.

19   BY MS. WOYTOWICZ:

20     Q.   Okay.  Were you ever given an explanation of -- I

21   think you said your medical benefits were terminated.

22          Do you know why that happened?

23     A.   Not really.  You know what?  Let me retract that.

24   I did speak to a young lady, and I was informed that I

25   was -- I had not paid the medical -- my portion, which

Reyna Arroyo
March 1, 2023

Page 88

1    was 100-something dollars or so.  But I would pay them

2    in advance, especially during the holidays.  And I

3    missed one payment, and that was because I went to the

4    emergency and I was down with COVID for three weeks.

5    And I couldn't make the payment.  I had no medical

6    coverage.  So they terminated.  And then they wanted to

7    say that I was notified, that they sent me

8    documentations but they sent it to the wrong address.

9        I had notified human resources, even the director

10   of human resources the change of address back in late

11   2020, I believe in early January 21st of 2021.

12       So with that, I requested an appeal, and I

13   haven't heard from the City.

14   **Q.  So is it -- I just want to make sure I**

15   **understand.**

16       **I think you missed one payment; is that correct?**

17   A.  Yes.

18   **Q.  And so they terminated the benefits, and then**

19   **they sent you a notice, but it was to the wrong address?**

20   A.  I think they sent me a notice that I was not

21   making the payments.  I'm not sure how they were

22   allocating the amounts, but that's beyond my control.

23       According to my records, I paid -- I will pay

24   double the payment, you know, because I figure I want to

25   get on top because this is important, you know.  And I

Reyna Arroyo
March 1, 2023

Page 89

1    missed one payment possibly for January 2021.  And when

2    I went to pay it online, I was cut off.  And that's when

3    I notified them what's going on, and they informed me --

4        **Q.  So is it that you're currently trying to appeal**

5    **to get back onto to the City's healthcare?**

6        A.  Yes.  But I have not received any information

7    from the City.

8        **Q.  Okay.  I just want to make sure I understand the**

9    **status.**

10       **Okay.  So going back, I guess, to your time in**

11   **finance when you were on limited-duty assignment, I**

12   **think we went over the letter saying you were running**

13   **out of time.**

14       **Correct?  Do you remember that?**

15       A.  I'm sorry.  Can you rephrase the question?

16       **Q.  Sure.  Yeah, yeah.**

17       **I'm going back to -- we were discussing you were**

18   **in the limited-duty assignment in finance, and you got**

19   **notice saying that you were running out of time.**

20       **Do you remember going over that letter?**

21       A.  Yes.

22       **Q.  Okay.  Other than asking -- or talking with**

23   **various people about staying in that limited-duty**

24   **assignment, did you ever contact the City's disability**

25   **officer during that time in 2019?**

Reyna Arroyo
March 1, 2023

Page 90

1      A.  I believe that was Marilyn Bishop (ph), if I'm
2  not mistaken.  I might have mentioned to her my
3  situation that I was forced to take a leave of absence,
4  and then I was waiting for the -- I know it was
5  something to the fact that I was waiting for the
6  arbitration outcome, but that's about it.
7      **Q.  Have you heard of the name Kathryn Perry Hopkins**
8  **(ph)?**
9      A.  I'm sorry.  What?
10     **Q.  The name Kathryn Perry Hopkins, does that ring a**
11 **bell?**
12     A.  I can't remember.
13     **Q.  Okay.  As you sit here, you don't remember that**
14 **name?**
15     A.  I don't remember her.  I don't think so.
16     **Q.  Okay.  Did you ever ask either Officer Bishop or**
17 **these other people for anything other than staying in**
18 **your limited-duty assignment?**
19     A.  I did contact Robert Crawford regarding
20  disability process.  This is during COVID time.  So it
21  was very hard for me to get a hold of officers or people
22  on the other end, and I sent an e-mail and spoke to him.
23  And he might have said -- I explained the situation
24  about the grievance, and he told me that it was best,
25  perhaps, for me to wait until the outcome to establish

Reyna Arroyo
March 1, 2023

Page 91

1    exactly what kind of disability that I will be getting.

2        Q.  Okay.  I'll get to the disability pension in a

3    second, but my question was a little different.

4            I was just trying to understand.  I know you

5    mentioned several people before that you talked to about

6    wanting to stay in the limited-duty assignment.  I was

7    just wondering if you -- those same people, if you asked

8    them about anything other than staying in the

9    limited-duty assignment?  Either, you know, other work

10   outside of CPD?  Anything like that, or whether you were

11   specifically speaking about your limited-duty assignment

12   only?

13       A.  I was only speaking about my limited-duty

14   assignment.

15       Q.  Okay.  And eventually -- so when you ran out of

16   the limited-duty assignment time, do you recall -- back

17   to the medical role?

18       A.  I did went to -- in August and also in November.

19   I gave the medical section my case manager Smith -- my

20   case manager -- doctors now were saying that I couldn't

21   have surgery and also that I was taking antidepressants.

22       Q.  Right.

23           So I guess I'm just trying to get a timeline of

24   when all this happened.

25           So do you remember when you ran out of the

Reyna Arroyo
March 1, 2023

Page 92

1    limited-duty assignment time that you were in the

2    finance division?

3        A.   Yes.   Limited duty was March 31st, 2019.

4        Q.   Okay.

5        A.   My medical ran out on November 16th, 2019.

6        Q.   Okay.   So between March 31st, 2019, and November,

7    you were on medical role; is that correct?

8        A.   Yes.

9        Q.   Okay.   And then you were placed on the leave of

10   absence on March -- I'm sorry -- November 17th, 2019,

11   correct?

12       A.   Yes.

13       Q.   Okay.   And when did you speak with Robert

14   Crawford, you said, about the disability pension, I

15   believe?

16       A.   I didn't speak to him directly.   I will just

17   receive e-mails that I was assigned to the officers by

18   human resources of change of address or, you know,

19   asking for a -- explaining my situation.   I was seeking

20   an extension or a limited position.

21       Q.   So two things with that.

22            So I thought you had said you spoke with him and

23   explained the grievance situation you were in with

24   Robert Crawford?

25       A.   I'm sorry.   I meant to say that I never spoke to

Reyna Arroyo
March 1, 2023

Page 93

```
 1    him.  I just e-mailed him.
 2        Q.  Do you recall when those e-mails were about?
 3        A.  Let me find out.
 4            Yeah.  August 26th, 2019, via e-mail.  I reached
 5    out to human resources, Robert Labonsky (ph), Lieutenant
 6    Ford, Janet Camper, Latoya Smith.
 7        Q.  When -- my question is:  When did you e-mail with
 8    Robert Crawford about the disability process?
 9        A.  Oh, Robert Crawford.  I'm so sorry.  I'm thinking
10    of --
11        Q.  Several Roberts are --
12        A.  Yeah.  It's, I want to say, 2020.  Like early
13    2020.  If you give me a minute, I can tell you.
14            October 16th, 2020.
15        Q.  Okay.  And you said you spoke with him about a
16    new position as well.
17            Did I hear that correctly?
18        A.  No.  I explained the situation with my case and
19    that I was waiting for arbitration, and he suggested
20    that it was up to me and either to continue waiting for
21    the arbitration's outcome, or something to that affect.
22        Q.  Sorry.  Go ahead.
23        A.  To see what kind of disability I would be
24    qualifying.
25        Q.  I guess I'm trying to -- did you have an
```

Reyna Arroyo
March 1, 2023

Page 94

1   understanding of what the options were at that point,

2   what he was having you wait on it, but what you could

3   have done at that point with your pension?

4       A.  He didn't explain.  He just told me just to wait,

5   whether it would be -- yeah, a work injury or not

6   injury.  That was it.  He was very short.

7       Q.  Okay.  So at that time, you had not applied

8   formally for pension benefits; is that correct?

9       A.  That is correct.

10      Q.  Okay.  So when you were placed -- the time

11  leading up to being placed on the leave of absence on

12  November 17th, 2019, did you have conversations with

13  Officer Nicole Brown?

14      A.  Yes.

15      Q.  And what did you and Officer Brown speak about at

16  that time?

17      A.  January 22nd, 2021.

18      Q.  I'm sorry.  I am talking more of like leading up

19  to the leave of absence in November 2019.  So a little

20  bit earlier than that.

21      A.  She told me that I needed to sign a leave of

22  absence and another form that she had.  I explained that

23  I was sick.  And also because of COVID, they were

24  working remote, I believe.  I can't remember exactly.

25  She did say that she was going to -- well, she did fill

Reyna Arroyo
March 1, 2023

Page 95

 1   the paperwork on my behalf, but that I needed to do my

 2   own.

