# EXHIBIT 13

## Part 1 of 2

## Pages 1-87

**In The Matter Of:**

*Reyna Arroyo v.*
*City of Chicago*

---

*LaTonya Yvette Smith*
*May 11, 2023*

---

*Textnet Digital Court Reporting*
*www.textnet.com | office@textnet.com*
*Madison, WI | Chicago, IL*
*608-620-3829 | 312-868-0305*



1

1

2                 IN THE UNITED STATES DISTRICT COURT

3                FOR THE NORTHERN DISTRICT OF ILLINOIS

4                           EASTERN DIVISION

5  ------------------------------------------------------------

6  REYNA ARROYO,                          )

7                  Plaintiff,             )

8  vs.                                    ) Case No. 2021 CV 01148

9  CITY OF CHICAGO,                       )

10                 Defendant.             )

11  ------------------------------------------------------------

12          Video Deposition of LATONYA YVETTE SMITH

13  ------------------------------------------------------------

14                        May 11, 2023

15

16

17

18

19

20

21

22

23

24

25                Reporter:  Eva Walsh, CER, CDLT

2

1                   A P P E A R A N C E S

2         (All appearances via remote Zoom videoconference.)

3

4   On behalf of the Plaintiff:

5   CHRISTINA W. ABRAHAM

6   ABRAHAM LAW & CONSULTING, LLC

7   161 N Clark St.

8   Suite 1600

9   Chicago, IL 60601

10

11  JANAAN HASHIM

12  AMAL LAW GROUP, LLC

13  161 N Clark St.

14  Suite 1600

15  Chicago, IL 60601

16

17  On behalf of the Defendant:

18  MATTHEW SUHL

19  PHILLIP SANTELL

20  CITY OF CHICAGO LAW DEPARTMENT

21  2 N. LaSalle St.

22  Suite 640

23  Chicago, IL 60602

24

25

3

```
1                    I N D E X

2   WITNESS                                    PAGE

3   LATONYA YVETTE SMITH

4        Examination by Ms. Abraham            5

5

6                  E X H I B I T S

7   NO.                                        MARKED

8   Exhibit 1                                  31

9   Exhibit 2                                  37

10  Exhibit 3                                  40

11  Exhibit 4                                  47

12  Exhibit 5                                  50

13  Exhibit 6                                  62

14  Exhibit 7                                  65

15  Exhibit 8                                  68

16  Exhibit 9                                  71

17  Exhibit 10                                 75

18  Exhibit 11                                 84

19  Exhibit 12                                 88

20  Exhibit 13                                 96

21  Exhibit 14                                 103

22  Exhibit 15                                 107

23  Exhibit 16                                 116

24  Exhibit 17                                 118

25  Exhibit 18                                 122
```

4

1                    I N D E X (Continued)

2                    E X H I B I T S

3    NO.                                          MARKED

4    Exhibit 19                                   123

5    Exhibit 20                                   127

6    Exhibit 21                                   134

7    Exhibit 22                                   137

8    Exhibit 23                                   140

9    Exhibit 24                                   143

10   Exhibit 25                                   147

11   Exhibit 26                                   173

12   Exhibit 27                                   174

13                         *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

LaTonya Yvette Smith - May 11, 2023

5

1                P R O C E E D I N G S

2              (Commencing at 9:30 a.m.)

3          THE REPORTER:  Good morning.  We're on the

4    record, 9:30 a.m., May 11th, 2023.  We are here in the

5    matter of Reyna Arroyo versus City of Chicago, Case No.

6    2021-CV-1148, in the Northern District of Illinois, Eastern

7    Division.  The witness today is Ms. LaTonya Smith.

8          Ms. Smith, please raise your right hand to be

9    sworn.

10                  (Witness sworn)

11          THE REPORTER:  Thank you.

12          Will counsel state their appearances for the

13    record?

14          MS. ABRAHAM:  Good morning.  Christina Abraham

15    and Janaan Hashim for the Plaintiff, Reyna Arroyo.

16          MR. SUHL:  And Matthew Suhl and Phillip Santell

17    for the Defendant, City of Chicago.

18          THE REPORTER:  Okay.  We can proceed.  Thank you.

19          MS. ABRAHAM:  Thank you.

20                   EXAMINATION

21    BY MS. ABRAHAM:

22      Q.   Ms. Smith, can you state your full name for the

23    record?

24      A.   LaTonya Yvette Smith.

25      Q.   And are you aware that you're being deposed in

LaTonya Yvette Smith - May 11, 2023

6

1   the matter of Arroyo versus the City of Chicago, which is a
2   discrimination and retaliation lawsuit in the Federal Court
3   for the Northern District of Illinois?
4        A.   Yes.
5        Q.   Have you been in a deposition before?
6        A.   Yes.
7        Q.   How many times have you been in a deposition?
8        A.   Once.  And that was for malpractice under the
9   hospital.
10       Q.   Okay.  Was it related to the -- your work with
11  the City of Chicago?
12       A.   No.  Related to Advocate Health Care.
13       Q.   Okay.  So I -- when was that?  Was it a long time
14  ago?
15       A.   About 15 years ago.
16       Q.   Okay.  I'm going to run through some of the
17  ground rules with you today.  So during the deposition,
18  you're under oath, which means that the testimony that
19  you're providing today applies the same expectation that
20  you're going to tell the truth under the penalty of
21  perjury.  Do you understand?
22       A.   Yes.
23       Q.   Okay.  So you can't give willfully false,
24  misleading, or incomplete testimony.  Okay?
25       A.   Okay.

LaTonya Yvette Smith - May 11, 2023

7

1      Q.   Also, unlike a conventional conversation, we have

2   a court reporter here, and she's taking down everything

3   that we say, and the added complication that this is a

4   remote proceeding.

5           So for those reasons, I'd ask that even if you

6   know what I'm about to ask you, that you wait until the

7   question is finished being posed before you start to

8   respond, because it makes the court reporter's job easier,

9   not taking down multiple people talking at the same time.

10          Also, because there's a transcript that's going

11  to be written up, try not to use signals or sounds to

12  indicate an answer, but use verbal responses.  So, for

13  example, try not to say "mm-hmm" or "uh-uh" or nod or shake

14  your head "yes" or "no," but rather say "yes" or "no."

15  Does that make sense?

16     A.   Yes.

17     Q.   Because this is a remote deposition, you're

18  probably on a personal device right now that has messaging

19  capabilities and notifications of messages might come in as

20  we're speaking.

21          I just ask that while -- while you're being

22  questioned, you don't open any messages or communicate with

23  other people.  However, if you do need to take a break,

24  just let me know.

25          If you ask to take a break while there's a

LaTonya Yvette Smith - May 11, 2023

8

1    pending question, I'm just going to ask that you answer the

2    question, and then we can take the break.  Does that make

3    sense?

4         A.   Yes.

5         Q.   If you don't understand a question, please ask me

6    to repeat it or to explain it.  If you answer a question,

7    I'm going to assume that you understood the question.

8              So if you need clarification at any time, just

9    let me know.  Okay?

10        A.   Okay.

11        Q.   Sometimes when I ask a question, you might have

12   partial knowledge but not absolute, certain, or complete

13   knowledge.  For example, if I asked you about the weather

14   right now, you might not be able to tell me the exact

15   temperature in degrees, but you can tell me if it's sunny

16   outside or warm or if it's cold or rainy.

17             In that situation, an "I don't know" is not an

18   appropriate answer.  You should tell me what you know and

19   what the basis of your knowledge is.  Do you understand?

20        A.   Yes.

21        Q.   Is there any reason, like being under duress, any

22   unusual stress, any physical or mental conditions, or being

23   under the influence of any medications, that would prevent

24   or limit you today from giving complete answers to my

25   questions?

LaTonya Yvette Smith - May 11, 2023

9

1       A.    No.

2       Q.    During the proceeding, you might hear somebody

3   make an objection.  Generally, unless the objection is on

4   the basis of a privilege and you're directed not to answer,

5   you're still going to answer the question that was posed.

6           But if you hear an objection, just wait for a

7   moment to let the attorney make the objection clear for the

8   record, and then you can give the answer.  Okay?

9       A.    Okay.

10      Q.    Have you done anything to prepare for today's

11  deposition?

12      A.    No.

13      Q.    Did you meet with any attorneys prior to today?

14      A.    Yes.  Matthew and I talked yesterday.

15      Q.    Okay.  Without talking about what you guys

16  specifically discussed, how many times did you discuss

17  today's deposition with an attorney?

18      A.    Just once with Matthew.

19      Q.    Okay.  About how long was your conversation with

20  him?

21      A.    About 30 minutes.

22      Q.    Is it your understanding today that the City's

23  attorneys represent you in this deposition?

24      A.    Yes.

25      Q.    Did you review any documents in preparation for

LaTonya Yvette Smith - May 11, 2023

10

1    today?

2         A.   No.

3         Q.   And other than the attorneys, did you talk to

4    anybody else about today's deposition?

5         A.   No.

6         Q.   Did anyone from the City's of the Chicago Police

7    Department's internal affairs or another department ask you

8    questions about your knowledge regarding this matter?

9         A.   No.

10        Q.   And did you talk about today's deposition with

11   anybody else other than the people I've asked you about

12   specifically?

13        A.   No.

14        Q.   Are you currently employed?

15        A.   Yes.

16        Q.   Where are you employed?

17        A.   The Chicago Department of Public Health.

18        Q.   Is that a department that serves the entire

19   City's -- the -- serves the entire City of Chicago, or is

20   it specific to the City's police department?

21        A.   The Chicago Public Health Department services all

22   the citizens of Chicago.

23        Q.   Okay.  When did you start working in that

24   position?

25        A.   1994, until I briefly was at the police

LaTonya Yvette Smith - May 11, 2023

11

1    department from 2017 to 2020.  And --
2        Q.    Okay.
3        A.    -- from 2020 until now, I was back at the health
4    department.
5        Q.    When you were at the City of Chicago's police
6    department, what was your position?
7        A.    Occupational health nurse.
8        Q.    Okay.  Do you have any disabilities?
9        A.    No.
10       Q.    Have you ever complained to anyone at the City of
11   Chicago that you were subject to or -- discrimination or
12   harassment or retaliation?
13       A.    No.
14       Q.    When -- focusing your memory on when you were
15   occupational health nurse for the Chicago Police
16   Department.  Who did you report to at that time?
17       A.    It was Sharita Jones.  She was the supervisor
18   that was over the occupational health nurses and the
19   medical service coordinator.  Sharice Jones since has
20   retired.
21       Q.    Okay.  Do you know who she reported to?
22       A.    I cannot think of his name off the top of my head
23   right now.  It was the director of HR.
24       Q.    What -- if I said the name Robert Landowski,
25   would that --

LaTonya Yvette Smith - May 11, 2023

12

1      A.    Yes.  Yes.  Yes.

2      Q.    So it was Landowski?  Okay.

3      A.    Yeah.  Yeah.

4      Q.    Okay.  And then today in your position, do you

5  report to any of these individuals?

6      A.    No.

7      Q.    When you were occupational health nurse, what

8  were your duties?

9      A.    To case manage injured officers, whether they

10  were injured on duty or off duty.

11      Q.    Did you have to perform any medical examinations

12  of your own in that --

13      A.    No.

14      Q.    -- job?  Did you review medical documents?

15      A.    I reviewed medical documents.  Yes.

16      Q.    Did you have to evaluate claims, like IOD claims

17  or anything like that?

18      A.    No.  And yes.  And let me explain.

19      Q.    Sure.

20      A.    The -- whether it was accepted for -- the injury

21  on duty was accepted, that was the responsibility of

22  Gallagher Bassett, which is the worker comp claim.

23          Once that claim was approved, then we'll approve

24  treatment based off medical documentation.  So we didn't

25  approve the IODs that came from a different department.

13

1          As long as it was approved, we treated it

2     accordingly to the policy and procedures of the directives.

3     But if they denied it, then we followed the non-medical

4     policy and procedures that was in place for the officers.

