# EXHIBIT 13
# Part 2 of 2
# Pages 88-175

LaTonya Yvette Smith - May 11, 2023

88

1      Q.    Mm-hmm.  At that point, was Reyna on the medical

2   roll -- and I'm just looking at the dates here.  It says

3   November 2019.

4          Was she on the medical roll because she had run

5   out of those limited duty days back in March of that year?

6   I think we were looking at those emails.  We can go back to

7   if you need to.

8      A.    I would need to look at her CLEAR records to see

9   the day she started medical and what it was.  Was it IOD,

10  was it non-IOD, was it sickness, was it injury.

11         I would have to look at her CLEAR note to know

12  what I meant by that email.

13     Q.    Okay.  So just looking off of this one email here

14  that Reyna sent to you, do you understand it to mean that

15  she was trying to say that these repeated IOD injuries to

16  her ankle caused the recurrence of the -- her injury now

17  and she -- that's why she wanted to go on IOD recurrence?

18     A.    According to her email, she wants to do a

19  reoccurent -- a reoccurring claim for previous injuries.

20  And the procedure is, for example, she injured her left

21  leg.

22         We need to look at that injury, send her to a

23  doctor, and see if the current pain that she is exhibiting

24  now is related to her injury of her left leg in 2018.

25     Q.    During this time where you've evaluating or the

89

1  City -- the police department's evaluating this claim and

2  whether it can be classified as a recurrence of injury, was

3  she given any kind of provisional IOD status?

4      A.   I can't answer that without looking at the CLEAR

5  notes.  Just based off this email, she's complaining that

6  she has swelling in both legs and ankles and she wants to

7  file a reoccurrence based off her previous injuries.

8           That's all I read from this email and that's all

9  I take from this email.

10     Q.   Okay.  And then -- and -- and then your response

11  to her was that she can't change it until she's cleared

12  from the medical roll.  Correct?

13     A.   For her current illness that she's -- so it

14  appears that, from this email, she's currently on the

15  medical roll for illness.  And I can't treat her

16  reoccurring IOD until she comes in to request a

17  reoccurrence.

18          Because she needs to tell me which injury is she

19  applying her pain to.  So she can't come in and say both my

20  legs are swollen and I want to open a reoccurrence to

21  HD82507, HL498.  She can't open a reoccurrence for three or

22  four IODs at one time.  She has to pick an injury that she

23  believed is related to her current symptoms.

24          So I can't treat her in the IOD December 30th,

25  2005 and August 5 -- August 2009.  I can't treat her for

LaTonya Yvette Smith - May 11, 2023

1    both of those at the same time.  So she has to tell me both

2    my legs are swollen.

3            And she only injured her left leg.  She has to

4    tell me which leg she wants to claim.  Because her right

5    leg, which is December 19th, and her left leg was 18 --

6    December 2018.  I cannot -- according to the directives, I

7    can't treat both of them at the same time.  So she has to

8    come in for --

9        Q.    Why not?

10       A.    -- reoccurring --

11       Q.    Because --

12       A.    That's just -- those are the directives that we

13   would get from Sharita Jones.  And there was probably some

14   directives that you can't treat the IODs at the same time.

15       Q.    Okay.  Did you ever --

16       A.    So she has -- so just from this email, when I

17   responded to her that she has to come in person to claim a

18   reoccurrence, when she comes in, she needs to tell me which

19   injury, which IOD, is she saying my -- both of my ankles,

20   both my legs and ankles are swollen because I injured on

21   this date.  And because of that injury, I am experiencing

22   this now.

23       Q.    Okay.  And your understanding was the policy

24   wouldn't allow an officer to make that claim on two

25   separate injuries; is that correct?

LaTonya Yvette Smith - May 11, 2023

1    A.   She can make the claim, but when it comes to

2  treating, it's in one of the directives that says you can't

3  treat two IODs at the same time.  That is the directive I

4  would get from Supervisor Jones and from the sergeants at

5  the time.

6    Q.   Did you ever see a written directive that she --

7  that said this, or was it just verbally communicated to you

8  by Supervisor Jones?

9    A.   It was very -- given to me, but I'm using the

10  person that looks for the policy.  So I probably did try to

11  find it.  But I will follow the directives of the

12  supervisor.

13         So there should be something in related to that.

14  Because then that would be a violation of their collective

15  bargaining agreement if it's not true.

16    Q.   Okay.  Do you remember talking not anyone else

17  about Reyna's request for this recurrence of IOD --

18    A.   I wouldn't have -- any recurrence IOD, we would

19  have to talk to Dr. Arjmand about.  So I know the procedure

20  is to talk to Dr. Arjmand, so I would've gathered -- and I

21  would have to look at the notes to see if she even make a

22  reoccurrence.

23         She has to -- excuse.  I'm sorry.  She would have

24  to make the reoccurrence.  I gather the information form

25  that injury and give it to Dr. Arjmand.

LaTonya Yvette Smith - May 11, 2023

92

1          Dr. Arjmand approves the -- for her to go to the
2   doctor, and then we wait for the doctor to give us a
3   written note saying that based off his examination and
4   looking at the documentation from this previous injury, I
5   believe that this, what's happening to this officer, is
6   related to this injury based off of this, this, this, and
7   this.

8          And then Dr. Arjmand would review that, and then
9   she would make the decision to either accept or deny the
10  reoccurrence.

11     Q.   Okay.  Do you remember what Dr. Arjmand may have
12  conveyed about Reyna's request for this recurrence of
13  injury?

14     A.   Not -- I don't -- I don't remember.  So I would
15  have to look at my documentations, and it would be in the
16  CLEAR note.

17          MS. ABRAHAM:  Okay.  I'm going to mark this next
18  one as Exhibit 13.

19          (Exhibit No. 13 marked for identification)
20  BY MS. ABRAHAM:

21     Q.   Can you see my screen?

22     A.   Yes.

23     Q.   And so for the record, this 3336 to 3337.  Those
24  are these two pages here.  Do you recognize this email?

25     A.   Yes.

LaTonya Yvette Smith - May 11, 2023

93

1       Q.    What is it?

2       A.    Okay.  So that's a memo.  So let me read the

3   email.  It says (as read):

4                   Good morning.  Please see below attached.

5                   And when was the last time we have spoken

6                   with this member?

7                   According to payroll, her time ran out in

8                   November.  She should have applied for leave

9                   of absence.  We do not have anything in HR

10                  with her applying.  Thanks.  Bob.

11      So he sent that to me.  And can I look at the

12  memo?

13      Q.    Yes.

14      A.    Okay.  (As read):

15                  Attention.  Hereby requesting that her

16                  appropriate to meet with HR regarding leave

17                  -- claim to be proposed until further

18                  notice.

19                  Said request is due to -- is currently

20                  experiencing much pain to her body due to

21                  weather, especially pain on her left

22                  shoulder and swollen leg.  Once R/O is

23                  feeling better, will report to the medical

24                  section.

25                  Okay.  So what was my reply?

94

1    Q.   So I first wanted to ask you this.  Did you -- do

2  you remember receiving a memo from Ms. -- from Officer

3  Arroyo about rescheduling this appointment to meet with HR

4  regarding her leave of absence or disability claim?

5    A.   No.  I don't remember this, but it's clearly

6  stated, so.

7    Q.   And then Landowski -- do you remember having any

8  kind of communications with Robert Landowski about Ms.

9  Arroyo?

10   A.   Not off the top of -- no.  Not off the top of my

11  head.  So I would have to look at -- see what I replied

12  back.

13   Q.   Okay.

14   A.   But I don't remember.

15   Q.   And -- and just going back to this.  I'm sorry.

16  I think I closed out a little too soon.

17   A.   Mm-hmm.

18   Q.   Here, this talk of her going on leave of -- of

19  absence or disability.  Is it correct to -- am I correct in

20  understanding that both of these options are for her to be

21  out of work, to not be working on a limited duty position?

22   A.   This is a memo that she is sending to us,

23  requesting that her leave of absence be postponed until

24  further notice.  This is just asking don't take me off

25  medical roll, I need it to be postponed.

LaTonya Yvette Smith - May 11, 2023

95

1          So she sent that to who?  Like, can you go back

2    down?

3        Q.    Yes.

4        A.    So she must've sent -- who did she send this to?

5    Because --

6        Q.    I see --

7        A.    -- this is a memo -- this -- this is just a memo

8    of her writing to --

9        Q.    I see here --

10       A.    -- the --

11       Q.    -- in the TO section, to Christi Ford and then

12   cc'd to you.

13       A.    Right.  See --

14       Q.    Does that --

15       A.    -- so she sent it to Lieutenant Ford so -- she

16   must've sent it to Lieutenant Ford.  So when she sent that,

17   did she email that to who?

18          She emailed it only to Landowski and Lieutenant

19   Ford, because this -- so she --

20       Q.    I'm --

21       A.    -- sent it -- so she --

22       Q.    So I --

23       A.    -- sent this --

24       Q.    -- this --

25       A.    Oh, okay, so --

LaTonya Yvette Smith - May 11, 2023

96

1     Q.    Sorry.

2     A.    -- she sent -- yeah.  So she sent it to

3  Lieutenant Ford and she cc'd Landowski and myself on it.

4  And Landowski in turn replied to Russell and then all the

5  people in the Medical Section plus the HR person, which is

6  that -- Jackson was the labor person.

7          Asking, you know, have we talked to her.  What

8  happened.  Like, when was the last time she spoke.  Because

9  she ran out of time in November.

10    Q.    Okay.  So this email that she had sent was in

11  November, correct --

12    A.    Mm-hmm.

13    Q.    -- Reyna?

14    A.    Yes.

15    Q.    And it's a memo here that's talking about -- and

16  she's postponing this -- this meeting --

17    A.    She's --

18    Q.    -- regarding --

19    A.    -- request- --

20    Q.    -- going on leave of absence or disability.  Is

21  that right?

22    A.    She's requesting a appointment to discuss it.

23  With Lieutenant Ford.

24    Q.    She's saying that -- she's requesting her

25  appointment be postponed until further notice.  Correct?

LaTonya Yvette Smith - May 11, 2023

97

1   That's how I'm reading this first sentence.

2        A.    Right.   That she -- that -- that her appointment

3   to meet with HR regarding leave of absence claim to be

4   postponed until further notice because she is currently

5   experiencing illness and under the weather.

6             She's sending that to Lieutenant Ford, asking if

7   her appointment with HR can be postponed.

8        Q.    Okay.   And is it -- am I correct in my

9   understanding that this conversation about her going on a

10  leave of absence or disability -- it's regarding her being

11  taken off of work.

12            It's not -- she's -- this conversation about her

13  leave of absence or disability claim does not include a

14  review of whether she can be placed in a limited duty

15  assignment.   Is -- is that correct in my understanding?

16       A.    I -- I don't -- I don't know.   All I know is

17  based off what I'm reading, it appears she has appointment

18  with HR to do her paperwork so that she can be placed on

19  leave of absence, and she's requesting that meeting be

20  postponed because she's not feeling good.

21            So it appears she has a appointment.   She wants

22  to reschedule that appointment.   So she drew up a memo from

23  her to the lieutenant, asking if that appointment can be

24  rescheduled.

25       Q.    Okay.

LaTonya Yvette Smith - May 11, 2023

98

1      A.    That's how I'm reading it.

2      Q.    And then Landowski -- and this is a -- about a

3  month later, December 24th, says she should've applied for

4  leave of absence.  Correct?

5      A.    In there, he wants to know did we speak to the

6  officer and did she apply for leave of absence.  And

7  according to him, HR doesn't have her applying for it.  So

8  he wants to know what's going on.

9      Q.    Do you remember having any conversations around

10 this time with Ms. -- with Officer Arroyo or any of the

11 individuals copied on this email about Arroyo's request?

12     A.    No.

13     Q.    Do you recall having any conversations with any

14 of these individuals in these -- these higher-ups about her

15 getting placed on a limited duty assignment around this

16 time?

17     A.    No.  I wouldn't talk to them about limited duty

18 assignments.  That's out of the scope of what I -- my job

19 description and duties.

20     Q.    Okay.  But it was clear to you at around this

21 time that that's what Reyna wanted.  Correct?

