# EXHIBIT 14

# Part 1 of 2

# Pages 1-73

# In The Matter Of:

*Reyna Arroyo v.*
*City of Chicago*

---

*Michele James*
*April 13, 2023*

---

*Textnet Digital Court Reporting*
*www.textnet.com | office@textnet.com*
*Madison, WI | Chicago, IL*
*608-620-3829 | 312-868-0305*



Min-U-Script® with Word Index

1

1

2                  IN THE UNITED STATES DISTRICT COURT

3                FOR THE NORTHERN DISTRICT OF ILLINOIS

4                          EASTERN DIVISION

5    ----------------------------------------------------------

6    REYNA ARROYO,                          )

7                      Plaintiff,           )

8    vs.                                    ) Case No. 2021 CV 01148

9    CITY OF CHICAGO,                       )

10                     Defendant.           )

11     ----------------------------------------------------------

12                  Video Deposition of MICHELE JAMES

13     ----------------------------------------------------------

14                          April 13, 2023

15

16

17

18

19

20

21

22

23

24

25              Reporter:  Margaret Goodwin, CER

2

1                          A P P E A R A N C E S

2              (All appearances via remote Zoom videoconference.)

3

4     On behalf of the Plaintiff:

5     JANAAN HASHIM

6     AMAL LAW GROUP, LLC

7     161 N Clark St.

8     Suite 1600

9     Chicago, IL 60601

10

11    On behalf of the Defendant:

12    KRISTEN WOYTOWICZ

13    MATTHEW SUHL

14    CITY OF CHICAGO LAW DEPARTMENT

15    2 N. LaSalle St.

16    Suite 640

17    Chicago, IL 60602

18

19

20

21

22

23

24

25

3

```
 1                     I N D E X
 2   WITNESS                                    PAGE
 3   MICHELE JAMES
 4        Examination by Ms. Hashim             5
 5        Cross-Examination by Ms. Woytowicz    144
 6        Redirect Examination by Ms. Hashim    147
 7
 8                   E X H I B I T S
 9   NO.                                        MARKED
10   Exhibit 1                                  45
11   Exhibit 2                                  63
12   Exhibit 3                                  104
13   Exhibit 4                                  106
14   Exhibit 5                                  112
15   Exhibit 6                                  119
16   Exhibit 7                                  123
17   Exhibit 8                                  129
18   Exhibit 9                                  134
19   Exhibit 10                                 139
20
21
22
23
24
25
```

Michele James - April 13, 2023

4

1                    P R O C E E D I N G S

2                (Commencing at 9:33 a.m.)

3          THE REPORTER:  Good morning.  We are on the

4   record, April 13th, 2023, at 9:33 a.m.  We're here in the

5   matter of Reyna Arroyo versus City of Chicago, Case No.

6   2021-CV-1148, in the Northern District of Illinois, Eastern

7   Division.

8          My name is Margaret Goodwin, and I'm recording on

9   behalf of Textnet Digital Court Reporting.  This is the

10  remote deposition of Michele James.

11         Ms. James, do you have a middle name?

12         THE WITNESS:  No, I do not.

13         THE REPORTER:  Okay.  And would you please raise

14  your right hand for the oath?

15                    (Witness sworn)

16         THE REPORTER:  Thank you.

17         And would the attorneys please state their

18  appearances for the record?

19         MS. HASHIM:  Janaan Hashim for the Plaintiff.

20         MS. WOYTOWICZ:  Kristen Woytowicz for the City of

21  Chicago.

22         MR. SUHL:  And Matthew Suhl for the City of

23  Chicago.

24         THE REPORTER:  All right.  Thank you.  We can

25  proceed.

Michele James - April 13, 2023

5

1          MS. HASHIM:  All right.  Thank you very much; and

2     good morning.

3                          EXAMINATION

4     BY MS. HASHIM:

5          Q.    Can you please state your name for the record?

6          A.    Yes.  Michele James.

7          Q.    And can you please spell your first name and last

8     name?

9          A.    Michele, M-I-C-H-E-L-E, James, J-A-M-E-S.

10         Q.    Thank you.  Are you aware that you're being

11     deposed in the matter of Arroyo v. City of Chicago, a

12     lawsuit alleging failure to accommodate under the Americans

13     with Disabilities Act and retaliation in the Federal Court

14     for the Northern District of Illinois?

15         A.    Yes, I am.

16         Q.    And I say ADA, would you understand this to mean

17     Americans with Disability Act?

18         A.    Yes, I do.

19         Q.    And if I say CPD, would you understand this to

20     mean Chicago Police Department?

21         A.    Yes, I do.

22         Q.    And I -- when I refer to the City, would you

23     understand this to mean the City of Chicago?

24         A.    Yes, I do.

25         Q.    Have you ever been deposed before, Ms. James?

Michele James - April 13, 2023

6

1      A.    Yes, I have.

2      Q.    How many times?

3      A.    Twice.

4      Q.    When was the most recent one?

5      A.    I want to say September 2019.

6      Q.    Okay.  Was that related to the ADA by any chance?

7      A.    Yes.  It was.

8      Q.    Okay.  Can you tell me a little bit about it?

9      A.    It was about an -- a medical claim about an

10   officer who was denied medical treatment, but it was

11   through the medical section.  There were medical documents

12   that were presented to me, and the counsel wanted to know

13   had I seen any of those documents, and I had not.

14            To be honest, I had no understanding in terms of

15   why I was even deposed for that case.  Because for that

16   particular officer, the only thing that my section in

17   finance, because I was the assistant director of finance at

18   the Chicago Police Department -- we would prepare injury on

19   duty letters for officers to submit with their taxes.

20            So for that particular officer, the only

21   documents that we had were simply when he was -- when he

22   was declared injury on duty by the medical section so we

23   can count those days and then we can calculate the money

24   associated with that, because that's considered workers'

25   compensation.

Michele James - April 13, 2023

7

1          So I really -- the information or documents that
2    were shared with me I had never seen.  Those would've been
3    all documents in the medical section.  And that was pretty
4    much my -- my statement.
5          Q.   Okay.  And so you were deposed as -- as a fact
6    witness.  Is -- would that be a fair statement?
7          A.   Yes.  It would be.
8          Q.   All right.  And the one -- you said that there
9    were two.  What was the one before the 2019 one that you
10   just described?
11         A.   That was personal.  So that was -- my husband and
12   I were -- we were rear-ended by a -- a -- a lady who -- she
13   was driving her boy- -- her deceased boyfriend's car.
14              And he had been deceased for two years.  So she
15   was driving his car and she rear-ended us.  And she did not
16   have a license.
17         Q.   Okay.  And that was -- do you know -- remember
18   what year that was in?
19         A.   I don't remember.
20         Q.   Okay.  That's fine.  So during this deposition,
21   you're under oath, and that means that the testimony you
22   provide today applies the same expect- -- expectation that
23   you will tell the truth under penalty of perjury.  Do you
24   understand this?
25         A.   Yes, I do.

Michele James - April 13, 2023

8

1    Q.   So in other words, you cannot willfully give
2  false, misleading, or incomplete testimony.  Do you
3  understand?
4    A.   Yes, I do.
5    Q.   Also, unlike a conventional conversation, we have
6  a court reporter here, and she is taking down everything we
7  say.  We have an additional complexity of this being a
8  remote proceeding.
9         So for these reasons, I would ask that you wait
10 until a question is finished before responding.  This will
11 make the job easier for the court reporter to be able to
12 record what's being said.  Okay?
13   A.   Yes.
14   Q.   All right.  And while it's -- it's human nature
15 to nod our heads and to say "mm-hmm" or "yeah," try to
16 avoid using signals or sounds to indicate an answer.
17 Again, it's -- the whole idea is just to create a very
18 clear record.  Okay?
19   A.   Okay.
20   Q.   Terrific.  Now, because this is a remote
21 deposition, you're likely on a personal device right now,
22 and they -- that may have messaging capabilities and
23 notifications of communications coming in as we are
24 speaking.  And I just ask that you do not open messages or
25 communicate with anyone generally, during the time you're

Michele James - April 13, 2023

9

1    being questioned.  Okay?

2        A.    Okay.

3        Q.    If you need to take a break, please let me know.

4    The only request that I have is that if you have to take a

5    break, and there is a question pending, please -- I will

6    need you to please answer the question first before we take

7    that break.  Is that all right?

8        A.    Yes.

9        Q.    Okay.  Now, the purpose of today's deposition is

10   to gather facts based on your knowledge.  If you do not

11   understand a question, there's nothing wrong with asking me

12   to repeat it or explain it.  If you answer my question, I'm

13   going to assume that you understood it.  Is that clear?

14       A.    Yes.

15       Q.    If you need clarification on any question, just

16   ask.  Okay?

17       A.    Okay.

18       Q.    All right.  Sometimes when I ask a question, you

19   may have partial knowledge but not absolute, certain, or

20   complete knowledge.

21            For example, if I ask you about the weather right

22   now, you can not necessarily tell me the exact degree in

23   temperature, but you can give me an approximate answer like

24   it's hot or it's cold or somewhere in between.  In that

25   kind of a circumstance, an answer of "I don't know" is not

Michele James - April 13, 2023

1   appropriate, but an answer giving a range or an estimate

2   based on your knowledge, with an explanation that it's a

3   range or estimate, is appropriate.  Do you understand that?

4        A.   Yes.

5        Q.   Is there any reason, Ms. James, such as being

6   under duress, unusual stress, a physical or mental

7   condition, or being under the influence of any medications

8   or substances, that would prevent or limit you today from

9   giving truthful answers to my questions?

10       A.   No.

11       Q.   During this proceeding, you might hear someone

12  make an objection.  Now, generally unless the objection is

13  on the basis of a privilege and you are directed not to

14  answer, you will still be expected to answer the question

15  posed.  Do you understand?

16       A.   Yes.

17       Q.   When you hear an objection, you should not start

18  answering the question until the attorney has a chance to

19  make the objection clear and on the record.  And then after

20  that, you can answer.  Okay?

