EXHIBIT 14

Part 2 of 2

Pages 74-149

Michele James - April 13, 2023

74

1   to full duty for a couple of years, and then all of a
2   sudden, she sustained a new non-IOD injury.  Or a
3   reoccurrence of an old non-IOD injury.
4           And if she doesn't use the medical time or
5   doesn't have enough medical time, she could be afforded the
6   opportunity to return or to go back on the limited duty
7   program on the non-IOD classification and she can -- can
8   pick up from that year.  So this -- the -- her time --
9   there could be some gaps in between there if she was able
10  to return to full duty.  And again, her limited duty time
11  will pause.
12          So I don't know the history of that.  All of that
13  would be with the medical section.  And --
14      Q.   Okay.
15      A.   -- that might be that history point.
16      Q.   Perhaps.  The only thing I'm -- I'm just trying
17  to reconcile with her is that we have her -- we don't have
18  her in 20- -- you said the merger was in 2020?
19      A.   Yes.
20      Q.   That might be in the next set.  Okay.  That's --
21  that's fine.  And the case worker, Amanda Castaneda?  Are
22  you familiar with her?
23      A.   Yes, I am.  But not in -- not because of she's in
24  the medical section.  She used to work in the grant section
25  before she transitioned over to -- in her role in the

Michele James - April 13, 2023

75

1    medical section.

2             So I am -- I know who she is.

3        Q.   While she worked at medical section, did you

4    interact with her?

5        A.   No more than hello and goodbye.  But no.

6        Q.   Okay.  I'm going to go now to the bottom of 25- -

7    - what's Bates numbered 2513.  This one kind of scrolls

8    onto the next page, 2514.

9             We have Margaret Jarvis here at the top and going

10   all the way down several rows to the next page.  You see

11   that?

12       A.   Yes, I do.

13       Q.   Okay.  And with her, we have her from 2018

14   through 2019 in here.  It -- did I read that correctly,

15   with the effective date?  Go all the way --

16       A.   You --

17       Q.   -- down to here.

18       A.   Yes, you did.

19       Q.   All right.  And do you know who she is?

20       A.   Yes, I do.

21       Q.   For how long was she detailed at finance?

22       A.   Looks like about a -- a year.

23       Q.   Mm-hmm.

24       A.   Little more than a year.  She wasn't there long.

25       Q.   Okay.  And you remember her not being there long.

Michele James - April 13, 2023

76

1   Is -- is that what you're saying?

2          A.    Correct.  She worked in the centralized

3   timekeeping unit.

4          Q.    And the case worker, Dawn Centeno?  Do you know

5   Dawn Centeno?

6          A.    No, I do not.

7          Q.    Okay.  When Officer Jarvis left finance, do you

8   recall whether her position was filled?

9          A.    No, it was not.

10         Q.    And do you know why it was not filled?

11         A.    She's an officer.  Again, the -- we didn't -- we

12  couldn't fill our civilian positions although we had some

13  vacancies.

14                And there was possibly no one from the limited

15  duty program that could help out.  I mean, in other words,

16  with the limited duty program, someone has to come in with

17  their packet and be assigned, so there was no one available

18  to fill her role.  She did mostly clerical work anyhow.

19         Q.    And this was centralized time?

20         A.    Correct.  Centralized timekeeping.

21         Q.    Timekeeping.  Yeah.

22         A.    She assisted Officer Gerrine Gniady.

23         Q.    In 20- -- we're going to 2521.  We're looking for

24  the name Mark Matker.

25         A.    Yes.

Michele James - April 13, 2023

1      Q.    There we go.  And we have a -- a few rows with

2    his name.  All right.  How long was he at finance?

3      A.    It looks like about a -- a -- a year.  But I

4    thought it was longer.  At least -- I thought at least two.

5      Q.    Okay.  So not looking at these records, you would

6    say two years?

7      A.    Yes.

8      Q.    All right.  And his case worker was Jess- --

9    Jessica Shines.  Do you know Jessica Shines?

10     A.    Indirectly.  Yes.  She --

11     Q.    Okay.

12     A.    -- was my husband's case manager.

13     Q.    All right.  And when she was at MSS, did you work

14   with her in the capacity of her being a case worker working

15   with any of the employees in finance?

16     A.    No.  Well, I -- I -- I can't say -- I take that

17   back.  I'm not exactly sure.  I know that I worked with the

18   case worker for Damian O'Sullivan, but I forget that

19   person's name, but I believe that person was Jessica

20   Shines.  But I'm not sure.

21     Q.    Okay.  And did Officer Matker leave finance?

22     A.    Yes.  He retired.

23     Q.    He retired?  And who replaced him?

24     A.    No one.

25     Q.    Do you remember when he retired?

Michele James - April 13, 2023

78

1      A.    No, I do not.

2      Q.    Okay.  And do you know no one replaced him?

3      A.    It's the same thing as the previous.  There was -

4  - and -- and with Mark Matker, he had a strong math

5  background.  It's -- you know, he was an investment banker.

6           So we needed somebody with his math skillset in

7  order to be able to assist with those backpay.  So there

8  was no one that came through the limited duty program that

9  had his math background.

10     Q.    Do you remember which of the sections he worked

11 in?

12     A.    He worked in payroll.

13     Q.    Payroll.  All right.  And then we're going to go

14 to 2524.  And we're looking for the name Derek Moss.  There

15 we go.  And do you know Derek Moss?

16     A.    Yes, I did.

17     Q.    And when -- how long was he at finance?

18     A.    Derek Moss came to finance as a full duty police

19 officer.  I forgot what year he came to finance.  He pretty

20 much came shortly after he completed the police academy.

21           And then towards the end, he -- he -- he was on

22 non-IOD.  So he pretty much -- for as long as he's been a

23 police officer, he was detailed to finance.

24     Q.    Okay.  So he was non-IOD and then he went full

25 duty and stayed at finance?

Michele James - April 13, 2023

1      A.    No.  When he came to finance, he -- he was a full
2  duty police officer.

3      Q.    Okay.

4      A.    And then -- or shortly before his retirement, he
5  was non-IOD.

6      Q.    And in terms of his position, do you recall which
7  section he worked in?

8      A.    Budget and accounting.

9      Q.    And was his position filled?

10     A.    No.

11     Q.    And do you know why it was not filled?

12     A.    This is -- he retired around August 2019.  It was
13 right before the announcement -- so the announcement about
14 the Office of Public Safety Administration -- that was
15 presented -- at least introduced in the fall of 2019.

16           And that was done by Barbara West and Jonathan
17 Lewin.  And so pretty much that's when all administrative
18 divisions -- we were called to a meeting, sworn and
19 civilian, to let us know about this new department.

20           And so at that point, no new sworn was being
21 detailed in.  To my knowledge, there was no new sworn that
22 was being detailed into finance.  So his position was not
23 filled.

24     Q.    Was it filled by a civilian, to your knowledge?

25     A.    I'm -- things start to get a little -- they --

Michele James - April 13, 2023

1    they weren't clear.  Because it's not like his position was

2    budgeted in our division.

3           So I -- I really can't say at that point what

4    division was for the Office of Public Safety

5    Administration, so I really do not know.

6        Q.   Okay.  And now we're on what's Bates numbered

7    Arroyo.Def. 2526.  And here is Damian O'Sullivan.  I

8    believe you've mentioned his name before?

9        A.   Yes.

10       Q.   All right.  And for how long has he been in

11   finance?

12       A.   At least two years.

13       Q.   Okay.  And his case worker is Dawn Neary.  Do you

14   know Dawn Neary?

15       A.   I presume she's the person that I met with when

16   Damian O'Sullivan ran out of time.  I did go with him to

17   the medical section.  And I presume it was her.  I'm not

18   sure.

19       Q.   Okay.  And do you know if when you left finance

20   he was still there?

21       A.   No.  He retired.

22       Q.   Okay.  And do you know when he --

23       A.   Due to disability.

24       Q.   -- retired on disability?

25       A.   Right.

Michele James - April 13, 2023

81

1        Q.    Okay.  And do you know when this was?

2        A.    I don't know the -- recall the exact date.

3        Q.    Was it 20- -- 2020, 20- -- was it before the

4    merge?

5        A.    It was after the merge.

6        Q.    After the merge?  Okay.

7              Do you know if a civilian filled his position?

8        A.    I do not know.  I do recall that Frank Lindbloom

9    shared a list with me and had his name down and they

10   identify a fiscal and -- a civilian title, fiscal

11   administrator, to replace him.  But he -- you know, he

12   retired before they filled their fiscal administrator

13   positions.  When I left Office of Public Safety

14   Administration, there were three fiscal administrator

15   positions.

16             One was already filled with Larry Blustain.  The

17   two were vacant, but then they were filled.  One was filled

18   by Cynthia Coleman, and the other one was filled by Destiny

19   Hernandez.  And although the fiscal administrator position

20   was identified for Damian, it -- of those two people,

21   Cynthia Coleman and Destiny Hernandez, none of them worked

22   in travel.  And that's where Damian worked.  So under this

23   new department, they decide wherever they see fit to assign

24   the new staff.  So.

25        Q.    Okay.  We're going to jump down to about two

Michele James - April 13, 2023

1    pages, 2528.  Sandra Thomas.  Oh.  More than that.  2538.

2           All right.  And are you familiar with Sandra

3    Thomas?

4        A.   Yes, I am.

5        Q.   How long was she at finance?  To your knowledge?

6        A.   I -- almost three years.  Maybe a little bit

7    longer.  But at least a good three years.

8        Q.   All right.  And her case worker is Jessica

9    Shines?  And you -- you stated that you do -- you're -- you

10   know of Jessica Shines.  Correct?

11       A.   Correct.

12       Q.   And when you left finance, was she still working

13   there?

14       A.   No.  She retired.

15       Q.   She retired?  And was -- did she retire before or

16   after the merge?

17       A.   Before the merge.

18       Q.   And was her position filled?

19       A.   It was filled.  I don't know like timings, but

20   either Damian O'Sullivan or Lisa Carli possibly filled her

21   position.

22       Q.   Okay.  And they were not at finance before she

23   retired.

24       A.   No, they were not.

25       Q.   Okay.  Do you know how long it took before her

Michele James - April 13, 2023

83

1   position was filled?

2       A.   No.  I do not.

3       Q.   A short period of time, long period of time it

4   was open?

5       A.   I really do not recall.

6       Q.   Okay.  I'm going to jump down a couple pages

7   here.  You mentioned, I believe, Darice Walker?  How --

8       A.   Yes.

9       Q.   -- long was Darice there at finance?  Do you

10  recall?

