# EXHIBIT 15

IN THE MATTER OF THE )
ARBITRATION BETWEEN: )
)
THE CITY OF CHICAGO, )
)
            Employer, )
and )
)
THE FRATERNAL ORDER OF POLICE, )
CHICAGO LODGE NO. 7, )
)
Union. )

Grv. No.: 123-13-011/116 ·
Officer: Reyna Sansone
Star No.: 18014
Date of Injury: January 21, 2013

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is entered into by and between the City of Chicago ("the City"), the Fraternal Order of Police, Chicago Lodge No. 7 ("the FOP") and Police Officer Reyna Sansone ("the Officer").

WHEREAS, the City and the FOP are parties to a collective bargaining agreement that covers police officers below the rank of sergeant ("the Agreement") and the FOP is the sole and exclusive bargaining representative for those police officers;

WHEREAS, on or about February 1, 2013, the FOP filed Grievance No. 112-13-011/116 ("the Grievance") in which it alleged that the City violated Section 18.1 and Section 18.5 of the Agreement when the City declined to certify the Officer's January 21, 2013 right ankle injury as an Injury on Duty ("the January 21, 2013 Injury");

WHEREAS, the City denied the Grievance, the FOP demanded arbitration, and the Grievance was scheduled for hearing before Arbitrator Robert Perkovich on December 18, 2019; and

WHEREAS, the City denies that it violated the Agreement and the parties desire to settle the Grievance amicably without setting precedent or proceeding further.

THEREFORE, the parties agree as follows:



Page 1 of 3

2784967.1

**ARROYO.DEF.002234**

1. The FOP and the Officer each hereby withdraws the Grievance with prejudice, and waives any and all individual or class claims, including, but not limited to, any other grievances, any suits at law or equity, and any claims before any administrative agency which each now has or may have against the City, its officers, employees and assigns, arising either directly or indirectly out of the subject matter of the Grievance, including any and all claims related to the payment of any medical bills, except only as may be necessary to enforce the specific provisions of this Settlement Agreement.

2. In consideration thereof, the City agrees to certify the Officer's January 21, 2013 Injury as an Injury on Duty and to recode the Officer's time and attendance records to reflect that the Officer was on IOD leave from January 22, 2013 to March 24, 2013. The City further agrees to pay the verifiable medical expenses for bills for reasonable and medically necessary treatment related to the January 21, 2013 Injury.

3. This Settlement Agreement shall not be construed as an admission of liability or as an admission of the legal position of any party, nor shall it be construed as setting any precedent. This Settlement Agreement shall not be used, referred to, or cited in any arbitration, court or administrative proceedings between the parties, except only as may be necessary to enforce the specific provisions of this Settlement Agreement and the rights of the parties hereto.

4. This Settlement Agreement shall be interpreted in accordance with the Agreement and the laws of the State of Illinois.

5. The City and the FOP will share equally the arbitration fees that are due as a result of the cancellation of the December 18, 2019 hearing.

6. This Settlement Agreement contains the entire agreement between the parties.

2784967.1

**ARROYO.DEF.002235**

**AGREED:**

For the FOP, Chicago Lodge No. 7:

By: _____
    Andrew Cantore
    Trustee

Date: 12 MAR 20

By: _____
    Catherine M. Chapman
    Attorney for the FOP

Date: 3-10-20

By: _____
    Reyna Sansone
    The Officer

Date: 12 MAR 2020

For the City of Chicago:

By: _____
    Director Wynter Jackson
    Labor Relations Division

Date: 2/28/20

By: _____
    Jennifer A. Dunn
    Attorney for the City

Date: 2/28/20

By: _____
    Elizabeth Mannion
    Department of Finance

Date: _____

By: _____
    Sgt. Clifford Russell, Jr.
    Medical Administrator

Date: 3 MARCH 2020

2784967.1

ARROYO.DEF.002236

**AGREED:**

**For the FOP, Chicago Lodge No. 7:**         **For the City of Chicago:**


By: _____              By: _____
          Andrew Cantore                                        Director Wynter Jackson
          Trustee                                               Labor Relations Division

Date: _____            Date: _____


By: _____              By: _____
          Catherine M. Chapman                                  Jennifer A. Dunn
          Attorney for the FOP                                  Attorney for the City

Date: _____            Date: 2/28/20


By: _____              By: _____
          Reyna Sansone                                         Elizabeth Mannion
          The Officer                                           Department of Finance

Date: _____            Date: _____


                                           By: _____
                                                     Sgt. Clifford Russell, Jr.
                                                     Medical Administrator

                                           Date: _____

2784967.1

ARROYO.DEF.002237

# EXHIBIT 16

**BEFORE**
**JACALYN J. ZIMMERMAN**
**ARBITRATOR**

FRATERNAL ORDER OF POLICE,
CHICAGO LODGE NO. 7

     **and**                    **Grievance No. 123-17-001/101**
                                          **(Arroyo IOD)**

CITY OF CHICAGO (DEPARTMENT
OF POLICE)

## OPINION AND AWARD

Appearances:

*For Fraternal Order of Police, Chicago Lodge No. 7:*

>    Catherine M. Chapman
>    BAUM SIGMAN AUERBACH & NEUMAN, LTD.
>    200 West Adams Street, Suite 2200
>    Chicago, Illinois 60606-5231

*For City of Chicago:*

>    Jennifer A. Dunn
>    FRANCZEK P.C.
>    300 South Wacker Drive, Suite 300
>    Chicago, Illinois 60606

ARROYO.DEF.004337

## Background

The Fraternal Order of Police, Chicago Lodge No. 7 (FOP or Union) and the City of Chicago (City or Employer) are parties to a collective bargaining agreement (agreement or contract) which was in effect at all times relevant to this proceeding and which provides for final and binding arbitration of grievances. This case concerns a medical grievance over whether Officer Reyna Arroyo (the Grievant) was "injured on duty" (IOD) on or about October 16, 2016, and whether the Employer violated the parties' contract by failing to designate her situation as such, thereby denying her entitlement to paid medical expenses and other benefits.

The hearing was held in Chicago, Illinois, and the matter was submitted for resolution on the parties' written briefs.

## Relevant contractual language

The contract provides, in relevant parts:

### ARTICLE 4 - MANAGEMENT RIGHTS

The Employer has and will continue to retain the right to operate and manage its affairs in each and every respect. The rights reserved to the sole discretion of the Employer shall include, but not be limited to, rights:

*   *   *

Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provision of this agreement are not in any way, directly or indirectly, subject to the grievance and arbitration procedures contained herein, provided that no right is exercised contrary to or inconsistent with other terms of this agreement.

