EXHIBIT 17

Part 2 of 2

Pages 83-166

83

1     A.    That's correct.

2     Q.    And then underneath that, it says, "The medical

3  service section", and then it lists out the

4  responsibilities of that section, correct?

5     A.    Yes.

6     Q.    And G, under this section, says that "The

7  medical services section reviews and renders a medical

8  opinion to the COF as to whether injuries documented in

9  the injury on duty report are consistent with reported

10  circumstances."  Correct?

11     A.    That's what it says, yes.

12     Q.    They give -- who is the COF here referring to?

13     A.    Committee on Finance was a group that for years

14  was headed by Alderman Burke.  I believe Alderman

15  Waguespack, at the time of my illness, was the head of

16  it.  They received all the medical billings for injured

17  on duty personnel.  But there is a caveat somewhere in

18  the police contract that police officers or firemen,

19  when they're transported by ambulances, it covers their

20  ambulance expenses.  So Committee of Finance would

21  process those bills.

22     Q.    So this says that the medical service section

23  will review and render a medical opinion to the

24  Committee on Finance, correct?

25     A.    Correct.

Jonathan Lewis Johnson - November 30, 2023

84

1    Q.    And that report is regarding whether the
2    injuries documented in the injury on duty report are
3    consistent with the reported circumstances, correct?
4    A.    Correct.
5    Q.    To your knowledge, does the COF ever go against
6    the medical opinion report of the medical services
7    section?
8         MR. SANTELL:  Object to form.
9         You can answer if you can.
10        THE WITNESS:  I know there are meetings between
11   the Committee on Finance group and the police medical
12   section.  I don't recall how routinely they occur, but
13   they are usually to discuss, I think, like arbitrable
14   issues.  And when I say arbitration, is this an IOD or
15   is this not an IOD?
16        And so the police department obviously has their
17   physician.  I'm sure that Committee on Finance also
18   employs a physician or medical assessment type
19   individual as well.
20   BY MS. ABRAHAM:
21   Q.    Are you aware of any cases, to your recollection
22   throughout your history there, in which the medical
23   services section made one recommendation and the
24   Committee on Finance made another decision?
25   A.    I do not recall.

85

1    Q.    Section J here, it says that the medical

2  services section ensures that each injury on duty report

3  and related documents are forwarded to the Committee on

4  Finance, correct?

5    A.    Yes.

6    Q.    And then they evaluate claims -- this is under K --

7  they evaluate claims of a recurrence of injury on duty

8  to determine certification, correct?

9    A.    Yes.

10   Q.    And then skipping to Subsection M, it says they

11  also administer the sworn, limited/convalescent duty

12  program, correct?

13   A.    Yes.

14   Q.    What is the sworn, limited convalescent duty

15  program?

16   A.    That's kind of a broad answer.  It's basically

17  their care while they are in a limited duty status in

18  terms of returning to work.  So, in terms of, they are

19  required to appear at the medical section in required

20  intervals.

21        Say, for example, someone is injured while

22  effectuating an arrest over the weekend.  I believe if

23  they are able to, by that Monday morning, they must

24  approach the medical section and begin the assessment

25  process of what is the injury?  When did the injury

Jonathan Lewis Johnson - November 30, 2023

86

1   happen?

2          Then at that point they will probably have to

3   schedule visits with their own physician, and probably

4   if the City has their own, like Concentra is -- I

5   believe that's the firm that the City uses, because I

6   had to go to them, and then they make an assessment of

7   the injury and then probably what the recovery time will

8   be.

9      Q.   Is there a difference between the limited duty

10  program and the convalescent duty program?  Do you know

11  what that term is a reference to?

12     A.   I don't necessarily think there is.  You see,

13  obviously the hyphen or the backslash in there, so it's

14  probably -- well, to me -- one of the same thing.

15         Obviously, if you are a limited duty officer,

16  there are probably functions you can't do.  I would say

17  convalescent, though, would be an officer that's been

18  badly injured and you can't do anything.

19     Q.   And then Section N, underneath it says,

20  "Recommends to the command staff member of the human

21  resources division that a sworn member be authorized a

22  leave of absence to apply for disability pension

23  benefits."  Do you see that?

24     A.   Yes, I do.

25     Q.   This recommendation to the command staff member

Jonathan Lewis Johnson - November 30, 2023

87

```
 1    of the human resources division, is that a reference to
 2    the director of human resources?
 3        A.    It could be the director of human resources, but
 4    it could also be someone in a higher level position,
 5    command staff, for example, within the police's
 6    administrative structure, they call command staff.  And
 7    that could be anyone from commander up through the
 8    superintendent itself.  But within an individual unit,
 9    it could be the director of that unit or commanding
10    officer, and then other personnel in upper level
11    positions.
12              I. E. for example, a command staff member in the
13    finance division would be, let's say, myself.  It could
14    be the assistant director of finance, it could be the
15    manager of payroll, it could be the chief finance.
16        Q.    Okay.  We're going to mark this next one as
17    Exhibit 5.
18              (Exhibit No. 5 was marked for identification.)
19    BY MS. ABRAHAM:
20        Q.    Can you see my screen?
21        A.    Yes.
22        Q.    I'm going to take you through all of the pages
23    of this document here.  Do you recognize this document?
24        A.    Unfortunately, I do not.  But I -- reasonable
25    accommodation policy.  So, obviously, the terminology I
```

Jonathan Lewis Johnson - November 30, 2023

88

1    remember, but I don't recall having reviewed it.

2        Q.    I'm sorry.  Half of your answer was a little

3    muffled.  You don't recall what?  I'm sorry.

4        A.    I said obviously, I see the title is Reasonable

5    Accommodation Policy.  I don't recall myself

6    individually reviewing it.

7        Q.    Okay.  My understanding is that this document is

8    the Reasonable Accommodation Policy for the City of

9    Chicago.

10       A.    That's --

11       Q.    -- Human Resources Department.  Is this a

12   document that's made available to CPD employers?

13       A.    I'm sure it is.

14       Q.    But you don't recall seeing it before?

15       A.    I don't recall having reviewed it.  Again,

16   especially at that time, let's say 2015, there was

17   probably a bit of a tug of war between whose rules were

18   followed -- were we following CPD rules?  Were we

19   following Department of DHR?

20            Because, again, it's quite different for an

21   administrative agency to kind of say what an operational

22   agency like the police department, that is monolithic,

23   should be doing.

24       Q.    So your knowledge --

25       A.    First, review their General Orders, directives

Jonathan Lewis Johnson - November 30, 2023

89

1    and contracts first.

2        Q.    To your knowledge, is there a difference between

3    the City of Chicago's reasonable accommodation policy

4    and the CPD's reasonable accommodation policy?

5        A.    I'd have to put them side-by-side to see what

6    differs.  Now, the police department, in the timeframe

7    that is my second tour there, they went through an

8    accreditation process called CALEA.  And CALEA is a

9    governmental body overseeing police departments across

10   the country.

11          So you'll see, like, for example, the reasonable

12   accommodation or ADA policy that you displayed earlier,

13   you see references to the term CALEA.  That means we've

14   been accredited or meet the standard.  So that means

15   standards across the board or across the country that we

16   are trying to adhere to.

17          So those also would be in line probably with

18   what the DHR standards are.  Obviously, DHR is following

19   based on human resource law and probably some direction

20   that they're receiving from the Department as well.

21       Q.    If there is a conflict between the policy -- the

22   CPD policy, and the City of Chicago's policy, which do

23   you follow?

24          MR. SANTELL:  Objection to form.

25          You can answer if you can.

Jonathan Lewis Johnson - November 30, 2023

90

1          THE WITNESS:  Well, then there would be --
2   because then the issue would be, who do we follow?  We
3   are supposed to be following the City's policy because
4   ADA is a federal law, so we can't -- or when I say we,
5   the police department -- should be adhering to federal
6   law.
7   BY MS. ABRAHAM:
8      Q.   About how many officers, to your recollection,
9   came into the finance department because they were
10  placed on limited duty status?
11     A.   I'm just going through where the cubes were
12  placed in my mind.
13     Q.   I'm not sure I caught that answer.
14     A.   I'm referring to, in my mind, the placement of
15  the cubes in the office and who was sitting in the
16  cubes --
17     Q.   Oh.
18     A.   -- in terms of desk locations and who was a
19  limited duty officer or civilian.  I would probably say
20  a minimum of six officers.  Well, that's just in
21  finance.  Let's say a minimum of ten in finance and
22  payroll and timekeeping.
23     Q.   Okay.  Did some officers get into the finance
24  division for other reasons?  In other words, they
25  weren't on limited duty status?

Jonathan Lewis Johnson - November 30, 2023

91

1          MR. SANTELL:  Objection, speculation.

2          You can answer if you can.

3          THE WITNESS:  There may have been an officer

4    placed there for another reason.  For example, I would

5    get phone calls on a Friday night.  I'm reassigning

6    (indiscernible) staff, that would be a civilian, but

7    also an officer, I'm getting someone for whatever the

8    reason may be, and that decision would have come from

9    above.

10          They're moving someone out of the unit for a

11   reason, and it could be disciplinary.  Maybe there is an

12   incident between that individual and a commanding

13   officer.  So -- but that has happened, so it hasn't just

14   been a limited duty officer.

15   BY MS. ABRAHAM:

16      Q.   When you were there, when you were the director,

17   did you have to approve the assignment of an officer to

18   the finance division?

19      A.   Well, as the example I just gave, that would be

20   something I would have no say in.  You are getting an

21   officer, so who am I to say no to the (indiscernible)?

22      Q.   Did that happen with you even when officers were

23   placed in limited duty status and assigned to finance?

24      A.   No.  In that case, it would normally be, we need

25   help in the travel section.  Can we speak to the medical

Jonathan Lewis Johnson - November 30, 2023

1    section?  And I would obviously always say yes if you

2    were in need of personnel.  So I would be approached by

3    someone, or someone's going to retire soon.  Obviously,

4    they might know that because of the City's hiring

5    policy, it's going to take long.  I have someone who is

6    working at this location that would like to come to

7    finance.

8           Finance also, for lack of a better term,

9    employed a cadre of maternity officers.  So an officer

10   that wasn't limited duty, but obviously because of their

11   pregnancy, they obviously should not be doing police

12   work.  So they may be doing some payroll clerk type

13   function within the Department of Finance.

14   Q.   So from what we've reviewed so far, the employer

15   has the discretion to fill to 20 percent of the vacant

16   assignments, correct?

17   A.   Yeah, but again, it's two different things.  The

18   example I was giving, those really aren't part of the 20

19   percent.  That's civilian-type functions.

20          In my opinion, the 20 percent rule or the 50

21   percent rule as it relates to aviation units, those are

22   sworn functions.

23   Q.   We've already established, though, that limited

24   duty officers are still sworn officers, correct?

25   A.   Yes, they are.  But I was just giving you the

93

1    caveat, though, they're still sworn officers, but that

2    group that talks about the 20 percent and the 50

3    percent, those are -- whenever there's a mention of a

4    D-1 and a D-2(a) and a D-2 position, you're generally

5    discussing full duty sworn officer positions versus

6    finance division or administrative/clerk. (Indiscernible).

7        Q.   Just to be clear, though, nothing in the

8    documents we reviewed made that distinction, correct?

9    That's just your understanding?

10       A.   That is correct.  It doesn't really -- I don't

11   think the one -- and I forget the number, whether that

12   was 23.9 or 18.4, that doesn't really discuss anything

13   about civilian positions.

