# EXHIBIT 18

# Part 1 of 2

# Pages 1-111

# In The Matter Of:

*Reyna Arroyo v.*
*City of Chicago*

---

*Sheree Jones*
*July 25, 2023*

---

*Textnet Digital Court Reporting*
*www.textnet.com | office@textnet.com*
*Madison, WI | Chicago, IL*
*608-620-3829 | 312-868-0305*



Min-U-Script® with Word Index

1

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF ILLINOIS

4                   EASTERN DIVISION

5   ---------------------------------------------------------

6   REYNA ARROYO,                      )

7                Plaintiff,            )

8   vs.                               ) Case No. 2021 CV 01148

9   CITY OF CHICAGO,                   )

10               Defendant.            )

11   --------------------------------------------------------

12          Video Deposition of SHEREE JONES

13   --------------------------------------------------------

14               July 25, 2023

15

16

17

18

19

20

21

22

23

24

25          Reporter:  Lisa Ann Lopez, CET/CER/CDR

2

1              A P P E A R A N C E S

2        (All appearances via remote Zoom videoconference.)

3

4   On behalf of the Plaintiff:

5   JANAAN HASHIM

6   AMAL LAW GROUP, LLC

7   161 N Clark St.

8   Suite 1600

9   Chicago, IL 60601

10

11  On behalf of the Defendant:

12  MATTHEW SUHL

13  PHILLIP SANTELL

14  CITY OF CHICAGO LAW DEPARTMENT

15  2 N. LaSalle St.

16  Suite 640

17  Chicago, IL 60602

18

19

20

21

22

23

24

25

3

1                      I N D E X

2   WITNESS                                      PAGE

3   SHEREE JONES

4   Examination by Ms. Hashim                    6

5

6                    E X H I B I T S

7   NO.                                          MARKED

8   Exhibit 1                                    31

9   Exhibit 2                                    46

10  Exhibit 3                                    57

11  Exhibit 4                                    79

12  Exhibit 5                                    82

13  Exhibit 6                                    87

14  Exhibit 7                                    95

15  Exhibit 8                                    101

16  Exhibit 9                                    107

17  Exhibit 10                                   119

18  Exhibit 11                                   124

19  Exhibit 12                                   125

20  Exhibit 13                                   127

21  Exhibit 14                                   131

22  Exhibit 15                                   136

23  Exhibit 16                                   143

24  Exhibit 17                                   148

25  Exhibit 18                                   163

4

1                     E X H I B I T S (continued)

2    NO.                                              MARKED

3    Exhibit 19A                                      175

4    Exhibit 19B                                      180

5    Exhibit 20                                       183

6    Exhibit 21                                       190

7    Exhibit 22                                       196

8    Exhibit 23                                       205

9    Exhibit 24                                       219

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sheree Jones - July 25, 2023

5

1                    P R O C E E D I N G S

2                 (Commencing at 9:30 a.m.)

3          REPORTER:  We are on the record.  Today is July

4    25th, 2023 at 9:30 a.m.  We are here in the matter of Reyna

5    Arroyo v. City of Chicago, case number 2021CV1148, in the

6    North District of Illinois Eastern Division.

7       My name is Lisa Lopez, and I'm recording this on

8    behalf of Textnet Digital Court Reporting.

9       This is the remote video deposition of Sheree Jones.

10      Ma'am, do you have a middle name?

11            THE WITNESS:  No.

12            REPORTER:  All right.  Thank you very much.

13   Would you please raise your right hand for the oath?

14                        (WITNESS SWORN)

15            THE WITNESS:  I do.

16            REPORTER:  Thank you very much.  You can lower

17   your hand.

18      Would the attorneys please state their appearances for

19   the record starting with the taking attorney?

20            MS. HASHIM:  Good morning.  Janaan Hashim for the

21   plaintiff with our intern, Isabella Devine, D-e-v-i-n-e,

22   observing.

23            MR. SUHL:  And Matthew Suhl for the defendant,

24   City of Chicago.

25            MR. SANTELL:  And Philip Santell, S-a-n-t-e-l-l,

Sheree Jones - July 25, 2023

6

1    assistant corporation counsel also for the defendants.

2              REPORTER:  Thank you very much.

3         Counsel, you may proceed.

4              MS. HASHIM:  Thank you very much.

5                         DIRECT EXAMINATION

6    BY MS. HASHIM:

7         Q.   Good morning.  Ms. Jones, can you please state

8    your full name for the record?

9         A.   Sheree Jones.

10        Q.   And are you aware that you're being deposed in

11   the matter of Arroyo v. The City of Chicago, a lawsuit in

12   the Federal Court for the Northern District of Illinois

13   alleging failure to accommodate under the Americans with

14   Disabilities Act, violations of the Rehabilitation Act, and

15   for retaliation?

16        A.   Yes.

17        Q.   And if I say ADA, would you understand this to

18   mean the Americans with Disability Act?

19        A.   Yes.

20        Q.   Okay.  Have you ever been deposed before, ma'am?

21        A.   Say that again.

22        Q.   Have you ever been deposed before?

23        A.   No.

24        Q.   Now, during this deposition, you are under oath.

25   That means that the testimony you provide today applies the

Sheree Jones - July 25, 2023

7

1  expectation that you will tell the truth under penalty of

2  perjury.

3      Do you understand this?

4      A.   Yes.

5      Q.   So that means you cannot willfully give false,

6  misleading, or incomplete testimony.  Do you understand?

7      A.   Yes.

8      Q.   Now, also, unlike a conventional conversation, we

9  have a court reporter here and she's recording everything

10  that we say.  We have the added complexity of a remote

11  proceeding.  And so for these reasons, I ask that you wait

12  until a question is finished before responding.  This makes

13  the court reporter's job much easier and allows us to have

14  a very clear record at the end.

15      And also, try not to use signals or sounds to indicate

16  an answer.  Like, don't nod your head or say uh-huh or nah-

17  uh, but rather say yes or no, I don't know, for example.

18      Do you understand?

19      A.   Yes.

20      Q.   Now, because this is a remote deposition, you are

21  likely on a personal device right now that may have

22  messaging capabilities and notifications of communications

23  coming in as we are speaking.  I simply ask that you don't

24  open the messages or communicate with anyone generally

25  during the time that you're being questioned.  Okay?

Sheree Jones - July 25, 2023

8

1      A.   Okay.

2      Q.   If you need to take a break, please let me know.

3  The only caveat is that if you ask to take a break while

4  there is a pending question, you will need to answer the

5  question first before we take that break.  Okay?

6      A.   Okay.

7      Q.   Now, the purpose of today's deposition is to

8  gather facts based on your knowledge.  If you do not

9  understand a question, there's nothing wrong with asking me

10  to repeat it or to explain what I'm asking.

11      If you answer my question, I'm going to assume that

12  you understood it.  Is that clear?

13      A.   Yes.

14      Q.   All right.  And if you need clarification on any

15  of my questions, just ask.  Okay?

16      A.   Okay.

17      Q.   Now, sometimes, when I ask a question, you will

18  have partial knowledge but not absolute, certain or

19  complete knowledge.  So for example, if I ask you about the

20  weather right now, you couldn't necessarily tell me the

21  exact Fahrenheit degree, but you could give me an

22  approximate answer, like it's hot or cold or somewhere in

23  between.  So in that circumstance, an answer of "I don't

24  know" is not appropriate, but an answer giving a range or

25  an estimate based on your knowledge, with an explanation

Sheree Jones - July 25, 2023

9

1    that it is a range or estimate is appropriate.

2         Do you understand this?

3         A.    Yes.

4         Q.    Is there any reason such as being under duress,

5    unusual stress, a physical or mental condition, or being

6    under the influence of any medications or substances that

7    would prevent or limit you today from giving truthful

8    answers to my questions?

9         A.    No.

10        Q.    During this proceeding, you might hear someone

11   make an objection.  Generally, unless the objection is on

12   the basis of a privilege and you are directed not to

13   answer, you will still be expected to answer the question

14   posed.

15        Do you understand?

16        A.    Yes.

17        Q.    Okay.  So when you hear an objection, you should

18   not start answering the question until the attorney has a

19   chance to make the objection clear and then you can answer.

20   All right?

21        A.    Okay.

22        Q.    All right.  So just jumping into some preliminary

23   questions here, have you prepared for this deposition

24   today?

25        A.    About as best I can.

Sheree Jones - July 25, 2023

1    Q.   So how did you prepare?

2    A.   Trying to remember who you're talking -- who the

3 disposition [sic] is about because I haven't worked in four

4 years, so I don't really know what it's about.

5    Q.   Okay.  Did you take a look at any documents?

6    A.    I haven't received any document but the subpoena.

7    Q.   Okay.  So is it correct to say you did not look

8 at any documents to prepare for today's deposition?

9    A.   Yes.

10    Q.   Okay.  And did you talk to anybody in relation to

11 preparing for today's deposition?

12    A.   No.

13    Q.   Now, prior to today's deposition, you and I had

14 communicated.  Correct?

15    A.   Yes.

16    Q.   All right.  And just for the record, can you

17 please share what you and I discussed, generally speaking?

18    A.   You told me I was being subpoenaed and you was

19 going to send it to me and that was basically it and any

20 questions I had, it would be asked, or a document would be

21 shown to me at the time of the Zoom meeting.

22    Q.   Okay.  So is it fair to say that we did not

23 discuss the merits of this case, just the getting the

24 deposition going for you?

25    A.   Right.  Yes.

Sheree Jones - July 25, 2023

11

1    Q.   Okay.  Now, other than communications between you

2  and me, did you communicate with anyone else from my law

3  firm, Amal Law Group?

4    A.   No.

5    Q.   Now, Ofc. Arroyo is also represented by the firm

6  Abraham Law and Consulting.  The two of us are co-counsels.

7    Did anyone from that firm communicate with you?

8    A.   No.

9    Q.   Did you meet or communicate with an attorney

10  prior to this deposition?

11    A.   No.

12    Q.   Did any of the City's attorneys contact you prior

13  to this deposition?

14    A.   No.

15    Q.   Is it your understanding that the City's

16  attorneys here today represent you in this deposition?

17    A.   I guess.  I'm not for sure who they representing.

18    MS. HASHIM:  Okay.  So Matthew, I'm just going to

19  ask you for the record, do you represent Ms. Jones?  Does

20  the City represent Ms. Jones?

21    MR. SUHL:  No.  We do not.

22    MS. HASHIM:  Okay.

23  BY MS. HASHIM:

24    Q.   So is it your understanding, Ms. Jones, that the

25  City does not represent you?

Sheree Jones - July 25, 2023

12

1      A.    Yes.

2      Q.    Okay.  And you're not a party to this suit.

3 Right?

4      A.    No.

5      Q.    Right.  And did you discuss this deposition with

6 anyone from the City of Chicago?  Any employees?

7      A.    No.

8      Q.    And did you discuss this deposition with any

9 employee from Chicago Police Department?

10      A.    No.

11      Q.    Okay.  Thank you.

12      So because this case alleges failure to accommodate

13 under the ADA, I'd just like to ask you some general

14 background questions.

15      Have you ever made a request for reasonable

16 accommodation under the ADA for a mental or physical

17 disability for yourself?

18      A.    No.

19      Q.    On someone else's behalf, have you ever made a

20 request for reasonable accommodation under the ADA for a

21 mental or physical disability?

22      A.    No.

23      Q.    And I understand you're currently retired.  Is

24 that correct?

25      A.    Yes.

Sheree Jones - July 25, 2023

13

1     Q.   Do you have any other employment or is this full
2  retirement?
3     A.   Full retirement.
4     Q.   And who was your last employer before retiring?
5     A.   Chicago Police.
6     Q.   Now, if I say "CPD", would you understand this to
7  mean Chicago Police Department?
8     A.   Yes.
9     Q.   Okay.  And in what section or unit did you work
10 before retiring?
11    A.   Medical section.
12    Q.   And what position did you hold in the medical
13 section with -- and this was within CPD.  Correct?
14    A.   Yes.
15    Q.   Okay.  So --
16    A.   I was the supervisor.
17    Q.   So I'm going to reask that question.  Medical
18 services section, if I say "MSS", is that the same thing?
19    A.   Yes.
20    Q.   Okay.  And MSS is a part of Chicago Police
21 Department?
22    A.   Yes.
23    Q.   Okay.  And what position did you hold when you
24 retired from CPD?
25    A.   I was the Administrator 3 supervisor.

Sheree Jones - July 25, 2023

14

1      Q.   Okay.  Is it correct to say you were the
2  supervisor of MSS?

3      A.   No.

4      Q.   Okay.

5      A.   I had a boss ahead of me.

6      Q.   And who was the boss that you answered to?

7      A.   I would answer to -- when I left, it was Dr.
8  Arjmand.

9      Q.   And for the record, I'm going to spell that.  A-
10  r-j-a-m-a-n-d.

11     Does that sound correct?  Actually, I think I'm adding
12  a letter there.

13          MS. HASHIM:  Counsel, is this spell --

14          THE WITNESS:  It's A-r-j-m-a-n-d.

15          MS. HASHIM:  Okay.  So I think I was talking on
16  top of you.  My apologies.

17  BY MS. HASHIM:

18     Q.   So it's A-r-j-m-a-n-d.  Correct?

19     A.   That's correct.

20     Q.   Okay.

21     A.   Yes.

22     Q.   Thank you.  I appreciate that.

23     And is she a physician?  Because you said Dr. Arjmand.
24  Is she a physician?

25     A.   Yes.

Sheree Jones - July 25, 2023

1      Q.    Okay.  And who does Dr. Arjmand answer to?

2      A.    Director of Human Resource of the Chicago Police

3  Department.

4      Q.    So you mentioned medical services section.  What

5  is the purpose of MSS?

6      A.    When the officers get injury or go off on

7  medical, the staffing take care of all of their documents,

8  when they IOD, you give them referrals to go to a different

9  doctor that is listed under the City and when they're on

10  medical, they go to their own primary doctor and bring they

11  documentations to the medical section and we look them

12  over.  The staffing look them over.

13      Q.    Okay.  And for how long did you hold the position

14  that you had when you retired?

15      A.    10 years, but I was with the City for 31 years.

16      Q.    So in terms of this particular position, what

17  kind of professional background did you have?

18      A.    Well, I worked in the medical section for the

19  Chicago Police for the majority of my career.  Had an

20  associate's degree, not in the medical field, but I was

21  trained by all of my previous bosses, Barb Hemmerling and

22  just know to know how to do what I did and was able to do

23  the job well.

24      Q.    I understand.  Thank you.

25      And in this position, what were your duties?  Can you

Sheree Jones - July 25, 2023

 1   please describe them?

 2        A.   I supervised the whole medical section, oversee

 3   the case manager, oversee the referral staff, and

 4   communicated with the director, communicated with the

 5   counselor, city hall, and everyone to make sure the daily

 6   operation functioned properly through the -- through the

 7   scheduling and therefore everything that needed to be --

 8   the order supplies and everything.

 9        Q.   And in this role, who reported to you?

10        A.   All of the other staff, the nurses, the case

11   managers, the referral staff, the clerks, everyone.