 3          February 16th, 2020, we spoke about filing a PAR

 4   form for my medical leave and extension and so forth.

 5       **Q.  Did she ask you to come in to fill out paperwork**

 6   **at that time about November 2019?**

 7       A.  I can't remember.

 8       **Q.  Okay.**

 9       A.  I don't think so because the City building was

10   limited, I guess, because of COVID, of how many people

11   could come in.

12       **Q.  Well, I'm talking about before COVID in 2019**

13   **still.**

14       A.  No.  I never talked to her -- 2020.

15       **Q.  Okay.  Got you.**

16          **Did you recall or do you recall receiving a**

17   **packet from Officer Brown that was mailed to your house?**

18       A.  No.

19       **Q.  Okay.  So once you were placed on the leave of**

20   **absence, you were required to return your star shield**

21   **and ID card, correct?**

22       A.  Yes.

23       **Q.  Do you know why that was required?**

24       A.  Because when an officer takes a leave of absence,

25   they automatically institute out of their police powers.

L.A. Court Reporters, L.L.C.
312-419-9292

Reyna Arroyo
March 1, 2023

Page 96

1    They're no longer a police officer, so I was told.  It
2    was very painful.
3        **Q.  And it is my understanding that once you're on**
4    **the leave of absence, you're no longer an active police**
5    **duty or active member?**
6        A.  I'm aware, yes.
7        **Q.  Okay.  Is it your understanding that your request**
8    **to stay in the limited-duty assignment were denied or**
9    **never granted basically?**
10       A.  Yes.
11       **Q.  Do you know why?**
12       A.  No.  I would turn to my immediate supervisors,
13   Helen Lee, Michelle James, Jonathan Johnson.  They told
14   me that I couldn't -- couldn't do anything to keep me
15   because there was a grievance issue.  More or less
16   letting me know there was a grievance issue and that --
17   because it was the medical section also was assigned to
18   human resources to another director.
19          But other than that, he told me also that I
20   already had exhausted my contract limited duty, that I
21   needed to go full duty, resign or leave of absence, FMLA
22   and so forth.
23       **Q.  Do you know who would have had the authority to**
24   **extend your limited-duty assignment?**
25       A.  Lieutenant First Chief.

Reyna Arroyo
March 1, 2023

Page 97

1    Q.  I meant -- I'm not -- if you know --

2    A.  Yeah.  I'm not sure if it was the First Chief at

3    the time, Chief West.

4    Q.  You believe it was Chief West, but you're not

5    positive; is that fair?

6    A.  I'm not sure.

7    Q.  Okay.  So as far as your shoulder injury, what

8    kind of life activities does that injury affect at this

9    time?

10   A.  Almost everything.  I can't -- my son -- I can't

11   even bring in my own groceries.  Sometimes I need help,

12   you know, putting on a coat or reaching.  It affects me

13   a great deal in my everyday life.  It's hard.  I can't

14   even sometimes sweep because it gets swollen, especially

15   when it rains.  I can't be getting cortisone shots all

16   the time.  I can't work.  I can't work so I can make

17   money to take my son out.  It has been very difficult.

18   Q.  So I have two questions from that:  How are you

19   still getting the cortisone injections as treatment for

20   your shoulder injury?

21   A.  Well, I haven't.  But in the past, I was.  I

22   haven't because I just barely got a new orthopedic.  I'm

23   going to be getting an appointment, but the cortisone

24   shots in the past by Dr. Datori -- I mean, Dr. Ho.

25   Helped a great deal with the -- I learned how to

Reyna Arroyo
March 1, 2023

Page 98

1   exercise and ice it a lot.  And you just do like home

2   therapy exercises.  That, again, I had no insurance.

3       **Q.  Right.**

4           **So was Dr. Ho, was she the orthopedic physician?**

5       A.  It's a he.  Erling Ho, yes.

6       **Q.  And then was Dr. Datori your previous primary**

7   **care physician; is that correct?**

8       A.  That is correct.

9       **Q.  Okay.  To your knowledge, did either Dr. Ho or**

10  **Dr. Datori ever return you without any physical**

11  **restrictions?**

12      A.  Proceeding this injury, no.

13      **Q.  And the other thing you mentioned, have you been**

14  **looking for another job since being placed on the leave**

15  **of absence in 2019?**

16      A.  No.

17      **Q.  Why not?**

18      A.  My understanding is, I was supposed to have a

19  full-time position.  And I'm hoping that my situation at

20  work will resolve so I can go back to work.  I want to

21  make myself available if there is some limited position.

22  I love my job.  I have a son to raise.  I can't afford

23  being off work.  And also because of my condition, my

24  shoulder and because of my medication as well.

25      **Q.  So I guess my question is:  If you were able to**

Reyna Arroyo
March 1, 2023

Page 99

1    come back to do limited-duty work, like desk work that
2    you were doing in finance, is there a reason you haven't
3    sought that kind of desk work outside of this
4    litigation?
5         A.  No.  Because of my health.  No.
6         Q.  Is it your understanding that you're not allowed
7    to work outside of working for the City?
8         A.  It's my understanding that I'm not allowed to
9    work a full-time position.  And like I mentioned, I
10   wanted to leave myself available just in case, you know,
11   give you guys compassion to resolve this as soon as
12   possible.
13        Q.  What is your belief that you can't have a
14   full-time position based on?
15        A.  It's in the general orders.  I can't remember the
16   exact general order.  It was supposed to have -- full
17   time.  I cannot have no other type of position.
18        Q.  But it's not your understanding that it precludes
19   part-time employment?
20        A.  I need to think about it, Perhaps.  But even if I
21   wanted to work part time, I couldn't because of my
22   shoulder.  I can't really move it.  It has minor
23   movement, but not fully.
24        Q.  So is it you would not be able to do even
25   part-time clerical work at this time?

Reyna Arroyo
March 1, 2023

Page 100

1      A.  I couldn't say.  I would have to go see my

2  doctor -- and, you know, I'm hoping to get better, get

3  surgery, come back.  It would be up to my supervisor.

4      **Q.  Okay.  So am I correct that you're not -- or your**

5  **doctors haven't released you to perform any type of work**

6  **at all right now?**

7      A.  That's correct.

8      **Q.  Okay.  And you're hoping to get shoulder surgery,**

9  **but your other issues that necessitate medication need**

10  **to be resolved first; is that fair?**

11      A.  That is fair.  And those issues would resolve

12  with what's going on with this case.

13      **Q.  Okay.  Now, is it your understanding for this**

14  **matter, you're seeking back pay since you were placed on**

15  **a leave of absence?**

16      A.  Yes.

17      **Q.  And do you recall what your last monthly salary**

18  **was before you were placed on a leave of absence?**

19      A.  I don't remember.

20      **Q.  Okay.  You also, I believe, mentioned in some of**

21  **the pleadings in this case, you took out money from your**

22  **pension.**

23          **Are you familiar with that?**

24      A.  Yes.

25      **Q.  What -- how did you take money out of your**

Reyna Arroyo
March 1, 2023

Page 101

1 pension?  I guess I don't quite understand what that

2 means.

3     A.  I have to borrow against my account, because as a

4 result, I have to pay $10,000 for taxes.  And I took

5 another 6,000.  I have to pay another "X" amount of

6 taxes.  When it was starting to come to taxes to be

7 filed, I couldn't qualify for any of the returns, not

8 even COVID relief because I have not paid those taxes

9 because of the lack of money.

10     Q.  So just to make sure, that's different than the

11 pension that we were discussing earlier with Robert

12 Crawford, right?

13     A.  Yes, correct.

14     Q.  And you have not applied to the pension through

15 the Police Pension Board -- I forget the acronym --

16 correct?

17     A.  No.

18     Q.  All right.  Your complaint in this case also

19 indicates you're seeking approximately $191,000 in pain

20 and suffering damages.

21         Are you aware of that?

22     A.  Yes, I'm aware of that, but my son should also be

23 included.

24     Q.  You said, "my son should also be included"?

25     A.  Yes.

Reyna Arroyo
March 1, 2023

Page 102

```
 1      Q.  What do you mean by that?
 2      A.  Well, he's affected, you know?
 3      Q.  So are you saying that figure, that $191,000
 4   should be more?
 5      A.  If it was up to me, yes.
 6      Q.  How -- starting with the first amount, the
 7   191,000, how did you calculate that number?
 8      A.  Where would it show the 191,000?
 9      Q.  I can show you what I'm looking at.  I'll share
10   this.
11          All right.  I'm sharing a document.  I'll start
12   at the top and I'll show you what I'm looking at.
13      A.  Is this the --
14      Q.  Plaintiff's initial disclosures in this case.
15          Have you seen this document?
16      A.  Yes.
17      Q.  So then I think we'll mark this -- no, we don't
18   need to.  We don't need to do that.
19          Flipping to the end of it, emotional harm on page
20   five.
21          "Plaintiff intends to seek 191,000 for emotional
22   harm.  Plaintiff reserves the right to amend this
23   calculation as more information is obtained regarding
24   defendant's conduct."
25          So that's the number I was looking at.
```

Reyna Arroyo
March 1, 2023

Page 103

 1      A.  I believe so.  I believe I qualify for 200,000 or

 2   so.  I have not -- my overall averages of not being able

 3   to go out, a lot of stuff.  I'm on medication at times.