5          Q.   Okay.  So you mentioned the -- the department's

6     name.  Can you repeat the name of the department that was

7     responsible --

8          A.   Oh, Gal- -- it was -- it was called Gallagher and

9     Bassett.  Which is the workers' comp.  And then it used to

10    be -- before Gallagher Bassett, it was -- I'm trying to go

11    through my memory.

12          Oh.  I cannot think of the previous company

13    before Gallagher Bassett.

14          Q.   That's okay.  Did -- so it -- was it a third

15    party, the company?  Like --

16          A.   Yes.  Yeah.

17          Q.   Okay.

18          A.   The third -- Gallagher Bassett's now the third

19    party.  But prior to that, it was a department within the

20    City department that approved or denied the injury on duty

21    claims.

22          It was like a in-house department.  And I can't

23    think of the department name.  So it was actual City

24    employees and contractors that would approve the IODs.

25          Q.   Do you --

LaTonya Yvette Smith - May 11, 2023

14

1      A.    But I can't remember -- I can't remember the name
2  of that department.  And --
3      Q.    Okay.
4      A.    -- then the third party came in with Gallagher
5  and Bassett.
6      Q.    Do you know around when the third party -- when
7  Gallagher and Bassett started to -- they -- they started to
8  get contracted?
9      A.    I can't remember exact time.  But I would try to
10 speculate it was 2019.  Because it was just around the time
11 I was leaving.
12          I left and transferred December of 2020.  And we
13 was going through that transition still relatively new to
14 me.  So I would try to say it was in 2019 when Gallagher
15 Bassett came on.
16     Q.    Okay.  And you said that before they came on, it
17 was City employees that would review those --
18     A.    It was --
19     Q.    -- correct?
20     A.    -- it was City employees and contractors for that
21 department.  I just don't know -- I can't remember what the
22 name of the department was.
23          It wasn't worker's compensation department.  So I
24 can't remember who.
25     Q.    Do you remember --

LaTonya Yvette Smith - May 11, 2023

15

1      A.   I can't remember what department it was.  I can't

2  --

3      Q.   Do you remember --

4      A.   -- remember if it was under -- under labor

5  department, if it was under main HR department.  I can't

6  remember.

7      Q.   Okay.  Do you remember the person that you

8  interacted with at the City that would evaluate those

9  injury claims?

10      A.   No.  Not off the top of my head.  I can't

11  remember.  It -- because there was various number of them

12  that we would talk to.  So I wouldn't remember off the top

13  of my head who was over.  There was like six or seven of

14  them.

15      Q.   Okay.  Were there any policies that you're aware

16  of that applied to officers who were injured on duty that,

17  you know, when you were doing your job, that you would have

18  to refer to?

19      A.   Yeah.  It's -- it -- it was on the website.  It

20  is a directive.  So we have to follow their collective

21  bargaining agreement language in regards to injury on duty.

22          So I would refer to the collective bargaining

23  unit.  And then the policy and procedures -- I believe at

24  the police department call them directives.

25          And so -- and they mostly mirror what was in the

LaTonya Yvette Smith - May 11, 2023

16

1   collective bargaining agreement.

2       Q.   Did you also evaluate or do anything regarding

3   medical leave claims?

4       A.   Only -- I'm not -- okay.  I want to say approved

5   them, but if they had the time, we would approve whatever

6   treatment that was recommended by the doctor.

7            But outside of my scope of practice, no.  We

8   wouldn't -- we only approve what was on record, based off

9   the policy and procedure.  If that makes sense.

10           Did that answer the question?

11      Q.   I think so.  If I -- if it -- if it doesn't, I'll

12  -- I'll ask you a follow-up, but --

13      A.   Okay.

14      Q.   -- thanks.

15      A.   Okay.

16      Q.   Okay.  And did your job have anything -- have you

17  reviewing accommodation requests by officers, reasonable

18  accommodation requests?

19      A.   Yes.  So there's a form that the doctors have to

20  fill out.  And based off of what that limited duty form,

21  how it was completed, according to the policy and

22  procedure, we return the officers back to work with those

23  accommodations based off what the doctor has documented and

24  based off their collective bargaining agreement.

25           The language.  So we follow the language.

LaTonya Yvette Smith - May 11, 2023

17

1    Because they have reasonable accommodation or limited duty

2    language in their contract.  So as long as the doctor fills

3    the forms 1 through 5, and then lists their limitations, as

4    long as they're able to shoot their gun, lift, certain

5    things like that, they can go back to work in a limited

6    capacity.

7            And once that was approved, it went up to HR.

8    And that was out of my hand.  Where they go, where they

9    went was not -- out of my control.

10   Q.    So what was your job in that process of receiving

11   -- if any officer wanted to make a request for reasonable

12   accommodations, where did you fit into that process?

13   A.    So the doctor -- I would fit in if I had --

14   reading the doctor's documentation, reading the light duty

15   form, and based off of which type of injury they had.

16           So a injury on duty -- as long as they can lift,

17   stand, walk, it's -- it's a five question -- I would have

18   to review the questionnaire.

19           But it's like five questions on the question.

20   And as long as they were able to do some of those -- as

21   long as they were able to do each one of those activities

22   with limited -- with limitations, they were able to return

23   back to work in limited duty status, which just mean they

24   didn't go out on the street or in a car.

25           The -- they would assign them a job or a

LaTonya Yvette Smith - May 11, 2023

18

1   department that fit their limited -- that fit their limited
2   duty.  Which I had no control over.
3        Q.   So --
4        A.   But --
5        Q.   Sorry.
6        A.   Mm-hmm.
7        Q.   So was your part to review the questionnaire to
8   make sure that the person met the qualifications for
9   limited duty work?
10       A.   Yes.  Based off their contract language.  So I
11  would have to review the form to give you more details.
12  But the overall view is as long as the doctor said that
13  that officer can return back to duty with limitations,
14  there was a limitation form that the doctor completed.
15            And based off the injury they had, whether it was
16  on duty or off duty, they were approved by me to return
17  back to work based off the documentations from the doctor
18  returning them back in the limited duty limitation forms.
19            And that form, along with the doctor's note,
20  would go up to HR, and then they would determine where that
21  officer went.
22       Q.   Okay.
23       A.   So once the -- the doctor's the one that release
24  him back to work, once the doctor said he can go back to
25  work, the limited duty was automatically approved as long

LaTonya Yvette Smith - May 11, 2023

19

1   as they met the qualifications to be a officer based off

2   their job description and the collective bargaining

3   agreement language.  So you --

4       Q.   To your --

5       A.   -- you had to look at both.

6       Q.   Okay.  To your knowledge, was there a difference

7   in the process for officers who were injured on duty versus

8   officers who were not injured on duty but requesting an

9   accommodation?

10      A.   Yes.  So the light duty pack -- I don't know if

11  anyone has a copy of it.  I would have to look at it.

12           Each question down the front sheet -- if they

13  were not injured on duty, all four had to be checked by the

14  doctor, which means that they were able to shoot their gun,

15  carry their weapon, they were able to walk, see, carry.

16           I forgot what all four of them were.  If all --

17  they had to be able to do all four of those in order to

18  return back to work as a non-injury on duty officer.

19  Whereas the officer that was injured on duty, number one,

20  did not have to be approved by the doctor.

21           As long as everything else was approved, they

22  were able to return back to duty in a injured duty status

23  of limited duty.  So it's limited duty non-IOD, and limited

24  duty injury on duty.

25           Or limited duty non-injury on duty.  So those are

LaTonya Yvette Smith - May 11, 2023

20

1    the two categories.  And based off that sheet, according to

2    the directives of the department, number one didn't have to

3    be checked for those who were injured on duty.

4              I can't remember what number one, two, three, and

5    four is right off the top of my head.

6         Q.   Okay.  Did you have any role in determining

7    whether an officer fell under the IOD or the non-IOD

8    category when they were requesting accommodations?

9         A.   No.  Those were approved through that department

10   that I spoke of earlier.  When a officer is injured, they

11   fill out a injury on duty report that goes to the City

12   department -- I cannot remember the name of the department.

13             But they will say that this is a injury on duty

14   or this was denied as a injury on duty.  So that decision

15   is always made outside of my scope of practice.

16             I just follow through on if it was approved or

17   not approved.  I follow the different policies in regards

18   to which one the department approved or didn't approve.

19        Q.   Would the City department be the Medical Services

20   Section, or was it a different department?

21        A.   It was a different department.  The Medical

22   Service Section is where we were working, were we treated

23   the officers.  It was another City department that

24   determined if those IODs -- if those injuries on duties

25   were approved claims or denied claims.  Which we didn't

LaTonya Yvette Smith - May 11, 2023

1    have control over.  The Medical Section didn't make that

2    decision.

3        Q.   Did the -- the whether -- if a -- if an officer's

4    case -- IOD claim was being arbitrated, did that affect how

5    you would be able to proceed with your processing of these

6    requests for accommodation?

7        A.   From my recollection, if a officer put a claim in

8    for injury on duty and it was denied, according to their

9    collective bargaining agreement, they can grieve it.  But

10   in the meantime, I treat it as a non-injury on duty.

11           So they get treatment on their own, but I manage

12   the care that they were getting through their own personal

13   doctor.  And then once the arbitration would end, if the

14   officer win, to my understanding, they would get back all

15   that time that they used to be off.

16           And then the injury became a injury that now we

17   paid for, what the -- what the City paid for and we manage,

18   is now a injury on duty versus a non-injury on duty.  But

19   during the arbitration period, if -- if it was denied, we

20   treat it as a non-injury on duty.

21       Q.   Is -- does the City have a policy or does CPD

22   have a policy on an officer changing their status from

23   being on the medical roll to being IOD?

24       A.   Yes.  So if a officer puts in a claim that they

25   were injured on duty, the initial status is injury on duty.

LaTonya Yvette Smith - May 11, 2023

22

1    Once that claim is denied, we then have to switch their

2    time from injury on duty to non-injury on duty.

3            We -- now they're starting to use their sick

4    time.  If the claim was denied.  And we would change it in

5    the office based off the documentation that we get from the

6    City stating that this injury is no longer a injury on

7    duty, it should be treated as a non-injury on duty.

8        Q.   Did you ever get cases where the person was --

9        A.   Okay.  Sorry.  Go ahead.

10       Q.   No, it's all right.  Did you ever get cases where

11   the person was on first non-IOD and then wanted to go IOD?

12       A.   That is called -- what is it?  It's -- it's not

13   reevaluation.  It's -- I'm thinking.  That happens in

14   instances where -- oh.

15           I have to look at their contract.  It's not

16   called -- reoccurrence.  It's called a reoccurrence.  So

17   it's very rare for a officer to be injured or on the

18   medical roll, complaining about pain related to their

19   original injury on duty.

20           Most of them put in a reoccurrence.  It would go

21   through the process of reoccurrence.  And if the medical

22   director determined, after evaluation by the medical

23   doctor, based off documentation from a previous injury, the

24   medical director, we'll make a determine that it's a

25   reoccurring -- I -- this -- it -- this pain or what's going

LaTonya Yvette Smith - May 11, 2023

23

1   on with the officer is related to their previous IOD, we'll

2   change them from -- we'll keep them on reoccurring IOD.

3           But if we feel that -- the doctor feel that it's

4   not related based off the documentation from the doctor,

5   we'll change it from reoccurring to non-injury on duty.

6   Sorry.

7       Q.   That's okay.  And with --

8       A.   It's very --

9       Q.   Oh, sorry --

10      A.   It's --

11      Q.   -- go ahead.

12      A.   -- very -- it's -- it -- it was very rare in my

13  instance where a officer was on the medical roll, using

14  their medical time, complaining about pain related to their

15  previous IOD.

16          Any time a officer get injured -- in my

17  appearance -- in my experience, any officer who's claim --

18  claiming about anything related to their injury, they

19  either went on reoccurring IOD or they were on IOD status.