22     A.    Just based off the documentation, she wanted her

23 disability to be postponed.  That was it.  She was trying

24 to figure out what -- it appears to me, just off the

25 documentation we went through so far, she was trying to

LaTonya Yvette Smith - May 11, 2023

99

1    figure out who she needed to talk to so that she can be

2    permanent limited duty status.

3        Q.    Okay.

4        A.    And what was her options.

5              MS. ABRAHAM:   I'm going to mark this next one as

6    Exhibit 14.   I'm going to have to redrop it in this chat

7    box.

8              (Exhibit No. 14 marked for identification)

9    BY MS. ABRAHAM:

10       Q.    See this screen here?

11       A.    Yes.

12       Q.    Okay.  So this is a one-page document.  And I'm -

13   - I'll just direct your attention to the top.  You can read

14   the whole page.

15             But I see this is your response to Mr.

16   Landowski's email from Exhibit 13.  Do you --

17       A.    Yeah --

18       Q.    -- so that?

19       A.    -- so -- yeah.  So I said (as read):

20                   Happy holidays.  You, her last day on

21                   medical was 17/19, and she was informed by

22                   Bishop and myself that she needed to

23                   complete a PAR form.  I don't know why she

24                   has not at this point.

25       Q.    So did you talk to her about the PAR form around

LaTonya Yvette Smith - May 11, 2023

1  this time?

2      A.   And it appears that -- it says that I'm -- that

3  she was informed by Bishop and myself that she needed to

4  complete the PAR form because she has ran out of time.  I

5  remember her in my office, letting her know that her time

6  as non-IOD has exhausted, and I remember her being very

7  distraught and upset.

8          That I remember.  But far as the extent of the

9  conversation word for word, I don't know.  I just know what

10 I probably charted when she came in.

11         So whatever I documented at those face to face

12 visits or phone calls, I will have documented in CLEAR.

13     Q.   Okay.

14     A.   Because once they're -- and let me explain this.

15 Once they're off the medical roll, I no longer have any

16 conversations with them.  I don't monitor them.

17         They're not bringing me in anything if they're

18 off the medical roll.  Because at that point, they're no

19 longer part of the Medical Section anymore, that would be

20 case manager, unless it's an injury on duty.

21         So if a -- if a officer is on injury on duty and

22 they exhausted their one year and now they have to apply

23 for leave of absence because they have no more IOD time, at

24 that point, they would be going through her process,

25 applying for leave of absence, fill out the PAR form,

LaTonya Yvette Smith - May 11, 2023

1   papers, charts, then sent to the pension board.

2          In the meantime, I would still be providing and

3   approving treatment for that officer because they have to

4   continue to -- to be treated for their injury on duty.  Any

5   officer that have exhausted their non-IOD time -- it's --

6   it's a HR issue.

7          They're communicating with H- -- with HR about

8   returning.  They're not having any discussions with us.

9   That's when I -- if we go back to a hour ago, that's when

10  the reinstatement comes.

11         So when HR reinstate them from a non-injury on

12  duty-related leave, that's when we would get the paperwork

13  to reinstate them.  And all the reinstatement requirements,

14  everything that they needs to do would be done at the HR

15  level.

16      Q.   Are you familiar with the folks at HR that handle

17  that part of the job, who were they and -- around 2019?

18      A.   No.

19      Q.   Was it any of the individuals that are here on

20  this email, like Robert --

21      A.   I --

22      Q.   -- Landowski or Clifford Russell or --

23      A.   Clifford --

24      Q.   -- Christi --

25      A.   -- Russell -- so Landowski was the director.

102

1    Russell is the sergeant that worked in the Medical Section

2    with myself.  Lieutenant Ford is the lieutenant of the

3    Medical Section which works downstairs with me at the time.

4            And Ms. Jackson, if I'm not mistaken, was the

5    labor relation attorney, I believe.  She was in HR.  If

6    she's not the labor attorney, they I don't know what her

7    title is.  But.

8            Those are their positions.  But I wouldn't have

9    had any like lengthy conversation about her reinstatement

10   or her process.  Because at this point, I'm no longer case

11   managing her.

12      Q.   Do you remember if any of these or anyone else,

13   any other higher-ups, asked you to do any more work on --

14   on Reyna's case after -- around this time when her non-IOD

15   limited duty days had expired and she was requested to

16   submit this PAR form?

17      A.   I just know from the emails that she had in

18   March, she was emailing about her disability application,

19   and that's when I referred her to Bishop.  And we completed

20   the PAR form to let HR know she was off the payroll.

21           So all I do is fill the PAR form out and give it

22   to Officer Bishop.  And Sharice Jones and the sergeants

23   handle it from that point.

24           MS. ABRAHAM:  Okay.  We're going to mark this

25   next one as Exhibit 15.

LaTonya Yvette Smith - May 11, 2023

103

```
 1              (Exhibit No. 15 marked for identification)
 2   BY MS. ABRAHAM:
 3        Q.    Can you see my screen?
 4        A.    Mm-hmm.
 5        Q.    So this is Arroyo.Def 3532.
 6        A.    Okay.
 7        Q.    Do you recognize this email?
 8        A.    So I am emailing Melissa and Reyna and I'm cc'ing
 9   Jones and Dr. Arjmand.  (As read):
10                    Good afternoon.  Limited duty of non-IO
11                    expired on 0- -- April 2009 (sic).  I'm
12                    would need to update limited duty form
13                    complete and returned to me before only if
14                    you and FOP clear up your time in regards to
15                    how many days you have left on limited duty
16                    non-IOD.  The time you have --
17            Okay.  Did she email first?  I emailed her.
18   Okay.  Who emailed who?  Because I'm not even understanding
19   --
20        Q.    The way that I'm reading it, Melissa Zollmer
21   emailed Reyna --
22        A.    You know, okay, that's -- okay.  Okay.  (As
23   read):
24                    Good afternoon, Officer Arroyo.  I'm
25                    emailing you in regards to your non-limited
```

LaTonya Yvette Smith - May 11, 2023

104

```
 1                duty status that is set to expire.  Please
 2                contact your case manager extension no later
 3                than this.
 4          And then I must -- I emailed Melissa.  Okay.  (As
 5     read):
 6                Good afternoon.  Your email -- okay.  So I
 7                would need an updated limited duty form
 8                complete and returned to me before only if
 9                you and FOP cleared up your time in regards
10                to how many days you have left on non-IOD.
11                The time you have to continue -- the time
12                you have to continue on limited non-IOD is a
13                separate issue, which is non-IOD limited
14                duty status is projected to expire on March
15                30th.  If you have any questions, please
16                give me a call.
17          So Melissa must have gotten a list, the way I
18     read it here, where things were going back then.  Melissa
19     got a list of officers who IOD was expiring and they need
20     to come in to update their limited duty, which is April
21     2019.
22          So she needed to come in to see me to get the
23     papers to take back to the doctor who are to be completed.
24     With her, I must've had a conversation that she feels that
25     the -- what they're calculating is incorrect.
```

LaTonya Yvette Smith - May 11, 2023

105

1    Q.    You said they --

2    A.    So she --

3    Q.    -- who -- who are you -- who are you talking --

4    A.    After -- okay.  I'm sorry.  So if -- if -- and

5    then what I have in parentheses (as read):

6                    Only if you and FOP cleared up your time in

7                    regards to how many days you have left on

8                    limited non-IOD.

9    So it's expected -- her limited duty is expected

10   to retire -- expected to be returned on April 1 of 2019.

11   If there is some difference in the time, then that -- the

12   date that the IO- -- the non-IOD would expire may change

13   based off her conversation with FOP if they, through a

14   grievance process, has -- if we go back to her -- I would

15   need to know -- at the time when I typed this, I probably

16   looked to see her limited duty non-IOD.

17           I need to know what date that injury was.

18   Because the date for it to expire would have started on

19   that date.  So a year ago, hypothetically, she was released

20   back to work 01 April 2018.

21           Because you have to renew your limited duty non-

22   IOD based off your doctor's recommendation.  So if he say

23   you need to be limited duty for six months, we'll only do

24   your six months.

25           If the doctor say you need to be on limited duty

1  for one year, we would extend the limited duty for one full

2  year.  And one year, you need to come back in and update it

3  or bring us a note to return you back to fully duty.

4        So in this email, it appears that there was a

5  discrepancy on when her limited duty non-IOD expired.  So

6  that's the reason why I -- my assumption based off what I

7  wrote, that only if FOP cleared up your time in regards to

8  how many days you left.

9        So that means that there was a conversation

10 between her and I, and I will have to look at the CLEAR

11 notes, that she believed that her limited duty non-IOD

12 should not expire on April of 2019.

13     Q.   And does your language here about clearing up the

14 time indicate that maybe she had less days than she thought

15 that she did?

16     A.   I don't know if she had less days or more days.

17 That's why I said that it's expected to.  She needed to

18 complete and return to me before her limited duty expires

19 on 01 of April.

20        And if she think this date is wrong, she needs to

21 come in and see me to get the forms to be filled out and we

22 need to talk about if her and the fraternal of police gave

23 her back days or took away days.  Like I don't know how

24 many days she should have left.

25        Bless you.

LaTonya Yvette Smith - May 11, 2023

107

1     Q.    Excuse me.  Do you know if this issue was related

2   to any grievances that Officer Arroyo had filed?

3     A.    I don't know.  Not from this email.

4     Q.    And then I'm seeing here that there's some

5   language about her limited duty non-IOD days being a

6   separate issue from where her limited duty non-IOD status

7   was projected to expire.  Do you see that?

8     A.    Yeah.  It says (as read):

9              The time you have to continue on limited

10             duty non-IOD is a separate issue, which is

11             non-IOD limited status, is projected to

12             expire on 30 March '19.

13       So I'm assuming when she received this email from

14   Melissa -- it's just my assumption.  I can't confirm or

15   not.  It appears from what I wrote, her and I had a

16   conversation and then I emailed her.

17          Or if there's a email in between Melissa and what

18   I responded to.  So Melissa sent this email to her and cc'd

19   me on -- did she reply back to Melissa with a question to

20   me is the reason why I responded.

21          Because overall, the way Melissa -- Officer

22   Melissa wrote this email, I would have not responded that

23   way.  So there's a email in between January 28th and

24   February from Arroyo to me, asking a question.

25     Q.    Here where you say that it's a separate issue,

LaTonya Yvette Smith - May 11, 2023

1  what do you mean?  Can you explain that a little bit more

2  to laymen?  How is her time to continue limited non-IOD

3  separate from her non-IOD limited duty status?

4      A.  So the time she had to continue on limited duty

5  non-IOD, which means she gets two years.  So if she's

6  having any issue with how much time she's supposed to get

7  with her IOD is a separate issue from the current IO- --

8  non-IOD status she's on which expires on March 30th.

9          So this is what I'm saying.  Melissa sent her

10  this email on January 28th.  I replied February 21.

11  There's something missing in that reply.

12          Because I would have not replied to this email

13  that Melissa has the way that I did.  So there is a email

14  or something missing that I am responding to her.

15      Q.  Do you recall specifically any conversations you

16  might've had with Melissa or with Officer Arroyo about this

17  issue?

18      A.  I don't remember off the top of my head.  I would

19  have to look at documents or emails.  Because I don't

20  remember the conversations that her and I in regards to her

21  non-IOD.

22          I just know she was very upset and distraught in

23  my office.

24      Q.  Okay.

25      A.  That's what I remember.  So I know she was very

LaTonya Yvette Smith - May 11, 2023

109

```
 1    upset.  So -- but that particular email, there's two issues
 2    going on.  She gets two years to be on limited duty non-IOD
 3    and that's it.
 4              But in order to extend, based off how much time
 5    she has, she needs to come in my office regardless by the -
 6    - by March 30th to give me paperworks to tell me that she
 7    is no longer eligible because the doctor had returned her
 8    back for duty or she wants to -- the doctor believe she
 9    needs to remain on limited duty non-IOD, and from there we
10    can have a conversation on what happens next.
11              But it appears there's a communi- -- there's
12    something missing in that email.  There's a -- I'm replying
13    to something she asks me.
14         Q.   I want to go back really quickly to Exhibit 13.
15    I have another question for you here.  This memo that --
16         A.   Mm-hmm.
17         Q.   -- we had seen earlier that --
18         A.   Yes.
19         Q.   -- Reyna had submitted to Christi Ford and
20    copying you.
21         A.   Yes.
22         Q.   This paragraph, the last paragraph here.  She
23    indicates that she has pain in her left shoulder and
24    swollen legs.  Do you see that?
25         A.   Yes.
```

LaTonya Yvette Smith - May 11, 2023

110

1     Q.  So as -- as of -- at -- around this time, were --

2  did she make you all aware that she was experiencing this

3  kind of pain in her shoulder and legs?