21       A.   Okay.

22       Q.   Have you prepared for today's deposition?

23       A.   Yes.

24       Q.   And how did you prepare for the deposition?

25       A.   I still have access to my Chicago Police

Michele James - April 13, 2023

11

1    Department email account.  And I went through and forwarded
2    the emails dealing with this -- with Officer Arroyo to my
3    City of Chicago email account.
4            And then I reviewed those notes just to refresh
5    my memory.  Only because this is personnel-related, and
6    then my current role is completely different.  So I needed
7    to refresh my memory about her particular case.
8        Q.   Did you meet or communicate with an attorney
9    prior to this deposition?
10       A.   Yes.
11       Q.   And who did you meet with?
12       A.   Kristen.
13           THE WITNESS:  I don't -- pronounce -- butcher
14   your last name.
15   BY MS. HASHIM:
16       Q.   And without divulging what you talked about with
17   Kristen, how many times did you discuss this deposition
18   with her?
19       A.   Possibly twice.
20       Q.   And when was the first time?
21       A.   I do not recall the exact date, but it was
22   earlier this year.
23       Q.   Okay.  And how long was -- how long was this
24   first conversation?  Do you recall?
25       A.   It was brief.  Probably five minutes.  Ten

Michele James - April 13, 2023

12

1    minutes max.

2         Q.   Okay.  And you -- you said twice.  When was the

3    second time that you talked with her?

4         A.   I'm sorry.  Let me correct myself.  I apologize,

5    because it's -- it's been a minute.

6              Actually, I did speak with Kristen last year.  Or

7    was it the year before.  I'm -- I'm not exactly sure of the

8    date.  When it first -- when it first came to my attention.

9    So I did speak with her about a -- a year before.  That

10   conversation -- I don't -- I do not recall how long it was.

11   It was more of fact information.

12             But for this year, it was early in the year and

13   it was brief.  Like I said, five, ten minutes max.  And

14   then on Tuesday of this week.  And that was a five-minute

15   conversation.

16        Q.   Okay.  Is it your understanding that the City's

17   attorneys here today represent you specifically in this

18   deposition?

19        A.   Yes.

20        Q.   Was it your choice to have them represent you?

21        A.   I wasn't given a option to select.  So no.

22        Q.   Okay.  Were you made aware that they did not need

23   to represent you here today because you are not involved in

24   any of the -- any of the decisions at issue in this case?

25             MS. WOYTOWICZ:  Object to foundation.

Michele James - April 13, 2023

13

```
 1   BY MS. HASHIM:
 2        Q.   You can answer.
 3        A.   I don't recall that being stated to me.
 4        Q.   Okay.
 5        A.   I just do not recall.
 6        Q.   Other than the emails that you referred to
 7   earlier, did you review any other documents in preparation
 8   for today?
 9        A.   I was able to pull up a director from the Chicago
10   Police Department's policies and procedures, and I reviewed
11   the -- the guidelines for the limited duty general order.
12   It --
13        Q.   Did you --
14        A.   -- was really to confirm my understanding.  As --
15   as a refresher.
16        Q.   Did you review any files, forms, or other
17   documents besides the ones you've mentioned?
18        A.   No.
19        Q.   And did you review any communications other than
20   the emails that you had stated earlier?
21        A.   No.
22        Q.   Did you discuss this deposition with anyone else
23   other than the attorney that you mentioned earlier, with
24   Kristen?
25        A.   My husband.
```

Michele James - April 13, 2023

14

1      Q.   Does your husband work for the City?

2      A.   He used to.  He was a former Chicago police

3  officer and he retired January 2021.

4      Q.   And what did you discuss with him?

5      A.   I just mentioned to him about the deposition that

6  I had to give.  And that was it.

7      Q.   Any -- any -- any kind of substance, other than

8  mentioning that you're going to give a deposition?

9      A.   No.

10      Q.   Did anyone from CPD other than the C- -- City's

11  attorneys question you about your knowledge in this matter?

12      A.   No.

13      Q.   Did you discuss this deposition with anyone in

14  the finance division?

15      A.   I mentioned it to my boss, Reshma Soni.  And also

16  human resources.  Ramona Hamilton and Doniece Stevens.

17  Just to alert them that I was have -- that I had to give a

18  deposition.  They're in HR.

19      Q.   Can you spell the name of the first individual

20  that you said, your boss?

21      A.   Yes.  Reshma, R-E-S-H-M-A, Soni, S-O-N-I.  She is

22  the City comptroller.  And anyone else?

23      Q.   You -- you mentioned Ramona Hamilton?  Is that a

24  standard spelling?

25      A.   Standard.  Yes, it is.

Michele James - April 13, 2023

1    Q.    Okay.   Now, while employed by the City, have you

2  been a witness in any investigation that had to do with

3  failure to accommodate under the ADA?

4    A.    No.

5    Q.    And while employed by the City, have you been a

6  witness to any investigation that had to do with

7  retaliation?

8    A.    Yes.

9    Q.    With the one with retaliation, when was -- when

10 did this happen?

11   A.    I do not recall the date.

12   Q.    Do you recall the rough year?  Maybe last five

13 years, pre-pandemic?

14   A.    Oh, that -- it's -- it's been a -- I would say

15 the last six years maybe.

16   Q.    And were you a witness for the City or for one of

17 the members of the party or who were -- who were you the

18 witness for?

19   A.    I apologize.  It wasn't -- I was the person who

20 was being accused.

21   Q.    Oh, okay.  So you were a party.

22   A.    Yes.

23   Q.    And do you know how that investigation resulted?

24   A.    No, I do not.

25   Q.    And what was the basis of retaliate --

Michele James - April 13, 2023

1    retaliation alleged?

2            MS. WOYTOWICZ:  Object to foundation.

3            Answer if you know.

4            THE WITNESS:  It had to do with a -- a -- a -- an

5    IOD, a limited duty police officer, who was detailed to the

6    finance division of the Chicago Police Department.  And she

7    accused myself as well as the director of finance of

8    retaliating by cancelling her detail.

9            She -- there was a lot of administrative

10   challenges with her in terms of her work, in terms of her

11   personality.  It -- it was like a -- kind of like a hostile

12   work environment.

13           And so the one thing about the limited duty

14   program is there is a clause in their application that

15   where their assignment -- they -- they can be reassigned or

16   assigned according to operational needs.

17           And it seems that it just wasn't working out with

18   her being in our office.  So she accused us of retaliating

19   against her, and we had to give a statement -- she filed a

20   grievance.

21           And it went to CPD's internal affairs division.

22   And I had to give a statement as well as the director.  Our

23   basis was she -- we show the CPD internal affairs division

24   her work and how she -- instead of giving the answers that

25   we needed, how she was confrontational in her emails, in

Michele James - April 13, 2023

17

1  her dialogue, not only with her peers but with external

2  City constituents.

3          There was email correspondences even from my

4  deputy chief, pretty much saying how come she's still here.

5  So we ended her detail, and then also she had a conflict

6  with another employee in the office, where it was appearing

7  to be threatening.

8          So -- so again, we just ended her detail.  So she

9  accused us of retaliation.  So I do not know the outcome of

10  that.

11 BY MS. HASHIM:

12     Q.    While employed by the City, have you -- you

13 yourself complained of retaliation?

14     A.    No, I have not.

15     Q.    Have you ever complained on another employee's

16 behalf about retaliation?

17     A.    I do not recall.

18     Q.    Okay.  Have you ever complained about unlawful

19 employment practices in general while working for the -- at

20 -- at CPD?

21     A.    No, I have not.

22     Q.    Are you aware that the law protects you from

23 reprisal or retaliation by your employer for speaking

24 truthfully about unlawful employment practices?

25     A.    Yes, I am.

Michele James - April 13, 2023

18

1      Q.   Now, because this case alleges failure to

2   accommodate under the ADA, I'd like just to ask you some

3   general background questions.  Have you ever made a request

4   for a reasonable accommodation under the ADA for a mental

5   or physical disability?

6      A.   For myself?

7      Q.   Correct.

8      A.   No.

9      Q.   Have you ever made a request for reasonable

10   accommodation under the ADA for a mental or physical

11   disability on someone else's behalf?

12      A.   No.  I have not.  But I've directed someone to do

13   that.

14      Q.   Can you share with me a -- a little bit about the

15   context of why you directed somebody to -- to do that?

16      A.   There was another limited duty -- an IOD limited

17   duty officer who also worked in finance.  And one day when

18   he was driving into work, he was rear-ended by a semi

19   truck.

20           And he sustained several injuries.  Mostly back.

21   He was on medical for about a year.  And then when he

22   returned to the office, he had -- it -- it was challenging

23   for him to work, where he's to sit for long periods of

24   time.

25           So I did instruct him to reach out to either

Michele James - April 13, 2023

19

1    human resources or the medical section to find out if they

2    could -- if the City can accommodate him with a -- a chair

3    and also an -- an extendable desk.  And he did do that, and

4    he was accommodated.

5         Q.    Do you currently work?

6         A.    Yes, I do.

7         Q.    And who is your employer?

8         A.    The City of Chicago.

9         Q.    And where do you currently work?

10        A.    Department of Finance.  121 North LaSalle Street.

11   Room 700.

12        Q.    And what is your position?

13        A.    Deputy comptroller.

14        Q.    And so this is the Department of Finance for the

15   City of Chicago, just to be clear.

16        A.    Correct.

17        Q.    Okay.  And when did you start this position?

18        A.    On paper, February 16th, 2022.  But I didn't

19   actually make my transition over until like March 22nd or

20   March 24th, 2022.  So a little more than a year.

21        Q.    And prior to that -- prior to February 16th, 2022

22   or even March 2022, where were you working?

23        A.    It became -- so the -- the Chicago Police

24   Department finance division was merged into the new Office

25   of Public Safety Administration.  So I was a part of the

Michele James - April 13, 2023

20

1   Office of Public Safety Administration.  That's where I

2   transferred from.

3       Q.   And so did your position stay the same when you -

4   - when the two offices merged?

5       A.   Yes.  My title stayed the same, but my

6   responsibilities were changing.

7       Q.   So let's go first with your title.  What was the

8   title that you had?