11      A.   About a couple of years.

12      Q.   Okay.  And when you left finance, was Darice

13  Walker still there?

14      A.   No, she was not.

15      Q.   When did she leave?

16      A.   I don't know when she left.  It was -- no, it --

17  I know she bidded out.  She --

18      Q.   What --

19      A.   -- bidded out --

20      Q.   -- did --

21      A.   So she was a full -- about a -- about a -- I

22  don't know if it was before TSA or at the beginning part of

23  it, but she was a full duty officers -- officer.  And as a

24  full duty officer, she has the ability to bid out to

25  another unit, a biddable unit.  And I know she bidded out

Michele James - April 13, 2023

84

1    and I -- I believe she went to the 1st District.

2          But I know she bidded out and she was the

3    successful bidder in order to leave.

4          Q.   And then was her position filled?

5          A.   No, it was not.  Her --

6          Q.   And --

7          A.   -- work was just spread out.

8          Q.   Okay.  Do you know why it was not filled and they

9    decided to spread out the work?

10         A.   Well, this is when -- when they were about to

11   start the Office of Public Safety Administration.  So with

12   -- with the new Office of Public -- for a -- a lot of the

13   full duty officers that were in -- that were part of

14   administrative units, they were -- they opted to bid or

15   apply for another position.

16         They had a choice in terms of where they could

17   go.  Whereas a -- an IOD or a -- a -- I'm sorry -- as a

18   limited duty officer, they are assigned by management.

19         So a lot of the officers, since they realized

20   that a new department was taking over, they realized it was

21   going to be civilianized, so they took the opportunity to

22   bid out to another unit.  And that's what she did.

23         Q.   Okay.  Helena Ward?  How long was Helena Ward at

24   finance?

25         A.   I do not know her full time range.  But I do know

Michele James - April 13, 2023

1    that she was off and on.  I do know that she did come to

2    finance.  I knew that she came in a limited duty capacity,

3    but I did not know what kind when she first came.  And then

4    for a moment, she was full duty.

5         And then she came back to finance in a limited

6    duty capacity.  So I don't -- I didn't keep track of how

7    long she was -- I -- I didn't keep track of any sworn in

8    terms of how long that they were finance.  But for her

9    case, I do know she did come to finance in a limited duty

10   capacity, and then at some point, I -- I -- she left.  I

11   know she was in a full duty capacity and then she came back

12   in a light duty capacity.

13        And when I left the Office of Public Safety

14   Administration, she was still there.  Initially she was

15   helping out with payables.  But right before I left --

16   although it says on here Unit 122, they never updated that.

17        She actually works in general support.  She works

18   under Deputy Director Joel Brown.  So they just never

19   updated this, but she did -- her -- her -- her detailed

20   assignment changed, and I don't -- do not recall the unit

21   number of that.

22        Q.   Okay.  And when she went to general support, do

23   you know if her position was filled?

24        A.   So I'm going to say Deputy Director Sarontey

25   Smith -- that's where she -- she had Jose Perez, Cynthia

Michele James - April 13, 2023

86

1    Rivera, Regina Beamon, Evelyn Daley, Barbara Littleton,

2    Vincent Thomas, and Maria Perez.  She -- so that was her

3    new payables team.  Because Helena was part of the payables

4    team.  But -- and all the people I just mentioned -- they

5    are all civilians.

6            So I -- it's not like it was one of the same that

7    -- one of those people replaced Helena.  It's just that

8    that was Sarontey's team for payables.

9        Q.   Okay.  2543.  We're looking for --

10       A.   Krystyna Zbela?

11       Q.   Zbela.  Yeah.  Here we go.  And how long was she

12   at finance, to your memory?

13       A.   Krystyna was off and on.  She's -- she's been in

14   finance for a long time, and then for a brief moment, I

15   believe she was detailed out but then came back.

16           So it wasn't quite consecutive.  And I -- again,

17   I didn't keep up with --

18       Q.   Sure.  The timing.

19       A.   Right.

20       Q.   Right?  Okay.  And you -- you said she's been

21   there for a long time.  Was she there -- during her time

22   there, was she non-IOD?

23       A.   I do not know.

24       Q.   Okay.

25       A.   Oh.

Michele James - April 13, 2023

87

1      Q.   And when -- I'm sorry.  I -- I didn't realize you
2  were still -- you still had a thought to --
3      A.   No --
4      Q.   -- to share.
5      A.   Right.  I -- I -- I really didn't know her status
6  that well.  No.
7      Q.   And when you left finance, was she still there?
8      A.   Yes, she was.
9      Q.   All right.  Whoops.  I don't want to do that.
10  Sorry.  I'm not pressing the right button here.  There we
11  go.  Stop share.  All right.
12          Now, you had talked about -- you testified a
13  little bit earlier about the treatment nature of the LD,
14  limited duty non-IOD positions.  Would it be fair to say
15  that if CPD provided an officer with a reasonable
16  accommodation to finance, that that detail would be a
17  permanent position?
18          MS. WOYTOWICZ:  Object to form.  Foundation,
19  misstates testimony.
20          You can answer.
21          THE WITNESS:  My understanding is no.  It's to my
22  understanding that Officer Arroyo was actually detailed to
23  another unit before she came to finance.  That was my
24  understanding.
25  BY MS. HASHIM:

Michele James - April 13, 2023

88

1      Q.   But I'm -- I'm -- I'm actually looking more at

2  the -- the nature of an officer placed -- the -- the

3  temporal nature of an officer who is placed in finance.

4          If -- if CPD provided an officer with an -- with

5  an accommodation to finance.  So it's a reasonable

6  accommodation because they have a disability.  All right?

7      A.   Yes.

8      Q.   Would that placement be a permanent position?

9  That's my question.  I'm sorry.  I needed to rephrase it

10  for you perhaps.

11          MS. WOYTOWICZ:  Object to foundation.

12  BY MS. HASHIM:

13      Q.   You can answer.

14      A.   I believe it's more -- that -- that this is a

15  question that's -- that should possibly be better addressed

16  by the medical section.  But my understanding is it's not a

17  permanent assignment.

18          There's supposed to be language in their limited

19  duty application application, stipulating they understand

20  that they are -- can be assigned based upon operational

21  needs.  So although it -- she was assigned to finance and -

22  - let's just say the budget office allowed -- allowed us to

23  fill all of our civilian positions and we have all the

24  people that we need and -- and it's like, well, thank you,

25  Officer Arroyo, possibly, you know, she could -- or

Michele James - April 13, 2023

89

1   especially if she had any more limited duty time, there's a

2   possibility that she could reassigned to another

3   administrative division within the Chicago Police

4   Department.

5        Q.   Right.

6        A.   So that's my --

7        Q.   And --

8        A.   -- understanding.

9        Q.   And if this -- if the -- if CPD were to place an

10  officer into finance as a reasonable accommodation, then

11  you're saying that that placement would be temporary.  Am I

12  understanding you correctly?

13       A.   Yes.

14       Q.   Okay.  To the best of your recollection, in 2019,

15  what positions, if any, were open in travel section for

16  sworn officers?

17       A.   None.  Zero.  Because there are no sworn

18  positions in the -- in -- that were budgeted in finance.

19  When --

20       Q.   So if -- if an officer left that -- that -- so

21  you -- I think you said that there were three positions, so

22  if one of the officers left, that one position would not be

23  filled because it was not budgeted.

24            Am I understanding that correctly?

25            MS. WOYTOWICZ:  Misstates testimony.

Michele James - April 13, 2023

90

1   BY MS. HASHIM:

2        Q.   Is -- yeah.  So can -- can you explain to me?

3        A.   Okay.  So for the finance division -- and -- and

4   actually, the -- the budgets for all departments are

5   available online through the City of Chicago Office of

6   Budget.

7             It's best to take a look at the budget ordinance

8   and scroll down to the police department.  And I apologize.

9   I can't -- it -- they moved that -- they moved finance

10  around a lot.

11            But if you take a look at the budget, there are

12  no sworn budgeted positions.  They're all civilian.  And --

13       Q.   In 20- --

14       A.   -- the only --

15       Q.   I'm talking about 2019.

16       A.   Right.  And it -- is -- there's never, ever been

17  any sworn positions budgeted in finance.  When the budget

18  is presented before City Council, one of the things that

19  the City Council look at is where are sworn positions

20  budgeted.

21            And it would be highly unfavorable to show sworn

22  positions in the finance division of the police department,

23  because officers are supposed to be in the field, boots on

24  the ground, doing police work.

25            So the officer -- so for the -- for the finance

Michele James - April 13, 2023

1  division, there were -- there was no need to budget for

2  sworn positions.  We were supposed to be all civilians.

3          So the sworn that was in finance -- all of them,

4  full duty, IOD limited duty, non- -- all -- IOD duty --

5  they were all detailed.  That means that wherever you saw

6  unit of assignment, that's where their positions were

7  budgeted at.  And they were just detailed on loan to

8  finance.

9      Q.   And so how many -- in 2019 in the travel section,

10  how many avail- -- how much availability was there for CPD

11  to loan its sworn officers by way of detail to the travel

12  section?

13          MS. WOYTOWICZ:  Object to foundation.

14          THE WITNESS:  So again, with the -- with the

15  limited duty program, no one -- an officer doesn't know

16  when they're going to sustain a injury and they don't know

17  how long it's going to take for them to heal.

18          I guess kind of once they get over the -- the

19  initial healing, it -- it may take some time, through

20  physical therapy or what have you, to rehabilitate them to

21  return to a full duty status.  It just depends on their

22  medical condition.

23          You know, some people have other health

24  conditions.  So when they submit their paperwork through

25  the medical section, that's when they go into their limited

Michele James - April 13, 2023

92

1    duty status.

2          So the -- being afforded the opportunity to

3    acquire or for a limited duty officer to come to finance is

4    -- is based on whenever they submit their packet.  When

5    they submit their packet to the medical section, it's that

6    day.

7          So we don't know when they're going to come in.

8    And that's when -- I'm sorry.  I'll -- I'll let you speak.

9    BY MS. HASHIM:

10         Q.   No, so and flipping it around, how would -- how

11   would the medical section that there were openings in the

12   travel section so they can pick up the phone -- the

13   sergeant could pick up the phone, call you, and say, you

14   know, I know you have an opening and here's a -- here's

15   somebody who -- on -- in limited duty who can -- who might

16   fit the bill?

17         A.   That's not how the medical section work.  They

18   will not contact the -- a -- a unit at all.  Their

19   instructions are to give it to -- give -- notify the chief

20   of bureau of administrative services -- 02:28:08

21         Q.   I'm sorry.  Yeah?  Sorry about that.

22         A.   So they're required to notify the chief, just one

23   central point section, and the administrative sergeant --

24   his name was Sergeant Carl Wasileski.  He would receive the

25   packet, review the packet.