### Section 9.5 – Medical Grievances.

Grievances concerning medical issues (excluding issues covered under Section 9.4) shall follow the procedure below. Medical issues are defined as grievances involving medical issues, including but not limited to the

ARROYO.DEF.004338

nonpayment of I.O.D. bills; removal of an Officer from duty for medical reasons; refusal to return an Officer to duty from medical roll; classification of an injury as non-I.O.D. and the Benefits Management Office's denial of payment of medical and hospital bills of an Officer or his or her covered dependent under the Employer's self-funded health care plan.

Step One: Initiating a Medical Grievance. Grievances concerning the Benefits Management Office's denial of payment of medical and hospital bills will be filed with the Management and Labor Affairs Section within ten (10) working days following the events or circumstances giving rise to the grievance or where first known by the grievant, but in no event later than thirty-five (35) calendar days following the events or circumstances giving rise to the grievance.

All other grievances concerning medical issues will be filed with the Medical Services Section within ten (10) working days following the events or circumstances giving rise to the grievance or where first known by the grievant, but in no event later than thirty-five (35) calendar days following the events or circumstances giving rise to the grievance. If the determination at Step One is not satisfactory, the Lodge may by written request made within fifteen (15) days of the Step One response, or the expiration of the period for said response submit the matter for mediation.

Step Two: Mediation of Medical Grievances. At mediation, representatives of the Lodge, the Police Department, the Benefits Management Office and the Finance Committee of the City Council, shall participate, as needed. Any settlements reached in the mediation proceedings shall be binding upon the parties. Medical mediation sessions shall occur each thirty (30) days. The parties shall split evenly the cost of the Mediator's fees and expenses.

The grievant shall be provided with the relevant medical records within the possession of the Medical Section, the Committee on Finance, Benefits Management Office and Management & Labor Affairs Section. A release shall be required for production of medical records. The relevant medical records shall include the Medical Services Section's determination of the grievant's status and the response to the grievance. The above records shall be submitted to the Lodge by the Department within forty-five (45) days of the Department's receipt of the Lodge's releases and mediation agenda, setting forth the grievants' names. Relevant records from the Medical Section, the Committee on Finance, the Benefits Management

ARROYO.DEF.004339

Office and Management and Labor Affairs Section shall be provided as stated above and throughout the grievance process until the grievance is fully resolved.

Relevant documents to be produced by the Benefits Management Office in mediation are limited to medical records, claim forms, medical bills, explanation of benefits, and recommendation to and decision of the Benefits Committee regarding the claim. This definition of relevant records to be produced by the Benefits Management Office does not preclude the Lodge from subpoenaing additional relevant documentation in response to the scheduling of an arbitration of a grievance.

Step Three: Arbitration. If the grievance is not resolved at Step Two, the Lodge upon written request within thirty (30) days of the date of mediation, may demand arbitration. The Mediator shall not be selected as the Arbitrator for the same case. The arbitration hearing shall be scheduled to commence within thirty (30) days of the selection of the Arbitrator unless the parties agree otherwise. Within ten (10) days of the Lodge's demand for arbitration, the Employer and Lodge shall attempt to mutually agree upon an Arbitrator. If they fail to agree, a list of seven qualified neutrals shall be requested from the American Arbitration Association. Within five (5) days after receipt of the list, the parties shall select an Arbitrator. Both the Employer and the Lodge shall alternately strike names from the list. The remaining person shall be the Arbitrator.

. . .

## Section 18.1 – I.O.D.

Any Officer absent from work on account of IOD (I.O.D.) for any period of time not exceeding twelve (12) months shall receive for each such I.O.D. full pay and benefits for the period of absence, provided such injury or illness is certified by the Medical Services Section. Such certification shall not be unreasonably withheld.

. . .

ARROYO.DEF.004340

**Section 18.5 – Certification.**

Certification that an Officer has been injured in the line of duty shall not be unreasonably withheld.

**Section 18.8 — Injuries on Duty and Recurrence Claims.**

The Employer and the Lodge have agreed upon procedures which will be followed by the Medical Services Section when an officer reports an IOD or a recurrence of an IOD. Those procedures are set forth in Appendix N of this agreement.

**APPENDIX N**
**PROCEDURES FOR IOD AND RECURRENCE CLAIMS**

An Officer who has been certified as injured on duty shall be provided a list of available physicians for treatment. The list of available physicians shall indicate the physicians' medical specialties and the physicians shall be members in good standing of a network of worker's compensation physicians qualified to render appropriate medical care for the injury claimed. The Officer will select a physician from the list provided by the Employer. The Medical Services Section will refer the Officer to the physician selected by the Officer.
. . .

<u>**Issues**</u>

The parties did not reach an agreement on the statement of the issues and stipulated that the arbitrator should frame it in the award.  The Union states the issues as follows:

Whether the City of Chicago violated Article 18, Sections 18.1 and 18.5 of the agreement when it withheld IOD certification of Officer Arroyo's left-shoulder injury sustained on October 16, 2016 while moving her gear from the front seat of a police car to the rear cargo area to provide access to the police computer in the front seat to complete an arrest?  If so, what shall be the remedy?

ARROYO.DEF.004341

The City proposes the following:

> Whether the grievance is timely; whether the grievance is substantively arbitrable; and whether the City violated Section 18.1, Section 18.5 and Section 18.8 of the agreement when it did not certify Officer Arroyo's October 12, 2016 injury as an IOD.

I find the issues are:

1. Whether the grievance is timely (and whether the issue of timeliness has been waived);
2. Whether the grievance is substantively arbitrable;
3. Whether in denying Officer Arroyo's IOD claim, the City violated Sections 18.5 and 18.8 of the parties' agreement.

**Findings of fact**

### *Events leading up to the filing of the grievance*

While the Illinois Workers' Compensation Act, 820 ILCS 305/1(b)1 excludes coverage of police officers employed by the City, Section 22-306 of the Illinois Pension Code, 40 ILCS 5/22-306, permits municipalities to enact ordinances providing for the payment of medical expenses to police officers injured in the line of duty. The City of Chicago has enacted such an ordinance.

The Grievant had been employed by the Chicago Police Department for nearly 22 years at the time of the arbitration hearing. During her employment, she has filed approximately 28 IOD claims. This matter involves the events of October 12, 2016.