14           But, again, when it discusses the function

15   itself of a D-1 or a D-2 or D-2(a) position, they're

16   usually discussing a sworn or a full duty sworn

17   function.

18       Q.   And then the employer also has discretion to

19   fill a vacancy if 72 hours has passed since they post a

20   bid and nobody applies for it, correct?

21       A.   That is my recollection of that verse or

22   chapter, but (indiscernible).

23       Q.   And then the employer also has discretion to

24   fill a position if they go through the process we went

25   over in Section 23.9 of the CBA, and none of the bidders

Jonathan Lewis Johnson - November 30, 2023

1    were qualified, correct?

2       A.    Along with the -- that would also be, though,

3    with the approval of -- again, I'm talking about sworn

4    positions.  There's usually a meeting of the bureau, and

5    when I say bureau, there's what's called, sometimes

6    referred to the detective division, Bureau of Patrol,

7    Bureau of Detectives, Bureau of Administrative Services,

8    and there may be some discussions of, I have X-number of

9    available spots, but what spots can be filled?

10       And then a determination is made whether all of

11   those spots can be filled.  Because, for example, the

12   Department may want to push more officers to spots that

13   are within a high crime district versus them putting

14   them in 016, which is on the Northwest Side of Chicago,

15   which has less crime or less violent crime.

16       So there's -- everything isn't as cut and dry as

17   what the contract says is basically what I'm trying to

18   say.

19       MS. ABRAHAM:  Eva, are you getting that full

20   answer there?  Because sometimes for me, it's a little

21   muffled.  I just want to make sure the transcript's

22   going to --

23       THE COURT REPORTER:  Yeah, it is a little

24   muffled.  If you can just speak up a little bit, sir.

25   Thank you.

Jonathan Lewis Johnson - November 30, 2023

95

1          MS. ABRAHAM:  Did you catch that last answer?

2          THE COURT REPORTER:  Yes, I have it.

3          MS. ABRAHAM:  Okay.

4     BY MS. ABRAHAM:

5       Q.   Would you agree, Mr. Johnson, that these

6     discretionary powers are exceptions to the general

7     bidding process?

8          MR. SANTELL:  Objection to form.

9          You can answer if you can.

10         THE WITNESS:  Are they exceptions or are they

11    parts of the process or the generally accepted parts of

12    the process?  I don't know if I can say that it's

13    outside of the realm of it because this is -- it's the

14    practice.

15    BY MS. ABRAHAM:

16      Q.   Right.  But if the employer is using their

17    discretion to fill a vacancy, they're not going through

18    the bidding process, correct?  They're using their

19    discretion, correct?

20      A.   Yes.

21      Q.   And is this something that these process -- the

22    ones that we went through, 23.8 and 23.9, is this

23    something widely known amongst CPD employees?

24         MR. SANTELL:  Objection to form.

25         You can answer if you can.

Jonathan Lewis Johnson - November 30, 2023

96

1         THE WITNESS:  Yes.  I don't know, because

2    obviously there's 13,500 plus police officers, or at

3    least police position.  I don't know if every police

4    officer is aware of it.  Obviously, it is the

5    responsibility of all officers to read and know their

6    contract and General Orders.  Obviously, in practice,

7    everyone does not look at them nor review them.

8         But if someone wants to bid on a position, they

9    are probably speaking to someone else within the unit of

10   assignment or someone somewhere saying, hey, I'd like to

11   bid on a position in patrol.  How do I go from the 5th

12   District to the 16th District?  What do I have to do?

13   Q.   Is it also known amongst officers that they

14   could request the employer to use their discretion to

15   assign them to a vacancy?

16        MR. SANTELL:  Objection to form.

17        You can answer if you can.

18        THE WITNESS:  Yeah, I'm not for sure if everyone

19   would know about employment (indiscernible).  Most

20   persons dealing with Union or collective bargaining

21   matters might, but the rank and file officer probably is

22   unaware of that.

23   BY MS. ABRAHAM:

24   Q.   Are you aware of, in your experience in your

25   time at CPD, of officers making requests to the employer

Jonathan Lewis Johnson - November 30, 2023

97

1    that the employer use their discretion to assign them to

2    a vacancy?

3        A.    That I'm not aware of -- if someone said, hey,

4    can I be part of the (indiscernible).  But obviously

5    there might be, I have a friend that usually -- let's

6    say the aviation units are usually the older officers

7    that are there.  All of a sudden, someone who was 28

8    appears out there.  I'm like, how did you get here?  And

9    they may smile and say, you know, it's discretion.  So,

10   but I would say everyone is now aware of those rules.

11       Q.    Could an officer be detailed or assigned to the

12   finance division as a reasonable accommodation for a

13   disability?

14           MR. SANTELL:  Objection to form.

15           You can answer if you can.

16           THE WITNESS:  Yeah, detailing is something like

17   out of the process.  So, for example, I mentioned where

18   someone would say, you're going to get officer so and

19   so.  They would detail them from the district to my

20   unit.  Or they might not -- they might still show on the

21   books as part of the unit.  But at some point in time,

22   there would be a cleanup process to put people where

23   they really are.

24           Because, for example, if you were to look at the

25   City's operating budget and look at the finance division,

Jonathan Lewis Johnson - November 30, 2023

98

1    I don't think it would show any police officers assigned

2    there.  But within the police department's own operating

3    system, that may show them assigned there.

4    BY MS. ABRAHAM:

5        Q.    Okay.  Could an officer be assigned -- whether

6    or not they're officially detailed or not, could an

7    officer be assigned to the finance division as a part of

8    a reasonable accommodation for their disability?

9        A.    In theory, they probably could, if there was

10   something, again, as I mentioned -- and I don't know the

11   full process, because if -- I don't know if Keisha (ph.)

12   was there.  If an officer was pregnant, so in this

13   person's case, you had been pregnant multiple times

14   before, I'm about to have a baby.  Can I go back to the

15   finance division?

16            So then that person would, during the time of

17   them being pregnant and then having the infant and being

18   able to go back to work, they would then work in the

19   finance division until the time that they could

20   medically return to their full duty position.

21       Q.    An officer --

22       A.    I see this confused look on your face,

23   Ms. Walsh.  Did you not hear what I said?

24            MS. ABRAHAM:  Did you catch that answer, Eva?

25            THE COURT REPORTER:  The last part was really

Jonathan Lewis Johnson - November 30, 2023

99

1   muffled.

2          THE WITNESS:  Was really what?

3          THE COURT REPORTER:  Your last part of that

4   answer was really muffled.

5          THE WITNESS:  Okay.  What did I say?

6          I think I was basically saying that an officer

7   that may have been, you know, pregnant before, upon

8   becoming pregnant again, might request to return to the

9   finance division for the time that they are pregnant,

10  having the child until it's deemed that they are

11  medically able to return to their full duty status.

12  BY MS. ABRAHAM:

13     Q.   When Officer Arroyo first arrived at the finance

14  division, she was in limited duty status, correct?

15     A.   She was not a full duty officer.  Now, the type

16  of limited duty status, I'm not for sure whether that

17  was IOD or non-IOD.

18     Q.   Prior to this, when you were interim HR

19  director, do you recall whether you came across any of

20  Officer Arroyo's IOD claims?

21     A.   No.

22     Q.   If she had made an IOD claim from, let's say, I

23  think you said October 2016 through May 2017, when you

24  were interim director, would you have been made aware of

25  her claim throughout the course of your role?

Jonathan Lewis Johnson - November 30, 2023

1     A.    Probably not, because receiving the individual

2  IOD claims of Department members was not something that

3  I would have reviewed.  It would have gone through the

4  medical section.

5     Q.    You oversaw the medical section during that

6  timeframe, though, correct?

7     A.    That is correct.

8     Q.    Would you have been made aware of her IOD claim?

9  So maybe not necessarily it wouldn't have come directly

10  to you, but would the medical services section have made

11  you aware of her claim?

12     A.    I can't think of any instance that they came to

13  me and said, this person is making an IOD claim.

14     Q.    Would you have seen or reviewed their

15  recommendation regarding her IOD claim?

16     A.    I never received any of their recommendations or

17  disputes regarding an IOD claim.  And, again, you have

18  to remember that at that time, I was serving in multiple

19  functions between DHR and finance and general support,

20  and then also logistics as well.  My time was spread

21  out.

22     Q.    Was it your understanding that at the time she

23  was working in the finance division, that Officer Arroyo

24  had a disability?

25     A.    I can't say whether she had a disability.  She

Jonathan Lewis Johnson - November 30, 2023

101

1  obviously had a limited status, because, again, I

2  reviewed them as two separate things.  You're either IOD

3  or non-IOD.  Then once you've exceeded the threshold of

4  whatever that status required, then you go on

5  disability.

6     Q.   At a certain point, was Officer Arroyo told that

7  she could no longer hold the limited duty position?

8     A.   I believe that everyone that was in the finance

9  division had what I referred to earlier as that time

10 limit of a number of days that -- you know, so we would

11 get something from the medical section saying, just to

12 let you know, Officer Arroyo is at day 600, so she has

13 whatever that top number is, days left.

14        And then whether it's Officer Arroyo or anyone

15 else, they would either have to get recertified in some

16 way to go beyond that time period or they would have to

17 go on disability or whatever type of disability they

18 qualify for.

19    Q.   So if the person reaches the maximum amount of

20 days that they could hold a limited duty status, they

21 could potentially go back to the medical services

22 section and get recertified and then extend their

23 limited duty status?  Am I correctly understanding you?

24    A.   To make sure I'm saying this correctly, there

25 would have to be some reason why either you could not go

102

1    back to work or whether you were fit to return to work.

2    So the issue is, were you fit to go back to the street?

3            But again, there was a big push on the other

4    side to -- instead of having someone on pension or being

5    paid by the pension fund, to try to get them to do

6    something.  What can they do?  And you were involved in

7    the medical section.  There were a handful of times that

8    I had to attend pension board meetings in terms of are

9    there functions that we have available for them to do?

10           So there's kind of a whole process, and then

11   also if there's competing medical opinions from the

12   individual doctor and then from the medical section.

13       Q.   Okay.  I just want to make sure, though, that my

14   question was answered, which is, if an officer reaches

15   that maximum number of days that you were referring to,

16   can they go back to the medical services section and get

17   recertified to basically start that count again, the

18   clock again?

19       A.   Yes.  Now what it would entail to do that, that

20   I can't specifically speak to.  But, for example, it's

21   kind of the example I gave, hey, the medical section

22   says you've got 32 days left.  You need to work with

23   them to -- because the issue is once they hit that magic

24   number, then they had to go -- had to go home, unless

25   there was some reason.

Jonathan Lewis Johnson - November 30, 2023

1      Now what that reason was, I'm not -- I can't

2  really say what allowed them to exceed that number of

3  days, if they ever allowed someone to exceed those days.

4      Q.   Are you aware of anyone that was allowed to

5  exceed those number of days by going back and getting

6  recertified or taking whatever other steps necessary?

7      A.   Vaguely.  And I can't remember the individual's

8  name, but this person had a lot of things wrong with

9  them.  But there would be -- you know, I'd get a call,

10  hey, I'm at day -- in two days, I'm going to be -- I

11  can't ask to leave the finance division.  You need to

12  work it out with the medical section, and then the

13  decision will be made what they had to do or I'm sorry,

14  you have to go back on disability.

15      But then they may go on disability and then

16  within a month or two, they may return.  Now the

17  specific reasons of the return, I'm not specifically

18  speaking, because again, you're getting into probably

19  individual medical issues and stuff like that.