12        Q.   You mentioned case managers.  What are the duties

13   of a case manager within MSS?

14        A.   The case manager, she's the officer, whether it's

15   IOD or medical -- if it's IOD, when -- according to what

16   the doctor refer, they go over it and get -- give them a

17   referral to go to the doctor that is on the CPD list, the

18   medical section list.  Chase papers.

19        Q.   I'm sorry.  You said "chase papers".

20        A.   That's basically what they did.  Look at the

21   papers, filed them, put them in the state to be filed.  If

22   it's not IOD, you don't do anything but just give them a

23   follow-up to come back.  When they doctor return them you

24   release them back to work.

25        If it's an injury on duty, then you give them

Sheree Jones - July 25, 2023

17

1   referrals according to what the doctor requested for them
2   to get a referral for and follow up with them.
3       Q.   And these case managers, are they civilian
4   employees?
5       A.   Half and half.
6       Q.   Okay.
7       A.   We have some sworn and some are civilian.
8   Majority was civilian.
9       Q.   Was any kind of professional background required
10  for case workers or to be a case worker at MSS?
11      A.   Well, some of them had nurse's degree and some of
12  them didn't.  But they had to have some type of background
13  in the medical field.
14      Q.   Now, you mentioned some sworn offers were case
15  managers.  Were you their supervisor?
16      A.   Yeah -- yes.
17      Q.   Okay.  And that would be the same for any of the
18  other sworn officers who worked at MSS.  They reported to
19  you?
20      A.   Yes.
21      Q.   And you had mentioned -- we had mentioned
22  civilian employees and sworn officers.
23      These are the -- is it fair to say that these are the
24  two kinds of employees that CPD hired?
25      A.   Yes.

Sheree Jones - July 25, 2023

18

1      Q.   And is it fair to say that you fell under the

2   civilian side?

3      A.   Yes.

4      Q.   And with the sworn officers at CPD, to your

5   knowledge, does the City have a collective bargaining

6   agreement with these officers?

7      A.   Yeah.  They have a union.

8      Q.   Okay.  And the union is called the Fraternal

9   Order of Police.  Is that correct?

10     A.   Yes.

11     Q.   Now, you mentioned that you were with CPD for --

12  did you say 33 years?

13     A.   31.

14     Q.   31 years.  Thank you for the correction.

15     Prior to working at MSS, did you work at any other

16  section?

17     A.   I worked at warrants.

18     Q.   I'm sorry, ma'am?

19     A.   I worked at warrants.  The warrant section.

20  Where the warrants come in and when people have the

21  warrants come from court when you had to -- the staff had

22  to enter them into the computer so they could be expedited.

23     Q.   So with the warrants section, is that where you

24  started with CPD and then you shifted over to MSS?

25     A.   Yes.

Sheree Jones - July 25, 2023

19

1      Q.   Now, from your experience and observations at

2   CPD, is it fair to say that CPD follows what could be

3   termed a paramilitary structure?  It can also be called a

4   chain of command structure.

5      Would you agree with that?

6           MR. SUHL:  Object to form.

7           MS. HASHIM:  Yes.

8   BY MS. HASHIM:

9      Q.   Okay.  So I'll rephrase that.  Would you agree

10  that based upon your experience and observations having

11  worked at CPD that CPD follows a chain of command

12  structure?

13          MR. SUHL:  Same objection.

14          THE WITNESS:  Yes.

15  BY MS. HASHIM:

16     Q.   Now, with the two types of employees that you

17  described, do they both follow this chain of command

18  structure?

19          MR. SUHL:  Same objection.

20          MS. HASHIM:  You can answer.

21          THE WITNESS:  Yes.

22  BY MS. HASHIM:

23     Q.   So it's fair to say that the civilian employees

24  follow a chain of command structure?

25          MR. SUHL:  Same objection.

Sheree Jones - July 25, 2023

20

```
 1              THE WITNESS:  Yes.
 2    BY MS. HASHIM:
 3        Q.   And it's fair to say that the sworn officers
 4    follow a chain of command structure?
 5              MR. SUHL:  Same objection.
 6              THE WITNESS:  Yes.
 7    BY MS. HASHIM:
 8        Q.   And this would be based upon your 31 years of
 9    working at Chicago Police Department.  Correct?
10        A.   Yes.
11        Q.   Are you familiar with something called general
12    orders that are issued by CPD?
13        A.   Yes.
14        Q.   And how are you familiar with general orders?
15    How did you become familiar with them?
16        A.   We had to learn them and know how to -- what they
17    stand for and follow the general orders.
18        Q.   And are civilian employees working at CPD
19    expected to follow the general orders?
20        A.   Yes.
21        Q.   And based on your observations, is the same true
22    for sworn officers, that they are expected to follow
23    general orders?
24        A.   Yes.
25        Q.   And are you familiar with something called
```

Sheree Jones - July 25, 2023

21

 1    directives issued by CPD?

 2         A.    Yes.

 3         Q.    And how are you familiar with directives?

 4         A.    Because we had director -- directive orders as

 5    well.

 6         Q.    And are these directive orders that you as a

 7    civilian would have to follow?

 8         A.    Yes.

 9         Q.    So to understand the difference between the two,

10    can you explain what is the difference between directives

11    and general orders?

12         A.    A director order [sic] means you must act it out

13    right that moment.  A general order is a order that can go

14    on and on and on while you're -- it's a guideline to

15    follow.

16         Q.    And to your recollection, were there directives

17    that involved MSS?

18         A.    I'm not for sure.  I don't remember.

19         Q.    Okay.  And are civilian employees working at CPD

20    expected to follow CPD directives?

21         A.    Yes.

22         Q.    And based on your observations, is the same true

23    for sworn officers, that they are expected to follow CPD

24    directives?

25         A.    Yes.

Sheree Jones - July 25, 2023

22

1      Q.   Now, to the best of your knowledge and based on

2   your training and experience, are some CPD directives

3   issued in order for the City to be in compliance with

4   local, state, and federal law?

5           MR. SUHL:  Object to form.  Foundation.

6           THE WITNESS:  Yeah.

7   BY MS. HASHIM:

8      Q.   Can you repeat your answer, ma'am?

9      A.   Yes.

10     Q.   And to the best of your knowledge and based on

11  your training and experience, are some CPD directives

12  issued in order for the City to be in compliance with any

13  collective bargaining agreements that involve sworn

14  officers?

15          MR. SUHL:  Object to form.  Foundation.

16          MS. HASHIM:  You can answer.

17          THE WITNESS:  Yes.

18  BY MS. HASHIM:

19     Q.   I think we got this on the record, but just to be

20  sure, if I say "CBA", do you understand this to mean a

21  collective bargaining agreement?

22     A.   Yes.

23     Q.   And to the best of your recollection, does the

24  CBA address issues related to MSS?

25     A.   Yes.

Sheree Jones - July 25, 2023

23

1    Q.   And do the directives include matters related to
2  MSS?
3    A.   I'm not so sure.
4    Q.   Okay.  And how about general orders?  Do they
5  relate -- do they include matters relating to MSS?
6    A.   Yes.
7    Q.   Are you familiar with the term "medical roll"?
8        MS. HASHIM:  And for the record, I'm just going
9  to spell out "roll" because there could be two spellings of
10 it.  So it would be r-o-l-l.
11 BY MS. HASHIM:
12   Q.   So ma'am, are you familiar with the term "medical
13 roll"?
14   A.   Yes.
15   Q.   And in layman's terms, what does medical roll
16 mean?
17   A.   It means the officer are on the medical.  You're
18 on medical.  That's the medical roll is when you're on
19 medical, whether it's IOD or medical.
20   Q.   So is it correct to say -- and I don't want to
21 mischaracterize your testimony -- when you say when they're
22 "on medical", it means that they're not working because of
23 a medical reason?
24   A.   Right.  Yes.
25   Q.   Now, I've heard the term while working on this

Sheree Jones - July 25, 2023

1    case "medical time".  Would that be the same as medical

2    roll, to your knowledge?

3         A.   In a sense.

4         Q.   Okay.  So it could be, depending upon the context

5    of how the term "medical time" is being used.  Right?

6         A.   Right.  Because your medical time, with CPD, you

7    get 365 days in a calendar year.  After the second year, it

8    rolls over.  You earn time back.  You get 365 on an injury.

9    You don't earn time back on a injury, a IOD.

10        Q.   So the phrase could be used in a time context as

11   well.

12        A.   Right.  Yes.

13        Q.   And with medical roll, who maintains records of

14   when an officer goes on medical roll?

15        A.   The computer.

16        Q.   Okay.

17        A.   And the medical section -- and then the medical

18   section, we had a staff that when they get to, say, 250

19   days, we start monitoring even more and then they get a

20   letter telling them when they time is getting ready to run

21   out on the medical or on injury on duty.

22        When they injury on duty, according to the union

23   contract, they can get extension because they can file --

24   write a letter, they doctor saying they need more time.

25   Then they can use their personal time to carry out their

Sheree Jones - July 25, 2023

1    injury on duty.

2         On the medical roll, when they get to 365, they have

3    to apply for disability.

4         Q.    And so for maintaining these records, are they

5    maintained through the medical services section?

6         A.    Yeah.  In the CLEAR system.

7         Q.    And who has access to these records, offhand?

8         A.    The medical section has it.  The director has it.

9    And that would be it, except the computer team that

10   processes -- created the program.  But they don't have

11   access to it.  They only able to keep the update or edit if

12   we needed something edit.

13        Q.    When an officer is on medical roll, who is the

14   officer's first in command during this time?

15        A.    They call and talk to the telephone staff after

16   they call they unit of assignment saying they're going on

17   the medical roll.  Once they does that, they have a day to

18   call the medical section.  When they call the medical

19   section, it depends on what they on medical for.  Then they

20   have them to come in within 24 hours.  Depends on what

21   they're for.  Once they come into the medical section with

22   a note, then they get to go what they call out of

23   stationary into ambulatory.  Stationary means you're stuck

24   at home.  You can't leave home unless you're called into

25   your district and put it on the books.  Ambulatory means

Sheree Jones - July 25, 2023

1    they can move around if they're ambulatory.

2        Q.    So if an officer is detailed to a certain unit,

3    then their first in command would be who they are detailed

4    to.  Is that correct?

5        A.    Yes.

6        Q.    Okay.  While they're on medical.

7        A.    Right.

8        Q.    Okay.  To your knowledge, is it fair to say that

9    MSS maintains officer's medical records?

10       A.    Yes.

11       Q.    And the records would be kept in the officer's

12   medical file.  Is that fair to say?

13       A.    Yes.

14       Q.    So I know that in this day and age, we can have a

15   hard copy and an electronic copy of files.  In terms of

16   hard copies, does CPD keep a hard copy of the officer's

17   file?

18       A.    That's the only thing CPD has are hard copy

19   files.

20       Q.    So --

21       A.    And the reason being is because if they get

22   subpoena and you need that file, we copy that file and we

23   send it to whoever the subpoena requests of that file.

24       Q.    So it's your testimony that -- if I'm

25   understanding you correctly -- that CPD only keeps hard

Sheree Jones - July 25, 2023

27

1   copies of medical records, not electronic copies.

2       Is that correct?

3       A.   That's correct.

4       Q.   And just generally speaking, what would you

5   expect to find in an officer's medical file?  What kind of

6   documents would be in the file?

7       A.   If they on medical, they doctor's note from when

8   they was on medical.  If they had -- they wanted their X-

9   rays in there or anything they doctor did to them would be

10  in their medical file.  If it's injury on duty, which is

11  IOD, the injury on duty report and every report that goes

12  along with it.  If it was a car accident or whatever, those

13  would be in there.  And the hospital.  The emergency room

14  and any doctor visit they have, any request the doctor

15  requests would be in the injury on duty file.

16      Q.   And when you mention hospital and ER, do you mean

17  the hospital and ER records?

18      A.   Right.  Yes.

19      Q.   Just to be make sure.  I want to be on the same

20  age as you.  That's all.

21      Now, how important would you say it is for CPD to know

22  about a sworn officer's medical condition?

23      A.   It's real important.

24      Q.   And why is that?

25      A.   Because they have to be able to be fit for duty.

Sheree Jones - July 25, 2023

1    Q.    And how does CPD ensure that it's aware of an

2    officer's medical condition?  Like, what mechanisms does it

3    use to make sure it's aware of the officer's medical

4    condition?

5        A.    Their medical file and when the officer come in

6    and talk to the case manager.

7        Q.    So is it assumed an officer is fit for duty until

8    they come in and they talk to someone from medical

9    services?

10       A.    Yeah.

11       Q.    And when we say "fit for duty", does this mean

12   full duty?

13       A.    (Audio interference).

14       Q.    Does this mean full duty, ma'am?

15       A.    Yes.

16       Q.    Okay.  So taking a look at an officer's physical

17   condition, based on your experience, how aware would MSS be

18   at any given time of an officer's physical condition?

19       A.    Only by the documentation they bring in.  We

20   don't examine them in the medical section.

21       Q.    And so if they bring some documentation in, would

22   this be stored -- would the physical copy be stored in that

23   medical file that we talked about earlier?

24       A.    Yes.

25       Q.    Would a record be kept electronically of them

Sheree Jones - July 25, 2023

29

1   coming in?

2       A.   Only in the CLEAR system.  The nurses, the case

3   manager put a brief note in saying, received document from

4   Doctor So-and-so saying, Millman needs to stay off of work

5   for another week and give him extension.  Nothing that is

6   related to their illness is actually typed hard in the

7   computer.

8       Q.   So are these -- I've come across documents in the

9   CLEAR system called progress notes.  Is that what you're

10  referring to?  Progress notes?

11      A.   Yes.

12      Q.   Okay.  And is it fair to say that when an entry

13  is made into these progress notes that the person making

14  the note is authorized and trained to do so?

15      A.   Yes.

16           MR. SUHL:  Object to form.

17  BY MS. HASHIM:

18      Q.   Actually, I'm going to repeat that question.

19      Is it fair to say that when an entry is made into the

20  progress note that the person making the entry is theorized

21  to do so?

22      A.   Yes.

23      Q.   And is it fair to say that when an entry is made

24  that the person making the entry is trained as to how to

25  make that entry?

Sheree Jones - July 25, 2023

30

1      A.    Yes.

2      Q.    Would MSS be aware of any sworn officer's

3   physical impairment should an officer have one?

4           MR. SUHL:  Object to form.

5           MS. HASHIM:  You can answer.

6           THE WITNESS:  I would say by looking at them you

7   can tell if something wrong with them, then you would get a

8   sergeant or a supervisor if you felt like that person was

9   not fit for duty by looking at them.  But looks are

10  deceiving.

11  BY MS. HASHIM:

12     Q.    What do you mean "looks are deceiving"?

13     A.    Because you can look one way and feel another

14  way.  That's why you get another -- two supervisor come and

15  observe while their officer in the medical section and if a

16  sergeant being feel like he's going to call that officer in

17  and talk to that officer to see his state of being at the

18  time and make that decision of how he work from there.

19  That's when a sergeant steps in.

20     Q.    And kind of on the same vein there, would MSS

21  also be aware of a sworn officer's physical disabilities,

22  should there be any?