 4   It has really, really affected me in all kinds of

 5   aspects.

 6      **Q.  So my specific question is:  How did you come up**

 7   **with this $191,000 number?**

 8      A.  I can't recall.  Maybe my attorney can answer

 9   that.

10      **Q.  If you have no independent recollection, that's**

11   **okay.**

12           **And then I guess so -- you said it should be more**

13   **with your son included.**

14           **If you had to calculate that for emotional harm,**

15   **what would that be?**

16      A.  300,000 according to the law.

17      **Q.  And you're obviously aware your son is not a**

18   **plaintiff in this case?**

19      A.  No.  But for me, it would be 200,000 or so.

20      **Q.  Okay.  But are you saying for you, your emotional**

21   **harm would be 200,000 or so?**

22      A.  Yes.

23      **Q.  So this number in the disclosure has increased**

24   **since it was submitted; is that correct?**

25      A.  I believe -- you know, I'm going to keep that

Reyna Arroyo
March 1, 2023

Page 104

1  number -- 200,000.

2          THE REPORTER:  I'm sorry.  Can the witness

3  please repeat that answer?

4          THE WITNESS:  I stated, I'm going to keep

5  that number, but as I do more reading through the

6  Disability Act, I do qualify for 200,000.

7  BY MS. WOYTOWICZ:

8  **Q.  And can you describe what emotional distress you**

9  **experienced in 20 -- March of 2019?  That's when the**

10  **limited-duty assignment time ran out.**

11  A.  Well, it's so much.  I don't know where to start.

12  After almost getting killed numerous times, I was kicked

13  out of the building practically like a dog, stripped of

14  my police powers.  I got injured at work, and they

15  didn't recognize my injury.  They did not move me to a

16  limited position, whereas they were allocating other

17  officers left and right, not me.

18          I was not able to -- I haven't been able to

19  sleep.  I have anxiety.  My shoulder still hurts.  I

20  can't get medical attention.  You can see the times

21  financially it has affected me a great deal.  I had to

22  take out of my son's college savings.  My fair come.  I

23  had to borrow money from my family.  I have to shop in

24  the secondhand.

25          I was without medical for months.  That was so

Reyna Arroyo
March 1, 2023

Page 105

1    bad because I have my son.  I was forced to move in with
2    my ex-husband, who has a drinking problem still.  It's
3    just so many things.  I can't take myself for vacation.
4    I have just been pretty much inside.
5            It's just so many things.
6        **Q.  So is it fair -- I don't want to mischaracterize**
7    **anything, but it sounds like a lot of your stress**
8    **results from financial distress; is that accurate?**
9        A.  Financially, yes.  And emotional because I take
10   pride in my job.  I love my job.  I still love my so
11   much that my two nephews and my niece decided to be a
12   police officer because they see the passion in me, you
13   know, when it comes to helping others.  I was very
14   driven.  I got along with everyone, whatever they asked
15   me to do, I would do.  I mean -- but I only have college
16   and some business training, you know, but I learned a
17   lot through the years in house with the Department.
18          But because of that, because of my work ethics, I
19   was able to work, you know, with high people in office.
20   To me, it was a privilege working in human resources, in
21   finance and working for the big bosses, preparing their
22   travel packets.  I got to know them.  And to be just
23   kicked out like that, like nothing.  Nobody really cares
24   to say hello, check on me or anything to see if I was
25   fine.  It's very -- it's very, very hard.

Reyna Arroyo
March 1, 2023

Page 106

1          I was trying to advocate.  I remember that when I
2     went back to turn in my police badge and my ID, there
3     was hardly no officers.  Officers were getting sick left
4     and right for COVID, and I offer Sergeant Collin Johnson
5     that would you please let me stay just to answer the
6     phones and help out.  And I was not -- you know, she
7     told me she couldn't do anything.  That it wasn't up to
8     her.
9          It's, both, emotional mentally, professionally,
10    financially for my son and I.
11    **Q.  Have you consulted with any mental health**
12    **professionals about your distress?**
13    A.  I have consulted with some people at church.  My
14    faith is Christian, so I've consulted with a church
15    member and a friend and also -- a church member, as I
16    mentioned.
17    **Q.  Have you -- you have not seen a therapist or any**
18    **licensed mental health professional about your emotional**
19    **distress?**
20    A.  No.  I think I'm pretty strong willed.  But I
21    just think that after this goes away, I'm going to be
22    fine.
23    **Q.  And I know you mentioned antidepressants being**
24    **prescribed, was that originally by Dr. Datori?**
25    A.  Yes, that was prescribed to me on November 19th,

Reyna Arroyo
March 1, 2023

Page 107

1  2019.  Late November 2019.

2  **Q.  Okay.  Do you know what prompted you seeking or**

3  **being prescribed antidepressants at that time?**

4  A.  What prompted?  Actually, I went to see a couple

5  of doctors regarding my past cancer because I had

6  surgery for -- I had five lumps and two of those

7  removed.  I went through a couple of biops (sic), and

8  they would talk to me and, you know, I would just cry

9  for nothing.  So they reach out to Dr. Datori.  Datori

10 had suspected it and I didn't want to take medication,

11 but he says, you know, you need to, it's okay.

12      So I started it.  Because of what's going on with

13 this situation, I have -- like I said, I went to the

14 emergency a few times with chest pains and abdominal

15 pain.  My most recent one was about three weeks, like I

16 stated.  And that's it.

17 **Q.  Okay.  So is it -- and you've had this cancer**

18 **treatment also since 2016; is that right?**

19 A.  Yeah.  But I got operated and went back to work

20 after three months or four months, I believe.

21 **Q.  But is it you were still seeing the physician,**

22 **the oncologist that like referred your issues to**

23 **Dr. Datori, is that what happened with the prescription?**

24 A.  Yes.  I would just do a follow up.  Like every

25 six months, everything was fine pertaining to that.

Reyna Arroyo
March 1, 2023

Page 108

1   Then I guess they saw me or, you know, they were

2   worried, they reach out to Datori and he made an

3   evaluation and determined that.

4       Q.  And you are -- also, that your divorce happened

5   around that time too, and I think it was 2015 or 2016

6   when that was filed?

7       A.  No, that was -- my divorce was already done.  I

8   believe 2014, 2015.

9       Q.  Okay.  I thought had you said earlier you filed

10  in 2014 or '15 and it was done in 2016 or '17; is

11  that --

12      A.  You know I can't recall -- I did say I can't

13  recall exactly when I filed, but it was terminated

14  before this incident.

15      Q.  Okay.  And are you still taking antidepressants?

16      A.  Yes.

17      Q.  Okay.  Any other medication for emotional issues?

18      A.  She prescribed me medication for my heart because

19  I was diagnosed with irregular heart beats.

20          Like I said, this case has really affected me.

21  That I went to see her yesterday and she said, okay, I'm

22  going to give you some medications, which I didn't pick

23  up today.

24      Q.  Okay.  Other than I'll say the stress of the

25  financial issues and then just general emotions,

Reyna Arroyo
March 1, 2023

Page 109

1   **anything else that you think we should know about your**

2   **emotional distress and how you're valuing that number of**

3   **damages?**

4   A.  Well, I'm worried for my son's education for the

5   future, you know.  He goes to a private school, and I'm

6   really concerned how I'm going to pay it.

7   **Q.  Okay.**

8           MS. WOYTOWICZ:  Counsel, I might be done

9   shortly.  I want to take a quick break and read my

10  notes.  Can we go off?  Is that okay --

11          MS. HASHIM:  How much time would you like?

12  Maybe five to ten minutes?

13          MS. WOYTOWICZ:  Yeah, that works.

14          MS. HASHIM:  Sounds good.

15          MS. WOYTOWICZ:  Thank you.

16          THE WITNESS:  1:27?

17          MS. HASHIM:  How about 1:20?

18          MS. WOYTOWICZ:  That works.

19          MS. HASHIM:  Thanks.

20          (WHEREUPON a short recess was taken.)

21          MS. WOYTOWICZ:  Thank you, Officer.  I don't

22  have any further question unless your counsel would like

23  to ask you a few.