20          I didn't handle a lot of cases where they were

21  just on the medical roll, using their time.  Because they

22  wanted to get evaluated for IOD.  Because in their

23  collective bargaining agreement, it says that they can be

24  put in reoccurring status until the determination has been

25  made.  So --

LaTonya Yvette Smith - May 11, 2023

24

1      Q.   Okay --

2      A.   -- I didn't have -- I didn't have a lot of

3  instances like that.

4      Q.   Okay.  So in that situation then, would they be

5  provisionally given the IOD recurrence status until the

6  medical director was able to evaluate, and make a decision

7  on it?

8      A.   It depends on the status that they went in.  Any

9  time a officer goes on -- on the medical roll, the

10  reporting sergeant -- I'm sorry -- the reporting sergeant

11  and lieutenant is the actual ones that put them on the

12  medical.

13          So the officer either told their supervisor that

14  it's IOD, it's reoccurring, or it's medical.  Because when

15  I would see them for the very first time, they're already

16  on the medical roll.

17          So we never make the determination which category

18  they go into.  That is decided at their district when their

19  supervisor or who -- their sergeant, lieutenant, or captain

20  is, put them on the medical roll.  So we never make that

21  decision.

22      Q.   Okay.  You'd mentioned something about the

23  medical director making the determination of whether it --

24  it was a recurrence to put them back on IOD.

25      A.   Mm-hmm.

LaTonya Yvette Smith - May 11, 2023

25

1      Q.   Do you remember in 20- -- between 2019 and 2020
2  who that medical director was?
3      A.   It was like a -- Susan Arjmand.  A-J-M-A-N-D.  I
4  believe that's how you spell it.  A-R-J-M-A-N-D, I think.
5  Susan was the first name.  I believe.
6      Q.   Did she have any role in evaluating any of the
7  other types of claims that you were -- you would be
8  receiving?  For example, any of the other types of IOD
9  claims or medical leave claims?
10      A.   It depends on -- to clarify your question.  So
11  she didn't make any determination on whether the injuries
12  were approved as IOD or not IOD.
13          When it comes to her judgment, it was based off
14  reoccurrence.  And reoccurrence are always based off the
15  collective bargaining agreement.
16          So a officer has to come in, report their
17  previous injury.  We get the medicals records together, and
18  we send them to a doctor.  And the doctor look at the
19  previous paperwork, previous scan, previous tests.  They
20  examine the officer and they write up a report.
21          That report and the previous documentation is
22  given to Dr. Arjmand.  And then based off that
23  documentation, she will let us know that this is a approved
24  reoccurrence claim.
25          So she then approve or deny people then on the

LaTonya Yvette Smith - May 11, 2023

1   medical roll for IOD, not IOD, or reoccurrence.  She made

2   the decision if the complaint that the officer's having is

3   related to the IOD.

4          And from there, we remove and change them to

5   whatever category they should be based off her evaluation.

6      Q.   Did your -- during the course of your work

7   between 2017 and 2020, did you have to oversee or help

8   coordinate officers undergoing independent medical

9   examinations?

10     A.   Yes.  And my only role was to schedule it.  And

11  my role is to get the report, and my role then was to take

12  it to Dr. Arjmand, and then she would read the report and

13  look at the previous other information and she would tell

14  us if this was final or if we should move forward with

15  treating the officer as a injury on duty or not injury on

16  duty.

17     Q.   Did you -- every officer have to undergo an

18  independent medical examination, or was that just on some

19  occasions?

20     A.   It's based off their collective bargaining

21  agreement.  It all depends on what -- is it -- are they

22  trying to return back to work from light duty, or are they

23  doing a reoccurrence claim.

24          It just depends on the case.  IMEs are done under

25  different circumstances based off their collective

LaTonya Yvette Smith - May 11, 2023

27

1   bargaining agreement.  So it depends on what's going on.

2       Q.   Okay.

3       A.   But all I do is schedule them, get -- get the

4   report and then discuss it with Dr. Arjmand.  And we'll

5   look at the overall picture of the injury or the sickness.

6       Q.   Do you -- do you recall what the procedure for --

7   and -- and just to summarize it for me, what the procedure

8   was if an officer wanted to request a reasonable

9   accommodation and go on limited duty?

10      A.   Yes.  So if a officer -- if the doctor returns

11  them to -- back to work, the officer doesn't -- the officer

12  him -- him or herself doesn't make the decision to go on

13  limited duty.

14           It is the physician who's examining them and

15  caring for them whether they're injured or not injury on

16  duty.  Hypothetically, say, also, they had a heart attack.

17  And went through extensive rehab.

18           The doctor say he can come back to work as a

19  officer but with limitations.  That doctor and that officer

20  make that determination.  It's the same with the injury on

21  duty.

22           So the doctor releases them back and let them

23  know you can go back to work in a limited duty status.  The

24  officer themselves do not -- do not have the capability of

25  coming to the office and say I want to go on limited duty.

LaTonya Yvette Smith - May 11, 2023

28

1          They have to be examined by a doctor based off a

2     illness. They just can't walk in and say I want to go on

3     limited duty because my knee hurt.  They have to be on the

4     medical, have to examined, be case managed, and follow the

5     directives of the Medical Section.

6          Q.   Do you mind if we take a short five-minute break?

7          A.   Yes.

8          Q.   Can we come back --

9          A.   Yeah, yeah, I'll go get some water.  Yeah.  What

10    time?

11          MS. ABRAHAM:  10:05?  Is that all right with

12    everyone?

13          THE WITNESS:  Yes.

14          MR. SUHL:  That works for us.

15          MS. ABRAHAM:  Okay.  Great.  Thank --

16          MR. SUHL:  Okay --

17          MS. ABRAHAM:  -- you.

18          MR. SUHL:  -- thanks.  Okay.

19               (Off the record)

20          THE REPORTER:  Back on the record, 10:06.

21          MS. ABRAHAM:  Thank you.

22    BY MS. ABRAHAM:

23          Q.   Ms. Smith, we were talking a little bit before

24    about the process of requesting a reasonable accommodation

25     for a police officer.  And you were talking about the

29

1   essential functions that -- were -- were those essential

2   functions listed on the form, the -- the form that an

3   officer's doctor would fill out?

4        A.   Yes.

5        Q.   And they had to kind of sign off on whether the

6   officer could or couldn't fulfill those essential

7   functions; is that correct?

8        A.   Correct.

9        Q.   And so if they did sign off and say that the

10  officer could perform those essential functions, then what

11  happened to the person's request at that point?

12       A.   So after we get the letter from the doctor saying

13  that they are -- because we need a -- two -- two forms.  We

14  need one that the doctor's release -- releasing them back

15  to work (indiscernible).

16            And then we need the essential -- thank you.

17  That's the name -- what's the name of -- essential

18  function.  I always call it the limited duty form.

19            But essential functions of a officer or something

20  that say it at the top.  And those questions have to be

21  signed off by the doctor, and then on the following sheet,

22  it lists the limitation.  No lifting over 10 pounds, no

23  driving at night, or whatever the doctor's limitations

24  were.  Once I receive that, I package that together, and we

25  gave it to the sergeant at the Medical Section.

LaTonya Yvette Smith - May 11, 2023

30

1          And from there, that paper went upstairs to

2    Landowski's office.  And then they assign the officer.  And

3    then we just cleared them off the medical roll.  And they

4    went to whatever assignment they were given from us there.

5          But my responsibility is to make sure that the

6    doctor is releasing them to work and make sure that the

7    doctor sign those forms.

8          Q.   Okay.  I'm going to share some exhibits you

9    today.  And the way that I'm going to do it is I first will

10   drop the document into the chat box.  That's for the

11   attorney and the court reporter mainly.

12          I'm going to share my screen with you so that you

13   can see what's on my screen.  Okay?

14          A.   Okay.

15          MS. ABRAHAM:  And I'm -- I'm going to mark this

16   as Exhibit 1.

17          (Exhibit No. 1 marked for identification)

18   BY MS. ABRAHAM:

19          Q.   Can you see my screen?

20          A.   I'm waiting -- yes, I can.

21          Q.   Okay.  Great.  I'm going to take you -- this is a

22   three-page document, so I just want to show you every page

23   here.

24          A.   Yes.

25          Q.   Okay.  Those are the three pages.  Take you up to

1  the top.  Is -- it -- do you recognize this document?

2      A.   Yes.

3      Q.   Is this the form that you were talking about that

4  a officer would fill out to request accommodations for

5  disability?

6      A.   Yes.

7      Q.   And it -- this form on this first page lists out

8  those essential functions that you were talking about

9  earlier.  Right?

10      A.   Yes.

11      Q.   Okay.  And then going over to the next two pages,

12  this next two pages sort of lays out what the doctor says

13  the restrictions should be, if any.  Right?

14      A.   Yes.

15      Q.   And then it's -- I think the -- and correct me if

16  I'm wrong.  But you were explaining that once this is

17  received by you and this is sort of -- this is checked off

18  by the doctor and you receive these restrictions, you send

19  it to Robert Landowski or his department, and they

20  determine where the officer would be placed to work for a

21  limited duty assignment; is that right?

22      A.   I receive the note from the doctor clearing them

23  back to work with restrictions and make sure this form is

24  completely filled out.  And then I gave it to the sergeant

25  at the Medical Section.  And they would take it upstairs.

LaTonya Yvette Smith - May 11, 2023

1        I wouldn't give it to Landowski office.  It was

2   the sergeant or the lieutenant or Sharice Jones, who was a

3   supervisors.  We always gave it to whomever they designated

4   the limited duty personnel in the Medical Section.

5        We would give it to them, and then they in turn

6   would take it to Landowski's office.

7        Q.   Were they people that worked in Landowski's

8   office?

9        A.   The sergeants worked inside the Medical Section.

10  At the time, we had -- oh, I cannot think of the sergeant's

11  name.  There was two sergeants.

12        And we would give the forms to them.  And they in

13  turn would send it to HR for reassignment.  We didn't send

14  anything to the HR department, to the police department.

15        That was given to the sergeants who are assigned

16  to the Medical Section.  And then they would take it

17  upstairs.  Because once we got the paperwork and we

18  released them from the medical roll in a limited duty

19  status, we were done with them.

20        Any communications of where they're going or

21  where they need to report to will come from HR.  Or --

22        Q.   Was one --

23        A.   -- if they had questions, they would talk to the

24  sergeant in the Medical Section.

25        Q.   Was one of those sergeants named Kempel

LaTonya Yvette Smith - May 11, 2023

33

1   (phonetic) by --

2       A.    Yes.

3       Q.    -- any chance?

4       A.    Sergeant Kempel and Sergeant -- it start with a

5   R.

6       Q.    It's okay.

7       A.    Yeah.  Okay.

8       Q.    Maybe we'll --

9       A.    I can't --

10      Q.    -- see it one of the documents later.  It's okay.

11      A.    Yeah.  Risley.  Risley.  Sergeant Risley.

12      Q.    Okay.  Do you remember Police Officer Reyna

13  Arroyo?

14      A.    Briefly.

15      Q.    Can you tell me what you do recall about her

16  case?

17      A.    I know she came in because she was on non -- not

18  injury on duty.  And her time was up.  Because we were

19  handling a lot of those that were running out of limited

20  duty time.

21          Because each officer gets 300 and -- 400 -- 700

22  and whatever 365 add up to.  Is that 730?  Hours of limited

23  duty.  After that, they're no longer eligible for limited

24  duty.

25          So she was in my office because she was running

LaTonya Yvette Smith - May 11, 2023

34

1   out of time and she was assigned to me.  And I remember

2   going through that process, explaining to her what was

3   going on.

4           And I know she put in a reoccurrence claim.  And

5   we went through that process.  I would have to look at my

6   notes to figure out what really happened, but I know she

7   was very distraught because she was running out of time.

8       Q.   Did she had a disability?

9       A.   Yes.  If she was on limited duty, it was.  But it

10  was -- I will have to look at documentation to say what

11  they were.