4     A.  I would have to look at my CLEAR note to see what

5  she called to ask.  Because it appears here she is no

6  longer on the medical roll.

7        And so she is have -- she has a scheduled

8  appointment with HR.  And she is explaining that she can't

9  make that appointment because she's having these symptoms

10  and she would like to reschedule that appointment or like

11  to postpone until I guess she feels better and to further

12  notice.

13     Q.  Okay.  And this memo that she writes to you -- to

14  Lieutenant Ford and copies you.  This is November 18, 2019?

15     A.  That's just the memo that says copied, but you

16  have to show me the email where when she sent it --

17     Q.  I see --

18     A.  -- and she --

19     Q.  -- this is also November 18, 2019.  Do you see

20  that?

21     A.  Mm-hmm.

22     Q.  So that was the last day she was on medical.  Is

23  that correct?

24     A.  I would have to look at the CLEAR note to see

25  when I cleared her.

LaTonya Yvette Smith - May 11, 2023

111

1    Q.   Okay.

2    A.   Because she sent that memo to Lieutenant Ford.

3 So she cc me on it.  So I wouldn't respond to the email,

4 because she's asking Lieutenant Ford those questions.

5         She actually sent the memo to Lieutenant Ford.

6 She's just cc'ing me to keep me in the loop.  What it

7 appears.

8    Q.   Do you remember talking to Lieutenant Ford about

9 this memo or about Officer Arroyo's claims?

10   A.   I can't remember any conversations.  I would have

11 to refer to the CLEAR to see what was discussed and if

12 Lieutenant Ford documented anything about her conversation

13 with her.

14        MS. ABRAHAM:  I'm going to mark this next one

15 Exhibit 16.

16        (Exhibit No. 16 marked for identification)

17 BY MS. ABRAHAM:

18   Q.   Can you see my screen?

19   A.   Yes.

20   Q.   Okay.  And this is two pages.  It's Arroyo.Def

21 3937 to 3938.  Okay.  Do you recognize this email here on

22 the first page?

23   A.   I see that she emailed me, yes.  I mean, I don't

24 remember, but I see that I was emailed.  And then it says

25 (as read):

LaTonya Yvette Smith - May 11, 2023

112

1          Good morning.  Hope you are well.  Per the

2          attached, I was wondering if you can kindly

3          confirm my medical status.

4          I'm not sure if inadvertently I was released

5          to return full duty.  Whereas per doctor's

6          note, my tentative release will take effect

7          September 4th with limited duty non-IOD belt

8          for six months.  Can you outstanding kindly

9          confirm, please.  Prompt attention.

10      Okay.

11     Q.   Okay.  And I'm taking you to the next page here.

12     A.   Mm-hmm.  Okay.  Let's --

13     Q.   Can you --

14     A.   -- see.

15     Q.   -- explain what this document is?

16     A.   So this document is her release back to work.  So

17 it appears that when I released her, I released her back

18 full duty.  Which could -- according to her, was a mistake

19 because she was on limited duty non-IOD.

20     Q.   Do you remember how --

21     A.   And then --

22     Q.   -- this was resolved?

23     A.   I would have went in and just changed the status.

24 So I would need to know what was my reply to her.

25     Q.   Okay.  At that point in August of 2018 --

LaTonya Yvette Smith - May 11, 2023

113

1      A.    Mm-hmm.

2      Q.    -- the process of Officer Arroyo requesting

3  limited duty basically just involved her providing you the

4  medical documentation showing that she could perform the

5  essential functions with restrictions.  Is that fair to

6  say?

7      A.    Yes.

8      Q.    And then is it -- my understanding correct that

9  after she ran out of those non-IOD days, then she had to go

10 on a -- some kind of a leave of absence, correct?

11      Like she couldn't continue to work in a limited

12 duty assignment, per your understanding.  Is that correct?

13      A.    Correct.  She can't work in non-limited duty

14 status.  So she either gets a letter from her doctor

15 returning her back full duty and I release her back full

16 duty and she goes back as a full duty officer, or she goes

17 on the medical roll -- roll and use any medical time she

18 has to see a doctor to determine what should be her next

19 step.  And if --

20      Q.    And how --

21      A.    -- she didn't have any more.  Mm-hmm.  And if she

22 didn't have any more sick time available, then she would

23 have to apply for a leave of absence.  Because she no

24 longer has time in her bank to be off.

25      Q.    And just so I'm clear.  When you say full duty,

LaTonya Yvette Smith - May 11, 2023

114

1    you mean without any kind of restrictions.  Right?

2        A.   Correct.  Correct.

3            MS. ABRAHAM:  Okay.  I'm going to mark this next

4    one as Exhibit 17.  And for the record, this is Arroyo

5    3943.  Arroyo.Def 3943.

6            THE WITNESS:  Mm-hmm.

7            (Exhibit No. 17 marked for identification)

8    BY MS. ABRAHAM:

9        Q.   Take a moment here to review this document.  My

10   first question is, do you recognize it?

11       A.   Yes.  I recognize the email.  And I can read

12   through it.  So Officer Bishop sent her a notification that

13   she needs to -- she -- expires on the 30th of '19.  She

14   need to schedule with Jones no later than March 1st in

15   regard her options to outline the limited duty.

16           So Bishop emailed her on the 29th of January and

17   then she replied back on the 21st to me.  (As read):

18                    Good afternoon.  Per our conversation this

19                    morning, you stated that my IOD non-limited

20                    has already expired but base on this letter

21                    and certification letter received at my

22                    resident, last day stated that it will be

23                    the 30th of March 2019.  Did something

24                    change?

25                    As stated this morning, I spoke to Jones and

LaTonya Yvette Smith - May 11, 2023

115

1            met with her on the 7th of February and we

2            discussed the situation that (1) I do not --

3            I did not had updated limited duty paperwork

4            due work -- paper -- limited duty paperwork

5            due was waiting for a referral for angiogram

6            and (2) that I will meet with FOP lawyer and

7            the medical board on the 19th.

8            Thank you for the extension.  Once limited

9            letter is available for pickup, I will give

10           you -- I will give to you as soon as

11           possible.

12           Per our conversation this morning, you

13           stated that my has already expired.  And --

14     Right.  And the last day stated on the letter.

15     So (as read):

16           Per our conversation this morning, you

17           stated that my non-IOD has already expired

18           but based on this letter certification

19           letter at my resident, the last date was

20           stated that 30th.

21     Correct.  So as I --

22     (As read):

23           As stated this morning, I spoke with Ms.

24           Jones and met with her on the 7th and we

25           will discuss the situation that (1) I did

LaTonya Yvette Smith - May 11, 2023

116

```
 1              not have -- I -- I did not had updated
 2              limited duty paperwork due and was waiting
 3              for a referral for angio.
 4         So I'm trying to figure out.  She was waiting for
 5    a referral for angiogram for a doctor.  And (as read):
 6              (2) I will meet with FOP.  So --
 7       Q.   So was there some --
 8       A.   I --
 9       Q.   -- communication about when her non-IOD limited
10    duty days were going to expire?  Do you recall anything
11    like that coming up?
12       A.   No.  But --
13       Q.   Do you know -- do you recall ever telling Officer
14    Arroyo that she didn't have any more days and her -- her
15    non-IOD limited duty and had expired, and it turned out
16    that it hadn't yet expired?
17       A.   I don't remember a conversation.  I just know
18    from what you have shown is that she was aware that her
19    non-limited duty expired on the 30th from a previous
20    attachment that you had.
21              That -- I told her it expired and she needed to
22    be in my office in order to update her limited duty.  And
23    when she came in, I would need to look at my CLEAR note to
24    see if she came in in February.
25              This out of context.  So I don't -- I don't
```

117

1   understand what she's saying.

2        Q.   Okay.

3        A.   Without looking at it in chronological order, I'm

4   -- I'm lost in the mix.

5             MS. ABRAHAM:  That's okay.  I -- I wish I could

6   share with you the documents all at once, and trust me,

7   that would probably be -- okay.  So that was 3943.

8             We're going to mark this next one as Exhibit 18.

9             (Exhibit No. 18 marked for identification)

10  BY MS. ABRAHAM:

11       Q.   Can you see my screen?  This is --

12       A.   Okay.

13       Q.   -- 3944.  And I'm just focusing your attention to

14  the top there that's your response.  It looks like a cut-

15  off email.  Do you see that?

16       A.   Yeah.  So I'm responding her, letting her know

17  that her -- your IOD is non- -- probably meant to say non-

18  IOD.

19       Q.   Do you remember what you were trying to say in

20  this email?

21       A.   No.

22       Q.   Okay.

23       A.   No.  No.  Was there another one that following

24  that that I know since I didn't complete it?

25       Q.   I think so.  I'm going to pull it up for you.  I

LaTonya Yvette Smith - May 11, 2023

118

1  think I -- okay.  All right.  We're at, now, Exhibit 18.

2       I'm sorry.  19.  Can you see my screen?

3       A.    Okay.

4            MS. ABRAHAM:  Oh.  You know what?  I -- I think

5  we've already shown you this email.  So let me take that

6  back.  This is not going to be Exhibit 19.  Sorry about

7  that, folks.

8            Actually -- yeah.  So that -- I'd already shown

9  that to you as Exhibit 15 for the record.  All right.

10 We're going to mark this as Exhibit 19.

11           (Exhibit No. 19 marked for identification)

12 BY MS. ABRAHAM:

13      Q.    Okay.  Can you see my screen?

14      A.    Yes.

15      Q.    For the record, I'm showing you Arroyo.Def 3947.

16 Do you recognize this email?

17      A.    Yes.

18      Q.    What is it?

19      A.    The -- Dr. Arjmand's saying that this officer --

20 when this officer come in, that, as this case is in

21 arbitration, to see her before we give out any referrals

22 for anything.

23      Q.    What does that mean?  How do you interpret that

24 to mean?

25      A.    So if a officer is claiming injury on duty or if

119

1    the officer's claiming reoccurrence of a IOD, we have to

2    talk to Dr. Arjmand before we make any referrals.

3         Q.   And what role does Dr. Arjmand play in that

4    process when a person is -- has a case in arbitration, for

5    example?

6         A.   She makes the decision to -- she makes the

7    decision to process with the reoccurrence.

8         Q.   So she would ultimately decide whether this was a

9    reoccurrence IOD or not?  Is that fair to say?

10        A.   She would make the determination based off

11   documentation from a medical -- medical provider.  So what

12   she's saying here is before you proceed with anything, come

13   talk to her, and then she -- you and her would discuss the

14   case.

15             And from there, she would give you directives on

16   what -- how to move forward.  So when a officer come in,

17   just don't give referrals and send her on her way.

18             Come talk to me first before you proceed with the

19   referral.  So she wanted us to talk to her before we make

20   any referrals to move forward.  Now, what that conversation

21   would be, I don't know.  She --

22        Q.   Okay.

23        A.   -- here, she just want us to talk to her before

24   any of us make any referrals for treatment.

25        Q.   Okay.  And --

LaTonya Yvette Smith - May 11, 2023

120

1      A.    Because this case is not (indiscernible).  Mm-
2  hmm.
3      Q.    Sorry.  When she refers to, see me before
4  proceeding with any referrals, can you explain what a
5  referral is to a layman in this context?  What does that --
6      A.    Yeah --
7      Q.    -- mean?
8      A.    Yeah, so a referral is authorization for the
9  officer to be seen by a medical provider that the City pays
10  for.  So, for example, if the officer, which is Arroyo, is
11  complaining of pain in her left knee, for example, we will
12  talk with Dr. Arjmand.
13          And then she will tell us refer her to, you know,
14  Dr. So and So based off the -- the previous documentation.
15  Because when we go in there to see her, we're going to take
16  the chart in there, and she's going to sake make referrals
17  for A, B, and C.
18      Q.    Okay.  And if the case was not in arbitration,
19  could you have just set her -- Officer Arroyo up with a
20  referral in your network without having to go through Dr.
21  Arjmand?
22      A.    If Arroyo was coming in with a reoccurrence
23  claim, which means she is claiming that pain that she is
24  currently having is related to a IOD, we would have to
25  still go talk to Dr. Arjmand before we make any referrals.