9       A.   Assistant director of finance.

10      Q.   And you said that your responsibilities changed;

11  is that correct?

12      A.   Yes, it did.

13      Q.   Okay.  So when -- when did this merge happen?

14      A.   It started in like the fall of 2020.

15      Q.   And from the fall of 2020 until you left this

16  position, what were your responsibilities as assistant

17  director of finance?

18      A.   It wasn't clear with the new department.  I can

19  tell you the before and a little of what was -- what was

20  happening.

21           When I was the assistant director of finance, I

22  was -- for the police department, I was responsible for the

23  payroll division, timekeeping.  There was a special

24  projects group that handled IT projects or special volume

25  type gather -- information gathering.

Michele James - April 13, 2023

1        Accounts payable, travel, over the budget,

2    reimbursement.  So I was second in command.  Under the new

3    Office of Public Safety Administration, they carved all of

4    that out.

5        So under this new department, they were merging

6    all the public safety departments for the police

7    department, fire department, Office of Emergency

8    Communication.  So all the payroll and the timekeeping was

9    now under a deputy director for all payroll and timekeeping

10   from those public safety departments.

11       That was no longer my responsibility.  Contracts.

12   I apologize.  I also was over contracts.  So the contracts

13   was merged with grants.  That was under another deputy

14   director.  That was no longer my responsibility.  So what

15   was left was the budgeting, travel section, the

16   reimbursements, and then payables.

17       That was under another deputy director whom I

18   reported to.  But I was no longer the person making those

19   decisions.  And so it wasn't -- by the time I left, I was

20   really sharing my information with those other deputy

21   directors in terms of the -- the history for payroll and

22   timekeeping to that director and this is the history for

23   the contracts to the other deputy director.

24       And with my new boss, sharing with her the

25   history of the budget for the police department and the

Michele James - April 13, 2023

1    travel and the reimbursements.  And the payables.

2         Q.   And so for how long did you have the position

3    with CPD before the merge?  Like when did you start with

4    the -- being the assistant director of finance?

5         A.   I want to -- it was either -- like -- I think it

6    was like August of 2024 or August of 2025.  I'm not exactly

7    sure which year.

8         Q.   20- -- what do you mean by 2024?

9         A.   You wanted to know how long that I have -- did I

10   hold the position --

11        Q.   What -- yeah --

12        A.   -- because it's --

13        Q.   -- when did you start the position?

14        A.   It was -- it was -- I want to say like August of

15   2024 or August of 2025.  I'm not exactly sure.

16        Q.   The --

17        A.   It --

18        Q.   -- the year?

19        A.   -- it was --

20        Q.   Can you --

21        A.   I don't remember -- I remember my husband had

22   surgery, but I forgot what year he had a major surgery.

23        Q.   I mean --

24        A.   I'm going --

25        Q.   -- so --

Michele James - April 13, 2023

23

1      A.    -- to go with the latter.  August 2025.

2      Q.    Okay.  So the year 2025.  Is --

3      A.    Correct.

4      Q.    -- that correct?

5      A.    Yes.  I had that position for a long time.

6      Q.    Or was it --

7      A.    Just --

8      Q.    -- 2005?

9      A.    I'm sorry.  2005.  You're correct.

10     Q.    Okay.

11     A.    I apologize.  Thank you.  I apologize.

12     Q.    Okay.

13           MS. WOYTOWICZ:  [Indiscernible].

14   BY MS. HASHIM:

15     Q.    No, it's all right.  I was just trying to figure

16   that one out without --

17     A.    I apologize.

18     Q.    It's all right.  We all make that mistake.

19           And in this position, was it a civilian position?

20     A.    Yes, it was.

21     Q.    So I guess it -- it would be correct to say you

22   were a civilian employee of CPD?

23     A.    Yes.

24     Q.    And prior to 2005, had you worked with the City

25   of Chicago in -- in any other position?

Michele James - April 13, 2023

24

```
 1        A.   I worked for the Chicago Police Department since
 2   day one.  July 1st, 1998.
 3        Q.   And what was your initial position?
 4        A.   Accountant 3.
 5        Q.   Was that --
 6        A.   Or about --
 7        Q.   -- in the finance --
 8        A.   Yes.
 9        Q.   -- division?
10        A.   Same finance division.
11        Q.   Have you worked in any other division other than
12   finance?
13        A.   Within the police department?  Um --
14        Q.   Correct.
15        A.   -- no.  No.
16        Q.   From your experience and observations while
17   working at CPD, is it fair to say that CPD follows a
18   hierarchal business model?
19             MS. WOYTOWICZ:  Object --
20             THE WITNESS:  Yes.
21             MS. WOYTOWICZ:  -- to form.
22             MS. HASHIM:  I -- I'm sorry.  Was there an
23   objection?
24             MS. WOYTOWICZ:  Yeah.  Object to form.
25             MS. HASHIM:  Okay.
```

Michele James - April 13, 2023

1  BY MS. HASHIM:

2       Q.    You can answer.

3       A.    Hierarchy structure?  Is that what you --

4       Q.    Yeah --

5       A.    -- were saying?

6       Q.    -- was it -- is it a business model based on a --

7  on a hierarchal schedule -- on -- based on a hierarchy?

8       A.    Yes.  It was mostly a paramilitary hierarchy

9  structure.

10       Q.    Now, before the merge in 2020, you -- you started

11  -- you explained some of the things that you did.  So I

12  just kind of want to divvy that up a little bit.

13            Is it correct to say that the finance division

14  was part of CPD?  Am I understanding that correctly?

15       A.    Yes.  You're correct.

16       Q.    And since CPD is comprised of sworn officers, do

17  sworn officers work in the finance division?

18            MS. WOYTOWICZ:  Object to form.

19            THE WITNESS:  They did.  When I first started

20  with the police department, it was all civilians.  There

21  were no sworn.

22            Over time, due to budget cuts and hiring freezes,

23  my former bosses started to take a look to see if possibly

24  we can have sworn help.  And the help that we initially

25  started to see were female officers who were pregnant.  So

Michele James - April 13, 2023

26

1   they could not go out into the field to be a police

2   officer, so they were assigned a desk job.  So they would

3   come to finance and do some clerical functions.

4           And then again, the -- the -- the budget cuts and

5   the hiring freezes -- they were -- they were years.  It

6   took us four years just to hire one civilian accountant

7   because of budget cuts and what have you.

8           But the work never went away.  So through the

9   limited duty program, when a officer would receive -- I

10  guess submit their package to the medical section, whether

11  they were IOD limited duty or non-IO- -- non-IOD limited

12  duty, their packet was given to the -- the -- the chief of

13  the -- the -- the bureau's name changed over the years, but

14  it's mostly the administrative divisions.

15          And within that packet, it went in -- the -- the

16  officer needs to indicate what they can do, like what their

17  background is, and then what their limitations are.  So I

18  always looked for a -- a light duty officer that had a math

19  background.

20          And then the administrative sergeant of the

21  bureau would just let -- just read to me what their

22  background is and if I was interested in that person

23  working in finance.  And based off of that, sometimes they

24  would -- there was this one person -- he used to be a

25  investment banker.

Michele James - April 13, 2023

27

1              One officer used to be an investment banker.  He
2    was limited duty, non-IOD limited duty.  And I thought he
3    was a good fit to work in payroll to help with the backpay
4    calculations.
5              So that's how the finance division was operating.
6    It's not that -- it's not that we didn't want the sworn.
7    It's just that we had -- we had work that needed to be
8    done, and we just didn't -- we could not hire our
9    civilians.
10             So for the light duty program, that's how we kind
11   of augmented our operations until they either returned to
12   full duty or they retired or whatever their circumstances
13   were.
14   BY MS. HASHIM:
15        Q.   And when did CPD start bringing in sworn -- you
16   called it sworn help.  It sounds like this would be sworn
17   officers coming in to -- to work in -- in the finance
18   division.  When did this begin?
19        A.   I do not remember the year.  But I remember the
20   first officer.
21        Q.   Would it have -- would it have been in place in
22   2019?
23        A.   Yes.  It was --
24        Q.   Okay.
25        A.   -- in place in 2019.

Michele James - April 13, 2023

28

1    Q.   And when -- when the merger happened in 2020, did
2  sworn officers continue to work despite the merge?
3    A.   Yes.  So -- yes.  The officers did continue to
4  work.  My -- under the Office of Public Safety
5  Administration, my boss, Frank Lindbloom, was required to
6  keep a list of all the officers that were -- we call it
7  detailed to the Office of Public Safety Administration.
8        And the whole point of this new Office of Public
9  Safety Administration was to civilianize all those
10  functions to not have those sworn there.  And as sworn
11  left, they were supposed to -- they -- they were supposed
12  to identify a civilian position to replace the sworn, and
13  as the sworn left, they were supposed to identify the
14  civilian that replaced that sworn.
15        So and was -- it was a slow transition.  The only
16  thing I know is at the time that I left, that transition
17  was not fully complete at the time I left.  It was in
18  process.
19    Q.   So is -- is this -- is it fair to say there was a
20  transition of replacing the sworn officers with civilians
21  as the sworn officers would leave for whatever reason that
22  they would leave?
23    A.   Yes.
24    Q.   Now, when -- when you were working there in 2019
25  and until you left, were you involved -- well, in 2019 and

Michele James - April 13, 2023

1    until the merge, were you involved in the administration of

2    sworn officers who were detailed to finance?

3        A.    Yes, I was.

4        Q.    And were you involved in the administration of

5    civilians who worked in finance?

6        A.    Yes.

7        Q.    Were you involved in the hiring process of

8    civilians in finance?

9        A.    Yes.  But certain -- I had other managers.  So

10   they would be responsible for filling their positions.  So

11   -- but I'm -- I'm still involved in making -- providing

12   some input for -- for some of the hiring.

13       Q.    What kind of input?

14       A.    Just right before -- just speaking with the

15   managers to -- to -- we wanted to make certain that we

16   would try to find a civilian candidate that -- with the

17   skillset to make certain like -- we -- we knew what the

18   staff was currently doing.