Michele James - April 13, 2023

93

1          And if -- like I said, if there was an officer

2   who was a paralegal before they came -- before they became

3   a police officer, then that administrative sergeant would

4   reach out to general counsel and let them know is this

5   somebody that you think could work in your office.  I don't

6   know -- I cannot speak on how the officers are detailed,

7   because that would've been under the purview of the Bureau

8   of Administrative Services.  But like I said, if there was

9   somebody who had a finance background, that's when the

10  sergeant would reach out to myself or the director of

11  finance to find out if we could utilize that person in the

12  finance.

13          Sometimes we did get people who did not have a --

14  a financial background.  But if they can do clerical

15  functions.  If we communicated to the sergeant that we

16  cannot utilize that person, then he will move on to another

17  division to see if they could utilize that person.

18          If it turns out that he could not find an

19  administrative division to receive that officer, my

20  understanding is that they will automatically go to -- they

21  call it callback, which is the 311.

22          So they're 311.  They answer calls.  When people

23  call and need general information, they -- they take calls

24  and provide guidance.  That's my understanding.

25      Q.   So how would the sergeant know whether finance

Michele James - April 13, 2023

94

1   was at capacity with the number of LD officers or whether

2   it was not at capacity?

3       A.   There was no limit set.  It was all based on

4   need.  And we would let him know if we could use that

5   person or not.

6       Q.   So in 2019, how much of a need was there in

7   finance?

8       A.   We needed help and definitely in the travel

9   section.  Although -- although Officer Arroyo was there, we

10  had Damian and Lisa, they're all -- all three have --

11  although they were detailed to finance, they all were out

12  on extended medical.

13          Officer Arroyo was out for several months.

14  Officer O'Sullivan was out for a year.  Officer Carli

15  sporadically would be out two or three months.

16          So we always was in need of help.  In payroll, is

17  that -- I mentioned that there was like four sworn and four

18  civilians.  We always needed help in payroll, especially --

19  Jeff Vega and Mark Matker.

20          They were our two primary people that processed

21  the -- the -- the backpays.  And that's -- that's -- that

22  requires a -- a high skill level of math.

23          Also -- I apologize.  They also prepared the

24  military payroll.  So it was the two of them working on

25  that.  And when Mark retired, it just left Jeff.

Michele James - April 13, 2023

95

1          So I -- we -- again, it's either hire a civilian,

2    which we could not do, or trying to find another sworn with

3    a -- a -- high -- strong math background to assist.  And

4    then there was definitely a need in the centralized

5    timekeeping unit to -- with -- with the timekeeping.

6          The timekeepers were already overloaded.  They

7    were -- they were pretty much in my office almost on a

8    weekly or bimonthly basis to let me know of the volume of

9    work was needed.

10         But again, not everyone can do timekeeping for

11   the police department.  So I would need somebody who had

12   some knowledge of CPD's contracts, collective bargaining

13   agreement contracts, in order to do timekeeping.

14         For payables, we always needed help.  We -- we

15   tried to automate what we could for payables.  That helped.

16   But to process the volume, payables for the police

17   department's massive.

18         So we always needed help.  So I really can't --

19   it -- it was -- it was fluid, you know.  Even if somebody

20   came in, although you see them detailed, but -- although

21   they were detailed, they were also out on medical as well.

22         So pretty much for the sworn, I'm estimating on

23   average that they're out on medical possibly to five to six

24   months out of the year.  And then of the other five or six

25   months out of the year, they have a furlough.

Michele James - April 13, 2023

96

1          A furlough's a month.  So -- and then they have

2    baby furlough days and personal days.  So that's how we --

3    we -- they -- they kind of help augment the -- the civilian

4    staff.  So we were always in need.

5          Q.    And did this need continue until the merger, and

6    then they were replacing with civilians; is that correct?

7          A.    Yes.

8          Q.    Okay.  And when the merger happened, were they

9    hiring new positions for -- or strike that.

10          When the merger happened and the sworn officers'

11    positions were not being replaced by sworn officers but by

12    civilians, were those -- were there vacancies for those

13    positions?  Did they fill those positions with --

14          A.    I'm sorry.  Can you --

15          Q.    -- civilians?

16          A.    Can you repeat that --

17          Q.    Yeah.  When the merger happened, were -- as I

18    understand your testimony, when the civilians left their

19    position, either those positions were not filled or they

20    were filled by civilians.  Is that correct?

21          A.    When the sworn vacated the --

22          Q.    No --

23          A.    -- positions?

24          Q.    -- when the sworns -- when the sworn officers

25    left the positions --

Michele James - April 13, 2023

97

1     A.    Okay.

2     Q.    -- right?  So as -- it -- the -- the goal was to

3  fill those positions with civilians.  Is that --

4     A.    Correct.

5     Q.    -- correct?

6     A.    Correct.  You're --

7     Q.    Okay.

8     A.    -- correct.

9     Q.    And so is it correct to say that positions became

10  open for civilians to fill?

11     A.    Yes.  The -- the -- the first step is -- under

12  this new department, they had to identify what those

13  civilian positions were based on the job duties that the

14  sworn were performing.

15          And then they had to discern how many positions

16  they needed.  And then through their HR division, through

17  the City DHR department, to have those positions posted so

18  people can apply for them.

19     Q.    Okay.  Thank you.  Appreciate that.

20          So you had mentioned Officer Arroyo's name.  Is

21  it safe for me to say that you know who she is?

22     A.    Yes.  I know her.

23     Q.    Okay.  And how do you know her?

24     A.    My first introduction of her was when she was

25  detailed to finance.

Michele James - April 13, 2023

1      Q.   And do you remember when this was?

2      A.   It was in 2017.  But I don't know an exact month.

3      Q.   Okay.  And how often would you say you interacted

4   with Officer Arroyo when she was detailed to finance?

5      A.   When she -- when she first was detailed to

6   finance, she was working under Contract Administrator Joel

7   Brown, assisting with accounts payable.  I -- to my

8   understanding, I -- I think she struggled with that.

9           That was what was communicated to me.  And then

10  Director -- Director Johnson, Director Jon Johnson, wanted

11  to know if she can assist in -- well, in the travel

12  section.

13          And so at that point, she started -- I -- I think

14  it was around February 2018 when she started to assist in

15  the travel section.  And so there's a lot of communication

16  with myself and Officer Arroyo.

17          Although Officer Arroyo reported to Helen Lee.

18  But when it came to travel, it really did not matter,

19  because everyone was involved with trying to get travel

20  approved.

21          Officer Arroyo would do her part in terms of

22  collecting the data, entering the information in Office of

23  Budget and Management's SharePoint site.  But there was a

24  lot of back and forth, a lot of phone calls between our

25  department and the budget office.

Michele James - April 13, 2023

99

1          So Officer Arroyo -- she would initiate it by

2   following up with the budget office for pending travels,

3   waiting approval.  And if she didn't get anywhere, then she

4   would ask Helen Lee.

5          And if not Helen Lee, she will ask me or ask Jon

6   Johnson.  So -- and sometimes it went all the way up to

7   getting the chief involved of the bureau.  Even sometimes

8   the superintendent's office.

9          So she -- I definitely had a lot of interaction

10  with her.

11      Q.   Were your interactions direct, face to face?

12      A.   Yes.

13      Q.   And how frequently would that be?  On average.

14      A.   Daily.  You know, nothing -- good morning, how

15  you doing, and she'll give me a travel update.  Right --

16  she was very conscientious about her work.

17          And right before she either was going to take

18  furlough or if she knew she was going to be going on

19  medical, she wanted to give everyone a update about her --

20  her pending travels.

21      Q.   Did she share with you issues relating to her

22  health?

23      A.   Yes, she did.

24      Q.   You had mentioned -- you had testified earlier

25  that it was usually through conversation in which you would

Michele James - April 13, 2023

100

1    learn what the work status was of -- of people who worked

2    in finance.

3              Did she -- did Officer Arroyo inform you that she

4    was -- what -- what her work status was?

5         A.   Yes, she did.  But she also communicated that she

6    disagreed with her status.

7         Q.   She -- she -- she disagreed with her limited duty

8    status?

9         A.   She disagreed with her being identified as non-

10   IOD limited duty.

11        Q.   Right.  But she -- but she did not disagree with

12   the limited duty status.

13        A.   Correct.

14        Q.   Okay.

15        A.   Just that it was non-IOD.

16        Q.   Sure.  And when -- when did she first tell you

17   about her limited duty status?

18        A.   I do not recall.

19        Q.   You stated that she started in 2017.  Would it

20   have been shortly after she started?

21        A.   I -- I really -- I do not -- I -- I did not

22   really -- when she first came to finance, I mean, I saw

23   her, I spoke to her.  But not in a work capacity.

24              So I -- I mean, she mentioned it to me, but I

25   can't recall when.  I mean, I didn't -- I -- we have so

Michele James - April 13, 2023

1   many sworn in our office.  I could not keep track of

2   everyone when they would communicate their status.

3          I will say that whether I spoke to her or not,

4   frequently, because we had sworn officers in finance, we

5   often had to justify why we had the sworn officers.  And

6   she was on that list.

7          And then also, if there were any special

8   deployments -- the police department, whenever there's

9   civil unrest or if there's -- or there's something that's

10   heightened where they need all officers or all hands on

11   deck, there will be a directive that will come out from the

12   first deputy superintendent where they would require that

13   we provide -- all divisions provide a roster of all the

14   sworn within your division.

15          They wanted to know what their duty status was.

16   And what I would -- and -- and also, their availability,

17   meaning if they were on furlough or not.

18          And what I would do is I had access to CLEAR, and

19   I would go into CLEAR, pull up all of the officers, and

20   indicate on the sheet what their duty status was and

21   indicate their furlough status.

22          I start out with that sheet, and then I will

23   follow up with the officers just to make certain that it's

24   correct, because sometimes CLEAR was -- the -- the CLEAR

25   system was incorrect.  So I can't recall when she first

Michele James - April 13, 2023

1   mentioned it to me that she was -- what her -- her duty

2   status was.

3          I know we had several conversations about it.

4   And -- and like I said, I'm -- we were -- frequently had to

5   provide a list through my chain of command of the duty

6   status of all the sworn, including Officer Arroyo.

7       Q.   So she would -- she started in 2017.  How

8   frequently would you have given that list to your superior?

9       A.   It's on a -- whenever they requested it.  It --

10  it was whenever it was demanded.  Definitely if there was -

11  - like the Ferguson situation.  I don't know if that was

12  before her.