The Grievant explained at the hearing that at the beginning of her shift that day, she went to roll call, picked up her equipment (including camera, TASER, and radio), inspected her vehicle (reporting no defects), and logged on to her computer. Her first call was to assist an officer on an adjoining beat, Officer John Pietryla, whose computer was not working. He needed to confirm an arrest, so the Grievant moved her personal

ARROYO.DEF.004342

items and an oversized green bag, referred to during the hearing as a backpack or book bag, which contained her equipment, from the front passenger seat so that he could access the computer.  She estimated that the bag weighed about 30 pounds.[1]

The Grievant testified that she placed the book bag on her left shoulder to move it to the vehicle's trunk and felt pain in that area while relocating the bag.  She did not tell Officer Pietryla[2] she was feeling pain and proceeded to assist with the arrest.  She also engaged in her normal activities during the rest of the day.

The Grievant had IOD claims involving shoulder injuries in 2007 and 2014.  She testified that feeling pain was therefore normal, especially when the weather was wet, as it was that day.  She took some Tylenol and thought the pain would improve, but, she stated, it worsened and by the end of day, her shoulder was swollen.

When her shift ended, the Grievant picked her son up from school, went home, and took a bath.  She was scheduled to work the desk the next day beginning at 5:00 a.m., but instead called Sergeant Kadus at about 4:30 a.m., explained that her shoulder was swollen, and told him that she wanted to go on medical leave.   When the sergeant asked if she had been in any fights or chases, she said "no" and that all she had done was pick up her backpack and stuff from the passenger seat and move it to the back.  The Grievant testified at hearing that when Sergeant Kadus asked if it was a new injury or an old one, she told him she could not tell, as she was not a doctor.

She then reported the same information to the Department's Medical Services Section (MSS),[3] where she spoke with an Officer Moreno.  MSS referred her to Dr.

---

[1] At the hearing, she also stated that she had moved her lunch and raincoat.

[2] Officer Pietryla did not prepare a To/From or otherwise provide any information about these events.

[3] The Grievant acknowledged that, as a sworn police officer, she is required to comply with the Department's General Orders (GOs) and that they require officers injured on duty to report that injury as soon as possible or no later than the end of their tour of duty after sustaining the injury or becoming aware of the injury.  The Grievant acknowledged that on the day of the injury, she finished her shift, during which she made three additional stops, including a pat down search of an individual.  She admitted she had not notified her supervisor of her injury on the day she was injured, but that she talked to Officer

ARROYO.DEF.004343

Forsythe, the same physician who had treated her for the 2014 shoulder injury, to obtain an opinion on what had caused the injury. He gave the Grievant cortisone shots and ordered an MRI.

On November 1, 2016, Dr. Forsythe submitted the following report to MSS, stating that the MRI taken on October 26 had shown:

> . . . mild-to-moderate supraspinatus tendinitis and tendinitis extending to the anterior infraspinatus tendon with a tiny partial rim rent tear in the anterior supraspinatus tendon fiber. There is mild AC joint arthritis and an inferior capsular ligamentous tear. There is mild-to-moderate intraarticular biceps long head tendinosis extending to the proximal extraarticular portion.

On December 6, 2016, Dr. Forsythe submitted another letter to MSS, including his first note dated October 18, 2016, which stated, "On Wednesday, while at work, she threw book bag over her shoulder and opened the hatchback of her car when she felt immediate pain in left shoulder." His letter also stated that the Grievant had presented for follow-up of "left rotator cuff and biceps tendinitis," that she had been seen by his office since 2014 for "previous left rotator cuff tendinitis," and that she had been "without any issue until October 12, 2016 . . ."[4]

On December 6, 2016, a MSS nurse contacted the Grievant and informed her that the situation had been determined a new injury. Therefore, it was necessary for the Grievant to obtain a new IOD report. Sergeant Kadus prepared an IOD report dated December 12, 2016, which stated:

> Subject related that she hurt her left shoulder while performing a job function on 12 Oct 2016. Since injury occurred on 12 Oct 2016 R/Sgt. Is using Case Report HZ548667 which was submitted on 12 Dec 2016 as reference to fill out IOD Report. Subject related that as she was taking a bag out of her squad car she lifted the hatch causing an injury to the

---

Moreno with MSS the next day. She said she became aware early the day after the injury that the pain in her left shoulder would not allow her to work. She testified that she complied with all MSS requests.

[4] Dr. Forsythe prescribed physical therapy, and offered the opinion that the Grievant could return to work " with no use of the left upper extremity and desk work only."

ARROYO.DEF.004344

interior of her left shoulder.  Subject related that P.O. J. Pietryla #7061 observed incident, but is not at work on todays date.  Subject also stated that incident is captured on her BWC [body worn camera].

The Grievant prepared a To/From, also dated December 12, 2016, in which she stated:

> On 12 OCT16, R/O was dispatched to assist Beat 1024 with a possible warrant arrest and needed to use[ ] R/O's working PDT computer.  Said incident later documented under CB# 19383472.  R/O removed her working backpack from front passenger's seat by then placing said bag onto her left shoulder, by then relocating to rear of police vehicle opened hatch door.  All these, so that Officer John Pietryla can use R/O's computer.  Inside bag were police reports, books, and helmet and water bag.  R/O then felt a sharp pain inside her left shoulder.  R/O went on her work day, but pain worsen as day progressed at her home.  R/O did not seek IOD/nor medical attention at that time because she believed it was normal humidity shoulder and back pains due to prior IOD injuries.  For reference, R/O has sustained at least 5 back IOD and 2 left shoulder injuries dating 2008, 2014 and now 2016.

An Original Incident Report was also prepared, including essentially the same information.[5]

Shortly after the submission of this information, MSS contacted the Grievant to inform her that her IOD request would be denied by the Employer's Committee on

---

[5] It stated:
> Event #04043 in summary, P.O. Reyna Arroyo #18014 (victim) came to the 010th District on the 12th of December, relating that she needs a case report documenting her injury. She related that she needs a report so the Medical Section can identify her stated injury as a new I.O.D. incident not a recurring injury.  She stated that while assisting P.O. John Pietryla #7061 on an arrest (Modesto Juarez-Soto-CB # 19383472) made on the 12th of October 2016 at 3947 W. 26th St. in which Reyna Arroyo (victim) removed her work back pack from the passenger seat and placed onto her left shoulder and relocated to the rear of her squad S.U.V. and opened the rear hatch door injuring her left shoulder and felt a sharp pain on the interior of her left shoulder.  Per D.S.S. Sgt. A. Kadus #1238, R/O generated an IOD report for P.O.R. Arroyo for injuries sustained on said date of occurrence. Reyna Arroyo (victim) did not seek medical attention at that time because she did not believe injury was that serious, but victim related that injury felt worse as the day progress.  P.O. Arroyo was wearing her body camera at the time of incident, and is available for further viewing.  Victim was given V.I.N. information.