20      So obviously those things wouldn't be

21  specifically discussed.  So I might know you're a

22  limited duty officer, but I might know why you're a

23  limited duty officer.

24      Q.   Was Officer Arroyo told she couldn't keep her

25  limited duty status because she was running out of the

104

1    days, the number of days that she could hold that

2    status?

3        A.   I'm speaking globally.  Again, as being part of

4    the finance division, my guess is she would have or the

5    finance division would have been notified of, here are

6    the number of days she has left.  I don't -- her case in

7    particular, I don't recall specifically, especially at

8    the time that I already left there.

9        Q.   Do you recall whether Officer Arroyo made the

10   request to stay in the finance department?

11       A.   I do not recall.

12       Q.   Do you know if she made a request to continue

13   on, on a limited duty assignment?

14       A.   Again, I do not recall that.

15       Q.   Did you talk about her situation or her case

16   with any of your subordinates?

17       A.   Again, I have to say, it's been a number of

18   years.  I don't recall.  If there was a discussion, it

19   probably would have been between Ms. Lee and the

20   assistant director, Michele James, would have also

21   brought it to me that, again, speaking globally, for any

22   limited duty officer, X-person has X-number of days.

23            But essentially, if someone was going to reach

24   that threshold, there would be nothing that I could do

25   or intervene with to extend it.

1    Q.   What was going to happen with her position, the

2 position she was filling in the finance division?

3    A.   That work would have to be assumed by other

4 persons.

5    Q.   Do you recall who assumed the position after

6 Officer Arroyo left it?

7    A.   Unfortunately, I don't recall the date that

8 Officer Arroyo left it.

9    Q.   If I said sometime in November of 2019 to

10 January of 2020, would that ring a bell?

11    A.   Unfortunately, I left the police department and

12 went to the Department of Aviation September 15th of '19.

13    Q.   Of 2019, okay.

14    A.   Yes.

15    Q.   Do you recall having any conversations with

16 Officer Arroyo about her limited duty status?

17    A.   Other than she being on limited duty, but I

18 don't recall any specific discussion with her.  Again,

19 most of my discussions with her, I don't want to call

20 them superficial, because, again, Officer Arroyo was a

21 very nice employee and I enjoyed working with her, but

22 it would normally be good morning, how are you doing,

23 that type of stuff.

24    Q.   At any point, are you aware if anyone in the

25 finance division contacted the City's disability liaison

Jonathan Lewis Johnson - November 30, 2023

106

1   regarding Officer Arroyo?

2       A.   No, I didn't.

3       Q.   Okay.  We're going to mark this next one Exhibit 6.

4            (Exhibit No. 6 was marked for identification.)

5   BY MS. ABRAHAM:

6       Q.   Can you see my screen?

7       A.   Yes.

8       Q.   Taking your attention to this email here.  That

9   appears to be from Michele James --

10      A.   Yes.

11      Q.   -- dated February 8, 2018.  Do you see that?

12      A.   I do.

13      Q.   Is this your email address here?  It's

14  John.Johnson?  It starts with that?

15      A.   Yes, that is mine.

16      Q.   @chicagopolice.org?

17      A.   Yes.

18      Q.   Do you recall this email?

19      A.   I do not.

20      Q.   Who's Barbara West?

21      A.   Barbara West would have been the chief of our

22  bureau.

23      Q.   Of your bureau?  I'm sorry, is that what you

24  said?

25      A.   Yes.

107

1    Q.    What does she oversee as chief of the bureau?

2    A.    Chief West would have oversaw essentially the

3    administrative arm of the Department.  So it would have

4    been, again, finance division, payroll, timekeeping,

5    human resources, records.  There are multiple sections

6    in the records division.

7          She would have also oversaw the other thing I

8    just saw before -- the general support division would

9    have also have been the -- kind of the print or mail

10   services sections.

11   Q.    Did she -- what is her position in relevance to

12   yours?  Do you report to her?  Does she report to you?

13   A.    No, no, no.  I would have reported to Chief West.

14   Q.    Okay.  And you'd mentioned earlier Michele James

15   is your assistant -- or was your assistant, correct?

16   A.    Correct.

17   Q.    And that Helen Lee was the direct supervisor for

18   Officer Arroyo, correct?

19   A.    Correct.  This was an email from Michele James.

20   You see the names Alexis White and Lori LaMantia, those

21   are -- and Christy George.  Those are all employees of

22   the City's Office of Budget and Management.

23         So what she's discussing in this email, needing

24   access to Sharepoint.  Sharepoint is the citywide

25   process of how information regarding travel is

Jonathan Lewis Johnson - November 30, 2023

108

1    transmitted from City department to the budget office.

2          So basically, they're asking the budget office

3    to provide access and training of Sharepoint for

4    Ms. Arroyo.

5    Q.   Did Barbara West raise any issues with Officer

6    Arroyo's assignment to the travel section?

7    A.   Not that I'm aware of.  Hold on.  She's got the

8    question mark -- why?

9    Q.   Do you recall any issues coming up around this

10   time regarding Officer Arroyo's assignment to the travel

11   section?

12   A.   Not necessarily Officer Arroyo, but I know Chief

13   West was very dogmatic in terms of officers being

14   assigned to the finance division, in terms of the

15   reasons why.

16         So my guess would have been -- and this is my

17   surmising -- she's probably asking, why are we asking

18   for a police officer to get access to Sharepoint?  And

19   so the response probably would have been, we're asking

20   for her access because she's been assigned to us to

21   fulfill whoever did that part of the travel

22   responsibility before.

23   Q.   Sharing with you what we'll mark as Exhibit 7.

24         (Exhibit No. 7 was marked for identification.)

25   BY MS. ABRAHAM:

Jonathan Lewis Johnson - November 30, 2023

1      Q.    Can you see my screen?

2      A.    Yes.

3      Q.    Do you recall having any conversations with

4   Ms. James about Ms. West's question here?

5      A.    I'm sure that she's making a justification as to

6   why we need Officer Arroyo assigned to the office

7   because of these other person's medical injuries,

8   whatever they are.

9      Q.    And here Ms. James indicates that -- well,

10  strike that.

11         Do you recall any discussions about Officer

12  Arroyo with Michele James?

13     A.    I know Ms. James would have had discussions, and

14  I do remember discussions that Helen needs help in the

15  travel section because one of the other officers was

16  kind of in and out on his medical status.  And so she

17  would have discussed specifically with me in terms of

18  Helen needs help.  And so that's probably why,

19  obviously, she eventually got Officer Arroyo.

20         Now, I don't remember the means of how we

21  received Officer Arroyo, but my guess is we would have

22  approached the medical section and said, we need someone

23  to do that.  And so then the medical section would have

24  sent them to us.  But, again, I know Chief West would

25  have been adamant that we not have any sworn duty

Jonathan Lewis Johnson - November 30, 2023

1   officers within the finance division.

2        Q.   We're going to mark this next one Exhibit 8.

3             (Exhibit No. 8 was marked for identification.)

4   BY MS. ABRAHAM:

5        Q.   Can you see my screen?

6        A.   Yes.

7        Q.   Do you recognize this email?

8        A.   It's been so long, I don't quite remember.

9        Q.   In June of 2018, did Ms. James inform you of

10  Officer Arroyo's cancer diagnosis?

11       A.   Per the email, it appears that she did.

12  Unfortunately, I don't recall the matter.

13       Q.   Okay.  Well, that was going to be my next

14  question, do you recall any conversations with Ms. James

15  about this?

16       A.   I'm sure that Michele James would have told me

17  that, you know, again, we're going to be short because I

18  do recall us receiving other limited duty officers to

19  work in the travel section probably around that time.

20       Q.   Who worked in the travel section?  Is that what

21  you said?

22       A.   Correct.

23       Q.   Are you aware of any other officers who were

24  assigned to the finance division because of a cancer

25  diagnosis?

111

1    A.   Again, I would know that they were a limited

2   duty officer, but I necessarily wouldn't know the

3   specifics of why they were limited duty officer.

4    Q.   But here Ms. James is telling you, at least in

5   Reyna's situation, she's being quite detailed with you,

6   correct?

7    A.   In her email, she is.  But, again, there were

8   six of them in finance.  I couldn't tell you why Damian

9   was there or Donna was there.  I know one person had a

10  bad hip.  There were a couple of others, one was, like,

11  in the procurement section.  I know she was limited

12  duty.

13       But I couldn't tell you what their -- unless

14  they shared with me their specific case, and even if

15  they did, so much time has passed, I have forgotten.  So

16  again, I don't doubt this email.  I just don't remember

17  the specifics of the discussion.

18   Q.   Okay.  We'll mark the next one Exhibit 9.

19       (Exhibit No. 9 was marked for identification.)

20  BY MS. ABRAHAM:

21   Q.   Can you see my screen?

22   A.   Yes.

23   Q.   Do you recognize this email here?  Let me just

24  scroll through the next page so you see the attachment

25  too.

Jonathan Lewis Johnson - November 30, 2023

112

1      A.    This is a screen print from the CLEAR system.

2   Someone scanned it.

3      Q.    What is this email telling you?

4      A.    So this would have meant that her status was

5   changed in the CLEAR system to full duty.  The CLEAR

6   system is a repository of -- it's basically the City's

7   operational management system.  So the CLEAR system will

8   have your information, your name, title, probably your

9   residency, next of kin, but also the assignment or where

10  your assignment is located.

11     Q.    Did you discuss this email with Ms. James before

12  she sent it to Officer Arroyo?

13     A.    I'm sorry, but I just don't recall.  I'm sure

14  Michele was a very efficient employee, so I'm sure she

15  probably would have discussed it.  Unfortunately, at

16  that time, you do have to remember that I was filled

17  with multiple responsibilities, you know, between

18  finance, administrative support, and I was still doing

19  most of these then.

20     Q.    Do you know why at this time, Officer Arroyo's

21  status indicated she was full duty?

22     A.    I do not know why it was changed, but my guess

23  is it would have had to been changed by the medical

24  section.

25     Q.    Is there any way to tell from this document when

Jonathan Lewis Johnson - November 30, 2023

113

1   that determination by the medical section was made?

2       A.    I don't see anything on there that denotes, like

3   when she went from limited duty to full duty, duty

4   status, and it just says full duty, but it doesn't --

5           The appointment date would have been her date

6   that she was appointed as a police officer, that's the

7   same as the seniority date, that would be the same

8   because you're in the same rank.  They may differ

9   because your appointment date was 16 of March, but maybe

10  the 1st of January of 2005 you became detective.  That

11  would be a different seniority date.

12          I see the detail date.  She, I guess, was

13  detailed to finance on 26 September.  Now it says date

14  modified 9 January 2018.  Now, modified to what, I guess

15  would be the question.  What was that modification?  Was

16  that modification from limited duty to full duty, or was

17  that modification something else in terms of her

18  assignment.

19      Q.    If she was detailed to the finance division

20  around September 26th, 2017, as this record indicates,

21  does that mean that's how long she's been on limited

22  duty status at this time?