23     A.    Well, you only know their physical disabilities

24  when they presented to the medical section.

25     Q.    So is it correct to say if the physical

Sheree Jones - July 25, 2023

31

1   disability is presented to MSS, then MSS would be aware of
2   it?
3       A.   Yes.
4       Q.   All right.  So I'm going to show you our first
5   exhibit and it's going to take a little bit of juggling on
6   my part because I'm going to do a screenshare and I'm also
7   going to put it into the chat for the reporter.  So just
8   give me a minute as I pull u this first one.
9       So this is going to be Exhibit 1.  And for the record,
10  it's Bates number Arroyo.Def.083 to 096.
11          (Exhibit No. 1 marked for identification)
12          MS. HASHIM:  Madam Court Reporter, can you please
13  enable screensharing?
14          REPORTER:  Of course.  My apologies.
15          MS. HASHIM:  No worries.
16  BY MS. HASHIM:
17      Q.   Okay.  Can you see my screen, ma'am?
18      A.   Yes.
19      Q.   All right.  Okay.  I'm going to go up to the top.
20  I'm just going to run through this so you can see this full
21  document.  It has the page numbers on the bottom right
22  corner.  It's 14 pages.  I'm just going to go all the way
23  down to the end so you can see it's complete.  And that's
24  the end.  Okay.
25      So are you familiar with this particular document,

Sheree Jones - July 25, 2023

32

1    ma'am?

2         A.    Yes.

3         Q.    And what is it?

4         A.    It's a reasonable accommodation is when a officer

5    get ready to run out of medical time or they're trying to

6    file for AD -- under the ADA, we have to give them a copy

7    of this when they get ready to apply for it.  When they

8    bring in documents saying they need to be under the ADA

9    because they are not able to work in their capacity of a

10   police officer, we give them that so they can follow the

11   guidelines.  And then we schedule a meeting and we help

12   them put their paperwork in and submit them to human

13   resources and from human resources, it goes to the ADA.

14        Q.    Gotcha.  And were you trained as to this

15   particular policy?

16        A.    Yes.

17        Q.    And how were the trainings conducted?

18        A.    Well, in-house, they have ADA people to come in

19   and explain it and talk to the supervisor staff about the

20   ADA and how we should address it and what to do and the

21   process to do it.

22        Q.    How frequently was the training?

23        A.    Not frequency at all.

24        Q.    So if you were to give a number, just a ballpark

25   number of how many times you had trainings for this, what

Sheree Jones - July 25, 2023

33

1    would it be?

2          A.    I had training at least two times on it.

3          Q.    And prior to your retirement, about how many

4    years before your retirement was your last training?

5          A.    I can't remember.

6          Q.    Okay.  And in terms of those who you supervise,

7    like the case managers -- actually, let me specify.

8          In terms of the case managers, do you know whether

9    they receive training as to the City's reasonable

10   accommodation policy?

11         A.    They only receive it in-house from the

12   supervisor.  As far as sitting with an ADA person, no, not

13   to my knowledge.

14         Q.    So when you say "supervisor", if you were the

15   supervisor of the case manager --

16         A.    Supervisor of staff.  Me, the medical director,

17   the medical administrator, the sergeants, we have staff

18   meetings and go over different things that they need to

19   know and understand.

20              REPORTER:  And I'm going to ask Ms. Jones, please

21   make sure you let her finish the question first so I can

22   get everything.

23              THE WITNESS:  I'm sorry.

24              MS. HASHIM:  No.  We just like to have a clear

25   record.  That's all.  We never realize how frequently we

Sheree Jones - July 25, 2023

34

1   talk on top of each other until we're in these kind of

2   situations, so no worries at all.

3   BY MS. HASHIM:

4       Q.   So you had mentioned how the people you supervise

5   were trained.  How frequently would these trainings be?

6       A.   We had a staff meeting once a month.

7       Q.   So every month, you discuss the ADA policy?

8       A.   We discuss whatever come up in hand that they

9   need to address and know if there's any change in -- in the

10  policies anywhere.

11      Q.   So how frequently do you think you discussed the

12  ADA policy with the people you supervised at these monthly

13  meetings?  In a year's time, you would have 12 meetings.

14      How many times would you have discussed the ADA?  Do

15  you recall?

16      A.   I can't remember.

17      Q.   Would it be frequently or infrequently?

18      A.   It probably was infrequently because we had other

19  stuff to discuss as well.  We didn't get a lot of ADAs.

20      Q.   So I'm going to take you to what's Bates marked

21  Arroy.def.084.  And you see Roman Numeral III here, it

22  says, "definitions", ma'am?

23      A.   Uh-huh.

24      Q.   Okay.  I'm going to read the Section III-a,

25  "Disability".

Sheree Jones - July 25, 2023

1       A.    Uh-huh.

2       Q.    Actually, let me preface that.  Under Section

3  Roman Numeral III, Definitions, it states, the following

4  definitions apply to interpretation of this policy.

5       Did I read that correctly?

6       A.    Yes.

7       Q.    Do I need to make my screen bigger for you?

8       A.    Nah-uh.  I got it.

9       Q.    Okay.  And then in Section a of Roman Number III,

10  I'll read the definition of disability.  It says:

11      Disability means either a current physical or mental

12  impairment that substantially limits one or more major life

13  activities or a record of having such a physical or mental

14  impairment.

15      Did I read that correctly?

16      A.    Yes.

17      Q.    And are you familiar with this definition?

18      A.    Yes.

19      Q.    And I'll read to you, under Roman Number III,

20  Section c., "Major Life Activities", the first sentence.

21      Major life activities include but are not limited to

22  eating, standing, walking, lifting, sleeping, breathing,

23  seeing, hearing, concentrating, learning, and working.

24      Did I read that first sentence correctly?

25      A.    Yes.

Sheree Jones - July 25, 2023

36

1      Q.   And would you agree with me that this list
2  includes lifting as a major life activity?
3      A.   Repeat your question.
4      Q.   Uh-huh.  Would you agree with me that this list
5  includes lifting as a major life activity?
6      A.   Yes.
7      Q.   And is it correct to say that this is not an
8  exclusive list?
9      A.   Yes.
10     Q.   Now, I'm going to scroll down to what's Bates
11 numbered Arroyo.def.094.  So this is -- if you're on 093,
12 which I'm going to back up -- 092, Bates number 092, it's
13 Section VIII, "Responsibilities of City Personnel".  It's
14 Roman Number VIII, "Responsibilities of City Personnel".
15 And then scrolling down, we have Section d, "Department
16 heads".  And then at Arroyo.def.094, we have Section e, it
17 says -- oh.  I'm sorry.  I'm going to f.  We have Section
18 f.  So under Section f, it has a title, "Supervisors".  I'm
19 just going to have you read -- and the section has four
20 bullet points.
21     Is that correct?
22     A.   Yes.
23     Q.   All right.  I'm just going to go ahead and just
24 have you read to yourself Section f and let me know when
25 you're done.

Sheree Jones - July 25, 2023

37

1     A.   I'm done.

2     Q.   All right.  Are you familiar with this section,

3  ma'am?

4     A.   Yes.

5     Q.   Now, I'm going to read the first bullet.  It

6  says, in the context of supervisors, the bullet reads:

7     Promptly report any request for reasonable

8  accommodation that they become aware of to the disability

9  officer or the disability liaison, whether the request is

10  verbal or written.

11     Did I read that correctly?

12     A.   Yes.

13     Q.   So in this bullet, it refers to the disability

14  officer and a disability liaison.  What is the difference

15  between the two?

16        MR. SUHL:  Object to form.

17        THE WITNESS:  Disability officer would be the

18  person that processes the forms all the way out from human

19  resource.  Those -- those two people work up in the human

20  resource section of Chicago Police.  The liaison would be -

21  -

22        MS. HASHIM:  So the --

23        THE WITNESS:  -- the liaison would be once this

24  person reach the 365 medical days, we then turn it over,

25  file his paperwork to put him on disability.  He applies --

Sheree Jones - July 25, 2023

38

1    apply for disability, but we have no -- after we send the
2    form, it goes to a meeting and the disability people figure
3    out if they're going to give him whatever disability
4    they're going to give him.  It's no longer in the medical
5    section hands.
6    BY MS. HASHIM:
7        Q.    And this particular section, in terms of
8    disability officer and disability liaison, is referring to
9    the City's policy as to the ADA, the reasonable
10   accommodation policy.  Right?
11       A.    Right.
12       Q.    Okay.  And the disability liaison, where does
13   this person work from?  Do they work at MSS or HR?
14       A.    We have two.  We have one in the medical section
15   who processes file, put it all together, submit it to the
16   pension board downtown, which was taken every week.  And
17   they have the one in human resource that follows through
18   with everything to let them know if they got the
19   accommodations.  So you got one that copies the files and
20   put it together and one that actually process it.  So they
21   have two different people doing it.
22       Q.    So the disability liaison at MSS processed
23   disability requests for reasonable accommodations?
24       A.    Correct.
25       Q.    Okay.  Because I heard you mention the pension

Sheree Jones - July 25, 2023

39

1  board.  How does the pension board tie into reasonable

2  accommodations?

3      A.   That's where we send our -- that's where we send

4  the files when they run out of medical time -- before they

5  get to that part, their file still has to go downtown to

6  the pension board for them to get on disability.

7      Q.   Is it your understanding that pension board

8  disability is the same as a reasonable request disability -

9  - I'm sorry -- is the same as a disabled person asking for

10  a reasonable request accommodation?

11      A.   It applies --

12          MR. SUHL:  Object --

13          THE WITNESS:  -- to everyone on the medicals --

14  every officer that comes in there, like I explained, they

15  get 365 days.  When they run out of time, their file is

16  automatic sent to -- for disability.  Whether they get that

17  disability or not, it's no longer in the medical section's

18  hand.  That's why the files are copied and sent.  But the

19  officer is called in for a meeting.  At that time, if the

20  officer say they want to have reasonable accommodation,

21  then it goes straight upstairs to human resource.

22  BY MS. HASHIM:

23      Q.   And the person -- can the officer ask for a

24  reasonable accommodation before they have that meeting with

25  the pension board?

Sheree Jones - July 25, 2023

40

1      A.   Yes.

2      Q.   In your supervisory position, how many times had

3  you contacted the disability officer to be in compliance

4  with this policy?

5      A.   Well, I didn't have to contact them because it

6  goes to the medical administrator then.

7      Q.   Did you have any of the people that you supervise

8  request a reasonable accommodation?

9           MR. SUHL:  Object to form.

10          THE WITNESS:  We've had people that --

11          REPORTER:  I'm sorry.  That was an objection to

12  form?

13          MS. HASHIM:  Okay.  You can answer, ma'am.

14          THE WITNESS:  We've had people that request it,

15  but once they request it and they sit down with the

16  liaison, then the medical administrator goes through

17  everything with them.

18  BY MS. HASHIM:

19      Q.   The medical administrator, would that be Dr.

20  Arjmand?

21      A.   Arjmand, no.  She's the medical director.  We had

22  a medical administrator when Barb Hemmerling used to be the

23  medical administrator.  Then Barb retired and it --

24  everything fell back on Dr. Arjmand.

25      Q.   So in 2019, would it have been Dr. Arjmand who

Sheree Jones - July 25, 2023

41

```
 1    would have been the person to have evaluated the reasonable
 2    accommodation requests?
 3         A.   Up until January -- from January to April, I was
 4    there in 2019.  Then I had two cardiac arrests, so when I
 5    left, she would have been.
 6         Q.   And I'm sorry.  I didn't ask you this earlier.
 7    When did you retire, ma'am?
 8         A.   I retired June of 2019, but I was in the hospital
 9    from April to that May.  I only came back to work a week
10    when I got out of the hospital.  Then I had to retire due
11    to my medical.
12         Q.   I'm going to go ahead and stop screensharing
13    this.  Whoops.  All right.
14         Are you familiar with -- strike that.
15         We had talked a little bit about the term "full duty".
16    So what is your understanding of what the term means as it
17    relates to a police officer?
18         A.   Full duty is when they can go out and actually
19    does the job at a hundred percent of what the police is
20    required to do.
21         Q.   And are you familiar with the term "limited
22    duty"?
23         A.   Yes.
24         Q.   If I say "LD", would you understand this to mean
25    limited duty?
```

Sheree Jones - July 25, 2023

42

1      A.    Yes.

2      Q.    And how would you describe what limited duty

3   status is for a CPD officer?

4      A.    They only had limited capability of being a full

5   duty police officer.  They have some medical reason why

6   they cannot complete their job at a hundred percent,

7   whether it's from an injury or regular medical.

8      Q.    And what would you say is the purpose of

9   providing this limited duty status?

10     A.    It's provided to try to help the officer get back

11  into a full-duty status by keeping them, say, on a desk job

12  until their doctor say they are fit to go back to work.  So

13  that's why the limited duty came up.

14     Q.    So you mentioned the phrase "desk job".  When an

15  officer is placed on limited-duty status, what does that

16  mean in terms of the work that the officer does?  Is it

17  desk work or is it other stuff other than desk work?

18     Can you describe that?

19     A.    99 percent be sitting in one of the units of

20  Chicago Police Department on a desk duty.  If their

21  limited duty say no lifting 20 pounds or they can't wear

22  their duty belt, then they're sitting on a desk, answering

23  a phone or whatever unit they put him in, they're able to

24  do that type of work.

25     Q.    Would you say -- is it fair to say that this is a

Sheree Jones - July 25, 2023

43

1   job modification for the officer who's on limited-duty

2   status?

3           MR. SUHL:   Object to form.

4           MS. HASHIM:   You can answer.

5           THE WITNESS:   Yes.

6   BY MS. HASHIM:

7       Q.   And you had mentioned the term "injured on duty".

8   If I say "IOD", would you understand this to mean injured

9   on duty?

10      A.   Yes.

11      Q.   And in layman's terms, what does IOD mean?

12      A.   Injury on duty.

13      Q.   Can you describe --

14      A.   Hurt in the line -- I'm sorry.  They got hurt in

15  the line of duty.

16      Q.   And as a consequence, they could -- they're

17  unable to perform their full-duty tasks and so therefore,

18  they work limited duty if they qualify.

19      Is that correct to say?

20      A.   Yes.

21      Q.   Are you familiar with a term that I've come by

22  which is "non-injured on duty"?

23      A.   Yes.

24      Q.   And if I say "non-IOD", would you understand this

25  to mean non-injured on duty?

Sheree Jones - July 25, 2023

44

1          A.    Yes.

2          Q.    And just similar to my last question about IOD,

3    in layman's terms, how would you describe what non-IOD

4    means?

5          A.    Non-IOD is medical.

6          Q.    Say it --

7          A.    Meaning they did not get hurt -- they did not get

8    hurt in the line of duty but say, I got high blood

9    pressure, diabetes, and my doctor's saying I don't need to

10   be out there.  Then they accommodate them by giving them

11   light duty for two years.

12         Q.    And who determines whether an injury is IOD or

13   non-IOD?