24          MS. HASHIM:  Yes.  Thank you very much,

25  Counsel.  I appreciate it.

Reyna Arroyo
March 1, 2023

```
 1                        EXAMINATION
 2   BY MS. HASHIM:
 3      Q.  So, Reyna, I'm going to be jumping around.  I'll
 4   do my best to segue into my questions for you so you can
 5   follow me, but forgive me in advance for if what I'm
 6   asking you comes across as disjointed.
 7           We just came off from break.
 8           Do you understand that your are still under oath,
 9   correct?
10      A.  Yes, I am.
11      Q.  Now, just before your medical role began when you
12   were working in the travel section in March of 2019, you
13   testified that you were aware of vacant positions.
14           Do you remember that testimony?
15      A.  Yes.
16      Q.  Did anyone from CPD HR discuss with you any
17   vacant positions that you could be reassigned to in
18   March of 2019?
19      A.  No.
20      Q.  And did anyone from CPD HR discuss with you any
21   vacant positions that you could be reassigned to between
22   March of 2019 and November of 2019?
23      A.  No.
24      Q.  Did anyone from CPD Medical Services Section
25   discuss with you any vacant positions that you could be
```

Reyna Arroyo
March 1, 2023

Page 111

1  reassigned to in March of 2019?

2      A.  No.

3      Q.  Did anyone from CPD Medical Services Section

4  discuss with you any vacant positions that you could be

5  reassigned to between March 2019 and November 2019?

6      A.  No.

7      Q.  Okay.  Now -- excuse me -- we had talked about

8  the collective bargaining agreement during the direct

9  examination.  And I will represent to you that the

10 collective bargaining agreement sets forth under Section

11 23.9 something called "recognized openings" that are

12 available to certain roles and positions of officers.

13          Based on your experience, what is a review

14 officer within a unit?

15     A.  A review officer would be someone that reviews a

16 case reports once they are approved by supervisor,

17 station supervisor.  They review them just to make sure

18 that each case report or traffic car or any document is

19 recorded properly, I guess, rejected.  Once it meets all

20 of the elements of a correct paperwork, it gets filed in

21 the district.

22     Q.  Were you qualified to hold the position of review

23 officer within a unit?

24              MS. WOYTOWICZ:  Object to foundation.

25              You can answer.

Reyna Arroyo
March 1, 2023

Page 112

1          THE WITNESS:  Yes.  I would have -- with the
2     small training, I would have qualify.
3     BY MS. HASHIM:
4        Q.  **And beyond small training, how else were you**
5     **qualified?**
6        A.  I was also qualified working on district as a
7     court officer, citation officer.  That would be
8     collecting all of the citations, put them into a log and
9     sending them to the proper courts for hearings.
10       Q.  **Okay.  Were you qualified for this position?**
11       A.  Yes, I'd done it in the past.
12          MS. WOYTOWICZ:  Objection.
13          Same thing, just try to give me a beat to
14    object, but then go ahead and answer.
15          THE WITNESS:  Yes, I've done it in the past.
16    BY MS. HASHIM:
17       Q.  **Again, why do you say you were qualified for this**
18    **position?**
19       A.  Because I've done it in the past, like I said.
20       Q.  **Okay.  And based on your experience, what is a**
21    **district desk positions within a unit do?**
22       A.  That's someone that sits behind a desk just to
23    take police reports.
24       Q.  **And were you qualified to hold a district**
25    **position within a unit?**

Reyna Arroyo
March 1, 2023

Page 113

```
 1      A.   Yes.
 2                MS. WOYTOWICZ:   Objection to foundation.
 3                You can answer.
 4                THE WITNESS:   Yes.
 5   BY MS. HASHIM:
 6      Q.   And why do you say you were qualified?
 7      A.   Because I've done that in the past.  Not just
 8   making police reports, taking -- answering phone calls,
 9   making proper notification for high risk situations,
10   like shootings, fires.  I also had the privilege of
11   acting in some degree for supervisor desk duties.  I
12   also -- prior to desk, I was also working as a watch
13   secretary doing schedules for the officers to work and
14   so forth.
15      Q.   Okay.  And based on your experience, what is the
16   traffic court/record unit?
17      A.   According to my experience, the traffic officer,
18   which would be in a particular courtroom and just log
19   all the officers just to see who would come to court,
20   who would be absent, making sure they would appear, and
21   if they didn't, they would make proper notifications or
22   paperwork, and they would manage the officer
23   professionally and up.
24      Q.   Were you qualified and experienced to work in
25   traffic court/record unit?
```

Reyna Arroyo
March 1, 2023

Page 114

```
 1              MS. WOYTOWICZ:  Object to foundation.
 2              You can answer.
 3              THE WITNESS:  I can you said?
 4              MS. WOYTOWICZ:  Yeah.
 5              THE WITNESS:  I believe that I was qualified
 6   to do that.  I never worked there, but I believe it's
 7   not a very complicated task to do.
 8   BY MS. HASHIM:
 9      Q.  Based on your experience, what is the records
10   inquiry section?
11      A.  That would be the -- I believe it was where
12   you -- when an officer calls a particular alternate
13   response, you know, not to make.  The records unit would
14   be someone they require records to be retrieved for
15   particular cases.  Also, when an officer will call -- I
16   believe, that's the description where officers will call
17   and to request like a confirmation of a warrant and so
18   forth.
19      Q.  Okay.  Were you qualified and experienced to work
20   in the records inquiry section?
21              MS. WOYTOWICZ:  Object to foundation.
22              You can answer.
23              THE WITNESS:  I never worked, but it's not
24   hard to do.  You meet with a lead system enforcement,
25   agency -- it's an agency that's able to confirm warrants
```

Reyna Arroyo
March 1, 2023

Page 115

```
 1   and other requirements.  They are required for the
 2   officers in the field and with the administration.  It's
 3   not hard to do.
 4   BY MS. HASHIM:
 5      Q.  Based on your experience, what is the alternate
 6   response section?
 7      A.  The alternate response section, I was detailed
 8   there when I would recover from my injuries.  I did work
 9   there.  My performance -- my duties at the time was to
10   take calls in the call back unit, take reports and just
11   answer phone calls and take reports over the phone.
12      Q.  So is it fair to say that because you had already
13   worked in this section, you were qualified and
14   experienced to work within in it?
15      A.  Yes.
16      Q.  Based on your experience, what is the police
17   document services section?
18      A.  I believe that's the department where an
19   officer -- where people come in, retrieve police
20   reports, and tech orders or any type of document
21   involving their name.
22      Q.  Were you qualified to work in the police document
23   services section?
24      A.  I never worked there, but I do have experience.
25   We cleared in our warehouse and all of the other
```

Reyna Arroyo
March 1, 2023

Page 116

1  programs available.

2    Q.  I'm going to shift gears.

3        When you -- you had testified earlier that you

4  pulled on your pension to make ends meet and you had

5  mentioned tax consequences.

6        Do you remember that testimony?

7    A.  I do.

8    Q.  Were you able to pay your taxes in full at the

9  time?  The taxes that I'm referring to are the taxes

10 that you incurred for pulling your pension early.

11   A.  I couldn't pay all of it.  I still have $5- or

12 $6,000 left or so.  Because of that, like I mentioned,

13 it was very hurtful I couldn't qualify for the COVID

14 relief.

15   Q.  Actually, that was my next question, the COVID

16 relief and not qualifying for it.

17       Can you explain, you know, what the COVID relief

18 was?

19   A.  I guess that's the federal aid for families to

20 help them supplement there income while COVID times,

21 hard times.

22   Q.  And what is the connection between -- to your

23 understanding, between paying your taxes and qualifying

24 for the COVID relief?

25   A.  My understanding is that I had to resolve the

Reyna Arroyo
March 1, 2023

Page 117

```
 1   debt in order to qualify for the federal aid, and I
 2   couldn't because I had no money.
 3       Q.  And is it a fair statement to say you never
 4   received any kind of COVID relief because of this
 5   situation, that pulling on your taxes -- that pulling on
 6   your pension caused with your taxes?
 7       A.  That is correct.
 8       Q.  And I'm going to shift gears again.
 9           Before you were placed on a LOA status, leave of
10   absence, am I correct in stating that you requested to
11   continued working within CPD?
12               MS. WOYTOWICZ:  Objection; misstates
13   testimony.
14               THE WITNESS:  Yes, I did request.
15   BY MS. HASHIM:
16       Q.  Okay.  And you requested to continue working at
17   CPD; is that correct?
18       A.  Yes, I did request it.
19       Q.  And do you remember who you asked?  One person at
20   a time?
21       A.  Well, I requested to the medical section would be
22   my case manager.
23       Q.  Do you remember who that person was?
24       A.  Smith.
25       Q.  I'm sorry.  Can you repeat that?  You cut off.
```

Reyna Arroyo
March 1, 2023

Page 118

1    A.  Latoya Smith.

2    **Q.  Thank you.**

3    A.  I also requested to Sherrie Jones.  At the time

4    she was a supervisor in the medical section.  She was a

5    civilian.  I also did spoke to Dr. Susan Arjman,

6    A-R-J-M-A-N.  I spoke to my immediate supervisor

7    Michelle James, to Dr. Johnson.

8    **Q.  Okay.**

9    A.  I -- there's more.  I'm sorry.  Jamika Jackson.

10   Marilyn Bishop, Sergent Camper.  Those are the officers.

11   I can't remember -- I mean, there's other people, I

12   know.