12      Q.   So when somebody -- when an officer receives

13  limited duty, it's -- is it because they're -- of -- of a

14  disability?  Are there any other reasons an officer would

15  go on limited duty that you're --

16      A.   If they --

17      Q.   -- aware of?

18      A.   -- have -- if they have any medical injuries that

19  prevent them from -- and so that's the variety of issues.

20  From stroke to breaking bones.

21           It just depends on the injury.  It can be

22  anything that puts them in a status that they can't perform

23  fully as a police officer.

24      Q.   Do you remember what specifically Reyna's

25  disability was?

LaTonya Yvette Smith - May 11, 2023

35

1      A.   Not without reading my documentation, no.

2      Q.   Did she want to stay on limited duty?

3      A.   That I don't remember.  I would have to look at

4  my notes.  I just know she was running out of time and she

5  was very distraught.  That I remember specifically -- how

6  do you say it -- specifically.  That's what I remember --

7      Q.   Okay.

8      A.   -- that she was running out of time.

9      Q.   Do you remember how her situation ended?

10      A.   No.  I -- no.  I would have to look at

11  documentation.

12      Q.   Okay.  Do you remember talking to anyone higher-

13  ups about Reyna's situation, like anyone from the Medical

14  Services Section or any of these other departments that you

15  might have to interact with when you're doing your work?

16      A.    In the process of taking care of her, I'm pretty

17  sure Dr. Arjmand and myself had a conversation.  Because

18  she came in about her injury on duty.

19           So it just wouldn't stayed in my office.  If

20  there was something going on with the case, Dr. Arjmand was

21  my point of contact to talk to.  So without looking at my

22  notes, I'm pretty sure I had a conversation with Dr.

23  Arjmand about it.

24      Q.   Okay.  Do you recall what, if anything, Dr.

25  Arjmand asked you to do regarding Reyna's case?

36

1       A.    Not without looking at my notes.  No.

2             MS. ABRAHAM:  I'm going to share with you what

3    we'll mark as Exhibit 2.  One moment.

4             (Exhibit No. 2 marked for identification)

5    BY MS. ABRAHAM:

6       Q.    Can you see my screen?

7       A.    Yes.

8       Q.    Okay.  So I'm sharing with you what's marked as

9    Arroyo.Def 1 through 45, the City of Chicago Personnel

10   Rules.  Have you ever had to refer to these in the course

11   of your work?

12      A.    No.  Mostly they are collective bargaining

13   agreement guided.  The officers treating along with the

14   directives.   That's within the police department.

15            It has a list of their policy and procedures.  So

16   if I'm not mistaken, contracts somewhat supersedes the

17   personnel rules depending on what's going on.

18      Q.    Okay.  And I just want to take your attention

19   here to paragraph 33 of this document.  Okay.  So I'm

20   seeing here -- sort of at the top of this page, something

21   that says Reasonable Accommodation Lists.

22            Are you familiar at all with this process or what

23   this section is discussing here?  It says (as read):

24                  Which contain the names of persons who have

25                  completed the City's reassignment process

37

```
 1                  without finding a new position and have

 2                  certification from the City's disability

 3                  officer that no effective accommodation

 4                  exists which would allow the employee to

 5                  perform the essential functions of his or

 6                  her current position or which would not

 7                  impose an undue hardship or cause a direct

 8                  threat to the safety of the employee or

 9                  others.

10       A.   My interpretation with this is always when this

11   was related to non-sworn employees.  Because the officers

12   have limited duty, and the limited duty goes through based

13   off their collective bargaining agreement.

14            The reasonable accommodation here in the

15   personnel rules really can't always refer to the non-sworn

16   citizens of Chicago.

17       Q.   Okay.  And where do you get that understanding

18   from?

19       A.   Just being a City employee.  Because this

20   language is not in their collective bargaining agreement.

21   Their collective bargaining agreement supersedes some of

22   the information in the personnel rules.

23       Q.   And did you come to learn that because that's how

24   other people you were working did it as well?

25       A.   No, that's just my understanding as a City
```

LaTonya Yvette Smith - May 11, 2023

38

1    employee.  Because when we were in the Medical Sections, we

2    had to follow their collective bargaining agreement, the

3    policy and procedures, and the directives that was part of

4    the policy and procedure of the police department.

5              And we started off with limited duty.  It wasn't

6    called reasonable accommodation.  It was called limited

7    duty.  For them.

8        Q.   Did you -- if you had a question about how the

9    policy should be applied in a situation that you were

10   involved in, did you talk to anybody about it?  Would you -

11   -

12       A.   I --

13       Q.   -- would ask questions of him?

14       A.   I would talk with the sergeant.

15       Q.   Okay.

16       A.   In fact, I was --

17       Q.   In the medical services?

18       A.   In the Medical Service Sections.  I would talk

19   with the sergeant or the lieutenant or Sharice.  Sharita's

20   very knowledgeable about that contract.

21             And we always follow their collective bargaining

22   agreement language in regards to the injury on duty or not

23   injury on duty.

24             MS. ABRAHAM:  Okay.  I'm going to share what

25   we'll mark as Exhibit 3.

LaTonya Yvette Smith - May 11, 2023

39

1          (Exhibit No. 3 marked for identification)
2    BY MS. ABRAHAM:
3          Q.    Can you see my screen?
4          A.    Mm-hmm.
5          Q.    Okay.  So I'm going to take you through these
6    pages just so you see everything here.  This is Arroyo.Def
7    83 through 96.
8               Are you familiar with this policy?
9          A.    Yes.
10         Q.    What is this?
11         A.    It's the reasonable accommodation policy for
12   employees to fill out if they need reasonable accommodation
13   for whatever is going on with them.  Sickness, injuries,
14   coming back -- returning back to work.  And they need to
15   have some reasonable accommodation in order for them to
16   function at their job.
17         Q.    Okay.  And does this policy here apply to police
18   officers?
19         A.    Not to my knowledge, they haven't.
20         Q.    Are you aware of anything in this policy that
21   excludes police officers?
22         A.    I don't know, unless it says it in the policy.
23         Q.    And I want to just focus your attention on the
24   second page of this document where it says "Major Life
25   activities."  It says (as read):

LaTonya Yvette Smith - May 11, 2023

40

1                    Includes, but it's not limited to eating,

2                    standing, walking, lifting, sleeping,

3                    breathing, seeing, hearing, concentrating,

4                    learning, and working.  Major life --

5      A.    Mm-hmm.

6      Q.          -- activities also include major bodily

7                    functions, including but not limited to,

8                    functions of the immune system, special

9                    sense organs and skin; normal cell growth;

10                    and digestive, genitourinary, bowel,

11                    bladder, neurological, brain, respiratory,

12                    circulatory, cardiovascular, endocrine,

13                    hemic, lymphatic, musculoskeletal, and

14                    reproductive functions.

15           Do you see that part there?

16      A.    Yes.

17      Q.    Is this consistent with your understanding of

18   what a major life activity is that get -- could be affected

19   by an officer requesting an accommodation?

20      A.    So I'm going to answer this in twofold.  I

21   understand what major life activities are.  But these

22   limitations in this form -- we never use it in regards to

23   CPD, because they have their own collective bargaining

24   language in regards to a officer's sickness on duty or off-

25   duty.

LaTonya Yvette Smith - May 11, 2023

41

1    So I understand what this form is for, but we

2  never had to refer to it or utilize it because their

3  collective bargaining agreement has -- is very detailed on

4  how to handle a officer who has been injured or is on the

5  medical roll for non-work-related injuries or sickness.

6    Q.   Did the CBA define or have its own definition of

7  what a major life activity is that may -- that was

8  different from this?

9    A.   I would have to look at the contract to see.  But

10  it's just -- because this policy has reasonable

11  accommodation forms that accompanies this policy that has

12  to be filled out by a doctor.

13    And those forms are never given to the officers

14  to take to their doctor to be filled out for reasonable

15  accommodation, because their collective bargaining

16  agreement has them filling out the essential functions of a

17  officer form.

18    So that form is equivalent to this form that

19  accompanies this policy.  So it's a different length for

20  civilians and then a sworn officer had a different length

21  for reasonable accommodation.

22    It's not even called reasonable accommodation.

23  It's called limited duty.

24    Q.   Okay.  And then just kind of taking your

25  attention to section e here at the bottom of this page.  It

LaTonya Yvette Smith - May 11, 2023

42

```
 1   says -- it talks about what a reasonable -- reasonable
 2   accommodation is.
 3           I'm not going to read the whole thing out --
 4      A.   Mm-hmm.
 5      Q.   -- loud.  You can take a moment to read it to
 6   yourself.  My question is, is this any different from what
 7   you are familiar with the language in the CBA containing
 8   about reasonable accommodation or putting an officer on
 9   limited duty?
10      A.   I would have to see their CBA to see if they had
11   the reasonable accommodation language.  I'm just always
12   familiar with -- I do know in the contract it has limited
13   duty non- -- non-injured on duty or sickness and injury on
14   duty, how to proceed for when a officer has limitations.
15           So I would have to look at the CBA to -- to
16   compare.  I can't remember offhand if the actual word
17   reasonable accommodation is in their collective bargaining
18   agreement.
19      Q.   When -- are you familiar with -- I'm -- I'm
20   sorry.  Let --
21      A.   Mm-hmm.
22      Q.   -- me go back.  I think earlier you had talked
23   about Reyna having had a limited duty assignment.  Is that
24   right?
25      A.   I believe she was limited duty non-IOD.
```

43

1      Q.   And where was she -- if you can remember, where
2  was she detailed when she was doing --
3      A.   I don't know that.  I don't know.
4      Q.   Okay.
5      A.   We're not really privy to where they're working.
6  Like once we release them back to work or once they come in
7  the Medical Section, where they're assigned or working, we
8  -- it's not relevant to us.
9           Because we're just treating their sickness and
10 managing their care.  Where they report to is not really
11 knowledge to us.  It's really not part of our treatment
12 where -- where they work or not.
13     Q.   And when an officer is on the medical roll, who
14 is their supervisor?  Who -- who's the person they're
15 supposed to report to during that time?
16     A.   So when they're on the medical roll, I am their
17 point of contact.  So it's the officer and myself managing
18 their care.  They are still -- if they have issues, they
19 report to me and the sergeant and their commanding officer,
20 which sergeant, lieutenant at their district, from my
21 recollection.
22          But when they're on the medical roll, I'm the one
23 communicating with them more than anybody.  Because they're
24 seeing me on a regular basis, they're talking to me on a
25 regular basis.

LaTonya Yvette Smith - May 11, 2023

44

1        If I have a issue with them or they have a issue
2    with me, they initially start with the sergeant or the
3    lieutenant in the Medical Service role.
4        Q.    Okay.  So -- and just so I understand you
5    correctly.  The people they would report to may be
6    yourself, may be also somebody in the Medical Services
7    Section, like a sergeant.
8        Could it -- and -- and I think I heard you say
9    this, but I just want to confirm.  Could it have also been
10   the sergeant or a director within the unit that they were
11   last detailed to?
12       A.    Yes.  So initially, I'm -- I'm only talking about
13   officers that's on the medical.  When they go on the
14   medical, they have to report to me.
15       Or whoever the medical service coordinator is or
16   the occupational health nurse.  So I'm the one that's
17   having most of the contact with them.
18       And long as they're following the policy and
19   procedures of the Medical Section, usually, unless there's
20   something pertaining to their sworn work, they might talk
21   to their unit supervisor.
22       But as regards to their care and remaining off,
23   they would talk to me.  And if I have a issue, if they're
24   not coming in, they're not going to their doctors'
25   appointments, they're not bringing documentations in, I

LaTonya Yvette Smith - May 11, 2023

45

1    then would discuss that with the sergeant or the lieutenant

2    in the Medical Section.

3          And then the sergeant or the lieutenant would

4    reach out to the commanding officer of that unit and they

5    would deal with the officer accordingly to whatever their

6    policies or directives are at that sworn level.

7          Does that make sense?  Does that -- did that

8    answer it?