LaTonya Yvette Smith - May 11, 2023

121

 1      If the officer was newly injured and the

 2  department has deemed that that is approved injury on duty,

 3  we would just move forward with the referral to a provider,

 4  and we would not have to see Dr. Arjmand, unless we had

 5  questions on what type of provider should this person go

 6  to.

 7      Q.   And is that practice that you just articulated

 8  just now -- was that written out for you anywhere, or is

 9  that -- did you come to understand it just because that's

10  how it was done or somebody else told you this is how it's

11  done?

12      A.   That was the training that I received from

13  Supervisor Sharita, that that was the procedures.

14      Q.   Okay.

15      A.   Of the --

16      Q.   Was there --

17      A.   -- Medical Section.

18      Q.   Was there any training materials that had this

19  written out for you, or was it verbally relayed --

20      A.   It was --

21      Q.   -- to you?

22      A.   -- in a -- it was in a training book.  And

23  verbally.

24      Q.   Okay.  Do you remember having, around this time

25  where Dr. Arjmand emails you about her case being in

LaTonya Yvette Smith - May 11, 2023

122

1    arbitration and to see her for any -- before the referrals

2    -- do you remember having any other conversations with Dr.

3    Arjmand or any of the other folks involved about Officer

4    Arroyo at that time?

5        A.   Not -- not -- I can't recall.  No.

6        Q.   Okay.  Did -- do you recall whether Officer

7    Arroyo did end up going to see an IME?

8        A.   I will have to look at the charting to know.

9             MS. ABRAHAM:  I'm going to mark this as Exhibit

10   20.

11             (Exhibit No. 20 marked for identification)

12   BY MS. ABRAHAM:

13       Q.   Can you see my screen?

14       A.   Yes.

15       Q.   Okay.  So this is Arroyo.Def 4012.  And it's the

16   most -- my understanding, my reading of this, is that the

17   most -- the oldest starts at the bottom, the older email --

18       A.   Okay.

19       Q.   -- starts at the bottom.  So --

20       A.   Okay.

21       Q.   -- if you want to go from the bottom and read

22   your way up.

23       A.   Okay.  Okay.  So she's emailing me.  (As read):

24             Did the medical section receive the IME

25             result?  Also, kindly extend my appointment

LaTonya Yvette Smith - May 11, 2023

123

1          to the medical section until April 16th,

2          '19.

3          Reason being, I will not be seeing Dr. Ho

4          today due to (1) I have a migraine and left

5          shoulder pain and (2) Doctor can't

6          administer any corticosteroids due to

7          upcoming biopsy and the IME and I will be

8          seen by Dr. Honestly.  Please see attached

9          supporting my upcoming procedure.

10     And the she emailed only me.  Okay.  And so that

11   was -- and I replied -- did I reply?  Oh, okay.  So on --

12   (As read):

13          Good morning.  No IME report.  Please call

14          the clinic and have Dr. Levin fax over the

15          IME report.

16     So she must've went and saw Dr. Levy (phonetic).

17     Okay.  And I didn't have the report.  And then

18   she emailed me back.  (As read):

19          Good morning.  Per your request, I left IME

20          office.  Spoke with manager Paula, who

21          related the report are not ready.

22          Normally it takes up to two weeks.  Once

23          completion, results are sent to GI services

24          who in turn, they will sent to the Medical

25          Section.  If there's anything else you need

LaTonya Yvette Smith - May 11, 2023

124

1          me to do help expedite, please let me know.

2          And then I said (as read):

3               It's out of my hands.  It's a waiting game.

4          We just got to wait for them to send the --

5     Q.    Was this an IME that Dr. Arjmand had selected the

6     doctor for?

7     A.    That I don't know.

8     Q.    Based on the last email, Exhibit -- Exhibit 19

9     that we had shown that was -- that she had sent you all on

10    February 26th, 2019, and by "she" I mean Dr. Arjmand, does

11    it make sense that this IME would've been set up without

12    Dr. Arjmand?

13    A.    The only thing I get from -- the only thing that

14    was -- well, see, I don't know.  I can't answer that.  All

15    I know is Dr. Arjmand wanted us to come -- if one of us --

16    if she sits on one of our chairs, she wanted us to come to

17    her before we made any referrals.  That's the only thing I

18    get from that email.  Regardless -- and regarding this, I

19    don't know who selected Dr. Levy.

20          We would have to look at CLEAR notes to see if

21    the recommendation was made or if she chose it.  I wouldn't

22    know.

23    Q.    Okay.

24    A.    Well -- but the two -- the two don't have

25    anything to do with each other.

LaTonya Yvette Smith - May 11, 2023

125

1    Q.   Why not?

2    A.   Because Dr. Arjmand -- when she did send -- Dr.

3    Arjmand sent that email when?

4    Q.   February 26th, 2019.

5    A.   And so -- and then she emails me in -- that's

6    April.  Right?

7    Q.   Of the same year.  But that -- at that point, she

8    was asking about whether the IME report was ready.

9    Correct?

10   A.   Right.  And so the I- -- so the IME report was --

11   it seems that the I- -- the IME was done, just based off

12   this email, was done in February.  Or April.  March.  It

13   was done in March.  Because it takes two weeks from the

14   date of the visit.

15        So if it's not ready yet, it happened within the

16   last two to three weeks.  That would be March.

17   Q.   Right.  And my question is, that IME that she

18   took let's say in March of 2019, that came after Dr.

19   Arjmand had directed you and a few others that the case is

20   in arbitration, see me before proceeding with any

21   referrals.  Correct?

22   A.   Right.

23   Q.   Okay.  So it's safe to -- is it -- you know, and

24   if you don't know, it's okay to just say I don't know.  But

25   is it safe to understand here that based on the timing of

LaTonya Yvette Smith - May 11, 2023

126

1   Dr. Arjmand's email and the timing of this email here,

2   under Exhibit 20, that Dr. Arjmand was somewhat involved in

3   this IME referral that Ms. -- Officer Arroyo underwent in

4   March of 2019?

5           MR. SUHL:  I'm going to object to form.

6           You can still answer.

7           THE WITNESS:  Oh.  In the email, she just wants

8   us to come to her and talk to her about the referral.  What

9   was said in that conversation or what will be proceeding, I

10  have no recollection.

11          So I can't say that based off her wanting us to

12  come to her for the referral, that it would be reference

13  that she made the recommendation for her to go to Dr. Levy

14  for a IME.  On --

15  BY MS. ABRAHAM:

16      Q.    Okay.

17      A.    -- on that date or whenever she came in, the --

18  whoever took care of Arroyo would have documented what Dr.

19  Arjmand said for them to do based off the conversation in

20  her office.

21          So you will have to look at the CLEAR note, and

22  the CLEAR will tell you -- so, for instance, if Arroyo

23  came, I brought her to Dr. Arjmand, I would have charted

24  what Dr. Arjmand said how to move forward.  That would be

25  documented in the CLEAR.

127

1      Q.   Okay.  My question was a little different.  It

2   was, is it -- is it safe to understand that you -- you or

3   whoever was coordinating this IME would've come see Dr.

4   Arjmand per her directions to you guys on February 26th,

5   2019, before setting up this IME for Officer Arroyo?

6      A.   I will say no, because referrals can be multiple

7   referrals for anything.  We don't know if -- what she means

8   by this email is that the referral for IME.

9           I would have to look at the CLEAR note to

10  determine after the 26th and before her appointment at the

11  IME -- it would document in the CLEAR who made the referral

12  and if any recommendations were made.

13     Q.   Okay.  So going -- and just focusing on this

14  Exhibit 19 then, what is your understanding of what Dr.

15  Arjmand was directing you all to do here with respect to

16  Officer Arroyo on February 26th, 2019?

17     A.   That if she came in the following day, to come

18  talk to her before we give her any referrals.  In the case

19  is in arbitration, so we will have to go in and talk to her

20  before giving any referrals.

21          And then she would give us our directives on how

22  to move forward with the case.  And then in turn, that

23  person would document in CLEAR on what the next steps were.

24     Q.   Okay.  So is it not always the case then, when

25  Dr. Arjmand sends a direction -- a directive like this one,

LaTonya Yvette Smith - May 11, 2023

128

1    that it gets followed?  Does it sometimes not get followed?

2        A.   I can only speak for myself.  If she says a

3    directive, I always follows her directives.

4        Q.   Okay.  So if she told you come see me before

5    proceeding with any referrals, at least you know you

6    would've done that.  Correct?

7        A.   Yes.  I would have done that.

8        Q.   Okay.  Based on your experience, when you were

9    working in this capacity, how long would it take for a

10   person's IME results to come in on average, if you

11   remember?

12       A.   I don't remember.  We -- it was -- it -- just to

13   give context.  2019 was the height of COVID.

14       Q.   I think it was a little --

15       A.   So --

16       Q.   -- before COVID.  Right?  COVID started March

17   2020?

18       A.   That's what everybody wants to think.  But 2019,

19   we had a lot of officers that were out.  So we were -- and

20   then there was only four of us.

21            I think if you count up.  So we all had like over

22   a hundred cases.  So a lot of things I can't -- wouldn't be

23   able to remember --

24       Q.   That's --

25       A.   -- per se --

LaTonya Yvette Smith - May 11, 2023

129

1      Q.   -- completely --

2      A.   -- certain things.

3      Q.   -- understandable.

4      A.   Yeah.

5           MS. ABRAHAM:  Yeah.  No, I -- I don't -- I don't

6   expect you to remember every detail (indiscernible) -- a

7   few years ago.

8           I'm going to share what's marked as Exhibit 21.

9           I am just going to ask you, though.  I mean, if

10  you don't remember, just -- it's okay to say I don't

11  remember.  But, you know, sometimes a -- a conversation

12  might come up in your memory.  If you do remember it, just

13  feel free to share it.

14          THE WITNESS:  Okay.

15          (Exhibit No. 21 marked for identification)

16  BY MS. ABRAHAM:

17     Q.   I'm sharing Exhibit 21 now, and this is Arroyo

18  4015.  Arroyo.Def 4015.

19     A.   Okay.

20     Q.   And this is a email.  Looking at the bottom

21  caption there, it's from Reyna to you, April 24th, 2019.

22  Do you see that?

23     A.   Yes.

24     Q.   And she's indicating here that she's wondering if

25  the -- the Medical Section has received the IME results

LaTonya Yvette Smith - May 11, 2023

130

1   from Dr. Levin's office.  Correct?

2        A.    Yes.

3        Q.    So just to remind you.  The last time we saw

4   Exhibit 20, Reyna was checking in on the status of this on

5   April 9th.  See that?

6        A.    Right.  She -- where you're pointing with your

7   cursor, she is emailing, let me know she talked to the

8   office and the office told her to take two weeks.

9        Q.    Okay.  And -- and I guess she flags this first

10  for you April 8th.  Do you see that?

11       A.    Mm-hmm.

12       Q.    And at this time, early April, you -- you all

13  were just waiting for the report to come in.  Is that fair

14  to say?

15       A.    Yes.

16       Q.    Okay.  And then it -- this Exhibit 21.  Now we're

17  at April 24th, and the IME report still hasn't come in.  Is

18  that -- am I correct in that understanding?

19       A.    I don't see what I reply.  I see from me -- I

20  don't understand.  It seems like she emailed me and said

21  (as read):

22               Good morning.  I was wondering if the

23               Medical Section received the IME.

24          And then I -- so I don't -- she's just asking.  I

25  don't see my reply.

LaTonya Yvette Smith - May 11, 2023

131

1      Q.   Right.  She's asking.  And she's asking -- and is

2   it fair to say that she's asking because she hasn't

3   received those results yet by this time?