19            We just wanted to make certain that they're

20   looking for someone with the skillset to be able to do,

21   especially with our light duty sworn, because we were

22   grateful to have them, but, you know, sometimes they just

23   weren't always available due to their medical situations.

24       Q.    So, you know, taking a step back and looking at

25   the bigger picture.  Is -- am -- am I correct in

Michele James - April 13, 2023

1    summarizing that you have a -- a -- you had a general

2    awareness of the needs of the division in terms of manpower

3    and personnel?

4         A.   Correct.

5         Q.   And it's -- it's pretty fair to say that you have

6    a working knowledge of the work that is completed by sworn

7    officers in the finance division.  Is that correct to say?

8         A.   Yes.

9         Q.   And because there's a civilian arm, this would be

10   the same for civilians working in -- in finance.  Right?

11        A.   Yes.

12        Q.   I'm sorry.  My computer is just doing something

13   really strange.  Okay.  Sorry.  I just -- my computer page

14   is -- did something very weird, but I think I'm back on

15   track here.

16        A.   Okay.  That's why I'm here.

17        Q.   Thank you.  All right.  There we go.

18             Now, in your -- in your role as assistant

19   director of finance, would you know what the essential

20   functions are of civilian positions within the finance

21   division?

22        A.   Yes.

23        Q.   In your experience, how are sworn officers

24   detailed to the finance division?  I know you touched on it

25   a little bit.  But I just kind of like want to run through

Michele James - April 13, 2023

1    this more thoroughly.

2        A.    For the limited duty program, I -- my

3    understanding is officers need -- they -- they're given a -

4    - a limited duty application.  And it requires for them to

5    meet with their doctor, fill that form out, and there's a

6    page in there that indicates what their limitations are,

7    whether they can't stand for too long, they can't sit, or

8    they can't lift a certain amount, whatever their

9    limitations are.

10           Then the officer has to fill out like a -- a

11   résumé possibly -- like what they possibly did prior to

12   becoming a police officer, whether they were a paralegal or

13   like I said, there was an investment banker, or whatever

14   their skillset is.  Some people have very limited

15   experience, but they might say that they could file, do --

16   do some clerical functions.

17           And I do not know the transition between the

18   medical section and when it goes to the bureau.  I'm going

19   to say administrative services, but actually their -- their

20   name's changed many times, so I'm -- I'm not exactly sure

21   what the last name was of that bureau.

22           But it was given to like, the administrative

23   sergeant, and he would review the packet and -- so let's

24   just say if someone, as I indicated, was a paralegal.

25   Well, then then that sergeant I presume would reach out to

Michele James - April 13, 2023

32

1  CPD's general counsel to see if they could use that person.

2        If somebody said that they had timekeeping

3  experience, then they would reach out to finance and say is

4  this someone that we can utilize.  And more than likely, I

5  would say yes.

6        And then that person would be detailed to the

7  centralized timekeeping section within finance.  We have

8  also accepted people who did not have a finance background.

9        We -- typically we would kind of look at are

10  there any clerical functions of filing, maybe they can

11  answer phones, they can make copies.  If somebody is

12  willing to do that, then we will accept them.

13        And then sometimes they -- I might have them to

14  be a floater, meaning -- in the centralized timekeeping

15  division, whenever the buyout checks were ready for people

16  who retired, they needed somebody to make copies.

17        They needed to help fill out the -- the certified

18  labels or to type their name in the system to keep a log of

19  them.  So -- but that's only whenever there's a buyout

20  check.

21        And then I might have that person to also assist

22  in payroll, either to be -- sit at the front desk, to

23  answer calls, or to gather papers.  Or like I said, like in

24  the travel section, to assist with just a lot of copying

25  or, again, answering phones.

Michele James - April 13, 2023

1          So it -- it -- that's how we kind of look at

2    helping support, only because we just did not have the --

3    the manpower.

4      Q.   You have mentioned the term "limited duty."  Can

5    you explain what your understanding is of this term?

6      A.   So for limited duty, I'm aware of two.  IOD,

7    injury on duty.  That's when a officer while working on

8    duty -- they sustain an injury.  And the -- the medical

9    section determines that the person's injury is deemed on

10   duty.

11         Non-IOD limited duty is -- let's just say if an

12   officer was at home, working on their roof or something,

13   and if they fell and hurt themselves and -- which prohibits

14   them from working, then they go on the medical.

15         If they're able to fully recover within their

16   medical time, then they can go back to full duty.  If they

17   are not able to return back to full duty, my understanding

18   is they're afforded an opportunity to complete a limited

19   duty packet and get it cleared by their doctor.

20         In both cases, whether it's IOD or non-IOD

21   limited duty, it's really a -- they're going to be given a

22   -- a desk assignment or an assignment where they would be

23   detailed to a unit that's not a CPD operational unit, where

24   they are not -- they're not supposed to be in a -- in a --

25   like a -- a district where they -- they should not be in a

Michele James - April 13, 2023

34

1  position where they need to pull or need to use police

2  force.  That's my understanding.

3      Q.   Okay.  Would the position through L- -- limited

4  duty be considered a permanent position for an officer?

5          MS. WOYTOWICZ:  Object to foundation.

6  BY MS. HASHIM:

7      Q.   You can answer.

8      A.   For the non-IOD limited officer, the answer is

9  no.  The -- they're only given two years.  Or it's -- or

10  yeah.  Two -- two years or like say 730 days.

11          For an IOD officer, it all depends on their

12  recovery and when they recover or if they recover from

13  their injury.  That is contingent upon them -- an -- an

14  annual evaluation by their doctor to deem them whether

15  they're still considered IOD limited duty.  And I also know

16  this firsthand because my husband was deemed IOD limited

17  duty at the time of his retirement.

18      Q.   This is -- you had mentioned a -- an -- a sworn

19  officer able to work in finance through limited duty.  Is

20  it possible for an officer to bid into finance using, you

21  know, the seniority system?

22      A.   The answer to that is no.  Because -- bidding.

23  This is something that is most best answered by the police

24  department general counsel.

25          My understanding is it gets complex when it comes

Michele James - April 13, 2023

1    to bidding.  Not all units within the Chicago Police
2    Department are biddable units.  The finance division is not
3    a biddable unit.
4          There are no sworn budgeted positions.  Although
5    there are other divisions within the police department that
6    do have sworn positions, they're not all biddable.
7          Only like the -- a district is a biddable unit.
8    The mass transportation unit is a biddable unit.  So
9    there's a list between -- and -- and that's something that
10   CPD general counsel might be -- might be better to address
11   that to -- that question to.  But not all units within the
12   police department are biddable units.
13       Q.   Okay.  Thank you.  I appreciate your explanation
14   of that.
15         Then going back to the limited duty means by
16   which a sworn officer would work at finance.  You had
17   mentioned for non-IOD, there -- it's a -- I think you --
18   you said 730 days is the maximum amount of time that they
19   could work in that status.
20         Would you be informed of when these days expire
21   for an officer who's detailed to your -- to the division?
22       A.   Yes.
23       Q.   And who would've informed you?
24       A.   The medical section provides a -- a status in
25   terms of how many days an officer have before they're going

Michele James - April 13, 2023

36

1   to run out of their time.  They kind of -- it tells you how

2   many days they used, and it kind of gives a projection date

3   in terms of when their estimated time will expire.

4          And the reason why it's just a projection date is

5   because that date may change, and it's contingent upon --

6   if there are some additional time that a officer may take

7   that may push that date out.  So.  But it's just a

8   projection date.

9          Q.   And so it's my understanding that it -- it's

10  Medical Services Section that has -- that maintains the

11  status, is your testimony.  Is -- is this status -- how --

12  how is this -- the status -- how is the status delivered to

13  you?

14         How were you informed of the status?  By -- from

15  MSS -- from Medical Services.

16         A.   They would send a copy through interoffice mail

17  to the commanding officer of the division.  And they'll

18  provide a copy to a timekeeper who keeps time for that

19  officer.

20         Q.   And so how would you have been informed?

21         A.   It came through the mail.

22         Q.   So --

23         A.   And I received it.

24         Q.   -- MSS would send a copy to the CO of the

25  division, to a timekeeper, and to you?

Michele James - April 13, 2023

1     A.   Yes.

2     Q.   Okay.  Just to be clear on that.  With limited

3  duty status officers, did -- did you work with individuals

4  from MS -- from Medical Services Section?

5     A.   I'm sorry.  Can you repeat that?  Or --

6     Q.   Yeah.

7     A.   -- clarify?

8     Q.   You -- you had mentioned Medical Services

9  Section.  So I'm just wondering if there was any

10  interaction between you and the individuals who worked at

11  Medical Services.

12        And forgive me.  If I say MSS, would you

13  understand that to being Medical Services Section?

14     A.   Yes.

15     Q.   Okay.  So -- so was there -- did you work with

16  people from MSS?

17     A.   I did for one officer.  And that was Officer

18  Damian O'Sullivan.  There was a question about when his

19  time expired.  And he needed to get his limited duty

20  paperwork in on the last day.

21        So I did -- I went with Officer Damian O'Sullivan

22  to CPD's medical section to discuss his situation on the

23  day that that was his last day.  And he did get his

24  paperwork in on time.

25     Q.   So outside of individual help like that, you

Michele James - April 13, 2023

38

1    really did not -- is it correct to say that you really did

2    not have any interaction with the individuals who worked at

3    MSS?

4         A.    Correct.  I did not.

5         Q.    And I just want to make sure I'm understanding

6    everything correctly from me.  Is it correct to say that a

7    hundred percent of the sworn officers who were detailed to

8    finance division were -- were detailed through MSS through

9    the limited duty program?

10        A.    No.

11        Q.    Okay.  So how else were people -- officers

12   detailed?

13        A.    I do not know all the situations.  But we also

14   had some floor duty sworn working in finance.  So although

15   I was assistant director of finance, don't forget a -- a --

16   a -- well, a -- a lot of decisions were made by the

17   director of finance or my deputy chief or chief.

18             So in some instances, there was a person that

19   appeared.  How they came to finance, I do not know.  But

20   there are few that I'm aware of that -- that came through

21   the limited duty program.