13         But like -- like I say, any time there was some

14  kind of civil unrest.  Sometimes light duty sworn was also

15  deployed but not in a -- not like for combat, more like for

16  support.

17         For instance -- because there were several

18  heightened alert situations that transpired at the police

19  department.  So sometimes what the department would do is

20  rent vans, 15- -- 12- or 15-passenger vans.

21         And so the light duty sworn was used to go and

22  transport those vans to different sites.  Or mostly to the

23  headquarters.  And then -- and then a -- a full duty

24  officer would take that van and then drive it out to

25  whatever location that they need to drive it to for those

Michele James - April 13, 2023

103

```
 1  officers.
 2          So that's how the light duty sworn might've been
 3  utilized.  Or if -- if there -- because I'm -- for the
 4  Chicago Police Department, they had several periods of
 5  working 12-hour days for a week or two week or what have
 6  you.
 7          And -- and then sometimes the situations were
 8  around the clock, you know.  So light duty sworn might have
 9  been utilized to give sandwiches or water, you know, or to
10  get radios.
11          They -- they -- they just -- they -- they -- they
12  did not put them in a harmful situation, but they were kind
13  of like behind the scenes for support, because the whole
14  point was for all full duty sworn to be out in the field.
15          And -- and the light duty was to be behind the
16  scenes to help get the supplies that was needed for those
17  officers.  So sometimes they were utilized and sometimes
18  they were not.
19      Q.   Did Officer Arroyo inform you of her work
20  restrictions?
21      A.   Yes, she did.  But I don't -- I can't recall all
22  of her restrictions.
23          MS. HASHIM:  Mm-hmm.  Sure.  All right.
24          So I'm going to pull up an exhibit.  We're on No.
25  3 now, I believe.  And it's Bates number Arroyo.Def. 3607.
```

Michele James - April 13, 2023

1        And of course my computer has decided it's going

2  to take its time.  Right?  There we go.  I got it open now.

3  And I'll go ahead and put it into the chat.

4        (Exhibit No. 3 marked for identification)

5  BY MS. HASHIM:

6      Q.   All right.  Can you see this?

7      A.   Yes, I can.

8      Q.   All right.  Make it a little bit bigger.

9      A.   Yes.

10     Q.   Yeah.  Let me make this wider here.

11     A.   Okay.

12     Q.   How's that?

13     A.   2018.  Yes.

14     Q.   Well, I'm going to scroll from the top down.

15  It's just a one-pager.  Okay.  And give you a chance to

16  read that to yourself.  Let me --

17     A.   Okay.

18     Q.   -- know when you're done.

19     A.   Okay.  I'm done.

20     Q.   Okay.  So you -- you had mentioned how Officer

21  Arroyo was first working with Joel Brown.  Is -- is that

22  your testimony, correct?

23     A.   Yes.  That's correct.

24     Q.   Okay.  Before I -- I've -- go into my questions,

25  let me ask you this.  Are you familiar with this email?

Michele James - April 13, 2023

105

1       A.    Yes.  In looking at it, yes.

2       Q.    Okay.  And did you write it?

3       A.    Yes, I did.

4       Q.    And it was originally from you to Joel Brown --

5       A.    Correct.

6       Q.    -- correct?  Okay.  And this would've been in

7   February 2018, so shortly after Officer Arroyo started in

8   finance.  Is that a fair statement?  You -- you said she

9   started in 2017?

10      A.    Yes.  She did.

11      Q.    Okay.

12      A.    So, yes.

13      Q.    Yeah.  Okay.  All right.  And who -- up here, you

14  -- it -- it says Helen Lee.  And to confirm, you -- you

15  stated that she was Officer Arroyo's supervisor?

16      A.    Yes.  She was.

17      Q.    Okay.  And did Helen Lee report to you?

18      A.    Yes, she did.

19      Q.    All right.  And to your knowledge, you -- you had

20  -- well, strike that.

21            You had stated that you -- it was your

22  understanding that Officer Arroyo was having some

23  difficulties in this initial placement?  Is that correct?

24      A.    That is correct.  That is what --

25      Q.    Okay.

Michele James - April 13, 2023

1     A.   -- was communicated to me.

2     Q.   All right.  And as a consequence, she was moved

3  to another section.  And that would be finance that you're

4  mentioning in here -- I mean, that -- that would be the

5  travel section that's mentioned in here.  Right?

6     A.   Yes.  That's --

7     Q.   Right.

8     A.   -- correct.

9     MS. HASHIM:  Yeah.  And this -- this -- what --

10  third paragraph down.  Okay.  All right.

11     I'm going to go ahead and share with you the next

12  exhibit, which will be No. 4.  That's Arroyo.Def. 3432.

13     I'm putting it here in the chat.  All right.  I

14  almost hit delete button.  That wouldn't be good, would it?

15  There we go.  Excuse me.

16     (Exhibit No. 4 marked for identification)

17  BY MS. HASHIM:

18     Q.   All right.  So I'm going to scroll through this,

19  have you take a look at it.  And actually, I want to start

20  from the bottom because it's a thread.

21     It's going to go from the -- you know, it starts

22  from the bottom up.

23     A.   Okay.

24     Q.   And let me know when you're done reading it.

25     A.   Oh, I'm done.

Michele James - April 13, 2023

107

1     Q.   Okay.  And then we have a response from Barbara

2  West.  Who is Barbara West?

3     A.   She was the chief --

4     Q.   Okay.

5     A.   -- of the bureau.

6     Q.   Okay.  And then scrolling up.  Let me know when

7  you're done with this.

8     A.   Hmm.  I'm done.

9     Q.   All right.  And that's the top.  Okay.  And do

10  you recognize this?

11     A.   Yes, I do.

12     Q.   What is it?

13     A.   An -- an email to the chief, and then later on I

14  did forward it on to my director of finance, apprising them

15  of Reyna's medical situation.

16        And -- and this communication that Reyna shared

17  with me about her information.  She didn't have to divulge

18  this information, but she shared it with me.

19     Q.   Okay.

20     A.   So I -- I provided an update to my boss, to let

21  them know that Reyna's going to be out and Helen could not

22  perform travel by herself.

23     Q.   Mm-hmm.  Okay.  Did I stop?  No, I didn't stop.

24  Now, we stopped the screensharing.  Okay.

25        Now, to your knowledge, and based on your

Michele James - April 13, 2023

108

1  observations, in -- in the travel section, did Officer

2  Arroyo satisfactorily perform her work?

3      A.   Yes, she did.

4      Q.   How would you describe her work ethic?

5      A.   Oh.  She had a wonderful work ethic.  She did her

6  work.  Sometimes the work of others.

7         And as I stated previously, if she was going to

8  be going on furlough or if she was going to go on medical,

9  she will give us an update about what was pending.  She did

10  not leave any incomplete work, meaning she did everything

11  that she needed to do, that she could do, and it was just a

12  matter of either waiting for the officer to provide us with

13  the information that we needed or we're waiting on another

14  department to give the approval.

15         But she -- she did great work.

16      Q.   And is it fair to say that, to your knowledge,

17  she was qualified to work in the travel section?

18      A.   Yes, she was.

19      Q.   Is it fair to say, to your knowledge, Officer

20  Arroyo was able to perform the essential functions of a

21  limited duty officer while working in the travel section?

22      A.   So I -- I really cannot answer that question.

23  Only because the essential duties of a limited duty officer

24  -- I don't think that really exists.

25         Because she was just assisting in an

Michele James - April 13, 2023

109

1    administrative capacity.  So.  But she was able to help

2    with the processing of travels.

3            Right before she exhausted her time, she was

4    learning the reimbursement part of travel.  But initially

5    she was helping with the processing of the travels to get

6    them approved.  So she -- she was great in that.

7        Q.   In terms of civilian positions, do you feel that

8    she would've been qualified to fill any positions that were

9    open, any vacancies that you were aware of?  From 2019

10   onward.

11       A.   Sure.  So the -- if -- if we had been able to

12   budget a civilian position for the work that Officer Arroyo

13   did, it would be considered -- the -- the civilian title

14   would've been an accounting technician 2 title.

15           As an accounting technician 2 title, that is a

16   civilian -- that's covered under the AFSCME union

17   collective bargaining agreement, the AFSCME.  So Officer

18   Arroyo would not have been able to assume that position.

19           That position would have to be posted.  And

20   because it is an AFSCME position, AFSCME members -- bidders

21   would take precedence, because she would be considered --

22   she -- so Officer Arroyo would have to have resigned as a

23   police officer in order to apply for this -- for this

24   civilian position.

25           And then she would be considered an external

Michele James - April 13, 2023

110

 1    candidate.  So she would -- I could not give this position

 2    to her, because it is an -- an AFSCME collective bargaining

 3    title.

 4            And she would have to go through the interview

 5    process and she would have to be rated if she could or

 6    could not fill the requirements of the job.  And -- and

 7    because this is an -- an AFSCME position, presuming she

 8    actually made the qualified list in terms of being hired,

 9    it would be based on seniority.

10            So if there are -- if there were other people

11    throughout the City of Chicago who are already AFSCME

12    employees and they could -- it -- it could've been a clerk.

13    And this person has the skillset in order to apply for that

14    position.

15            And if that person is on the list to recommend

16    for hire, that clerk will take precedence over Officer

17    Arroyo because she was an external candidate and that

18    civilian would've already had time with the City.  So in --

19    in fairness, Officer Arroyo did not do all of the duties

20    that was required for that title.

21            She processed the travels, but the other piece of

22    it was the reimbursement, which she was learning right

23    before she exhausted her time.

24       Q.   Were there civilian clerical positions that were

25    -- were open that she could've filled?

Michele James - April 13, 2023

1      A.    A lot of our positions -- we didn't have any

2  vacant civilian positions in the travel section.  They were

3  all cuts eliminated through the budget process.

4      Q.    What about in finance division?

5      A.    I do not recall.  I will have to take a look at

6  the -- at the manpower report from that time.  Because part

7  of my division was responsible for tracking manpower

8  throughout the -- the police department for all the

9  divisions, including finance.

10      So I cannot recall.  Only thing I recall is a lot

11  of our civilian positions were cut.  We had some civilian

12  positions.  Yeah, we had some civilian positions.  But I do

13  not recall -- like even in the other divisions -- even if

14  it's payroll, again, they would be looking for a certain

15  skillset in payroll.

16      In timekeeping -- we never lost any of our

17  timekeeping positions.  If anything, we did not have enough

18  timekeeping positions.  But I can tell you -- that's also

19  AFSCME.  And Officer Arroyo would not have the background

20  to even fill that position.  So.