Finance (COF), which was responsible for reviewing claims of on-duty injuries to civilian and sworn personnel in the City's Police and Fire Department. Then-COF Director Monica Somerville issued a denial letter on December 22, 2016.

Janet Galvin Carpenter testified at the hearing that she began working for the COF in February 2013, and in March 2019 began working for the City's Department of Finance, which took over the COF's duties. She explained that the COF applied the general principles of workers' compensation, which she described as "a greater risk, mechanism of injury, arising out of (on-duty employment), and no defect," to determine whether to approve claims.

Ms. Carpenter explained that prior to its denial of the Grievant's claim, the COF reviewed Sergeant Kadus' IOD Report, the Grievant's To/From memo, and the incident report. She stated that the claim had been denied because there did not appear to be any greater risk to the Grievant than would be present for any other individual, there was no mechanism of injury, and it did not a appear that the injury arose out of her employment.

On January 4, 2017, the Grievant filed a grievance alleging that the City violated Sections 18.1, 18.5 and 18.8 of the parties' contract. She described the circumstances giving rise to the grievance as follows:

> On December 22, 2016, grievant went into the MSS for a recurrence claim for a certified IOD but was denied the request by the MSS. Grievant was told by the MSS that her injury was a new one and not related to a prior IOD from July 23, 2014. Grievant had injured her "L" shoulder on October 12, 2016 while relocating her work backpack to the rear cargo area of a police vehicle (SUV) to make room for her partner to use the PDT to run the name of an arrestee. The grievant was unable to hold the work backpack stable on her "L" shoulder causing a[n] injury to it because, she had to hold up the rear door/hatch to the SUV with her other hand because, it would not stay open on its own. Grievant was given a copy of the denial letter from the COF on January 4, 2017.

ARROYO.DEF.004346

### *Subsequent medical evaluations/treatment*

Beginning in January 2017, the Grievant's personal physician, Dr. Ho, treated her left shoulder. He ordered x-rays taken and gave her cortisone shots and physical therapy.[6]

The parties also agreed to obtain further medical opinions concerning the cause of the Grievant's left shoulder condition. Ultimately, she received three additional IMEs.

The first was from Dr. Steven Nash, who submitted a report dated May 31, 2017, which stated:

> Officer Arroyo presents today with complaints relative to the left shoulder. This right-handed individual has an injury which dates really to an initial injury of 2007 when the patient was struck about the chest by a perpetrator. Since that time, Officer Arroyo has intermittent difficulties with her left shoulder. In 2014, the patient was again injured about the left shoulder while chasing a perpetrator, lifting the patient's shoulder, noting the onset of pain about the left shoulder. (The Grievant) did undergo an MRI study at that time followed by cortisone injections on multiple occasions. She slowly improved in therapy over 3 months but then was off on administrative leave due to other health problems, only recently returning to work several months before a new injury, which occurred in October 2016. The claimant again was involved in an effort to arrest a resisting offender, noted the onset of discomfort about the left shoulder.

After an examination and review of prior medical records, Dr. Nash listed his impression as "chronic rotator cuff syndrome, left shoulder." He concluded:

> In my opinion, the patient's current complaints relative to the left shoulder are to be considered a temporary aggravation of a pre-existing underlying condition.

---

[6] The record contains an assessment by Dr. Ho on November 13, 2017, opining that through the date of her next assessment in February, 2018, the Grievant should not push or pull more than 10 pounds, perform over the shoulder work, or wear her vest.

ARROYO.DEF.004347

> The individual's shoulder difficulties date to at least 2007, and the claimant has had numerous episodes where she has been impaired relative to the left shoulder. MRI carried out in 2014 is essentially identical to that carried out in 2016. As such, the 2016 injury is considered an aggravation of a previously existing underlying condition, as is the 2014 injury.
>
> I believe the diagnosis is clear-cut. Conservative care may be offered this individual or surgical intervention may be considered.[7]

An MSS doctor found certain aspects of Dr. Nash's evaluation problematic and requested clarification. Thereafter, MSS decided to treat Dr. Nash's evaluation as a determination that the instant situation represented a recurrence of the Grievant's 2007 IOD. Since there were now two opposite opinions, the parties agreed to seek another IME.

The Grievant saw Dr. Guido Marra on November 21, 2017, He issued a report on December 15, 2017. Coventry, the third-party payer of the City's medical bills, had asked Dr. Marra, "Do you feel that the current state of ill-being is related to her work accident?" and he replied as follows:

> It is my opinion these are two distinct dates of accidents. The first which occurred on 07/23/2014, was what appear to be traumatic impingement syndrome which was successfully treated and completely resolved and is at maximal improvement. The second injury occurred on 10/18/2016, at

---

[7] The report added:

> The claimant is considered to have an impairment for any activity that would involve lifting, pushing, pulling, or any repetitious overhead use of the hand and arm on the left. Importantly, this individual, while capable of handling her department approved firearm, would not be able to effectively restrain an actively resisting offender. The officer would be able to work at light duty as above noted.
>
> In summation, I believe this claimant's difficulty is entirely related to a pre-existing underlying difficulty which has been temporarily aggravated from time to time.
>
> Lastly, please note the claimant did provide Swedish Covenant Hospital note of 2007, which substantiates difficulty to the left shoulder as the index injury for this patient's problem.

ARROYO.DEF.004348

which time she was lifting a book bag and swung it over her shoulder and experienced pain in her shoulder.

This appears to have caused rotator cuff tendinitis which is documented on the 10/26/2016 MRI scan....

I do feel that current state of ill being is related to the 10/12/2016 date of injury. I believe that she would be a candidate for a corticosteroid injection. There is no indication that surgical intervention is warranted.

The City determined, based on these medical opinions, that the October 12, 2016 situation was not related to the Grievant's 2014 IOD. Looking at the October 12, 2016 incident as a new injury, it concluded that the Grievant had not been involved in a police function when it allegedly occurred. Although the matter was referred to arbitration, the parties agreed to obtain one more IME to determine whether the current situation was related to the 2007 IOD.

The Grievant was examined by Dr. Mark Levin, who issued a report dated April 4, 2019. He concluded that the Grievant's current shoulder complaints were not related to her 2007 IOD, and that he could not substantiate any need for treatment or work restrictions stemming from the 2007 IOD.

The Grievant had been working light duty from the time of the 2016 alleged injury until March 31, 2019, when that work modification expired. Her physician had cleared her to have surgery on her left shoulder but she could not proceed due to unrelated health issues. The Grievant eventually had surgery on her shoulder, in June 2019, but it was unsuccessful and resulted in a frozen shoulder.