23      A.    Not necessarily, because she could have been in

24  finance longer than even the detailed date.  So there

25  usually has to be a lot of cleanup done within the CLEAR

114

 1   system of people that are working somewhere, but their
 2   detail hasn't been changed.
 3          So Reyna could have still been assigned to the
 4   10th District, but not detailed to the finance division.
 5   But, at some point, someone would have said, hey, we
 6   need to know where the people are, so if they're not
 7   working in the 10th District -- the unit -- there will
 8   be a discrepancy with the unit saying, oh, we've got 200
 9   officers assigned to the 10th District.  I do have that,
10   but I've got 20 folks elsewhere that aren't here.  So
11   instead of me only having ten vacancies, I really have
12   30 vacancies.
13          So there would have been a push at some point to
14   clean up where people are.
15      Q.   And earlier -- and I don't want to put words in
16   your mouth, please tell me if this is incorrect -- but
17   earlier, I think I heard you say that it's possible for
18   a full duty officer to get assigned to the finance
19   division as well, if there was a reason for it, correct?
20      A.   Assign or detail.  I might have used that term
21   loosely because assignments would be physically taking
22   them out of the district that they were and putting them
23   within the finance.  Maybe they left them in their
24   district, but they had them working in finance.
25      Q.   I'm looking at the bottom of this record as

115

1    well.  It says, "Bid management data, District 010,

2    Watch 2, bid, management, B, seniority note number 028."

3    Do you see that?

4        A.    Yes, I do.

5        Q.    What does that signify on this record?

6        A.    That would signify to me that that's what she

7    did.  So she was working on the second watch in the 10th

8    District.

9            So based on someone's seniority, let's just say

10   I'm a younger person coming in.  You get an assignment

11   on the third watch or whatever watch is late at night,

12   as time goes on and people bid out of that unit or bid

13   for better assignments, based on your seniority, you

14   could bid into a better assignment -- whatever you might

15   deem a better assignment.

16       Q.    So does this -- that record under bid management

17   data indicate that she made a bid for a management

18   position at District 010 on the second watch?

19           MR. SANTELL:  Objection to form.

20           You can answer if you can.

21           THE WITNESS:  I would be surmising based on how

22   that reads, that she had a bid to the second watch, that

23   it was a management bid and not a, you know, based fully

24   on her seniority.

25   BY MS. ABRAHAM:

116

1    Q.   Does this tell you one way or the other whether

2  she got the bid or not, or does this just tell you that

3  she applied for it?

4    A.   Well, this is bid management, and that speaks to

5  what watch -- obviously, and I'm assuming you understand

6  what the watch process is in terms of when the hours

7  that they're working.  At one point in time, she was

8  working the second watch in the 5th District.

9    Q.   How did this information come to Ms. James's

10  attention if you know?

11    A.   Someone obviously, probably would have told her

12  that, hey, you've got a full duty person in finance.  We

13  want them back in the 10th District.  And so then

14  discussion would be, hey, I'm not full duty.

15        So that's through some notification whether that

16  person is (indiscernible) notified from someone from HR,

17  but obviously at some point, even if it came from Chief

18  West saying you've got a full duty officer working in

19  finance, and then it would have been probably to

20  Michele's surprise that, hey, you're showing as a full

21  duty position.  Unfortunately, she was obviously

22  convalescent at that time.

23        And, again, I don't see the email prior to this.

24  I'm surmising how this would have happened because,

25  again, I know the doctors out there, but Chief West

117

1    would have been very dogmatic if I had a full duty

2    person working in finance.  I'd need to get rid of them.

3    Getting rid of them means basically them going back to

4    district law.

5        Q.   Can you say that last part again?  I didn't

6    quite catch it.

7        A.   Basically meaning they'd not get rid of them,

8    but making sure that person goes back to district law or

9    what's known as the patrol unit.

10       Q.   Do you recall having any conversations with

11   Ms. James or Ms. West or Ms. Lee around this time about

12   Officer Arroyo's full duty status?

13       A.   I don't recall, but again, I'm sure if Ms. James

14   was sending her an email, she would have talked to me.

15   Ms. James was very efficient in notifying me of stuff

16   that went on.

17       Q.   Who enters this information in a person's CLEAR

18   record regarding their duty status?

19            MR. SANTELL:  Objection to form.

20            You can answer if you can.

21            THE WITNESS:  There would be probably a couple

22   of different means.  It depends on the level of access.

23   One would be human resources section.

24            Obviously, if someone's seniority date, status,

25   title, address, assignment, if all those things need to

Jonathan Lewis Johnson - November 30, 2023

118

1    be changed, HR is the primary place.

2            Now, would the unit have certain fields that

3    they are able to access and change?  I don't recall the

4    security level of unit of assignments versus HR.  HR

5    would probably be the super user in that they could

6    change everything.  And I'm trying to recall the process

7    for changing that.

8            Obviously, if there was an address change, a

9    member would have to submit some kind of notification

10   that I'm moving from address-X to address-Y, and that

11   would have to be signed by probably the director of HR,

12   because I know there were many of those that I had to

13   sign off on.  I don't remember all of them because there

14   were thousands of them, but I guess there would be some

15   access that could make -- I don't know if, let's say,

16   finance would have the ability to change someone's duty

17   status, because I don't think that's within financial

18   purview.

19   BY MS. ABRAHAM:

20       Q.   Can an officer change their duty status

21   themselves in the CLEAR system?

22       A.   I think the officers would only be able to view

23   only.  Now I know there was a push to try to decrease

24   the volume of paper coming into the Department.  So

25   could an officer go in and change their address?  That

Jonathan Lewis Johnson - November 30, 2023

1    may have been done at a certain point, because, again,

2    there was just daily so many pieces of paper that were

3    coming in.

4            So I know there was a push for non-secure

5    things -- you wouldn't necessarily want an officer

6    changing their status or their appointment date.  They

7    could view them so that in the event -- because the

8    security date, appointment date goes into the whole

9    bidding process.  And if that's the law -- so I would,

10   and I do recall receiving complaints from, let's say,

11   the sergeant at sergeant's Union.  Hey, you haven't

12   changed Don Johnson's seniority date from X to Y, which

13   affects his ability to bid.

14           But the issue would be we couldn't change

15   anything until after everything was documented or

16   approved.  So there may be some lag time.

17           So they could see it, but I don't know

18   necessarily what they can change.  You're making me

19   relive my whole police experience.

20   Q.   I'm sorry, can you say that again?

21   A.   You're making me relive my whole police

22   department experience.  Oh, my God.

23   Q.   Sorry.  Okay.  I'm going to show you what we'll

24   mark as Exhibit 10.

25           (Exhibit No. 10 was marked for identification.)

Jonathan Lewis Johnson - November 30, 2023

120

1    BY MS. ABRAHAM:

2        Q.    Okay.  Can you see my screen?

3        A.    Yes.

4        Q.    Let me just scroll through to the bottom here.

5    So the bottom of this shows that email that we just

6    reviewed from Ms. James, right?

7        A.    Okay.  So full duty status.

8        Q.    Here, Officer Arroyo appears to tell Ms. James

9    that this is incorrect and that she's provided

10   documentation to the medical section regarding her

11   status, correct?

12       A.    Yes, she's saying them, but I'm assuming them

13   would be the medical section, because, again, they would

14   more than likely be the ones changing that, not the

15   finance division.

16       Q.    Did anyone discuss Reyna's response with you

17   around this time?

18       A.    Again, I don't recall, but again, Ms. James

19   would have probably notified me that, hey, Reyna says

20   that that's incorrect.

21       Q.    Would Ms. James also notify you that she

22   expected to return in September in limited duty status?

23       A.    She probably would have.

24       Q.    At this time, she's on leave, is that correct?

25       A.    I thought that from the previous email, she was

121

1    convalescent from the search (indiscernible).

2        Q.   So when she would have returned in September,

3    did that restart the clock as far as how many limited

4    duty days she would have had available to her?

5        A.   Well --

6            MR. SANTELL:  Objection to form.

7            You can answer if you can.

8            THE WITNESS:  Okay.  It sounds like the cancer

9    event was different than her limited duty status.  So,

10   again, as the one document or the FOP contract said that

11   for each occurrence, you get 365 days over a two-year

12   period.  So the occurrence of cancer would be different

13   from whatever called for limited duty.

14           But once she came back to work, if she left work

15   at a certain (indiscernible) -- if she left work with

16   450 days, that clock would start up as soon as she came

17   back.  It's counting towards the total number of days.

18   BY MS. ABRAHAM:

19       Q.   Was her placement in finance for limited -- on

20   limited duty status related to an injury at work?

21       A.   I don't know specifically what -- whether it was

22   an IOD or non-IOD injury.

23       Q.   Let's say it was an IOD injury, there would not

24   be a time limitation as to how many days she could serve

25   in limited duty position, correct?

Jonathan Lewis Johnson - November 30, 2023

122

1      MR. SANTELL:  Objection to form.

2      You can answer if you can.

3      THE WITNESS:  In that particular case, yes.  If

4  it was an IOD injury where someone would not be able.  I

5  believe that the use of the number of days limitations

6  are for non-IOD, limited use.

7  BY MS. ABRAHAM:

8      Q.   Do you recall talking about Officer Arroyo's

9  duty status or her return to work with anyone else

10  around this time?

11     A.   Not that I recall.

12     Q.   Do you recall having conversations with Ms. West

13  about it?

14     A.   Again, if I did, it would have been -- now, I do

15  remember having multiple conversations with Ms. West in

16  terms of the number of employees I had in finance, along

17  with the number of employees that I had of the

18  retirement age and the number of operational vacancies

19  that I had, we were going to be in trouble in terms of

20  completing our tasks and responsibilities, especially at

21  that time with the Department viewing that a

22  finance-related function was as important as a patrol

23  position.

24     Q.   Do you recall having conversations with Ms. West

25  about Officer Arroyo?

123

1      A.    Not that I recall.

2      Q.    We'll mark this next one Exhibit 11.

3            (Exhibit No. 11 was marked for identification.)

4    BY MS. ABRAHAM:

5      Q.    Can you see my screen?

6      A.    Yes.

7      Q.    And the bottom of this is the same email we

8    already reviewed.  Here I just wanted to confirm that

9    Ms. James forwarded this email exchange between her and

10   Officer Arroyo to you and Ms. Lee.

11     A.    Okay.  Her email, yes, it does show that she was

12   showing it to me to make me aware.  Because, again, when

13   you had the response up from Chief West saying why,

14   obviously this would be -- and my guess, probably

15   something either for Ms. James or for me to follow up

16   with Chief West as saying, there's a mistake in the

17   CLEAR system for Officer Arroyo.  She is not full duty.

18     Q.    Can you say that last sentence again?  I'm

19   sorry.

20     A.    Yes.  If Ms. James sent this to me, which it

21   shows that she did, it would be for either Ms. James or

22   myself to go to speak with Chief West in terms of

23   responding to her inquiry as to why we're having a full

24   duty person in finance.

25     Q.    What is your understanding of what Officer

124

1    Arroyo is requesting here, if anything?

2            MR. SANTELL:  Objection to form.

3            You can answer if you can.

4            THE WITNESS:  I don't think she's requesting

5    anything.  I think she's clarifying what's in the CLEAR

6    system.  She's --

7    BY MS. ABRAHAM:

8        Q.   Do you recall -- yeah, sorry, go ahead.

9        A.   She's stating that she provided the proper

10   documentation to them and them being, I'm assuming, the

11   medical section.

12       Q.   Do you recall having any conversations with

13   anyone after receiving this email forwarded to you from

14   Ms. James?

15       A.   I'm sorry.  I'm just having a hard time

16   recalling a lot of miscellaneous discussions from that

17   time period, but I'm sure this is the -- well, Helen

18   would have probably also seen this and then Ms. James

19   would have discussed the matter with me verbally.  Hey,

20   I'm going to send you an email.  I got a response from

21   her.