14         A.    It goes to a committee on finance.

15         Q.    And do all of the -- so a person's -- how does

16   that process work?

17         A.    Okay.  So if I get hurt and I go to my sergeant

18   and I say, well, I hurt my -- sprained my ankle, I need you

19   to fill out an injury on duty.  That form goes into the

20   system and it connects to the committee on finance and they

21   determine if that person got hurt in the line of duty or

22   not.  The medical section don't make that decision.

23         Q.    We had talked about Dr. Arjmand.

24         A.    Arjmand.

25         Q.    Arjmand.  Thank you.

Sheree Jones - July 25, 2023

45

1      How frequently would you say you interacted with her?

2      A.   Every day.

3      Q.   How would you describe her professional skill

4    set?

5      A.   I believe she's being a professional.

6      Q.   Was she thorough in the work that she did?

7      A.   Yeah.

8      Q.   And in terms of her work, do you have any reason

9    to question her truthfulness?

10      A.   No.

11      Q.   At CPD, am I correct in my understanding that MSS

12    is responsible for the limited-duty program?

13      A.   Yes.

14      Q.   So is it correct for me to say that MSS is the

15    section that either grants or denies limited-duty status to

16    a CPD officer?

17      A.   Well, we don't reject them because if they got

18    documentation from their doctor, that's how they go on

19    limited duty.  Based on their doctor's note is how they go

20    on limited duty.  The doctor will state in the note that

21    this member needs to be light duty for six months.  Then

22    they get the limited duty status.

23      Q.   I heard you say the term "light duty".  Is that

24    the same as limited duty?

25      A.   Yes.

Sheree Jones - July 25, 2023

46

1      Q.    So which employee within MSS reviews these

2   documents to determine everything is in order and the

3   officer should be given limited duty?

4      A.    The case manager.  And when the case manager has

5   a question about it, they submit it to Dr. Arjmand.

6      Q.    So Dr. Arjmand serves in the capacity of a

7   consultant in that situation or would Dr. Arjmand say yes

8   or no?

9      A.    She serve as a consultant.  She's the only one

10  would reach out to the doctor and have a meeting with the

11  doctor, discussing that medical case to say, why is it that

12  person couldn't go to work, what is the problem, your note

13  wasn't clear enough, or et cetera.

14         MS. HASHIM:  I'm going to share with you this

15  next exhibit.  It's going to be Exhibit Number 2.

16         (Exhibit No. 2 marked for identification)

17         MS. HASHIM:  Okay.  I just sent it in the chat.

18  If I don't hear from anybody, I will assume that you all

19  received it and I'll go ahead and do the screenshare.

20      Okay.  I'm going to just scroll through this.  It's

21  like a three-page document.  This is the end.  We'll go

22  back up to the top here.

23  BY MS. HASHIM:

24      Q.    All right, ma'am.  Are you familiar with this

25  document?

Sheree Jones - July 25, 2023

1    A.   Yes.

2    Q.   And what is it?

3    A.   It's the letter -- limited-duty program, general

4 order for it.

5    Q.   Is this a true and accurate copy of Directive

6 E03-01-03 as is indicated on the top right corner?

7    A.   Yes.

8    Q.   Now, under Section II-B -- and Section II is

9 "Eligibility Requirements" --

10   A.   Uh-huh.

11   Q.   -- in order to be approved for LD status, it

12 seems that there are four requirements based upon this that

13 a sworn member must have the ability to do.

14   Would you say that's correct?

15   A.   That's correct.  Yes.

16   Q.   And what happens if an officer does not meet one

17 of these requirements?

18   A.   If they do not meet one of these requirements,

19 then they will -- that's when they would take it -- say

20 they come in with this paperwork.  It goes to the case

21 manager.  The case manager then goes with Dr. Arjmand and

22 discuss why they didn't meet one of these requirements.

23 And Dr. Arjmand take it from there.

24   Q.   And if these requirements are met, what would the

25 case manager do?

Sheree Jones - July 25, 2023

48

1     A.   They go on limited duty.  They go on limited
2  duty.
3     Q.   So is it correct to say then that if an officer
4  is granted limited-duty status, then that officer satisfies
5  all four of these requirements?
6     A.   Yes.
7     Q.   Okay.  Now, underneath that is Roman Numeral III,
8  "Limited Duty" section, and Subsection A, I'm just going to
9  read that for the record.
10          Subject to the availability of an
11          assignment, the needs of the department, and
12          consistent with an eligible sworn member's
13          medical limitations, the medical services section
14          may place the member into a limited-duty status
15          when the member will not be able to perform full-
16          duty tasks.
17     Did I read that correctly?
18     A.   Yes.
19     Q.   So looking at what I just read, is it a fair
20  summary to say being placed on limited-duty status depends
21  upon three things:  the availability of an assignment, the
22  needs of the department, and meeting the needs of the
23  officer's medical limitations?
24     Is that correct?
25          MR. SUHL:  Object to form.  Foundation.

Sheree Jones - July 25, 2023

1    MS. HASHIM:  You can answer.

2    THE WITNESS:  No.  Because -- it's not correct

3  because if they cannot perform their duties and meet one of

4  the four above that, then they are placed under the middle.

5  They have to have one of those capabilities, whether it's a

6  unit of assignment.  They can't go -- that means they can't

7  go back to their regular assignment.  Then they put them

8  somewhere where it's needed.  That's what that means.

9  Wherever the department need help at or short at, they'll

10  send them to their unit and they would be accommodated.

11  BY MS. HASHIM:

12    Q.   So it's maybe a combination of those two things.

13  If you meet those four items under Section Roman Numeral II

14  and if there's availability under Roman Numeral III, then

15  the officer will be placed.

16    Is that a better understanding?

17    A.   Yes.

18    Q.   So in here -- I'm just going to highlight this

19  right here.  It says, the medical services section may

20  place the member into limited-duty status when the member

21  will not be able to perform the full-duty task -- let me

22  rephrase that.

23    Actually, I want to reread that.  It says:

24    The medical services section may place the member into

25  a limited-duty status when the member will not be able to

Sheree Jones - July 25, 2023

50

1   perform full-duty tasks.

2        Did I read that correctly?

3        A.   Yes.

4        Q.   Okay.  So I'm focusing on the "may place"

5   language that's there.  Since MSS may place the member into

6   limited-duty status, would you agree that this is not

7   requiring MSS to place the officer into a limited-duty

8   status?

9             MR. SUHL:  Object to form.  Foundation.

10            THE WITNESS:  It is the --

11            MS. HASHIM:  You can answer.

12            THE WITNESS:  It is based on the medical

13  documentation the officer bring in to the MSS, medical

14  service section, is what that actually covers.

15  BY MS. HASHIM:

16       Q.   So if they bring in those documentation, is MSS

17  required to place them on LD status?

18            MR. SUHL:  Object to form.  Foundation.

19            THE WITNESS:  Yes.  We can't go against the

20  doctor orders.

21  BY MS. HASHIM:

22       Q.   Okay.  I guess I'm kind of confused because of

23  the "may" language in here.  But it's okay.  We'll let that

24  go.

25       And in Section III a, it refers to the availability of

Sheree Jones - July 25, 2023

51

1    an assignment.  To your understanding, what does

2    "availability of an assignment" mean?

3        A.   It means wherever there is an availability,

4    whether it's in warrants, whether it's in human resource,

5    whether it's in callback.  Wherever one of the many

6    departments the police department has, that's where they

7    put him at, according to their availability.  If you got a

8    bad back and can't sit long, they're going to try to place

9    you somewhere where you would be able to sit and if there's

10   less there -- they give you a comfortable chair to sit in

11   while you are sitting.  If you can't sit that long, you can

12   work part-time.  You have to be able to still work full-

13   time.

14       Q.   So does this phrase mean the availability of a

15   limited-duty assignment?

16            MR. SUHL:  Object to form.  Foundation.

17            THE WITNESS:  Yes.

18            MS. HASHIM:  I'm sorry.  Can you --

19            THE WITNESS:  Yes.

20            MS. HASHIM:  Okay.

21   BY MS. HASHIM:

22       Q.   Now, within Section III-A, it refers to an

23   officer's inability to perform full-duty tasks.  Based on

24   your experience and to the best of your understanding, what

25   would those full-duty tasks be?

Sheree Jones - July 25, 2023

1    I know we kind of touched on it a little bit earlier,

2 but I just kind of want to focus on what full-duty tasks

3 mean to your understanding.

4    A.   Well, to my understanding, full-duty task is you

5 can carry your weapon, you can shoot your weapon, you can

6 run, you can jump, you can do everything that is in the

7 call of a duty of a police officer.  If you're unable to do

8 that, then that's when you can apply for the limited-duty

9 status.

10    Q.   Would you agree when an officer is detailed to a

11 limited-duty assignment, since the officer cannot perform

12 the full-duty tasks, the limited-duty assignment is a form

13 of a job role modification for the officer?

14         MR. SUHL:  Object to form.

15         THE WITNESS:  Yes.

16 BY MS. HASHIM:

17    Q.   Now, to your knowledge, can an officer be

18 assigned to a limited-duty role to accommodate a disability

19 through the City's reasonable accommodation policy?

20         MR. SUHL:  Object to form.

21         THE WITNESS:  Not to my knowledge.

22 BY MS. HASHIM:

23    Q.   So to your knowledge, is a limited-duty

24 assignment not provided as an accommodation through the

25 City's reasonable accommodation policy?

Sheree Jones - July 25, 2023

53

1          MR. SUHL:  Object to form.

2          THE WITNESS:  Not to my knowledge.

3    BY MS. HASHIM:

4      Q.   So it is possible, based upon what you just

5    testified to, for the City to give a reasonable

6    accommodation to an officer with the accommodation being a

7    limited-duty role.

8          MR. SUHL:  Same objection.

9          THE WITNESS:  Yeah.  Basically what it is.  Yes.

10   BY MS. HASHIM:

11     Q.   When an officer has a physical impairment due to

12   an illness or an injury and wants to be placed on limited-

13   duty status, what are the main steps the officer needs to

14   take to get on limited-duty status?

15        I know you might have mentioned it before, but I just

16   want to make sure we have it down.

17     A.   Okay.  The officer cannot have crutches, walker,

18   cane, anything of those things.  They have to still be able

19   to physically walk into that unit of assignment and be able

20   to do some type of duty.  That's why they came up with the

21   limited-duty program is to try to keep the officers on --

22   at work if they wanted to be at work.

23        If they have those things, then they're not -- they're

24   going to be placed on disability.

25     Q.   So once the paperwork is provided and the officer

Sheree Jones - July 25, 2023

54

```
 1   qualifies for limited-duty status and has been approved by

 2   the case manager or Dr. Arjmand chiming in and helping to

 3   approve this, what does the officer provide in order for

 4   their skill set to be matched to the department's needs and

 5   assignment availability?

 6        A.   Their medical documentation is telling us why

 7   they need to go on limited duty.

 8        Q.   So they go on limited duty, but how do they get

 9   matched up with what skills they have and what the City

10   needs -- or I'm sorry -- what the department needs.

11             MR. SUHL:  Object to form.  Foundation.

12             THE WITNESS:  They do that -- they tell us that

13   up front, when they apply for disability, what they able to

14   do.  They have a whole -- basically a application to fill

15   out.

16   BY MS. HASHIM:

17        Q.   Does the application ask for a resume?

18        A.   No.

19        Q.   Can an officer provide a resume?

20        A.   It's up to the officer.  It's not required.

21        Q.   And if the officer provides it, would it be

22   reviewed and considered when matching up, to your

23   knowledge?

24        A.   To my knowledge, I don't think so.

25        Q.   Okay.  And who's the one who assigns to the
```

Sheree Jones - July 25, 2023

55

1   officer the limited-duty assignment?  Who's the one who

2   matches up the officer's abilities to where the

3   department's needs are?

4        A.   That would come from the assistant or the second-

5   in-command or the superintendent.  So the first deputy

6   office does the placement of people unit of assignment.  It

7   goes to human resource.  From there, she -- he or she

8   submit it to the first deputy office because they know

9   where they're short manpower at.  They'll try to put them

10  when they -- whatever unit need the help and work -- for

11  work.  That's where they put them at.  They don't get to

12  pick and choose where they want to go.

13       Q.   And so then once the officer is assigned to that

14  desk job, who would be the officer's next in command?

15       A.   Whatever sergeant is at their unit of assignment.

16       Q.   If the officer is in a section in which there is

17  no ranking officer but there are civilian supervisors, who

18  would the direct supervisor?

19       A.   The civilian supervisor.

20       Q.   And would that civilian supervisor or the officer

21  -- ranking officer in either of those situations, would

22  they be informed of the officer's work restrictions?

23       A.   Yes.  It's in the computer.  It's in the CLEAR

24  system.

25       Q.   And is it expected that this supervisor would

Sheree Jones - July 25, 2023

56

```
 1    look in the CLEAR system to understand what those
 2    restrictions are?
 3              MR. SUHL:  Object to form.  Foundation.
 4              THE WITNESS:  They get a copy of the stuff --
 5    computer printout to take with them to the unit of
 6    assignment that they're going to.  So when they get there,
 7    they should have that already.  They get it two ways:
 8    through the CLEAR system and a handwritten -- a hand hard
 9    copy from the officer to take with them to know what their
10    limited ability are.
11    BY MS. HASHIM:
12        Q.   So MSS gives that hard copy to the officer and
13    the officer gives it to the supervisor.  Is that correct?
14        A.   Yes.
15        Q.   And MSS also puts that information in the CLEAR
16    system.
17        A.   That's correct.
18              MS. HASHIM:  Okay.  So I have a line of
19    questioning that I can go through and maybe take 15
20    minutes.  We can either take a break now or we can take it
21    after this next line of questioning.  What would you like
22    to do, ma'am?
23              THE WITNESS:  We can keep going.
24              MS. HASHIM:  Okay.
25    BY MS. HASHIM:
```

Sheree Jones - July 25, 2023

1      Q.   In your years of experience at CPD, do you recall

2  any situations or times in which there were -- there was an

3  officer who made a reasonable accommodation request and was

4  given a reassignment because of the request?

5      A.   Not to my knowledge.

6      Q.   To your knowledge, were officers reassigned to a

7  desk job due to a reasonable accommodation request?  Do you

8  have any experience observing that?

9      A.   No.

10      Q.   So in terms of MSS and reasonable accommodation

11  request process, was there any overlap, to your

12  recollection, between MSS and the reasonable accommodation

13  request process?

14          MR. SUHL:  Object to form.

15          THE WITNESS:  Not to my knowledge.  Not to my

16  knowledge.

17          MS. HASHIM:  Okay.  I want to pull up this next

18  exhibit.  It's going to be Exhibit Number 3, for the

19  record, Bates Number def.Arroyo.400 [sic] to 514.

20      Oh.  I didn't realize I was sharing that the whole

21  time.  My apologies.

22      Okay.  I just put that in the chat.

23          (Exhibit No. 3 marked for identification)

24          REPORTER:  We can address this at the break, but

25  I'm not seeing anything coming into the chat.   I don't

Sheree Jones - July 25, 2023

58

1   want to --

2           MR. SUHL:  Yeah.  I'm not seeing it either.

3           REPORTER:  All right.

4           MS. HASHIM:  Okay.  Well, we'll take a look at

5   that during the break then.  Thank you for bringing that to

6   my attention.