13   **Q.  Okay.**

14   A.  Collin Johnson -- yeah.

15   **Q.  So let's go with when you were at the travel**

16   **section.**

17       **You had mentioned Helen Lee.  She was your**

18   **supervisor when you were at the travel section; is that**

19   **correct?**

20   A.  Yes.

21   **Q.  And this would have been in March of 2019?**

22   A.  Yes.

23   **Q.  Okay.  Do you recall what you stated to her?**

24   A.  Not verbatim, but the fact that I really wanted

25   to stay there, if she would help me.  She more or less

Reyna Arroyo
March 1, 2023

Page 119

1    stated that because she's a civilian that she couldn't

2    do anything.

3         Same thing with James, Michelle James.  They were

4    both civilians, and they didn't handle any police

5    positions -- I mean, situations like that.  And they

6    suggested to speak to Director Johnson, which I did, as

7    mentioned before but not verbatim, he told me that he

8    would look into it.  And then he told me that he

9    couldn't really do nothing because my case was in a

10   grievance, it was going through a grievance procedure,

11   and he couldn't do anything because that moved on to the

12   human resources section.

13        **Q.  Just to understand the hierarchy, you had two**

14   **supervisors, Helen Lee and Michelle James when you were**

15   **at the travel section?**

16        A.  Yes.  There's the hierarchy, would be the hire

17   Director Johnson, then under him would be Michelle James

18   assistant director of finance, I believe.  And then it

19   would be my immediate supervisor Helen Lee.

20        **Q.  Okay.**

21        A.  At the time they did mention, there was two

22   positions.  But again, they couldn't say anything --

23   they couldn't allocate me because it was not in their

24   power.

25        **Q.  You mentioned the name Jamika Jackson.**

Reyna Arroyo
March 1, 2023

Page 120

1          Who was she?

2     A.  Jamika Jackson is the human resources supervisor,

3     which March 23, as I quote:  "It is to my understanding

4     that you have exhausted all medical injury on duty time

5     allotted to you.  At this time you will be placed on a

6     LOA absent status while you petition the police pension

7     port for duty benefits.  Also, while leave of absence,

8     you no longer have police powers.  Please have those

9     items, bring them to the police department as soon as

10    possible."

11    Q.  And it looks like you were reading from

12    something; is that correct?

13    A.  Yes, my notes.  Like I mentioned.

14    Q.  Is this an e-mail or from a conversation?

15    A.  This is coming from an e-mail that she replied to

16    me.

17    Q.  Okay.  Can you give me the date of that e-mail?

18    A.  Absolutely.  That would be March 23rd, 2020.

19    Q.  I'm sorry.

20        2020?

21    A.  Yes.

22    Q.  Okay.  And so this was in response to you telling

23    her that you wanted to continue working at CPD?

24    A.  Yes.  I explained my situation and -- yeah.

25    Every time, if I may, but not verbatim, if I speak to an

Reyna Arroyo
March 1, 2023

Page 121

```
 1   officer on the other side, I would reiterate my
 2   situation in hopes they will help me.  But they
 3   couldn't.
 4       Q.  You had mentioned Marilyn Bishop?
 5       A.  Marilyn Bishop would be the officer in benefits,
 6   I believe.  She --
 7       Q.  What did you ask her?
 8       A.  Same situation.  You know, and more or less.  I
 9   can't remember if this is from an e-mail or a
10   conversation that I had.  It may be from e-mail as well.
11   She stated, and I quote:  "You cannot return to duty
12   before you've exhausted your medical absence benefits.
13   You will be removed from the active role.  Your opinion
14   at this time will enter for retirement, resignation or
15   leave of absence, such as to apply for civility pension
16   benefits."
17       Q.  Now, with all these people -- I'm sorry.
18           Would you say that your answer is essentially the
19   same with Tanya Smith, in terms of you described to her
20   your situation, that you wanted to continue working, you
21   had a disability, and you got a similar reaction from
22   Latoya Smith?
23       A.  Yes.  Most of the people that I will send this to
24   them, they would all respond, you know, more or less,
25   but not verbatim, that they couldn't do anything.  But
```

Reyna Arroyo
March 1, 2023

Page 122

```
 1   they didn't offer a position, you know, to help me, to
 2   allocate me to a position with limited duties.
 3       Q.  Did any of them give you the option of requesting
 4   a reasonable accommodation for your disability?
 5       A.  No.  No.
 6       Q.  Okay.  Thank you.
 7                MS. WOYTOWICZ:  Sorry.  I thought you were
 8   done.
 9                MS. HASHIM:  No, no.  I'm looking at my
10   notes.
11                MS. WOYTOWICZ:  Got it.  No worries.
12                MS. HASHIM:  This is the disadvantage of
13   doing things remotely, right?
14                MS. WOYTOWICZ:  Tracking your eyes, I
15   couldn't tell.
16   BY MS. HASHIM:
17       Q.  How many times do you remember your case worker
18   from -- actually, let me back up.
19            What was the name of your first case worker in
20   2016 from medical services section?
21       A.  My first case manager was Michelle Moreno.
22       Q.  For how long did you have her as your case
23   worker?
24       A.  I can't remember.  Maybe for a year or two or so.
25   Maybe less.
```

Reyna Arroyo
March 1, 2023

Page 123

1    Q.  And then who took over after Officer Moreno?

2    A.  Latoya Smith.

3    Q.  Okay.  And how many times do you remember either

4  case worker from medical services section discussing

5  with you the option of requesting a reasonable

6  accommodation because of your disability?

7    A.  How many times.  Maybe about three or four times.

8  Actually, every time I would go to the medical section,

9  I would ask Jamika, any news, you know, more or less,

10  not verbatim, has anything changed, any positions for

11  me?  And she would respond the same thing.

12    Q.  So did you specifically -- did she discuss with

13  you how to go about requesting a reasonable

14  accommodation?

15    A.  No.

16    Q.  And the same question with the CPD HR:  Did

17  anyone from there discuss with you how to go about

18  requesting a reasonable accommodation?

19    A.  No.

20    Q.  Okay.  And similarly with the City's Department

21  of Human Resources, do you remember anybody from there

22  discussing with you how to request a reasonable

23  accommodation for your disability?

24    A.  (Shaking head.)

25    Q.  I'm going to switch gears again.

Reyna Arroyo
March 1, 2023

Page 124

```
 1        You had testified earlier about drawing on your
 2   son's college savings, is it fair to say that was to
 3   help make ends meet and to pay your bills?
 4        A.  That is correct, yes.
 5        Q.  And how much did you draw from his college
 6   savings?
 7        A.  I thought it was a little higher, but it was
 8   actually 20,000.
 9        Q.  And was that the full college savings that you
10   had set aside for him?
11        A.  No.  I was still paying it.  My hope was to pay
12   as much as possible.  It was an Illinois program, until
13   he will go to college.
14        Q.  So is your testimony -- just to make sure I'm
15   getting it correctly -- you pulled $20,000 for that to
16   help make ends meet; is that right?
17        A.  (Nodding head.)  Yes.
18        Q.  You stated rather -- I strike that.
19            You testified that you requested personal loans;
20   is that correct?
21        A.  Yes.
22        Q.  About how much did you request in personal loans?
23        A.  About 5,000.  5,000 or so.  Yeah, like 5,000 the
24   last time I spoke to you, but I just borrowed $100.
25        Q.  You testified earlier that you are now currently
```

Reyna Arroyo
March 1, 2023

Page 125

1    **on public aid in as much as health insurance; is that**
2    **right?**
3        A.  Yes.  I get some food stamps and public
4    healthcare.
5        **Q.  How does the public healthcare compare to the**
6    **health insurance you receive from the City?**
7            **Take your time.**
8        A.  It's not good because I had to change my
9    oncologist.  He sent me to another one.  He doesn't take
10   public aid, so I'm still waiting to see an oncologist.
11   My orthopedic, I had to change.  Not many people take
12   public aid.
13           My son's pediatrician since he was a little boy,
14   I had to change it to someone else, Dr.  -- what's her
15   name? -- Dr. Virginia.  She is, basically, a very nice
16   person, but I wish we got someone nicer with all the
17   doctors, you know, better hospital.
18           So it has been difficult in that aspect as well.
19   It's very hard for me to make appointments with my
20   mammograms, my shoulder, like I said.  My son, you know,
21   started developing sleep apnea, and it's been almost two
22   weeks trying to find someone that can take the public
23   insurance.  So it's been hard.
24       **Q.  And you testified about a period of time that you**
25   **did not have health insurance; is that correct?**

Reyna Arroyo
March 1, 2023

Page 126

1    A.  Correct.

2    **Q.  Okay.  For how long was this period?**

3    A.  From February -- no.  I'm sorry.  To my

4  knowledge, it was from February, but it was actually

5  determined that from January to August of last year.