9        Q.   I -- I think so.  I believe so.  So --

10       A.   But that's only if they're -- that's only if

11   they're on the medical.  If they're not on the medical, we

12   won't have any interaction with them in regards to their

13   limited duty until they either go on the medical roll or

14   until they are seeking out treatment.

15         MS. ABRAHAM:  Okay.  I'm going to share with you

16   what we'll mark as Exhibit 4.

17         THE WITNESS:  Mm-hmm.

18         (Exhibit No. 4 marked for identification)

19   BY MS. ABRAHAM:

20       Q.   And then I'll take you through these pages here.

21   So this is Arroyo.Def 1 -- 97 to 114.  Are you familiar

22   with this document that I'm sharing with you?

23       A.   Yes.

24       Q.   What is it?

25       A.   It's a family medical leave policy.

LaTonya Yvette Smith - May 11, 2023

46

1    Q.   To your knowledge, does this policy apply to
2  police officers?
3    A.   I -- it applies to everybody.  However, this --
4  the FMLA is unpaid leave.  You can use any time you have on
5  the books to pay.  But FMLA is 12 weeks of unpaid.
6  Officers --
7    Q.   Mm-hmm.
8    A.   -- get 365 days to go on the medical.  If a
9  officer wanted FMLA, they didn't even come to us.  They
10  went straight to HR and applied for FMLA, which is unpaid.
11       If they are sick, they go on the medical roll.  I
12  never dealt with officer that was on FMLA.
13    Q.   What I wanted to ask you about here in this
14  policy was -- this section on page -- where it says -- it's
15  marked 105, a return from leave.  And then under the bullet
16  point -- the number 5, Reasonable Accommodation.
17    A.   Mm-hmm.
18    Q.   It talks about an employee attempting to return
19  from FML leave -- from FMLA leave and then requesting a
20  reasonable accommodation for a disability.  Do you see that
21  part?
22    A.   Yes.
23    Q.   Did you ever have to deal with officers in this
24  situation, returning from FMLA and requesting an
25  accommodation?

LaTonya Yvette Smith - May 11, 2023

47

1     A.    Only time we had to deal with officer coming back
2   from FMLA non-paid is that they came through what is called
3   reinstatement.  And what happened before that is HR issue.
4         We would only schedule their -- it's called
5   reinstatement.  They're coming back from either military
6   leave, some type of form of absence, maybe they were on
7   disability or a non-injury or a injury on duty, and now
8   they're being reinstated.
9         And we would just get the form for them to get
10  their complete physical to make sure that they're fit for
11  duty and they get their drug testing.  I on the Medical
12  Section made no decisions about reinstating.
13        Once they get their reinstatement, that means
14  whatever work was done by HR, they got approved to return
15  back to work.  We were just following through with the
16  policy of reinstating the officer based off their
17  collective bargaining agreement directives.
18        They had to get a complete physical to make sure
19  they was fit for duty and they had to get a drug test to
20  make sure I guess they're drug-free.  And then once we sent
21  them and got the paperwork from the Concentra saying that
22  they're fit for duty and they are able to return
23  physically, that paper went up to HR.
24        And HR made the decision where they went, when
25  they brought them back.  We had -- all we're responsible is

LaTonya Yvette Smith - May 11, 2023

1  to get the physical done.  And make sure they have their

2  drug testing.

3          Where the drug testing results went to, it went

4  to HR.  From my understanding.  We were only -- we're only

5  supposed to get back that form that says that they're fit

6  for duty that was made by the Concentra.  That was our only

7  role.

8      Q.  This part about under full -- under section a

9  that says (as read):

10              The employee must request a reasonable

11              accommodation from the City's disability

12              officer.

13          Do you see that?

14      A.  Yes.  And this is whoever is the disability

15  officer in the HR department of the police department.

16  That had nothing do with the Medical Section.  That's a

17  separate entity from us.

18          MS. ABRAHAM:  Okay.  I'm going to mark this next

19  one as Exhibit 5.

20          (Exhibit No. 5 marked for identification)

21  BY MS. ABRAHAM:

22      Q.  Can you see my screen?

23      A.  Yes.

24      Q.  Okay.  So I am sharing with you what's been

25  marked as Arroyo.Def 129 to 146.  And I'll just kind of

49

1   quickly scroll through the pages here.

2        A.   Mm-hmm.

3        Q.   Are you familiar with this document?

4        A.   Yes.  This is their collective bargaining

5   agreement, if I'm not mistaken.  Yes.

6        Q.   And then I want to take your attention to page --

7   what's marked as page 133 here.  Okay?  Starting with under

8   the Americans with Disabilities Act.

9             So that kind of goes from -- at the bottom of 133

10  and into the next page.

11       A.   Mm-hmm.

12       Q.   Can you just take a moment and -- and review that

13  to yourself and just let me know when -- when you're ready?

14       A.   Okay.  Okay.

15       Q.   Okay.  Are you familiar with this section?

16       A.   The disability act.  Yes.

17       Q.   Okay.  Does this -- am I correct in -- in

18  understanding that this says that if the employer can't

19  provide a reasonable accommodation that wouldn't conflict

20  with the right of another officer under this collective

21  bargaining agreement, that the employer has to bring the

22  matter to the attention of the lodge, in other words, the

23  Fraternal Order of Police?

24       A.   Mm-hmm.  Yes.  Yes.  I'm sorry.  Yes.  Yes.  Yes.

25       Q.   Are you aware of whether that happened in Reyna's

LaTonya Yvette Smith - May 11, 2023

50

1    case?

2        A.    I don't know.  I -- all I can remember without

3    reading my documentation from the CLEAR document is that

4    she was running out of time.

5            And because of that, she needed to file a

6    grievance.  After that, it's out of my -- out of our hand

7    at the Medical Section.  It's like once she's run out of

8    time, she's run out of time.

9            Anything after that, she has to talk to the --

10   she has to go to her collective bargaining agreement so it

11   means she files a grieve -- files a grievance that she is

12   running out of time and she doesn't think it's fair,

13   whatever the reason may be.

14       Q.    How did you get the understanding that she would

15   have to file a grievance?  Is that from the collective

16   bargaining agreement or did somebody explain that to you?

17       A.    That's based off the collective bargaining

18   agreement and there was a explanation that the sergeant

19   gave her.  So just like it -- where it says here that (as

20   read):

21               In the event the employer shall be required

22               to make reasonable accommodation under the

23               disability act, incumbent officer that may

24               be in conflict with the rights of a officer

25               under this agreement, the employer shall

LaTonya Yvette Smith - May 11, 2023

51

```
 1                    bring this matter to the attention of the
 2                    fraternal police or the lodge.  In the event
 3                    the parties cannot reach agreement such
 4                    accommodation, provision Article 9 shall be
 5                    available and the arbitration shall consider
 6                    employer's lodge if existed under this
 7                    agreement.
 8           And that's from my understanding that they will
 9    file a grievance.  If she --
10           Q.    Okay.
11           A.    -- disagrees with it.  If she disagrees that she
12    should not be receiving any more work hours.  It has to go
13    on a mandated medical leave.
14                  If she disagrees with it, that's what she contact
15    the union for and she files a grievance.
16           Q.    So here it says the employer, so that's the
17    police department, brings this matter to the attention of
18    the lodge.  That's the FOP?  Is that correct?
19           A.    Yes.
20           Q.    Okay.  Were you aware of whether this -- the
21    police department addressed this issue with the FOP in
22    Reyna's case?
23           A.    No.  I have no knowledge.  And it wouldn't --
24    that's out of the scope of what I would do.  My only scope
25    was that if she has exhausted her 730 days, she has no more
```

LaTonya Yvette Smith - May 11, 2023

52

1   time to be limited duty not IOD.

2          So she will have to be placed on mandatory

3   medical.  Because she can no longer function as a limited

4   duty not IOD past the 730 days.  Once we put them on the

5   medical roll, she dealt with FOP and with the sergeant, and

6   they did whatever they needed to do.

7          And then she would just be on medical with me

8   providing whatever documentation I needed in regards to her

9   injury.  The reason why she couldn't be returned to back

10  for duty.

11     Q.   Where is it established that the officer would

12  only get 730 days on IOD limited duty?

13     A.   It -- I think it's in their contract.

14     Q.   In the collective bargaining agreement I showed?

15     A.   Mm-hmm.  Mm-hmm.  In the collective bargaining

16  agreement, and I think it's part of their directives.  So I

17  probably have to look at the table of content.

18     Q.   Get there.  Oh, I don't have a table of content

19  in this document.

20     A.   It should -- at the -- like at the -- go down.

21  Oh, so it -- wherever the -- so medical grievance.  If you

22  go back up to the medical grievance.

23     Q.   Here?

24     A.   Yes.  So it's says (as read):

25          Grievances concerning medical issues shall

LaTonya Yvette Smith - May 11, 2023

53

1          follow the procedures below.  Medical issues

2          are defined as grievances involving medical

3          issues, including but not limited to

4          nonpayment of IOD bills, removal of a

5          officer from duty for medical reason,

6          refusal to return a officer to duty for --

7          on the medical roll, classification of

8          injuries such as non-IOD and benefits.

9       That's where I get she had to file a grievance if

10   she disagreed.

11     Q.    Mm-hmm.

12     A.    And -- and then if we can go down.

13     Q.    Do you want me to go to the next page?

14     A.    Yeah.  Go down some more.  Because they have a

15   whole section on the medical procedures.  Okay.  Stop here.

16          (As read):

17          An officer absent from work on account of

18          injury on duty for a period of time not to

19          exceed 12 months shall receive each IOD full

20          pay and benefit for pay of absence, provided

21          such is certified by the Medical Service

22          Section.  Such a certification shall not be

23          unreasonably withheld.

24          An officer who has exhausted said 12 pay IOD

25          leave shall be given the option to

LaTonya Yvette Smith - May 11, 2023

54

```
1              voluntarily go on non-paid medical leave of
2              instance of disability pension, provided the
3              officer exhausted all of that.
4         And then for non-IOD (as read):
5              A officer absent from work on a amount of
6              non-IOD injury for any periods of time not
7              exceeding 12 months in a 24 consecutive
8              month period, shall receive full pay and
9              benefit for the periods of absence, provided
10             the injury or illness is certified by the
11             Medical Service Section.  Such certification
12             shall not be unreasonably withheld.
13             An officer's limited duty IOD --
14        It should be a limited duty non-IOD.  If we can
15   go down some more.  Okay.  Reoccurring --
16        Q.   Keep going.  I see a limited duty IOD but not a
17   limited duty non-IOD.
18        A.   Okay.
19        Q.   I can keep -- let's keep scrolling.
20        A.   Okay.  Injuries on duty reoccurring.  Okay.
21   Medical statements.  Okay.  Keep going.  A little bit more
22   down.  That's bereavement.
23             Okay.  Bereavement.  Keep going.  Keep going.
24   Keep going some more.  Keep going some more.  Some more.
25   Some more.  Okay.  Can you go back up to the medical --
```

55

1    back where it says IOD and not IOD?

2              Okay.  Let's see.  Oh here.  Here.  I'm sorry.

3    This is it.  (As read):

4                    An officer absent from work on -- on account

5                    of not IOD injury or illness for any period

6                    for a time not to exceed 12 months in a 24

7                    consecutive month period, shall receive full

8                    pay and benefits for the period of absence,

9                    provide such injury or illness is certified

10                   by the Medical Section.  Such certification

11                   shall not be unreasonably withheld.

12             And it should be a directive that gives more

13   detail about Section 18.2.

14        Q.   So I read -- and correct me if -- but I read

15   Sections 18.1 and 18.2 to be about officers who are out of

16   work.  Right?  They're not working?

17        A.   That's the reason why I believe there is a

18   directive related to 18.2.  Because they had it in writing

19   that limited duty non-IOD was only for 730 days, which was

20   two years.

21             A limited officer can be off and they go onto

22   disability and so can a officer who's on non-injury can

23   also apply for disability, provided that they meet whatever

24   the recommendations at the pension office is.  But non-IOD

25   -- I don't know what their language says for non-IOD.