4      A.   I don't know.  You have to ask her what she meant

5   by that.  She was --

6      Q.   Okay.

7      A.   -- just wondering if we received it, and that's

8   all I get from this email.  She's asking if we received it.

9      Q.   Okay.  And -- and just above that caption there,

10  where it shows that she went this email Wednesday, April

11  24th, I see --

12     A.   Mm-hmm.

13     Q.   -- this caption here, these first three lines at

14  the top.

15     A.   Mm-hmm.

16     Q.   See that?  It says (as read):

17              From LaTonya Smith on behalf of LaTonya --

18              Smith, comma, LaTonya?

19          You see that?

20     A.   Mm-hmm.  Mm-hmm.

21     Q.   What was this top part?  Do you remember what you

22  --

23     A.   No.

24     Q.   -- said in this email?  Did you --

25     A.   No.

LaTonya Yvette Smith - May 11, 2023

132

1       Q.   -- forward it -- and seeing here that this is a

2   full word, IME results.  Do --

3       A.   Mm-hmm.

4       Q.   -- you see that?  Did you forward --

5       A.   Yeah.

6       Q.   -- this email to anyone?

7       A.   It look like I did, because it says from me to

8   me.

9       Q.   Why did you send it to yourself?

10      A.   I have no idea.

11      Q.   Did you ever bcc anyone on emails like this?

12      A.   No.

13          MS. ABRAHAM:   Okay.  We're going to mark this

14  next one Exhibit 22.

15          (Exhibit No. 22 marked for identification)

16  BY MS. ABRAHAM:

17      Q.   Okay.  Can you see my screen?

18      A.   Yes.

19      Q.   And for the record, this is Arroyo.Def 4025.  And

20  this is sort of a continuation of the email we were just

21  looking at here.  On April --

22      A.   Mm-hmm.

23      Q.   -- 24th, Reyna asks you, did -- you know, if you

24  guys have received the results from Dr. Levin's office.  Do

25  you see that at the bottom?

LaTonya Yvette Smith - May 11, 2023

133

1      A.    Mm-hmm.

2      Q.    Okay.  And then you can take a moment to look at

3  the rest of the page there and just --

4      A.    So --

5      Q.    -- let me know if you remember the email, do you

6  -- and do you recognize this?

7      A.    Okay.  So I -- so did I email her.  So -- (as

8  read):

9            Good morning.  I have not received the

10           report.  Sergeant Kemper have the doctor

11           send over the IME report?

12       And (as read):

13           Good morning.

14           Any word on the IME results, please?  Also,

15           for reference, I don't have access to my

16           work email.  Therefore, any notifications

17           while I'm not at work, please send to this

18           email.

19       And then I said (as read):

20           Good morning.

21           No word.  We have -- we -- we have reached

22           out and asked where is the IME report.  We

23           are waiting on their response.

24     Q.    So is it fair to say that as of May 1st, 2019,

25  you'd still not received a response or a -- the IME report

134

1   from the IME that she underwent in March?

2       A.   Yes.

3       Q.   Okay.  Do you recall whether Dr. Arjmand was made

4   aware of this issue?

5       A.   No.  No.  I can't remember if she did or didn't.

6   She's not on the email, so she wouldn't be aware.

7       Q.   Okay.  Do you remember --

8       A.   Other than --

9       Q.   -- speaking about it?

10      A.   No.

11      Q.   Do you remember talking to anyone else around

12  this time about the issue of not receiving the IME report

13  yet for --

14      A.   No.

15      Q.   -- Reyna?

16      A.   No.

17          MS. ABRAHAM:  Okay.  We're going to mark this

18  next one Exhibit 23.  We're in the home stretch.  Just so

19  you know.

20          THE WITNESS:  Okay.

21          (Exhibit No. 23 marked for identification)

22  BY MS. ABRAHAM:

23      Q.   Okay.  Can -- and you let me know when you can

24  see my screen.

25      A.   Okay.  So there's a attachment, May 1st from me,

LaTonya Yvette Smith - May 11, 2023

135

1    and I sent it to her.

2        Q.   I'm going to take you through all the pages just

3    so you see what I'm sharing with you here, and then we'll -

4    - we'll get into --

5        A.   Okay, can you go -- can you go back up?

6        Q.   Go back up?

7        A.   So -- yeah.  So what you see from canon425.  So I

8    have a report.  I scanned it to myself so that I could

9    forward it to her.

10       Q.   Okay.  And that's  May 1st, 2019?

11       A.   Yes.  At 3:57.  Yes.  So I scanned it to me and

12   then I sent it to her at 4:11.

13       Q.   Okay.  So is it fair to understand that you

14   received this report on May 1st, 2019?

15       A.   No.  I must have got it in my hand May 1st.  But

16   when it got to the office is unknowns to me.

17       Q.   Okay.  And then just taking you through these

18   next pages here.  Do you recognize this document here?

19   I'll go through all of them just so you see it, and you

20   don't have to read it line by line.

21       A.   Okay.  Okay, so this is her IME report.

22   Q        Do --

23       A.   Okay.

24       Q.   -- you remember -- is -- is this -- is this what

25   your office received as the IME report regarding Reyna

LaTonya Yvette Smith - May 11, 2023

136

1   Arroyo?

2        A.   Based off this email, yes.  Like I don't

3   remember.  I can say yes, that's it, but reading what it

4   says, that's the IME report that was received.

5        Q.   And then just, I'm calling your attention to the

6   date of this report.  Does it show here April 4th, 2019?

7        A.   Yes.

8        Q.   Do you know why it -- this report may have been

9   dated April 14 (sic), 2019 but it wasn't provided to Reyna

10  until May 1st, 2019?

11       A.   That's something for the doctor's office.

12  Because it was probably the date of the exam.  But in

13  previous email, she even said the doctor's office said it's

14  going to take a few weeks, and it was already April 29th.

15            I mean, I can't answer -- I can't answer --

16       Q.   Okay.  I --

17       A.   -- that.  I don't know why.  Yeah.  I don't know

18  why the doctor's office.  Because the date of that exam --

19  the date that's on this letter is the date of the exam.

20            That doesn't mean that's the date it was mailed.

21  It's the date that the exam was done.

22       Q.   I see.  And this -- so that date doesn't indicate

23  to you when your office would've received the report.

24  Right?  Is that --

25       A.   Correct.

LaTonya Yvette Smith - May 11, 2023

137

1     Q.   -- fair?

2        Okay.  Does it -- when the doctor sends the IME

3  report to the City, does it come straight to you, or does

4  it go to someone else first?  How does it work --

5     A.   It --

6     Q.   -- usually?

7     A.   It goes -- the mail comes into the mailroom.  And

8  the mailroom delivers the mail.  We in turn get the

9  information from the front desk.

10     Q.   And does it come to your department or does it go

11  to the Medical Services Section or another department?

12     A.   The Medical Service Section is all in the same

13  room or location.  So the mail comes to the mailroom, which

14  is inside 35th Street, and then they sort it and then they

15  bring the mail over to the Medical Section.

16     Q.   Okay.

17     A.   Paper just appears on my desk.  So I don't know

18  what the process at the front desk is to get that

19  information to us.

20        MS. ABRAHAM:  Okay.  I'm going to mark this next

21  one as Exhibit 24.

22        (Exhibit No. 24 marked for identification)

23  BY MS. ABRAHAM:

24     Q.   Can you see my screen?

25     A.   Yes.

LaTonya Yvette Smith - May 11, 2023

138

1     Q.   So this is Arroyo.Def 4050.  And I'm seeing this
2   as an email from you to Reyna on May 2nd, 2019?  Do you --
3     A.   Mm-hmm.
4     Q.   -- see that?  Do you --
5     A.   Yes.
6     Q.   -- recognize this email?  Do you remember it?
7     A.   I don't remember it, but I understand it.
8     Q.   What is this?  It says -- I see it says, "Please
9   shred all papers," but the subject, it says, "Please
10  disregard the email I sent."
11         Do you remember what -- what you were trying to
12  communicate here to Ms. Arroyo?
13    A.   No.
14    Q.   When you say please shred all papers, what were
15  you referring to?
16    A.   I can't recall what I was referring to unless
17  it's the one -- it's the email prior to this.  So please
18  disregard the email I sent, so it's that email, and I want
19  her to -- to shred the papers.
20    Q.   Were you ever given directions while you were an
21  occupational health nurse at the CPD to shred any
22  documents?
23    A.   No.  I can't recall.
24    Q.   No, you never gave -- got those --
25    A.   No, I -- I -- no.  Oh.  No.  As far as this is

139

 1   concerned, I can't remember if that's the directive that I

 2   gave, the reason why I said that.  That's all.

 3          But far as previously, I can't remember if I did

 4   or didn't.

 5      Q.   You can't remember if anyone directed you to

 6   shred any papers while you were working in this position.

 7   Is that fair to say?

 8      A.   Yes.  Because the CLEAR notes have employees'

 9   information, birthdays, and Social Security numbers.  So

10   once we were done with that, we would shred them.  For

11   confidentiality.

12          Because those papers didn't need to go in their

13   chart.  So I don't have a answer to -- to that one.

14      Q.   Okay.  Do you normally ask members to shred

15   documents like that?

16      A.   That -- no, not -- not that I recall, except for

17   this one time probably.

18      Q.   Do you -- as you sit here today, do you remember

19   what documents you were referring to in this email?

20      A.   No.  Can we go back to the email?  Was it the --

21   did I send her the wrong IME report with the wrong person's

22   name on it?

23      Q.   Let me -- let's -- let me share my screen here

24   for you.  So I'll say this is all I have, so I don't know

25   what it refers to.

LaTonya Yvette Smith - May 11, 2023

140

1        A.    But the --the --

2        Q.    But the one --

3        A.    -- IME report.

4        Q.    -- before this --

5        A.    Yeah, the one before --

6        Q.    -- May 1st?

7        A.    Yeah, the one before that I sent her the copy of

8    it.  Yeah.

9        Q.    I see it as it's --

10       A.    Oh.  Okay.  All right.

11       Q.    So.  Okay.  So the next one we're going mark as

12   Exhibit 25.  Oops.

13       A.    Because that -- with the shred the papers, it

14   should've been a attachment.  Can you pull it back up

15   again?  Is that the same that says copy the IME?

16       Q.    It -- it doesn't really say.

17       A.    So that's what I want to know.  With -- with this

18   email, I would have -- assuming I would have replied to

19   that same email with that attachment maybe.  So I would

20   like to see if I -- in this email if there was a -- a -- a

21   -- a conversation along with this.

22             Did I send her something accidentally.

23       Q.    I can't --

24       A.    Because I email -- this was I -- was I emailing

25   her and meant to email someone else and sent her the wrong

LaTonya Yvette Smith - May 11, 2023

141

1  information on someone else?  And for privacy, asked her to

2  shred it?

3         Q.   I can't tell.

4         A.   Do you know what I'm saying?  So in --

5         Q.   Yeah.

6         A.   -- that email, did I just send that email by

7  itself?  Because it's all cut and paste.  So was it a

8  following -- like the -- see the email conversation.

9         Q.   Yeah.  This --

10        A.   Or --

11        Q.   -- is all I have.  But, you know, that's okay.

12        A.   Mm-hmm.

13        Q.   We'll -- we'll mark this next one as Exhibit 25.

14 I think I dropped it in the chat already.

15        A.   Mm-hmm.

16             MS. ABRAHAM:  Get it.  Yeah, if you please let me

17 know.  This is Arroyo.Def 4061.

18             (Exhibit No. 25 marked for identification)

19 BY MS. ABRAHAM:

20        Q.   And --

21        A.   If we can go down to the bottom.

22        Q.   Sure.

23        A.   And read it the way it came in.  Okay.  So she

24 sent the email in the morning from her to me.