22             So I -- I -- at the time that Officer Arroyo was

23   present in finance, we -- there was another officer.  She

24   came to us because she was pregnant.

25             But I was not a part of that.  She was there.  So

Michele James - April 13, 2023

1    the director of finance probably handled that situation.  I

2    just met her, and that was -- that was it.  But we also had

3    some floor duty sworn there.

4         Q.   So the -- the full duty sworn -- am I

5    understanding you correctly that they receive that -- the -

6    - the detail to finance through the discretionary powers

7    afforded to the CPD leadership?

8              MS. WOYTOWICZ:  Object to form.  Foundation.

9              THE WITNESS:  I do not know every full duty sworn

10   situation.  But some of the sworn came to us in the form of

11   the -- a limited duty capacity.

12             Or -- now, there's like the sworn officer,

13   Officer Darice Walker.  She came to finance as a non-IOD

14   limited duty officer.  She hurt her foot.  She was on the

15   medical, and I guess she -- I guess she was able to walk

16   without any kind of apparatus support.  So she was able to

17   do a desk job.  I don't -- do not know how long she was in

18   the limited duty capacity before she was healed enough to

19   return to full duty.  So she just remained in our office in

20   -- working in the full duty capacity.

21             And then maybe a year or so later, she had

22   surgery on her other foot, so she went on medical.  And

23   then after medical, she came in a non-IOD limited duty

24   capacity, until she healed from that.  And then she became

25   a full duty.  So it -- it can vary.  So I -- for the full

Michele James - April 13, 2023

40

1    duty officers, I -- I don't know how they came to finance,

2    because that was not my decision.

3           I'm mostly familiar with the limited duty

4    officers that kind of come in.

5    BY MS. HASHIM:

6        Q.   Okay.  I -- I appreciate your explanation.  When

7    an officer was detailed through MSS, were you -- correct me

8    if I'm wrong.  My understanding is that you were informed

9    of the officer's limited duty work status, whether it was

10   IOD or non-IOD.  Is that correct?

11       A.   Not always.  Once the officer was detailed to the

12   finance division and through conversation, they'll let me

13   know if their situation was IOD or non-IOD.

14       Q.   Okay.  So it wasn't like in -- within their

15   packet and they came over to finance.  It was somewhere in

16   the paperwork that you received.

17       A.   That paperwork only remained with the

18   administrative sergeant of Bureau of Administrative

19   Service.  I recall he would give me a name.  He would read

20   off with their limitations, and he would tell me what they

21   can do.  And wanted to know if we were interested in that

22   person joining finance.  And it's either a yes or a no.

23   And if it was yes, I did not ever receive a copy of that

24   packet.  So I don't know.

25       Q.   So that -- is that how you would know whether

Michele James - April 13, 2023

41

1    they were limited?  When -- when the sergeant called,

2    here's a person, Jane Doe, and if Jane Doe came, then you

3    knew that it -- Jane Doe was limited duty?  Is -- is that

4    how it worked?

5         A.   Correct.

6         Q.   And you had mentioned limited duty involves

7    restrictions, work restrictions.  How were you informed of

8    the work restrictions when an officer was detailed to

9    finance?

10        A.   The sergeant would read them off to me.  But of

11   course I wouldn't really know until the officer started

12   working.  And if I would give them an assignment and

13   they'll kind of let me know what their restrictions are.

14        Q.   When the sergeant would read the restrictions to

15   you, did you keep a record of this?

16        A.   No, ma'am.

17        Q.   Okay.  So it was just verbal?

18        A.   Correct.

19        Q.   And when you were at finance division, you said

20   that you were the second in command.  Who was your

21   immediate supervisor?

22        A.   For the -- well, okay.  Frank Wilson.  He was the

23   director of finance when I started July 1st, 1998 up

24   through September 15th, 2016.

25             Then Jon Johnson or Jonathan Johnson was my

Michele James - April 13, 2023

42

1    director, but I forgot when he -- when he was appointed

2    director of finance.  But I do know he left in September

3    16th, 2019.

4         Q.   He left in September of 2019?

5         A.   Yes.

6         Q.   And who became the director after Jonathan

7    Johnson?

8         A.   The position was not filled, and it was cut from

9    the budget to form the new Office of Public Safety

10   Administration.

11        Q.   Did you have a second line supervisor?  Let --

12        A.   During the --

13        Q.   -- me -- I'm sorry.  Let me clarify that.

14             Did you have a second line supervisor while

15   Jonathan Johnson was the director of finance?

16        A.   That was Frank Lindbloom.

17        Q.   Can you spell that, please?

18        A.   Frank.  Lind- -- Lindbloom.  L-I-N-D-B=L-O-O-M.

19   He was the deputy chief.  Yeah, he was deputy chief.  For

20   about a year.

21             And then before that, it was Susie Park.  For

22   about a year.  And they had shared the same title.

23        Q.   When you were the assistant finance director

24   before the merge, it -- it -- it seems to me that you had a

25   supervisory role.  Is that correct?

Michele James - April 13, 2023

43

1          MS. WOYTOWICZ:  Object to found- -- form.  Sorry.

2          You can answer.

3          THE WITNESS:  Yes.

4    BY MS. HASHIM:

5       Q.    And what positions did you supervise?

6       A.    The manager of police payroll.

7       Q.    I -- I'm sorry.  Can you repeat that?

8       A.    The manager of police payroll.  Contracts

9    administrator.  Director of administration.  And fiscal

10   administrator.

11      Q.    While you were the assistant director of finance,

12   did you receive training from CPD as to its rules,

13   directives, and policies in general?

14      A.    Not all policies.  I -- I did receive sporadic

15   training.  Or -- one of the -- one of the things that CPD's

16   research and development does is whenever they draft a new

17   policy or procedure or if they revise an existing policy or

18   procedure, they will send out an automatic email to all

19   Chicago Police Department employees to make them aware of

20   this policy or procedure.

21          So it's not all.  But it's whenever there's a

22   change or something new.  And this is something that they

23   implemented about two years or three years from then.

24      Q.    So it -- I'm sorry.  They -- they implemented two

25   to three years from when?

Michele James - April 13, 2023

44

1      A.   It's been existing for about two or three years

2   from -- yeah.

3      Q.   So around 2020?

4      A.   Yes.   Mm-hmm.

5      Q.   Okay.

6      A.   Yes.

7      Q.   And did you receive training from the City as to

8   its reasonable accommodation policy?

9      A.   Yes, I did.   I know I received the training, but

10  I do not recall when.

11     Q.   Would there be a record of your attendance

12  documented by the City?   Would you -- do you remember

13  something along those lines?

14     A.   No.   It was online.   So I don't know if they have

15  that or not.   That would be with the Chicago Police

16  Department.

17     Q.   Okay.   So I'm going to share with you Plaintiff's

18  first exhibit.   So you're going to have to bear with me

19  because I'm going to have to do a little bit of juggling

20  between my -- my screens here and -- and -- and whatnot.

21          So I'm going to pull this one up.   Okay.   And

22  screenshare.   All right.   Can you see this?

23     A.   Yes, I can.

24          MS. HASHIM:   I'm going to scroll through it.   For

25  the record, this is Bates number Arroyo.Def. 083 to 096.

Michele James - April 13, 2023

1    It's a few more pages.  It's a few more pages.

2              (Exhibit No. 1 marked for identification)

3              MS. WOYTOWICZ:  Janaan, I just want to make sure

4    you're not -- that you're not expecting her to have like

5    read while you're scrolling, right?  You're going quite

6    quickly.

7              MS. HASHIM:  Yeah.  You -- you can't read that

8    fast?

9              MS. WOYTOWICZ:  That's --

10   BY MS. HASHIM:

11       Q.   Just showing it to you -- the -- the -- you know,

12   all -- all the sections are here and everything.  So you

13   see that we're not missing any pages.

14              So if you see there's like a -- a page number,

15   you know, like 12 and it goes all the way up through 14 and

16   then it ends right there at 14.  You see that on the

17   bottom?  Okay.

18              Okay.  So I'm going to go -- kind of go back up

19   to the top.  Okay.  So I scrolled through it.  Do you know

20   what this is?

21       A.   I -- this is my first time seeing this.  But I

22   know what it is.

23       Q.   Do you remember seeing it when you did your

24   training, your online training?

25       A.   I do not recall.

Michele James - April 13, 2023

46

1      Q.   Are you --

2      A.   I'm -- I -- I received a lot of documents.  I do

3  not recall.  But I -- I just do not recall.

4      Q.   Okay.  So what I'll represent to you is that this

5  is the City of Chicago Reasonable Accommodation Policy that

6  was produced to us by the City.

7           It has an effective date of July 24th, 2015.  And

8  I'm going to scroll down to the section here on page Bates

9  number Arroyo.Def. 084.  Right here.  There are some

10  Definitions here.  All right?

11          And it has a definition of disability.  Can you

12  read that to yourself and just let me know when you've read

13  it, completed reading it?

14     A.   So you want me to read section III.a.?  I'm done.

15     Q.   III.a.  I'm sorry.  I should've clarified that.

16  Yeah.  I mean, I can read it.  So -- so it -- section

17  III.a. says (as read):  Disability means either a current

18  physical or mental impairment that substantially limits one

19  or more major life activities, or a record of having such a

20  physical or mental  impairment.

21          Did I read that properly?

22     A.   Yes, you did.

23     Q.   Okay.  And then under III.c. definitions of major

24  life activities, it says (as read):  Major Life activities

25  include, but are not limited to eating, standing, walking,

Michele James - April 13, 2023

47

1    lifting, sleeping, breathing, seeing, hearing,

2    concentrating, learning and working.

3            And then goes on to describe other major life

4    activities that involve bodily functions.  Did I read that

5    correctly and summarize it properly?

6        A.    Yes, you did.

7        Q.    All right.  And I'm going to scroll down to Bates

8    -- what's Bates numbered 90 -- Arroyo.Def. 095.  Actually,

9    094.

10            There's a section here -- I'm going to scroll up,

11   because this is subsection f.  There's a section here

12   that's section VIII on page Bates number Arroyo.Def. 92.