21      Q.    Okay.  Do you recall whether -- you -- you had

22  testified earlier that Officer Arroyo shared with you

23  information about her health.

24      Do you remember that testimony?

25      A.    Yes, I do.

Michele James - April 13, 2023

112

1       Q.    Did she share with you issues relating to her
2    shoulder impairment?
3       A.    Yes, she did.
4       Q.    Okay.  I'm going to pull up Exhibit No. -- No. 5.
5    And share that.  Thank you so much for your patience while
6    I do this juggling act.
7       A.    Okay.
8             MS. HASHIM:  All right.  Share the screen here.
9    And this is Bates number Arroyo.Def. 3486.
10            (Exhibit No. 5 marked for identification)
11   BY MS. HASHIM:
12      Q.    I'm going to scroll through it.  Actually, start
13   from the bottom.  It's just a one-pager, so let's start
14   from the bottom.        You can take a look at the --
15   what's written here.  Let me know when you're ready to move
16   up.
17      A.    Okay.  You can move up.  Okay.
18      Q.    Okay.  And are you familiar with this email?
19      A.    Yes.
20      Q.    Okay.  And -- let me see.  You are involved in
21   writing these emails.  So that's you who, you know -- it
22   was -- and we see the first one down here at the bottom was
23   from Reyna to you.
24            And Helen Lee is cc'd to it.  Am I reading that
25   correctly?

Michele James - April 13, 2023

113

1      A.    Yes, you are.

2      Q.    Okay.  And then we have Helen Lee who responded.

3    Okay, see here.  Is it correct to say that by June 17th,

4    2019, based on Helen Lee's response, you were aware of the

5    kind of pain that Officer Arroyo had been experiencing

6    relating to her shoulder?

7      A.    Yes.  I am.  Or was.

8      Q.    Do you recall whether Officer Arroyo shared with

9    you information relating to her shoulder impairment?

10     A.    Yes.  Verbally and in writing.

11     Q.    Okay.  Verbally, what did she tell you?

12     A.    She just mentioned to me about how she hurt

13   herself in a -- a -- an auto accident while working.

14   That's what I recall.

15     Q.    Do you recall what she shared with you about why

16   she was going to have shoulder surgery?

17     A.    No.  I do not recall.  But I will say that the

18   fact that she -- she volunteered to share her information

19   with myself and Helen Lee.

20           She didn't -- she was under no obligation to do

21   it due to HIPAA violations or a reason.  All the

22   communication about her injuries and pain -- she was

23   obligated to notify the medical section.

24     Q.    Mm-hmm.

25     A.    So.

Michele James - April 13, 2023

114

1    Q.   Do you recall what she shared with you about the
2    condition of her shoulder and the limitations that it
3    caused at the time?
4    A.   I know -- I -- I forgot all the limitations.
5    I'll be honest.  But --
6    Q.   Mm-hmm.
7    A.   -- I do recall having conversations.  I just
8    cannot recall the specific detail.  I had a lot of limited
9    duty sworn with a lot of medical issues, so I apologize.
10   Q.   All right.  Well, do you -- do you recall whether
11   she had difficulty lifting or limitations in lifting?
12   A.   She mentioned that.
13   Q.   How about limitations in its movement?
14   A.   She mentioned that.
15   Q.   Anything else you might recall?
16   A.   No more than she -- her -- her -- the
17   communication that she's been dealing with the medical
18   section for them to see that it -- the -- the difference
19   between a recurring IOD injury or a new injury.
20       She shared that information with me, but that's -
21   - I -- I couldn't help her with that.  The medical section
22   could help her with.
23   Q.   Okay.  Did Helen Lee ever discuss with you
24   anything about the condition of Officer Arroyo's shoulder?
25   A.   I do not recall.  I do not recall.

Michele James - April 13, 2023

115

1     Q.   Do you recall making a conversation between you,
2  Officer Arroyo, and Helen Lee about her shoulder?
3     A.   I mean, we -- we -- we -- Helen Lee spoke, you
4  know, in terms of her medical.  Because she had a lot of
5  medical health.  Some of it was IOD.
6          She did share that with us.  But I can't like
7  recall a specific conversation with Helen Lee about her
8  shoulder, specific shoulder.  Yeah, specifically about her
9  shoulder.
10     Q.   Mm-hmm.  To the best of your memory, what did
11  Officer Arroyo share with you about her shoulder impairment
12  in -- inasmuch as her symptoms are concerned?
13     A.   Aside from the -- the lifting and the fact that
14  it still hurt, I -- I know that she communicate --
15  communicated that she was going to have so -- a -- I'm
16  sorry -- surgery on her shoulder.  She did relay that.  But
17  that's about it.
18     Q.   Is it fair to infer that because she was going to
19  have surgery on her shoulder to fix the impairment, that
20  this is not a minor injury?
21          MS. WOYTOWICZ:  Object to foundation.  Form.
22          THE WITNESS:  It -- it is a major surgery.  But
23  again, she wasn't obligated to tell us.  This is something
24  that she needs to relay to the medical section.
25  BY MS. HASHIM:

Michele James - April 13, 2023

116

1     Q.    Okay.  I'm going to pull up defense Exhibit -- I
2  mean Plaintiff's Exhibit No. 1.  All right.  Do you see
3  this?
4     A.    Yes, I do.
5     Q.    Okay.  That worked.  Taking a look a look at
6  section III under the Definitions.
7           We -- we went through these earlier.  You
8  remember the -- going through that earlier today?
9     A.    Yes.
10    Q.    Would you like to reread section a and c or you -
11 - do you not need to?
12    A.    I just want to review number c.
13    Q.    Sure.  I can -- it's up here.  There we go.
14    A.    Okay.  Okay.  I'm done.
15    Q.    All right.  So based upon these Definitions in
16 the -- in the City's policy, is it fair to say that the
17 knowledge that you had about Officer Arroyo when she was at
18 financial that she had a physical impairment?
19         MS. WOYTOWICZ:  Objection.  Form, foundation, and
20 calls for a legal conclusion.
21 BY MS. HASHIM:
22    Q.    You can answer.
23    A.    Yes.  But that's not for my division to make that
24 determination.  That's -- when Officer Arroyo was detailed
25 to finance and when she submitted her limited duty

Michele James - April 13, 2023

117

1   paperwork, that was between her doctor and the medical

2   section.

3           The medical section had to clear her, to come and

4   work in administrative capacity.  And, in regards to an

5   accommodation, Officer Arroyo needs to follow with the

6   medical section to communicate that she needs a special

7   accommodation.

8       Q.   I understand.  Under this policy, is it fair to

9   say that the impairment limited -- that Officer Arroyo's

10  impairment limited the major life activity of what's listed

11  here as lifting?

12          MS. WOYTOWICZ:  Objection.  Same.  Form,

13  foundation, legal conclusion.

14          You can answer.

15          THE WITNESS:  So, yes to lifting.  However, when

16  she had her surgery, on her shoulder, she was on the

17  medical roll.  She was not working.

18  BY MS. HASHIM:

19      Q.   Right.  But she had her shoulder injury from

20  February -- I'm sorry -- from 2017 until she went on

21  medical roll.

22      A.   To my knowledge, yes.

23      Q.   Okay.  Let me stop screen -- screensharing here.

24  And is it correct to say Officer Arroyo no longer works in

25  finance division, at least -- at least by the time you

Michele James - April 13, 2023

118

1   left?

2          A.    Yes.   You're correct.

3          Q.    Do you recall why she stopped working at finance?

4          A.    She had exhausted all of her -- she had exhausted

5   both her limited duty time as well as her medical time.

6          Q.    Did you receive any notification from another

7   City or CPD department as to the expiration of her limited

8   duty non-IOD status?

9          A.    For the limited duty, non- -- non-IOD status,

10  Director Jon Johnson received that correspondence.  And to

11  alert him in terms of her time was being exhausted.

12         I do recall seeing a email where Officer Arroyo

13  had reached out to the medical section, stating that she

14  had used 686 of her days.  It was -- apparently Director

15  Johnson had received a correspondence from the medical

16  section, indicating that she had a -- a -- used 686 of her

17  730 days.

18         Q.    And how did you learn about this?

19         A.    It was a email correspondence that Officer Arroyo

20  sent that she copied me on.  She -- it was -- the email she

21  sent was to the medical section, copying myself and

22  Director Jon Johnson.

23         MS. HASHIM:  I'm going to share with you what's

24  been marked as Plaintiff's Exhibit No. 6.  I can share it

25  with you through the chat.

Michele James - April 13, 2023

119

1           (Exhibit No. 6 marked for identification)

2   BY MS. HASHIM:

3       Q.   Okay.  So it's another email.  And it's just this

4   one page.  Would you go ahead and let me know when you're

5   done reading it?

6       A.   I'm done.

7       Q.   Do you recognize this?

8       A.   Yes, I do.

9       Q.   And what is it?

10      A.   It's a email to Larry Blustain, Leo Ming, Gerrine

11  Gniady, Rita Young, alerting them that Officer Arroyo was

12  going on medical.

13           Gerrine Gniady and Rita Young -- they are like

14  the -- the timekeepers.  So I was alerting them.  And I was

15  letting Larry and Leo know in the event that there are some

16  travel -- some of the grant programs that they administered

17  involved travel.

18           So it was just to alert staff.

19      Q.   Okay.  And is it fair to say that on or around

20  March 28th, 2019, which was the date of that email, that

21  you learned -- strike that.

22           Is it fair to say that on or around March 28th,

23  2019, you learned of Officer Arroyo going on medical leave

24  either on or before March 28th?

25      A.   It was on March 28th.  She verbally told me.

Michele James - April 13, 2023

120

1      Q.   Okay.  So you -- prior to March 28th, did she

2   notify you of the termination of her LD on non-IOD days?

3      A.   No, she did not.  Also, by her being an officer,

4   when she notified me about her medical status, I -- as a

5   supervisor, I was required to go into CLEAR medical to put

6   her on the medical.

7      Q.   Mm-hmm.

8      A.   So.

9      Q.   Okay.  And the email -- if you want me to pull it

10  up again, I'll -- I'll be happy to.  It does say that you -

11  - that she would be going on medical.

12        Did I remember that correctly?

13     A.   Yes.

14     Q.   Okay.  What -- what did you mean by going on

15  medical?

16     A.   So every -- in the -- in the limited -- on the

17  limited duty program or non-IOD limited duty program, for

18  every day that she comes in to the office and work, her

19  limited duty -- I'll call it a clock ticks down.

20        Or -- or -- however it counts.  So every day that

21  she worked -- because she's only limited to 730 days where

22  she -- when she comes into the office.