As of the arbitration hearing, unrelated medical conditions prevented the Grievant from attempting another surgery on her shoulder. She was in no-pay status as of November 15, 2019.

ARROYO.DEF.004349

### _Body worn camera video recording_

The Grievant wore her body worn camera throughout the day on October 12, 2016. The video was subpoenaed by, and provided to, the Union. It was not considered by MSS or the COF, although it was viewed during the mediation in this case.

The video was entered into the record and played at the hearing, and the arbitrator has studied it carefully. The camera making the recording was attached to the front of Officer Arroyo's uniform, and, as it shows a somewhat wide angle, the recording has a slightly distorted "fisheye" look. There are four video segments.

The first segment includes the incident at issue. It shows the Grievant driving, then pulling over and parking her vehicle. Officer Pietryla is present, and the Grievant tells him that she will remove her belongings from the front seat.

The video shows the Grievant reaching into the car and picking up the green backpack by its handle with her right hand. She takes what looks to be a raincoat with her left hand and appears to put it over the backpack. She then picks up a briefcase-type item, by the handle, with her left hand.

After that, the video shows only a blur, although there is a slight, momentary green flash near the bottom of the screen, until the viewer can observe the Grievant standing behind the vehicle's trunk. She opens the hatch, which stays open on its own, and lifts the backpack, with her right hand on the top strap, from what appears to be the ground on the right side of the image. She then picks up the coat and briefcase-type item with her left hand, from the left side of the image, and places them in the trunk. She then closes the trunk with her right hand.

At no time can the viewer observe the backpack on the Grievant's left shoulder.

The fourth video segment shows Officer Arroyo returning to the back of the vehicle, seeming to use her left hand to open the truck, and then retrieving the raincoat and some items from the backpack. The trunk stays open on its own throughout, until she uses her right hand to close it. Throughout all four video segments there is no visual or auditory indication of an injury or subsequent manifestations of an injury.

ARROYO.DEF.004350

## Positions of the parties

### *The Union*

#### *The merits*

The Union acknowledges that it bears the burden of proving the City violated the agreement when it denied the Grievant's IOD claim. Citing numerous arbitration awards between the parties, the Union first asserts that it has met this burden by demonstrating that the City's former manager of workers' compensation claims, Monica Somerville, failed to conduct a reasonable investigation because she based her denial of the Grievant's IOD claim on incomplete information.

In support of its position, the Union notes that the agreement and the City's Municipal Code provide the City bears the ultimate responsibility for "gathering all relevant evidence necessary to allow the COF to make an appropriate and reasonable determination on an IOD claim," quoting *Fraternal Order of Police, Lodge No. 7 and City of Chicago, Chicago Police Department (Matlock-Horton)*, Grv. No. 123-09-070/297 (Meyers 2013). It also quotes from several arbitration awards where reliance on only the IOD claim and one or two To/From memos was found insufficient. See *City of Chicago and Fraternal Order of Police, Lodge No. 7 (Spalding IOD Denial)*, Grv. No. 123-07-147/459 (Perkovich 2009) (involving injury on stairwell not used by public); *City of Chicago and Fraternal Order of Police Lodge No. 7 (Aguinaga)*, Grv. No. 123-11-004/106 (Perkovich 2013) (noting a failure to talk to the grievant and determine the nature of the grievant's work at the time of the injury); *Fraternal Order of Police, Chicago Lodge No. 7 and City of Chicago (Salcedo)*, Grv. No. 123-10-046/156 (Meyers 2013) (noting a lack of detail in the IOD report and the To/Froms); *Fraternal Order of Police Chicago Lodge No. 7 and City of Chicago (Bell)*, Grv. No. 123-16-016/196 (Meyers 2017); and *City of Chicago Police Department and Fraternal Order of Police, Lodge 7 (Nelson)*, Grv. No. 123-17-014/187 (Perkovich 2018).

The Union stresses Ms. Carpenter's testimony that the City had in its possession only three documents at the time Ms. Somerville made her determination: the IOD

ARROYO.DEF.004351

report; the Grievant's To/From; and the incident report. The Union states that the investigation was therefore inadequate, as found in *Spalding*, *Aguinaga*, *Salcedo*, *Bell*, and *Nelson*.

Further, citing *Salcedo*, the Union states that the fact of an inadequate investigation cannot be overcome by suggestions that the Grievant was not placed at greater risk of injury than the general public. The evidence here clearly supports the conclusion that the Grievant was at an increased risk of injury.

The Union notes that, in addition to the IOD Report and the Grievant's To/From, Ms. Somerville had the incident report. While that report in itself did not provide much more information than the other two documents, it included a reference to the arrest in which the Grievant was involved, and to body camera video recording of the actual incident. According to the Union, these "highlighted the fact that (the Grievant) was assisting with an arrest when she injured her left shoulder." It notes it is undisputed that neither the arrest report nor the body camera video recording was reviewed at the time of the denial of IOD status, and they could have led the COF to reach a different conclusion because they demonstrated that the Grievant had been placed at greater risk of injury than the general public.

The Union states that it is therefore well-settled in matters involving the FOP and the City that arbitrators apply the increased risk doctrine to determine whether an injury arises out of employment. It states that the instant dispute centers on whether the Grievant was involved in police functions at the time of injury and exposed to greater risk of injury than the general public when she placed her gear in the back of her car. Ms. Carpenter assumed Ms. Somerville's denial was based on the appearance that the incident did not involve greater risk or mechanism of injury.

With respect to greater risk, the Union quotes from Arbitrator Meyers' decision in *Bell*, indicating that it is improper to "break up the grievant's actions into small, discrete pieces [and thus] leav[e] behind all of the context by which the grievant's actions must be judged." The FOP claims the City is doing that with respect to the Grievant, and

ARROYO.DEF.004352

states that it is inappropriate for the City to separate the action of moving her bags to the back of her vehicle from the need to allow Officer Pietryla access to her computer in order to assist with an arrest. It further notes that, while engaging in this activity, Officer Arroyo was in full uniform, which weighed about 30 pounds, a factor which Arbitrator Meyers found significant in *Bell*:

> There can be little serious doubt that however well the weight of these various items was distributed, the Grievant's police vest, duty belt, Taser, night stick, radio, body camera, and other required equipment had an impact upon her ability to freely move, upon her center of gravity, and upon her overall balance.... There is no way to tell from the evidence in the record whether some or all of this equipment absolutely contributed to, or even caused, the Grievant's fall, but it is impossible to dismiss the potential impact of the weight of the police equipment that the Grievant was required to wear and/or carry. The fact that the Grievant did have to wear and/or carry so much and such heavy police equipment, which is something that does not burden the members of the general public, supports a finding that the Grievant did face an increased risk of injury, over and above what faces the general public . . .