22       Q.   Do you recall having any conversations with

23   Helen Lee about this situation when it arose?

24       A.   I'm sure Helen would have also spoken to me just

25   in regard of the standpoint of fear of potentially

125

1   losing something.  I don't remember, but I do recall

2   Helen having discussions with me, just regarding

3   assignments as it related to travel.  Number one, the

4   whole travel became a cumbersome responsibility

5   citywide, and because of the size of the police

6   department, it became difficult for just one person, or

7   even two people to handle.

8       Q.   I'm going to mark the next one Exhibit 12.

9            (Exhibit No. 12 was marked for identification.)

10  BY MS. ABRAHAM:

11      Q.   Can you see my screen?

12      A.   Yes.

13      Q.   And for the record, this is Arroyo.def 3468.

14  Just taking your attention to the top here.  She says to

15  Michelle, "John Johnson stated that it would be between

16  her doctor and medical section.  We, finance, cannot

17  extension on the qualification.  I have already emailed

18  Reyna that information.  Thank you."  Do you see that?

19      A.   Yes.

20      Q.   Do you recall talking to Ms. Lee about this

21  issue?  Now that you've seen this email, does it help

22  refresh your memory?

23      A.   Unfortunately, it does not.  And, again,

24  that's -- especially in October, I would have been

25  working on the Department's budget or preparing to go to

Jonathan Lewis Johnson - November 30, 2023

1    City Council.

2            So, but again, just because I don't remember

3    doesn't mean that it didn't happen.  And, again, I'm

4    sure Helen would have kept me abreast of what's going on

5    regarding her individual person, but that sounds like

6    something that I would say that any kind of extension

7    would have to be the purview of between her doctor and

8    the medical section, and not us.

9        Q.   And this is in response to an email from Officer

10   Arroyo indicating she's not able to return to work the

11   day she was expected to, correct?

12       A.   Yes.

13       Q.   What is your understanding of what Reyna was

14   asking for in her email to -- well, not directly to you

15   at this time -- it's a Ms. Latonya Smith and Michele

16   James.

17           MR. SANTELL:  Objection, calls for speculation.

18           You can answer if you can.

19           THE WITNESS:  Yeah, I don't recall who LaTonya

20   Smith is, but all police officers, even limited duty

21   officers, are required to qualify, and doing that

22   requires wearing certain types of equipment.  As

23   Ms. Arroyo is stating, obviously wearing the duty belt,

24   which carries a lot of ancillary things, cuffs, probably

25   mace, maybe that because of her injuries, she was not

127

1   able to do that.

2        So normally, if you're not able to qualify, I

3   can't remember specifically what the punishment is, but

4   you're required within a certain timeframe -- I believe

5   every year -- for all police officers to qualify on the

6   shooting range.

7        Q.   On the -- I'm sorry.  I didn't catch --

8        A.   The police department has a number of ranges

9   that officers are allowed to go to to qualify to shoot.

10       Q.   Do you recall anyone asking you about this email

11   or anyone telling you, talking to you about this email

12   from Reyna on October 1st, 2018?

13       A.   Again, I don't remember the specific email.

14   Even though I don't appear to be copied on here -- well,

15   she did -- I think the next message above, she did copy

16   me.  It looks like Reyna had concerns.  But, again, I'm

17   sure Ms. James would have spoken to me about it.

18       Q.   We're going to mark this next one as Exhibit 13.

19            (Exhibit No. 13 was marked for identification.)

20   BY MS. ABRAHAM:

21       Q.   Can you see my screen?

22       A.   Yes.

23       Q.   This is Arroyo.def 3633.  And it's an email from

24   Ms. Lee to you asking if she could discuss the matter

25   with you when you get in.  Do you see that?

Jonathan Lewis Johnson - November 30, 2023

128

1     A.    Yes, I do.

2     Q.    Does that help refresh your recollection as to

3  whether you spoke to Ms. Lee regarding this email from

4  Officer Arroyo?

5     A.    I'm sure -- I'm sorry.  I don't recall, but I

6  will not refute that Ms. Lee spoke to me about it, but

7  because of the matter of things that would have been

8  going on at this time.  I'm sure that on the basis of

9  what Reyna had sent, that Helen was probably concerned

10  that she wasn't going to be able to return to work or --

11  and, again, I have forgotten what the -- if someone

12  can't qualify to shoot, what happens?  I don't remember

13  specifically whether they have to send them home or they

14  put them in a non-pay status.  I don't recall.

15     Q.    I'll mark this next one Exhibit 14.

16          (Exhibit No. 14 was marked for identification.)

17  BY MS. ABRAHAM:

18     Q.    Can you see my email?  Can you see my screen?

19     A.    Yes, I can.

20     Q.    This is Arroyo.def 3469 to 3470.  So this email

21  chain starts with that same October 1st email we've

22  already seen from Reyna.

23     A.    Okay.

24     Q.    And then I was just scrolling to the first page

25  here, and I'm just looking at this email from Helen Lee

129

1    on October 1st at 9:48 p.m.  She tells Reyna, "Sorry I

2    did not get back to you, but Director Johnson said he

3    was going to contact you.  I'm uncertain of this type of

4    situation.  He did mention it would be between the

5    medical section and your doctor.  We will not be able to

6    extend your time out.  It would be best to speak with

7    you.  Praying for your speedy recovery."  Do you see

8    that?

9        A.   Yes, I do.

10       Q.   Do you recall talking to Officer Arroyo about

11   this issue when it first came up in October 2018?

12       A.   Again, I do not.  Because -- normally because of

13   the number of functions and responsibilities I would

14   have, I would have probably placed them back in the lap

15   of Ms. James or Ms. Lee.

16            Because of me contacting her directly, there

17   would be nothing more that I can say, than they would

18   say, so -- because even though I was no longer in HR, I

19   still had other multiple responsibilities, as well as,

20   again, at that time it would be understaffed in the

21   budget section.  So I would have said please call.

22       Q.   Here Reyna's saying she already took care of it

23   with the medical section, correct?

24       A.   I recall seeing an email where she did say that.

25       Q.   And she also said that in her initial email,

130

1  correct?  She said I called the medical section and

2  related the incident in hopes of getting an extension,

3  but she was told she had to speak with the finance

4  division, correct?

5     A.   Speak to -- I do see that she says that, but

6  that wouldn't make any sense, since we don't determine

7  someone's limited duty status or -- the medical section

8  keeps the records of what number of days you have used.

9  So I don't know why someone would have said that's for

10  us to give them an extension.

11     Q.   And just so I'm clear, this conversation is

12  about Reyna's return to work, not her duty status,

13  correct?

14     A.   It appears to be unable to return to work and

15  she's saying because she's not able to qualify to shoot.

16     Q.   Right.  So if she needed to stay out of work

17  longer, she would have to go through a different process

18  in order to get that time off approved as opposed to her

19  being in a limited duty versus full duty status?  Am I

20  understanding the process correctly?  That these are two

21  separate issues?

22     A.   Well, again, this is kind of causing me to have

23  to guess, so I want to qualify that because the issue is

24  if she can't qualify to shoot, the Department may very

25  well say, you can't return to work.

Jonathan Lewis Johnson - November 30, 2023

131

1          So then the issue is how long would it be for
2    her to get to a point where she can wear her duty belt
3    or whatever is required to do when you're qualifying to
4    shoot?  But, again, that's something where the finance
5    division couldn't intervene in, per se, because -- what
6    is the punishment?  And I use the word punishment for
7    someone who can't qualify to shoot.  Can they go back to
8    their limited duty status or do they -- or they can't go
9    back to their limited duty status until they qualify to
10   shoot?  I don't remember the specifics of that.
11       Q.   Okay.  We're going to mark this next one Exhibit
12   15.
13          (Exhibit No. 15 was marked for identification.)
14   BY MS. ABRAHAM:
15       Q.   Can you see my screen?
16       A.   I can.
17       Q.   Do you recognize this email?  This is Arroyo.def
18   3645.
19       A.   I don't recall having seen it.  But, again --
20       Q.   This is an email from Michele James to you, to
21   your email, correct?
22       A.   That is correct.
23       Q.   Okay.  And it's dated October 16, 2018?
24       A.   That is correct.
25       Q.   And is this email, Ms. James is notifying you

132

1    that she completed her ethics training and that she is
2    expecting to return to work?
3        A.    Okay, yes.
4        Q.    What is your understanding here of what needed
5    to be resolved before Officer Arroyo could return?
6            MR. SANTELL:  Objection, calls for speculation.
7            You can answer if you can.
8            THE WITNESS:  Yes.  Again, per some of the
9    previous emails, still goes back to that, you know,
10   qualifying or completing her annual weapons
11   requirements.
12           But still there may have been an issue of what
13   is she really?  Is she, per the CLEAR system that had
14   said that she was full duty versus her statement that
15   she was limited duty.  So, to me, that speaks to the
16   question of that status.
17       Q.    Am I correct in understanding here, based on
18   Ms. James's email, that regardless of whether she was
19   going to return as full duty or limited duty, that she
20   still needed to complete the ethics training and the
21   weapons requirements before returning?
22       A.    That is correct.
23       Q.    Is that because -- well, strike that.
24           Was Reyna trying to return to the finance
25   division?

133

1    A.    By the emails, I'm assuming that she would.

2    Because my guess is before he left, he was in the

3    finance.  And, again, the email from the Chief of why

4    would be -- and, again, because of the nature of the

5    travel section, it was an urgent issue for Helen and

6    Michelle to notify me that if we -- because we were

7    utilizing a lot or mostly all the travel section outside

8    of Helen Lee was limited duty officers.  There obviously

9    was always a concern if someone was going to be out or

10   losing their status or they were in the hospital.

11   Q.    Was somebody filling Reyna's position in the

12   travel section during this time?

13   A.    I don't remember specifically, but I know there

14   were, again, a number of officers that we were bringing

15   in to work in the travel section.

16   Q.    We're going to mark this next one Exhibit 16.

17        (Exhibit No. 16 was marked for identification.)

18   BY MS. ABRAHAM:

19   Q.    Can you see my screen?

20   A.    Yes.

21   Q.    Is this an email from Ms. James to you on

22   October 30th letting you know that Officer Arroyo was

23   returning to work on that Friday?

24   A.    Yes, it is.

25   Q.    Do you know what position she was returning to

Jonathan Lewis Johnson - November 30, 2023

134

1   at this time?

2       A.   My assumption would have been that she was

3   returning to her work with Ms. Lee.

4       Q.   Was she returning in a limited duty status?

5       A.   That -- from this, I don't know.  Because there

6   could be an instance, as I mentioned, that someone could

7   be a full duty officer in finance.  It seems like with

8   Ms. Arroyo that the issue was, what is she really?  Is

9   she full duty or is she limited?

10      Q.   We'll mark this next one Exhibit 17.

11          (Exhibit No. 17 was marked for identification.)

12  BY MS. ABRAHAM:

13      Q.   Can you see my screen?

14      A.   Yes.

15      Q.   For the record, this is Arroyo.def 3301.  Do you

16  recognize this email?

17      A.   I do not.

18      Q.   Do you want to take a moment to read it?

19      A.   Okay.

20      Q.   Do you recall this email?

21      A.   I don't, but as I stated earlier, that we would

22  get some type of notification of, like in this case,

23  that Officer Arroyo is at 686 days and at that

24  threshold, 730, meaning you've got basically 40

25  something days or whatever, but she's reaching the

135

1  threshold.  And this email speaks to there being a

2  discrepancy of this being an old injury or new injury,

3  because that would affect the number of dates or days

4  that are on there.

5      Q.   How did it come to your attention at this time

6  that Officer Arroyo needed to -- that she had used 686

7  days and she needed to reach out to Ms. West?