7           REPORTER:  Yes.

8           MS. HASHIM:  Okay.  So I'm going to go ahead and

9   screenshare.

10      So this is a very large document.  It is 115 pages.

11  All right?  And I'll represent to you that this exhibit is

12  the MSS progress notes through the CLEAR system relating to

13  Ofc. Arroyo dated February 2nd, 2007 through March 6th,

14  2020, which the City produced during the course of

15  discovery.

16      For the record, the City stipulated via email to the

17  authentication of this document after plaintiff's counsel

18  had emailed it to the City.

19      I'm just going to scroll through it.  I'm not going to

20  ask you to look at every page.  But if you notice at the

21  top right corner, it says the page number, just so you know

22  we're not skipping any pages here.  I'm going to kind of go

23  through this as quickly as I can for you.

24      And this is the last page.  So here, it has the dates,

25  February 2nd, 2007 on page 513.  All right.

Sheree Jones - July 25, 2023

1    All right.  Thank you for your patience as I scrolled

2  through that.

3  BY MS. HASHIM:

4    Q.   Based on your experience, are these the progress

5  notes, Ms. Jones, that you were talking about earlier?

6    A.   Yes.

7    Q.   And are these progress notes considered business

8  records kept and maintained in the ordinary course of

9  business by CPD?

10    A.   Yes.

11    Q.   You might have touched on this a little bit

12  earlier, but just to make sure we have it on the record,

13  what is your understanding of the purpose of progress

14  notes?

15    A.   It's so we can know what was put in there and

16  kind of progress of the officer's medical or any injury or

17  whatever and the number of days they used, the cause of it,

18  and who did the notes, and everything.  Whoever put a note

19  in, you'll see their names on the side whether it was a

20  referral or whatever.  Anything that happened on that

21  officer, it is progress and put into the computer.  So that

22  way -- it's like a second medical file, basically.  Only

23  for CPD use.

24    Q.   And on any given day, how often would you access

25  these progress notes?

Sheree Jones - July 25, 2023

60

1      A.   When the officer come in to the medical section.
2   When he on the medical or IOD, a note is put in.
3      Q.   And for you, yourself, about how frequently in a
4   day would you go in and you need to take a look at the
5   progress notes?
6      A.   Only if I had to do something on a medical file,
7   a case.  That's the only time I would have to actually
8   look, if I helped out or an officer came to me and talked
9   to me about something.  That's the only time I would have
10  to put one in while I was doing the referral, helping out
11  with the staff to do a referral or something.
12     Q.   And prior to your retirement, can you tell me who
13  in general entered notes into the system?
14     A.   All the case manager and the referral staff --
15     Q.   Would you --
16     A.   -- whoever seen that officer.
17     Q.   I'm sorry.  Say that again, ma'am.
18     A.   Whoever seen that officer at the time that
19  officer signed into the medical section, whoever his case
20  manager was or referral staff if he needed a referral.  If
21  -- only way he get a referral if it was IOD, injury on
22  duty.
23     Q.   So is it fair to say civilian employees would
24  have entered notes into the system?
25     A.   If they're a case manager or referral staff.

Sheree Jones - July 25, 2023

1    Q.   And is it fair to say sworn officers detailed to
2  MSS would have entered notes into the system?
3    A.   If they're case manager and they're referral
4  staff.
5    Q.   So is it only case managers and referral staffs
6  who entered notes or would other people?
7    A.   Only one other people is when it's filed, it's
8  being processed out to go to apply for disability, that
9  would be the disability liaison.
10   Q.   And with these notes, do you have -- have you
11 ever had any reason to doubt their accuracy?
12   A.   No.
13   Q.   And how about the truthfulness of these notes?
14 Do you recall ever having to question the truthfulness of
15 them?
16   A.   Only thing that was brought to my -- our
17 attention as a supervisor, as the management staff, if an
18 officer came in and talked to me and he said or she said, I
19 gave them a doctor note and it's not in my file and I want
20 to know what they put in the computer.  If an officer came
21 and made a complaint, then we would address that complaint
22 of that officer.
23   Q.   But otherwise, you would feel -- is it fair to
24 say, otherwise, these notes are accurate and truthful to
25 what they're reflecting?

Sheree Jones - July 25, 2023

62

1        A.    To the best of my (audio interference) --

2        Q.    I'm sorry.  You broke up there on my end.  Can

3    you repeat that, please?

4        A.    Yes.  To the best -- best of my ability, I would

5    say it's fair that they're putting the right thing in the

6    computers.

7        Q.    All right.  So I'm going to scroll down here on

8    this first page to the bottom half.  I just kind of -- be

9    able to get on the record what we're visualizing here.

10        Is it fair to say that these notes are kind of split

11    up into two columns?

12        A.    It's just the way it look on the screen.  You

13    have the medical absent report.  Then you have the day it

14    was entered and the time.  The computer generates that.

15    And then the note itself and then the detail is basically

16    what she written up there and what he is out for.  And the

17    day it was entered.

18        Q.    Who --

19        A.    And his status is ambulatory.

20        Q.    Okay.  So let's take a look at this particular

21    note here.  We're on what's Bates numbered 401.  And it's

22    the first full note on that page.  On the lefthand, it says

23    "Type" and the righthand side, it says "Notes".

24        Did I read that correctly?

25        A.    Yes.

Sheree Jones - July 25, 2023

1      Q.   And then on the left, it says, "Medical Absence"
2   and that's in bold.  So it looks like everything on the
3   lefthand side of this column is in bold and that on the
4   right hand side is what's entered in that moment for that
5   particular note.

6      Is that a fair description?

7      A.   Yes.

8      Q.   Okay.  And it looks like to differentiate one
9   note from the next, it begins with, at the top, "type" on
10  the left and "notes" on the right.  Is that correct?

11     A.   Right.

12     Q.   And then every note ends with a note number at
13  the bottom.  It says "note number" on the left and on the
14  right is, not in bold, some kind of very long digit.

15     A.   Right.

16     Q.   Okay.  So I'm going to direct your attention to
17  what's Bates numbered Arroyo.def.414.  I think we got it
18  now.  Yeah.

19     Is this big enough for you to see, ma'am?

20     A.   Yes.

21     Q.   Okay.  I want to direct your attention to this
22  note.  The highlight is only for the entered date and time
23  and it's August 9th, 2017 at 12:56 p.m.

24     Do you see that note?

25     A.   Yes.

Sheree Jones - July 25, 2023

64

1      Q.   So based on this entry, on the line ERMDTX --
2  what does ERMDTX mean?
3      A.   That's if he went to the ER medical -- medical
4  doctor.
5      Q.   And what does TX mean?
6      A.   I -- I don't know what that one means.
7      Q.   Okay.  And then on the righthand side, it has Dr.
8  Dettore, PMD on it.
9      A.   Uh-huh.
10     Q.   What does --
11     A.   Go ahead.  I'm sorry.
12     Q.   Oh.  Thank you.  What does "PMD" mean?
13     A.   That's his physician medical doctor.
14     Q.   Okay.  Could it mean primary medical doctor?
15  Like the primary care physician?
16     A.   Yes.
17     Q.   And then "APT", would that stand for appointment?
18     A.   Yes.
19     Q.   Based on this record, just reading at it, is it -
20  - would you agree that it's possible for Dr. Dettore to be
21  Ofc. Arroyo's primary care physician?
22     A.   Yes.  That's who she received a note from.
23     Q.   Okay.  Now, I'm going to go to what's Bates
24  labeled Arroyo.def -- what is it -- Arroyo.def.420.  Okay.
25     So I'm going to direct your attention to the note

Sheree Jones - July 25, 2023

65

1   that's dated January 17th, 2017, the time being 1319 hours.

2   It's military time.

3       A.   Uh-huh.

4       Q.   Based on this entry, reading the officer

5   description entry and the ERMDTX entry, who would you say

6   is -- strike that.

7       Based upon this entry, was Ofc. Arroyo seeing an

8   orthopedist?

9       A.   Yeah.  Because she received an order from the

10  orthopedic doctor.  Dr --

11      Q.   And what's the name of --

12      A.   Dr. Ho was the orthopedic --

13      Q.   Dr. --

14      A.   Dr. Ho.

15      Q.   And for the record, that's spelled H-o.  Dr. Ho.

16      A.   Yes.

17      Q.   And to your knowledge, would the disability

18  liaison have access to these records if needed?

19      A.   Only if they request it when they get their file.

20  They see all records.

21      Q.   So they would have access if access was needed.

22      A.   Right.

23      Q.   Okay.  Thank you.  I'm just going to stop sharing

24  this for right now.

25      Do you recall an officer by the name of Reyna Arroyo?

Sheree Jones - July 25, 2023

66

1      A.   I can't remember.  I seen a lot of officers, talk
2  to a lot of officers.  Since my tragedy, I can't verbally
3  picture him or remember the name too good.
4      Q.   I understand.  Is the name familiar to you?
5      A.   The name sound familiar, but I don't know who he
6  is.
7      Q.   Okay.  All right.  So I'm going to share Exhibit
8  Number 3 again.  Okay.  And here we're at what's Bates
9  labeled Arroyo.def.449.  Okay?
10     And I'm going to draw your attention, ma'am, to a note
11  dated January 23rd, 2013 at 7:16 a.m.  Do you see that note
12  here?
13     A.   Yep.
14     Q.   And at the top, in the column on the left, it
15  says, "Type", and on the righthand side, it says "Category
16  changed".  So it's not a notice, a category change.
17     Would you agree with that?
18     A.   Yeah.
19     Q.   And based upon your reading of this, ma'am, who
20  entered this note?
21     A.   It was entered by me.
22     Q.   Okay.
23     A.   Sheree Jones.
24     Q.   And it reads, under notes -- in the notes column
25  or in the column on the left where it says "notes", to the

Sheree Jones - July 25, 2023

1    right of it, it says, IOD for 21 Jan 13 is denied by COF

2    Supv -- s-u-p-v -- Jones.

3         S-u-p-v here, does that stand for supervisor?

4         A.    Yes.

5         Q.    Okay.  And Jones is a common last name.  Was this

6    you or was this someone else with COF?

7         A.    Well, that's me.

8         Q.    Okay.  And how long did you serve in this

9    capacity of working with COF?

10        A.    The whole career, I dealt with COF, committee on

11   finance.

12        Q.    All right.  So let me ask you this, because you

13   entered this note.  I think it could be read several

14   different ways.  One way that I was reading it was the

15   supervisor of COF was Supervisor Jones.

16        Is that how it's to be read, or is it to be read

17   differently?

18        A.    It's to be read different.  It says that IOD for

19   that date is denied by COF.  Then it don't have a comma in

20   there.  I entered the note.  That's the way we used to have

21   to put the notes in.

22        Q.    That makes sense now.  So it's essentially saying

23   it's denied by COF and if there was a comma there, okay,

24   then it would have been as if it was entered by you.

25        Is that right?

Sheree Jones - July 25, 2023

68

1        A.    That is correct.

2        Q.    Okay.  All right.  Well, thanks for that

3   clarification.  I appreciate that.

4        And with COF, what capacity did you work with them?

5        A.    We did all the -- we used to -- in 2013, we used

6   to get a printout on everything that is approved and

7   everything that was denied.  And what -- and when you filed

8   the IOD report, it automatic goes in as injury on duty

9   because you filed that report.  But once the committee made

10  the decision was you in the line of duty or was you not in

11  the line of duty, we then have to go back in and change the

12  category.  Only a supervisor can change the category or we

13  authorize someone else that we assign to change the

14  category.  But 99 percent of the time, supervisor the only

15  one change the categories.

16       Q.    Gotcha.  Okay.  Thank you.

17       All right.  I'm going to go to what's Bates labeled

18  Arroyo.def.425 to '26.  Okay.  I'm going to just have you

19  take a look at this bottom note that's at the bottom of

20  425.  And it straddles onto the next page.  So I'm going to

21  have you just take a look at this note and then when you're

22  ready to go to the next page, let me know and I'll scroll

23  it down so you can finish reading the note.

24       A.    Okay.  I finished reading.

25       Q.    Okay.  And I think the note ends here with that

Sheree Jones - July 25, 2023

69

1    note number.  So just to give you a fair chance to read
2    everything on here.
3         A.   Okay.
4         Q.   All right.  So does this by any chance, that last
5    note combined with this one -- does it refresh your memory
6    as to Ofc. Arroyo, by any chance?
7         A.   It still don't refresh my memory.
8         Q.   It might come.
9         A.   Probably if seeing her -- well, I know it's a
10   police officer and I can read the note, it would bring it
11   back, but no, it don't refresh my memory who she is because
12   I see this all the time.
13        Q.   Sure.  No.  I understand.  And hopefully, I'll
14   just keep asking you if this refreshes your recollection
15   hoping that it will.  So we'll just keep plowing forward.
16        But in terms of this note, at least, would you agree
17   that Ofc. Arroyo had injured her shoulder on or around
18   October 13th, 2016?
19        A.   Yeah.
20        Q.   This is a longshot, but do you recall whether the
21   shoulder injury was determined non-IOD or IOD by COF?
22        A.   I'm not for sure because if you're looking down
23   in this note, it's saying recurrence to a previous IOD.  So
24   it don't mean that she injured her shoulder on that day.
25   She's filing a -- trying to file a recurrence to a IOD on

Sheree Jones - July 25, 2023

70

1    July 23rd, 2014.

2         Q.   Okay.  All right.  So then I'll take you up to

3    what's Bates labeled Arroyo.def.421.  Okay.

4         Drawing your attention here to this note that's dated

5    December 16th, 2019 at 10:54 and it ends at the bottom of

6    this page.  So go ahead and take a look at it so you can

7    understand the context of the note.

8         A.   Okay.  This note is basically saying that she had

9    an injury or he had an injury, and he had an IOD that was

10   denied by COF on October the 12th, 2016.  So he filed in a

11   reoccurrence, tried to file a reoccurrence to a IOD for the

12   shoulder and the shoulder pain.

13        Q.   Okay.  And so keep this one in mind.  I want to

14   take you to what's Bates numbered Arroyo.def.419.  Okay.

15   And it's dated February 16th, 2017 at the time of 1537.

16        A.   Uh-huh.

17        Q.   Again, that's military time.  Take a look at that

18   note.

19        A.   Okay.

20        Q.   All right.  And this note, is it correct to say,

21   was entered by Dr. Arjmand?

22        A.   Yes.

23        Q.   All right.  Do you remember her discussing this

24   issue with you, by any chance?  Does this ring -- does this

25   note --

Sheree Jones - July 25, 2023

1      A.   No.

2      Q.   -- ring a bell?

3      A.   No.

4      Q.   Okay.  So I'm going to go up a page to

5  Arroyo.def.418 and look at this bottom note here which also

6  ends on that same page.  And it is dated May 4th, 2017.

7  The time is 12:07.  Take a look at that note.  Maybe this

8  will help you remember things.