6    **Q.  So that would be 2022?**

7    A.  Yeah.

8    **Q.  And did you have medical expenses from January of**

9  **2022 to August of 2022 that you paid out of pocket for?**

10   A.  You know what?  I -- let me retract that.  I

11  can't remember if it was '21.  But I did went to the

12  emergency on February and I had COVID, like I mentioned,

13  and I have a pending bill of almost -- I forgot, but it

14  was over $10,000.

15   **Q.  And that was when you were not insured?**

16   A.  That was when I was not insured.  And I thought I

17  was insured, but I was not insured.  I have collection

18  people calling me.  My credit, it was a good credit

19  report.  Now it's all destroyed.  It's just sad

20  everywhere.

21   **Q.  Okay.  So I'm going to shift gears again; okay?**

22   A.  (Nodding head.)

23   **Q.  Early on into this disposition, the City had**

24  **asked you about CPD directives.**

25       **Do you remember that?**

Reyna Arroyo
March 1, 2023

Page 127

1    A.  Yes.

2    Q.  Do you know offhand how many CPD directives there

3    are in total?

4    A.  Not right now.  I don't.

5    Q.  Would it be a few or a lot?

6    A.  A lot.

7    Q.  Okay.  When I say a lot, would you say it's more

8    than 50?

9    A.  I can't recall.

10   Q.  Okay.  I'm going to shift gears and talk a little

11   bit about your testimony earlier about performing an

12   essential functions of a police officer.

13          When you went on to -- when you were cleared to

14   return to work but in a limited-duty capacity, was it

15   your testimony that it was the doctor who would clear

16   you to go back to work?

17              MS. WOYTOWICZ:  Objection; form, and

18   misstates testimony.

19   BY MS. HASHIM:

20   Q.  You can answer.

21   A.  Yes.

22   Q.  So it's correct to say it was your doctor who

23   would clear you to return to work; is that right?

24   A.  Correct.

25   Q.  Okay.  I'm going to pull up -- I believe we're on

Reyna Arroyo
March 1, 2023

Page 128

**Exhibit 9.**

1

2          MS. HASHIM:  Is that correct, Kristen?

3          MS. WOYTOWICZ:  I think it was 7.  You might

4    be at 8.

5          MS. HASHIM:  Right.  The initial

6    disclosures, was that an exhibit?

7          MS. WOYTOWICZ:  No, I don't need to mark

8    that.

9          MS. HASHIM:  Okay.  So this will be Exhibit

10   Number 8.

11         (Exhibit 8 was marked for

12         identification by the reporter

13         and is attached hereto.)

14   BY MS. HASHIM:

15     **Q.  Just give me a second to do some multitasking**

16   **here.**

17         **Okay.  Can you see my screen?**

18     A.  Yes.

19     **Q.  All right.  So I'm just going to scroll through**

20   **this.  The top of it, the title of it, am I correct in**

21   **saying, it's titled "Essential Functions For Limited**

22   **Duty Approval"?**

23         **Did I state that correctly?**

24     A.  Yes.

25     **Q.  All right.  I'm going scroll through this.**

Reyna Arroyo
March 1, 2023

Page 129

```
 1          Do you see your name here on the top, kind of,
 2    right corner?
 3       A.  Yes.
 4       Q.  All right.  I'm going to scroll through so you
 5    can just take a look at this.  Let me know when you're
 6    ready for me to scroll down.
 7       A.  I'm ready.
 8       Q.  Okay.  And the second page, the top of it says,
 9    "Medical certification for limited-duty assignment."
10          Did I read that correctly?
11       A.  Yes.
12       Q.  And that's your name on there?
13       A.  Yes.  My married name, but I'm divorce now.
14       Q.  Correct.
15          It says Reyna Sansone, S-A-N-S-O-N-E, your prior
16    married name, right?
17       A.  Yes.
18       Q.  Okay.  I'm going to keep scrolling down.  And it
19    continues.  And at the bottom, the date would you agree
20    it says October 26th, 2015?
21       A.  Yes.
22       Q.  And have you ever seen this form before?
23       A.  I don't recall.
24       Q.  Okay.  On the bottom left of the last page, it's
25    a signature of physician or practitioner.
```

Reyna Arroyo
March 1, 2023

Page 130

```
 1          Is there a signature there of some sort?
 2     A.   Yes, it is a signature.
 3     Q.   Okay.  I'm going to represent to you that over
 4   the course of discovery, this document was produced by
 5   the City as part of your medical records.
 6     A.   Yes.
 7     Q.   I'm going to scroll up here.  I'm already up
 8   there to the first page.
 9          Do you see the section, it says "Essential
10   functions of a police officer"?
11     A.   Yes.
12     Q.   Okay.  There are five paragraphs under that
13   section; is that correct?
14     A.   Yes.
15     Q.   Okay.  The first one it says, "Essential
16   functions of police officer have the physical,
17   psychological and emotional ability to safely effectuate
18   an arrest at the resistor (ph) level of the Chicago
19   Police Department's use of force model.  In parenthesis,
20   this includes the ability to struggle with those
21   resisting arrest, and may involve punching, hitting,
22   kicking, running, climbing, squatting and another
23   physical activities.  Please initial."
24          And does it look like it's marked off there?
25     A.   Yes.
```

Reyna Arroyo
March 1, 2023

Page 131

```
 1      Q.  Okay.  And in the second one it says "Have a
 2   physical, psychological and emotional ability to safely
 3   carry, handle and use a department approved prescribed
 4   firearm.  Please initial."
 5          It looks like it's marked off there; is that
 6   correct?
 7      A.  Yes.
 8      Q.  All right.  And then number three it says
 9   "Maintain an independent and stable gait without the
10   assistance of external ambulatory supporting devices, in
11   parenthesis, EG, no crutches, canes, walkers,
12   wheelchairs, et cetera.  Please initial."
13          And is marked, correct?
14      A.  Yes.
15      Q.  And then in number four it says, "Have and
16   maintain the ability to drive, in parenthesis, this
17   includes having the physical, psychological, and
18   emotional ability to safely drive a motor vehicle.
19   Please initial."
20          And it's marked; is that correct?
21      A.  Yes.
22      Q.  Okay.  And did you have a driver's license at the
23   time in 2015?
24      A.  Yes, I did.
25      Q.  Have you always had a driver's license?
```

Reyna Arroyo
March 1, 2023

Page 132

1    A.  There was one time that my driver's license

2    lapsed because I didn't renew it.  I think it was a -- I

3    can't remember if it was two days or three days.  I

4    can't remember, but it lapsed.  So I had no driver's

5    license because of that.  But that was because I was

6    ill.  I couldn't go renew it.  And I overlooked the time

7    frame.

8    **Q.  Did you get it renewed?**

9    A.  Yes.  That was one of my conditions to be at

10   work.

11   **Q.  And have you, at this time and since this date in**

12   **2015, have you maintained a valid and current firearms**

13   **owner identification card?**

14   A.  I maintained it until 2019 and I -- my belief,

15   that it was probably stopped as a human resources

16   procedure.  I could be mistaken.  I don't think I have a

17   valid FYD right now.