56

1      Q.   So it's not that -- that part isn't actually in

2    the collective bargaining agreement, though, right, the

3    time limitation for officers who are on limited duty non-

4    IOD.

5      A.   So I don't know.  Go back up to the top, 20 --

6    that's page 26.  So where it's pages 21 through 25.

7      Q.   This is kind of how it was produced to us.

8      A.   Okay.

9      Q.   Okay.  I --

10     A.   Okay, 20 -- what's after -- what -- what's the

11   page after 26?

12     Q.   The page after 26 is 27.

13     A.   27.  Okay.  Okay.  All right.

14     Q.   Well, let me ask you this way.  This section,

15   18.3 here at the bottom of page 26 of this document.  It

16   says (as read):

17                    Officers injured in the line of duty, who

18                    are certified by Medical Services Section as

19                    being able to perform limited duty

20                    assignments, shall be given limited duty

21                    assignments until they can perform regular

22                    duty assignments, or until they're

23                    mandatorily retired, whichever occurs first.

24             Do you see that?

25     A.   Mm-hmm.

LaTonya Yvette Smith - May 11, 2023

57

1      Q.    So under the collective bargaining agreement, am
2   I correct in my understanding that if a person's on limited
3   duty as a result of a injury on duty, that they can be on a
4   limited duty assignment indefinitely; is --
5      A.    Mm-hmm.
6      Q.    -- that right?
7      A.    As long as the doctor keeps them on limited duty.
8   Each year -- excuse.  I'm sorry.  Each year, a officer has
9   to go back to their provider to be reexamined.
10         And based off the doctor's examination, they will
11   let us know if this officer can return back for duty in the
12   capacity as a Chicago police officer or if this officer
13   needs to remain on limited duty status for another year.
14   It's renewed every year.  So it's not --
15      Q.    Okay.
16      A.    -- like they're go on limited duty and then they
17   stay.  They are constantly evaluated by a medical provider
18   to tell us if, yes, they can.  And based off the
19   documentation that we get back from the doctor and based
20   off Dr. Arjmand evaluation of the medical records, if the
21   officer stays on limited duty, if there's a question in
22   regards to if that officer being limited duty.
23         But they are constantly evaluated through that
24   process.
25      Q.    Okay.  And then as far as what we've seen

58

1    together so far, there isn't a section that explicitly

2    relates to limited duty for non-IOD officers in this

3    document.  Is that fair to say?

4         A.   Not in this document.  But it's in a -- it must

5    be in a directive about limited duty non-IOD.

6         Q.   Okay.

7         A.   Because the officer -- it says right here a

8    course --

9         Q.   Okay.

10        A.   --  of 24 months.

11        Q.   Sorry.  Let me go --

12        A.   If you --

13        Q.   -- share the screen again.  I took it off too

14   soon.  Go ahead.  Sorry.

15        A.   All right.  Because here it says the officer

16   who's absent from work on account of a non-IOD injury or

17   illness for any periods not to exceed 12 hours in a 24-

18   month period shall receive full pay and benefit for periods

19   of absence, provided the injury is certified by the Medical

20   Section.

21             So I believe there's a directive that addresses

22   officers who are on non-IOD injury.  So it might not be in

23   the collective bargaining agreement but in a directive of

24   the police department policy and procedures.

25             Because we wouldn't randomly just say you were --

LaTonya Yvette Smith - May 11, 2023

59

1   you had a stroke and you've been on limited duty for two

2   years, now you have to come off.  It's a directive within

3   the police department that gives them the 24 months.

4          Q.   Okay.  Based on your experience, what -- in the

5   situation -- the hypothetical you just gave out, where

6   let's say an officer had a stroke and was on, you know,

7   non-IOD limited duty for two years.

8              What happens when that two years expires and

9   let's say they still require restrictions?

10         A.   Then they have to get a note from their doctor,

11  saying that they cannot go back full duty, and they have to

12  be placed on mandatory medical roll.  They can no longer

13  function as a non-injury on duty limited duty officer past

14  730 days.

15             Whatever 365 add up to.  Was it 3- -- was it --

16  is it 730?

17         Q.   I trust your math.  I'm not going to -- okay.  So

18  after that, they -- they are not given a full duty

19  assignment.  Is that correct?

20         A.   Correct.  From my -- from what we -- when I was

21  there, we would have to put them on mandatory medical

22  leave.  They could no longer back to their assignment.

23             And that decision was made by the sergeants and

24  the lieutenants.  We just followed through on the policy.

25  We did not put them on medical.  Like we didn't go onto the

LaTonya Yvette Smith - May 11, 2023

60

1   computer and -- and say you can no longer work.

2          That directive came from one of the sergeants.

3   And then they would put them on -- their district or one of

4   the office -- one of the commanding officers in the Medical

5   Section will put them on the medical roll.

6          MS. ABRAHAM:  Okay.  I'm going to share what

7   we'll mark as Exhibit 6.

8          (Exhibit No. 6 marked for identification)

9   BY MS. ABRAHAM:

10       Q.   Can you see my screen?

11       A.   Okay.  There we go.

12       Q.   Do you see it?

13       A.   Uh-huh.

14       Q.   Okay.  I'm going to just show you these three

15   pages here.  And for the record, this is Arroyo.Def 168 to

16   170.  Okay.  I'm taking you to the top.  Do you recognize

17   this document?

18       A.   Yes.

19       Q.   What is it?

20       A.   It's the reasonable accommodation policy.

21       Q.   And is this the policy that applies to the police

22   department and used by the police department?

23       A.   Okay.  Yes.

24       Q.   Does -- is this the policy that -- that may have

25   contained that language about the limit -- the time limit

LaTonya Yvette Smith - May 11, 2023

61

1    for officers going on limited duty who are non-IOD?

2        A.   This looks like it mirrors the reasonable

3    accommodation City of Chicago policy.  But.  Yeah.  But the

4    reasonable -- because right here it says that availability

5    of the Chicago reasonable accommodation requirement forms

6    were at -- you received the liaison.

7            So we wouldn't be the disability liaison for them

8    to get the reasonable accommodation forms from us.  Because

9    we don't do the reasonable accommodation forms.  We only do

10   the essential functions of a officer form, which -- it

11   doesn't mention that form in this policy.

12       Q.   So does this policy indicate that the City's

13   reasonable accommodation policy that I'd shown you earlier

14   applies to police officers?

15       A.   It seem like it applies to the Chicago Police

16   Department employees but not sworn officer.  It doesn't say

17   it in here.  But when you read through the policy, the form

18   that accommodates this policy is the reasonable -- it's the

19   same reasonable accommodation forms that matches the

20   reasonable accommodation policy that you show earlier.

21           And officers who's on non-IOD would not complete

22   these reasonable accommodation forms for us to be assigned

23   as a limited duty officer.  This must be something that

24   happens after they go on the medical roll after they have

25   their exhausted their non-limited duty IOD.

LaTonya Yvette Smith - May 11, 2023

62

1        Because I have never had to give a officer

2  reasonable accommodation form from this policy to take to

3  their doctor in order to work limited duty non-IOD.

4      Q.   When you say you've never had to, does that mean

5  nobody ever directed you to do that?

6      A.   They never directed me to do it, because they

7  obviously follow the collective bargaining agreement and

8  the directives in regards to limited duty non-IOD.  So it

9  must be another policy.  Because this doesn't even mention

10  a officer who is out on non-IOD for injury or illness.

11         MS. ABRAHAM:  Okay.  I'm going to mark this next

12  one as Exhibit 7, and it's a bit of a long document, but I

13  just want --

14         THE WITNESS:  Mm-hmm.

15         MS. ABRAHAM:  -- to see if you recognize.  I'm

16  not going to go through --

17         THE WITNESS:  Mm-hmm.

18         MS. ABRAHAM:  -- the whole document with you.

19         (Exhibit No. 7 marked for identification)

20  BY MS. ABRAHAM:

21      Q.   Can you see my screen?

22      A.   Yes.

23      Q.   I'm sharing with you what's been marked as

24  Arroyo.Def 400 to 514.  And I'll represent that these are

25  CLEAR progress notes that were produced to us.

LaTonya Yvette Smith - May 11, 2023

63

1       A.    Mm-hmm.

2       Q.    See these pages I'm scrolling through here?

3       A.    Yes.  Yes.  I'm familiar with those.

4       Q.    Okay.  I'm just going to, for the sake of, you

5    know, efficiency, just really quickly go through these

6    pages here so you can at least see that -- all the pages

7    that I'm sharing with you as this exhibit.

8       A.    Mm-hmm.

9       Q.    Okay.  So taking you back to the top.  You do

10   recognize this.  Correct?

11      A.    Yes.

12      Q.    So what is this document?  What is it for?

13      A.    This is where we document our interactions with

14   the officers.

15      Q.    Every time --

16      A.    In the --

17      Q.    -- you talk with an officer, you put it in a note

18   in this system?

19      A.    Yes.

20      Q.    And is it just you that does that, or does

21   anybody that works on this officer's case file have to also

22   input these notes in the system?

23      A.    I can only speak for myself.  Any time I have

24   interaction with a officer, whether it's phone call or in

25   person, I will document it into CLEAR.

64

1    I can't speak to other individuals.  Because they
2  may not document the conversation.  I don't know what their
3  -- what they do.  Every time I had a conversation or
4  directed the officer to do something, I would document it
5  in CLEAR.
6        Q.   Okay.  So, for example -- and on the second page
7  of this document, at the bottom here, I see a note, and
8  it's entered by LaTonya Smith.  That's you.  Right?
9        A.   Yes.
10        Q.   And then down here, it would say (as read):
11             Member in MSS with clinic note dated for the
12             2nd August 2019.
13        Right?  You see --
14        A.   Yes.
15        Q.   -- that?  And --
16        A.   Yes.
17        Q.   -- you put that in there; is that correct?
18        A.   Yes.
19        Q.   And then it says (as read):
20             Member is s/p L.  Shoulder --
21        A.   Status post.  I'm --
22        Q.   Sorry?
23        A.   I'm sorry.
24        Q.   It's okay.  It's -- I'm just reading the note.
25  It says (as read):

65

1              Shoulder surgery due to tear -- tear of
2              rotator cuff by Dr. Ho.
3         You see that?
4    A.    Yes.
5    Q.    Okay.  So you entered this note; is that correct?
6    A.    Yes.
7    Q.    And what does "s/p L" mean?
8    A.    Status post.  So she status post left surgery.
9  So this is her -- she's here after having surgery.  It's
10 what -- status post.
11   Q.    Okay.
12   A.    It's what nursing language is.
13   Q.    Okay.  Is it expected that case managers or
14 people working on the case will collect documentation
15 related to the case as they communicate with a member?
16   A.    Yes.
17   Q.    And is that done just by you, the -- the document
18 gathering, or are some of the other folks that we see here
19 entering notes also responsible for that?
20   A.    Yes.  So if they come in with documentation, the
21 procedure is to collect it, copy it, and put it in the
22 officer's file.
23        MS. ABRAHAM:  Okay.  I'm going to mark this next
24 one Exhibit 8.  And for the record, this is Arroyo.Def 515
25 to 516.

LaTonya Yvette Smith - May 11, 2023

66

1          (Exhibit No. 8 marked for identification)
2   BY MS. ABRAHAM:
3        Q.   Can you see my screen?
4        A.   Yes.
5        Q.   These are more CLEAR records, and it's just two
6   pages, thankfully, here.
7        A.   Yes.
8        Q.   Do you recognize this document?
9        A.   Yes.
10       Q.   And did you enter some notes in here dated March
11  6th, 2020?
12       A.   Yes.
13       Q.   Okay.  Do you recall -- as you're reviewing this
14  record as it pertains to Reyna, does it help you remember
15  any of the specifics about what happened during her case?
16       A.   No.  I just know what I have here.  I completed
17  the PAR form because she was not reporting to HR to
18  complete the PAR form herself.  So RN informed that the PAR
19  form was completed on her behalf.
20            And I put why she was -- why she was currently on
21  medical, which was she had a left shoulder surgery due to a
22  tear of the rotator cuff, and which surgeon did it.
23       Q.   Did Ms. -- did Officer Arroyo claim that this
24  shoulder injury -- the -- this rotator cuff issue that she
25  was having was work-related?