25             (As read):

LaTonya Yvette Smith - May 11, 2023

142

1          Good morning.  Any word on my -- I -- also -
2          - I don't have access.
3      Okay.  And then I said (as read):
4              No, no word.  We have reached out and asked
5              where your IME report.  We are waiting on
6              their response.
7      That was at 9:00.  And then on Wednesday at 1:30
8  (as read):
9              Dr. Leo has not submitted the report yet.
10     So I'm assuming Kemper replied to her original
11 email that sent both of us.  And then as we go up at --
12 received it at 1:30.  Okay.  So on March -- I May 30th, she
13 sent the email.  (As read):
14              I have not heard from Dr. Rashid regarding
15              my request for permanent limited duty.  Any
16              updates?  Also, I'm -- I hereby officially
17              request a copy of my entire medical file
18              please as soon as possible.
19     Okay.
20     Q.   So around this time, May 30th, 2019, was Officer
21 Arroyo asking for a limited duty assignment?
22     A.   She was asking about have they made a decision on
23 her permanent limited duty status.
24     Q.   And she's addressing this to Sergeant Kemper.
25 Right?

LaTonya Yvette Smith - May 11, 2023

143

1    A.    Mm-hmm.  Yes.  Yes.

2    Q.    Do you recall any conversations you may have had

3    with Sergeant Kemper about this request by Officer Arroyo

4    for a permanent limited duty assignment?

5    A.    No.  Do you happen to have a copy of the CLEAR

6    notes from the timesheet start coming into the Medical

7    Section?  Because that will help me understand the flow of

8    the case.

9         Like not to say that these are not informative,

10   but they're so random and so out of order.  I can't -- I'm

11   a nurse.  So I -- we read chronological, like from the time

12   she came in and what happens, to get a better --

13   Q.    Yeah.

14   A.    You -- you know what I'm saying?  I can't --

15   Q.    Excuse me.  I have the Exhibit 7 that I shared

16   with you, the CLEAR notes.  Do you want to try to go

17   towards one of these May entries here?  Maybe that'll help

18   --

19   A.    I would want to go -- I would want to go all the

20   way back to November of 2019.  Because we -- she went on

21   the medical roll in November.

22   Q.    So I have here -- and you can maybe help me

23   understand this document better, how to read this CLEAR

24   report better.  I'm seeing notes.

25        The most recent one on this one is March 6th,

LaTonya Yvette Smith - May 11, 2023

144

1   2020.  And then the next one is October 21st, 2019.  And
2   that's when she's extended November 18th, 2019.  Do you see
3   that there on the first page?
4          A.   Mm-hmm.  Okay, so let me look.  So member last
5   day of medical roll was November 17.  (As read):
6                    RN completed PAR form due to member not
7                    reporting.  RN informed member that.
8               Right.  So I would need to go -- I would need to
9   see CLEAR notes back to November.
10         Q.   So the next CLEAR note that I have here was
11  entered in September of 2019.  It goes -- the way I see it
12  here, it starts with the most recent one first and it goes
13  down.
14              And the most recent here on the top is March 6th,
15  2020.  And --
16         A.   Okay, so --
17         Q.   -- then the next one is October 2019.  I don't
18  see any November entries, unless you can --
19         A.   Right.  That's -- that's what I'm saying.  If you
20  go back down.  So -- I mean go back up.  Yeah.  To the very
21  top.  Yeah.
22         Q.   Okay.
23         A.   So even before we're at now, on March 6, she's
24  been on the medical roll, it appears, because the progress
25  notes here is like old.  But here it seems like she was on

LaTonya Yvette Smith - May 11, 2023

145

1    the medical starting -- enter my date.

2            So she was on ambulatory status for a personal

3    injury.  And if you can go down some just a little bit.

4    Okay.  I'm looking for when she went on the medical.

5            Supposed to return on the 19th.  So she -- she

6    started her medical -- so November 17th, 2019, she went on

7    the medical.  Because she went out of time for her non-IOD.

8            So that's the reason why she was forced on

9    mandatory medical.  During that time, she was getting paid

10   through her sick time, starting November 18th, for left

11   shoulder pain.

12           So she's been on the medical up until this point

13   since November.  So what conversations happened starting in

14   November.  It appears that she's on the medical because she

15   had surgery in November.

16       Q.   Would those --

17       A.   And so during --

18       Q.   Sorry.  Go ahead.  Go ahead.

19       A.   I don't know -- I would have to look at her

20   November CLEAR notes to see if she -- she ran out of time.

21   I don't know, based on the documentation, her non-IOD, what

22   body part she was claiming she injured and has a disability

23   for.

24           Because this current medical documentation shows

25   that she didn't -- no longer had any time, so we put her on

146

1    the medical on November 18th, November 2019, and she

2    started getting the treatment for a left shoulder that is

3    non-IOD.

4         Q.   And you're --

5         A.   So --

6         Q.   -- getting that from this -- is it from this

7    first entry up top here?

8         A.   Mm-hmm.  So the way you read it is the medical

9    absence details.  The date that they are extended to in the

10   -- is always the first date.  And then the second date is

11   the day they started medical.

12        Q.   Okay.  Taking your attention to the next notes --

13        A.   Mm-hmm.

14        Q.   -- here.

15        A.   Mm-hmm.

16        Q.   At the bottom of this page.

17        A.   Mm-hmm.

18        Q.   Does it show here that she was -- that this

19   absence period was from March 29, 2019 through November

20   17th, 2019 here?

21        A.   Uh-huh.

22        Q.   And then under -- at the -- toward -- again,

23   further down, it indicates the body parts affected,

24   shoulder --

25        A.   Mm-hmm.

LaTonya Yvette Smith - May 11, 2023

147

1        Q.    -- right?

2        A.    Correct.

3        Q.    And then the note following, starting at the top

4   of the next page.  It says her last day on the medical roll

5   was projected to be November 17, 2019?  Is that correct?

6        A.    Mm-hmm.  Correct.

7        Q.    So I see that that entry -- this entry was made

8   October 21st, 2019.  Do you see that?

9        A.    Yes.

10       Q.    Okay.  And then I'm seeing the next entry, the

11  one -- the -- immediately after that was made by Christi

12  Ford, and that's September 27, 2019?

13       A.    Yes.

14       Q.    So the way that I'm seeing it is it starts with

15  the most recent notes and then it goes down.  Is --

16       A.    Yes.

17       Q.    -- that correct?

18       A.    Yeah.

19       Q.    Okay.

20       A.    So can we go down?  Yeah.

21       Q.    So if we're looking from November 2019 notes, are

22  -- and we don't see them in here, does that mean that --

23       A.    If you -- if you can -- if you can go all the way

24  down.  Because you're at the top.  Can you go to the bottom

25  of this attachment?

LaTonya Yvette Smith - May 11, 2023

148

1      Q.   Yeah.  All the way to the bottom?

2      A.   Yeah, a hundred -- down to page 115.  Is that?

3  Okay.  And this is from 2007.  Okay.  Maybe go to the

4  middle?

5           Okay.  Let's see.  Okay.  Go up a little bit

6  more.  Okay.  A little bit more.  Okay, 2014, '15.  '15.

7  Okay.  Go back up some more.

8           Some more.  It seems like something is missing.

9  Okay, go up some more.  Maybe we should -- downwards.

10  Okay.  Go up some more.  Okay.  So -- okay.  So more.  I'm

11  sorry.

12      Q.   It's okay.

13      A.   Okay.  Can we -- can we stop -- wait a minute.

14  Can you go back down just.  This is a IME.  It's -- so it

15  was decided at the medical mediation regarding grievance

16  related to IOD to not -- that this member would -- IME

17  claim of her shoulder injury.

18           Okay.  Go up.  Go up.  So that's -- okay.  This

19  is where I think she was asking for reoccurrence.  Up some

20  more.

21      Q.   It's 2017.  Correct?

22      A.   Yes.  It's 2017.  A little bit more.  So let's

23  stop right there.  Doctor rescheduled to March.  Have

24  scheduled IME with Dr. Marsh again for 5 of '17.

25           Okay.  Let's go up some more.  Some more, some

LaTonya Yvette Smith - May 11, 2023

149

1   more, some more.  A little bit more.  We should've started
2   from the top down, now that I think --
3        Q.   We're --
4        A.   -- about it.  Okay.
5        Q.   We're in --
6        A.   Okay, I --
7        Q.   -- September 2017 now.  I think that's the page
8   I'm on.
9        A.   Okay.  So let's go to page 12.  Okay.  Let's see.
10  This is 2018.  Okay.  Can we go down a little bit more?
11  Like down.
12       Because Dr. Arjmand made a note in January of
13  2018.  Then reporting that relates to -- okay.  Because I'm
14  trying to figure out her -- okay.  Here's Moreno.  (As
15  read):
16                 A member hand delivered a complete ID packet
17                 but MSS covering did not update in CLEAR.
18                 Member here today on limited duty status.
19                 RN to extend limitations non-IOD status
20                 through extension given February '18.
21                 Member will continue patient order.
22       She didn't put the IO- -- the not IO- -- oh.
23  Okay.  IOD from -- no relatedness to 2007 IOD in 26 injury
24  in surgery are separate events.  Okay.  All right.  Go up
25  some more.  And some more.  Okay, some more.  Some more.

LaTonya Yvette Smith - May 11, 2023

150

```
 1   Okay.  Stop right here.

 2           In July, this personal injury member in medical -

 3   - blah, blah, blah.  Member is to return -- remain off work

 4   to MSS.

 5           Okay.  Okay.  Go up some more.  Okay.  I'm sorry.

 6   So I believe that other test -- and this is where I return

 7   to the full duty on September 8th, which was a mistake on

 8   my part.  (As read):

 9                   And then I charted member with -- the

10                   document says member is released return to

11                   limited duty on October 1st, 2018.  Member

12                   was given range form and will report to

13                   medical section on 1, to be cleared for

14                   work.

15           And then on June 2018, was projected -- (as

16           read):

17                   Member's last day on medical roll is

18                   projected to be February 1st, 2019.

19           Because she was running out of just medical time.

20           (As read):

21                   And then I will contact Doctor in hopes for

22                   him today.

23                   As driving to range this morning and wearing

24                   my duty belt for a couple of minutes, my

25                   left stomach side started to hurt.  I
```

LaTonya Yvette Smith - May 11, 2023

151

1              thought it will go away but persistent.

2              I immediately took my belt off and came back

3              home.

4              I will be contacting my doctor in hopes to

5              see him today.

6         So that's October '18.  Okay, can we go up, go

7   up, go up.  Okay.  (As read):

8              Member here today with Dr.  Portion of

9              limited, NON IOD.

10             Officer is able to conduct the essential

11             functions for limited duty per doctor.  Can

12             do function 1 through 4.

13             And starting limited duty duties begins 02

14             November '18.

15             Duration is five months.

16        So she was on limited duty non-IOD --

17        Q.   The duration of the limited duty was only five

18   months here?

19        A.   That's what the doctor wrote.  So this is a note

20   from Jessica.  From what it appears she brought her limited

21   duty and then that limited duty pack.  He said that the

22   limited duty was only for five months.  Which means in five

23   months, she has to -- so when Jessica made this note, she

24   created the limited duty inside the CLEAR system so that

25   her department knows that she's on limited duty and not

152

1    full duty.

2            And the doctor only extended for five months.

3    And then that's when the -- so that was -- she entered --

4    Jessica entered that on October of 2018.  And then on

5    January the following year, 2019, this was where we get

6    into all the other information.

7            Her last date on limited duty status is projected

8    for April 6, 2019.  And then Officer Bishop then it appears

9    did the recalculation and the member's last day on non-IOD

10   limited status is projected for the 30th of 2019.

11           And that's when Melissa sent the email on January

12   29th to her and she cc me, letting her know that her -- she

13   needed to contact me no later than the 1st because her IOD

14   status expires on 1 April 2019.

15           So between -- because I don't calculate their

16   limited duty time.  Officer Bishop -- Bishop and it appears

17   that Melissa are the ones calculating when her non-IOD is

18   to expire.

19           It appears her last updated note, she was on

20   limited duty non-IOD for medical reasons.  That's not

21   related.

22      Q.   Are the medical reasons here because of her

23   cancer?

24      A.   Yes.

25      Q.   Getting back to my initial question here.

LaTonya Yvette Smith - May 11, 2023

153

1      A.    Mm-hmm.

2      Q.    I'm sorry.  Did you want me to keep scrolling

3 through something you wanted to review?