13            Section VIII, Responsibilities of City Personnel.

14   And if you scroll down, there's subsection f that involves

15   -- has a title of Supervisors.  You see that?

16       A.    Yes.

17       Q.    In your training of this policy, are you familiar

18   of these responsibilities that supervisors have?  Does it

19   look familiar to you?

20       A.    I do not recall.

21       Q.    If you needed to know what the policy is for --

22   that the City has for reasonable accommodations, did you

23   have access to this policy?

24       A.    I'm not sure.  More than likely, if I thought I

25   needed -- needed this information, I would reach out to

Michele James - April 13, 2023

48

1  human resources, the director of human resources.

2      Q.   Okay.  Had you ever needed to ask human resources

3  where to locate this policy?

4      A.   No.  I have not.

5      Q.   During your time at finance, how many sworn

6  officers had been detailed to the division as a result of

7  an ADA accommodation?

8          MS. WOYTOWICZ:  Object to foundation.  Form.

9          THE WITNESS:  I do not know the exact count.

10 There were quite a few officers in and out over the years.

11         Donna Miller.  Darice Walker.  Tracy Boland.

12 Lisa Carli.  Damian O'Sullivan.  Helena Walker.  Jeffrey

13 Vega.  Jose Garcia.  Michael Minneci.  Krystyna Zbela.

14         Krystyna is spelled K-R-Y-S-T-Y-N-A.  And then

15 Zbela, Z-B-E-L-A.  Mark Matker.  Tina Susa.  Bertha

16 McDaniels.  Margaret Jarvis.  Margaret Jarvis.  Sandra

17 Thomas.  Maria Cartagena.

18 BY MS. HASHIM:

19     Q.   How do you spell that last name?

20     A.   C-A-R-T-E-G- -- I know I'm misspelling it.

21 Cartagena, C-A-R-T-E-G-N-A (sic).  I'm not sure.

22     Q.   Okay.

23     A.   And then Reyna.  Reyna Arroyo.  So --

24     Q.   So --

25     A.

Michele James - April 13, 2023

49

1    Q.   -- these individuals that you listed.  They were

2  detailed to the division as a result of providing an ADA

3  accommodation.  Is -- is -- do you agree with that?

4    A.   Yes.

5    Q.   Okay.  All right.  Taking a quick look at the --

6  the finance division.  You had mentioned previously I think

7  some of the sections that made -- made it up, again, before

8  this merger.

9         Can you just tell me the basic structure that

10  made up the division?  What -- what -- what were the

11  sections?

12    A.   Payroll division.  They -- you know, we -- we're

13  responsible [indiscernible] certain payrolls, process

14  overtime, specialty pay.  The sell back hours for the rank

15  or supervisors.  They conduct backpay calculations if an

16  officer's step was incorrect, working -- working with the

17  contracts.  He's looking at them for their -- a proper

18  rate.

19         Suspensions that were processed.  Verification of

20  employment.  Injury on duty letters for officers for tax

21  season.

22         And a whole -- a whole host of other duties, but

23  those like the -- the major duties.  And then there's the

24  centralized timekeeping unit.  Respon- -- the timekeeper's

25  responsible for the time for various units throughout the

Michele James - April 13, 2023

50

1   police department.

2         There -- if a -- an individual needs to go on a

3   leave of absence, they're responsible for kind of going

4   back to see do they qualify for family medical leave and

5   help them fill out the paperwork.

6         Within the timekeeping unit, we also have -- like

7   my chief timekeeper was a -- at the time, she was a full

8   duty officer who ended up becoming light duty.  She was

9   responsible -- she and another timekeeper were responsible

10  for the buyout of employees who were going -- who were

11  retiring or going on a disability or death.

12        And that responsibility required for them to

13  audit the past three years of an officer's time and

14  attendance cards.  And then putting all that information

15  into the system so that they could get their check.

16        And then also depending on the officers -- how

17  they vacate or leave the department, whether they leave

18  with the option of being age 55 and with the insurance,

19  then there's paperwork with that where the officer

20  stipulates they understand that their compensatory time

21  will be -- be staggered, and there's a formula for that.

22        And it's based on certain ranks, and I cannot

23  recall.  So that was the centralized timekeeping unit.

24  Then the special projects group was primarily -- it started

25  out with -- it was -- it was a civilian unit.  Then it

Michele James - April 13, 2023

51

1    became sworn.

2            They were responsible for running the

3    applications that were needed for the timekeeping, running

4    for the payrolls, for the budget, keeping up with the --

5    the manpower throughout the police department, running

6    special reports with mass data, doing comparisons.

7            And -- and a whole host of other things.  So my

8    contracts and payables was all in one, and it should've

9    been separate, but because we didn't have the staff, we

10   couldn't separate.

11           So the contracts administrator oversaw the

12   payables.  Obviously, you know, you pay bills.  And then

13   also trying to get the contracts for the department that

14   are needed for them to procure the goods that they needed.

15           And then there's the travel section.  The police

16   department does a lot of travel, whether it's for

17   investigation purposes, conferences, depositions, or

18   presenters.  Some of them have to speak.

19           That is -- and then there's local travel that

20   does not -- well, most of the travel -- out of town travels

21   require approval from the budget office.  And they have a

22   list -- a -- a checklist in terms of what those documents

23   are needed.

24           Local travel.  Because there's -- they -- the

25   police officers do a lot of training.  Yeah, a -- a lot of

Michele James - April 13, 2023

52

1    training.  So that -- that could be done in-house.  That
2    did not require a -- a budget office approval.
3              And then there were invest- -- covert
4    investigation travels.  So that's where Officer Arroyo
5    helped us with that.  And also the supervisor of the travel
6    section -- she was responsible for the taskforce
7    reimbursements.
8              And the police department received a lot of --
9    they -- they -- they work with a lot of federal agencies on
10   missions, and typically it -- it's mostly like the FBI, the
11   DEA, IRS, ATF, United States Borders.  It's a laundry list
12   of -- of federal agencies that work with.
13             And so that -- the supervisor of the travel
14   section also supervised the staff that was responsible for
15   making certain those bills went out and we collected that
16   money.  She was also responsible for the -- the Chicago
17   Police Department's Equitable Sharing Program.
18             She was also responsible for the District
19   Advisory Council reimbursements where within the districts
20   in -- within the police department, they have a team of
21   people that work with the community.  So a lot of the
22   community events.
23             Engaging the community for meetings, beat
24   meetings, or just community events, trying to, you know,
25   get -- work with the community to get information so the

Michele James - April 13, 2023

53

1    police department can better assist them.

2            But that required meetings and there was expenses

3    incurred with that, and there was a whole separate policy

4    on that.  So that same supervisor was over all of that.

5            Then there's the budgeting and accounting piece.

6    We kind of did the budget.  We assisted with the -- the

7    City Council.  Preparation for the City Council.

8            There were -- and also worked with the grants.

9    We did the finance piece of the grants and we worked more

10   closely with a grants division with the application and

11   they did the progress reports.

12           And that was pretty much the overall.  How the

13   police -- how the finance division was set up.

14       Q.   You had mentioned contracts and payables.  Is

15   that -- that would that be the same as accounts payable?

16       A.   Yes.

17       Q.   Okay.  Just to make sure.  I don't have a -- a

18   finance background, so I just want to make sure that we're

19   all on the same page.

20           With the -- I just have a few questions, and then

21   maybe after maybe -- just give us ten minutes, we can take

22   a break, because we -- we've been at this for a while.  I

23   just want to finish up this line of questioning.

24           You mentioned the travel section.  How many sworn

25   officers do you recall worked in the travel section before

Michele James - April 13, 2023

54

1    the merger?

2         A.    There were three.  Officer Arroyo, Officer

3    O'Sullivan, and Lisa Carli.

4         Q.    And how about after the merger?

5         A.    It was just Damian O'Sullivan and Tracy Boland.

6         Q.    So two positions?

7         A.    Yes.

8         Q.    And in terms of civilians who worked in the

9    travel section before the merger, how many civilians worked

10   there?

11        A.    Two.

12        Q.    And after the merge?

13        A.    I'm going to say one.  It was Helen Lee.  Then

14   she was on a leave.  And then Kim Cook.  She was the point

15   person for travel for all three departments.

16            And then when -- and then Helen came back.  But

17   that's after I left Office of Public Safety Administration.

18        Q.    So Helen Lee returned after you had left.  So you

19   don't -- it's at least person, possibly two.

20        A.    Correct.

21        Q.    Okay.  And in the contracts and accounts payable

22   section, how many sworn officers were in that section

23   before the merger?

24        A.    One.  One sworn.

25        Q.    One sworn.  And in terms of civilians?  Before

Michele James - April 13, 2023

55

1    the merger.

2        A.    Yeah.   So there was Joel Brown, Valerie Hull,

3    Yolanda Hopkins, Kelly -- I forget Kelly's last name -- and

4    Esther Bullock.   So there were five.

5        Q.    And how about after the merger, to the best of

6    your knowledge?   For -- I'm sorry.   Let me be clearer.

7            After the merge, how many sworn officers worked

8    in accounts payable section?

9        A.    Just one.

10       Q.    And how many civilians worked in the accounts

11   payable section after the merge?

12       A.    So that's -- that was under the direct -- Deputy

13   Director Sarontey Smith.   She -- and so at this point, it

14   was a merge of police, fire, and OMC personnel.

15           So there was Jose Perez, Cynthia Rivera.   Some --

16   some people didn't always do all payables.   So they had

17   other duties, but they did some.

18           So like Regina Beamon.   She assisted.   Barbara

19   Littleton.   Evelyn Daley.   Maria Perez.   Vincent Thomas.

20   Esther Bullock -- Bullock.   She helped, but then she

21   retired.

22           And I know she retired in February 2021.   That's

23   when she retired.   So there was eight.   And then Esther

24   left.   That's it.

25       Q.    And you had mentioned there's payroll.   How many

Michele James - April 13, 2023

56

1    sworn officers worked in payroll before the merge?

2         A.   Michael Minneci, Jeff Vega, Jose Garcia, Krystyna

3    Zbela.   Four.

4         Q.   And after the merge?

5         A.   At the time that I left, they were still there.

6    So still four.

7         Q.   The four?   And how many civilians worked in

8    payroll before the merge?