23        If she takes a furlough, that does not count

24  against her.  If she takes a baby furlough day, personal

25  day, whether she uses comp time, that does not count

Michele James - April 13, 2023

121

1    against her.

2           If for whatever reason she needs to go on medical

3    because she's out sick with the flu and out for three or

4    four days, that does not count against her.  So her limited

5    duty clock is limited to 730 days of when she comes in to

6    the office.

7           So when I said that she was going on the medical,

8    she came off the limited duty clock and now she moved onto

9    her medical roll clock.  The medical roll clock is 365

10   days.

11       Q.   And when she went onto medical, is that her

12   decision, or is that something that was automatically done?

13       A.   No.  She had to submit paperwork to the medical

14   section, necessitating the reason why she needed to go on

15   medical.

16       Q.   Did she discuss with you any concerns she

17   might've had about weighing whether or not she should go on

18   medical?

19       A.   I do not recall.  I do not recall.

20       Q.   So it's -- it's fair to say that you didn't

21   discuss -- you -- to your -- to your memory, you don't

22   remember discussing with her any kind of concerns that she

23   might've raised about going on medical at that time.

24       A.   I -- right.  I do not recall.  And --

25       Q.   All right.

Michele James - April 13, 2023

122

1      A.   -- and her going on the medical would be strictly

2   her decision.

3      Q.   Mm-hmm.  Did Officer Arroyo talk to you about

4   wanting to be reassigned to the finance division on a

5   permanent basis?

6      A.   She's expressed interest in staying.  Her -- her

7   -- what -- what she was trying to prove -- and again, I --

8   I have no input in it -- is about her injury that she

9   sustained in 2016 and how she's still suffering from that

10  and how it should -- should've been classified as IOD.

11      Had she won her case on that and depending on a

12  doctor affirming that her injury is ongoing, of which she

13  would have to be reevaluated every year, then she could've

14  been reclassified from non-IOD to IOD limited duty.

15      And had she been classified as IOD non-limited

16  duty, I would have welcomed her to remain in finance.

17      Q.   Okay.  Who did you contact, if anyone, about

18  whether Officer Arroyo could make a request for a

19  reasonable accommodation under the City's ADA policy?

20      A.   I did not contact anyone.  And again, that's

21  something that the medical section would address.

22      MS. HASHIM:  Okay.  I'm going to pull up Bates

23  number Arroyo.Def. 3482, what's marked as Plaintiff's

24  Exhibit No. 6.

25      MS. WOYTOWICZ:  I think we're on 7.

Michele James - April 13, 2023

123

1          MS. HASHIM:  I'm sorry.  7.  I was looking at No.
2     6 and it just came out.  I'm -- you see -- thanks for the
3     correction.
4          (Exhibit No. 7 marked for identification)
5     BY MS. HASHIM:
6          Q.   All right.  All right.  Do you see this email?
7          A.   Yes, I do.
8          Q.   I'm --
9          A.   Yeah.
10         Q.   -- going to start from the bottom up.  All right.
11    Let me know when you want me to scroll up.
12         A.   You can scroll up.
13         Q.   I -- I'll go to the top of her -- of the -- this
14    email response and then scroll down as necessary so you can
15    read it in its -- in -- in its entirety.
16         A.   Okay.  You can scroll.  Okay.  I'm done.
17         Q.   And that's the top of it.
18         A.   Okay.  I'm done.
19         Q.   Okay.  Excuse me.  So do you recognize this email
20    thread?
21         A.   Yes, I do.
22         Q.   And who is it between?
23         A.   Myself, and Officer Arroyo.
24         Q.   And is it an accurate and fair representation?
25         A.   Yes, it is.

Michele James - April 13, 2023

124

1    Q.   At 3482 -- here we go.  On this page here.  It
2  looks like on June 7th, you reach -- you reached out -- oh,
3  I'm sorry, it's one page down.
4         You reached out to Officer Arroyo on June 7th.
5  Is that correct?
6    A.   Yes.  That is correct.
7    Q.   And to the best of your recollection, what
8  prompted you to reach out to her?
9    A.   I cared about her.  She was on my mind.  She's
10 been on the medical since, what, March 29th?  And we hadn't
11 heard anything.  I was just checking up on her to see if
12 she was okay.
13   Q.   And then a couple days later, attorney -- Officer
14 Arroyo replied to you.  Is that correct?  Did I say that
15 correctly?
16   A.   Yes, you did.
17   Q.   All right.  And in the second paragraph up here,
18 she shares with you -- she says (as read):  I'm sorry I --
19 I have not reached out to you or anyone for that matter.
20        I truly find myself at a crossroads with much
21 mixed emotions because I'm being forced to either retire or
22 even sue the city.  I want to work with limited duty but
23 can't.
24        Did I read that correctly?
25   A.   Yes, you did.

Michele James - April 13, 2023

1     Q.   Now, based on this, is it fair to say that

2  Officer Arroyo was trying to find a way to continue

3  working?

4          MS. WOYTOWICZ:  Objection.  Form, foundation.

5  BY MS. HASHIM:

6     Q.   You can answer.

7     A.   Yes, she was.  She was trying to find a way to

8  work.

9     Q.   And in June 2019, when you read the line -- it --

10 well, let me rephrase that.  Did you read this email from

11 her?

12    A.   Yes, I did.

13    Q.   Okay.  So in June 2019, when you read the line

14 (as read):  I truly find myself at a crossroads with much

15 mixed emotion because I'm being forced to either retire or

16 even sue the city.

17         Did you any reason to doubt Officer Arroyo's

18 assessment of her situation as she described it?

19    A.   Her situa- -- so I -- I can't answer that

20 question.  I knew that there was nothing I could do for

21 her.  Because it -- it was again a matter between her

22 doctor and the medical section and their determination of

23 her status.

24         But I -- I supported -- you know, I -- well.  I

25 knew that she was taking steps to try to get her October

Michele James - April 13, 2023

126

1   2016 injury documented as a new IOD injury.

2           I knew she was taking steps.  And I was being

3   hopeful that she would be successful.  But there was

4   nothing I could do for her.

5       Q.  So that -- your answer has to do with what you

6   could do for her.  But in reading this, did you have any

7   reason to doubt her assessment of her situation?

8           The truthfulness of what she was saying.

9       A.  No.  Yes, I didn't have any doubt in -- in the

10  truthfulness.

11      Q.  Okay.  And then the -- two paragraphs later,

12  which begins, "As to the independent medical examiner's

13  results."

14          Is it a fair summary to say that she discusses a

15  -- her grievance and arbitration -- is -- is that -- is

16  that fair enough to say?

17      A.  I would say that she just gave me some history on

18  the background about what was going on.  But I -- a -- a --

19  a -- a little snippet in terms of what was going on with

20  the arbitration.  But it -- not -- not everything.  Just as

21  a high level summary.

22      Q.  It -- it -- had she discussed her grievance with

23  you prior to this date?

24      A.  She mentioned about the grievance.

25      Q.  Do you know around what time, what month?  Was it

Michele James - April 13, 2023

127

1   spring or fall, maybe what season, around what time she
2   first mentioned it to you?
3       A.   No.  I do not recall.
4       Q.   Do you know when she discussed the grievance with
5   you whether it was in the context of going into her
6   decision of whether to go on medical or not?
7       A.   I'm sorry.  Can you repeat that?
8       Q.   Yeah.  When -- when she discussed the grievance
9   with you, did she discuss it with you in the context of
10  making her decision of going on medical?
11      A.   I cannot speak to that.  About her decision on --
12  on the medical.  I cannot speak to that.  She mentioned
13  about the grievance.
14      Q.   Mm-hmm.
15      A.   And she mentioned about medical.  But again, the
16  final decision is hers.  I mean, I -- I -- there was
17  nothing more I can add.  I mean, no more than to -- to
18  listen to her.
19      Q.   I'm sorry.  My Word document just disappeared.
20  And that's when the heart, you know, sinks into the
21  stomach.  It's like where are my questions.  Thank you for
22  your patience.
23          So after June 10th, 2019, when she's shared this
24  with you, did you contact your superior to inquire whether
25  Officer Arroyo had any other options other than retirement?

Michele James - April 13, 2023

128

1      A.   No, I did not.  And she did not -- when -- when -
2  - when a officer goes on medical, they are no longer with
3  finance.  They are in the hands of the medical section.
4           So, she was just sharing that information with
5  me, which it should be shared with the medical section,
6  which it seems like she has.  But like I said, once an
7  officer goes on medical, the division hands -- and that's
8  department-wide -- they belong to medical until the medical
9  section clears them to return to work.
10     Q.   Okay.  After June 10th, 2019, did you contact
11 medical to inquire whether Officer Arroyo had any other
12 options other than retirement?
13     A.   No, I did not.
14     Q.   And after June 10th, 2019, did you contact the
15 disability liaison to inquire whether Officer Arroyo could
16 request a -- an -- a -- request a reasonable accommodation?
17     A.   No, I did not.  And that would not fall under my
18 division.
19     Q.   After June 10th, 2019, did you talk to Helen Lee
20 about having her -- having Helen Lee contact the disability
21 liaison to inquire whether Officer Arroyo could request an
22 ADA reasonable accommodation?
23     A.   No, I did not.  And again, it would not fall
24 under our division to do that.
25          MS. HASHIM:  Okay.  I'm going to pull up

Michele James - April 13, 2023

129

1    Plaintiff's Exhibit No. 8.  That will be Bates number

2    Arroyo.Def. 3488.

3              All right.  It's here in the chat.

4              (Exhibit No. 8 marked for identification)

5    BY MS. HASHIM:

6         Q.   And this is just a one-page email.  I'll start

7    from the bottom up.  Let me know when you're done reading

8    it, please.

9         A.   Okay.  I'm done.

10        Q.   All right.  And then scrolling up to the top.

11        A.   Okay.

12        Q.   And do you recognize this email?

13        A.   Yes, I do.

14        Q.   Do you recall having received and read it?

15        A.   Yes.

16        Q.   Okay.  And who is this email between?

17        A.   Initially between Helen Lee and Officer Arroyo.

18   And then Helen Lee forwarded it on to me.

19        Q.   All right.  And it's dated October 20 -- October

20   16th, 2019.  Correct?

21        A.   Correct.

22        Q.   And is this a fair and accurate copy of the email

23   that you received and read?

24        A.   Yes.

25        Q.   Now, looking at Officer Arroyo's email.  It says

Michele James - April 13, 2023

130

1    right here (as read):  I feel the department.

2             I'm sorry.  We're looking at -- I'm sorry -- at

3    the middle of this first paragraph, where it says right

4    here, "I'm functioning."