Therefore, the Union states, as in *Bell*, the Grievant was at increased risk when she injured her shoulder while in full uniform while assisting in an arrest.

The Union also takes issue with Ms. Carpenter's statement that there was no mechanism of injury, stating that the evidence supports the conclusion that matters related to her job caused her left-shoulder injury. It states it is undisputed that the Grievant's left shoulder was compromised by at least two prior injuries sustained on duty. The FOP adds thaty it is clear that Officer Arroyo suffered another left shoulder injury on October 12, 2016. It states the record is clear that: 1) on that date she moved her gear to the back of her police vehicle; 2) from that date forward she referenced that action as the probable cause of that injury; and 3) she reported this to her supervisor and MSS from the onset of her injury.

The Union further takes issue with the City's argument that the Grievant's failure to say anything at the immediate time of her injury, and not report it to her supervisor

ARROYO.DEF.004353

until the following morning, indicates that her movement on October 12, 2016, was not the cause of her injury. The Union points out that the Grievant testified she did not say anything at the moment she opened the rear hatch of the car because it was normal for her to experience pain in her left shoulder due to undisputed past injuries and the damp weather that day. She explained that she hoped the pain would go away by the next morning, but it did not. The Union asserts that the conclusion that nothing related to the Grievant's work caused her injury on October 12, 2016 is based solely on conjecture, and therefore the City's denial of IOD status for her left shoulder injury was unreasonable. The grievance should be granted on the merits.

*Arbitrability*

As for the City's arbitrability contentions, the Union first asserts that the City's argument that the grievance is untimely was waived and is otherwise without merit. It states the City raised timeliness for the first time at the arbitration, and points to the reasoning by Arbitrator Berman in *City of Chicago and Fraternal Order of Police, Lodge No. 7 (Health Care Insurance for Police Officers on Occupational Disability Leave)*, Grv. No. 129-03-005 (2016):

> In most cases ... a waiver is found because the employer did nothing to apprise the union of its procedural objections until the arbitration hearing. In these situations, the union has been misled and may have incurred expenses in preparing for arbitration. The union may well have believed that the employer's silence was a waiver. Indeed, the arbitrator may question the sincerity of a defense never raised until arbitration. Moreover, the rejection of an untimeliness argument made for the first time at arbitration encourages the parties to address a grievance meaningfully at the lower steps.

The Union stresses that this untimeliness argument cannot be brought to the arbitrator at this time.

In any event, the Union asserts, the grievance was timely filed. Section 9.5 of the parties' agreement, it notes, provides that grievances concerning medical issues must be

ARROYO.DEF.004354

filed "within ten (10) working days following the events or circumstances giving rise to the grievance or where first known by the grievant, but in no event later than thirty-five (35) calendar days following the events or circumstances giving rise to the grievance." The Grievant received a copy of the COF's denial on January 4, 2017, and filed a grievance that same day. Consequently, the grievance was timely filed.

The Union notes further that the City's timeliness argument assumes that the grievance addresses only the recurrence claim. More specifically, the City's position is that because the Grievant did not report her injury to her supervisor until the morning after her injury, and did not complete an IOD report until the City's referral doctor found her injury separate and apart from her prior shoulder injuries, the grievance must be untimely.

The Union contends that the City's position conflates timely reporting of an IOD to a supervisor with the timely filing of a grievance. It notes that there is no contract violation if an officer reports a duty-related injury the day following the injury. Second, there is no need for a grievance if the COF certifies an injury as an IOD (regardless of when the officer reported the injury to her supervisor) and therefore there was no workplace dispute to grieve until such time as the COF denied the Grievant's claim for IOD certification. Here, the grievance was filed on the same day the IOD claim was denied and therefore is timely and arbitrable.

As for the City's similar argument that the grievance is not substantively arbitrable, the Union states that the grievance is not limited to denial of a claim of recurrence, but rather challenges the City's failure to certify Officer Arroyo's injury as IOD under either the recurrence or initial IOD contract provisions. Therefore, there is no merit to the Employer's arbitrability claims.

ARROYO.DEF.004355

### ***The City***

#### *Arbitrability*

The City initially asserts that the instant grievance is untimely. The Employer cites several arbitration awards for the proposition that where time limits established in a collective bargaining agreement are not satisfied, the arbitrator is effectively without jurisdiction.[8] It quotes from Section 9.5 of the parties' agreement, which provides that a medical grievance must be filed "within ten (10) working days following the events or circumstances giving rise to the grievance or when first known by the grievant, but in no event later than thirty-five (35) calendar days following the events or circumstances giving rise to the grievance." The City notes that, on its face, the grievance concerns the denial of a recurrence claim, and challenges the Union's contention that it should be construed to encompass an alleged injury that first occurred on October 12, 2016, as well as the COF's refusal to recognize that injury as a compensable IOD claim.

The City states that, to the extent the grievance relates to MSS's denial of the Grievant's first recurrence claim (concerning the 2014 injury), the grievance is not cognizable because it was filed, improperly according to the City, while the Appendix N process was ongoing and it was not ripe for dispute resolution.

The Employer also claims that, to the extent the grievance is improperly construed to challenge the COF's denial of the claim as one for a new injury, the grievance is also untimely because the Grievant failed to timely report her injury, in violation of City policy. The injury allegedly occurred on October 16, 2016, the Grievant did not report it until the next day, and she did not submit any report of that injury until two months later.

---

[8] The City points to *Tompkis Indus. Inc.*, 114 Lab. Arb. Rep. (BNA) 1299 (Eisenmenger, 2000); *Sterling Chem, Inc.*, 114 Lab. Arb. Rep. (BNA) 269 (Baroni, 2000); *Ohio Dept. of Rehabilitation & Corrections*, 104 Lab. Arb. Rep. (BNA), 1064 (Smith, 1995); and *Dept. of Air Force*, 84 Lab. Arb. Rep. (BNA) 1173 (Holley, 1985).

ARROYO.DEF.004356

Further, the City points out, the COF denied Officer Arroyo's December 12, 2016, IOD claim in a letter dated December 22, 2016. The Grievant did not deny receiving that letter, yet she did not file her grievance until January 4, 2017, which was well outside the time frame set forth in Section 9.5.