8      A.   Because she's (indiscernible) here, then

9  Sergeant Christi Ford probably notified me.

10     Q.   Do you recall the conversation you had with

11  Officer Arroyo at this time, that she's referring to

12  here?

13     A.   I do not.

14     Q.   It says in the second paragraph here that her

15  2016 injury on duty was first classified as a new injury

16  and then the medical section changed it to a recurrence

17  of injury.  Do you recall that happening?

18     A.   I do not.

19     Q.   And then she mentions here that there was a

20  grievance resulting to three independent medical

21  examiners provided by the Chicago Police Medical Office.

22  Do you see that?

23     A.   Yes, I do.

24     Q.   As of January of 2019, is it fair to say you

25  were aware that Officer Arroyo had some kind of IOD

Jonathan Lewis Johnson - November 30, 2023

136

1   claim that was being grieved at that time?

2       A.   Whether it was being grieved, I don't know if

3   there was a grievance resulting.  So, based on this,

4   obviously there would be some type of grievance based on

5   old injury or new injury.

6       Q.   Would that issue have changed the amount of days

7   that she was entitled to in limited duty status?  The

8   issue of whether it was a new injury versus a

9   recurrence?

10      A.   Yes.  Because let's just say if it was an old

11  injury that occurred in 2015 versus a new injury in

12  2016, so there could be a difference of 300 days that

13  would be added to.  So instead of being at 686, she

14  might be at 386.

15      Q.   I don't recall seeing anything in the sections

16  of the collective bargaining agreement that we reviewed

17  that put a limit on the number of limited duty days that

18  an IOD worker could have, do you?

19      A.   Not in what we looked at.  But that's where you

20  come into a discussion of there's the contract, there's

21  also general directives or operating procedures, or

22  maybe there is a side letter somewhere agreeing to that

23  threshold number of days.

24      Q.   And then just going back to that section, the

25  Article 18 that we had reviewed.  Here, under limited

Jonathan Lewis Johnson - November 30, 2023

137

1   duty IOD, it said -- this is Section 18.3.  It says,

2   "Officers injured in the line of duty who were certified

3   by the medical services section as being able to perform

4   limited duty assignments shall be given limited duty

5   assignments until they can perform regular duty

6   assignments or until they are mandatorily retired,

7   whichever occurs first."  Right?

8       A.   Yes.

9       Q.   So there isn't a limit of the number of days

10  that an officer on limited duty IOD can be on limited

11  duty, correct?  They can be there until they retire?

12          MR. SANTELL:  Objection to form.

13          You can answer.

14          THE WITNESS:  Yes.  Basically, then, if they

15  have a limit on the number of days, it would tell me

16  that she was a non-IOD.

17  BY MS. ABRAHAM:

18      Q.   So at some point, is it -- am I correct in

19  understanding that the medical services section first

20  classified her injury as a new injury and then a

21  recurrence of injury; and then at some point, non-IOD

22  altogether?  Am I understanding that correctly?

23          MR. SANTELL:  Objection to form.

24          You can answer if you can.

25          THE WITNESS:  The things that we looked at from

138

1  the report from CLEAR basically takes her from wherever

2  she was before to full duty status.  Now, what was that

3  before?  Was it limited duty IOD or limited duty

4  non-IOD?  That I can't say without seeing some

5  historical data from the CLEAR system.

6  BY MS. ABRAHAM:

7      Q.   The email that we were reviewing from Officer

8  Arroyo here, from January of 2019, says at first it was

9  classified as a new injury, and then the medical section

10  changed it to a recurrence of injury, correct?

11     A.   Yes.

12     Q.   Do you recall yourself, like, independently, as

13  to any of -- whether Officer Arroyo's injury was, how it

14  was categorized by the medical services section at any

15  point in time?  Do you recall anything about that?

16     A.   No, I do not recall whether it was IOD or

17  non-IOD.

18     Q.   In your experience, either as the director of

19  finance or even when you were interim HR director, are

20  you aware of the medical section changing

21  classifications in this manner?

22     A.   I mean, in terms of if they would have made a

23  change to someone's status, it would not have been

24  something they would have notified me about, unless

25  there was an issue.

Jonathan Lewis Johnson - November 30, 2023

139

1          Something that was -- you know, on a day-to-day
2    basis, as they would change someone's status, that would
3    be something they would not notify (indiscernible).
4       Q.   Well, are you aware in your experience and your
5    history at CPD, as either the HR director or finance
6    division director, are you aware of the med section
7    changing the classification of an officer in this
8    manner?
9       A.   Well, that would be part of their responsibility
10   or someone within human resources to change them from
11   full duty to IOD to non-IOD.
12      Q.   I guess I just want to be sure that you
13   understand the question I'm asking you right now,
14   though.  The question is, are you aware, in your
15   experience, did you ever observe that the medical
16   section started by classifying an injury as IOD as a new
17   IOD, and then changing that classification to a
18   recurrence and then changing that classification to
19   non-IOD?
20      A.   I guess I answered this somewhat difficultly
21   because that wouldn't have been something in my
22   responsibilities that I would have sat over someone's
23   shoulder and watched them changing their status.  That's
24   something through whatever assessment that they use to
25   determine that, that they would make that not requiring

140

1    my intervention in any way.

2        Q.   And I'm not asking necessarily that you were

3    part of that decision, but would you have, as the

4    director of a department with potentially employees

5    affected by these changes in classification, wouldn't

6    you be made aware of that?  Like, so and so was here on

7    limited duty and now they're not.

8        A.   Again, as the protocol mentioned earlier about

9    reaching the threshold number of days, yes, the medical

10   section would have probably said, hey, person-XYZ is at

11   this number.

12           So we would get something from the medical

13   section saying that -- whether they are, and again, 686

14   as I said, or -- and, again, I don't recall what the

15   threshold number was.  Let's say it was 735.  Hey, this

16   person's at 730.  They got to do something within the

17   next five days.  I would get something like that.

18       Q.   Do you recall ever getting anything along the

19   lines of this person had initially been classified as an

20   IOD limited duty, and now they're non-IOD limited duty?

21   So they have a limited number of days they can be in

22   this role, for example.

23       A.   I mean, obviously, there is the example of

24   Ms. Arroyo being changed to full duty and that being

25   brought to our attention, but I don't really recall

141

1  instances of that, like, happening routinely.

2  Q.   Okay.  We'll mark this next one Exhibit 18.

3         (Exhibit No. 18 was marked for identification.)

4  BY MS. ABRAHAM:

5  Q.   Can you see my screen?

6  A.   Yes, I can.

7  Q.   So this is, for the record, *Arroyo.def 3303.

8  And this half of this email we've already reviewed in

9  the previous exhibit.  So it's just really taking your

10 attention to Ms. Ford's response at the top of the page

11 here.  Do you see that?

12 A.   Yes.

13 Q.   You recognize this email?

14 A.   I do not, but obviously, my name is on there, so

15 I would have received it.

16 Q.   And again, at this time, you were aware that

17 Officer Arroyo had a grievance related to her IOD claim,

18 correct?

19 A.   Per this email, yes.

20 Q.   And, again, who is Christi Ford?

21 A.   Christi Ford, at this point, was a -- I'm sorry,

22 I said sergeant.  She was a lieutenant in the medical

23 services section.

24 Q.   Did you discuss anything with Ms. Ford around

25 this time?

142

1     A.   I do recall having discussions with Ms. Ford

2   multiple times regarding different medical section

3   issues, but this specific issue, I don't recall.  But I

4   do recall Supervisor Jones also discussing a number of

5   things with me, because, again, I had a number of

6   officers who were in the high threshold of the --

7   whatever amount of days was used of those days.

8          So they would -- both of them would have

9   approached me with that, hey, you've got someone that

10  (indiscernible).

11    Q.   Do you recall what you may have told Officer

12  Arroyo to talk to Christi Ford about?

13    A.   If there would have been a issue regarding the

14  discrepancy of days, then that would have been something

15  I would have directed her to because it's something that

16  I could not change.

17         I can only go by, in the medical section it says

18  only that you have X-number of days.  Ms. Arroyo may

19  have said to me, that's not true because this is a new

20  injury.  It should be Y-days.  Then I would have said,

21  then that's something you need to clear with the medical

22  team.

23    Q.   Is Ms. Ford, is she a doctor, to your knowledge?

24    A.   No, she's a lieutenant of police.

25    Q.   Do you know if Cherie Jones is a doctor?

Jonathan Lewis Johnson - November 30, 2023

143

1    A.   No, she was a civilian supervisor in the medical
2    section.
3    Q.   How long does it typically take, if you know,
4    for a grievance to resolve?
5    A.   I think depends on the specific issue, but it
6    could be months or it could be years.
7    Q.   What's the typical amount of time for a
8    grievance to be resolved?
9    A.   Again, I would think it would vary on the type
10   of grievance.  For example, I had suspended someone who
11   did not appear to work one day.  So within a matter of
12   months, I had to pay them back, but I knew there were
13   other -- like the erosion grievance that probably took
14   in excess of a year to come to an agreement between the
15   City or the Department and the individual affected.
16        So I think depending on the type of grievance,
17   my guess is something like this could be months versus
18   years, I would guess, but I would say I don't know
19   specifically.
20   Q.   Have you heard of it taking two and a half years
21   for a grievance like Officer Arroyo's to resolve?
22   A.   I would say that might, depending upon the
23   intricacy of the issue, would be the amount of time that
24   it would take to settle.  It's not uncommon to see some
25   grievances sitting out there for a long period of time

144

1   or to be unresolved for a long period of time.

2       Q.   In a case of a grievance that relates to an IOD

3   claim, is that usually because the officer claims that

4   their injury is related to their performance of their

5   duties and the medical services section determines that

6   it was not?

7       A.   I don't know if I could speak specifically to,

8   but that would be obviously part of the grieving

9   process.  The individual says, I appeared at work.  The

10  Department says, no, you weren't.

11      Q.   I'll mark this next one Exhibit 19.

12           (Exhibit No. 19 was marked for identification.)

13  BY MS. ABRAHAM:

14      Q.   Can you see my screen?

15      A.   Yes, I can.

16      Q.   Do you recognize this email?

17      A.   I do not.

18      Q.   Is this an email from Ms. James to you regarding

19  Officer Arroyo in June of '19?

20      A.   It is.

21      Q.   And here, does she indicate that she has

22  clearance for shoulder surgery?

23      A.   Yes, it does.

24      Q.   Did you discuss Officer Arroyo's surgery with

25  Ms. James at this time?

Jonathan Lewis Johnson - November 30, 2023

1     A.    Not that I recall.

2     Q.    What is your understanding of what required

3  Officer Arroyo to have shoulder surgery at this time?

4  Do you know?

5     A.    If it's saying that her physicians finally gave

6  clearance for the surgery, I'm assuming that that's been

7  cleared by the medical section to have the surgery.

8     Q.    If an officer was having shoulder surgery for

9  their own personal reasons, do they need clearance from

10  the medical section for the surgery?  In other words,

11  it's not IOD related, do they need clearance to have

12  shoulder surgery from the medical section?

13     A.    They would still have to report to the medical

14  section because they're not able to perform their

15  function.  And so there may be some discussion between

16  the individual's physicians saying you need this.  Does

17  the physician or whoever the medical section is using to

18  make an assessment, which I believe was Mercy, do they

19  concur with the primary care physicians or orthopedic

20  physician's decision to do the surgery?