9      A.   Okay.

10     Q.   All right.  This note was entered by Janet

11  Kemper.  Do you know who Janet Kemper is?

12     A.   She was a sergeant in the medical section.

13     Q.   Okay.  And does reading this, along with those

14  other notes -- does it bring anything back to you?

15     A.   It's basically saying that her -- his or her IOD

16  was denied and now they're doing an IME because she's still

17  be saying -- or he's saying that the shoulder should have

18  been IOD and so the IME would determine what should the

19  shoulder has been by the IOD or reoccurrence to a IOD.

20     Q.   Okay.  And you said in there -- actually, before

21  I ask the question, just for a point of clarification, Ofc.

22  Arroyo is female.  Okay?  So now you won't have to be

23  saying he/she, his/her.

24     So you mentioned IME.  What does "IME" stand for?

25     A.   Independent medical examination.

Sheree Jones - July 25, 2023

1     Q.    Okay.  And when a grievance is filed disputing
2   the determination as to whether an injury is IOD or non-
3   IOD, to your knowledge, who does the officer file the
4   grievance with?
5     A.    I'm not for sure how the grievance is filed.  I
6   just know the people that's involved when they go to the
7   meetings for the hearing for the grievance, which would be
8   Dr. Arjmand and Janet Kemper, Sgt. Kemper.
9     Q.    Did you ever hear them mentioning that the
10  Fraternal Order of Police represented the officer?
11    A.    Well, I hear it all the time about FOP.
12    Q.    And was it in the context of grievances?
13    A.    Well, being -- being myself get their files
14  together for them, the grievance, preparing it, make sure
15  that FOP and the City attorneys got what they need or Dr.
16  Arjmand would submit them when she go.  They would take the
17  copies of the file with her and Sgt. Kemper.
18    Q.    So it sounds likes the Fraternal Order of Police
19  is involved with the grievance.  Is that a fair statement?
20    A.    Oh.  Yes.
21    Q.    Would an independent medical examiner -- strike
22  that.
23        To what extent is the independent medical examiner's
24  involvement in a grievance?  I think you might have
25  mentioned it, but I just really want to make sure we hone

Sheree Jones - July 25, 2023

73

1    that out.
2        A.    If it's a recurrence and the City is still -- or
3    it's still being denied, then the officer has a right to
4    that IME under the FOP -- federal -- the FO -- the union.
5        Q.    Okay.
6        A.    Then it's requested during the grievance process,
7    and they get the IME to determine if it's IOD or not.
8        Q.    So is the independent medical examiner who
9    determines whether it's IOD or not?
10       A.    Based on their examination.  They submit the
11   forms back to the medical section until they make the final
12   decision.  It's not a doctor that is regular seeing injured
13   on duty people.  It's an independent medical exam.
14       Q.    And how many examiners are typically involved in
15   a grievance, from your experience?
16       A.    I have no clue.
17       Q.    Is it typical for more than one IME to be
18   involved in a grievance?
19       A.    I have no clue.  I didn't work with the grievance
20   process.
21       Q.    To your knowledge, does the IME exam the officer?
22       A.    To my knowledge, yeah.  They give them a physical
23   and if they have to be able to do certain things in their
24   physical that is required to say if they can move their
25   shoulder or whatever.  They do give them a physical.

Sheree Jones - July 25, 2023

74

1    Q.    Does the IME review any documents or anything
2    else or does the IME only do the medical exam?
3    A.    No.  They request previous documents, like the
4    injury on duty and when they went to the ER and certain
5    document, whatever they requested, Dr. Arjmand needs to
6    package together and the officer -- we send it over to the
7    IME to -- or whichever IME doctor they choose to go to.
8    Q.    And to your knowledge --
9    A.    To compare notes.
10   Q.    Okay.  Thank you.  And to your knowledge, is the
11   IME typically the officer's primary care physician?
12   A.    No.  It's not.
13   Q.    And to your knowledge, is the officer typically
14   under the regular medical care of the IME?
15   A.    No.  It's not.
16   Q.    And the IME, I believe you mentioned, provides a
17   report?
18   A.    Yes.
19   Q.    Have you ever read an IME report as part of your
20   supervisory roles at MSS?
21   A.    I didn't have to read them, but I seen them in
22   the files before.
23   Q.    Do you know what typically goes into the IME
24   report?
25   A.    No.

Sheree Jones - July 25, 2023

75

1      Q.   And just hearing your testimony, am I correct in

2   saying that you're not involved at all in grievances?

3      A.   That's correct.

4      Q.   Okay.  Just based upon your observations and your

5   interactions with FOP and Dr. Arjmand, do you know how

6   grievances just generally get resolved?

7      A.   No.  Not really because I wasn't involved, and I

8   was too busy taking care of everything else in the medical

9   section.

10     Q.   Are you familiar with grievances going to

11  arbitration?

12     A.   I have processed some -- the files to get ready

13  for arbitration, but far as being in arbitration, no.

14     Q.   Would you happen to know on average how long it

15  usually takes for the arbitrator to make their decision?

16     A.   No.

17     Q.   And these IME reports, where would they typically

18  be maintained?

19     A.   In the medical file.

20     Q.   And you've said that you've seen them but it's

21  not as part of your regular duties.  Who reviews the IME

22  reports?

23     A.   Dr. Arjmand.

24     Q.   Does COF take a look at them?

25     A.   I don't know if they even get a copy of them.  I

Sheree Jones - July 25, 2023

1   don't know.

2        Q.   Do you know if Dr. Arjmand discusses the IME

3   report with anyone?

4        A.   I have (audio interference).

5        Q.   I'm sorry.  It cut off there.

6        A.   I have no knowledge of who she discuss them with.

7             MS. HASHIM:  Thank you.  I only heard half of

8   that.  I had -- I heard you go up to "I have", so sorry

9   about it.  Thank you.  I appreciate that.  Okay.

10       Would you like to take a five-minute break now or

11  would you like to keep going?

12            THE WITNESS:  I can keep going.

13            MS. HASHIM:  Okay.  Counsel, how are you doing?

14  Do you need to take a break or are you okay?

15            MR. SUHL:  Yeah.  If we could take a couple

16  minutes, that would be great.

17            MS. HASHIM:  All right.  So let's just go ahead

18  and do a five-minute break.  I'm looking at the time now.

19  How about at 11:35?  So we'll make it more than just a

20  couple minutes.  Is that okay?

21            MR. SUHL:  That works for us.

22            MS. HASHIM:  Okay.  So see you guys at the :35

23  mark.  All right?

24            REPORTER:  All right.  We're off the record at

25  11:27.

Sheree Jones - July 25, 2023

77

```
 1              (Off the record 11:27 a.m. to 11:36 a.m.)

 2              REPORTER:  We're back on the record at 11:36.

 3     BY MS. HASHIM:

 4         Q.   Okay.  So Ms. Jones, you understand that you're

 5     still under oath?

 6         A.   Yes.

 7         Q.   And did you talk or communicate to anyone about

 8     this deposition during the break?

 9         A.   No.

10         Q.   Okay.  So in the progress notes that we had

11     looked at, is it fair to say that you had looked at Ofc.

12     Arroyo's notes regarding Ofc. Arroyo's left shoulder injury

13     and a note indicating that there was an IME report?

14         A.   Yes.

15         Q.   Okay.  So I'm going to draw your attention to

16     Exhibit 3 again.  Go ahead and share that.  And here we are

17     at what's Bates numbered Arroyo.def.415.  And I'm looking

18     at a note that is dated June 6- -- yeah -- June 16th, 2017

19     at what's -- at the time of 10:11.

20         Who made this entry, Ms. Jones?

21         A.   Dr. Arjmand.

22         Q.   Okay.  And go ahead and take a look at the note.

23     Let me know when you're done.

24         A.   Okay.

25         Q.   So do you have any reason to question the
```

Sheree Jones - July 25, 2023

78

1   truthfulness of Dr. Arjmand's entry?

2       A.   No.

3       Q.   Based on your experience in working with her,

4   would you agree that she -- if anything, she received this

5   particular IME report from Dr. Mash?

6       A.   Yes.

7       Q.   Okay.  And just for clarification, this note, how

8   would you summarize it?

9       A.   She's basically saying that he did not answer the

10  question, does not refer to the letter that she sent and

11  related to the IOD and it is unclear to say that the

12  symptoms or whether to understand the issue of the 2014

13  IOD.

14      Q.   Okay.  And this is regarding Dr. Mash's IME

15  report that he submitted to CPD after examining Ofc. Arroyo

16  and reviewing --

17      A.   Right.

18      Q.   -- whatever documents he had.  Is that fair to

19  say?

20      A.   Yes.

21      Q.   And based on this, is it a fair statement that

22  she read the report?

23           MR. SUHL:  Object to form.  Foundation.

24           THE WITNESS:  Yes.

25           MS. HASHIM:  And so there was talking on top.

Sheree Jones - July 25, 2023

79

1   BY MS. HASHIM:

2        Q.   Can you repeat your answer, please?

3        A.   Yes.

4             MS. HASHIM:  Okay.  Now, I want to pull up my

5   next exhibit.  It's Number 4, Bates numbered

6   Arroyo.def.3303.

7             (Exhibit No. 4 marked for identification)

8             MS. HASHIM:  You said that you were not receiving

9   these -- oh.  I apologize.  I didn't see the little blue

10  button for sending these out.  So you should be getting

11  them.

12            MR. SUHL:  I see them now.

13            MS. HASHIM:  Yeah.  Here's Number 4.  My

14  apologies.  It's hiding there in the corner.  I didn't see

15  it.  All right.  So that's Number 4.

16       Madam Court Reporter, did you receive all four of

17  them?

18            REPORTER:  Yes.  I did.  Thank you, Counsel.

19            MS. HASHIM:  Okay.  Terrific.

20  BY MS. HASHIM:

21       Q.   All right.  Ma'am, can you see my screen?

22       A.   Yes.

23       Q.   Okay.  So this is a one-page document.  I'll just

24  have you take a look at it and let me know when you're done

25  reviewing it.

Sheree Jones - July 25, 2023

80

1       A.   Yes.

2       Q.   Okay.  So do you recognize this email, ma'am?

3       A.   No.  I don't recognize the email, but I see my

4   name on here, but don't mean I actually got it, so.

5       Q.   Okay.  Did you typically not receive emails that

6   you were CC'd on?

7       A.   Well, due to the fact I didn't come back to work

8   until after the 15th -- I came back on the 18th of 2019.  I

9   was not at work, so I couldn't have received it.

10      Q.   So when you came back to work three days later,

11  would it have been in your inbox?

12      A.   My -- once they reactivated my inbox, it could

13  have been in my inbox.

14      Q.   Okay.

15      A.   Uh-huh.  Okay.

16      Q.   And this is an email that is dated January 15th,

17  2019.  Correct?

18      A.   Right.

19      Q.   Who is Christi Ford?

20      A.   She was the lieutenant.

21      Q.   Okay.  And she is the one who this email is from.

22  Correct?

23      A.   Correct.

24      Q.   And it's to Reyna Arroyo, who is the officer

25  we're talking about in this particular case.  Right?

Sheree Jones - July 25, 2023

81

1      A.    Right.

2      Q.    And CC'd on it in addition to you is Jon Johnson.

3  Do you know who he is?

4      A.    He was our director -- acting director at the

5  time.

6      Q.    Okay.  And Michele James, do you know who she

7  was?

8      A.    Michele James is over -- was in finance.  Jon

9  Johnson was holding two titles at the time.  He was finance

10 director and medical service section director at the same

11 time until we got somebody else.

12     Q.    I thought you also said that he's -- was the

13 interim director for HR?

14     A.    He probably was at that time too.  He held

15 multiple titles at one time.

16     Q.    And with MSS, can you please repeat the title

17 that he had?

18     A.    He was acting director of MSS at the time.

19     Q.    Okay.  I appreciate that.  Thank you, ma'am.

20     And you said Michele James was with finance section?

21     A.    Yes.  She's the supervisor in finance.  She would

22 have been under Jon Johnson.

23     Q.    And so I will represent to you, ma'am that during

24 this time period, Ofc. Arroyo was detailed to the finance

25 section as a part of her LD status, just so you can have

Sheree Jones - July 25, 2023

82

1    some context since it seems like you're not quite

2    remembering who Ofc. Arroyo was.  Okay?

3         A.    Uh-huh.

4         Q.    And the subject line here reads: Limited-duty

5    notification letter A.  Is that correct?  Did I read that

6    correctly?

7         A.    Yes.

8         Q.    All right.  Is it correct to say that as of this

9    date, Ofc. Arroyo was on limited-duty status?

10        A.    Yes.

11        Q.    And to the best of your knowledge, what is a

12   limited-duty notification letter A?  How would you describe

13   that?

14        A.    That's -- that was when they getting -- say, they

15   have less than a hundred days left -- anywhere from a

16   hundred to 50 days left on limited-duty status where they

17   have to make their decision of going back to work full-duty

18   or applying for disability.

19             MS. HASHIM:  All right.  I'm going to share with

20   you what's been previously marked as Exhibit 5, Bates

21   number Arroyo.def.3188.

22             (Exhibit No. 5 marked for identification)

23   BY MS. HASHIM:

24        Q.    All right, can everybody see this?  Can you see

25   this, ma'am?

Sheree Jones - July 25, 2023

83

1          A.    Uh-huh.

2          Q.    All right.  And I'm going to scroll down here.

3     That's just a one-page document.

4          A.    Uh-huh.

5          Q.    And give you an opportunity to go ahead and read

6     it.  Let me know when you're done.

7          A.    I'm done.

8          Q.    All right.  And is it correct to say that this is

9     an email from Marilyn Bishop to the plaintiff, Reyna

10    Arroyo?

11         A.    Yes.

12         Q.    All right.  And you are CC'd onto this.  And it's

13    dated --

14         A.    Yeah.

15         Q.    -- and it's dated January 29th, 2019.  Correct?

16         A.    Correct.

17         Q.    And Latonya Smith and Dr. Arjmand are also CC'd

18    to this.  Correct?

19         A.    Correct.

20         Q.    All right.  And the subject line reads:  Limited-

21    duty notification letter B.  Did I read that properly?

22         A.    Yeah.

23         Q.    And to the best of your knowledge, what is a

24    limited-duty notification letter B?  How would you describe

25    that?

Sheree Jones - July 25, 2023

84

1        A.    Limited-duty letter number B is your final letter
2   to let you know exactly what date you will be pulled off of
3   payroll and you schedule a meeting to come in so that way
4   we can try to get your documents and your file done and you
5   sign off on your disability forms and everything to get
6   your file out the office to go downtown to where it needs
7   to go for you to apply for disability.
8        Q.    And --
9        A.    So when this letters states she expire on March
10  the 30th, she was supposed to come in no later than March
11  the 1st.
12       Q.    And do you know Marilyn Bishop?
13       A.    Yes.
14       Q.    And who is Marilyn Bishop?
15       A.    Marilyn Bishop's an officer that does the
16  limited-duty accounts and send out the letters, keep up
17  with how many days they use and when they're getting ready
18  to expire.
19       Q.    And you see her signature block down to the
20  bottom left.  Under her name, it says, "Disability
21  Liaison".
22       A.    Right.
23       Q.    Did I read that correctly?
24       A.    Yes.
25       Q.    And this -- is this a correct title for Ofc.