18   **Q.  And at the bottom of this form it says, "Doctor**

19   **signature," and it looks like there is a signature**

20   **there; is that correct?**

21   A.  Yes.

22   **Q.  Okay.  And would you agree with the person who**

23   **signed this that you were able to perform -- oh, I'm**

24   **sorry.  Strike that.  I forgot the second page.**

25        **This is the second page that has been filled out.**

Reyna Arroyo
March 1, 2023

Page 133

1  It say at the top, "Medical certification per limited
2  duty assignment."
3       And am I reading the date correct where it says
4  "October 26th, 2015"?
5    A.  Yeah.  But that was for a different injury, not
6  2016 injury.  But I went --
7    Q.  I understand.  I understand.
8    A.  Okay.
9    Q.  I understand.
10   A.  Yes.
11   Q.  And it says here that there are certain things
12 that you can and cannot do; is that correct?
13   A.  Correct.
14   Q.  All right.  And these limitations are the
15 limitations of when you're coming back to duty, okay.
16      While you can do these essential functions is
17 within these limitations on page two; is that correct?
18   A.  That is correct.  Yes, correct.
19   Q.  All right.  And to your understanding, was this
20 the process that had to be completed from 2015 onward
21 until you went on leave of absence?
22   A.  Yes.
23   Q.  Okay.  And I'm going to stop the screen sharing.
24      Would you agree with the person who signed this
25 and with any physician who signed this on your behalf

Reyna Arroyo
March 1, 2023

Page 134

1   that you were able to perform the essential functions of

2   a police officer as described with the limitations that

3   would have been set forth?

4       A.  Yes.

5       Q.  And was there ever a time from this date in 2015

6   until you went on leave of absence that you were not

7   able to perform the essential functions of a police

8   officer as described in this form with the limitations

9   that were set forth?

10      A.  No.

11      Q.  Okay.

12              MS. HASHIM:  Counsel, can you pull up

13  Exhibit 5, which was Bates numbered ARROYO.Def.190 to

14  192, please.

15              MS. WOYTOWICZ:  Which one was that?

16              MS. HASHIM:  That was the limited -- the

17  directive.

18              MS. WOYTOWICZ:  Got it.  Yeah.

19              MS. HASHIM:  Thank you.

20  BY MS. HASHIM:

21      Q.  Okay.  This is the directive that has been

22  previously marked as Exhibit Number 5.  It's a directive

23  about limited duty.

24          Do you remember seeing this earlier from earlier

25  today?

Reyna Arroyo
March 1, 2023

Page 135

```
 1      A.  Yes, I do.
 2      Q.  Okay.  You had reviewed it page by page earlier
 3  today, right?
 4      A.  Yes.
 5      Q.  Does this directive -- and you can look it at
 6  again if you have to.
 7          My question is this:  Does this directive state
 8  anywhere in it that it applies to police officers who
 9  request a reasonable accommodation for their disability?
10      A.  Yes.
11      Q.  So take a look at it and see where it applies to
12  police officers who request a reasonable accommodation.
13      A.  It will be under number three.
14              MS. HASHIM:  Can you make it a little bit
15  bigger?
16              MS. WOYTOWICZ:  Let me know if you need to
17  scroll either direction.
18  BY MS. HASHIM:
19      Q.  So this is note section three.
20          Where does it say request for reasonable
21  accommodation?  And when I say "reasonable
22  accommodation," I meaning under the ADA, the Americans
23  for Disability Act?
24              MS. WOYTOWICZ:  Object to form and
25  foundation.
```

Reyna Arroyo
March 1, 2023

Page 136

```
 1              THE WITNESS:  It would be number three,
 2   letter B and C.
 3   BY MS. HASHIM:
 4      Q.  Does it state in section three, sub B, request
 5   for accommodation?  I'm not seeing it there.
 6      A.  Well, for the letter B, it says -- oh, I'm sorry.
 7   No.  It's on duty.  Medical --
 8              THE REPORTER:  I'm sorry.  The reporter is
 9   unable to understand the witness at this time.
10              THE WITNESS:  I'm sorry.  I'm just reading
11   the number three, letter B.
12   BY MS. HASHIM:
13      Q.  How about this?  I'll go ahead and read it to
14   you.
15          It says -- this is section 3, limited duty,
16   subsection B.  "Eligible sworn department members who
17   are injured in the line of duty and certified by the
18   medical services section as being able to perform
19   limited-duty assignments shall be given available
20   limited-duty assignments until they can perform
21   full-duty assignments or until they are mandatorily
22   retired, whichever occurs first.  Note, for the purposes
23   of this directive, quote, 'injury -- injured in the line
24   of duty,' unquote, is defined as an injury to an active
25   duty officer during the course of performing police
```

Reyna Arroyo
March 1, 2023

Page 137

```
 1    functions while on or off duty as determined by the
 2    committee of finance."
 3         Did I read that accurately?
 4    A.  Yes.
 5    Q.  And that section does not state anywhere about a
 6    police officer who requests a reasonable accommodation
 7    for the their disability; is that correct?
 8    A.  That is correct.  It does not state it.
 9    Q.  Is there anywhere else in here that you believe
10    that this directive applies to police officers who
11    request a reasonable accommodation for their disability
12    under the ADA?
13    A.  No.
14    Q.  Is it fair to say from your reading of this that
15    its scope, the directive scope is limited to those who
16    are officers who are injured on duty and for those who
17    are not injured on duty?
18    A.  Absolutely, yes.
19    Q.  And when you applied for limited duty status in
20    the fall of 2016, you had a disability, namely an
21    impairment to your left shoulder; is that correct?
22    A.  Yes.
23    Q.  And the City gave you limited-duty status because
24    of this disability; is that correct?
25    A.  They gave me a limited, yes.
```

Reyna Arroyo
March 1, 2023

Page 138

1    Q.  And injuries --

2    A.  I'm sorry.

3    Q.  I'm sorry.  Strike that.

4            MS. HASHIM:  You can stop screen sharing,

5    Kristen.  Thank you.

6            MS. WOYTOWICZ:  Thank you.

7            MS. HASHIM:  There might be another one I

8    want to ask your assistance on.

9            MS. WOYTOWICZ:  Okay.

10   BY MS. HASHIM:

11   Q.  I want to switch gears now.

12       You had testified earlier about the settlement

13   negotiations in which they were kind of combined with

14   your ankle injury and your shoulder injury.

15       Do you remember that?

16   A.  I do.

17   Q.  Okay.  At the time of the settlement negotiations

18   regarding both of these injuries, if I'm not mistaken,

19   your testimony was that this was in like the fall of

20   2019; is that correct?

21   A.  I'm so sorry.  Can you repeat the question there.

22   Q.  Sure.

23       At the time of this settlement negotiations of

24   the ankle and shoulder injury, this was in the fall of

25   2019, correct?

Reyna Arroyo
March 1, 2023

Page 139

1     A.   Correct.

2     **Q.   And this was before the arbitrator determined**

3     **that your left shoulder injury was non-IOD, which**

4     **happened in June 2022, right?**

5     A.   Correct.

6     **Q.   And, in fact, this was even before any**

7     **arbitration related to the shoulder injury, correct?**

8     A.   Correct.

9     **Q.   So is it fair to say that the time of the**

10    **settlement negotiations, it was not determined that your**

11    **left shoulder injury was non-IOD?**

12    A.   Correct.

13    **Q.   And it was your belief at this time when**

14    **negotiations were happening, that it was an IOD injury,**

15    **right?**

16    A.   Yes.

17          MS. HASHIM:  Kristen, can you please pull up

18    Exhibit 7, which is ARROYO.Def.2012?  That's the limited

19    duty notification letter.

20          MS. WOYTOWICZ:  Yes.

21          MS. HASHIM:  Thank you.

22    BY MS. HASHIM:

23    **Q.   All right.  Do you recall seeing this earlier**

24    **today?  This is what was previously marked as Exhibit**

25    **Number 7.**

Reyna Arroyo
March 1, 2023

Page 140

```
 1      A.  Yes.
 2      Q.  Okay.  And when you received this on January
 3  24th, 2019, you had already been given the limited duty
 4  for the disability that you had to your shoulder; is
 5  that correct?
 6      A.  Yes.
 7      Q.  Okay.
 8          MS. HASHIM:  You can stop screen sharing,
 9  Kristen.  Thank you.
10  BY MS. HASHIM:
11      Q.  I'm going to shift gears and talk a little bit
12  about your shoulder injury and your damages.
13          Do you recall that you had testified about the
14  stress that the left shoulder injury had caused you?
15      A.  Yes.
16      Q.  I'm sorry.  Can you repeat that?
17      A.  Yes.
18      Q.  Thank you.
19          And this is important.  We need to create a
20  record.  And so the noddings are nice, but they don't
21  get recorded into the transcript.  So that's why we need
22  you to be clear with your yeses and nos and your other
23  answers.  So sorry for being persistent like that.
24          So you had testified about the stress that the
25  shoulder injury has caused.
```

Reyna Arroyo
March 1, 2023

Page 141

1      Can you go into some explanation or description,
2  rather?  Can you please describe the stress?
3      A.  Well, the stress is that it hurts.  I have very
4  limited motion to my arm which prevents me to do a lot
5  of stuff at home, lifting, cleaning, you know.  I can't
6  hardly sleep.  It swells periodically when it gets very
7  humid or very cold, like damp.
8          As far as my -- it really has affected me every
9  way possible, emotionally, financially, physically, you
10  know.  I wish -- I can't even sleep at times.  Most of
11  the time with abdominal pains, chest pains now.
12      Q.  So let me ask you this:  How could returning to
13  work in a limited-duty position with CPD resolve the
14  shoulder injury for you?
15      A.  I need to go back to work because I need to feed
16  my son.  I need to pay my bills.  It would help me
17  financially, mostly, in the fact that going back to work
18  will also give me peace of mind, like having medical
19  coverage for my son and I.  Just to get my life back
20  together.
21          I'm hoping to get surgery and get better and go
22  back limited duty once my doctor give me the approval.
23  I know I can.  But for now, I can't do nothing like
24  that.
25      Q.  Okay.  If you were to return to CPD in a

Reyna Arroyo
March 1, 2023

Page 142

1   **limited-duty position, would you be able to work?**

2       A.   Well, that is my hope.   You know, as soon as I

3   get my insurance back, I could get another surgery and

4   hopes the doctor will clear me.