67

1      A.   I would have to look at the notes.  I can't
2  remember at the --
3      Q.   Okay.
4      A.   -- time.  I know she was on non-IOD.  So if it
5  was caused to the left shoulder, whether it was related or
6  not.  I would have to look at the notes.
7      Q.   Okay.  And can you tell us what the PAR form is
8  and what P-A-R stands for, if you know?
9      A.   I -- I can't remember what it stands for off the
10  top of my head.  But it's a form that has to be given to HR
11  from the Medical Session -- Section, stating that she no
12  longer has any paid time.
13          So we can't keep her on the medical roll because
14  she has no time on the books to continue to get paid.  And
15  officers usually come in and have that filled out, and it
16  goes to HR.
17          But she was -- according to this, I guess she was
18  not coming in.  So I had to look at the rest of everybody's
19  notes to see what was actually going on, the full picture.
20      Q.   So the officers need to complete this form if
21  they've run out of time to be on the medical roll; is that
22  correct?
23      A.   Right.
24      Q.   And then it goes to HR.  Correct?
25      A.   Correct.  So if you look at the dates, it seems

LaTonya Yvette Smith - May 11, 2023

68

1    like I entered that on March 2020 when -- and so I -- I'm
2    trying to read it.  Wait.
3            So I entered on March 20 and then I charted it
4    again on March 29th, and then the lieutenant charted and
5    then Elizabeth charted.  So I would look to see all of
6    what's going on with that.
7            But according to just this, the PAR form has to
8    be completed so that HR knows to no longer -- that the pay
9    -- that the officer is no longer on the medical roll.
10   Q.   What do they do with that information when they
11   know that the officer -- they receive this form, they see
12   the officer is no longer on the medical but is, you know --
13   requires restrictions to work --
14   A.   The only thing -- the only -- only thing here is
15   the PAR form -- is that the Medical Section is saying that
16   this officer has exhausted all paid time.  We fill the form
17   out and it goes to HR.  What happens after that, I don't
18   know.
19   Q.   Okay.
20   A.   I don't know what the policy and the procedures
21   are at that point.  We just can't keep people on the
22   medical who no longer has time in their bank to be on the
23   medical.  Whether it's IOD or non-IOD.
24           MS. ABRAHAM:  Okay.  All right.  I'm going to
25   share what we'll mark as Exhibit 9.

LaTonya Yvette Smith - May 11, 2023

69

1              (Exhibit No. 9 marked for identification)

2    BY MS. ABRAHAM:

3         Q.    Can you see my screen?

4         A.    Yes.

5         Q.    I'll take you through these four pages here.

6         A.    Okay.

7         Q.    Okay.  Do you recognize these emails?

8         A.    Am I included on the emails?

9         Q.    I see you there as copied on it.

10        A.    Okay.  I mean, I can read it.  I don't --

11        Q.    Sure.

12        A.    Okay.  The 20th.  (As read):

13                   Please schedule an appointment with

14                   Supervisor Jones no later than -- in regards

15                   to your chosen outlined in the limited duty

16                   notification letter B mailed to you.

17             Okay.

18        Q.    Okay.  I'm just going to -- I think that a lot of

19   these are the same email but just sent at different times,

20   but you can take a look at it just --

21        A.    So I was -- I was cc'd on them, so I wasn't

22   sending them.  Officer Bishop was.  I was just cc'd on

23   them.

24        Q.    That's what I'm seeing here.  I don't know if you

25   remember anything differently, but I see it's from Marilyn

LaTonya Yvette Smith - May 11, 2023

70

1    Bishop to Ms. Arroyo and it's got you copied on here with a
2    few other people.  I think Sharita --
3        A.    Right.
4        Q.    -- Jones was who you had mentioned was your
5    supervisor before?
6        A.    Yes.
7        Q.    And then Susan Arjmand, who was the --
8        A.    Medical --
9        Q.    Yes.  The medical person --
10       A.    Mm-hmm.
11       Q.    -- right?
12       A.    Yeah.  Yes.
13       Q.    Okay.  And I think this is actually the same
14   email that I just showed you because the timestamp is the
15   same.
16       A.    Mm-hmm.
17       Q.    And then another one at 12:05 but on --
18       A.    Mm-hmm.
19       Q.    -- the same date.
20       A.    Yes.  Yes.
21       Q.    Okay.  So first question is, who's Marilyn
22   Bishop, if you know?
23       A.    She is the officer in the Medical Section.  So
24   I'm assuming she put disability liaison.  That's who she's
25   acting as, I guess.

LaTonya Yvette Smith - May 11, 2023

71

1      Q.   And what is it -- to your understanding, what's
2  the disability liaison in the Medical Services Section
3  supposed to do?
4      A.   I don't know.  She's a officer and she would
5  inform us when the officer is running out of time, whether
6  it's IOD or non-IOD.  Now, whether she was designated
7  disability liaison, that I don't remember.
8          She was the officer that monitored the officers'
9  time for injury on duty, not injury on duty, and they would
10  give us a list of whoever was running out of time to get
11  them back into the office to make sure that they get their
12  paperwork in on whether they're going to stay on limited
13  duty, whether they have to go on mandatory medical.
14     Q.   Okay.  So I am correct in understanding that this
15  email dated January 29, 2019 is letting Reyna know that her
16  non-limited IOD status would expire on March 30th, 2019?
17     A.   Yes.  Based off what's typed there, yes.
18     Q.   Okay.  And then it requests that she schedule an
19  appointment with Supervisor Jones.  That's your supervisor;
20  is that correct?
21     A.   Yes.
22     Q.   And what was she to do in this appointment with
23  Supervisor Jones?
24     A.   According to the email, it's choose her options,
25  what is laid out in the limited duty notification letter B.

LaTonya Yvette Smith - May 11, 2023

72

1   See, it -- it's a letter -- it would be nice to see what

2   that letter duty notification is.

3              So based off of that letter, that's what her and

4   Supervisor Jones would meet about.

5        Q.   Okay.  Do you recall having any conversations

6   with either Supervisor Jones or Dr. Arjmand or Marilyn

7   Bishop about Reyna's expiring status?

8        A.   Not without looking at my notes.  No.

9              MS. ABRAHAM:  Okay.  And we're going to mark this

10  next one as Exhibit 10.  Excuse me.

11             (Exhibit No. 10 marked for identification)

12  BY MS. ABRAHAM:

13       Q.   Can you see my screen?

14       A.   Yes.

15       Q.   Okay.  So for the record, this is Arroyo.Def 3191

16  to 3195.  And I'll just take you through these five pages

17  here.  Do you recognize these emails?

18       A.   I -- yes.  Not like -- unless I can read through

19  them.  Because my name was added to it.  But I don't

20  remember.

21       Q.   Do you want to --

22       A.   But I can --

23       Q.   -- take a moment to just kind of read through

24  them and see if it helps you remember?

25       A.   Okay.  If you can go back to the top.  Is it in

LaTonya Yvette Smith - May 11, 2023

73

1    order from again -- okay.

2        Q.    Just starting from where it says on Friday, March

3    20th, and then below that.

4        A.    Okay.  And she -- it's from her to me.  (As

5    read):

6                    Will do.  Thank you.  Be safe.

7              So I don't know what was before that, but okay.

8    And then (as read):

9                    Good morning, You can call PO Bishop and ask

10                   her.  I can't send the forms by email.

11             So I don't know what was before that.

12       Q.    I think it -- the way I read it, it goes in

13   reverse chronological order, so her more recent email is on

14   top where she's saying (as read):

15                   Will do.  Thank you.  Be safe.

16       A.    So she responding to you can call --

17       Q.    I am --

18       A.    -- PO Bishop.  So she responding to my email?

19       Q.    That's how I'm seeing it, because I see your

20   email --

21       A.    Okay.  What -- what -- what -- can you start from

22   the bottom and then we'll work our way up --

23       Q.    Sure --

24       A.    -- if that's the --

25       Q.    -- yeah, yeah.

LaTonya Yvette Smith - May 11, 2023

74

```
 1        A.    -- way it is?

 2        Q.    Sure.  Let's do --

 3        A.    Okay.  So she emailed me.  Okay.  So she emailed.

 4   (as read):

 5                    Good morning.  Hope things are well.  Per

 6                    our conversation held on, did you get a

 7                    chance to turn in disability on my behalf?

 8                    If so, what's the process?  Time?  Has it --

 9                    has it been approved?

10        And then please -- thank you.  And then my reply

11   was (as read):

12                    Good evening.  I only did the PAR form.  You

13                    must come and sign for your chart to be copy

14                    and delivered to the pension board.

15        So she -- so I'm assuming, just from these two

16   emails -- my assumption is that she was applying for

17   disability.  And the disability can only be completed once

18   the PAR form is completed, which means the Medical Section

19   is telling HR that this person no longer has any available

20   time on the books to continue to be on payroll.

21        The PAR form was completed, but in order for her

22   disability paperwork to go, she has to come in and sign for

23   the chart to be copied to be sent over to the pension board

24   -- pension board.

25                    That's just from -- those -- these are just the
```

LaTonya Yvette Smith - May 11, 2023

75

1    procedures.

2              So if we can go up some more?

3        Q.    Sure.

4        A.    She said (as read):

5                   Thank you.  Can I come in tomorrow, or do I

6                   need to make a appointment?  Please let me

7                   know.

8              And then I -- I said (as read):

9                   Good morning.  Come in MSS any time between

10                  8 and 11 and 3 -- and 1 and 3.

11             Okay.  And she asked me -- if you go up some --

12   okay.  (As read):

13                  Good morning.  Any possible way you can scan

14                  required chart paperwork for the release to

15                  the pension board and sent to me for

16                  signature.

17                  I have a child at home and no sitter.  Plus,

18                  I'm congested/asthma sufferer, and blah,

19                  blah, blah.

20             Okay.  And then I respond to her (as read):

21                  You can call Officer Bishop and ask her.  I

22                  can't send the forms via email.

23             And then she said (as read):

24                  Will do.  Be safe.

25             And what's after that?  Okay.  (As read):

LaTonya Yvette Smith - May 11, 2023

76

1          Good morning, Officer Bishop.  Being that I
2          have not received any news from
3          FOP/arbitration regarding my -- I am being
4          forced to apply for disability.
5          Though, being that I am a cancer survivor
6          and asthma, I am scared to go outside.  Any
7          possible way you can email paperwork.  If
8          not, please let me know what steps to take.
9          I need money in order to sustain my.
10      And then what did Bishop -- what did Officer
11   Bishop reply?
12      Q.   I see that as here.
13      A.   (As read):
14          The Medical Section documents are required
15          for application for leave of -- disability
16          have -- have been mailed to.
17      Okay.  So she must've sent the documentation.
18      And then (as read):
19          Good morning, Ms. Smith.  Hope all is well.
20          Per our phone conversation --
21      Q.   I think this just kind of goes through what you
22   already through below.
23      A.   Yeah.  Okay, I'm sorry.  Can you stop?  (As
24   read):
25          Good morning.  Hope is well.  Per our

LaTonya Yvette Smith - May 11, 2023

77

1          conversation, did you get a chance to turn

2          in -- turn in disability on my behalf?  If

3          so, what's the process?

4          Good evening.  I only did the PAR form.  You

5          must come in and sign the chart to be copied

6          and delivered to the pension board.

7     So what date -- (as read):

8          Thank you.  I can come in tomorrow, or do I

9          need to make appointment?  Please let me

10         know.

11    So can we go back down to Officer Bishop's?

12    Q.   Mm-hmm.

13    A.   (As read):

14         Medical Section document require for

15         application for leave of absence have been

16         emailed to.

17    What date is that?

18    Q.   I see it as March 20th.

19    A.   And -- and then -- all right.  So does she cc

20    her?  So the -- okay.  I'm sorry.  You can go back to that

21    email?