4      A.    Yeah.

5      Q.    Go ahead.  Where did you --

6      A.    Because I -- because I -- because now I'm

7 understanding where the emails were coming into.  Because

8 she originally was on medical because in that previous

9 attachment you showed, I replied to her that we can't deal

10 with her IOD until she's cleared from her medical illness,

11 which appears to have been her cancer.

12            So -- and then here, Dr. Arjmand, which was in

13 February of 2019 -- because I'm trying to figure out --

14 when you show just the emails without me understanding the

15 case, I can't really analyze or give you a -- you know,

16 answers to what may have thought.  What the emails --

17 what's behind the emails.

18            So Dr. Arjmand sent the email February 20 -- was

19 it 29th or 26th, saying that -- to see her before we give

20 any referrals.

21            So Dr. Arjmand documented he had spoken to PO

22 this a.m.  Decision made in arbitration for paying for FOP

23 and City PO to obtain one more IME for her 2007 relatedness

24 opinion which was denied back in 2013.

25            Letter written to IME doctor noted related to

LaTonya Yvette Smith - May 11, 2023

154

1    2007 IOD coupled -- I guess five volumes were sent and SIG

2    contacted person notifying the need for urgent IME with

3    cervical spine specialist.

4            So it appears that that referral was for the IME,

5    a IME who is a cervical spine specialist.  Is what -- one

6    we brought the chart to her, before we did --

7        Q.    Who decided --

8        A.    -- the referral --

9        Q.    Sorry.

10       A.    Mm-hmm.

11       Q.    Do you remember we saw -- saw that email where

12   Reyna -- Reyna sent a list of all the previous injuries

13   including injuries from 2018 and -- and back, who --

14       A.    Right.

15       Q.    -- decided --

16       A.    Yeah.

17       Q.    -- that the connecting injury was going to be the

18   2007 one as opposed to the 2018 one?  Do you know?

19       A.    Just based off this documentation, she wanted a

20   relatedness to her 2007 injury.  So we were having to look

21   at the previous attachment to see what injury was dated for

22   2007.  Because this is --

23       Q.    But where --

24       A.    -- where she --

25       Q.    -- does it say -- I'm sorry.  Where does it say

LaTonya Yvette Smith - May 11, 2023

155

1   that she selected that?  Because in the email we had

2   shared, and I can go back to it, she lists a number of

3   injuries --

4           A.   But those are the injuries.  You're --

5           Q.   She --

6           A.   -- asking me about -- mm-hmm.

7           Q.   Sorry.

8           A.   I'm sorry.  No --

9           Q.   No, it's okay.  She listed a number of injuries

10  and she said that she wanted to claim a recurrence because

11  of her leg pain.

12          And there were multiple previous IODs that she

13  had referred back to.  So my question --

14          A.   Mm-hmm.

15          Q.   -- is, who decided that they were going to

16  connect it just to that 2007 injury as opposed to all of

17  the other injuries that she had listed out here?

18          A.   It said in the -- in Dr. Arjmand note FOP and the

19  officer.

20          Q.   Okay.  So that's based on Dr. Arjmand's notes

21  connecting this injury to the 2007 injury; is that correct?

22          A.   Right.  So it says spoke to PO, which is Dr. --

23  which is Officer Arroyo, in this a.m.  Decision made in

24  arbitration prepared by the Fraternal Order to Police and

25  the City of -- City -- I'm -- I'm assuming the City of

LaTonya Yvette Smith - May 11, 2023

156

1  Chicago for PO to obtain one more IME for her 2007

2  relatedness opinion.

3          Letter to IME doctor noted -- letter to IME

4  doctor notes related to the 2017 coupled with her five

5  volumes were sent to the IME doctor whom -- when she put

6  urgent IME with cervical spine specialist, we would have to

7  look and see -- member and limited -- dated.

8          So we have to go to the referral person, because

9  a referral person will have -- here you go, right here.

10                Waiting for confirmation from ISG regarding

11                ISG referral process.

12          So Dr. Arjmand wanted her to get a IME with a

13  cervical sign -- a cervical spine specialist. ISG. I

14  don't know what that stands for. We can go up to page 6.

15          Okay. Confirmed letter. IG representative IME

16  appointment for member. The letter was emailed to member's

17  CDPA email in response in affirm. Member also appear in

18  and was given a hard copy of IME confirmation.

19          That was -- a referral was issued to Dr. Levin

20  for a relatedness of pain to her IOD injury of February

21  2007. So you will have to ask Kemper or Arroyo who chose

22  Dr. Levy.

23      Q.    This is --

24      A.    Levin.  Levin.

25      Q.    Sorry.  But this is after Arjmand -- Dr.

LaTonya Yvette Smith - May 11, 2023

157

1    Arjmand's directive that no referral should be given to
2    this officer until they discussed it with her first.
3    Correct?
4          A.   Correct.
5          Q.   Okay.  So is it your understanding that sometimes
6    in that situation where the case is in arbitration, that
7    the officer will get to choose the doctor that they are
8    seeing that they conduct the IME with?
9          A.   From my experience, most of the officer choose
10   their doctors.
11         Q.   Okay.
12         A.   So I wouldn't -- because I'm not the -- because
13   at -- it appears that based off this document -- if you can
14   go down.  After Dr. Arjmand sent the email on February
15   29th, it appears she didn't see -- she didn't see one of
16   us.
17              It appears that -- because when I saw her, Dr.
18   Arjmand sent the email on the -- February 29th.  And then I
19   documented (as read):
20                   Member in with limited duty packet dated
21                   4/06.  Updated for 3 months.
22                   Member has a IME appointment April 4th,
23                   2019.
24              I didn't make that appointment.  That appointment
25   was already scheduled.  So it appeared that she saw

LaTonya Yvette Smith - May 11, 2023

158

1  Sergeant Kemper.

2          And can we go back -- can we look at the date

3  Kemper entered her note?

4      Q.   Was it before or after this?

5      A.   The -- that's what I want to see.  So on the 7th

6  -- and then that was at almost 4:00.  And what time was

7  mine?  Want to go back down?

8          So I saw her at 2:00.  And then the appointment

9  Dr. -- Kemper must -- oh, I'm sorry.  Oh.  No, that's me

10 messing up.  Did I do that?

11         And it appears that Kemper made the appointment

12 for her.  So she saw me.  And Kemper probably was working

13 on the appointment.  And she scheduled appointment and

14 notified me and she probably entered it late.

15     Q.   Is there --

16     A.   But --

17     Q.   -- anything in this documentation that tells you

18 one way or the other that Officer Arroyo had any choice in

19 the selection of the doctor that would conduct this IME?

20     A.   Based off the documentation, no.

21     Q.   Okay.

22     A.   And then --

23     Q.   And --

24     A.   -- here -- if -- if -- if we can stop.  So then

25 she -- then she went on the medical for her left shoulder.

LaTonya Yvette Smith - May 11, 2023

159

1    So on the 29th, right after whatever was going on there,

2    she then went on the medical on March 29th.

3            So she was on the medical March 29th for her left

4    shoulder injury.  So those emails that you showed previous

5    to that was later on in 2019, asking to be moved from

6    medical to reoccurring IOD.

7        Q.    Okay.

8        A.    So now it has -- I couldn't remove her until she

9    was cleared.  Because I need to know if she was trying to -

10   - was trying to do a reoccurrence and be on reoccurring IOD

11   when she was actually off for a medical issue.

12           Or was she claiming that her left pain that she's

13   having now was related to that 2007 IOD.  But the February

14   -- February 1st, 2017.  I will have to look at that IOD and

15   see what body part did she injure.

16           Because I can't understand the context of when

17   she emailed me about changing her from medical to put her

18   on reoccurring IOD.  Can we look at that list of her

19   injuries?

20       Q.    Do you see my screen?

21       A.    Mm-hmm.

22       Q.    See how the first one is from 2018?  Left leg

23   injury and approved IOD?  Another one from July 20- --

24   2005, a left leg injury, approved IOD.

25       A.    So she only listed -- she only listed injuries to

LaTonya Yvette Smith - May 11, 2023

160

1   her body part that she's complaining about the swelling.

2       Q.   Okay.   So she's listing here previous IODs that

3   had been approved, at least most of them --

4       A.   Mm-hmm.

5       Q.   -- had been approved related --

6       A.   Mm-hmm.

7       Q.   -- to the body parts that she was identifying to

8   you that in that moment she was --

9       A.   Mm-hmm.

10      Q.   -- experiencing pain and she believes she -- it

11  was a recurrence of injury.   Is that --

12      A.   Right.

13      Q.   -- fair to say?

14      A.   Yes.   But she was currently on medical for her

15  cancer at the time.

16      Q.   Understood.

17      A.   But I couldn't -- so I couldn't do anything for

18  her.   That's where that come from --

19      Q.   Okay.

20      A.   -- okay.

21      Q.   Now, I want to take you back to those CLEAR

22  notes, though, that we were looking at, because I want to

23  just confirm with you here --

24      A.   Mm-hmm.

25      Q.   -- I couldn't see anything.

LaTonya Yvette Smith - May 11, 2023

161

```
 1       A.    Mm-hmm.

 2       Q.    Okay?

 3       A.    Mm-hmm.

 4       Q.    Is there anything here, any notes between --

 5  sorry, my computer's freezing.

 6       A.    Mm-hmm.

 7       Q.    Just going back to the top here.  And we saw that

 8  these notes are chronologically entered, right, with the

 9  most --

10       A.    Mm-hmm.

11       Q.    -- recent at the top --

12       A.    Mm-hmm.

13       Q.    Do you see any notes entered in here between

14  October 21st, 2019 and March 6th, 20- -- 2020?  Sorry.

15       A.    Mm-hmm.  Got it.  I'm listening.  Ask --

16       Q.    Do you --

17       A.    -- the --

18       Q.    -- do you --

19       A.    -- question again.

20       Q.    The question is, do you see any notes in here

21  entered between October 21st, 2019 and March 6th, 2020?

22       A.    Do I see any notes?

23       Q.    Right.  Are there -- were there any notes entered

24  between the time October 21st, 2019 and March 6th, 2020?

25       A.    Right.  You have to scroll down.
```

LaTonya Yvette Smith - May 11, 2023

162

1      Q.    Why do I have to scroll down if these are in
2   chronological order?
3      A.    Because if you -- I have to look at the dates.
4   So if we start back at the top.  The notes that you have
5   here.  This one's entered March 6.
6           And then the next one was entered October -- so
7   October 21 was entered by me.  And her last medical was on
8   November.
9      Q.    So right now, do you see anything in this record
10  of any notes entered between this October 21st, 2019 entry
11  and the March 6th, 2020 entry?
12     A.    No.
13     Q.    Okay.  And then we looked at the past.  Like none
14  of these are from in between that timeframe either.
15  Correct?  They all go from before October 21st, 2019.
16  Correct?
17     A.    Mm-hmm.  And then the next one is?
18     Q.    So the next one --
19     A.    Enter --
20     Q.    September --
21     A.    -- September --
22     Q.    -- 27, 2019.  Do you see that there?
23     A.    Yeah.  And then the next one was -- is September
24  5.  Uh-huh.
25     Q.    Right.  And the one after that, August 12, 2019?

LaTonya Yvette Smith - May 11, 2023

163

1     A.    Mm-hmm.

2     Q.    See that?  So --

3     A.    Yes.

4     Q.    Well, is it correct in -- in my reading of this

5   document, that there aren't any notes here entered between

6   October 21st, 2019 and March 6th, 2020?

7     A.    Right.  But what we would have to figure out is

8   her last -- oh.  I'm sorry.  Her last day -- so we have to

9   look at this -- her last day is November 17th, two thou- --

10  so she was off payroll November of 2019.  And once they're

11  off the payroll, we won't document any of her care because

12  she's not on the medical.

13    Q.    So how come this March 6th, 2020 entry was

14  entered for her about the PAR form?

15    A.    Because any time I have a conversation do

16  something with the officer, I will document it.

17    Q.    Even if you had an -- a conversation with Officer

18  Arroyo between, say -- after this October 21st, 2019 date,

19  after her, you know, her days -- her last day on the

20  medical roll was -- had expired, you still would've entered

21  a note in the system, correct, if you'd had -- had a

22  conversation with Officer Arroyo --

23    A.    I would -- I would try to it's pertaining to

24  something pertinent, yes.  Because this is what I'm saying.