9         A.   Yasmin Kelly, Jackie Whitted, Cheryl McLain.

10   Cheryl Pickens.   Just four.

11        Q.   And after the merge?

12        A.   They were still there, the same four, but I do

13   not know, because payroll relocated, and I have no

14   knowledge.

15        Q.   Sure.   Of course.   Of course.   And you mentioned

16   centralized timekeeping.   How many sworn officers worked in

17   centralized timekeeping before the merge, to the best of

18   your knowledge?

19        A.   There were two.   Gerrine Gniady and Bertha

20   McDaniels.   But then Bertha retired.

21        Q.   Was her position filled after she retired?

22        A.   I do not know.   She -- so -- so for Bertha

23   McDaniels, she was just -- she operated in the capacity of

24   a timekeeper.   Gerrine Gniady was considered like the chief

25   timekeeper buyout coordinator.

Michele James - April 13, 2023

57

1          Her position was filled.  I think her name was
2    Erica Pena.  She was appointed by the deputy director over
3    payroll.  So Erica Pena.  She's a civilian.
4          Q.   And after the merge, how many sworn officers
5    worked in centralized timekeeping?
6          A.   Just one.  And that was Officer Gerrine Gniady.
7    But then she retired shortly thereafter.
8          Q.   How do you spell the last name?
9          A.   G-N-I-A-D-Y.  Fir name Gerrine, G-E-R-R-I-N-E.
10         Q.   And how many civilians worked in centralized
11   timekeeping before the merge?
12         A.   Rita Young, Darcella Southall, Angela Parra,
13   Pamela Spraggens.  Stephanie Warren.  Laverne Duncan.  Six.
14         Q.   And how many civilians worked in centralized
15   timekeeping after the merge?
16         A.   The same six.  Plus Cherrie Gillespie.  Cherrie
17   Gillespie.
18         Q.   So --
19         A.   She --
20         Q.   -- seven total?
21         A.   I'm sorry?
22         Q.   Seven total?
23         A.   Yes.  But Cherrie -- she had the CPD timekeeping
24   position.  And before the merger, she was helping out in
25   travel.  So she just transferred over to the timekeeping

Michele James - April 13, 2023

58

1   after the merger.

2        Q.   Okay.  So you had mentioned before the merger

3   with travel, they had three individuals.  And Cherrie was

4   one of the three?

5        A.   Right.  She -- it was two civilians.  So Cherrie

6   was one of the two civilians.

7        Q.   I'm sorry.  Two civilians.  I was looking at the

8   wrong line.  Okay.  And -- her and -- and Helen Lee.

9        A.   Correct.

10       Q.   Okay.  And you had mentioned special projects.

11  How many sworn officers were in the special projects

12  section before the merger?

13       A.   One.

14       Q.   Okay.  And after the merger, how many sworn

15  officers worked in special projects?

16       A.   One.

17       Q.   And how many civilians worked in special projects

18  before the merger?

19       A.   None.  Zero.

20       Q.   Okay.  Was it a vacancy that was need -- that

21  needed to be filled, or how did that happen -- how did it

22  happen so that there were no civilians working in special

23  projects?

24       A.   Position was eliminated from the budget.

25       Q.   Okay.  When was the position eliminated from the

Michele James - April 13, 2023

59

1   budget for civilians working in special projects?

2        A.   I do not recall.  Over the years, all the

3   positions were cut, one here, two there, over time.  So I

4   do not recall.

5        Q.   Would -- would it be before 2019?

6        A.   I'm not sure.

7        Q.   Okay.  Okay.  And after the merger -- so I take

8   it the position for civilians in special projects did not

9   exist after the merger.  Is that correct to say?

10       A.   That is correct to say.

11       Q.   All right.  And then we have budgeting and

12  accounting.  How many sworn officers were in budgeting and

13  accounting before the merger?

14       A.   One.  Derek Moss.

15       Q.   I'm --

16       A.   Just --

17       Q.   -- sorry?

18       A.   -- one.  Oh.  Just one.

19       Q.   Okay.  And after the merger?

20       A.   None.

21       Q.   Is it --

22       A.   Zero.

23       Q.   -- because they eliminated the position?

24       A.   Well, he retired.  And that was it.  He just

25  retired.  So there were no new sworn added, and it was --

Michele James - April 13, 2023

1    you know, since there was the merger.

2            Part of the -- the condition of the Office of

3    Public Safety Administration was they could not receive any

4    more sworn.  The --

5        Q.    [Indiscernible] had --

6        A.    -- whole --

7        Q.    -- mentioned that, right?

8        A.    The whole point was to civilianize it.

9        Q.    Okay.  And how many civilians in the budgeting

10   accounting were -- let me -- let me rephrase that.  So

11   strike that.

12           How many civilians worked in budgeting and

13   accounting before the merger?

14       A.    Oh, three.

15       Q.    And after the merger?

16       A.    Same three.

17           MS. HASHIM:  All right.  So it -- it's been --

18   we've been at this for a little over an hour and a half.

19   So let's go ahead and -- and take a break.

20           Do you guys want this to be a lunch break?  I see

21   us going probably another couple hours or so, maybe two or

22   three more hours.

23           MS. WOYTOWICZ:  Yeah.  Would you rather try -- I

24   mean, if we do shorter, would it -- still do you think by

25   like 1:30 you'd be done-ish?  As long as it's not -- I mean

Michele James - April 13, 2023

1  --

2          THE WITNESS:  Yeah.  I -- yeah.

3          MS. WOYTOWICZ:  If you'd rather try to push --

4          THE WITNESS:  I'm --

5          MS. WOYTOWICZ:  -- through and --

6          THE WITNESS:  I'm --

7          MS. WOYTOWICZ:  -- eat after --

8          THE WITNESS:  I would rather push through --

9          MS. HASHIM:  Okay.

10          THE WITNESS:  -- rather than have lunch.

11          MS. HASHIM:  If you want to take a break, just --

12          MS. WOYTOWICZ:  Okay.

13          MS. HASHIM:  -- let me know.  And you know, when

14  you finish -- if -- if -- and if it's an appropriate time,

15  then we'll go ahead and -- and take that break.

16          In -- in other words, if it's not in the middle

17  of a question being --

18          THE WITNESS:  Okay.

19          MS. HASHIM:  -- answered.  Okay?

20          THE WITNESS:  All right.

21          MS. HASHIM:  All right.  So let's keep plowing

22  forward.  Excuse me.

23          MS. WOYTOWICZ:  Can I ask, do you want me to get

24  water for now or?

25          THE WITNESS:  Yes, please.

Michele James - April 13, 2023

62

1          MS. WOYTOWICZ:  Okay.

2          THE WITNESS:  That -- that -- a little sip of

3   water.  My mouth is dry.

4          MS. HASHIM:  Right.  Do you want to take just a -

5   - a -- a two-, three-minute break?

6          MS. WOYTOWICZ:  Yeah --

7          THE WITNESS:  Yes.

8          MS. WOYTOWICZ:  -- if we could, please.

9          THE WITNESS:  Yes.

10          MS. HASHIM:  So let's come back at -- do you want

11   to make it five minutes?  Just --

12          MS. WOYTOWICZ:  Sure.

13          MS. HASHIM:  -- come back in five minutes?  Okay.

14   So at 12:20?

15          MS. WOYTOWICZ:  11:20?

16          THE WITNESS:  Yes.

17          MS. HASHIM:  I'm sorry.  11:20.

18          MS. WOYTOWICZ:  I don't know.  Maybe a time zone

19   difference.  Yeah.  Okay.  That's sound good.

20          MS. HASHIM:  Yeah.

21          MS. WOYTOWICZ:  Thanks.

22          MS. HASHIM:  Okay.

23          THE REPORTER:  Off the record at 11:14 a.m.

24                    (Off the record)

25          THE REPORTER:  Back on the record at 11:22 a.m.

Michele James - April 13, 2023

63

1    BY MS. HASHIM:

2         Q.    Okay, Ms. James.  We're going back onto the

3    record.  You understand that you're still under oath?

4         A.    Yes.

5               (Exhibit No. 2 marked for identification)

6               MS. HASHIM:  All right.  I'm going to pull up

7    this next Exhibit No. 2.

8               Oh.  And Counsel, I -- I put the exhibit into the

9    chat for you.

10              MS. WOYTOWICZ:  Great.

11              MS. HASHIM:  In case you get it.  This is Bates

12   number 2 -- Arroyo.Def. 2495 to 2543.  Oh, let me put it

13   into the chat while I have that on my mind.

14              All right.  Did everybody -- did you receive it,

15   Madam Court Reporter?

16              THE REPORTER:  I did.  Thank you.

17              MS. HASHIM:  All right.

18   BY MS. HASHIM:

19        Q.    I'm going to share the screen now.  This up to

20   the top.  All right.  Can you see that, Ms. James?

21        A.    Yes, I can.

22        Q.    Okay.  Are you familiar with this document?

23        A.    I've seen it.  It looks like the A&A sheets.

24        Q.    It's a -- if you look at the top, it's a Work

25   Status.  Is - - is this the same as an -- what you called

Michele James - April 13, 2023

64

1    an A&A sheet?

2        A.   I have not seen this report, the Work Status, but

3    I've seen like a -- an A&A sheet.  But the A&A sheet does

4    not include the category like their status, their -- their

5    work status.  No.

6        Q.   All right.  So I'm just going to scroll through

7    this, okay, and I'll represent to you this is -- that this

8    is a document that the City produced to the Plaintiff as to

9    the work status of individuals from 2015 to 2022 who had a

10   work status of limited duty.  Okay?

11           And I'll scroll through this and then I'll come

12   back up to the top, and we can take a look at the

13   categories together just to familiarize you with the --

14   with the document.  Okay?

15       A.   Okay.

16       Q.   It's -- it's kind of long, so I'm just going to

17   go through it real quickly just so you can see we're just

18   going through the pages here.  And it says like 1 of 49 at

19   the bottom here.

20       A.   Okay.

21       Q.   All right.  Two, three.  You want me to slow down

22   at any point, let me know.