5             All right.  It says (as read):  I'm functioning

6    as long as I -- as long as I have my arm down with a slight

7    bent.

8             Did I read that correctly?

9        A.   Yes, you did.

10       Q.   And so is -- is it fair to say that Officer

11   Arroyo was informing Helen Lee of the condition of her

12   shoulder and its impairment?

13            MS. WOYTOWICZ:  Objection --

14            THE WITNESS:  Yes.

15            MS. WOYTOWICZ:  -- form.  Foundation.

16            You can answer.

17            THE WITNESS:  Yes.  She did.

18   BY MS. HASHIM:

19       Q.   Okay.  And the next paragraph, where it says

20   right here -- oops.  (As read):  I feel the department

21   forced me to get surgery in order for -- and I think she

22   meant to say for me -- not to lose my job and return ASAP.

23   Though, is the opposite.

24            Did I read that correctly?

25       A.   Though, is the opposite.  Yes.

Michele James - April 13, 2023

131

1    Q.   Okay.  And when you read this email, what did you

2    understand "though, it's the -- is the opposite" to mean?

3    A.   I'm not -- I -- I really didn't focus on that.  I

4    mean, that was her opinion.  So I -- I really didn't have

5    any like -- it's -- it's just her opinion, how she's -- or

6    it -- it was her perception.  So I really didn't have a --

7    an opinion on her opinion.

8    Q.   Sure.  Did you have any reason to doubt her

9    perception?

10   A.   Okay.  So it's a combination of facts and her

11   thoughts.  So the facts that she was sharing are her facts.

12        It -- it just seems like she was struggling.

13   Nobody was listening to her.  It -- it -- I presume it was

14   factual.  Again, it was -- she -- she was just doing a

15   summation in terms of what's been going on with her

16   situation.  And it seems like she was going through the

17   right channels to try to get some kind of resolution of her

18   case.

19   Q.   And after reading this, did you ask Helen Lee

20   whether she had contacted the disability liaison to let

21   them know of Officer Arroyo's disability?

22   A.   No, I did not.  And this would not fall under

23   finance.

24   Q.   And did you ask Helen Lee to contact the

25   disability liaison to let them know of Officer Arroyo's

Michele James - April 13, 2023

132

 1    disability?

 2         A.   No, I did not.  And again, this would not fall

 3    under finance.

 4         Q.   And so is it safe to say that you did not contact

 5    -- you yourself did not contact the disability liaison to

 6    let them know of Reyna's disability?

 7         A.   No, I did not.  And this would not fall under

 8    finance.

 9         Q.   Did you consult -- consult any higher-up as to

10    how you could perhaps guide Officer Arroyo to continue

11    working at CPD?

12         A.   No, I did not.  Because at that point, she was on

13    -- in -- under the medical section.  So there was nothing I

14    could do for her.  She was -- she was under -- under their

15    -- she was with them.  She was temporarily under them.  So

16    --

17         Q.   Okay.

18         A.   -- there was nothing I could do for her.

19         Q.   Now, at the top, in -- in your response to Helen

20    Lee, you wrote (as read):  Wow, thanks.  I'll keep her in

21    prayer.

22              Did I read that correctly?

23         A.   Yes, you did.

24         Q.   Was the "Wow, thanks" -- so a -- a response of

25    surprise?

Michele James - April 13, 2023

133

1      A.   Yes.  It was.  I --

2      Q.   What --

3      A.   -- didn't realize she was going through the --

4 the stuff that she was going through.

5      Q.   Okay.  And what was it that surprised you?

6           MS. WOYTOWICZ:  Objection.  Asked and answered.

7 BY MS. HASHIM:

8      Q.   You -- you had said what she was -- the stuff she

9 was going through.  Can you specify?

10     A.   What was summarized in the email.  All the

11 challenges, the roadblocks that she's been -- like I said,

12 she was going through the right channel.  Her union, the

13 medical section.  She -- she was going through the right

14 procedures and channels, and it just seems that she wasn't

15 getting very far.

16     Q.   Did Helen Lee ask you if there was anything she

17 could do to assist Officer Arroyo in obtaining a reasonable

18 accommodation for her disability?

19     A.   I do not recall having a conversation with Helen

20 Lee.

21          MS. HASHIM:  So how about we take a five-minute

22 break?  I probably have about another half hour to go or 45

23 minutes.  Would that be okay?  Can kind of take a stretch

24 break?

25          THE WITNESS:  Yes.  I need to drink some water.

Michele James - April 13, 2023

134

1    Thank you.

2              MS. HASHIM:  Thank you.

3              MS. WOYTOWICZ:  Yeah.

4              THE WITNESS:  Okay.

5              MS. HASHIM:  We're off the record.

6              THE REPORTER:  We're off the record at 1:24 p.m.

7                     (Off the record)

8              THE REPORTER:  We are back on the record at 1:33

9    p.m.

10             MS. HASHIM:  All right.  Thank you.

11   BY MS. HASHIM:

12        Q.   Ms. James, you realize that you're still under

13   oath?

14        A.   Yes.  I do.

15        Q.   Other than your attorney, did you talk to anybody

16   or text anybody about the substance of today's deposition?

17        A.   No.  I did not.

18             MS. HASHIM:  All right.  Okay.  I'm going to

19   bring to your attention Exhibit No. 9.  I'm going to go

20   ahead and share it here.

21             (Exhibit No. 9 marked for identification)

22   BY MS. HASHIM:

23        Q.   All right.  This is just a one-page email.  Go

24   ahead and let me know when you're done reading it, please.

25        A.   Okay.  I'm done.

Michele James - April 13, 2023

135

1      Q.   All right.  And do you recognize this email?

2      A.   Yes, I do.

3      Q.   And what is it?

4      A.   It's a email to Helen, who was Reyna's

5 supervisor, and Leo and Larry, Gerrine, and Rita.  Gerrine

6 and Rita -- the -- they were the timekeepers.

7           So they were actually keeping track of Reyna's

8 time because she was detailed to Unit 122.  And -- and

9 again, Leo and Larry, because they do what -- correspond to

10 work with her.

11     Q.   And it is correct to say that the email was

12 written by you?

13     A.   Yes.  It --

14     Q.   Do you --

15     A.   -- was.

16     Q.   Do you remember sending out this email?

17     A.   Now I do.  Yes.

18     Q.   And it's dated November 18th, 2019.  Correct?

19     A.   Correct.

20     Q.   All right.  And is it a fair and accurate

21 representation of what you -- what you sent out and to whom

22 you sent it?

23     A.   Yes.

24     Q.   Based on this email, is it, you know, just

25 correct to say that Officer Arroyo's last day in finance

Michele James - April 13, 2023

136

1  division was November 18th, 2019?

2       A.   I -- when I sent this email out on November 18th,

3  it's actually the 17th.  I spoke to her the day after.  So

4  I -- I misspoke in this email.

5            Technically, the 17th was her last day.  November

6  17th, 2019.

7       Q.   Okay.  And was her position filled?  Do you

8  recall?

9       A.   It's -- again, it's not like she had a -- a -- we

10 didn't have any sworn positions budgeted in finance.  By --

11 when Officer Arroyo went on medical, Officer Tracy Boland

12 was detailed to the finance division to assist with travel.

13           She -- she was -- she didn't have the knowledge

14 or skillset as Reyna.  But she did assist us with the

15 clerical functions, some of the clerical functions that

16 Reyna would've handled.

17      Q.   Yeah, I'm learning the nuanced language of your

18 field, so my apologies.  I -- I should have -- because I've

19 learned through this deposition that with sworn positions,

20 there has to be a need.  So I should've rephrased that to

21 be more accurate.  I'll -- I'll do my best for the

22 remaining few questions that we had.

23           How long did it take to fill the need for -- that

24 was created by Reyna or by Officer Arroyo going on medical?

25      A.   Officer Boland was detailed to finance in May of

Michele James - April 13, 2023

137

1   2019.  And again, it was because she submitted a -- she

2   limited duty packet to the medical section.  And -- and

3   then she came to finance.

4       Q.   Now, you testified that you had talked to her.

5   And it even says in the email you just -- I just spoke with

6   Reyna Arroyo.

7           What -- was this -- I don't want to assume

8   anything.  Was this a -- a conversation over the phone or

9   face to face?

10      A.   It was a conversation over the telephone.

11      Q.   To the best of your recollection, what did the

12  two of you discuss?

13      A.   Officer Arroyo was very upset.  I -- I reached

14  out to her.  I'm sorry.  I -- I know she was upset.

15          I don't want to misspeak.  I'm not sure if I

16  reached out to her or if she reached out to me.  Because

17  the fact that we knew, based off the notification we

18  received from the medication section, that November 17th

19  was her last day.

20          I do recall Helen Lee informing that the medical

21  section was trying to get in contact with her.  Because she

22  needed to come in to the medical section.  And so we did

23  speak, and she was -- she was very upset, almost in tears.

24  I did not put that in the -- in this email because staff

25  didn't need to know that.  She just didn't quite know what

Michele James - April 13, 2023

138

1    she should do.  Because she had been trying to go through

2    the proper channels to get her duty status changed to what

3    she believed should've been IOD limited duty, and that was

4    no resolution.

5           And I can only communicate to her that the

6    medical section was reaching -- needed for her to reach out

7    to them.  And like I said, she was just very upset.

8    Q.    I see that you -- you wrote (as read):  It's

9    highly doubtful that she will return to work.

10          Did I read that correctly?

11   A.    Yes.

12   Q.    And what did you base this assessment on?

13   A.    Because of the fact that there was a -- an

14   arbitration or something that was still pending.  Because

15   she was in the non-IOD limited duty program, she had

16   exhausted all of that time, and she had exhausted all of

17   her medical -- paid medical time.  So she had exhausted

18   both of those.

19   Q.    Did it -- did it come -- come across your mind to

20   suggest for her to make a reasonable request accommodation?

21   A.    No.  Because that's not part of my -- the --

22   addressing the -- the ADA -- that's something that would

23   fall under the medical section or human resources.

24          That's what they specialize in.

25   Q.    Okay.  After Officer Arroyo's last day on

Michele James - April 13, 2023

139

1   November 17th, 2019, did Officer Arroyo contact you?

2        A.   On the 18th, when we spoke.

3        Q.   Mm-hmm.  And any time after the 18th?

4        A.   Yes.  Either phone -- by telephone.  But I don't

5   recall all the dates.

6        Q.   Do you recall the conversation?

7        A.   The conversations were pretty much the same.  She

8   might not -- I mean, she probably wasn't as upset like she

9   was on November 18th.  But just restating her -- her -- the

10  same situation.