As for the City's argument that the grievance is not substantively arbitrable, it rests on the same assumption that the grievance does not challenge the denial of the Grievant's December 12, 2016 IOD claim, but rather MSS's allegedly improper denial of her request to file a recurrence claim.

The City treats the Grievant's alleged recurrence as two separate claims: one relating to her 2014 IOD claim, and the other relating to her 2007 IOD claim. It states both were resolved conclusively against her following completion of the Appendix N dispute resolution framework, and that it was only after this that the Union argued for the first time that the grievance challenged the COF's December 12, 2016 IOD claim.

The City contends that the Grievant has maintained inconsistently that her October 2016 symptoms were the result of (1) her left shoulder July 2014 IOD; (2) her left shoulder February 2007 IOD; and (3) her alleged October 12, 2016, left shoulder injury. It accuses her and the Union of forum shopping and raising patently inconsistent theories, settling on the October 12, 2016 independent injury theory only after losing her two recurrence claims. The City argues that this "untimely and dilatory third attempt" is substantively inarbitrable, and these diametrically opposed efforts to obtain IOD benefits should not be awarded in this manner.

### *The merits*

The City states that the Union has failed to meet its burden of proving any contract violation with respect to the Grievant's IOD claims. First, the City argues, its decision to deny the IOD claim was reasonable. It notes that the applicable standards provide for the COF to authorize payment of medical expenses only where "satisfactory proof shall have been presented to said COF that such injury was sustained by such

ARROYO.DEF.004357

policeman or fireman in the performance of his duty." The City states it is well established by both Illinois courts and arbitrators that the City acts reasonably when it relies upon Illinois workers' compensation standards to determine whether to certify an officer's injury as an IOD. It clearly did so here.

The City first argues that the Union failed to demonstrate that the Grievant injured her left shoulder at all on October 12, 2016. The City contends that the Grievant made seven statements concerning how she allegedly injured her shoulder, and they are patently and internally inconsistent.

However, the City states, the video recording from the Grievant's body-worn camera is the most compelling evidence, and definitively demonstrates that the Grievant did not suffer any injury on October 12, 2016. In contrast to her statements, the video does not show her picking up her backpack with her left hand, let alone placing it over her left shoulder. Contrary to her statement in the grievance, the video shows she never held up the hatch because it would not stay open on its own; moreover, she never reported a defect on her vehicle inspection report. The video shows she lifted her backpack with her right hand, and used her left hand only to lift a laptop computer case by the hand strap. The video also does not capture any expression of pain and shows her subsequently exercising a full range of motion and performing physical tasks like patting down two individuals. The video alone is sufficient to defeat the grievance.

Even if an injury *had* occurred, the City stresses, it was not compensable. Citing *Deborah Allen*, the City states that to be compensable as an IOD, the injury must both (1) "arise out of" and (2) be sustained while "in the course of" employment.[9] The City notes that the latter refers to the time, place and circumstances under which the injury occurred, conditions it concedes were met here if there was indeed an injury. However, the need to "arise out of" employment means the origin of the injury must be a risk connected with an individual's work so as to create a causal connection between the

---

[9] The Employer cites *Caterpillar Tractor Co. v. Industrial Commission*, 129 Ill. 2d 52 (1989).

ARROYO.DEF.004358

employment and the accidental injury. This criterion is met if the conditions or nature of the employment increase the employee's risk of harm beyond that to which the general public is exposed. The mere fact that an employee was present at the place of her injury because of her employment duties (the "positional risk doctrine") is insufficient.

The City asserts that any left shoulder injury did not arise out of the Grievant's employment. It states that employees are exposed to three types of risks: risks distinctly and uniquely associated with their employment; risks that are personal to the employee; and neutral risks that have no particular employment or personal characteristics. The latter two types generally are not found to arise out of employment unless the employee was exposed to the risk to a greater degree than the general public.

The City states that nothing in the record even remotely suggests that the Grievant's injury was the result of a risk uniquely associated with her work as a police officer, or that employment conditions on October 16, 2016 increased her risk of injury. First, the City points out that the rear hatch of the Grievant's police vehicle was not defective, as evidenced by the video recording. It contrasts her situation with those in which an employee was exposed to a defect in the employer's premises to which the public was not exposed.[10]

Second, the City notes that neither the Grievant nor the Union claim, nor is there record evidence supporting, that the Grievant's injury was the result of repetitive tasks or exposure to risks more frequently than the public. Third, the City points out that there was no evidence that the Grievant had been instructed to remove items from the passenger side of her vehicle as part of her duties, and the vehicle's computer is usually accessed from the driver's seat to which Officer Pietryla had ready access.

---

[10] The City cites *First Cash Financial Services*, 367 Ill. App. 3d at 106, where an employee had to stretch his arm into a deep, narrow box to retrieve a part for inspection, and *Young v. Ill. Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC ¶¶4-5.

ARROYO.DEF.004359

The City also asserts that any suggestion by the Union that the Grievant's duty belt and uniform increased the risk of injury to her left shoulder would be meritless and refuted by the evidence which includes no allegation by the Grievant that the injury to her shoulder was caused by her need to wear her duty belt and other equipment on her uniform.[11]

The City again cites the video recording as evidence that no injury occurred, let alone that it was compensable as an IOD. It points to *Hopkins v. Indus. Comm'n*, 196 Ill. App. 3d 347, 351-52 (3rd Dist. 1990), where a police officer's back injury was found not compensable where he simply turned in his chair and there was no evidence the chair was defective or unusual, nor was there evidence that his holster caught the chair as he turned. The Employer concludes that the record evidence fails to establish that the Grievant faced any increased risk of injury caused by her duties as a police officer and, therefore, any injury that might have occurred was not compensable.

Finally, the City argues that the investigation and resulting denial of the Grievant's December 12, 2016 IOD claim were entirely reasonable. Citing *Fraternal Order of Police Lodge No. 7 and City of Chicago (Rudolfo Segovia)*, Grv. No. 123-06-052/295 (Clauss, 2009), it states that the reasonableness of the denial of an IOD claim is determined by the information available at the time the decision is made, and it is well-established that withholding certification of an IOD claim is reasonable where it is based upon a thorough examination of the available and pertinent medical evidence.[12]

---

[11] The City contrasts the Grievant's situation with that in *Pollock v. State of Ill., Southern Ill. Univ. Edwardsville*, 12 IL WC12420 16657 (Ill. Indus. Comm'n Dec. 13, 2019), where aspects of a uniform was found to increase the risk of a mis-step while descending stairs, and suggests it is more comparable to the situation in *Sykes v. Ill. State Police*, 12 IL WC 12420 (Ill. Indus. Comm'n June 5, 2014), where a wet sidewalk caused by rain was found not to be a risk caused by employment but a risk common to the general public and a police officer's need to carry a backpack with files, a gun, handcuffs, a bullet magazine and a badge was found to not increase the risk of injury.