21          So their work will have to be -- because, again,

22  if you're going to have a surgery or a shoulder

23  operation, and especially if it's your shooting arm, you

24  can't be qualified to discharge your firearm as well as

25  you can't perform your functions as a police officer.

146

1      Because, again, if you have a harmed shoulder
2  and someone tackles you now, now it becomes an injury on
3  duty issue.  So they would have to involve the medical
4  section in my opinion.
5      Q.    Based on the email we reviewed prior in Exhibit
6  18, Officer Arroyo talks about her injury in the context
7  of an IOD claim, correct?
8      A.    Well, again, it does discuss a number of days as
9  it relates to the injury, which would tell me that it's
10  non-IOD and not IOD.
11      Q.    Can you please read Officer Arroyo's entire
12  email and tell me if she's talking about herself, her
13  own injuries in the context of an IOD claim or not?
14          MR. SANTELL:  Objection to form.
15          You can answer if you can.
16          THE WITNESS:  It says two different things.  In
17  the first paragraph, it refers to limited duty days, and
18  in the second paragraph, she refers to her injury on
19  duty.  Because if you're referring to limited duty days,
20  to me, that denotes a non-IOD limited duty.
21          But then in the second paragraph, it discusses
22  injury on duty, which to me is different.
23  BY MS. ABRAHAM:
24      Q.    And she's also talking about a grievance related
25  to this, correct?

147

1    A.    Yes.  Well, the lawyers are meeting with the

2   Board on February 13th, so --

3    Q.    And then there was a grievance resulting to

4   three independent medical examiners, right?

5    A.    Okay.  So the grievance resulted -- so the

6   grievance would be -- what is it?  Is it a new injury or

7   an old injury?

8    Q.    Say that again.  I'm sorry.

9    A.    Basically, right, it refers to the three

10  independent medical examiners.  But, again, surmising

11  from what this says, is this a new injury or an old

12  injury?  But then on top of that, is this new injury an

13  IOD injury or limited duty?

14   Q.    So I'm looking at -- and I'm asking what

15  Reyna's -- what she's claiming her injuries are the

16  result of.  She says, "As stated to Director Johnson, my

17  2016 injury on duty was first classified as a new

18  injury.  Then the medical section changed it to

19  recurrence injury."  So based off of this sentence that

20  Reyna writes and the conversation with you that she's

21  referencing, is she talking about her injuries in the

22  context of her getting injured on duty or not?

23          MR. SANTELL:  Objection to form.

24          You can answer if you can.

25          THE WITNESS:  Yes.  But I also have to bring in

Jonathan Lewis Johnson - November 30, 2023

148

1    the first paragraph, where it's discussing the number of

2    days used.

3    BY MS. ABRAHAM:

4        Q.   Right.  And those number of days, if she was, in

5    fact, injured on duty, she shouldn't be given a

6    limitation on the number of days, correct?  Per the --

7        A.   That's why that tells me that it wasn't being

8    classified as an injury on duty, if she had a finite

9    number of days.

10       Q.   And she was grieving that issue, correct?

11       A.   It does appear that she was.

12       Q.   Okay.  Then in June of that year, she notifies

13   Ms. James and Ms. Lee that she was given clearance for

14   shoulder surgery, correct?

15       A.   Yes.

16       Q.   Is it your understanding that this shoulder

17   surgery was related to this injury that she was writing

18   to and talking to you about back in January of 2019?

19           MR. SANTELL:  Objection to form.

20           You can answer if you can.

21           THE WITNESS:  Yes.  That I don't know because it

22   doesn't say that what her injury on duty or what her

23   limited duty was.  And, again, because of medical

24   issues, I did not, because of HIPAA rules, go into

25   individual's medical concerns.

Jonathan Lewis Johnson - November 30, 2023

149

 1    BY MS. ABRAHAM:

 2        Q.   We'll mark this next one Exhibit 20.

 3             (Exhibit No. 20 was marked for identification.)

 4    BY MS. ABRAHAM:

 5        Q.   Can you see my screen?

 6        A.   Yes, I do.  Robert Landowski.  Thank you.  I

 7    forgot his name.

 8        Q.   Is that the person that replaced you as the

 9    finance --

10        A.   No, as the director of human resources.

11        Q.   Okay.  Do you know who replaced you as the

12    finance director?

13        A.   At the time that I left is when the police

14    department went through a major civilianization process.

15    So they were consolidating the finance units of CPD,

16    Fire, and OEMC.  And I can see the face of the person,

17    but I can't remember her name.  It was (indiscernible).

18        Q.   So the person that replaced you as the finance

19    director, was that somebody -- did the Department merge,

20    she said, with the Fire Department and another

21    department?

22        A.   Office of Emergency Management Communications.

23        Q.   So the finance division was no longer exclusive

24    to the Chicago Police Department after you left?

25        A.   At some point, let's see.  I left in September

Jonathan Lewis Johnson - November 30, 2023

1    of '19.  It was officially codified, I believe, in the

2    2020 budget, where it became Public Safety

3    Administration.  But the person that replaced me, that

4    filled my line came from OEMC.

5        Q.    What was Landowski doing before he took over as

6    human resources director?  Do you know?

7        A.    He was the human resources person -- I don't

8    know the specific title -- at the Chicago Public

9    Schools.

10       Q.    Do you recall whether anyone communicated with

11   you about this email string at this time?

12       A.    Unfortunately, I would have been gone at that

13   time.  I would have been, again, at the Department of

14   Aviation.

15       Q.    Looking at this top here, this email from

16   Sergeant Russell.  He says, "Our records show she was

17   taken off the medical role November 17, 2019."  This is

18   in reference to Officer Arroyo.  "After she used up all

19   of her allotted time, at that point, her options would

20   be, one, clear medical and return to full duty; two,

21   clear medical and return limited duty; three, be removed

22   from medical and contact HR for LOA and apply for

23   disability."  LOA is leave of absence.

24       A.    Correct.

25       Q.    And "Four, be removed from medical and contact

Jonathan Lewis Johnson - November 30, 2023

1  HR to initiate retire a resignation process."  Do you

2  see that?

3      A.   Yes, I do.

4      Q.   To your understanding, is Sergeant Russell here

5  correct?  Are these the four options at this point that

6  are available to Officer Arroyo?

7          MR. SANTELL:  Objection to form.

8          You can answer if you can.

9          THE WITNESS:  This would seem to be correct.

10 It's basically saying that if she clears medical, she

11 can become a full duty offer.  If she clears medical --

12 now, what is clearing medical specifically?  I can't

13 detail for you.  And then return to limited duty.

14         Obviously, the issue is she can apply for

15 disability or can she apply for pension.

16 BY MS. ABRAHAM:

17     Q.   So one of the options would have been her being

18 able to return to a limited duty assignment, correct?

19     A.   Did you say what are her options?

20     Q.   One of her options here, I'm seeing --

21 specifically number two, the second one listed --

22     A.   Yes.

23     Q.   -- would have involved her clearing a medical

24 and returning to a limited duty position?

25     A.   Correct.  Now, the only question I would have on

152

1   that -- how could you do that?  Depending on your

2   status, the whole 686 or 735 threshold affected it.

3       Q.    What are those numbers you just referred to, for

4   the layman?

5       A.    686 is the number from one of the previous

6   emails that you showed me, that when I notified her

7   that, hey, you're at 686.  735 is just a number that

8   I -- and, again, as I said before, I don't remember what

9   the threshold number was, but it was, I believe,

10  something in the 700s, that once you reach that -- and

11  let's just say, for lack of memory, 735 -- once you

12  reach that, you had to do either three or four.

13      Q.    Are you aware of whether when the finance

14  division was restructured in January of 2019 -- well,

15  strike that.

16          Was there any restructuring to the finance

17  division in around January of 2019?

18      A.    There were discussions at that time, if I can

19  pull up the mayoral calendar in my head -- because I

20  believe in June of '19, the person that was my boss

21  left, and then someone from OEMC came over, took her

22  spot within a matter of -- in July, I had interviewed

23  for the position at Department of Aviation.  I was gone

24  by September.  So discussions were ongoing at that

25  point.  So we knew that it was going to happen, just

Jonathan Lewis Johnson - November 30, 2023

153

1    structurally, it hadn't been done yet.

2        Q.    Okay.  Did the finance division oversee some --

3    accounts payable?

4        A.    Yes.

5        Q.    Okay.  And the travel section as well?

6        A.    Yes.

7        Q.    And tuition reimbursement?

8        A.    Yes.

9        Q.    And audit and travel advances?

10       A.    Yes -- or travel audits.

11       Q.    Did the division have vacancies or positions it

12   needed to fill in any of those sections?

13            MR. SANTELL:  Objection to form.

14            You can answer if you can.

15            THE WITNESS:  What specific -- I know we had

16   civilian vacancies, but part of the issue is where we

17   had vacancies -- remember I had mentioned earlier, I'd

18   said this morning, that where the travel section had

19   grown over time, that there were functions that, even

20   when we may have attempted to put positions in the

21   budget to expand upon it, those positions weren't

22   approved to be filled because you had kind of the

23   (indiscernible).

24            We had these positions, but the budget might

25   say, we can't give them to you because we know you're

Jonathan Lewis Johnson - November 30, 2023

154

1   using limited duty officers.  But on the other side is

2   where operations department may say, I don't want my

3   police officers doing travel.

4   BY MS. ABRAHAM:

5       Q.   So was there always a need for people in the

6   travel section because of that?

7       A.   The time that I was there, yes.

8       Q.   And were there civilian positions available in

9   the finance division that Officer Arroyo could have

10  filled then from January of 2019 until, say, now?

11          MR. SANTELL:  Objection to form.

12          You can answer if you can.

13          THE WITNESS:  As of now, I'm not for sure of the

14  full complement or budgeted position for the finance

15  division.  But speaking of the travel section, because

16  prior to me coming to police department, I also worked

17  for the Office of Budget Management, and I oversaw all

18  the public safety departments -- police, fire, OEMC, in

19  general, so I would have a lot of dealings with the

20  police department.

21          I knew their travel section was burdensome then,

22  and that's when they started pulling officers out of

23  travel to go to other civilianized or vacancies within

24  the Department to identify sworn officers who are doing

25  things to get them on the street.  But the travel

155

1    section was burdensome at the very least.

2        Q.    Okay.  And then we'll mark this one Exhibit 21.

3            (Exhibit No. 21 was marked for identification.)

4    BY MS. ABRAHAM:

5        Q.    Can you see my screen?

6        A.    Yes, I do.

7        Q.    I'll represent to you that this is the City's

8    responses to some requests for production of documents

9    that we had sent.  And I want to take your attention to

10   page 10 of the documents.  The City's response to our

11   requests, Number 15.  We had asked for all vacant

12   civilian positions available in the finance section of

13   CPD from January 8, 2019 to present.  Do you recall

14   vacancies around this time?

15       A.    I'm sure we had vacancies, but when I say we,

16   the finance section -- well, just the finance section

17   would be mixed with the finance area.  I don't recall

18   the specific one, but there probably were vacancies

19   available.

20       Q.    So I'm going to show you what the City had

21   provided to us in response to this.  And they provided

22   us posts throughout the City.  There were administrative

23   assistant -- 50 job announcements for Administrative

24   Assistant II.  Do you recall whether any of those

25   positions were within the finance division?

Jonathan Lewis Johnson - November 30, 2023

156

1      A.   I do not recall.

2      Q.   There were 56 job announcements for

3  Administrative Assistant III.  Do you recall if any of

4  those positions came out of the finance division?