Sheree Jones - July 25, 2023

85

1    Bishop?

2         A.    Yes.

3         Q.    And can you -- forgive me for asking you this

4    again, but I'd just like to have a greater understanding of

5    the responsibilities of the disability liaison who is in

6    the medical services section.

7         So what are her duties and responsibilities?

8         A.    She runs a daily report which give her the total

9    numbers of days our officer used, whether it's IOD or

10   injury on duty.  Once she gets to -- to -- they get 365.

11   So when she gets to the 250 mark, she sends out the letter

12   A, so it might be more than a hundred days left.  When they

13   get all the way done prior to their ending date, they get

14   the letter B.  They are to come in.  We try our best to get

15   them in three weeks prior to their getting down to their

16   last day so to give Marilyn Bishop time to copy the file,

17   black out what you need to black out that you're not

18   supposed to send out and get their files down to the

19   pension board for their meeting with the pension board when

20   they schedule their meeting to apply for the disability.

21        Q.    And so to your knowledge, this title, disability

22   liaison, is this the same disability liaison that we had

23   covered earlier in the reasonable accommodation policy?

24        A.    No.

25        Q.    Okay.

Sheree Jones - July 25, 2023

86

1      A.    It's an in-house disability liaison.

2      Q.    That's what Marilyn Bishop is?

3      A.    Yes.

4      Q.    And does Marilyn Bishop have anything to do with

5  the reasonable accommodation policy?

6      A.    No.

7      Q.    Okay.  And Latonya Smith, she's CC'd on here.

8  Who is she?

9      A.    She was her case manager at the time.

10     Q.    And the Supervisor Jones that's referred to in

11 the body of the email, was -- is that you?

12     A.    Yes.

13     Q.    And was your -- was that your phone number at the

14 time?

15     A.    That's the medical section phone number.  Yes.

16 That was my direct phone number.

17     Q.    And so it correct to say that the email instructs

18 Ofc. Arroyo to contact you to discuss her chosen option

19 provided in the limited-duty notification letter B?

20     A.    Yes.

21     Q.    And to the best of your recollection, what

22 options is this email referring to?

23     A.    The option is by her being out of time, the only

24 option was to apply for disability and in the package, it

25 tell them about the reasonable accommodation that she can

Sheree Jones - July 25, 2023

1    try to apply for.  So those are the two options.  If she
2    felt -- or like, if she had -- based on her medical file,
3    we would have looked at it, getting it ready for the
4    pension board.  We would have given her her options to tell
5    her what she can try to apply for.
6                 MS. HASHIM:  So I'm going to share with you
7    what's been previously marked as Exhibit 7.
8         I'm sorry.  You have to give me a second here.
9         Did I skip a number, Madam Court Reporter?
10                REPORTER:  We haven't seen --
11                MS. HASHIM:  Is this Exhibit 7 or 6.
12                REPORTER:  We have not seen 6 yet.  You did just
13   --
14                MS. HASHIM:  Okay.  This is --
15                REPORTER:  -- name the last one 7, though.
16                MS. HASHIM:  My apologies.  Then it is 6.
17                REPORTER:  Okay.  So we will correct that and
18   this will be Number 6.
19                (Exhibit No. 6 marked for identification)
20   BY MS. HASHIM:
21        Q.   Okay.  Do you see this, ma'am?
22        A.   Yes.
23        Q.   Okay.  I'm going to go ahead and scroll down
24   It's a two-page document.  Okay.  Going up -- down here.
25   I'm going to page Arroyo.def.2013.

Sheree Jones - July 25, 2023

88

1      A.    Uh-huh.

2      Q.    Taking it to the top of the page.

3      All right.  Do you recognize this?

4      A.    Yep.

5      Q.    And what is it, ma'am?

6      A.    This is a limited-duty notification letter A that

7   tells you about the days she used.  It is filled out by

8   Marilyn Bisho, tell her when she went on the medical, how

9   many days she used, and when will her days expire.

10     Q.    And is this a fair and accurate representation of

11  the letter that was sent to Ofc. Arroyo on January 8th,

12  2018?

13     A.    Yes.  This would be the exact letter that was

14  sent to her.

15     Q.    And who issued it?

16     A.    Bishop.  Marilyn Bishop.  The liaison for her.

17     Q.    Okay.  And on the signature line, who signed it?

18  The commanding officer.  That's not Marilyn Bishop.  Right?

19     A.    No.  That's Christi Ford.

20     Q.    Okay.  So is it more accurate to say that

21  Christine Ford is the one who issued this?

22     A.    Well, she just signed off on the date -- had to

23  sign off on all the documents we sent out.

24     Q.    All right.  You see the five bullet points that

25  are in this letter, ma'am?

Sheree Jones - July 25, 2023

89

1      A.    Uh-huh.

2      Q.    And what are these referring to?

3      A.    Those five bullet points are what they can try to

4  -- if you go before the board and they say you cannot

5  return to full duty, these are five things they are able to

6  apply for and do and such doing.  You may use your medical

7  roll time.  You may retire or resign and submit it in

8  personnel a PAR form.  And you may apply for a leave of

9  absence in order to apply for disability benefit and then

10  it tells you you can apply -- you may require [sic] for the

11  reasonable accommodation definition as American Disability

12  Act and if applicable, you may require [sic] for a leave of

13  absence under Family Medical Leave Act.  Those are the

14  choices that they give us to give to them.

15      Q.    So these are the choices, the options, that Ofc.

16  Arroyo had at this point in time.  Is that correct?  These

17  five things?

18      A.    Yes.

19      Q.    And down here at the bottom, it has "Rec" with a

20  line and then to the right of that "Date" and then "Witness

21  or certified" and then to the right of that "Date" and

22  "Time".

23      What is the purpose of this particular section down

24  here?

25      A.    When she come in to meet and tell us what she

Sheree Jones - July 25, 2023

1   wants to do, take one of those five options, she see -- she

2   received it, so she signed off and date.  The witness would

3   be myself and date and time or if I was absent, it would be

4   Lt. Ford.  And if both of us was not there, then Bishop

5   would sign off on it to tell her that she received it.

6   It's a witness say that she received this document and

7   signed off on it.

8        Q.   So I'll represent to you that this is the

9   document that was provided by the City of Chicago as far as

10  this particular letter is concerned, what they had in their

11  records.  And is it correct for me to say that there's no

12  signature -- there are no signatures or dates at the bottom

13  of this?

14       A.   On this one, yes.

15       Q.   And is it protocol for this not to be completed?

16       A.   Well --

17            MR. SUHL:  Object to form.

18            THE WITNESS:  -- we put a copy -- we put a copy

19  in the file once we send them out, whether by email or we

20  send it to your house.  When you come in, then you sign off

21  on the document.  So when the document's first sent, you

22  don't necessarily have that on the signature on that.  You

23  only get the signature when they sit in front of their

24  meeting with you to say what they're going to do.

25  BY MS. HASHIM:

Sheree Jones - July 25, 2023

1    Q.   And so once it's signed, the City would have that

2  signed document?

3    A.   Yes.

4    Q.   So if the City -- if this is the only document

5  that the City provided to us, to the plaintiff, isn't it

6  fair to say that protocol was not followed because there's

7  no signature on here?

8         MR. SUHL:  Object to form.  Foundation.

9         MS. HASHIM:  You can answer.

10         THE WITNESS:  I can't say that's -- say that the

11  officer wasn't notified because if the officer refused to

12  sign, it should have been refused to sign on that.  So I

13  can't say that.

14  BY MS. HASHIM:

15    Q.   I'm not asking you that, ma'am, as much as

16  whether protocol was followed.  You know, we don't have the

17  signatures that are on here.  This is the only document

18  that the City produced, and I'm understanding from you that

19  it is proper protocol that once this is given to the

20  officer, they sign it and then it's placed into their file.

21  But we don't have anything with a signature.

22    So I'm just asking you if protocol was followed here.

23         MR. SUHL:  Same objection.

24         THE WITNESS:  Protocol is -- protocol is followed

25  when she come.  Then her signature should have been on the

Sheree Jones - July 25, 2023

92

1  documentation.  That is protocol.

2          MS. HASHIM:  Okay.

3          THE WITNESS:  Now where the other document at, I

4  can't speak for that.

5          MS. HASHIM:  Okay.

6  BY MS. HASHIM:

7      Q.   And I want to go up to the first page of this

8  document, what's Bates numbered Arroyo.def.2012.  All

9  right.

10      And do you recognize this document, ma'am?

11      A.   Yes.

12      Q.   And how are you familiar with it?

13      A.   It's the same -- it's the part B.

14      Q.   Okay.

15      A.   It's the same document, just it has different

16  dates on it when it was sent out, part B, and it tell her

17  the date and everything.  And it was sent to this address

18  that she has on file in the CLEAR system.  Then it's also

19  sent to both units that she works in.  She was originally

20  from 10 and she was assigned to 122.  So it went to both

21  places for her to receive the document.

22      Q.   And do you have any reason to doubt that this is

23  not a fair and accurate representation of the letter sent

24  to Ofc. Arroyo on January 24th, 2019?

25      A.   No.

Sheree Jones - July 25, 2023

93

1     Q.   And looking at the signature at the bottom, would

2  agree that the same person, CO Christi Ford, signed this

3  letter?

4     A.   Yes.

5     Q.   Would you also agree that the bottom of the

6  section is not filled out?

7     A.   Yes.

8     Q.   And would you agree that it is proper standard

9  protocol for LD notification letter B to completed when

10  it's filed.

11          MR. SUHL:  Object to form.  Foundation.

12          THE WITNESS:  No.  It -- because you're also

13  going to get a second copy of the same letter when the

14  officer come in to sit down and sign her final forms.  So

15  it's possible that form was done before she came in.

16  BY MS. HASHIM:

17     Q.   So this was the only form that we have.  And it's

18  the only form that the City provided to us.  And the City

19  has represented to us that they've given us everything

20  that's in her file.  So if it's the only form, then would

21  you agree that protocol was not followed because it's not

22  signed?

23          MR. SUHL:  Object to form.  Foundation.

24          THE WITNESS:  Yeah.  I would agree.

25  BY MS. HASHIM:

Sheree Jones - July 25, 2023

1    Q.   Can you repeat your answer, ma'am?

2    A.   Yeah.  Yes.  I would agree.  It was not followed

3  because it's not signed.

4    Q.   All right.  Now, let me stop the screensharing.

5    Do you recall having a conversation with Ofc. Arroyo

6  about those options that were provided in the letter?

7    A.   I cannot remember if I had one with her or not.

8    Q.   And if I represent to you that Ofc. Arroyo had

9  testified that she did meet with you, do you have any

10  reason to doubt that?

11    A.   No.

12    Q.   Now, Ofc. Arroyo -- I would represent to you that

13  Ofc. Arroyo had testified that she did discuss with you

14  taking medical roll days.

15    Do you have any reason to doubt that?

16    A.   No.  Because when she got that letter, her

17  medical time was running out, so she was already used her -

18  - if she went on the medical, you should have a document in

19  her file stating that she went on the medical after those

20  dates and use her days out.

21    Q.   Right.  And in fact, that is what she said.  I'll

22  represent to you that she did go on medical roll to utilize

23  her days, which gave her until November 17th of 2019.

24    Does any of that ring a bell to you?

25    A.   No.

Sheree Jones - July 25, 2023

95

1      Q.   All right.  If she had discussed with you the
2  medical roll days, would it be typical of you to have
3  looked up how many medical roll days she had available?
4      A.   Yes.
5      Q.   And under that scenario, would you have told her
6  when her medical roll days would end?
7      A.   Yes.
8           MS. HASHIM:  Okay.  So I'm going to share with
9  you Exhibit 7.  All right.  Sending with you in the chat.
10 And then we'll share with you now.  All right.
11          (Exhibit No. 7 marked for identification)
12 BY MS. HASHIM:
13     Q.   This is a one-page document and just for the
14 record, it's Bates numbered Arroyo.def.3535.  And are you
15 familiar with this document, ma'am?
16     A.   Yes.
17     Q.   And what is it?
18     A.   This is a medical absent [sic] report.
19     Q.   And is this kept in the ordinary course of
20 business at CPD?
21     A.   Yes.  When we close their file out in the CLEAR
22 system, this is the report that is given.  When she went on
23 the medical and her time ran out, her last day of medical
24 was November 17th, 2019.  The reason being the leave of
25 absence or disability application it means that she filed -

Sheree Jones - July 25, 2023

96

1   - filed for disability.

2        Q.    And based on this document, when was Ofc.

3   Arroyo's first day of medical absence?

4        A.    Her first day of medical absence was the 29th of

5   March.

6        Q.    And then it continue -- she continued on medical

7   -- she started then on medical roll and stayed on medical

8   roll until November 17th, 2019.   Is that correct?

9        A.    That's correct.

10       Q.    And so how long would her medical roll have been?

11       A.    From a two-year period and she earned days back,

12  so --

13       Q.    No.   I'm simply --

14       A.    -- they give you specific time.

15       Q.    -- how much time -- I'm sorry, ma'am.   How much

16  time between March 29th, 2019 and November 17th, 2019?

17       A.    That would be March, April, May, June, July,

18  August, September, October -- almost eight to nine months.

19       Q.    Okay.   So about eight to nine months is how much

20  time she would have had between the termination of her LD

21  non-IOD days and the end of her medical roll.

22       Am I saying that correctly?

23       A.    Yes.

24       Q.    Okay.   Do you recall, by any chance, the two of

25  you discussing whether this would be enough time for her

Sheree Jones - July 25, 2023

97

1    left shoulder to heal and for her to return to work during
2    this eight-and-a-half months or nine-month period?
3          A.   No.  I do not recall.
4          Q.   Do you recall discussing with her the option of
5    retiring or resigning?
6          A.   I don't recall.
7          Q.   When you're discussing these options with an
8    officer, do you go through each one of them one by one or
9    do you just discuss with them the one that seems most
10   logical to them and kind of flesh it out?
11         A.   No.  I -- I talk one individually -- when their
12   meeting is scheduled, then I sit in on their meeting and
13   help the liaison tell them what they need to do.  If they
14   want to speak to me privately, then I allow them to speak
15   to my privately.
16         Q.   And when they speak with you privately, do you
17   just kind of listen to which of the options they think
18   would be good and kind of flesh it out with them or do you
19   go through each one of those five options.
20         A.   I go through each one of the five options and
21   explain to them what their options are, but they still have
22   to make a final decision on what they wants to do.
23         Q.   Sure.  That's understandable.  And you don't
24   recall, though, discussing with Ofc. Arroyo retiring or
25   resigning?

Sheree Jones - July 25, 2023

98

1      A.    No.

2      Q.    And you don't recall discussing with her the

3   option of taking a leave of absence in order to apply for

4   disability?

5      A.    Well, looking at the document, she applied for

6   disability, so that's the only reason I remember it.  So I

7   can't remember when I had the meeting with her, what did we

8   say in that meeting, or anything.