5       **Q.   So is it correct to say that -- that the timeline**

6   **would be this:   The doctor would clear you for limited**

7   **duty.   And if a position became available for you, and**

8   **then you would -- because the doctor cleared you for**

9   **limited duty, then you would be able to work at CPD in a**

10  **limited-duty position; is that correct?**

11              MS. HASHIM:   Object to the form and

12  foundation.

13              THE WITNESS:   That is correct.

14              MS. HASHIM:   I'll hand it back to you,

15  Counsel.

16              MS. WOYTOWICZ:   Okay.   Just a couple of

17  quick ones.   Sorry.   We're almost done here.

18                      EXAMINATION

19  BY MS. WOYTOWICZ:

20      **Q.   Officer Arroyo, your counsel went over a few**

21  **vacant positions, I believe, if you recall, discussing**

22  **the review officer, citation officer, district desk**

23  **position, traffic court records unit, records inquiry**

24  **section, alternate response section and police documents**

25  **services section.**

Reyna Arroyo
March 1, 2023

Page 143

1          Do you remember that?

2      A.  Yes.

3      Q.  And I believe you testified that you believed you

4  were qualified to work in those assignments; is that

5  correct?

6      A.  For sure I was qualified to work at least three

7  of them, yes.  The other ones, I would be training.  I

8  would have learned and then qualify.

9      Q.  Is it your position you could have gone back to

10 those or could have been assigned to those in a

11 full-duty capacity, or would you still need the

12 limited-duty assignment to those positions?

13     A.  I would be a limited-duty assignment per my

14 doctor's release or instructions.

15     Q.  Okay.  And is that because your shoulder

16 prohibits you from being able to do full duty?

17     A.  Yes.

18     Q.  Okay.  And also your counsel went over your

19 request to stay working at CPD.

20          Do you remember that?

21     A.  Yes.

22     Q.  And just to be clear, you requested to stay

23 working at CPD as a police officer only in a

24 limited-duty capacity, correct?

25     A.  That is correct.

Reyna Arroyo
March 1, 2023

Page 144

1      Q.  And I think you guys, if you remember, you went

2   over a few people you spoke with who said they couldn't

3   do anything to keep you in a limited-duty assignment.

4           Do you remember that testimony?

5      A.  I do, yes.

6      Q.  Do you know why they couldn't do anything to keep

7   you in a limited-duty assignment?

8      A.  Just to reiterate, there was at least two or

9   three positions available within the finance section.

10  At least two with the travel section.  That would be --

11  those people, I want to say, they couldn't help me --

12  they stated, not verbatim, like I mentioned, that they

13  couldn't do anything because, more or less, there was

14  grievance still pending, and they couldn't do anything.

15  Two of them because they were civilians, and I'm a

16  police officer.  And police officer supervisor has to

17  handle my decision, so-to-speak.

18          And also the medical section was under a

19  different director.  So they couldn't help me.  It was

20  up to another -- it was up to another person to make

21  that decision, not them.

22     Q.  Okay.  And then the last thing.

23          You went over the restrictions from that October

24  2015 doctor's return to limited duty.

25          Do you remember that testimony?

Reyna Arroyo
March 1, 2023

Page 145

1    A.  Yes.

2    Q.  And in that -- if you needed to bring it up

3    again, let us know -- but it said that it was marked

4    check that you were able to perform the essentially

5    functions, including effectuating arrests?

6    A.  Yes.

7    Q.  Do you remember that?

8    A.  Yes.

9    Q.  Now I think we've already gone over this, but I

10   just want to be clear.

11        Since your shoulder injury, you've not been able

12   to effectuate arrests and those types of functions of

13   the police officer, correct?

14   A.  I haven't been exposed to any situation like

15   that, but no.

16   Q.  Okay.  So with your shoulder injury, you would

17   not be able to do those physical restricting of

18   offenders, chasing offenders, effectuating arrests?  All

19   those things that caused a bunch of injuries throughout

20   the year; is that fair?

21   A.  Well, it's kind of limited, but I wouldn't be

22   able to effect the arrests per limited restrictions,

23   yes.

24   Q.  So if your doctor returned you to duty with those

25   restrictions, is it your understanding that's not full

Reyna Arroyo
March 1, 2023

Page 146

1   **duty?**

2     A.  Correct.

3     **Q.  Okay.**

4         MS. WOYTOWICZ:  Okay.  No further questions.

5         MS. HASHIM:  I just have one -- or three

6   questions.

7                   EXAMINATION

8   BY MS. HASHIM:

9     **Q.  We are almost done, Reyna.  Bear with us.**

10       **If you were cleared to work from limited-duty**

11  **status to work full-time -- I'm sorry.  Strike that.**

12       **If you were cleared to work from limited-duty to**

13  **full-duty status, would you be opposed to working in**

14  **full-duty status capacity?**

15         MS. WOYTOWICZ:  Objection to form.

16         You can answer.

17         MS. HASHIM:  Let me repeat the question.  So

18  we'll strike the question.

19  BY MS. HASHIM:

20     **Q.  If you were workings in a limited-duty capacity**

21  **and then your doctor cleared you to work in a full-duty**

22  **capacity, would you be opposed to working in a full-duty**

23  **capacity?**

24     A.  Of course not.  I love my job.

25     **Q.  So theoretically, the limited-duty capacity could**

Reyna Arroyo
March 1, 2023

Page 147

1   be temporary until your disability is resolved, correct?

2       A.  Yes, until the doctor determines.

3       Q.  At the time that you were performing the

4   limited-duty work, were you performing the essential

5   functions of the limited-duty assignment?

6       A.  Yes.

7       Q.  You were doing those satisfactorily?

8       A.  I believe so.

9               MS. HASHIM:  Okay.  Nothing further.

10              MS. WOYTOWICZ:  Do you want to go over the

11  review and waive signature?

12              MS. HASHIM:  I'm sorry.  Yeah.

13              THE REPORTER:  I'm sorry.  Is the witness

14  going to read or waive?

15              MS. HASHIM:  We'll waive.

16              THE REPORTER:  And, Counsel, are you

17  ordering the transcript?

18              MS. WOYTOWICZ:  Yes, please.

19              (Witness excused.)

20              (The deposition  concluded at 2:10 p.m.)

21                      -   -   -

22

23

24

25

Reyna Arroyo
March 1, 2023

Page 148

```
 1                      CERTIFICATE OF OATH

 2

 3

 4          I, the undersigned authority, certify that

 5     REYNA ARROYO personally appeared before me and was duly

 6     sworn.

 7

 8          WITNESS my hand and official seal this 1st day of

 9     March, 2023

10

11

12                    _____

                      Lakesha Jackson
13                    Notary Public, Commonwealth of Virginia

14

15

16

17

18

19

20

21

22

23

24

25
```

Reyna Arroyo
March 1, 2023

Page 149

1                    C E R T I F I C A T E

2

3

4          I, Lakesha Jackson, Professional Court Reporter,

5    do hereby certify that I was authorized to and did

6    stenographically report the deposition of REYNA ARROYO;

7    that a review of the transcript was not requested; and

8    that the transcript is a true and correct record of my

9    stenographic notes.

10

11        I further certify that I am not a relative, employee,

12   attorney or counsel of any of the parties, nor am I a

13   relative or employee of any of the parties' attorney or

14   counsel connected with the action, nor am I financially

15   interested in the action.

16

17          DATED this 25th day of April, 2023

18

19

20                      _____
                         Lakesha Jackson
21                       Professional Court Reporter

22

23

24

25