22    Q.   This one?

23    A.   The -- the Officer -- yes.  That one.  So Officer

24    Bishop emailed Arroyo on the 20th, saying that the Medical

25    Section documentation required for application has been

LaTonya Yvette Smith - May 11, 2023

1  mailed to have been emailed to her.  So that's on the --
2  that's the application.
3          So that's on the 20th.  Okay.  Go up.  So those
4  are March 12th, March 12th, March 12th.  Okay.
5      Q.   Okay.
6      A.   Okay.  So I communicated with her.  On the 18th,
7  she emailed me, asking me for signatures because she was
8  congested, and then I told her on March 20th at 7:19 that
9  she can call Officer Bishop, and that was -- so she called
10 Officer Bishop, and from there, they were talking about her
11 application.
12     Q.   Okay.  So my first question.  The PAR form here
13 that you had filled out for Ms. Arroyo.  Was that so that
14 she can go on disability, correct?  Am I understanding that
15 correctly?
16     A.   No.  The PAR form is notification to HR that she
17 is no longer eligible.  She no longer has time to be on the
18 medical service roll for continuous payment.
19          She has exhausted all her time in her bank.  And
20 she has no more time.  So this is letting HR know that she
21 is no longer on the medical because she exhausted all her
22 time.  That's my part.
23          There's another part -- I would have to look at
24 the form.  It's the part that Bishop was supposed to fill
25 out.  And I know the PAR form is something that has to be

LaTonya Yvette Smith - May 11, 2023

79

1  filled out to let HR know that she is no longer on the
2  medical.
3      Q.   What does the pension board have to do with this
4  process?  Because I saw that the pension board was brought
5  up.  Can you explain that part a little bit, if you
6  remember?
7      A.   Just to -- just to my knowledge, is that if a
8  officer wants to continue to get disability, whether it's
9  IOD, not IOD, the pension board needs a copy of the chart
10 in order to evaluate the officer.
11          That's as much to the extent that I know.  What
12 happens at the pension board, I don't know.  I just know
13 copies of the chart has to be sent over to the pension
14 board.  And what they do with them, I don't know.
15     Q.   Did you have any conversations with PO Bishop
16 about the PAR form of about Renya's request to stay on
17 limited duty?
18     A.   All I can know is what's here, is that Officer
19 Bishop notified me that she was out of time.  A PAR form
20 needed to be completed.
21          And that's my part.  So I completed the PAR form.
22 That PAR form was given to Sharice Jones or either the
23 sergeant or the lieutenant, and then from there, they take
24 it over.
25          My job is only to make sure that the officer is

LaTonya Yvette Smith - May 11, 2023

80

1   off the medical roll based off the information I get from

2   Bishop.  In regards to what she does, I have no part of

3   that.

4          My part is only to do the PAR form and remove

5   them from the medical roll based off what Officer Bishop or

6   Sharice Jones has said.  It's a -- it's a printout that

7   says how much time each officer has exhausted.

8          And she -- okay, this officer has exhausted this,

9   this.  They need to be removed and a PAR form needs to be

10  done.  That's to my extent.

11         I know that the officer's chart has to be copied

12  to go to the pension board.  But what the pension board

13  does with the chart or whether -- why is it required, I

14  don't know.

15     Q.   Did PO Bishop or Dr. Arjmand ever explain to you

16  what was going to happen next with Ms. Arroyo, with Officer

17  Arroyo?

18     A.   I don't remember.

19     Q.   We're going to mark this next one as Exhibit 11.

20     A.   I have to blow my nose, so I'm going to put y'all

21  on mute.

22         MS. ABRAHAM:  You know, I have to charge my

23  laptop.  Do you guys mind taking another -- like we can do

24  a two-minute break, come back at 11:20?  01:41:28

25         THE WITNESS:  Sure.

LaTonya Yvette Smith - May 11, 2023

81

1          MR. SUHL:  That's fine by us.

2          MS. ABRAHAM:  Thank you.

3          THE REPORTER:  11:19.

4                    (Off the record)

5          THE REPORTER:  Back on the record, 11:23.

6          MS. ABRAHAM:  Thank you.

7          Okay.  So I'm going to share with you another

8    document.  We'll mark this as Exhibit 11.

9          (Exhibit No. 11 marked for identification)

10   BY MS. ABRAHAM:

11        Q.   Can you see my screen?

12        A.   Yes.

13        Q.   And for the record, this is Arroyo.Def 3307.  Do

14   you want to take a moment to review the email?

15        A.   Yes.  Yes.  I'm reading it now.  Okay.  So she's

16   asking for -- she's asking Sergeant Kempel about her

17   permanent limited duty status and all of that.  Okay.

18        Q.   Do you remember this email?

19        A.   Not offhand, no.  But I understand what it's

20   saying.  She's asking for her file and she wants to know

21   her status of her limited duty status.

22        Q.   Do you remember talking to anybody around this

23   time, and it's March 30, 2019, about Reyna's status?

24        A.   I can't remember any conversation.  But based off

25   this email, if the -- if she -- what I remember about her

LaTonya Yvette Smith - May 11, 2023

82

1    is that she was very distraught that she was coming off the

2    medical roll for limited duty non-IOD.

3            So of course I would talk with one of the

4    sergeants, have her talk with one of the sergeants about

5    what's going on.  Because anything -- I couldn't -- there's

6    nothing I could do.  Because in my scope of my job is to

7    put her on medical roll, follow -- somebody put her on

8    medical roll.  And then followed the policy and procedures

9    on -- when they're on medical.

10           So if she's having an issue with her limited duty

11   status, it appears here that she talked to Dr. -- I don't

12   know who Dr. Rashid is.  Maybe she meant Dr. Arjmand.

13           And she talked to Dr. Kempel updates and then she

14   could've asked me that -- no, she wanted a copy of her

15   file, and I probably told her it was a fee.  I don't know

16   what the fee was.  I know they charge for officers to get a

17   complete copy of their medical file.  There was a fee.

18   What that fee is, I don't know.  So maybe that's the reason

19   why she was emailing her.

20       Q.   Was it your understanding from this email that

21   Ms. -- that Officer Arroyo wanted to continue on in a

22   permanent light duty position?

23       A.   Yes.  Yeah.  She was in my office.  She was

24   distraught that she had to come off.  So I'm assuming she

25   wanted to go through whatever the steps were to continue to

LaTonya Yvette Smith - May 11, 2023

83

1   be on payroll.

2          Because she had a life to live and they was

3   putting her on medical roll, which means she was losing her

4   income.  So anything when it comes to the collective

5   bargaining contract and the directives that outside of what

6   I do, we always refer them to the sergeant or the

7   lieutenant in the office.

8          Which was Sharice Jones.  I don't -- I -- I don't

9   know if Sharice was off.  Because at one point, Sharice had

10  got sick.  And we didn't have a supervisor, and Kemper and

11  Risley were our immediate supervisors.

12     Q.   And what, to your knowledge, is Sergeant Kemper's

13  role in being able to determine or response to Officer

14  Arroyo's request here?

15     A.   I don't know.  We have to ask Sergeant Kemper.

16  They -- all I know from my recollection, the policies are

17  clear.  If you are a non-IOD, you only get the two years to

18  be on limited duty status.

19          After that, you have to go on mandatory medical.

20  And either the sergeant in your unit or a sergeant in the

21  Medical Section or a lieutenant, caption, or commanding

22  officer will put that person in a medical status.

23          And then they will have that discussion with

24  those commanding officers.  So no one makes the

25  determination whether she'd be permanent limited duty in

LaTonya Yvette Smith - May 11, 2023

84

1    the Medical Section as the case manager.

2            All those decision is made higher up.  So she --

3    I guess she was -- according to this email, she was -- she

4    had talked to Sergeant Kemper and Dr. Arjmand about

5    remaining on permanent limited duty status.  So I wouldn't

6    know what that conversation was or what advice they gave to

7    her.

8        Q.    Okay.

9        A.    Did -- did Sergeant Kemper reply?

10       Q.    Well, we'll see.  But my question is, do you

11   remember if Sergeant Kemper and Officer Bishop worked in

12   the same department?

13       A.    Yes.  They both worked in Medical Section.

14       Q.    Okay.

15       A.    We're all in the office together in --

16       Q.    Okay.

17       A.    -- the same location.

18            MS. ABRAHAM:  Okay.  I'm going to put -- mark

19   this as Exhibit 12.

20            (Exhibit No. 12 marked for identification)

21   BY MS. ABRAHAM:

22       Q.    Can you see my screen?

23       A.    Yes.

24       Q.    I'll just take you through these two pages here.

25   This is Arroyo.Def 3329 to 3330.  Okay.  So starting with

LaTonya Yvette Smith - May 11, 2023

85

1    the -- I believe the second page here is the more -- well,

2    let's start from the top here.

3              November 12th, 2019, Reyna emails, asking to

4    change her status from medical to recurrence injury on duty

5    status.  Do you see that?

6        A.   Yes.  But what timestamp is on the bottom email?

7    Because this is at 2:24.

8        Q.   The bottom email, like on the next page here?

9        A.   The bottom one here.  From her to me.  Is that

10   the same --

11       Q.   I believe --

12       A.   -- time and date?

13       Q.   -- so.  Right.  I think she sends it to you

14   November 12th at 2:24 p.m.

15       A.   Okay.  All right.  So okay.  Good -- okay.  Go

16   ahead.  Is that -- is that 2 -- is the 2:24 the same as the

17   email at the bottom?

18       Q.   Yeah, the --

19       A.   Is it --

20       Q.   From what I can see, yes.

21       A.   Okay.  I just want to make sure I'm reading in --

22   in the order that it was -- okay.  All right.  Okay.  We

23   can start.  Okay.

24              (As read):

25                   I will like to change my status from medical

LaTonya Yvette Smith - May 11, 2023

86

1                    status to reoccurring injury on duty status
2                    due -- due that I have pain and swelling of
3                    both legs and -- specially with the left leg
4                    and ankle.
5                    I have experienced the pain the past on and
6                    off some time but now worse.  The following
7                    is a itemized list of the following approved
8                    injury on duty incident pertaining to leg
9                    ankle.  Please advise how do you want --
10                   want me to proceed or do I need contact this
11                   to be changed.
12          So 2018.  Left leg.  2005.  2009.  Leg swollen.
13   Pending IOD grievance of right ankle.  Pending IOD.  Okay.
14   (As read):
15                   I cannot make it to the medical office
16                   tomorrow due to I have a blood test and
17                   appointment with my physician.  I will go on
18                   Thursday morning.
19          Okay.  And then what did I -- I don't remember
20   it, but I'm -- I'm --
21       Q.   We just have --
22       A.   I was --
23       Q.   -- you on the second page here, your response,
24   and then we can --
25       A.   Okay.

LaTonya Yvette Smith - May 11, 2023

87

1      Q.    -- talk about it.

2      A.    Okay.  (As read):

3                  Good morning, Reyna.  Your status cannot be

4                  changed to recurrent IOD you -- until you

5                  have cleared from the medical roll for your

6                  current illness.  You have to report in

7                  person to claim a reoccurrence.

8      Okay.  So I -- I need to know why she was on the

9  medical.  So she must be on the medical roll for something

10  else.  So policy is if I am on the medical for --

11  hypothetically, say I was on the medical for a cold.

12          And -- for bronchitis.  So I was taking

13  medications and things of that nature.  And while I was off

14  in treatment for my upper respiratory illness, my ankle

15  start bothering me from a previous IOD.

16          I cannot treat that IOD until you -- until your

17  doctor have cleared you to return back to duty from your

18  upper respiratory issue.  Once your respiratory issue is

19  cleared, then you can go back on the medical for a

20  reoccurring IOD.

21          But I cannot treat your work-related injury while

22  you're on -- on medical for a non-IOD issue.  We can't

23  treat, which was weird to me -- I cannot treat two

24  different IODs at the same time.  You have to utilize your

25  time for that injury.