25  I -- we have to go back to the emails.

LaTonya Yvette Smith - May 11, 2023

164

1      Because she was sending me emails in February.

2  Correct?

3      Q.   Okay.  Let's just -- let's move on here just so

4  we can save some time here --

5      A.   Yeah, I mean, it's just -- it's just everything

6  is just like -- like see here.  At this CLEAR note, where

7  it says progress note history --

8      Q.   I'm -- just for the record, I'm sharing with you

9  Exhibit 8 again, just so the court reporter knows --

10     A.   Mm-hmm.

11     Q.   -- sorry.  And go --

12     A.   Mm-hmm.

13     Q.   -- ahead.  Say what you were going to say.

14     A.   Okay.  So see where it says progress note

15  history?  You will have to click on the note.  Because see,

16  Officer Bishop charted something in -- we're talking about

17  from March -- I got it in my mind.  I have to write it out.

18          So we're talking from March --

19     Q.   So in Exhibit 7, the notes stop after March 6th,

20  2020.  And there --

21     A.   But that's the -- that's because you can -- if

22  you go back up to the top.  I'm sorry.

23     Q.   Okay.

24     A.   Can you go back up to the -- all the way back up

25  to the -- it was a previous exhibit.  8?  Was it 8?

LaTonya Yvette Smith - May 11, 2023

165

1    Q.   Is this -- this is Exhibit 7 now, and then the
2 last one we were looking at is 8.

3    A.   Can you go back to 8?

4    Q.   Yeah.

5    A.   So we're talking about October 12th.  Right?
6 Because it was October 2019 to March -- was that March 20-
7 -- I'm sorry.  I was --

8    Q.   March --

9    A.   -- trying --

10   Q.   -- 6th, 2020 is what I see here.

11   A.   Oh, okay.  March 2020.  Okay.  So if you look
12 here, there was a note from Bishop.  You have to like go to
13 the next.  So -- but -- but you can't.

14        It says printout of the progress note.  So the
15 progress history lists all the progress note in
16 chronological.  So the 6th and then the March -- October
17 21st.

18        And then September and -- September 9th and
19 September 5th.  So your question to me.  I -- I just have
20 to regurgitate so I'm understanding, I'm answering the
21 question correctly.

22        You were asking me, were there any communication
23 between -- was there any documentation of communication
24 between the officer and anyone in the Medical Section
25 between October 21st and March 6th.  And my answer to that

LaTonya Yvette Smith - May 11, 2023

166

1    question was no.  Is no, I mean.  Is no.  Okay.

2        Q.   Okay.

3        A.   And it appear -- and it appears that she was --

4    she started on the medical November 17th.  And was -- I

5    mean on -- yeah.  Oh.  March 29th to November 17th, she was

6    on the medical roll and she exhausted her time in November.

7            So documentation between October 21st, which is

8    before she went on the medical, up until the time she was

9    off the medical, which was March 29th, I only documented a

10   note for October and March 6.

11       Q.   If your office had received any kind of medical

12   documentation from Officer Arroyo after November 17, 2019,

13   would that have been entered in the CLEAR system?

14       A.   It should have been, but according to the emails

15   and my communication with her starting after March 29th, I

16   didn't document anything because she was emailing me.  And

17   so for me, I should have in my opinion some of the

18   communications that the IME was received.

19           But because she was not on the medical roll, I

20   didn't document any of those conversations in the emails

21   into the CLEAR.  Because her IME was scheduled for April

22   4th, 20- -- was -- 2019.

23           And then April 4 of 2019, she was -- she was off

24   the medical roll.  And that's the reason why she was

25   requesting a IME, because she felt that she -- her IOD

LaTonya Yvette Smith - May 11, 2023

167

1   should have been the IOD limited duty and non-IOD limited
2   duty.
3           MS. ABRAHAM:  Okay.  I'm sharing what I'm going
4   to mark as Exhibit 26 here.
5           THE WITNESS:  Okay.
6           (Exhibit No. 26 marked for identification)
7   BY MS. ABRAHAM:
8       Q.   Can you see my screen?
9       A.   Yes.
10      Q.   And this is a -- just for the record, Arroyo.Def
11  4064.
12      A.   Mm-hmm.
13      Q.   Do you recognize this email?
14      A.   Yes.  I -- I see me.  Yes.
15      Q.   And what is it?
16      A.   A -- it's -- Kemper is emailing me, saying (as
17  read):
18              Can you tell me how many limited duty days
19              Arroyo has used?  Can help -- can help you
20              determine that if you need help.
21          So I emailed her back that she used 730 days of
22  non-IOD.
23      Q.   And that's as of May 31st, 2019.  Is that
24  correct?
25      A.   Yes.

LaTonya Yvette Smith - May 11, 2023

168

1              MS. ABRAHAM:  I'm going to mark this next one
2  Exhibit 27.

3              THE WITNESS:  Okay.

4              (Exhibit No. 27 marked for identification)

5  BY MS. ABRAHAM:

6       Q.   Can you see my screen?  Just for --

7       A.   Yeah.

8       Q.   -- the record, this is Arroyo.Def 4101.  Do you

9  recognize this email?

10      A.   I see that I'm cc'd on it.

11      Q.   Starting here, at the bottom of -- where it's

12  from Reyna to a Karla Johnson and it copies you.  Do you

13  see that?

14      A.   Mm-hmm.

15      Q.   Who is Karla Johnson?

16      A.   I don't know.

17      Q.   Okay.  But she --

18      A.   But --

19      Q.   -- copied you on this email.  Do you remember

20  having any communications with Sergeant Johnson or with

21  Officer Arroyo around this time about her coming in to turn

22  in her badge and her star?

23      A.   No.

24      Q.   And I'm seeing here under Karla Johnson's

25  signature line that she's from the human resources

LaTonya Yvette Smith - May 11, 2023

169

1    division.  Do you see that?

2         A.    Okay.  Yes.

3         Q.    Does that --

4         A.    But I don't --

5         Q.    -- refresh your memory as to who she may have

6    been?

7         A.    I -- I can assume so.  That's what she put on her

8    email, but I don't know who Karla Johnson is.

9         Q.    Okay.  At some point, though, was Officer Arroyo

10   asked to come in and turn in her star, her shield, her ID?

11        A.    According to the email, she was asked.

12        Q.    And that was in May of 2020; is that correct?

13        A.    That's what the email says.  Yes.

14        Q.    Okay.  Do you remember having any conversations

15   with Officer Arroyo about this issue?

16        A.    No.

17        Q.    So is it -- is it your understanding that the

18   reason that Reyna was not continued in a -- a light duty

19   assignment was because she ran out of those days, is that

20   correct?

21        A.    Of non- -- I -- yeah.  Of non-IOD.  Yes.

22        Q.    Okay.  And had she been on an IOD -- had

23   restrictions related to an injury on duty, she would've

24   been entitled to an  unlimited permanent limited duty

25   assignment?  Is that --

LaTonya Yvette Smith - May 11, 2023

170

1    A.   Correct.

2    Q.   Okay.

3    A.   Yes.

4    Q.   I think I --

5    A.   Correct.

6    Q.   -- asked that question a little confusingly.  So

7    just for the record --

8    A.   No, no, no.

9    Q.   -- I'll rephrase it.

10   A.   Yeah, right.

11   Q.   Right, like if she had been injured IOD, is it

12   your understanding that that limited duty assignment

13   wouldn't have ended?

14   A.   Correct.  Officers that's injured on duty who

15   have restriction and are on limited duty status has a

16   number of unlimited days to remain limited duty IOD.

17   Q.   Okay.  But is it -- am -- am I correct in

18   understanding that the issue wasn't so much about her

19   needing those restrictions, it was the source of the

20   injury, whether it was work-related or not?

21   A.   That didn't matter.  She -- it was that she

22   didn't have the time for non-IOD to remain --

23   Q.   Okay.

24   A.   -- on duty.  So her restrictions didn't play a

25   role in it.  Except for that if you are non- -- non-IOD

LaTonya Yvette Smith - May 11, 2023

171

1   limited duty and you run out of your 730 days, if you

2   remain disabled with restrictions, you have to follow the

3   guidelines of leave of absence.

4           Or return back to full duty.  Those are the only

5   options.

6       Q.   And are you aware of anyone from the Medical

7   Services Section reporting Reyna's request to continue in a

8   permanent limited duty assignment to like a disability

9   liaison with the City?

10      A.   Officer Bishop is responsible -- she informs us -

11  - because I didn't know -- I just knew her as Officer

12  Bishop.  I didn't know she was the disability liaison.

13  Like I didn't pay attention to any of that.

14          I just know she's the officer that informs us

15  when a officer's time is being exhausted.  And we have to

16  get in contact with the member to get them into the office

17  to go through their options.

18      Q.   Okay.

19      A.   So once they go through the options, they talk

20  with Officer Bishop and Sharice Jones, who was the

21  supervisor.

22      Q.   Okay.  So nobody ever talked with you about doing

23  anything to see if there was another place that Reyna could

24  have been assigned to to accommodate the disability or

25  anything like that.  Is that fair to say?

LaTonya Yvette Smith - May 11, 2023

172

1      A.   Yeah, that's out the scope of my duties as a

2  occupational health nurse.

3      Q.   Okay.  Okay.  If you guys don't mind, I want to

4  take just a few minutes just to go over my notes, make sure

5  there's nothing else I want to ask you.

6           I think I'm done today.  But I just want to make

7  sure.  Okay?

8      A.   Okay.

9      Q.   So if you don't mind, we can come back at 1:35.

10          After that, I want to turn it over to the City.

11  They may have some questions they want to ask you.  Okay?

12     A.   Okay.

13          MR. SUHL:  Yeah.

14          THE WITNESS:  Okay.

15          MR. SUHL:  No problem.

16          MS. ABRAHAM:  Thank you.

17          THE REPORTER:  1:31.

18                    (Off the record)

19          THE REPORTER:  Back on the record, 1:36.

20          MS. ABRAHAM:  Thank you.

21          Ms. Smith, I don't have any further questions for

22  you today.  Thank you so much.

23          THE WITNESS:  Okay.

24          MS. ABRAHAM:  I'm going to turn it over to your

25  attorney.

LaTonya Yvette Smith - May 11, 2023

173

1          MR. SUHL:  And the City doesn't have any -- any
2   questions today.
3          MS. ABRAHAM:  Okay.  Great.
4          Well, thank you so much for your time today, Ms.
5   Smith.
6          THE WITNESS:  Okay, thank you.  Bye-bye.
7          MR. SUHL:  Ms. Smith, before you go.  You can
8   either waive -- waive signature on this or you can review
9   the -- the transcript to look for any inaccuracies.
10  03:50:26
11         You can't change the substance of anything.  But
12  if there's a -- like a typo or something like that, if you
13  want to review the transcript and correct that, you can
14  reserve your signature and sign it later.
15         Or you can just waive it now and not worry about
16  it.
17         THE WITNESS:  I'll just waive it, don't worry
18  about it, because I can't change nothing, so.
19         MR. SUHL:  Substantively, no.
20         THE WITNESS:  All right.  So --
21         MR. SUHL:  Okay.
22         THE WITNESS:  Okay.  All right.
23         MR. SUHL:  We just want to take care of that
24  while we had you here.
25         THE WITNESS:  Okay, no problem.

LaTonya Yvette Smith - May 11, 2023

174

1          MR. SUHL:  All right.  Thank you.

2          THE REPORTER:  Okay.  Off the record, 1:37.

3                  (Adjourning at 1:37 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

175

C E R T I F I C A T I O N

1

2

3        I, Jodi Needleman, do hereby certify that the

4    foregoing is a correct transcript from the official audio-

5    visual recording of proceedings in the above-entitled

6    matter.

7        I further certify that I am not related to nor an

8    employee of counsel or any of the parties to the action,

9    nor am I in any way financially interested in the outcome

10   of this case.

11       Dated this day, June 2, 2023.

12

13

14                              (Electronically signed)

15                              Jodi Needleman

16

17

18

19

20

21

22

23

24

25