23       A.   No, you're -- you're fine.

24       Q.   Thanks.

25       A.   May I ask, is there anything you want me to

Michele James - April 13, 2023

65

1    notice?

2         Q.   Not at this point.  We'll go through the -- the

3    titles of the -- of these columns.  And then I'll have just

4    some questions for you based off of this document.

5              Just for fairness, I want to show you all of

6    these pages to let you know that it's a complete document

7    that the defense had provided to us.

8         A.   Okay.

9         Q.   It's in alphabetical order.  So we're at the Ps.

10   But I hate to say this, but it's -- to use a proverbial.

11   But wait, there's more.

12             It was sent to us in two -- two groups.  So just

13   bear with me.

14        A.   Okay.

15             MS. WOYTOWICZ:  Janaan, if it's -- I mean, the

16   witness said she's not seen it before, but can we like

17   stipulate that it's the whole thing that the City --

18             MS. HASHIM:  Sure.

19             MS. WOYTOWICZ:  -- produced.  If there's a

20   specific question.

21             MS. HASHIM:  Yeah.  There are specific questions.

22   If you want to stipulate, that's fine.  Makes it easier for

23   all of us.

24             MS. WOYTOWICZ:  Especially since she's not

25   familiar with it.  I don't -- she couldn't speak to the

Michele James - April 13, 2023

66

1  whole completeness --

2           MS. HASHIM:  Right.

3           MS. WOYTOWICZ:  -- of it.

4           MS. HASHIM:  Right.  And that's fine.  So -- so

5  does it -- do you stipulate that it -- this is the complete

6  document for --

7           MS. WOYTOWICZ:  That the City produced.

8           MS. HASHIM:  -- the record?

9           MS. WOYTOWICZ:  Yeah.

10          MS. HASHIM:  Okay.  Great.

11 BY MS. HASHIM:

12      Q.   All right.  So we have -- just going from the

13 left to the right.  The Employee Name, Employee Number,

14 their Position, and the Assigned/Detailed Unit here in the

15 fourth column.  Right?

16      A.   Yes.

17      Q.   Do you know what unit the finance division is?

18      A.   122.

19      Q.   Okay --

20      A.   And -- and 222 for centralized timekeeping.

21      Q.   Okay.  Next to that, we have the Watch, Work

22 Status.  And Work Status has LD here.  And what -- what do

23 you understand LD to be?

24      A.   Limited duty.

25      Q.   And then we have Category, and this is -- it

Michele James - April 13, 2023

67

1    seems to be the same thing that you had mentioned earlier,
2    IOD being injury on -- injured on duty, and non-IOD, non-
3    injured on duty.
4              Would you agree with that?
5         A.   Yes.
6         Q.   Okay.  Then we have Effective Date, and then the
7    column to the right of that, Reevaluation Date, and then an
8    End Date to the right of that one.
9              And then continuing to the right, Medical
10   Classifications with some numbers, Work Restrictions, and
11   then the name -- and the Case Manager.  Do you know what
12   Case Manager -- what -- what is meant by that?
13        A.   That is the person assigned to that particular
14   officer that's keeping track of their case, and -- and that
15   person is in the medical section.  I recognize some of the
16   names.
17        Q.   Okay.  And we have Time In Service here.  Does it
18   look like to you this is their total time in service?
19             MS. WOYTOWICZ:  Object to foundation.
20             THE WITNESS:  I do not know.
21   BY MS. HASHIM:
22        Q.   That's --
23        A.   I cannot speak to this document.
24        Q.   Okay.  And then to the right of that column, it
25   says Currently on Med.  And there's like -- seems to some

Michele James - April 13, 2023

68

1    yesses on there.  And then other entries that are just
2    empty.
3              And then to the right, has History.  It seems to
4    be a link.  Did I describe that correctly?
5         A.   Yes, you did.
6         Q.   Okay.  So I'm going to go to what's Bates
7    numbered Arroyo.Def. 2508.  Okay.  And you see the name
8    here of Jose Garcia?
9         A.   Yes.
10        Q.   Okay.  Are you familiar with this individual?
11        A.   Yes.
12        Q.   And it says here that he was detailed to 122,
13   which you had stated earlier is finance division?
14        A.   Yes.
15        Q.   And for how long was he detailed to finance?
16        A.   I do not recall.  I didn't keep track of that.
17   It's been several years.
18        Q.   Mm-hmm.  Okay.  I mean, for a short time or?
19        A.   A long time.  Several --
20        Q.   Long --
21        A.   -- years.
22        Q.   -- time?  Did you say seven years?
23        A.   Several years.  I didn't keep track of like how
24   long people were there because they were in and out.  But
25   he -- he -- he's one of the persons I -- I would consider

Michele James - April 13, 2023

69

1   longevity with finance.

2          Longevity I will say is -- is at least four or

3   more.

4          Q.   Okay.  That's -- that's a -- a fair assessment.

5   I appreciate that.  And it says here that he's there as an

6   IOD, injured on duty.  Right?

7          A.   Yes.

8          Q.   Okay.  The case worker name is LaTonya Smith.  Do

9   you know LaTonya Smith?

10         A.   No, I do not know her.  No more than via email.

11         Q.   So you would've emailed -- you guys would've

12  emailed each other?

13         A.   No.  I didn't email her.  I just -- there were

14  some email correspondences that Reyna sent to her.

15         Q.   Oh, okay.  I understand.  And to your knowledge,

16  by the time that you left finance, was Officer Garcia still

17  with the section?

18         A.   Yes, he was.

19         Q.   Okay.  And then I'm going to scroll down here to

20  the next page.

21         A.   There's Gerrine.

22         Q.   There we go.  You -- you saw it before I did.

23  Excuse me.  So Gerrine.  How do we pronounce her last name?

24         A.   Gniady.

25         Q.   Gniady?  All right.  And she was there as a non-

Michele James - April 13, 2023

70

1    IOD.  Right?

2         A.    Right before she retired.  Yes.

3         Q.    Okay.  And for how long would you say she was

4    detailed to -- to finance?

5         A.    She's also there longevity as well.  I can't

6    recall how --

7         Q.    Okay.

8         A.    -- long.

9         Q.    And you're saying longevity is --

10        A.    At least --

11        Q.    -- at least four years?

12        A.    Four years or more.

13        Q.    Okay.  And are you familiar with Erin Arvetis?

14        A.    No more than via emails.

15        Q.    Okay.  By the time you left finance, was she

16   still there?  I think you said that she retired?  So it

17   sounds like she retired while you were there?

18        A.    Yes.  She retired before I left.

19        Q.    Okay.

20        A.    In the --

21        Q.    Do you --

22        A.    -- summer.

23        Q.    -- know -- do you know if anybody filled her

24   position?

25        A.    It's Erica Pena.

Michele James - April 13, 2023

71

1     Q.   How do you spell the last name?

2     A.   P-E-N-A.

3     Q.   Oh.  Pena.  Gotcha.  All right.

4        And how long was this position open before it was

5 filled?

6     A.   I do not know.

7     Q.   Okay.  Would it be open for a very long time,

8 months, or was it a brief -- briefer period of time?

9     A.   Okay.  I believe Erica was hired before Gerrine

10 left.  I -- so Officer Gniady worked with Rita Young.  And

11 Rita Young is civilian timekeeper.

12        And I know Rita was training Erica on the -- to

13 be like the -- the civilian chief timekeeper and the buyout

14 coordinator.  So I'm not exactly sure when Erica came, and

15 I do know that both Gerrine and Rita retired in the same

16 year.

17        Gerrine retired in the summer, and I -- around

18 maybe October, November of the same year, Rita Young

19 retired.  So I'm not sure when Erica Pena was hired.

20 Because that fell under the deputy director of payroll.

21 That was no longer under my purview.

22     Q.   And Erica Pena is a civilian, to be clear.

23     A.   Correct.

24     Q.   Okay.  Was this after the merge, so they were

25 trying to eliminate those sworn officer positions and

Michele James - April 13, 2023

1    replace them with civilian positions?

2         A.    Yes.

3         Q.    Now I'm going to go to what's Bates number 2511.

4    Looking for Harrington.  Here we go.  We've got that here.

5    Mellownie Harrington.  Do you see that name?  There are

6    three lines, three rows with her name.

7         A.    Yes.

8         Q.    Okay.  Do you know for how long she was there?

9    At finance?

10        A.    No, I do not.  I know that she came after the

11   merger.  And I do know she assisted in the centralized

12   timekeeping unit.  And the only reason why I know is

13   because she sat at the front desk.

14             So when I went to go see some of the -- John

15   Arvetis, he's the deputy director over payroll.  When I

16   went to go visit him, she stopped me, because she didn't

17   know who I was.  And that's how I met her.

18             And I -- that's when I learned that she was

19   there.  And so she was just at the front desk.  But --

20        Q.    Is it --

21        A.    -- other than that, I don't know her.

22        Q.    Is it possible she was -- whoops -- she was there

23   in 2016 and 2017 based upon these records?

24        A.    No.  She was not.

25        Q.    Okay.  Because the record says effective date

Michele James - April 13, 2023

73

1    here is November 19th, 2016.  And then the reevaluation is
2    February 2nd, 2017.
3        A.   No.  She --
4        Q.   What --
5        A.   -- didn't --
6        Q.   Okay.
7        A.   She did not come to finance until after the
8    merge.
9        Q.   Okay.
10       A.   The medical section -- we need to explain this
11   report to you, because when officers sustain an injury for
12   this IOD or non-IOD, there could be pauses.
13           For instance, if an officer -- so like in this
14   case -- I'm not exactly sure which column this was, but
15   whenever she sustained her injury and -- let's just say
16   she's well enough to -- maybe she was well enough to return
17   to a full duty status.
18           And she was on the -- her limited duty, her non-
19   limited duty clock, which is 730 days.  That clock will
20   pause.  So let's just say -- and I don't know her history.
21           But let's just say that she was well enough to
22   return to a full duty status when that -- let's say if she
23   used a -- a -- I don't know, a -- a year of her limited
24   duty time.
25           So she has a year left.  And -- but she returned