11       MS. HASHIM:  Going to share with you Plaintiff's

12  Exhibit 10, which is Bates numbered Arroyo.Def. 3499.  My

13  computer decided it wants a break right now, of course.

14  Right?

15       (Exhibit No. 10 marked for identification)

16  BY MS. HASHIM:

17       Q.   There we go.  And I'm going to start from the

18  bottom -- bottom up when the computer lets me.  There we

19  go.  So actually, I'm going to start from the top, because

20  this was a forward.  So I'll give you a chance to take a

21  look at it.  Let me know when you want me to scroll down.

22       A.   Okay.  Okay, start.  Okay.  I need to review the

23  email at the bottom.

24       Q.   Yeah.  So here's the -- where it says forwarded -

25  - forwarded message here.

Michele James - April 13, 2023

1     A.   Okay.

2     Q.   Okay.  So now I'm going to just kind of scroll

3 down so you can take a look at it.

4     A.   Okay.

5     Q.   Let me know when you want me to continue.

6     A.   Okay.  I -- I -- I -- that's -- I'm still

7 reading.

8     Q.   Mm-hmm.

9     A.   Okay.  So can you go back up?  Oh, there's --

10    Q.   I -- I'm just going to go down through the rest

11 of it.  This -- this is what was forwarded to you.

12    A.   Okay.  Okay.

13    Q.   That's the bottom.  All right.

14    A.   Okay.

15    Q.   And so here -- here is that email thread.  And

16 the -- she sends you an email.  This is from Reyna to

17 Michele James.  It's dated December 23rd, 2019.

18        (As read):  Good morning.  Per our phone conver-

19 -- per our phone conversation, here is the email discussed.

20 Thank you for all you do.

21        Did I read that correctly?

22    A.   Yes, you did.

23    Q.   Okay.  And so you've taken a look at this email.

24 Just for authentication purposes, do you recognize this

25 email?

Michele James - April 13, 2023

1    A.   Yes, I do.

2    Q.   Do you remember having received it and read it?

3    A.   Yeah.  Well, I don't -- I remember now.

4    Q.   Sure.  Do you -- do you have any reason to doubt

5   that you did not read it when you received it on December

6   23rd, 2019?

7    A.   No.  No reason to doubt it.  It's authentic.

8    Q.   Sure.  And is a fair and accurate representation

9   of your email exchange with Officer Arroyo at this time?

10   A.   Yes.  It is.

11   Q.   Okay.  On December 23rd, 2019, Officer Arroyo

12  forwarded you emails relating to her grievances.  Is -- is

13  that a fair assessment?

14   A.   Yes.  It is.

15   Q.   And it says, "Per our phone conversation."

16       You see that?

17   A.   Yes.

18   Q.   Do you have any doubt -- any reason to doubt the

19  accuracy of her statement, "Per our phone conversation?"

20   A.   No, I do not.

21   Q.   Do you recall the general discussion of that

22  phone call that you had with her?

23   A.   Not really.  No, I do not.

24   Q.   And so receiving -- looking at these forward

25  emails, it's not ringing a bell of any conversation you

Michele James - April 13, 2023

142

1   might've had with her about the grievance?

2        A.   No.  I -- I really do not recall.

3        Q.   Okay.  In your response at the top, just for my

4   own education purposes.  MLAS?  What does that stand for?

5        A.   That is a division within the Chicago Police

6   Department, which is Management Labor Affairs Section.

7        Q.   Okay.  Do --

8        A.   They handle --

9        Q.   -- you --

10       A.   -- all grievances for the officers.

11       Q.   Do you recall talking to Officer Arroyo about the

12   contents of this -- the -- the email thread?

13       A.   No, I do not.

14       Q.   Mm-hmm.  By any chance, did you discuss with

15   anyone in the finance division leadership about the email

16   thread that was forwarded to you?

17       A.   No, I did not.

18       Q.   All right.  And just kind of going broader than

19   that.  Did you inform anyone about the contents of the

20   email thread?

21       A.   No, I did not.

22       Q.   Okay.  And I'm just going to pull up one -- the -

23   - Plaintiff's Exhibit No. 1.  I just have a couple of

24   questions relating back to that.

25            I'm going to go to what's Bates numbered

Michele James - April 13, 2023

143

1    Arroyo.Def. 092.  Actually, 93.  So at 92, you see section
2    VIII, Roman numeral VIII, Responsibilities of City
3    Personnel?
4         A.   Yes.
5         Q.   And you see where it has subsection b, Disability
6    Officer?
7         A.   Yes.
8         Q.   And underneath that, there are some bullet
9    points.  Correct?
10        A.   Correct.
11        Q.   All right.  And the third bullet down -- one,
12   two, three.  It says -- so we're talking about the
13   disability officer.  And it says (as read):  Disability
14   officer -- officer will conduct training to ensure that all
15   employees are aware of this policy and that all department
16   heads, disability liaisons, and supervisors understand
17   their responsibilities for implementing this policy and
18   accommodating employees with disabilities.
19            Did I read that correctly?
20        A.   Yes, you did.
21        Q.   Do you recall receiving any training from the
22   disability officer?
23        A.   I -- I really cannot say for sure.  I do know
24   there were several trainings, and they would be through the
25   e-learning system.  So if I had this training, this -- I

Michele James - April 13, 2023

144

1   presume it should've been through an e-learning -- a record

2   I read through e-learning.   Through CPD.

3       Q.    Okay.   I'm going to go up to what's Bates --

4   Bates numbered Arroyo.Def. 085.   And section Roman numeral

5   IV, The Accommodation Process for Employees.

6           Do you see that?

7       A.    Yes.   I do.

8       Q.    Okay.   And I'm going to look at b, The

9   Application section.   I'm going to scroll down to the last

10  paragraph.   It says here (as read):   Any supervisor who

11  receives a verbal request for accommodation from an

12  employee shall direct the employee to the departmental

13  disability liaison or the disability officer.

14          Did I read that correctly?

15      A.    Yes, you did.

16      Q.    Were you aware of this policy?

17      A.    I do not recall.

18      Q.    Okay.   And that is it.   I have nothing further.

19  I'll hand it over to Kristen.

20          MS. WOYTOWICZ:   Okay.   Couple quick questions.

21  Then we'll get out of here.

22                          EXAMINATION

23  BY MS. WOYTOWICZ:

24      Q.    Earlier you testified about I think 17 sworn

25  members who were detailed to the finance section as

Michele James - April 13, 2023

145

1    accommodations, including Ms. -- Officer Arroyo.  Do you
2    recall that?
3         A.   Yes, I do.
4         Q.   And is it your understanding that all 17 you
5    identified are part of the limited duty program that you
6    described earlier?
7         A.   Yes.
8         Q.   Okay.
9         MS. HASHIM:  I'm sorry.  Kristen, can you -- can
10   you project your voice a little bit more?  I'm having a
11   hard time hearing you.  Can -- I -- I didn't quite get the
12   question that she answered "yes" to.
13        MS. WOYTOWICZ:  I was just confirming the 17
14   officers in finance that she identified were part of the
15   limited duty program.
16        MS. HASHIM:  Okay.
17   BY MS. WOYTOWICZ:
18        Q.   And that's correct?
19        A.   Correct.
20        Q.   And I know you briefly touched on the deployment
21   of sworn officers detailed to finance.  Was it your
22   understanding that full duty sworn officers in finance
23   would be detailed to -- to perform police work out in the
24   field?
25        A.   Yes.

Michele James - April 13, 2023

146

1     Q.   And then do you recall earlier testifying about

2  the needs for extra help in the finance division?

3     A.   Yes.

4     Q.   If -- even if finance has a lot of need, is it

5  your understanding that you could not keep an officer if

6  they ran out of non-IOD limited duty time?

7     A.   Correct.  We cannot keep them.

8     Q.   Do you recall testifying about a specific title

9  that would've been what the duties Officer Arroyo was

10  performing?  Do you remember that testimony?

11     A.   Yes, I do.

12     Q.   And -- and you mentioned a few other civilian

13  positions that were cut.  Would the ones that Officer

14  Arroyo could have performed have been titles covered by

15  other bargaining units?

16     A.   Yes.  The AFSCME bargaining unit.

17     Q.   They were all AFSCME?

18     A.   Right.

19     Q.   Okay.  And then I just want to clarify.  I know

20  you said Officer Arroyo went out on medical roll.  Is it

21  your understanding that is different than a leave of

22  absence?

23     A.   Correct.  The medical roll is a paid -- she was

24  paid.  Leave of absence is not paid.

25     Q.   Okay.

Michele James - April 13, 2023

147

1          MS. WOYTOWICZ:  That's all I had.

2          MS. HASHIM:  Okay.

3                    FURTHER EXAMINATION

4    BY MS. HASHIM:

5          Q.    And I just have one -- excuse me -- one follow-up

6    question for you.  In terms of deployment of officers, when

7    you were testifying earlier of officers providing a support

8    role, did that include limited duty officers?

9               The ones who would drive the van to headquarters,

10   who would get food and other items?

11         A.    Only when they were requested by the first

12   deputy.  Oftentimes, the first deputy would send an order,

13   indicating that they want to know the status of all of our

14   sworn.

15              And they will alert us, if they needed limited

16   duty sworn as well.

17         Q.    Okay.  Thank --

18         A.    Typically those orders were for full duty.

19         Q.    Thank you very much.

20         MS. HASHIM:  Nothing further.

21         MS. WOYTOWICZ:  Okay.  All right.

22         THE WITNESS:  Okay.

23         MS. WOYTOWICZ:  So you can either -- the court

24   reporter types up everything that was said today.  And you

25   can either reserve signature, which means you want to

Michele James - April 13, 2023

148

1    review it, and you can't change substantive testimony.

2            But if there's typos or spellings you wanted to,

3    you could do that.  Or most people waive signature, and

4    they just don't review it.  They trust the court report

5    took it down.

6            THE WITNESS:  I trust the court reporter.

7            MS. WOYTOWICZ:  Okay.  We will waive.

8            MS. HASHIM:  Are -- are we off the record?

9            THE REPORTER:  Off the record at 1:55 p.m.

10                   (Adjourning at 1:55 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

149

C E R T I F I C A T I O N

1
2
3      I, Jodi Needleman, do hereby certify that the
4  foregoing is a correct transcript from the official audio-
5  visual recording of proceedings in the above-entitled
6  matter.
7      I further certify that I am not related to nor an
8  employee of counsel or any of the parties to the action,
9  nor am I in any way financially interested in the outcome
10 of this case.
11     Dated this day, April 26, 2023.
12
13
14                              (Electronically signed)
15                              Jodi Needleman
16
17
18
19
20
21
22
23
24
25