[12] The City cites *City of Chicago and Fraternal Order of Police Lodge 7 (Kathleen McClory)*, Grv. No. 123-05-034/165 (Perkovich, 2005); *Deborah Allen*; *City of Chicago and Fraternal Order of Police Lodge No. 7 (Richard Hanley)*, Grv. No. 123M-93-011 (Feuille, 1994).

ARROYO.DEF.004360

The City concludes that the claim was not reported in a timely manner as required the Department's General Orders; rather, all of the initial reports and narratives were submitted two months after the alleged injury. Moreover, the accounts of the injury do not credibly support the conclusion that the Grievant was injured on that date because they contain inconsistencies, including that the Grievant claimed the instant situation was the recurrence of two earlier injuries. The City urges that its review, investigation and processing of the claim was thorough and comprehensive, and the Union cannot point to any aspect of the investigation as evidence of a violation of the parties' agreement. The grievance must be denied.

## Discussion and analysis

### *Arbitrability*

The City contends that the grievance was not timely filed, and that it is not substantively arbitrable because it challenged the handling of the Grievant's recurrence claims (which were not ripe at the time of filing) rather than the alleged new injury in 2016 which was litigated in this hearing.

The Union responds that the City never raised the timeliness issue until arbitration, and that it was therefore waived. The Employer never disputes nor explains that the timeliness issue arose for the first time at arbitration. Whether waived or not, however, the timeliness and substantive arbitrability contentions are intertwined, as they rest upon the same premise, that the instant grievance challenged only the handling of the asserted recurrence and not the alleged new injury.[13]

Parsing various statements made by the Grievant, the Employer contends that she is actually grieving two recurrence claims, one alleging a recurrence of an injury in

---

[13] The Employer does argue that the Grievant did not file the grievance within 10 days of the City's December 22, 2016 denial of the new injury claim. However, the Grievant testified that she received the letter on January 4, 2016 and filed the grievance the same day.

ARROYO.DEF.004361

2007, the other alleging a recurrence of an injury in 2014. The City argues that the Grievant only began to construe her grievance as concerning the denial of a claim of a new injury incurred on October 12, 2016, when she realized that grieving the recurrence claims was futile.

However, as the Union asserts, it is unreasonable to expect an employee to articulate the basis of the grievance with lawyer-like precision. That is particularly the case here, where the City would require the Grievant to be able to state the precise basis of an alleged injury, something the Employer ultimately expended considerable effort to attempt to determine.[14] The Grievant stated that she had a great deal of pain after moving her backpack to the trunk on October 16, 2016, and that she did not know whether that was a recurrence of one of her previous injuries or a new one.

The grievance concerns the denial of IOD status for an alleged injury on October 16, 2016. The Grievant stated in the grievance that she initially went to MSS for a recurrence claim but was told instead that her injury was new and she filed the grievance when her new injury claim was rejected by the Employer. The grievance clearly covers the matters addressed at arbitration. The City's substantive arbitrability contention is without merit.

### *The merits*

The record evidence concerning the relevant events of October 16, 2016 consists of the Grievant's account, in the form of her hearing testimony and various statements made during the course of events, and video from her body worn camera. The Employer contends that, before any consideration of whether whatever occurred should have been given IOD status, the Union must demonstrate that an injury actually occurred, or at least that events occurred as the Grievant described, giving rise to the asserted injury.

---

[14] Indeed, there were conflicting professional medical opinions on that topic that took some time to sort out.

ARROYO.DEF.004362

The City argues that the video flatly contradicts the Grievant's account, demonstrates that the events the Grievant alleged led to her injury did not occur, and that the grievance must be denied on this basis. I agree.

In the grievance, the Grievant asserted that she " . . . was unable to hold the backpack stable on her "L" shoulder . . . causing the injury to it because, she had to hold up the rear door/hatch to the SUV with her other hand because it would not stay open on its own." The Grievant therefore succinctly described the injury as occurring largely because the trunk or hatch would not stay open. Her description is patently untrue

The video from the asserted injury itself clearly shows the hatch open, without a hand holding the door open, as the Grievant uses both hands to put items into the hatch. Another video segment from later in the day, when the Grievant went to retrieve her raincoat, also shows the hatch open, on its own without being held, as she removed the item and then used her hand to close the trunk. This is conclusive evidence that what the Grievant describes as the primary causal event simply did not occur.[15]

Moreover, the video never shows the backpack on the Grievant's left shoulder and strongly suggests that it was never on the Grievant's left shoulder *at all*.[16] As the Employer states, the video shows the Grievant removing the backpack from the front seat by taking the handle, not the shoulder strap, with her *right* hand. She moves what appears to be her raincoat with her left hand, and then takes another, much smaller briefcase-type bag, by the handle with her *left hand,* the second bag being something the Grievant never mentioned at all.

After some blur as the Grievant apparently moves from the passenger side to the back of the vehicle, she is shown lifting the bag, from the lower right of the screen, apparently the ground, with her *right* hand, and lifting the briefcase into the trunk from the lower right side. Had the bag been on her left shoulder, one would have observed

---

[15] Further, as the Employer notes, the Grievant never reported any defect on her vehicle.
[16] Indeed, one must wonder why, if as she stated the Grievant experienced near-constant pain in that area, she would have "thrown" the bag, as recited in Dr. Forsythe/s report, over her left shoulder.

ARROYO.DEF.004363

the bag moving downward, rather than upward, into the hatch, from the left side of the screen rather than the right. The Grievant did not address the disparities between her descriptions and what is depicted on the video, and the video conclusively disproves her account of what occurred.

I do not doubt that the Grievant suffers pain in her left shoulder and am sympathetic to that and her other medical conditions. Perhaps her shoulder pain increased at around the time of the alleged incident. But the record does not support that something happened on duty at the time in question that could possibly have injured her left shoulder. It follows that there could therefore be no injury on duty, and the grievance must be denied.

## **AWARD**

The Employer did not violate Sections 18.5 and 18.8 of the parties' agreement as alleged. Therefore, the grievance is denied.

_____
Jacalyn J. Zimmerman, Arbitrator
June 20, 2022

FOP Chicago Lodge No. 7/City of Chicago (Arroyo)
Grievance No. 123-17-001/101
Page 28 of 28

ARROYO.DEF.004364