5      A.   I do not recall.

6      Q.   And there are three job announcements for a

7  Clerk II position.  Do you know if any of those

8  positions came out of the finance division?

9      A.   Yeah, that's a lower-level position -- I believe

10  a grade six, so that would have been eliminated.

11      Q.   Say that last part again.  I'm sorry.

12      A.   I'm sorry.  I had my hands in front of my face.

13  That's a grade six position, so that was almost

14  basically knocked out of the budget or not even filled,

15  I should say, at the time of my return to the police

16  department.  So, no.

17      Q.   I see also nine job announcements for a Clerk III

18  position.  Do you know if any of those announcements

19  were for the finance division?

20      A.   Not in the finance section.  In the finance

21  division, it might have been.  That's, I believe, a

22  grade eight position.

23      Q.   Okay.

24      A.   The next one, Clerk IV, that might be a position

25  you might find in payroll, but I don't recall there

Jonathan Lewis Johnson - November 30, 2023

157

1    being -- in the finance position, there were more

2    specific titled positions like especially with the

3    director, administration, and even the folks who work in

4    accounts payable/accounts receivable, there were more

5    specific titles.

6          These titles that you've listed here outside of

7    help desk, technician, and timekeeper, are general

8    administrative titles that you find across the board in

9    every department.

10   Q.    The help desk tech position, is there a position

11   like that in the finance section?

12   A.    There was a help desk position created for the

13   implementation of a new time and attendance position --

14   time and attendance system.  It was kind of a technical

15   type title, but clearly it was someone that has a need

16   to have an IT background.

17   Q.    What about the timekeeper position?  It says

18   timekeeper CPD, three job announcements.  Is that in the

19   finance section?

20   A.    In the finance division, where, again, there's

21   the timekeeping section in the finance division, which

22   is where those positions lie.  Again, it is a

23   specialized title in that you must be very familiar with

24   the CPD contract and also FLSA requirements.

25   Q.    Okay.

158

1     A.    If I may ask a favor.  Can I have a few minutes
2     to kind of catch my wind and get some more water?
3     Q.    Sure.  I have, like, three more questions for
4     you, and then I expect to be done.  Do you mind if I ask
5     you those three questions first?  And then it'll be,
6     like, an even place to take a break for the City to, you
7     know -- is that okay?
8     A.    For you I will persevere.
9     Q.    We could take the break now, too, if you want.
10    I just wanted to let you know I'm really close to being
11    finished, so you might --
12    A.    Yes.
13    Q.    Okay.  Do you recall Officer Arroyo ever
14    directly working under you when you were director of
15    finance?
16    A.    Not that I recall.  Her office was somewhat near
17    mine, so there may have been -- especially when I had
18    my -- I had offices in HR, I had offices in finance, I
19    had offices in general support.  So I know persons
20    sometimes taking messages or maybe getting information
21    off of my phone that you need to call this person or you
22    need -- so there were different people who did that
23    because physically, I was in three different locations
24    in the building each day.  Who they used to take my
25    messages and stuff like that, because of the proximity

Jonathan Lewis Johnson - November 30, 2023

159

1   of her cube and because of the person who sat outside my

2   cube or was on medical or whatever.  She unfortunately

3   may have been nominated to answer this phone, things

4   like that.

5       Q.   You testified earlier that a recognized opening

6   is a vacancy for when there's a need identified in a

7   unit.  How are the needs -- what do you mean when you

8   say there's a need identified by a unit?

9       A.   I believe I was referring to in the travel

10  section, Helen Lee's position is budgeted.  There was

11  another position budgeted that I don't recall the title,

12  but in essence, we could have up -- excuse me -- we

13  could have upwards of four or five people doing the

14  various functions associated with travel, but I did not

15  have a budgeted position.

16      Q.   Okay.  And then last question for you.  Do you

17  agree or disagree with the understanding that Section

18  18.4 of the collective bargaining agreement that we

19  reviewed before -- and I can go back to if you want to

20  have it in front of you -- yeah, actually, let's just do

21  that, just for good measure.

22          Section 18.4 says that limited duty status can

23  be assigned to a recognized vacancy in Section 23.9.

24      A.   Okay.

25      Q.   Would you agree that Section 23.9 vacancies can

Jonathan Lewis Johnson - November 30, 2023

160

1    be filled by an officer who's in limited duty status for

2    18.4 here?

3         MR. SANTELL:  Objection to form.

4         You can answer.

5         THE WITNESS:  Well, if my memory is correct,

6    23.9, though, referring to openings as D-1, D-2, D-2(a)

7    positions.  And so when I see that as a reference, that

8    tells me those are, for the most part, positions that

9    are being filled by full duty personnel, lest there be a

10   handful of spots, let's say, in the canine unit where

11   someone is gathering timesheets or whatever or ANA

12   sheets.  But most of those assignments, again, full unit

13   duty assignments kind of tells me that these are

14   probably full duty assignments per se is what this is

15   referring to.

16   BY MS. ABRAHAM:

17     Q.   So you disagree, then, that Section 18.4 says

18   that a vacancy can be filled by a limited duty officer?

19     A.   Yes.  Just because of, what is the scope of the

20   function that needs to be filled?  And with them being a

21   limited duty officer, they would have certain

22   restrictions on what they could do.

23         Because even though they're still getting paid

24   as a police officer and receiving the benefits from

25   police officer, they are not functioning as a full duty

Jonathan Lewis Johnson - November 30, 2023

161

1    police officer.

2        Q.    What is it -- is there anything specific in this

3    section that causes you to believe that?  Or is that

4    just your understanding of, typically, the position --

5        A.    Can you go down a little bit further?

6        Q.    -- follow the process.  Sorry.

7        A.    I'm sorry.  I over spoke you.

8        Q.    That's okay.  Did you understand my question?

9        A.    Yes.  But could you go down a little further on

10   page 39?  Yes.  In this first paragraph, again, when I

11   see D-1, D-2.  D-2(a) position, that tells me that these

12   are full duty assignments because these are positions

13   that can only be filled by, shall I say, an able-bodied

14   officer.

15       Q.    Okay.  All right.  I have no other questions for

16   you, Mr. Johnson.  Thank you.

17            MS. ABRAHAM:  At this time we can take a break,

18   and after we get back from the break, the City may have

19   some questions.  Okay?

20            MR. SANTELL:  Yeah.  Let's do that.

21            Mr. Johnson, you can go get that drink of water

22   that you were talking about.  And why don't we reconvene

23   here in, let's say, what, 15, 20 minutes?  What's the

24   feeling?

25            THE WITNESS:  That'd be fine.

Jonathan Lewis Johnson - November 30, 2023

162

1           MR. SANTELL:  Do you prefer 15 or 20?

2           THE WITNESS:  Let's do 20 if you could.

3           MR. SANTELL:  Okay.  So 2:20 p.m. we can meet

4    back here.

5           MS. ABRAHAM:  All right, thank you.

6           MR. SANTELL:  Thank you, everyone.

7           THE COURT REPORTER:  Off the record, 2:01.

8           (Recess.)

9           THE COURT REPORTER:  Back on the record, 2:24.

10                      CROSS-EXAMINATION

11   BY MR. SANTELL:

12      Q.   Okay.  Mr. Johnson, thank you again for bearing

13   with us today.  I just have a couple of questions I want

14   to run through here quickly just to kind of clarify a

15   couple of things.

16      A.   Okay.

17      Q.   I know that in the beginning of the deposition,

18   you testified about when you started with CPD.  When was

19   that again?

20      A.   That was November 1st, 1994.

21      Q.   '94.  And when was it that you left CPD?

22      A.   I left CPD in August of 2000, and I went to the

23   Chicago Transit Authority.

24      Q.   Okay.  You went to the CTA?

25      A.   Yes.

Jonathan Lewis Johnson - November 30, 2023

163

1      Q.    Okay.

2      A.    As their manager of payroll examination and

3   compensation.

4      Q.    Perfect.  And when you were working in the

5   position that we've been talking about here today, when

6   you were with finance, when is it that you left that

7   position?

8      A.    My last day working would have been September

9   12th of 2019.

10      Q.    2019.  Okay.  Perfect.  Okay.  And when is it

11   that you went on your medical leave?

12      A.    Before I went on my leave, though, I have to

13   mention October 24th I went on the medical or sick with

14   pay, from that point until, I believe, it was March 24th

15   when I had exhausted my medical time.  And then for the

16   reasons of the pension or disability fund, that kicked

17   in on April 2nd of 2023.

18      Q.    Okay.  All right.  So you've been out since

19   April 2nd of 2023, basically.  Is that fair to say?

20      A.    I've been on a medical leave of absence since

21   that time.  But, physically, being off, I was admitted

22   to the hospital in October of '22.  October 24th of '22.

23      Q.    Of 2022.  Okay.  Perfect.  That's what I needed

24   to know.  And while you were working with Officer Arroyo

25   in finance, what was her title when she was working with

164

1    you in finance?

2        A.    I don't know if there was specifically a title

3    that she was performing, because, again, as I mentioned,

4    although we had need for vacancies for titles, they

5    weren't approved in the budget, so thereby we would use

6    limited duty officers.

7        Q.    Okay.  So then she would've still been

8    considered a police officer, is that right?

9        A.    She still would have been a police officer

10   working in the travel section.

11       Q.    Okay.

12       A.    Yes.  If you look in the page that had the CLEAR

13   system, it will still show that she is a 9161, also

14   referred to a D-1, which is a police officer.

15       Q.    Perfect.  I think that that's all I have.  Thank

16   you again, Mr. Johnson, for bearing with us here today,

17   but I don't think I've got anything else.

18            THE WITNESS:  If I may ask a question of

19   Ms. Abraham.

20            MS. ABRAHAM:  Oh, sure.

21            THE WITNESS:  If you can do me a favor, please

22   tell Mr. Arroyo I said hello.

23            MS. ABRAHAM:  I will do that for sure.  Thank

24   you so much.

25            THE WITNESS:  She was a wonderful employee when

Jonathan Lewis Johnson - November 30, 2023

165

1    I work with her.  She always asked me how I was doing

2    because I had multiple functions.  She would always ask

3    me if I had eaten.  So tell her I said thank you.  I

4    appreciate that very much.  If I listened to her, I

5    probably --

6             MS. ABRAHAM:  If she was here, she would have

7    reminded you to have something to eat.

8             THE WITNESS:  What's that?

9             MS. ABRAHAM:  I said, if she'd have been here,

10   she may have reminded you to eat something before your

11   blood sugar dropped too low.

12            THE WITNESS:  She would have made you take a

13   break earlier.

14            MS. ABRAHAM:  Okay.  Well, thank you so much.  I

15   don't have any other questions for you either.  And I

16   will relay that to Officer Arroyo.  Thank you.

17            THE WITNESS:  Please do.

18            THE COURT REPORTER:  Okay.  Off the record,

19   2:28.

20            (Proceedings concluded at 2:28 p.m.)

21

22

23

24

25

166

1                   C E R T I F I C A T I O N

2

3        I, Katherine Pasciak-Lenti, Certified Shorthand

4    Reporter for the State of Illinois, do hereby certify that

5    the foregoing is a correct transcript from the official

6    proceedings in the above-entitled matter.

7        I further certify that I am not related to nor an

8    employee of counsel or any of the parties to the action,

9    nor am I in any way financially interested in the outcome

10   of this case.

11

12       Dated this day, January 23rd, 2024.

13

14

15

16                    _____
                      Katherine Pasciak-Lenti
17                    CSR No. 084.004958

18

19

20

21

22

23

24

25