9      Q.    Right.  But she didn't take leave of absence on

10  March 30th, 2019.  Correct?

11     A.    She took it after she went off the medical.  So

12  if looking at this and try to refresh my memory, I mean,

13  she took the option to use all of her medical time up.

14  Because that's the only way she could have did this anyway.

15  She would have had to take the option to burn her medical

16  time up, which they would allow her to do that.  And then

17  she would apply for a leave of absence.

18     Q.    And would it make sense that one of the reasons

19  for doing this is to give for the body to heal and then get

20  back onto full-time, full-duty service?

21          MR. SUHL:  Object to form.  Foundation.

22          THE WITNESS:  Well, that's normal -- that's

23  normally what they want to do, what they tries to do.

24  BY MS. HASHIM:

25     Q.    So this is not -- her decision is a decision to

Sheree Jones - July 25, 2023

99

1    continue working.  Would you agree with that?

2         A.   No.  I do not.

3         Q.   So did she intend to resign?

4         A.    I don't know what her intent.

5         Q.   Right.  I mean --

6         A.    Why she did what she did.

7         Q.    -- if you're looking at the picture, she had an

8    option on March 30th of resigning.  Right?  Or retiring.

9    And based upon this CLEAR document, she did not choose

10   that.

11        Is that correct?

12        A.    That's correct.

13        Q.    Okay.  And she had the option of -- bottom line

14   is that the option that she chose was taking medical roll

15   days.  And she took eight-and-a-half months.  Correct?

16        A.    Correct.

17        Q.    All right.  And so if she's taking these eight-

18   and-a-half medical roll days, is that typically to allow

19   the body to heal so that the officer can go onto full duty?

20             MR. SUHL:  Object to form.  Foundation.

21             THE WITNESS:  I can't say what the officer intent

22   was because I don't know what her intent was.  What we

23   might think is not what the officer think.  We give her the

24   option and she took the option that was given to her.  Wha

25   the intents of it, I cannot speak on that because I don't

Sheree Jones - July 25, 2023

1    know what's -- what she's thinking of how she was thinking.

2    BY MS. HASHIM:

3        Q.    Okay.  So if an officer takes these medical roll

4    days and returns to work full duty because the body has

5    healed itself, would taking those medical roll days ensure

6    that the officer would be able to continue working once

7    those medical roll days end and the officer is healed?

8            MR. SUHL:  Object to form.

9            THE WITNESS:  No.  That do not ensure that they

10   could still come back to work full duty.  Some people --

11   officers don't want to be in a no-pay status, so I don't

12   know what the financial state is or her mind state was or

13   why she did what she did.  I cannot speak on why she did

14   what she choose to do.

15           MS. HASHIM:  And sure.  I understand that.

16           THE WITNESS:  It's out of my control.

17           MS. HASHIM:  Sure.  I understand that.  I

18   understand that.

19   BY MS. HASHIM:

20       Q.    And then the final option on the notification

21   letter B was a reasonable accommodation under the ADA.

22       Is it correct for me to say that you don't recall

23   discussing that with her because you didn't recall

24   discussing those other options as well?

25       A.    No.  I do not recall.

Sheree Jones - July 25, 2023

101

1      Q.   Okay.  I'm sorry.  Also FMLA leave was on there.
2  Do you recall discussing that option with her?
3      A.   I don't even recall having a meeting with her.
4           MS. HASHIM:  Okay.  That's fine.
5  We're on Exhibit 8.
6           (Exhibit No. 8 marked for identification)
7           MS. HASHIM:  I'll go ahead and put that into the
8  chat for you.
9  BY MS. HASHIM:
10      Q.   All right.  Can you see this, ma'am?
11      A.   Yes.
12      Q.   Okay.  This is, for the record, Bates numbered
13  Arroyo.def.3534.  It's a one-page document.
14           MS. HASHIM:  Sorry.  One of my applications just
15  disappeared.  There we go.  I found it.  All right.
16  BY MS. HASHIM:
17      Q.   Do you recognize this, ma'am?
18      A.   Yes.
19      Q.   And what is it?
20      A.   This is when you use so many days of -- I'm sorry
21  -- medical roll and we tell you when your last day on the
22  medical roll.
23      Q.   Now, with the notification A and notification B,
24  you had testified that reasonable accommodation were one of
25  those options.  Do you remember that testimony?

Sheree Jones - July 25, 2023

102

1    A.    Yes.

2    Q.    Okay.  Now, for this document, it is dated

3  September 3rd, 2019.  Correct?

4    A.    That's the date that she's saying that she used -

5  - yes.  It's dated the day that she wrote it out.  Yes.

6    Q.    Okay.  And who sent this?

7    A.    Marilyn Bishop.

8    Q.    Okay.  And that's her signature on the bottom

9  right corner.  Correct?

10    A.    Yes.

11    Q.    Now, below the handwritten date here where it

12  says 17 November '19, okay, it reads:

13         If you do not return to duty before you

14         exhaust these paid medical absence benefits, you

15         will be removed from the active roll.  Your

16         options at that time will include retirement,

17         resignation, or leave of absence, such as to

18         apply for disability pension benefits.

19    Did I read that accurately?

20    A.    Yes.

21    Q.    And the word "duty" in here on the first line,

22  how do you understand that word as it's used?

23    A.    Say that one more time, please?

24    Q.    Sure.  The word "duty" here -- I'll highlight it

25  for you -- is that -- we've talked about two kinds of duty:

Sheree Jones - July 25, 2023

1    full duty and limited duty.

2         Is it one of those --

3         A.    That means when they --

4         Q.    -- or is it some --

5         A.    -- when they get this letter, she done went

6    through all the other options.  When she hit that medical

7    roll, she took that option to burn her medical time, so

8    that's why she received this letter telling her her last

9    day of medical -- it would be November 17th.  She must

10   return to full duty because she has no more limited duty

11   time.  So that's why it tells you in here the option at

12   this time will include retirement, resign, or leave of

13   absence such as disability pension because she had all the

14   time to apply and do -- choose one of the options before it

15   came to this point.  It's just a standard letter that the

16   medical service section use.

17        Q.    So in this letter, the way the word "duty" is

18   used, is it referring to full duty?

19        A.    Yes.

20        Q.    Okay.  And is it fair to say that according to

21   this letter, if Ofc. Arroyo could not return to full duty,

22   then she had the option to request a reasonable

23   accommodation under the ADA?

24        A.    You can request that any time, so that would be a

25   yes.  But the letter's only stating these reasons because

Sheree Jones - July 25, 2023

1   she had that in the beginning to select and she choose to

2   go on the medical roll.

3       Q.    And the option here of requesting a reasonable

4   accommodation is not listed.  Correct?

5       A.    That's correct.

6       Q.    Okay.  And this is a document issued from MSS.

7   Right?

8       A.    Yes.

9       Q.    And is it fair to say that this particular letter

10  did not inform Ofc. Arroyo per se of the option of

11  requesting a reasonable accommodation?

12      A.    Yes.

13      Q.    Okay.

14          MS. HASHIM:  I'm going to share with you the

15  next exhibit, which we're on to Number 9 now, and that

16  would be Bates number Arroyo.def.3303.

17      Oh, I'm sorry.  Strike that.  We're going back to

18  3303, which we have already gotten into -- here it goes.

19  Exhibit Number 4.  Let me pull up Number 4 and share it

20  with you.

21      Okay.  I've just got a couple questions about this

22  particular email.

23      And ma'am, can you take a quick read -- I'll just read

24  it for the record, this first paragraph.

25      I'm sorry.  That was unclear.  Let me rephrase that.

Sheree Jones - July 25, 2023

105

1    BY MS. HASHIM:

2        Q.   I'm going to read the first paragraph from -- of

3    this email sent from Reyna Arroyo on Monday, January 14th

4    at 12:55 p.m. to Christi Ford.

5        She says:

6                    It has been brought to my attention by

7              Director Johnson to reach out to you regarding

8              usage of limited-duty days.  I have used -- in

9              parentheses -- 686 days.  As mentioned to him, I

10             have not received an actual notification in the

11             mail, parentheses, probably in transit.  However,

12             I would like to inform you that the Fraternal

13             Order of Police lawyers are meeting with the

14             board early, dash, February 14th, 2019.

15       Did I read that correctly?

16       A.   Yes.

17       Q.   Now, based on your experience and training and

18   observations, are you aware of whether MSS meets with the

19   FOP to discuss open grievances or other matters?

20       A.   Not to my recollection.

21       Q.   Okay.  Do you have -- can you deduce what she is

22   referring to with this board?

23       A.   She's saying that she used 686 days based on the

24   letter that was sent to her or her calculation.  In the

25   experience of dealing with this, people tends to figure the

Sheree Jones - July 25, 2023

1  dates wrong according to the computer and what they get
2  back.  They never deduct or -- when they get a vacation --
3  when you're on limited duty, non-IOD, your vacation time --
4  you'll get that.  So you'll get 14 straight days back.  We
5  deduct that.  Based on the -- I would have to see the
6  breakdown of her days on how they calculated because
7  everybody calculate them different.  I have to go back in
8  and correct them.  So she said she only used 686 days, but
9  the letter that was sent out on the part A shows another
10 date.  So she was discruption [sic] her days that she used
11 on limited duty.  So that's what this letter is -- so she
12 filed a grievance based on this is what she's looking at to
13 talk to the FOP based on the limited-duty days she felt
14 weren't calculated right.
15      Q.   So this last sentence, the Fraternal Order of
16 Police lawyers are meeting with the board early February
17 13th, 2019.
18      Do you know what board she's referring to?
19      A.   No.  I do not.
20      Q.   All right.  Now we're going to go to Exhibit
21 Number 9.  This is, for the record, Bates numbered
22 Arroyo.def.2080 to 2081 and 2079.
23           MS. HASHIM:  Can we just take two minutes?
24 Something is off with my exhibits.  I just want to rectify
25 that.  Can we go off for two minutes?

Sheree Jones - July 25, 2023

107

1          REPORTER:  All right.  We're off the record.  The
2     time is 12:27.
3               (Off the record 12:27 p.m. to 12:36 p.m.)
4          REPORTER:  We're back on the record.  The time is
5     12:36.
6     BY MS. HASHIM:
7          Q.   Okay.  Ms. Jones, we're coming off of a brief
8     break.  You realize that you're still under oath?
9          A.   Yes.
10         Q.   Okay.  And did you talk to anybody or discuss
11    this deposition with anybody during the break?
12         A.   No.
13              MS. HASHIM:  Okay.  I placed into the chat
14    Exhibit 9, which we'll be taking a look at now.  I'll go
15    ahead and share the screen.
16              (Exhibit No. 9 marked for identification)
17    BY MS. HASHIM:
18         Q.   All right.  I'm just going to scroll through this
19    so you can get an idea of what this document is.  Okay.
20         All right.  Are you familiar with this form, ma'am?
21         A.   Yes.
22         Q.   And what is it?
23         A.   This is when they're coming back to work off of
24    limited duty and they returning back to work.  It says
25    essential functioning for limited duty approval.

Sheree Jones - July 25, 2023

108

1      Q.   Okay.  And how are you familiar with this

2  document?

3      A.   We use it all the time.

4      Q.   Okay.  And do you have any reason to believe that

5  this form is not a true and accurate copy?

6      A.   No.

7      Q.   Okay.  And who issues this letter?

8      A.   The case manager.

9      Q.   And which officer is this regarding?

10      A.   Arroyo, Reyna.  Reyna Arroyo.

11      Q.   Reyna Arroyo.  Okay.  Thank you.

12      Okay.  So taking a look at this second paragraph here,

13  it reads:

14      Officers who are full duty are required to perform all

15  police duties without restriction.

16      Did I read that correctly?

17      A.   Yeah.

18      Q.   Okay.  And then if you look at the rest of the

19  paragraph, it describes officers who can work but have some

20  restrictions and that they may be considered for limited-

21  duty assignments.

22      Is that a fair summary?

23      A.   Yeah.

24      Q.   Okay.  And then in bold and in the last three

25  lines, it says:

Sheree Jones - July 25, 2023

109

1      Officers must be able to perform all of the essential

2   functions of police officer position in order to be

3   considered for a limited-duty assignment.

4      Did I read that sentence correctly?

5      A.   Yes.

6      Q.   And then on the same page was a list of five --

7   what seems to be -- essential functions of a police officer

8   --

9      A.   Uh-huh.

10     Q.   -- because that's the heading on top of these

11  five items.  Is that correct?

12     A.   Correct.

13     Q.   And looking at this sentence that I read to you

14  and that particular sentence toward the highlighted right

15  here -- it's not letting me; oh, there we go -- this

16  particular sentence that's bold, officers must be able to

17  perform all of the essential functions of the police

18  officer position in order to be considered for limited-duty

19  assignment.

20     Would that particular sentence -- would you agree that

21  it's referring to all sworn officers?

22     A.   Yes.

23          MR. SUHL:  Object to form.

24  BY MS. HASHIM:

25     Q.   Okay.  And then the paragraph concludes, we are

Sheree Jones - July 25, 2023

1    requesting your certification that your patient is able to

2    do the following.

3         What does "certification" in this sentence mean?

4         A.   The doctor has to say the officer can perform all

5    of their duties.

6         Q.   Okay.  And the heading of the next section reads

7    "essential functions of police officer".  Right?

8         A.   Right.

9         Q.   And in your plain reading of this, it says

10   "essential functions of police officer" -- is that

11   referring to all sworn officers?

12        A.   Yes.

13        Q.   And with what follows under the heading -- in

14   this heading, would you agree that what's listed, these

15   five things, are the essential functions of a police

16   officer, just based on how this is -- a basic reading of

17   this?

18        A.   Yes.

19        Q.   Now, there are four essential functions that are

20   listed, followed by "Please initial".  Whose initials would

21   be signed here?

22        A.   That's the doctor's initial.  That form is given

23   to the officer to take to the doctor.

24        Q.   And with number 5, it says, "Have and maintain a

25   valid and current firearms owner identification card".  And

Sheree Jones - July 25, 2023

111

1    there's no line for the doctor to initial.  Correct?

2        A.    Right.

3        Q.    Who would verify this?

4        A.    The police department that they got a firearm

5    card, they still got an active firearm card.

6        Q.    Now, if this form is signed by the physician and

7    each of those four essential functions are initialed by the

8    physician, would this then be considered certification by

9    the physician that the officer referred to is able to

10   perform the first four essential functions of the police

11   officer position?

12            MR. SUHL:  Object to form.

13            THE WITNESS:  Yes.  Yes.

14   BY MS. HASHIM:

15       Q.    Okay.  And here at 20- -- what's Bates numbered

16   Arroyo.def.2080, are all four essential functions of a

17   police officer initialed as they relate to Ofc. Arroyo?

18       A.    Yes.

19       Q.    And going on to the next page at 2080, now you're

20   more familiar with these documents than I am.  The heading

21   here is kind of cut off.  Could you fill in the blanks?

22       What would the title of this particular document be

23   where it's cut off?

24       A.    "Medical certification for limited duty

25   assignment".