EXHIBIT 18

Part 2 of 2

Pages 112-223

Sheree Jones - July 25, 2023

112

1      Q.   And what's the purpose of this form?

2      A.   This form is to say that when they come to work,

3  this is the form that they fill out for limited duty.

4      Q.   And so the physician fills this out along with

5  that essential functions for limited-duty approval form

6  that we just looked at.  Is that right?

7      A.   Right.  Correct.  The doctor fills this out as

8  well.

9      Q.   And these two forms are typically submitted

10  together.  Right?

11      A.   Yes.

12      Q.   And it would be the doctor that submits it to

13  medical services?

14      A.   The doctor give it back to the officer.  They

15  bring it in when they come in or sometime, the doctor will

16  fax it over to the case manager or email it to the case

17  manager, but we prefer them to bring it in.

18      Q.   Okay.  And above this solid line here, it says

19  that if a restrict prevents an officer from performing

20  essential functions of a police officer, then the officer

21  will not be eligible for a limited duty assignment.

22      Is that correct?

23      A.   Correct.

24      Q.   Is that a fair summary?

25      A.   Yes.

Sheree Jones - July 25, 2023

1    Q.   And like the prior form, a plain reading of this

2  sentence indicates that it's referring to the essential

3  functions of a police officer in general.   Right?

4    A.   Right.

5    Q.   And I guess just one next step.   Is it reasonable

6  to state that if an officer's eligible for limited-duty

7  assignment, then they're able to perform the essential

8  functions of a police officer.   Right?

9    A.   No.   Because it's -- the form say medical

10  certification for limited-duty assignment, but if in this

11  case she already been on limited duty, she should have

12  never received this form but to come back to work.   So she

13  can't have any restriction to come back to work as a police

14  officer because she ran out of all her time, unless this

15  form was showing later on.   But that would be the form that

16  we would give them to go -- to say what they able to do by

17  a doctor --

18    Q.   This form is dated --

19    A.   -- which she can do everything -- go ahead.

20    Q.   I'm sorry.   This form is dated September 8th,

21  2017.   My apologies.   I should have brought that to your

22  attention.

23    So that being said, with this form being completed, if

24  she's eligible for a limited-duty assignment, she is then

25  able to perform the essential functions of a police officer

Sheree Jones - July 25, 2023

114

1    because the language here says if you cannot perform the

2    essential functions of the police officer, then you're not

3    eligible for limited duty.

4              MR. SUHL:  Object to form.  Foundation.

5              THE WITNESS:  Well, in this case, she can't push

6    or pull, so that's going to take her out of full duty.

7              MS. HASHIM:  Right.

8              THE WITNESS:  The form shouldn't say she can go

9    back full duty.  The form is created wrong, which we've

10   been saying that, but who am I?  I'm just -- was the

11   supervisor.

12       It should have be if she could return back full duty.

13   It doesn't mean -- in her case, she went in and got another

14   limited duty because she burnt up all her time when she

15   took her medical roll out.  So this is a form that

16   shouldn't have been never given to her.

17   BY MS. HASHIM:

18       Q.   Well, this form, if it's completed, all right, it

19   indicates -- and I'm asking you this -- does it not

20   indicate that this officer is able to perform these five

21   essential functions and because they can finish those five

22   -- because they can perform those five essential functions,

23   then they're able to go into limited duty.

24             MR. SUHL:  Object to form.

25             THE WITNESS:  That would be correct.

Sheree Jones - July 25, 2023

 1    BY MS. HASHIM:

 2        Q.   Right.  So the doctor signed off with these four

 3    things.  We'll assume with number 5 that -- you said the

 4    police department would have a copy of her FOID card.

 5        So is the completion of this form an indication that

 6    Ofc. Arroyo, at least as of this date, was able to perform

 7    the essential functions of police officer?

 8            MR. SUHL:  Object to form.  Foundation.

 9            THE WITNESS:  According to the first sheet, she -

10    - she could.  But when he put the second sheet, it's

11    showing restriction, means that she can't.

12    BY MS. HASHIM:

13        Q.   So the essential functions that we have on here,

14    okay, that he signed off here, it is coupled with these

15    restrictions.  So it says, officers will not be eligible

16    for limited duty assignment if their restrictions prevent

17    them from performing essential functions.

18        And is it your position that these two things would

19    prevent her from being eligible for limited duty?

20        A.   It would be in her ineligible return for duty.

21    Not limited duty.

22        Q.   Okay.  So she would be eligible for limited duty

23    and because -- she would -- let me -- strike that.

24        She would be eligible for limited duty because her

25    restriction does not prevent her from performing the

Sheree Jones - July 25, 2023

1    essential functions of a police officer.

2              MR. SUHL:  Object to form.  Foundation.

3              THE WITNESS:  Well, she is restricted because she

4    can't pull ten pounds.  If you get a man that's 250 pounds,

5    how you going to push or pull him if you can't?  That's

6    going to become another IOD.  So she wouldn't be able to go

7    back on the street and she got to be able to wear her duty

8    belt.  So whoever she went to the doctor, we don't send her

9    to the doctor to get this form done.  She went to her

10   primary doctor and got this form done and it is done

11   incorrectly.

12        That's -- this form would then go to Dr. Arjmand for a

13   review and to call the doctor to communicate on why the

14   form is filled out the way it's filled out.

15   BY MS. HASHIM:

16        Q.    And so if -- I'll represent to you that limited

17   duty was granted -- a limited-duty assignment was granted

18   to Officer Nawala [sic] based off of this form.  So this

19   form, the doctor is signing off saying that she can perform

20   the essential functions of a police officer and these are

21   the restrictions, but these restrictions do not prevent her

22   from performing these essential functions.  And that's why

23   she got the limited duty.

24        Would you agree with that?

25              MR. SUHL:  Object to form.  Foundation.

Sheree Jones - July 25, 2023

1          THE WITNESS:  That is correct.

2     BY MS. HASHIM:

3          Q.   Can you repeat your answer?

4          A.   That's correct.  That's why she -- that's why she

5     got limited duty because she can't push or pull, she can't

6     -- she can't wear her vest, her duty vest.  So that's why

7     she got that because she can't do those things, she was

8     granted limited duty.  That's why she was on limited duty.

9          Q.   Now, in the scenario in which a doctor does not

10    sign off on one of these things, one of these four items,

11    okay, would you understand it to mean that the officer is

12    not able to perform that particular essential function that

13    is not initialed?

14         A.   If it's not initialed, then a officer would stay

15    on medical until the doctor say she could or can't do that

16    function.

17         Q.   Okay.

18         A.   That's the way you get the limited duty.  She can

19    be able to do it.  The doctor would have to explain why he

20    refused to sign off on it.

21         Q.   So --

22         A.   And again, they would talk to Dr. Arjmand.

23         Q.   So it is essential for all four of these items

24    under essential functions of police officer to be initialed

25    by the physician before the officer can be given limited

Sheree Jones - July 25, 2023

1   duty status.  Correct?

2              MR. SUHL:  Object to form.  Foundation.

3              THE WITNESS:  Correct.

4              MS. HASHIM:  You can answer, ma'am.

5              THE WITNESS:  Yes.  That's correct.

6   BY MS. HASHIM:

7       Q.   Okay.  Then taking a look at this next page,

8   which is Bates numbered Arroyo.def.2071, it states that she

9   may return to work on September 6th, 2017.

10      Did I read that correctly?

11      A.   Yes.

12      Q.   And it's with certain restrictions.  Right?

13      A.   Right.

14      Q.   Now, based on your experience and observations,

15  would these three documents be -- I'm sorry.

16             MS. HASHIM:  Just for the record, this last

17  document that I read from is Arroyo.def.2071.

18  BY MS. HASHIM:

19      Q.   Would these three documents be collectively

20  reviewed by the case manager to determine whether limited-

21  duty status should be granted or not?

22      A.   Yes.

23             MS. HASHIM:  Okay.  We're going to pull up the

24  next exhibit, which is Number 10.  For the record, it is

25  Arroyo.def.2083 to 2089 and 2079.

Sheree Jones - July 25, 2023

1      I inadvertently sent it to you without the exhibit

2    number.  So we're on Number 12?  Is that correct, Madam

3    Court Reporter?

4              REPORTER:  No.  I believe we're on 10.

5              MS. HASHIM:  Okay.  Ah.  I see what I'm doing

6    wrong.  Yes.  We are on 10.  Sorry about that.

7              (Exhibit No. 10 marked for identification)

8              REPORTER:  Okay.

9              MS. HASHIM:  Okay.  Thank you for your patience,

10   everyone.  Okay.  I'm going to do the screenshare.

11        All right.  I'm going to scroll through this one, give

12   you a chance to take a look at it.  Okay.

13   BY MS. HASHIM:

14        Q.  All right, ma'am.  Do you recognize this

15   document?

16        A.  Yes.

17        Q.  And what is it?

18        A.  This is an application for limited-duty

19   assessment that is given to the officer to fill out when

20   they're trying to go limited duty.

21        Q.  Do you have any reason to believe that is not a

22   fair and accurate representation of Ofc. Arroyo's

23   application for a limited-duty assignment?

24        A.  No.

25        Q.  Okay.  And see, can we tell what date it was

Sheree Jones - July 25, 2023

1   completed on?  I think I have to scroll down, perhaps.

2        Would this be the date on here, ma'am?  The 25th of

3   September, 2017?

4        A.   Right.  Yes.

5        Q.   You agree with that?  Okay.

6        A.   Yes.

7        Q.   And this particular form here is -- at the top is

8   kind of cut off.  Do you know what the heading would be on

9   here at the top, the first line?

10       A.   Certification eligibility for limited-duty

11  assignment.

12       Q.   Okay.

13       A.   Medical service section, human resource division,

14  Chicago Police Department.

15       Q.   Okay.  And for the record, that's

16  Arroyo.def.2086.  Okay.  Now, in taking a look at this

17  application, would you agree particularly this first line

18  here in this first paragraph -- would you agree that Ofc.

19  Arroyo conveyed to CPD that at the time she was seeking

20  assistance from CPD in the form of a job role modification

21  because of her injury?

22       A.   Yes.  If she's filling out this application, she

23  was.

24       Q.   Okay.  And taking a look at Bates number 2079,

25  down here at the bottom, the last page, would you agree

Sheree Jones - July 25, 2023

121

1    that Ofc. Arroyo passed the firearm qualification course?

2        A.    Yes.

3        Q.    And what is the date on the top right that is

4    handwritten?

5        A.    September the 25th, 2017.

6        Q.    Okay.  And I'm going to take you to Exhibit 3 and

7    I want to take a look at what's Bates numbered

8    Arroyo.def.412.  And on this entry on September 25th, 2017

9    at 10:37 a.m., it indicates that on that date that Ofc.

10   Arroyo passed at the range.

11       Would that mean the firing range?

12       A.    Yes.

13       Q.    And that she was there with her portion of the

14   limited-duty packet.  Is that correct?

15       A.    Yes.

16       Q.    "CM", that would be case manager.  Correct?

17       A.    Yes.

18       Q.    All right.  CM will initiate LD non-IOD effect

19   September 26th, 2017 for left shoulder.  Did I read that

20   correctly?

21       A.    Yes.

22       Q.    So did she begin -- does this record reflect that

23   she began her limited-duty non-IOD status on that

24   particular date?

25       A.    Yes.

Sheree Jones - July 25, 2023

1     Q.   And now, going back to the essential functions,

2  this is because the doctor completed the form, she was able

3  to perform, according to the doctor, the essential

4  functions of a police officer, with those particular

5  restrictions, and therefore she qualified for the limited-

6  duty status.

7     Is that correct?

8         MR. SUHL:  Object to form.  Foundation.

9         THE WITNESS:  That's correct.  Yes.

10        MS. HASHIM:  Thank you.

11  BY MS. HASHIM:

12     Q.   So taking a look at this particular record, is it

13  correct to say that on September 25th, 2017, when the case

14  manager initiated this status for Ofc. Arroyo that MSS knew

15  of Ofc. Arroyo's left shoulder medical condition and

16  disability?

17     A.   Well, according to this, yes.  If she had -- she

18  was on non-IOD limited duty for her left shoulder.

19     Q.   And is it correct to say that Ofc. Arroyo would

20  not have been eligible for limited-duty status had she been

21  unable to perform those five essential functions of a

22  police officer?

23         MR. SUHL:  Object to form.  Foundation.

24  Misstates prior testimony.

25         MS. HASHIM:  You can answer.

Sheree Jones - July 25, 2023

123

1        THE WITNESS:  If she wouldn't have passed part of

2  the range, she wouldn't have been back at work, so.

3  BY MS. HASHIM:

4     Q.  So is your answer yes, that Ofc. Arroyo would not

5  have been eligible for LD -- for limited-duty status had

6  she been unable to perform the five essential functions of

7  a police officer?

8        MR. SUHL:  Same objection.

9        THE WITNESS:  That would --

10       MS. HASHIM:  I'm sorry.  You broke up there.

11       THE WITNESS:  That would be yes.

12       MS. HASHIM:  Thank you.

13       THE WITNESS:  That would be yes.

14       MS. HASHIM:  Thank you.

15  BY MS. HASHIM:

16     Q.  And is it fair to say that if Ofc. Arroyo was

17  detailed to a limited-duty assignment after this date, the

18  assignment would be a job role modification from the full-

19  duty status that she had been on prior to the shoulder

20  disability?

21       MR. SUHL:  Object to form.  Foundation.

22       THE WITNESS:  Yes.

23       MS. HASHIM:  Okay.  Can you repeat your answer,

24  please?

25       THE WITNESS:  Yes.

Sheree Jones - July 25, 2023

1          MS. HASHIM:  Thank you.

2       All right.  I'm going to pull up Number 11.

3   And that's going to be Arroyo.def.2641.

4       All right.  I just sent it to you.  All right.

5          (Exhibit No. 11 marked for identification)

6   BY MS. HASHIM:

7       Q.   Just a one-page document.  Are you familiar with

8   this?

9       A.   It's not coming up on my screen.

10      Q.   Oh.  I haven't shared it with you yet.  My

11  apologies.  Thank you.  There we go.

12      Can you see it now?

13      A.   Yes.

14      Q.   Are you familiar with this document?

15      A.   Yes.

16      Q.   And would you agree that Ofc. Arroyo worked

17  limited-duty assignments after MSS placed her on limited-

18  duty status?

19      A.   She -- you don't have the full pages.

20      Q.   This is all that was given to us.  But down here

21  on the second line from the bottom, it says, September

22  26th, 2017.

23      A.   Yeah.  She -- she on limited duty because that's

24  when she went into effect.

25      Q.   And to your knowledge, Ofc. Arroyo accepted this

Sheree Jones - July 25, 2023

125

1    limited-duty job role modification.  Right?

2        A.   Yes.

3            MS. HASHIM:  Okay.  Now, we're going to go to

4    Number 12.  For the record, Arroyo.def.2149 is the Bates

5    number.

6            (Exhibit No. 12 marked for identification)

7            MS. HASHIM:  In a normal setting, when we're all

8    in a room, we just hand this over to the witness.  I'm

9    sorry with how long it's taking and I really appreciate

10   everyone's patience.  All righty.

11       There is Exhibit 12, putting it into the chat.

12   Opening it up for you to see.

13   BY MS. HASHIM:

14       Q.   All right.  Can you see it, ma'am?

15       A.   Yes.

16       Q.   And this is just a one-page document.  Are you

17   familiar with this document?

18       A.   Yes.  It's a pre-release form.

19       Q.   Okay.  And is this a form that MSS would issue?

20       A.   Yes.

21       Q.   And do you have any reason to doubt its accuracy?

22       A.   No.

23       Q.   And under the member's signature, what is the

24   date listed on the form?  Can you read that?

25       A.   Um --

Sheree Jones - July 25, 2023

126

1     Q.   It's maybe a little bit bigger on my screen.  I

2  see the 3rd of January 2018 -- or 3 Jan '18, so it'd be the

3  3rd of January, 2018.  Does that look right?

4     A.   Yeah.

5     Q.   Okay.  And what is the purpose of this form?  Can

6  you explain that to me, please?

7     A.   Medical section is normally closed only for

8  return to duty, regular people returning to duty, so her

9  case manager at the time gave her pre-release on the last

10  day she came in to the medical section.  So she had to come

11  in to the medical section on the 2nd of February to be

12  returned to duty, effective the 4th of February, so that

13  way, when she -- when the 4th get here, she goes straight

14  to her unit of assignment instead of coming in and then get

15  held up on going her regular start time.

16     Q.   Okay.  Now, this handwritten part on the bottom,

17  I've shown it to so many people.  We can't really make it

18  out.  But since this is your field and your language, maybe

19  you can help us figure it out.

20     We see, return to CM -- and "CM" as you testified, is

21  case manager -- to something and then we can't figure out -

22  - limited-duty non-IOD.

23     A.   To recreate limited-duty non-IOD status.

24     Q.   I'm sorry.  I didn't catch that.

25     A.   it's return to case manager to recreate limited-

Sheree Jones - July 25, 2023

127

1   duty non-IOD status.

2       Q.   Recreate.  There we go.  All right.  Thank you.

3   You solved a big mystery going around in our office.

4       And so what would you say was Ofc. Arroyo's work

5   status as of this date?

6       A.   She was -- she's coming off the medical roll, so

7   since she's coming off the medical roll --

8       Q.   I'm sorry.

9       A.    -- she's been pre-released to limited duty and

10  she had to create -- the case manager to create the limited

11  (audio interference).

12      Q.   I'm sorry.  To -- the last of your sentence --

13  she had to create?

14      A.   The limited-duty package in the CLEAR system, put

15  her status as limited duty in the CLEAR.

16      Q.   Okay.  Thank you.

17          MS. HASHIM:  Okay.  We're going to go to Exhibit

18  13 now, which for the record is Arroyo.def.2042 to '43.

19          (Exhibit No. 13 marked for identification)

20          MS. HASHIM:  Do you need to take a break or are

21  you okay?

22          THE WITNESS:  No.  I'm okay.

23          MS. HASHIM:  All right.  I'm going to share this

24  with you.

25  BY MS. HASHIM:

Sheree Jones - July 25, 2023

128

1      Q.   And do you recognize this document?

2      A.   That's the limited-duty package.

3      Q.   Okay.  And what's the date next to the doctor's

4  signature?  If I said February 26th, 2018, would you agree

5  to that?

6      A.   Yes.  That's the up-to-date one.

7      Q.   All right.  And it looks like it's Dr. Ho, H-o,

8  who we testified to earlier was her orthopedist.  Would you

9  agree with that?

10     A.   Yes.

11     Q.   And the four items that are under the heading

12 essential function of a police officer, are all four

13 functions initialed?

14          THE WITNESS:  I know by dog barking, somebody

15 knocking at my door.

16          MS. HASHIM:  Would you like to take a one-minute

17 break, ma'am?

18          THE WITNESS:  Yes, please.

19          MS. HASHIM:  All right.  We'll resume at 2:15 --

20 I mean, 1:15.

21          THE WITNESS:  Okay.  Thank you.

22          REPORTER:  We're off the record at 1:10.

23            (Off the record 1:10 p.m. to 1:18 p.m.)

24          REPORTER:  We're on the record.  The time is

25 1:18.

Sheree Jones - July 25, 2023

1  BY MS. HASHIM:

2       Q.   Okay.  Ms. Jones, you realize you're still under

3  oath as we continue off of this break?

4       A.   Yes.

5       Q.   All right.  And did you talk to anybody or

6  converse with anyone regarding this deposition during the

7  break?

8       A.   No.

9       Q.   Okay.  We were looking at Exhibit 13.  I'll go

10 ahead and pull that up for you.  All right.  And the date

11 is February 26th, 2018 of this form that Dr. Ho completed.

12      Is that correct?

13      A.   Yes.

14      Q.   Okay.  Thank you.

15      And is it correct to say this is concerning Ofc. Reyna

16 Arroyo?

17      A.   Yes.

18      Q.   And the physician, would you agree that the

19 physician had signed off on all four essential functions of

20 a police officer?

21      A.   Yes.

22      Q.   Okay.  And then here we have the second page of

23 this form.  It's similar to the one that you testified to

24 before, medical certification for limited-duty assignment.

25      As to this, do you have any reason to believe that

Sheree Jones - July 25, 2023

1  this was not submitted with the first page on February 8th,

2  2018?

3       So here's the date for this one --

4       A.   No.

5       Q.   -- sorry.  February 26th, 2018.

6       A.   No.

7       Q.   And is it correct for me to say that these

8  documents would have been reviewed by MSS to evaluate Ofc.

9  Arroyo's limited-duty status?

10      A.   Yes.

11      Q.   Okay.  So we're going to go back to Exhibit

12  Number 3 here.  And I'm going to go what's Bates number

13  Arroyo.def.410 and I'm going to draw your attention to

14  February 27th, 2018 entry at 7:31 a.m.  If you take a quick

15  look at that, let me know when you're done.

16      A.   I'm done.

17      Q.   Okay.  And in the notes, did the -- well, who was

18  this entered by?

19      A.   It was her old case manager, Michelle Moreno.

20      Q.   Okay.  So that was her case manager and the case

21  manager said -- noted in this entry that Ofc. Arroyo's able

22  to perform the four essential functions.

23      Those four essential functions, is she referring to

24  those four essential functions that Dr. Ho had signed off

25  on?

Sheree Jones - July 25, 2023

1      A.   Yes.

2      Q.   Okay.  And then it says, RN updated LD non-IOD.

3      Is Ofc. Moreno a registered nurse?

4      A.   Yes.

5      Q.   And does RN here refer to her as -- is she

6      referring to herself here?

7      A.   Yes.

8      Q.   Okay.  And so as of this day, Ofc. Arroyo is on

9      limited duty non-IOD.  Would you agree to that?

10     A.   Yes.

11     Q.   Okay.

12          MS. HASHIM:  So now we're going to go to Exhibit

13     14, Bates number Arroyo.def.2037 to '41.

14          (Exhibit No. 14 marked for identification)

15          MS. HASHIM:  Now, on your end, just a technical

16     question, did the screen change?  Are you seeing at the

17     bottom --

18          THE WITNESS:  Yeah.

19          MS. HASHIM:  -- yeah.  2037?

20          THE WITNESS:  Uh-huh.

21          MS. HASHIM:  Okay.  Good.  So that's like half of

22     the next step.  Now I just have to go ahead and put it into

23     the chat.  Oh.  I'm having difficulty doing that.  Hang on

24     one second.

25     This is a consequence of minimizing things.  Now I

Sheree Jones - July 25, 2023

1    can't find the chat on here.  Ah.  Found it.  Okay.
2    Fabulous.
3         All right.  Thank you for your patience.
4    BY MS. HASHIM:
5         Q.   And with this particular document, do you
6    recognize it?
7         A.   Yes.
8         Q.   Okay.  And this is regarding Ofc. Arroyo?
9         A.   Yes.
10        Q.   And you would agree that the -- on the doctor's
11   signature line, it's signed by Dr. Ho?
12        A.   Yes.
13        Q.   And what's the date on there?
14        A.   May the 18th, 2018.
15        Q.   And did he initial all four of the essential
16   functions of a police officer?
17        A.   Yes.
18        Q.   And then he included the medical certification
19   for limited-duty assignment.  Correct?
20        A.   Yes.
21        Q.   And it's the same date in the top left corner,
22   May 18th, 2018.  Right?
23        A.   Yes.
24        Q.   Okay.  Let me see.  I'm just kind of going
25   through here.  I'll give you a chance to read that.

Sheree Jones - July 25, 2023

1     A.    Okay.

2     Q.    Okay.  So who electronically signed this

3  document?

4     A.    Dr. Ho.

5     Q.    Okay.  And just for my own clarification, Dr. Ho

6  is the signing provider.  Is that right?

7     A.    Right.

8     Q.    And he's the authorizing provider?

9     A.    He's the -- her doctor.  Her doctor that she went

10 to see.

11    Q.    Okay.  All right.  And do you -- can you make out

12 what the diagnosis is listed on here?

13    A.    It's saying that MRI left shoulder order, patient

14 to follow up in four weeks to review MRI.

15    Q.    I should have brought you down to here.  There we

16 go.  On here, I'll highlight this.  It says diagnosis and

17 it says, left -- sprain of left rotator cuff capsule,

18 subsequent to --

19    A.    (Audio interference) --

20    Q.    Would you agree --

21    A.    Right.  That's what it says.

22    Q.    That's the diagnosis and it's to her left

23 shoulder.  Right?

24    A.    Right.

25    Q.    Okay.  And going on to this next document here at

Sheree Jones - July 25, 2023

1  2041, do you know what this document is?

2  　　　A.　　It's a duty status -- active duty status.

3  　　　Q.　　Okay.　And who's it from?

4  　　　A.　　The orthopedic.

5  　　　Q.　　The orthopedist, Dr. Ho?　Dr. Ho's name is

6  mentioned on this document, right?　At the top in the

7  letterhead?

8  　　　A.　　It's mentioned (audio interference) --

9  　　　Q.　　And you've -- and you've identified that she --

10  he is her orthopedist.　Right?

11  　　　A.　　Uh-huh.

12  　　　Q.　　So taking a look at these documents, based upon

13  your experience, would all of these documents collectively

14  been reviewed by MSS to evaluate Ofc. Arroyo's limited-duty

15  status?

16  　　　A.　　They're saying she could return to work on the

17  18th and filled out that she got a restriction of ten

18  pounds, no pushing or pulling, no over the shoulder, so

19  that would still keep her in limited duty.

20  　　　Q.　　Right.　For what?　Three months here?

21  　　　A.　　Yeah.　That's what --

22  　　　Q.　　Would you agree to that --

23  　　　A.　　-- according to this limited duty, three months.

24  　　　Q.　　All right.　That's at Bates number 2038.　Okay.

25  All right.　And going back to Exhibit 3, page -- Bates

Sheree Jones - July 25, 2023

1  number 410, we have this entry, May 18th at 1355 hours.

2      What does -- do you see that entry?

3      A.   I see it.

4      Q.   Okay.  And under notes, it says, LD updated X one

5  year.

6      What does that mean?  Can you interpret that for me,

7  please?

8      A.   It means that she go on limited duty for a whole

9  'nother year --

10     Q.   Okay.

11     A.   -- if she has the time to stay on that for the

12 whole year.

13     Q.   All right.  And Dawn Neary, who is she?

14     A.   She's a RN as well, case manager.

15     Q.   And do you have any reason to doubt the accuracy

16 of her entry?

17     A.   No.

18     Q.   Would you say that -- would you agree that as of

19 May 18th, 2018, MSS had determined that Ofc. Arroyo was

20 able to perform the essential functions of a police officer

21 based on those documents that I showed you?

22     A.   She was able to perform as a limited-duty police

23 officer.

24     Q.   Right.  But the essential functions, Dr. Ho

25 signed off on those.  Right?  So would you agree --

Sheree Jones - July 25, 2023

136

1      A.    Right.  But he still gave --

2      Q.    Uh-huh.

3      A.    I agree, but he still gave her restrictions.

4      Q.    With those restrictions.  Correct.  She was able

5  to perform the essential functions with those restrictions.

6  Is that a correct statement?

7           MR. SUHL:  Object to form.

8           THE WITNESS:  Yes.  Yes.

9           MS. HASHIM:  Thank you.

10 BY MS. HASHIM:

11     Q.    All right.  And is it correct to say that she

12 remained on limited-duty status?  I believe you stated

13 that.  Right?

14     A.    Yes.

15          MS. HASHIM:  Okay.  We're going to go now to

16 Exhibit 15, for the record, Arroyo.def.2020 to '22 and

17 Arroyo.def.2026.

18          (Exhibit No. 15 marked for identification)

19          MS. HASHIM:  And I just sent it in the chat and

20 here's the share.  Okay.  Take a look at this one.

21 BY MS. HASHIM:

22     Q.    And do you recognize this document?

23     A.    It's a essential function limited-duty approval.

24     Q.    Right.  And it's for Reyna Arroyo.  Right?

25     A.    Yes.

Sheree Jones - July 25, 2023

137

1    Q.   Okay.  Now, down here at the bottom, it doesn't

2  have Dr. Dettore's -- I'm sorry -- Dr. Ho's initials --

3  signature.  Correct?

4    A.   That's correct.

5    Q.   Does it look like it's Dr. Dettore?  D-e-t-t-o-r-

6  e?

7         MR. SUHL:  Object to form.

8         THE WITNESS:  Yeah.

9         MS. HASHIM:  Okay.

10  BY MS. HASHIM:

11    Q.   Was that a yes, ma'am?

12    A.   Yes.

13    Q.   Okay.  And you had testified earlier that this is

14  her primary care physician.  Do you remember that

15  testimony?

16    A.   Yes.

17    Q.   Okay.  And he initialed here in the essential

18  functions of police officer -- he initialed all of those

19  essential functions.  Correct?

20    A.   Correct.

21    Q.   Okay.  And in the medical certification for

22  limited-duty assignment, the second page, he provides

23  restrictions.  Correct?

24    A.   Correct.

25    Q.   Okay.  I want to kind of enlarge this.  I want to

Sheree Jones - July 25, 2023

1   read what he has on the third page for additional

2   information.  I read it as:

3        Reyna Arroyo had surgery on 7/19/18.  She may return

4   to work with restriction on Monday, October 1st, 2018.  No

5   duty belt for six months.  No lifting more than ten pounds.

6        Did I read that correctly?

7        A.   Yes.

8        Q.   Okay.  And then here, we have a letter.  And

9   who's this letter from?

10       Do you want me to read it?

11       It looks like Gynecologic Cancer Institute of Chicago.

12       Did I read that correctly?

13       A.   Yeah.

14       Q.   Okay.  That's in the letterhead.  All right.  And

15   it has patient name as Reyna Arroyo.  Correct?

16       A.   Correct.

17       Q.   Okay.  And the date is July 27, 2018.  Right?

18       A.   Yes.

19       Q.   And this is regarding a surgery that she had, if

20   you read the body of the letter.  Would you agree with

21   that?

22       A.   Yes.  Yes.

23       Q.   And this is from a cancer institute.  Right?

24       A.   Yes.

25       Q.   Not her orthopedist.

Sheree Jones - July 25, 2023

1      A.    Correct.

2            REPORTER:  I just want to make sure -- I think it

3   was three questions ago, was there an objection?

4            MR. SUHL:  Three questions ago?  I --

5            REPORTER:  Just a few?

6            MR. SUHL:  -- I think it's been -- I think it's

7   been at least a minute and a half, two minutes.

8            REPORTER:  Okay.  Then no.  I heard --

9            MR. SUHL:  I would say no, I don't think so.

10           REPORTER:  Okay.  I thought I heard something.

11  Thank you.

12  BY MS. HASHIM:

13      Q.    Okay.  And so based on your experience with these

14  documents have been reviewed by MSS to evaluate Ofc.

15  Arroyo's limited-duty status?

16      A.    Yes.

17      Q.    Okay.  Now, I'm going to go back to Exhibit 3,

18  page 408.  Or I'm sorry.  Bates number Arroyo.def.408.  And

19  taking a look at this August 31st, 2018 entry at 1316

20  hours, we have this note here.

21      Can you take a quick look at that, please?

22      A.    Okay.

23      Q.    Okay.  And who entered this note?

24      A.    RN Latonya Smith.

25      Q.    Okay.  And I believe you stated she was a case

Sheree Jones - July 25, 2023

140

1  manager.  Right?

2      A.  She's a case manager, but she's a nurse as well.

3      Q.  Okay.  And do you have any reason to question the

4  honesty of her progress note entries?

5      A.  No.

6      Q.  And do you have any reason to doubt the accuracy

7  of this particular note on August 31st, 2018?

8      A.  No.

9      Q.  In the note section, is it correct to say that

10  the note reflects what the two physicians had indicated as

11  Ofc. Arroyo's return to work date, basically October 1st,

12  2018?

13      A.  Yes.

14      Q.  Okay.  And so is it correct to say that as of

15  August 31st, 2018, MSS had expected that Ofc. Arroyo would

16  be able to perform essential functions of a police officer

17  by October 1st, 2018?

18          MR. SUHL:  Object to form.  Foundation.

19          THE WITNESS:  With the restriction that the

20  doctor had provided on the form.

21  BY MS. HASHIM:

22      Q.  Okay.  So in anticipating Ofc. Arroyo's ability

23  to perform the essential functions of a police officer on

24  that October date and to accommodate Ofc. Arroyo's shoulder

25  impairment, is it correct to say that Ofc. Arroyo did not

Sheree Jones - July 25, 2023

 1  have her limited-duty status removed?

 2       A.   No.  She did not.  When you go into medical, you

 3  have the medical removed.  Then when you come back, it's

 4  put back in.

 5       Q.   Okay.  And this note that's straddling Bates

 6  number 408 to 409, it's dated July -- it's being covered up

 7  here by a window -- July 23rd, 2018 at 1526 hours.

 8       Putting your attention there, this is also by Latonya

 9  Smith, the case manager.  Right?

10       A.   Right.

11       Q.   And in the note section, it says, member is to

12  ROW for the next four weeks.  All right.  Right here on the

13  righthand side?

14       A.   Yes.

15       Q.   Okay.  What does "ROW" mean?

16       A.   Remain off work.

17       Q.   Okay.  So at this point, what was Ofc. Arroyo's

18  status?

19       A.   Medical.

20       Q.   Okay.  We had talked earlier, it would also be

21  called medical roll.  Right?

22       A.   Yes.

23       Q.   Okay.  So when an officer who was on LD status

24  goes on medical roll, what happens to their LD status?

25       A.   It's just on hold --

Sheree Jones - July 25, 2023

142

1      Q.   Okay.

2      A.   -- while they're on the medical roll.

3      Q.   All right.  Now, I'm going up to here to the note

4  that straddles Bates number 407 to 408.  It's dated October

5  1st, 2018 at 0813 hours.  And the case manager is Latonya

6  Smith.  Take a quick look at this note.  Let me know when

7  you want me to scroll up.

8      A.   You can scroll up.

9      Q.   Sure.

10     A.   Okay.

11     Q.   Okay.  And is it correct to say that Ofc. Arroyo

12  was unable to complete the firearm requirement because she

13  could not wear her gun belt and so she remained off work?

14     A.   That's correct.

15     Q.   To the best of your understanding, based on what

16  you've seen, was Ofc. Arroyo's limited-duty status removed

17  at this point?

18     A.   No.

19     Q.   Okay.

20     A.   She's still on the medical roll.

21     Q.   Okay.  Is it correct to say that this firearm

22  qualification was related to returning to work after being

23  out on medical roll?

24     A.   Yes.

25     Q.   It's not related to her limited-duty status.

Sheree Jones - July 25, 2023

143

1      A.    Right.

2            MR. SUHL:  Object to form.  Foundation.

3            MS. HASHIM:  And so now we're going to take a

4   look at --

5            THE WITNESS:  That's right.

6            MS. HASHIM:  Exhibit 16, and for the record, it's

7   Arroyo.def.2014 to 2017.

8            (Exhibit No. 16 marked for identification)

9            MS. HASHIM:  I'm sorry.  It might go to 2018.

10  We'll see.

11      No.  It only goes to 2017.  So just for the record,

12  Arroyo.def.2014 to 2017.

13      Okay.  Make this a little bit larger so we can both

14  see it.  All right.

15  BY MS. HASHIM:

16      Q.    And going through this again, do you recognize

17  this document?

18      A.    Yes.

19      Q.    And who is the member that's listed at the top?

20      A.    Reyna Arroyo.

21      Q.    Okay.  And taking a look on the second page, what

22  is the date that is indicated on this document?

23      A.    10/1/18.

24      Q.    Okay.  So October 1st, 2018.  And the doctor's

25  signature, it looks like -- would you say it's Dr. Dettore?

Sheree Jones - July 25, 2023

144

1  It's not Dr. Ho.  Right?

2      A.   Right.

3      Q.   All right.  And all four of the essential

4  functions have been initialed by him.  Correct?

5      A.   Correct.

6      Q.   And then he has on the restrictions, a few

7  restrictions that are listed.  Correct?

8      A.   Yes.

9      Q.   Okay.  And then I'll read this to you that's on

10 page 2016.

11              Reyna Arroyo had surgery on 7/19/18.  She

12              may return to work on Friday, November 2nd, 2018.

13              No duty belt for five months since her surgical

14              site remains tender and swollen on her left side

15              and she cannot -- I can't make that out -- the

16              pressure against the healing incision.  No

17              lifting more than ten pounds.

18      So do you think you can fill in the blank for me of

19 what this word after cannot could be?

20      Maybe is it "tolerate"?

21              MR. SUHL:  Object to form.

22              THE WITNESS:  No.  I cannot make that word out.

23 BY MS. HASHIM:

24      Q.   Okay.  Would it make sense if it's the word

25 "tolerate"?  She cannot tolerate the pressure against the

Sheree Jones - July 25, 2023

145

1    healing incision, given the context of the paragraph?

2        A.    Yes.

3        Q.    Okay.  And let's see, five months from November

4    2nd, 2018.  Do you know when that would be?

5        A.    That would be April of 2019.

6        Q.    Okay.  And so based on your experience reading

7    this note from her physician and the other documents we

8    looked at, is it fair to say that from November 2018 to

9    April 2019, Ofc. Arroyo's restrictions were related to her

10   healing incision that -- and they were not related to her

11   left shoulder impairment at the time?

12       Is that correct to say?

13       A.    Yes.

14       Q.    And is it fair to say based on this note that she

15   was not to wear her duty belt because of the surgical

16   incision?

17       A.    Yes.

18       Q.    And no other medical reason is given as to why

19   she should not wear her duty vest.  Is that right?

20       A.    Correct.

21       Q.    And based on your experience and observations,

22   would these documents have been reviewed by MSS to evaluate

23   Ofc. Arroyo's limited-duty status?

24       A.    What's the question?

25       Q.    Yeah.  Would these documents that you've looked

Sheree Jones - July 25, 2023

146

1    at here, going up to the first page, so --

2         A.    Uh-huh.

3         Q.    -- yeah, would these documents have been reviewed

4    by MSS to evaluate Ofc. Arroyo's limited-duty status?

5         A.    Yes.

6         Q.    Okay.  Now we're going to go back to Exhibit 3

7    and we're going to go to page 407.  I'm sorry.  Bates

8    number 407.  And we're looking at an October 2nd entry

9    here.

10        Okay.  Do you see this October 2nd entry at the time

11   of 1559?

12        A.    Yes.  Yes.

13        Q.    Okay.  And case manager Latonya Smith made this

14   entry.  Right?

15        A.    Yes.

16        Q.    And do you have any reason to doubt the veracity

17   of this entry?

18        A.    No.

19        Q.    Okay.  All right.  Let me know when you're done -

20   -

21        A.    The only thing about this -- only thing about

22   this note, Latonya didn't enter this note.  Jessica Shines,

23   which is a case manager --

24        Q.    Oh.

25        A.    -- civilian case manager entered the note, but

Sheree Jones - July 25, 2023

1    Latonya was still her case manager.

2        Q.   Okay.  So Jessica entered it.  My apologies.

3    Thanks for catching that.  See, this is why we go over

4    these documents with the experts.

5        So Jessica Shines entered the note.

6        A.   Right.

7        Q.   And is it your testimony that Jessica Shines was

8    not the case manager?

9        A.   That's correct.

10       Q.   She's just the one making the entry.  Correct?

11       A.   Right.

12       Q.   Okay.  So if you can just take a look at the rest

13   of the note, let me know when you're done looking at it.

14       A.   Okay.

15       Q.   Okay.  And do you have any reason to question

16   Jessica Shines' truthfulness?

17       A.   No.

18       Q.   Okay.  And based on this entry, is it correct to

19   say that MSS approved Ofc. Arroyo for limited duty

20   beginning on November 2nd, 2018?

21       A.   Yes.

22       Q.   Okay.  And the note reflects that Ofc. Arroyo was

23   able to do the essential functions, number 1 through number

24   4.

25       Did I read that correctly?

Sheree Jones - July 25, 2023

 1        A.    Yes.

 2        Q.    And do you have any reason to doubt the accuracy

 3   of this entry?

 4        A.    No.

 5        Q.    And Ofc. Arroyo would not have been given

 6   limited-duty status had MSS determined that she was unable

 7   to perform the essential functions of a police officer.

 8   Right?

 9        A.    Right.

10        Q.    So is it correct to say that as of October 2nd,

11   2018, MSS determined that Ofc. Arroyo was able to perform

12   the essential functions of a police officer.

13             MR. SUHL:  Object to form.  Foundation.

14             THE WITNESS:  Yes.  Based on the documentation

15   they received from her doctor, it says that she can perform

16   it.  So it was approved.

17             MS. HASHIM:  Okay.  So now we're going to go to

18   Exhibit Number 17.  And for the record, that's Bates number

19   Arroyo.def.1956 to '58.  And I just put it in the chat.

20   Okay.  And take a look at this.  It's three pages.  All

21   right.

22             (Exhibit No. 17 marked for identification)

23   BY MS. HASHIM:

24        Q.    And do you recognize this document?

25        A.    Yes.

Sheree Jones - July 25, 2023

149

1      Q.   And what is it?

2      A.   Essential function for limited duty.

3      Q.   Okay.  And the member's name on this, what is the

4 name?

5      A.   Reyna Arroyo.

6      Q.   Okay.  And the doctor's signature, would you

7 agree that this Dr. Ho, the orthopedist?

8      A.   Yes.

9      Q.   And are all four of the essential functions

10 initialed by the doctor?

11     A.   Yes.

12     Q.   Okay.  And then on the next page, that would be

13 at 1957, Dr. Ho put the date on here of March 1st, 2019.

14 Right?

15     On the left side here?

16     A.   Yes.  Uh-huh.  Yes.

17     Q.   Thank you.  And then he has a number of

18 restrictions.  Correct?

19     A.   Correct.

20     Q.   For three months.  Right?

21     A.   Correct.

22     Q.   Okay.  And then going down to this next page, he

23 signed it on March 1st, 2019.  Right?

24     Did he sign this on March 1st, 2019?

25        MR. SUHL:  Object to form.  Foundation.

Sheree Jones - July 25, 2023

1          THE WITNESS:  Yes.

2          MS. HASHIM:  I'm sorry.  I can't hear you.

3          THE WITNESS:  Yes.

4          MS. HASHIM:  Thank you.

5          THE WITNESS:  Yes.

6    BY MS. HASHIM:

7       Q.   And looking at this note here, I read it as:

8       MRI left shoulder ordered, patient to follow up to

9    review MRI.

10       Did I read that correctly?

11       A.   I couldn't hear your question.

12       Q.   Sure.  I'll repeat it.

13       It says here in this note -- I'm reading it as, MRI

14   left shoulder ordered, patient to follow up to review MRI.

15       Did I read that correctly?

16       A.   Yes.

17       Q.   Okay.  So based on this record, what is the basis

18   of Ofc. Arroyo's restrictions?

19          MR. SUHL:  Object to form.  Foundation.

20          THE WITNESS:  It's saying -- it's saying she

21   previous had and they order MRI.

22   BY MS. HASHIM:

23       Q.   Right.  It's related to the shoulder.  Right?

24       A.   Right.

25       Q.   The left shoulder.

Sheree Jones - July 25, 2023

151

1       A.    Yes.

2       Q.    Okay.  And you don't see any language here of

3   this explanation being related to a surgery or an incision.

4   Right?

5       A.    No.

6       Q.    Okay.  And based on your experience, would these

7   documents have been reviewed by medical services to

8   evaluate Ofc. Arroyo's limited-duty status?

9       A.    She would have still got limited duty based on

10  this with the restriction, but they were (audio

11  interference).

12      Q.    Okay.  Taking a look at Exhibit 3 --

13            MR. SUHL:  Ms. Jones, I think you --

14            THE WITNESS:  It's getting into audits because

15  she got three different doctors doing limited-duty

16  packages.

17            MR. SUHL:  Ms. Jones, you were muted for a large

18  portion of that answer.

19            THE WITNESS:  I'm sorry.  She has three different

20  doctors doing her limited duty.  She has her orthopedist.

21  She has her cancer doctor.  And she had another doctor.  So

22  that would have brought a red flag to the medical section

23  why she not using the same doctor for her limited duty.

24  BY MS. HASHIM:

25      Q.    Uh-huh.  Sure.  And her orthopedist here in March

Sheree Jones - July 25, 2023

152

1   is the one who is taking a look at the limited-duty status

2   because prior to that, it was her cancer surgery and that

3   had all finished. Her incision had healed.

4      Is that correct?

5          MR. SUHL: Object to form. Foundation.

6          THE WITNESS: That's correct, but -- that's

7   correct, but she's not supposed to have three different

8   doctor do her limited duty because that's could be where

9   her timing is -- is wrong in her mind because every time

10   you go on the medical, your limited-duty days are still

11   counted against you in a sense when you're calculating.

12   You don't get the medical time back for that.

13          MS. HASHIM: Okay.

14          THE WITNESS: You only get medical time back is

15   when you're not on limited duty and that's where they go

16   wrong at. That's all I'm saying.

17   BY MS. HASHIM:

18      Q. I gotcha. So your answer is related to the

19   medical -- to the number of days.

20      A. Right.

21      Q. But as far as this is concerned, Dr. Ho is --

22      A. She would have been granted limited duty again.

23      Q. Okay. Thank you. Okay. We're going to go back

24   to Exhibit 3, to page -- Bates number 406. And take a look

25   at this entry on March 7th, 2019 at 1436 hours. Go ahead

Sheree Jones - July 25, 2023

1    and take a look at it, ma'am.

2         A.    Okay.

3         Q.    All right.  And it's entered by Latonya Smith,

4    the case manager.  Right?

5         A.    Correct.

6         Q.    And what work status did MSS give Ofc. Arroyo on

7    March 7th, 2019?

8         A.    They gave her another limited-duty package dated

9    March the 6th, update for three months.  And then she had

10   an IME appointment on April the 4th, 2019.

11        Q.    And Ofc. Arroyo would not have been given limited

12   duty had MSS determined that she was unable to perform the

13   essential functions of a police officer.  Right?

14             MR. SUHL:  Object to form.  Foundation.

15             THE WITNESS:  That's correct.

16   BY MS. HASHIM:

17        Q.    So is it correct to say that as of March 7th,

18   2019, MSS believed that Ofc. Arroyo was able to perform the

19   essential functions of a police officer, given the

20   restrictions?

21             MR. SUHL:  Object to form.  Foundation.

22             MS. HASHIM:  Can you repeat your answer, please?

23             THE WITNESS:  Say that again?

24             MS. HASHIM:  Sure.

25   BY MS. HASHIM:

Sheree Jones - July 25, 2023

1    Q.   Is it correct to say that as of March 7th, 2019,

2  MSS believed that Ofc. Arroyo was able to perform the

3  essential functions of a police officer?

4            MR. SUHL:  Same objection.

5            THE WITNESS:  Based on her limited-duty package,

6  they gave her limited duty.

7  BY MS. HASHIM:

8    Q.   And they would not have given her limited duty if

9  she could not perform those essential functions that the

10  doctor signed off on.  Right?

11           MR. SUHL:  Object to form.  Foundation.

12           THE WITNESS:  That's correct.

13           MS. HASHIM:  Okay.  Repeat your answer, please.

14           THE WITNESS:  Yes.  They wouldn't have gave it to

15  her.

16           MS. HASHIM:  Thank you.

17    And I'm going to -- let me see this next one, Bates

18  number 403 to 404.  It's kind of straddling these pages.

19  We're looking at a note dated May 8th, 2019 at 1324 hours.

20  Let me know when you want me to scroll down so you can read

21  it.

22           THE WITNESS:  Scroll down.  I can't see it.  I

23  can see the date, but --

24           MS. HASHIM:  Okay.

25           THE WITNESS:  Right.  Okay.

Sheree Jones - July 25, 2023

155

1        MS. HASHIM:  Yeah.  The substance of it's on the
2   next page.
3        Let me know when you're done reading.
4        THE WITNESS:  I'm done.
5        MS. HASHIM:  Okay.
6   BY MS. HASHIM:
7        Q.   So based upon your experience, when you're
8   reading this, what does this note say to you?
9        A.   It's saying that her shoulder was not related --
10  if you read all this on this page, it's saying her shoulder
11  was not related to her '07 IOD.  She had a biopsy.  She had
12  an MRI.  She was treated for her left shoulder, possible
13  rotator cuff by Dr. Ho.  She had to follow up with Dr.
14  Dettore on three months.
15       Q.   And the -- can you please repeat what you said in
16  the beginning of your answer?  I didn't quite understand
17  that.
18       A.   Okay.  If I'm going all the way down these notes
19  that I'm reading that's coming up on my screen, if you go
20  to March the --
21       Q.   Uh-huh.  29th.
22       A.   29th.
23       Q.   Yeah.  So just hold on back on that.  I'm just
24  talking about this note for May 8th, 2019.  Okay?  Which
25  kind of ends right here, kind of like in the middle --

Sheree Jones - July 25, 2023

1    bottom of the page.

2        So is it correct to say that on this particular date,

3    May 8th, 2019, that MSS knew that Ofc. Arroyo was being

4    treated for her left shoulder, possible tear of rotator

5    cuff --

6        A.   I got June the 20- -- I've got June the 28th on

7    my screen and March 29th.  I don't have May the 8th.

8        Q.   So -- okay.

9        A.   Scroll down some more.  Okay.

10       Q.   All right.  So you see the May 8th?

11       A.   Right.  But I don't get the notes part.

12       Q.   So I'm scrolling down.  Here's the May 8th.  I'm

13   --

14       A.   Okay.

15       Q.   -- scrolling down and it continues here with --

16       A.   Okay.

17       Q.   -- a --

18       A.   Go right there.

19       Q.   Okay.  There we go.

20       A.   And she was then treated for her left shoulder

21   and pain.

22       Q.   Okay.

23       A.   And she had the clinical note dated May the 8th,

24   2019, member is being treated for left shoulder, possible

25   tear to rotator cuff by Dr. Ho.

Sheree Jones - July 25, 2023

1      Q.   Right.

2      A.   And member had M -- okay.

3      Q.   All right.  So now you've read it and we're on

4 the same page, the same date.  Right?

5      So based on this, as of May 8th, 2019, is it fair to

6 say that CPD was aware of Ofc. Arroyo's left shoulder

7 impairment?

8      A.   Yes.

9      Q.   Okay.

10     A.   Because she been on and off the medical.  She on

11 limited duty for it.

12     Q.   Okay.  I'm going to go up here to June -- this

13 June 10th, 2019 entry at 1319 hours.  Do you see that one?

14     A.   Yes.

15     Q.   Okay.  And so taking a look at this note, all

16 right, let me know when you're done reading the entry.

17     A.   Okay.  It basically --

18     Q.   And this note --

19     A.   -- say the same thing.

20     Q.   Same thing.  That she's being treated for her

21 left shoulder.  Right?

22     A.   Right.

23     Q.   Okay.  So based on this, as of June 10th, 2019,

24 is it fair to say that CPD was aware of Ofc. Arroyo's left

25 shoulder impairment?

Sheree Jones - July 25, 2023

158

1      A.    Yes.

2      Q.    Okay.  Now, going up to June 14th, take a look at

3  that note.

4      A.    Same note again.

5      Q.    Okay.  About the left shoulder.  Correct?

6      A.    Right.

7      Q.    All right.  And so based on this, as of June

8  14th, 2019, is it fair to say that CPD was aware of Ofc.

9  Arroyo's left shoulder impairment?

10     A.    Yes.

11     Q.    Okay.  And going up to Bates number 402, taking a

12  look at this July 10th, 2019 entry at 11:35.  Take a look

13  at that.

14     A.    Yes.

15     Q.    Okay.  What --

16     A.    It was for her left shoulder -- she -- she had

17  shoulder surgery due to her rotated tear cuff by Dr. Ho and

18  she received member discharge summary.

19     Q.    Okay.  And so based on this, as of June 10th,

20  2019, is it fair to say that CPD was aware of Ofc. Arroyo's

21  left shoulder impairment?

22     A.    Yes.

23     Q.    Okay.  And that she had surgery for this.  Right?

24     A.    Yes.

25     Q.    All right.  Taking a look at -- let's see here --

Sheree Jones - July 25, 2023

159

1   this August 6th, 2019 entry at 1343, why don't you take a

2   look at that?

3       A.   It just says she talked to member by phone about

4   her left shoulder surgery due to a tear in her rotator cuff

5   by Dr. Ho and she received a discharge summary.  So she's

6   still out on the medical for the same thing, her left

7   shoulder.

8       Q.   And so based on this as of August 6th, 2019, it's

9   fair to say that CPD was aware of Ofc. Arroyo's left

10  shoulder impairment.  Right?

11      A.   Yes.

12      Q.   Okay.  And this August 12th, 2019 entry at the

13  time of 11:45.  Why don't you take a look at that one?

14      A.   She's still out for her left shoulder for her

15  rotator cuff surgery by Dr. Ho and she's planning to start

16  physical therapy.  Remain off of work.

17      Q.   Is that what "ROW" stands for?

18      A.   Yes.

19      Q.   Okay.  So as of August 12th, 2019, it's fair to

20  say that CPD was aware of Ofc. Arroyo's left shoulder

21  impairment.  Right?

22      A.   Yes.

23      Q.   And that CPD was aware that the plan was for her

24  to stay off work while getting physical therapy.  Is that

25  right?

Sheree Jones - July 25, 2023

160

1      A.   Yes.

2      Q.   All right.  And that's for the left shoulder.

3  Right?

4      A.   Yes.

5      Q.   Okay.  The note right above it on September 5th,

6  2019 at 1508, what does -- on that line on notes, after the

7  date, what does that mean?  It's "Mem/comm/TK copies

8  mailed".

9      What does that mean?

10     A.   Where -- where are you seeing that at?  In the

11 note?

12     Q.   Yeah.  It's just here.  I just highlighted --

13     A.   Member last day on medical roll is projected to

14 be November the 17th, 2019.  Member communicate TK copy

15 mail.  I don't know what the TK is because we never use TK

16 for nothing.

17     Q.   Okay.

18     A.   Timecard.  That's what that is.

19     Q.   Maybe timecard copies mailed?  Okay.

20     A.   Yeah.

21     Q.   Okay.

22     A.   Maybe that they came from the district, in-house.

23     Q.   Okay.  And then to the one prior, September 9th,

24 2019 at 11:57.  Take a look at that one.

25     A.   To remain off until October the 18th.  She had an

Sheree Jones - July 25, 2023

161

1    appointment at 11:50, physical therapy, left shoulder, SLAP

2    lesion two to three times a week for four to six week.

3    Status paused to left surgery due to tear rotator cuff in

4    June 2019 by Dr. Ho.

5        Q.   So this is entered by Amanda Costan -- how do you

6    say her last name?

7        A.   Casteneda.

8        Q.   Okay.  And I'll --

9        A.   She's the case -- a civilian case manager.

10       Q.   And is she a nurse?

11       A.   No.

12       Q.   Okay.

13       A.   She a case manager.

14       Q.   Okay.  And I'll spell her last name for the

15   record.  C-a-s-t like Tom-a-n like Nancy-e-d like Doctor-a.

16       Okay.  Would you -- I'm not expecting you to

17   understand some of these medical terms.  I don't know what

18   they mean.  But if you know what -- do you know what SLAP

19   lesion is?

20       A.   That's a -- a SLA lesion is an extension.

21       Q.   An extension?

22       A.   Extension.  Yes.

23       Q.   Okay.

24       A.   She has a shoulder strap on her shoulder --

25   shoulder keep her from constantly moving it and then she

Sheree Jones - July 25, 2023

162

1   got to go to therapy.

2        Q.   Okay.

3        A.   That's the only sense I can make out of that.

4        Q.   That's your understanding.  That's fine.  Just

5   trying to shed some light onto this -- these nondoctor

6   eyes.  All right.  Thank you.

7        So as of September 9th, 2019, is it fair to say CPD

8   was aware of Ofc. Arroyo's left shoulder impairment?

9        A.   Yes.

10       Q.   And that CPD was aware that Ofc. Arroyo was doing

11  physical therapy for her shoulder impairment.  Is that

12  right?

13       A.   Yes.

14       Q.   Okay.  All right.  Taking a look at this next

15  entry, it straddles what's Bates number 400 to 401.  So

16  I'll start and just let me know when you want me to scroll

17  down if you need that.  This is the --

18       A.   Scroll down.

19       Q.   -- yeah.  This is the entry dated October 21st,

20  2019 at 1350.

21       A.   Okay.  It says, member last day on the medical

22  roll is projected 17th of November, '19.  Mem/comm timecard

23  copy mail.  Member MSS with clinical note dated for the

24  18th of October 2019.  Member status post left shoulder

25  surgery due to tear rotator cuff by Dr. Ho.  Planned

Sheree Jones - July 25, 2023

```
 1   physical therapy.  And that's it.

 2        Q.   And the "s/p", you read it as status post.  Is

 3   that correct?

 4        A.   Yeah.  Yes.

 5        Q.   Okay.  Just making sure I heard you correctly.

 6   And as of October 21st, 2019, is it fair to say that CPD

 7   was aware of Ofc. Arroyo's left shoulder impairment?

 8        A.   Yes.

 9        Q.   And that CPD was aware that Ofc. Arroyo was doing

10   physical therapy for her shoulder impairment?

11        A.   Yes.

12             MS. HASHIM:  Okay.  Now we're going to go to

13   Exhibit 18.  And for the record, this is Bates number --

14   Bates labeled Arroyo_347 to '38.

15             (Exhibit No. 18 marked for identification)

16             THE WITNESS:  What date you say?

17             MS. HASHIM:  Give me just one second, ma'am.

18   There we go.  Okay.  This is Exhibit 18.  Did you have a

19   question for me, ma'am?

20             THE WITNESS:  You did, and I asked you what date.

21             MS. HASHIM:  So I'm pulling up a new exhibit

22   right now.

23             THE WITNESS:  Oh.  Okay.

24             MS. HASHIM:  Yeah.  And we have it up.

25   BY MS. HASHIM:
```

Sheree Jones - July 25, 2023

164

1      Q.    Can you see this Exhibit 18?  It's like an email
2    on a Gmail account?
3      A.    Yeah.
4      Q.    Okay.
5      A.    Uh-huh.
6      Q.    Okay.  So I'll report to you that this is an
7    email and attachment that Ofc. Arroyo produced during the
8    course of discovery to the City.  Go ahead and take a look
9    at the email.  You can just read it to yourself, and I'll
10   scroll down based upon your instructions.
11     A.    Okay.  Okay.
12     Q.    And then this is the attachment.
13     A.    Okay.
14     Q.    Okay.  So you've looked -- this is the end of it.
15   And let's just go ahead and start at the top.  How would
16   you describe this?  What is this?
17     A.    She said --
18     Q.    You don't have to summarize it.
19     A.    -- she said her -- oh.
20     Q.    Yeah.  You don't need to summarize it.
21     A.    She basically --
22     Q.    What is this?
23     A.    Okay.  She had a medical form and couldn't make
24   it due to her going to the doctor.  Her surgery wasn't
25   approved.

Sheree Jones - July 25, 2023

1     Q.   Okay.  And is this an email?

2     A.   This is a email from her.

3     Q.   From Ofc. Arroyo.  Right?

4     A.   Yes.

5     Q.   And it's to Latonya Smith, her case manager?

6     A.   To Latonya Smith, CC'd to Lt. Ford.

7     Q.   Okay.  And it's dated November 14th, 2019.  Did I

8 read that correctly?

9     A.   Yes.

10    Q.   Okay.  And it looks like this is -- what she did

11 is forwarded a message and it -- the subject line --

12    A.   She forwarded it for Maria Torres.

13    Q.   Uh-huh.  And the subject line of the forward

14 "Surgery canceled note".  Is that right?

15    A.   Uh-huh.

16    Q.   And it's --

17    A.   Yeah.

18    Q.   -- the same date.  November 14th.  Right?

19    A.   Right.

20    Q.   Okay.  And taking a look at this note, what is

21 the date of this note?

22    A.   The same date, November the 14th.

23    Q.   Okay.  And at the top, in the letterhead, it's

24 from Diamond Dettore.  Is that correct?

25    A.   Yes.

Sheree Jones - July 25, 2023

1     Q.   And he was his -- her primary care physician.

2  Right?

3     A.   Right.

4     Q.   All right.  And this is how I read it.  Let me

5  know if I'm correct.

6     Reyna was seen today for her left shoulder.  Surgical

7  intervention but delayed due to onset of acute sinusitis.

8  No work until surgical procedure and rehab completed.  To

9  be cleared to return to work per orthopedic.

10  Antidepressant started today.

11     Would you agree with that reading?

12         MR. SUHL:  Object to form.  Foundation.

13         THE WITNESS:  Yeah.  Yes.

14  BY MS. HASHIM:

15     Q.   Okay.  At MSS, what is the normal protocol upon

16  receiving a physician's note from a member?

17         MR. SUHL:  Object to form.

18         THE WITNESS:  The case manager calls the member,

19  to see and discuss the note that was written, sent into the

20  medical section.

21  BY MS. HASHIM:

22     Q.   And what happens to the note itself?  So what

23  would --

24     A.   It goes in their -- it goes in their medical

25  file.

Sheree Jones - July 25, 2023

167

1      Q.   Okay.  So it would be expected for this note to
2  be in the medical file?
3      A.   Yes.
4      Q.   Okay.  So I'm going to go back to Exhibit 3.  Is
5  there any record in here of a note being dropped off to MSS
6  on November 14th, 2019?
7           MR. SUHL:  Object to form.
8           THE WITNESS:  No.
9  BY MS. HASHIM:
10     Q.   Would it be part of the proper protocol to have
11 entered a note, that this was dropped -- that a doctor's
12 note was dropped off?
13     A.   Yeah.
14     Q.   And seeing this note, would you agree that as of
15 November 14th, 2019, CPD was made aware of the condition of
16 Ofc. Arroyo's shoulder impairment?
17          MR. SUHL:  Object to form.
18          THE WITNESS:  Well, there was a follow-up note
19 about her left shoulder.
20 BY MS. HASHIM:
21     Q.   Right.  So they were informed about the left
22 shoulder.  Correct?
23          MR. SUHL:  Object to form.
24          THE WITNESS:  Yes.
25          MS. HASHIM:  Can you repeat your answer, please?

Sheree Jones - July 25, 2023

168

```
 1              THE WITNESS:  Yes.

 2              MS. HASHIM:  Thank you.

 3              THE WITNESS:  Yes.

 4              MS. HASHIM:  Okay.  Thank you.

 5  BY MS. HASHIM:

 6      Q.   And was CPD made aware of the status of Ofc.

 7  Arroyo's pending surgical procedure?

 8              MR. SUHL:  Same objection.

 9              THE WITNESS:  Yes.

10  BY MS. HASHIM:

11      Q.   Would you agree that based upon this email and

12  the attachment that you read that CPD was made aware of

13  Ofc. Arroyo's starting to take antidepressants on or around

14  November 14th, 2019?

15              MR. SUHL:  Object to form.

16              THE WITNESS:  Yes.

17              MS. HASHIM:  Okay.  Should we take a five or ten-

18  minute break?  No?  You want to keep going?

19              THE WITNESS:  I'm fine to keep going.

20              MR. SUHL:  Do we know how much longer you think

21  it's going to take?

22              MS. HASHIM:  It depends upon the witness and

23  everything.  Probably an hour to 90 minutes, maybe less.

24              MR. SUHL:  Yeah.  Let's take a break.

25              MS. HASHIM:  Yeah.  Shall we take a break, ma'am?
```

Sheree Jones - July 25, 2023

1          THE WITNESS:  I guess so.  I got no choice, do I?

2          MS. HASHIM:  No.  No.  I -- you know what?  If

3     opposing counsel is okay --

4          THE WITNESS:  I just -- I've been restless and

5     tired.  I'd just rather get through, so whatever we got to

6     do so I can get through with this --

7          MS. HASHIM:  Okay.

8          THE WITNESS:  -- because after these dates, I

9     wasn't even on CPD no more, so -- but I'm going to answer

10    to the best of my abilities.

11         MS. HASHIM:  Yes, ma'am.  Yes, ma'am.

12       So Counsel --

13         MR. SUHL:  We can keep going.  That's fine.

14         MS. HASHIM:  Okay.  Thank you, Counsel.  Thank

15    you.  I appreciate that.

16       We're going to keep going then, ma'am.

17         THE WITNESS:  Okay.

18         MS. HASHIM:  I'm going to pull up the next

19    exhibit.

20       And so I'm going to be going back to Exhibit 7.  Let

21    me share that with you.

22       All right.  Sorry.  I can't seem to find the share

23    button again.  It's just kind of -- got lost.  I'm looking

24    for it.  Where did it go?  My goodness.  There we go.

25    Found it, finally.  Okay.  We're in business.  Okay.

Sheree Jones - July 25, 2023

170

1        So we're back to Exhibit Number 7, which is Bates
2   numbered Arroyo.def.3535.
3   BY MS. HASHIM:
4        Q.   According to this, when was Ofc. Arroyo's
5   limited-duty status terminated, ma'am?
6        A.   She was released on the 17th of November, 2019.
7        Q.   Okay.  And based on your experience and having
8   looked at all these documents, do you know why it was
9   terminated?
10            MR. SUHL:  Object to --
11            THE WITNESS:  Limited -- she applied for LOA for
12   disability application.
13   BY MS. HASHIM:
14       Q.   So that's why it was terminated?
15       A.   Yes.  And she ran out of time.  So that's why.
16       Q.   Having taken a look at all these documents and
17   these progress notes, would you agree that on March 29th,
18   2019, Ofc. Arroyo could not be a full-duty police officer
19   when her LD non-IOD days terminated?
20       A.   Yes.
21       Q.   And then in order for Ofc. Arroyo to continue
22   working at CPD after this termination date in March of
23   2019, she would need some kind of reasonable accommodation.
24       Is that correct?
25            MR. SUHL:  Object to form.

Sheree Jones - July 25, 2023

171

 1            THE WITNESS:  Yes.

 2    BY MS. HASHIM:

 3        Q.   Is it fair to say, based on your knowledge and

 4    the progress notes that MSS knew Ofc. Arroyo could not

 5    perform all police duties without restrictions when her

 6    limited duty ended?

 7        A.   Yes.

 8        Q.   And I guess is it kind of fair to say by

 9    extension, CPD knew this by way of MSS?

10            MR. SUHL:  Object to form.

11            THE WITNESS:  Well, yes.  Based on her being on

12    limited duty all that time for the same thing, that's why

13    she had to apply for disability.

14    BY MS. HASHIM:

15        Q.   And when did her -- taking a look at this exhibit

16    that's up, when did her medical roll days terminate?

17        A.   She went on the medical -- she had to -- her

18    first day of medical was the 29th of March 2019, so her

19    last day was November 17th, 2019.

20        Q.   And what is your opinion as to why it terminated?

21        A.   Because she ran out of limited-duty non-IOD days

22    and then she ran out of medical time.  So all that time she

23    been out, waiting on her surgery to get approved, she ran

24    out of time.

25        Q.   Okay.  And on November 17th, 2019, is it fair to

Sheree Jones - July 25, 2023

1    say that Ofc. Arroyo could not be full-duty police officer

2    when her medical roll days terminated.  Is that correct?

3         A.    That's correct.

4         Q.    And in order for Ofc. Arroyo to continue working

5    at CPD after this medical roll termination date in November

6    of 2019, some kind of reasonable accommodation would be

7    needed.

8         Is that correct?

9              MR. SUHL:  Object to form.  Foundation.

10             THE WITNESS:  I can't answer that because I can't

11   say what she would have needed after then.

12             MS. HASHIM:  But do you --

13             THE WITNESS:  I can only go off -- I can go off

14   of based on how the policy and procedure read.  If she ran

15   out of medical time, limited-duty days, she applied for

16   disability.

17   BY MS. HASHIM:

18        Q.    Could she have applied for reasonable

19   accommodation?

20        A.    If that's what she wanted to apply for.  I can't

21   speak for her, what she applied for.  I can only speak for

22   what's in the computer.

23        Q.    Sure.  So that was an option for her.  Right?

24        A.    Yes.  It was.  When she sat down in the meeting,

25   that was her option.  It -- whoever she had that meeting

Sheree Jones - July 25, 2023

1   with, that was her option.

2       Q.   Is it fair to say, based on your knowledge and on

3   these progress notes, that MSS knew Ofc. Arroyo could not

4   be full duty when her medical roll days ended?

5       A.   Yes.

6       Q.   Okay.  And is it fair to say that by extension,

7   CPD was aware of this as well?

8       A.   Well, yes.  Because medical section is CPD.

9       Q.   And what is your understanding why Ofc. Arroyo

10  did not continue in a limited-duty assignment?

11      A.   Because she ran out of limited-duty days.

12      Q.   To your recollection, do you know whether Ofc.

13  Arroyo's case manager discussed with Ofc. Arroyo whether

14  she should be instructed to request a reasonable

15  accommodation?

16      A.   I cannot speak for that.  I don't know what the

17  case manager discussed with her unless I was in the office.

18      Q.   Did --

19      A.   And at the end of Ape -- end of May, I was gone.

20      Q.   So before --

21      A.   Of 2019.

22      Q.   -- before -- so between -- and the time that she

23  was on medical roll, from March 30th until you left, do you

24  recall Latonya Smith discussing with you whether she

25  recommend Ofc. Arroyo to request a reasonable

Sheree Jones - July 25, 2023

1  accommodation?

2      A.   I cannot say that due to my medical illness.  I

3  was out of the office for a year and a half, fighting for

4  my own life, so I cannot say what Latonya discussed with

5  her while I was gone.  During the time I was there, I did

6  not get called in Latonya office and discuss anything with

7  her about anything that I can remember.

8      Q.   And I'm remembering now, I jotted down in my

9  notes -- my apologies -- that was in April 2019 that you

10 went to the hospital.  Right?

11     A.   I had the cardiac arrest, but before that, I had

12 cancer myself and I was on a leave of absence.

13     Q.   And do you recall anybody from MSS discussing

14 with you whether Ofc. Arroyo should make request a

15 reasonable accommodation?

16     A.   From my recollection, no, we do not sit and tell

17 them what they should do.  We only give them the options to

18 do.

19     Q.   And did anybody give --

20     A.   It's up to the officer to do that.

21     Q.   Did anybody discuss with you whether they should

22 instruct Ofc. Arroyo to consider making a request for

23 reasonable accommodation?

24     A.   Not that I can remember.

25          MS. HASHIM:  All right.  I'm going to pull up the

Sheree Jones - July 25, 2023

175

1    next exhibit.

2         All right.  Putting it into the chat for you guys.

3    And going to share screen.

4              (Exhibit No. 19A marked for identification)

5    BY MS. HASHIM:

6         Q.    Okay.  Do you see an email that's dated May 30th,

7    2019?

8         A.    Yes.

9         Q.    Okay.  Making sure we're on the same page.  So

10   this is Exhibit 19, Bates number Arroyo.def.4061.  Okay.

11   I'm just going to scroll down through this.  It's just a

12   two-page document.  Okay?

13        So I'm going to -- yeah, start at the bottom because

14   it's chronologically reversed and have you read through it

15   and just let me know when you want me to scroll up.

16        A.    You can scroll up because all it is just saying

17   the same thing.

18        Q.    Okay.  Just let me know when you're done.

19        A.    Okay.

20        Q.    All right.  So this is an email from Ofc. Arroyo

21   to Ofc. Kemper.  Actually, strike that.

22        I'll represent to you that for a period of time, Ofc.

23   Arroyo was married and she had changed her last name to

24   Sansone, S-a-n-s-o-n-e.  So this is one and the same

25   person.

Sheree Jones - July 25, 2023

1      So is this email from Reyna Sansone, also known as

2  Reyna Arroyo, to Janet Kemper?

3           MR. SUHL:  Object to form.  Foundation.

4           THE WITNESS:  Janet Kemper is a sergeant.  Was a

5  sergeant.

6  BY MS. HASHIM:

7      Q.   And so this is email from Ofc. Arroyo to Sgt.

8  Kemper?

9           MR. SUHL:  Same objection.

10  BY MS. HASHIM:

11     Q.   Would you agree to that?

12     A.   Yes.

13     Q.   Okay.  And it's dated May 30th, 2019.  Correct?

14     A.   Correct.

15     Q.   Okay.  Now, at this point, you were not at CPD,

16  just to understand your timeline.  Right?

17     A.   Right.

18     Q.   Okay.  Just real quickly, she states -- I'm

19  sorry.  And just for the record, Latonya Smith, the case

20  manager, is also CC'd to this email.  Right?

21     A.   Right.

22     Q.   Okay.  So this first sentence, she says:

23     I have not heard from you nor Dr. Rashid regarding my

24  request for permanent limited-duty status.  Any updates,

25  please?

Sheree Jones - July 25, 2023

177

1      Do you know of a Dr. Rashid?

2      A.    That's one of those independent review doctors.

3      Q.    Okay.

4      A.    That does the IMEs.

5      Q.    Okay.  So and also, just real quickly, did I read

6   that sentence to you correctly, just to have a clean

7   record?

8      A.    Yes.

9      Q.    Okay.  And is it fair to say, based upon this

10   sentence, that Ofc. Arroyo was interested in -- if not

11   requesting -- strike that.

12      In looking at the rest of this sentence, is it fair to

13   say that Ofc. Arroyo was requesting to be reassigned to

14   accommodate her disability of her left shoulder?

15           MR. SUHL:  Object to form.  Foundation.

16           THE WITNESS:  She requested -- according to this,

17   she's saying with the Dr. Rashid regarding my request.  She

18   requested to the doctor, but the doctor doesn't say if she

19   can get permanent limited duty.  She -- it had to change

20   her status from non-IOD to IOD to get permanent limited

21   duty.  Only permanent -- only IODs get permanent limited

22   duty because they got hurt in the line of duty.  So based

23   on her IME result that they're waiting on would determine

24   of her status being changed.

25   BY MS. HASHIM:

Sheree Jones - July 25, 2023

1      Q.   Now, it does say in the beginning of this, I've

2   not heard from you nor Dr. Rashid regarding my request.

3      So it sounds like -- is it correct to say that this

4   sentence is about asking Sgt. Kemper and Dr. Rashid about

5   her request for permanent limited-duty status.

6              MR. SUHL:  Object to form.  Foundation.

7   BY MS. HASHIM:

8      Q.   Can I read it that way?

9      A.   It reads that way, but if you look at the subject

10  lines, she simply said IME result, so I'm assuming they

11  waiting on the results for them to make a final decision.

12     Q.   And --

13     A.   That's what we normally -- they would normally

14  do.

15     Q.   Okay.  And does CPD allow for a permanent

16  reassignment as a reasonable accommodation under the ADA?

17             MR. SUHL:  Object to form.

18             THE WITNESS:  That's only if the ADA give them

19  the reasonable accommodation.  They gets a letter stating

20  they was granted reasonable accommodation from the ADA.

21  BY MS. HASHIM:

22     Q.   So it is possible, from your understanding and

23  experience, that she could get reassigned to limited-duty

24  status as an accommodation for -- as a reasonable

25  accommodation.

Sheree Jones - July 25, 2023

179

1          MR. SUHL:  Object to form.  Foundation.
2     BY MS. HASHIM:
3          Q.   Have you seen that before?
4          A.   From my understanding, only if the documents are
5     there and everything -- the IME results was in and she
6     filed that and they gave it to her, yes, the medical
7     service section at CPD will change her status.  It has
8     happened.  But without documentation, they're not going to
9     change it just because she request it.
10         Q.   All right.  Thank you.  So during that time
11    period from March 30th, 2019 to November 17th, 2019, when
12    Ofc. Arroyo was on medical roll, who would she be reporting
13    to if she needed to report anything?  Who would be her
14    immediate supervisor?
15         MR. SUHL:  Object to form.  Foundation.
16         THE WITNESS:  That would be finance or whoever
17    she worked for in finance would have been her immediate
18    supervisor.  If she on the medical roll, she would report
19    to her case manager.
20    BY MS. HASHIM:
21         Q.   Okay.  So when she was on medical roll, she would
22    report to Latonya Smith?
23         A.   Yes.
24         Q.   Okay.
25         MS. HASHIM:  All right.  I'm going to share this

Sheree Jones - July 25, 2023

180

1    next exhibit with you.  Oop, not that one.  Sorry.  Okay.

2    This is going to be Number 19.  For the record,

3    Arroyo.def.2381.

4            (Exhibit No. 19B marked for identification)

5    BY MS. HASHIM:

6        Q.   Okay.  I represent to you that this is a -- can

7    you see my screen, first?  I'm sorry.

8        A.   Yes.

9        Q.   Okay.  So I'll represent to you that this is a

10   physician's note produced by the City during the course of

11   discovery as being part of Ofc. Arroyo's MSS medical file.

12       Based upon this, who would you say wrote this medical

13   note -- wrote this note?  Who is it --

14           MR. SUHL:  Object to form.  Foundation.

15           MS. HASHIM:  So strike that.  Let me rephrase

16   this.

17   BY MS. HASHIM:

18       Q.   What name is in the letterhead of this document?

19       A.   Reyna Arroyo.

20       Q.   Okay.  And above that?  Who is the -- what is the

21   letterhead?

22       A.   Diamond Dettore, MD.

23       Q.   Okay.  So is it fair to say this is a doctor's

24   note?

25       A.   This is her primary doctor's note.

Sheree Jones - July 25, 2023

1      Q.   Okay.  And how would you read the doctor's note?

2  Can you read that?

3           MR. SUHL:  Object to form.

4           THE WITNESS:  It says she -- she had left

5  shoulder and may return to work limited duty,

6  administrative only, pending surgery to her left shoulder.

7  BY MS. HASHIM:

8      Q.   And this says, if unavailable --

9      A.   Available --

10     Q.   -- if unavailable --

11     A.   If unavailable, she would not return to work

12  until after surgery.

13     Q.   Okay.  If a physician's note is -- strike that.

14     Okay.  If a physician's note is in Ofc. Arroyo's

15  medical file maintained by MSS, would you agree that this

16  means that MSS received the note?

17          MR. SUHL:  Object to form.

18          THE WITNESS:  Yeah.

19          MS. HASHIM:  And upon receiving --

20          THE WITNESS:  They -- if they --

21          MS. HASHIM:  Go ahead.

22          THE WITNESS:  -- they received it by mail or she

23  brought it in there to them.  Yes.

24  BY MS. HASHIM:

25     Q.   And would you expect the same protocol that you

Sheree Jones - July 25, 2023

1  testified to earlier to be followed here, that this would

2  be put into her file?

3       A.   Yes.

4       Q.   And should there be a progress note about this

5  reflecting the receipt of this medical note?

6       A.   It depends on how it came in there.  It came via

7  mail, the clerks would just put it in the file.  If it came

8  in -- she hand brought it in there, the case manager should

9  put a note in the system.

10      Q.   Okay.  So knowing that at a minimum, it was put

11 in her file, would you agree that as of April 29th, 2020,

12 CPD was made aware of the condition of Ofc. Arroyo's

13 shoulder impairment and --

14          MR. SUHL:  Object to form.  Foundation.

15          MS. HASHIM:  Allow me to please finish my

16 question.  Now I'm going to repeat my question.

17 BY MS. HASHIM:

18      Q.   Would you agree that as of April 29th, 2020, CPD

19 was made aware of the condition of Ofc. Arroyo's shoulder

20 impairment and the status of her pending surgical

21 procedure?

22          MR. SUHL:  Same objection.

23          THE WITNESS:  Based on the note that I'm looking

24 at and based on what she has been on for, they still aware

25 of her with this shoulder problem, left shoulder problem.

Sheree Jones - July 25, 2023

1          MS. HASHIM:  Okay.  I'm going to share with you

2     the next exhibit, Number 20, Arroyo.def.1814.

3          (Exhibit No. 20 marked for identification)

4     BY MS. HASHIM:

5          Q.   All right.  Can you see this, ma'am?

6          A.   I see it now.

7          Q.   Okay.  And I'll represent to you that this is a

8     physician's note produced by the City during the course of

9     discovery as being part of Ofc. Arroyo's MSS medical file.

10         And at the very top, what is the name that is typed on

11    there?

12         A.   Reyna Arroyo.

13         Q.   The name that's typed at the top in the

14    letterhead, ma'am.

15         A.   Dr. Diamond Dettore, MD, her primary doctor.

16         Q.   And what is the date of this doctor's note?

17         A.   June the 1st, 2020.

18         Q.   Okay.  And my reading of the note is:

19         Ofc. Arroyo is waiting for second shoulder surgery

20    which has been postponed due to COVID-19.  She is able to

21    work limited duty, in parentheses, desk without vest until

22    her surgery is performed.

23         Did I read that correctly?

24         A.   Yes.

25         Q.   And would you expect the same protocol that you

Sheree Jones - July 25, 2023

184

1  testified to earlier be followed upon receiving this note,

2  namely that it would be placed in her medical file?

3      A.   Yes.

4      Q.   Okay.  And --

5      A.   The same thing.  Be it how they got it, whether

6  it's in the mail or she -- she walked in there with it.  If

7  she walked it in there, she would have seen a case manager.

8  They should have put a note in it.  If it was mailed in

9  there, no, it would have not have got a CLEAR note.  It'd

10  just been placed in her medical file.

11      Q.   So even at a minimum, if it's placed in the

12  medical file, would you agree that as of June 1st, 2020 was

13  made aware of the condition of Ofc. Arroyo's shoulder

14  impairment and status of her pending surgical procedure?

15              MR. SUHL:  Object to form.  Foundation.

16              THE WITNESS:  I can't answer that.  I can't

17  answer that because if it had been brought in the mail,

18  they don't just put it -- they put it in the file.  Unless

19  the case manager requested her file, that's the only way

20  she's going to get that file.  The clerks put them in the

21  file.  So I can't say that because I wasn't there.  I don't

22  know if they changed their procedure and how they do stuff.

23  BY MS. HASHIM:

24      Q.   And under the circumstance of Ofc. Arroyo

25  delivering it, hand delivering it or -- would it be put

Sheree Jones - July 25, 2023

185

1  into the progress notes?

2       A.   Yes.

3       Q.   Okay.  And if she had hand delivered it to her

4  case manager, would CPD been placed on notice?

5       A.   Yes.

6       Q.   Okay.  And if this was emailed to her case

7  manager and the case manager received it, would CPD have

8  been placed on notice?

9       A.   Yes.

10      Q.   We're going to shift gears a little bit and see

11 if you can help me out with this next topic.

12      Based on your experience and observations, are CPD

13 assignments filled through a seniority system?

14           MR. SUHL:  Object to form.  Foundation.

15           THE WITNESS:  Based on what as far as their

16 seniority?

17           MS. HASHIM:  So --

18           THE WITNESS:  Because when you're on the medical

19 --

20           MS. HASHIM:  Yes.

21           THE WITNESS:  -- when you're on the medical, your

22 seniority don't really count at that point because you're

23 on the medical and they could be thousands of officers on

24 the medical at the same time.  So based on the manpower

25 that is need, the first deputy office put them in the unit

Sheree Jones - July 25, 2023

186

1    of assignment.  Medical section don't assign their unit of

2    assignment.

3    BY MS. HASHIM:

4        Q.    Okay.  So outside of medical services section,

5    just based upon your 31 years of experience being at CPD,

6    are you aware of how the seniority system plays in terms of

7    officers getting assignments?

8        A.    Well, seniority counts, but like I just said, I

9    don't -- I don't know how they does it upstairs in the

10   first deputy office because that was out of league.

11       Q.    Okay.

12       A.    So I don't know how first deputy and them do it.

13       Q.    To your knowledge, are positions filled when a --

14   strike that.

15       When an officer is on limited duty -- strike that.

16       So to your knowledge, does MSA play -- I'm sorry --

17   does MSS play a role in filling details where need arising

18   within CPD?

19       A.    No.  Only detail [sic] they play is submitting

20   the package.  Once the package completed, then it is

21   submitted to the first deputy office who assign where they

22   go.

23       Q.    Okay.  So it's the first deputy's office, not

24   MSS, that plays a role in filling details?

25       A.    That is correct.

Sheree Jones - July 25, 2023

187

1    Q.   Okay.  All right.  I understand now.  Thank you.

2         And with these details that are being filled, they are

3    positions -- it would be through MSS.  So it's by way of

4    MSS that these officers would be able to fill these details

5    through the first deputy.

6    A.   That's if they're applying for a limited duty,

7    yes.

8    Q.   And to your knowledge, are limited-duty positions

9    filled by way of seniority?

10   A.   No.

11   Q.   And they're not bidded for, are they?

12   A.   No.  When they get to that unit that they're

13   assigned to, their seniority kicks in.  So whatever their

14   seniority number is in that unit, that goes with the unit

15   of assignment.  It has nothing to do with the medical

16   section sending them there.  They send them there based on

17   the first deputy recommendation.

18   Q.   Okay.  Thank you.

19        MS. HASHIM:  I'm going to pull up this next

20   exhibit.  It's Exhibit Number 21, Arroyo.def.2641.  To be

21   clear -- I think I stumbled on my language there -- 2461.

22        Actually, I will strike that.

23        We're going to go back to Exhibit Number 11, which is

24   Arroyo.def.2641.

25   BY MS. HASHIM:

Sheree Jones - July 25, 2023

1    Q.   All right.  You've seen this earlier today.  Do
2  you remember seeing this, ma'am?
3    A.   It's not up on my screen.
4    Q.   Oh.  I think we're all getting tired here.  We'll
5  do our best.  Okay.  Thank you for noting that for me.
6  There we go.  I think it's just a one-pager.
7    Do you remember seeing this earlier today?
8    A.   Yes.
9    Q.   All right.  And I'll direct your attention to the
10  second row from the bottom, with the date of September
11  26th, 2017 in the first column.
12    Are you there?  Do you see that?
13    Okay.  So if you look to the right of that row, where
14  was Ofc. Arroyo detailed?
15    A.   Finance.
16    Q.   Okay.  And when did this begin?
17    A.   May the 23rd, 20- -- 2 -- 2 -- I'm sorry.  May
18  the 2nd, 2002 [sic].
19    Q.   If you look to the right of finance division,
20  that column at the top says "detail effective date".
21    A.   Uh-huh.
22    Q.   Would it seem --
23    A.   September the 26th, 2017.
24    Q.   Would that be her --
25    A.   Day that she went there.

Sheree Jones - July 25, 2023

189

1      Q.    -- start date?  Okay.

2      A.    Yeah.

3      Q.    So that earlier date with 2002 is incorrect.

4  Right?

5      A.    That's correct.

6      Q.    Right.  Okay.  And when an officer was given a

7  limited-duty assignment to finance, would that be for a

8  fixed temporary time and then the officer would have to

9  leave for someone else to take the stop or are they there

10 until they are detailed elsewhere?

11     A.    They there, until they're detailed elsewhere.

12     Q.    Do you recall what kind of need the finance

13 section had for officers to be detailed to that section in

14 2019?

15            MR. SUHL:  Object to form.  Foundation.

16            THE WITNESS:  They have -- they have

17 administrative -- all of them in office have administrative

18 positions.  Answering the phone, typing, timekeeper,

19 whatever they do in finance.

20 BY MS. HASHIM:

21     Q.    When an officer is on limited-duty status, can

22 they be deployed to the field, to your knowledge?

23     A.    No.  They limited duty.

24     Q.    Okay.

25            MS. HASHIM:  I'm going to bring up this next

Sheree Jones - July 25, 2023

190

1   exhibit.  It's going to be -- what is it?  21.  And for the

2   record, it's Arroyo_427 to 489.

3          (Exhibit No. 21 marked for identification)

4          MS. HASHIM:  And Madam Court Reporter, we're at

5   Number 20 now.  Right?

6          REPORTER:  We just did 20.  That was 1814.

7          MS. HASHIM:  And I think I had corrected that

8   because I had had that earlier.  Oh, no, no.  I stand

9   corrected.

10          REPORTER:  Yeah.  That was -- another one.

11          MS. HASHIM:  Okay.

12          REPORTER:  It went out my head when I corrected

13   it.

14          MS. HASHIM:  That's all right.  We're at 21 now.

15   Exhibit 21.

16          REPORTER:  Yes.

17          MS. HASHIM:  Okay.  I'm just going to go to the

18   top of this document.

19   BY MS. HASHIM:

20      Q.  Can you see it, ma'am?

21      A.  Yes.

22      Q.  Okay.  We're going to scroll through it real

23   quickly.  I'm sorry.  I didn't give you a chance to look at

24   the title.

25      A.  I know what it is.

Sheree Jones - July 25, 2023

191

1      Q.   Oh.  Okay.  Great.  So I'm just going to go ahead

2  and scroll through.  It's kind of long, but I'm just going

3  to do this for the record.

4      Okay.  And that's the bottom -- Arroyo dot -- I'm

5  sorry -- Arroyo_409.  Okay.

6      Okay.  So I'll represent to you that this is

7  collective bargaining agreement produced by the plaintiff

8  to the City during the course of discovery.

9      Are you familiar with this document?

10      A.   Yes.

11      Q.   And what is the name of the document?

12      A.   This is Article 10, Nondiscrimination, equal

13  employment opportunity, nondiscrimination.

14      Q.   I'm sorry.  I should have gone to the first page.

15      Do you know what the name of this document is?

16      A.   This is part of the union contract.

17      Q.   Right.  Right.

18      A.   The union book.

19      Q.   Right.  It's the collective bargaining agreement.

20  Would you agree to that?

21      A.   Yes.

22      Q.   Okay.  Okay.  So taking a look at Section 10.5.

23  All right.  Section 10.5 is titled "Americans with

24  Disability Act".  Is that correct?

25      A.   Yes.

Sheree Jones - July 25, 2023

1      Q.    Are you familiar with this particular section?

2      A.    I read it.

3      Q.    Okay.  Are you familiar with this particular

4  provision?

5      A.    No.  I never had to look at the contract.

6      Q.    Oh.  Okay.  So based upon what you've reviewed

7  today, I'm just going to ask you a few questions here.

8  Now, the beginning of this, it reads:

9                In the event the employer should be required

10             to make reasonable accommodation under the

11             Americans with Disabilities Act, to the

12             disability of an applicant or incumbent officer

13             that may be in conflict with the right of an

14             officer under this agreement, the employer shall

15             bring this matter to the attention of the lodge.

16      Did I read that correctly?

17      A.    Yes.

18      Q.    And here, the employer would be CPD.  Correct?

19      A.    Yes.

20      Q.    Is it also correct to say it would be the City?

21             MR. SUHL:  Object to form.

22             THE WITNESS:  Well, CPD is the City.

23             MS. HASHIM:  Right.  Okay.

24             THE WITNESS:  CPD is the City.

25  BY MS. HASHIM:

Sheree Jones - July 25, 2023

193

1    Q.   Okay.  And the "lodge" here would be Fraternal
2    Order of Police?
3    A.   Yes.
4    Q.   And the provision that I read to you, are you
5    aware whether this happened with Ofc. Arroyo?
6              MR. SUHL:  Object to form.  Foundation.
7              THE WITNESS:  I do not know.
8              MS. HASHIM:  Okay.  Can you repeat --
9              THE WITNESS:  I'm not aware of it.  I'm not aware
10   of it.  I don't know.
11             REPORTER:  I'm sorry.  Mr. Suhl, was object, form
12   --
13             MR. SUHL:  Form.  Foundation.
14             REPORTER:  Foundation.  Thank you.
15   BY MS. HASHIM:
16   Q.   And are you aware of whether the police
17   department addressed this issue with the FOP in Reyna's
18   case?
19             MR. SUHL:  Same objection.
20             THE WITNESS:  I cannot -- I cannot say.  I don't
21   know what they discussed.
22   BY MS. HASHIM:
23   Q.   So nobody brought this to your attention, in
24   other words.  Is that correct to say?
25   A.   Yes.  No one brought it to my attention.

Sheree Jones - July 25, 2023

194

1      Q.   Okay.   Looking at Section 18 here, and we'll look
2  specifically at 18.4 at the bottom of what's Bates labeled
3  Arroyo_460 and it's page 26 of the CBA.   And it says here -
4  - I'm going to read it to you --
5              Any officer who is certified by the medical
6           services section as being able to perform a
7           limited-duty assignment may be placed by the
8           employer in a recognized opening as defined in
9           Section 23.9, notwithstanding anything from 23.9
10          to the contrary.
11     Did I read that accurately?
12     A.   Yes.
13     Q.   Are you familiar with this particular provision?
14     A.   Not to my recollection.   I never read the union
15 contract.
16     Q.   Okay.   Well, in taking a look at that and with
17 your 31 years of experience and knowing that there is
18 interplay with the union and CPD, is it fair to say that
19 MSS was bound to follow the CBA, to your knowledge?
20          MR. SUHL:  Object to form.   Foundation.
21          THE WITNESS:  Well, to my -- best of my ability,
22 medical section did follow Section 18.4 when they gave her
23 my -- our -- the limited duty.   When she ran out of the
24 time is where the problem come in.
25 BY MS. HASHIM:

Sheree Jones - July 25, 2023

1      Q.   And so is this a provision that MSS would have to

2   follow?  Is that what you're saying?

3      A.   Yes.  They would have to follow it because it's a

4   union bargaining agreement and they did follow it.  When

5   you run out of time, you're out of time.  Nobody can -- we

6   can't change that.  That's the policy and procedure and the

7   union has to take up.  That's not under the medical section

8   rights to give her more time.  If she run out of time,

9   she's out of time.

10     Q.   And what is your understanding of what a

11  recognize opening is?

12     A.   Recognized opening means if a position is

13  available that she is accommodated for, she can go to that

14  position -- she's -- can go into that position wherever the

15  position is in the police department.  That's what they do.

16  And it's not where the officer want to go.  That's not a

17  bid.  The position is not a bid when you're on the medical.

18  When you're coming off of medical on limited duty, non-IOD

19  or IOD, you don't get to tell them where you want to go.

20  Where they need -- wherever there's an open and they need

21  you there, that's where they're going to put you.

22     Q.   And this provision, it says:

23     Any officer who is certified by medical services

24  section.

25     Correct?

Sheree Jones - July 25, 2023

196

1      A.    Right.

2      Q.    And it doesn't state anywhere in this provision

3  whether the officer is IOD or non-IOD.  Is that correct?

4      A.    That's correct.

5      Q.    Okay.

6          MS. HASHIM:  I want to do the next exhibit, which

7  is -- I think we're at Number 22, Arroyo.def.2558 to 66.

8          (Exhibit No. 22 marked for identification)

9          MS. HASHIM:  All right.  I just shared in the

10  chat.  Did you guys get it?

11          MR. SUHL:  Yeah.

12          THE WITNESS:  Yes.  I did.

13          MS. HASHIM:  Okay.  So I just want to double

14  check with our court reporter -- we're -- I just want to

15  double check.  We're at Exhibit 22?

16          REPORTER:  The next exhibit that you're going to

17  give us is 23.

18          MS. HASHIM:  Okay.  So what I just provided is

19  22.

20          REPORTER:  Yes.  That's Arroyo.def.2558 to 2566.

21          MS. HASHIM:  Great.  Thank you very much.  Okay.

22  We're on the same page here.  Thank you.

23          REPORTER:  You're welcome

24          MS. HASHIM:  All right.  We're going to go to the

25  top.

Sheree Jones - July 25, 2023

197

1      All right.  I'm just going to scroll through this

2 ma'am.  Let me know when you want me to go down.  Well, you

3 don't have to read it --

4           THE WITNESS:  I'm going to --

5           MS. HASHIM:  I'm just going to go down.  It's 9

6 pages, so.  Okay.  Now, I'll go up to the top here.

7 BY MS. HASHIM:

8      Q.   And do you recognize this document?

9      A.   I seen it before.

10     Q.   Okay.  And would you say this is an accurate copy

11 of Directive E04-01 as it's indicated in the top right

12 corner?

13     A.   Yes.

14     Q.   Okay.  And then after it, we have another

15 directive, personnel -- I'm sorry.  Strike that.

16     And the title of Employee Resource E04-01 is

17 "Personnel Transfer and Assignment Procedures".  Correct?

18     A.   Right.

19     Q.   Right.  And on the next page, we have Employee

20 Resource Number E04-01-01, titled "Personnel Transfer and

21 Assignment Procedures-FOP".

22     Q.   Did I read that correctly?

23     A.   Yes.

24     Q.   All right.  And that one is eight pages long,

25 which we just finished scrolling through.

Sheree Jones - July 25, 2023

1      And are you familiar with this particular directive?

2   Have you seen this one before?

3      A.   Yes.  Yes.

4      Q.   Okay.  To your knowledge -- we had talked about -

5   - strike that.

6      We had talked about recognized vacancies and as I

7   understand your testimony, you said that recognized

8   vacancies are not filled by seniority system.

9      Is that correct?

10      A.   I said it's not filled by seniority when they're

11   coming off the medical.  Recognized vacancy means that they

12   have a vacancy open, and you can bid on that vacancy.  When

13   you're coming off the medical and you're being

14   accommodated, you don't have -- you can't bid on an opening

15   because you're not a full-duty officer.

16      Q.   So is that a --

17      A.   You're on a limited duty.

18      Q.   Is that a requirement for bidding?  To be a full-

19   duty police officer?

20      A.   From my understanding, it is.

21      Q.   Okay.  And taking a look at Bates number

22   Arroyo.def.2559, in Roman Numeral III, recognized vacancy,

23   Section A, if you take a quick look at that from the -- go

24   ahead and read it to yourself and tell me when you're done.

25      A.   Okay.

Sheree Jones - July 25, 2023

199

1      Q.   All right.  And in that maybe third line down, it
2  states:
3      20 percent of all recognized vacancies and all
4  recognized vacancies which bids have not been received
5  within 72 hours of posting will be filled at the discretion
6  of the department.
7      Did I read that correctly?
8      A.   Yes.
9      Q.   Is it correct to say that MSS is involved
10 pursuant to the CBA Section 18.4 that we discussed earlier?
11          MR. SUHL:  Object to form.
12          THE WITNESS:  No.  No.
13 BY MS. HASHIM:
14     Q.   So the discretion that you see here in recognized
15 vacancies --
16     A.   Okay.
17     Q.   -- which was also in CBA Section 18.4, is it your
18 testimony that MSS is not involved with this?
19     A.   Yes.  It's my testimony MSS is not involved.  As
20 I said earlier, we do not place them -- MSS does not place
21 anyone anywhere.  It goes further beyond us.  It goes to
22 the first deputy office.  They does the placement.  So MSS
23 wouldn't have anything to do with placing no one anywhere.
24     Q.   I understand about placement, but I didn't ask
25 about placement, ma'am.  I asked about involvement.  And I

Sheree Jones - July 25, 2023

200

1   say involvement because if you take a look at Exhibit 21,
2   which we have here, it says here, any officer who's
3   certified by medical services section; so I'm just trying
4   to understand is medical services section involved,
5   generally speaking, when it comes down to recognized
6   openings.
7       A.   Okay.  If you -- if you -- okay.  If you finished
8   reading it, it says limited duty as well.  We let them know
9   the person is limited duty.  But we don't tell them where
10  to place the person at.  That's the difference.
11      Q.   Okay.  So --
12      A.   They're able to -- a limited duty is what this is
13  saying.
14      Q.   Right.  Right.  So what I'm understanding you to
15  say is that the involvement of MSS the certification of
16  limited duty.  Right?
17      A.   That's correct.
18      Q.   When it comes down to recognized openings.
19  Right?
20      A.   Right.
21      Q.   Would you say that -- I have switched to Exhibit
22  21.  I'm back on Exhibit 22 now and I'm at Arroyo.def.2559,
23  taking a look at recognized vacancy, Roman Numeral III and
24  Section A.  Taking a look at this 20 percent language, in
25  reading this, would you agree that filling 20 -- let me

Sheree Jones - July 25, 2023

1   rephrase that.

2        Would you agree that filling 20 percent of the

3   recognized vacancies at the discretion of CPD is an

4   exception to the bidding process?

5              MR. SUHL:  Object to form.

6              THE WITNESS:  I have no knowledge because I'm not

7   involved in any of this.  This is out of my paygrade.

8              MS. HASHIM:  Okay.  I understand.  I appreciate

9   it.  I just wanted to ask just to make sure since we have

10  you with us.

11  BY MS. HASHIM:

12       Q.   Would you agree that not all recognized vacancies

13  are filled exclusively by the seniority system?

14             MR. SUHL:  Object to form.

15             THE WITNESS:  I cannot say if it's done, or it's

16  not done.  It's out of my paygrade.  It was out of my

17  paygrade.  Had no involvement in it.

18             MS. HASHIM:  Okay.  So we're going to do Exhibit

19  Number 23 now, Bates number Arroyo.def -- oh, I'm sorry.

20  It's not 23.  We're going back to Exhibit 3, Arroyo.def.425

21  to 26.  Okay.

22  BY MS. HASHIM:

23       Q.   So I'm going to bring your attention to this

24  progress note dated October 13, 2016.  The time is 1347 on

25  the note.  Do you see that, ma'am?

Sheree Jones - July 25, 2023

202

1       A.    Yes.

2       Q.    So take a look at the note.  Let me know if you

3   want me to scroll down.

4       A.    I read the note.

5       Q.    Okay.  And just so you can see the note in this

6   completed form there.  I just kind of scrolled up, scrolled

7   down.  Okay?

8       A.    Yes.

9       Q.    All right.  So in looking at this note, would you

10  agree that Ofc. Arroyo injured her left shoulder on October

11  13th -- strike that.

12      In looking at this note, would you agree that Ofc.

13  Arroyo injured her shoulder on or about October 13th, 2016

14  that led to her being placed on limited-duty status?

15          MR. SUHL:  Object to form.

16          THE WITNESS:  No.  I would not say that she

17  injured it because she had a -- according to this note, she

18  had a pre-existing injury in 2014.  She filed a

19  reoccurrence to an old IOD on that date.  Okay.

20  BY MS. HASHIM:

21      Q.    So let's take a look at the note that's above it,

22  that's -- the entered date and time is October 14th, 2016.

23  The time is 10:13.  I want you to take a look at that note.

24      A.    Okay.  So they gave her a referral to go see

25  their document for relatedness to that original IOD that

Sheree Jones - July 25, 2023

1   she was claiming.

2       Q.    Okay.  All right.  So we're now going to go to

3   what's Bates number 422 and take a look at this entry on

4   December 6th, 2016 at 11:59.  Take a look at that note.

5       A.    Looking at this note, she told the doctor that

6   she threw a bookbag over her shoulder and opened a

7   hatchback of a car when she felt immediately pain in her

8   left shoulder.  So that's why they gave her the referral to

9   go see him for the relatedness and this is what she told

10  the doctor.  She received the -- the doctor note from Dr.

11  Forsythe discussing MSS doctor note and it did not address

12  relating opinions to the 20- -- 23rd of July '14 IOD.  So

13  the doctor she chose to go and see saying it was not

14  related to her original injury, based on what she told that

15  doctor.

16      Q.    Okay.  So we looked at that prior note on October

17  13th, 2016.  Okay?  And you said that it indicated that she

18  had some kind of pain on her shoulder, and it related to a

19  prior injury.  Right?

20      A.    That's what she --

21      Q.    Yeah.  Right.  Right.  Okay.  And now we have

22  this December 6th, 2016 note that you just read.  How much

23  time is there between when the October 13th note and this

24  December 6th note -- would you agree it's about two months?

25      A.    Almost.  She went to the doctor on the 1st of

Sheree Jones - July 25, 2023

1    November.

2        Q.   All right.  And in the note, if you look at the

3    second paragraph, it says:

4        MSS MD related that shoulder sounds new and because MD

5    did not address relatedness opinion, the member is to

6    contact district sergeant to see if they can retro an IOD

7    report.

8        And then the next paragraph:

9        RN called member and explained above.  She concurs

10   that at a job, she felt pain after lifting a backpack and

11   closing hatchback of car.  She will call the district

12   sergeant to have him create an IOD report, MSS date for

13   tracking purposes.

14       Okay.  Did I read that correctly?

15       A.   Yes.

16       Q.   Based on your experience, is it normal protocol

17   for MSS to ask a district sergeant to write an IOD report

18   retroactively after about two months?

19       A.   Yes.  If the officer is still complaining and

20   telling us it was an IOD and she thought it was a

21   relatedness to a previous IOD, it becomes a new IOD.  So

22   before it can be seen as a new IOD, a IOD report got to be

23   done based on what she told the doctor, what she did that

24   caused that pain.  She threw a bookbag and shut a -- a

25   hatchback and felt the pain immediately when she did that.

Sheree Jones - July 25, 2023

1  That's not saying that that's the same injury.  So that's

2  why the nurse said, okay, it's not related to this IOD,

3  what did you do based on what the doctor -- you told the

4  doctor this is what happened.  You need an IOD report to

5  cover that.

6      Q.   Okay.  So it's common for notes to be written two

7  months later retroactively.  Is that correct?

8      A.   Yes.  That's when she came back in to the doctor.

9  When she came back in and she had an appointment to see the

10 doctor on November the 1st -- probably was the earliest

11 appointment they can give her because she choose that

12 doctor which wasn't rushed.  That was a busy doctor.

13 Because they get to chose their doctor.  Then, when she

14 came back to the medical section, this is what had

15 occurred.

16     Q.   Okay.

17     A.   From the doctor's note that she told the doctor.

18         MS. HASHIM:  All right.  Now, we're going to do

19 Exhibit 23.

20         (Exhibit No. 23 marked for identification)

21 BY MS. HASHIM:

22     Q.   All right.  Do you see Exhibit 23, ma'am?  It's

23 two pages?

24     A.   Yes.  IOD report.

25     Q.   All right.  And for the record, it's

Sheree Jones - July 25, 2023

206

1    Arroyo.def.1903 Bates number.

2         Okay.  So do you recognize this?

3         A.   This is an injury on duty report.  Yes.

4         Q.   Okay.  And you're familiar with them.  Right?

5         A.   Yes.

6         Q.   And these are kept in the ordinary course of

7    business at CPD?

8         A.   Yes.

9         Q.   And do you have any reason to doubt the accuracy

10   of what you're looking at?

11        A.   No.

12        Q.   Okay.  And who is the claimant in this IOD

13   report?

14        A.   Reyna Arroyo.

15        Q.   I'm just going to go down here.  I think the

16   information is here on page 2.  Okay.  All right.

17        Reyna Arroyo is the claimant?  Ah, I'm sorry.  It's on

18   --

19        A.   Yes.

20        Q.   -- page -- yeah.  Sorry.  Thank you.

21        Okay.  And who authored this report?

22        A.   Look like Andrew K-a-d-u-s.

23        Q.   Kadus?  K-a-d-u-s.  Okay.

24        A.   Kadus.

25        Q.   And that's on the bottom on page Bates number

Sheree Jones - July 25, 2023

1    Arroyo.def.1904.  Okay.  So it's on page 2.  All right.

2        And what is the date entered for this?

3        A.   They entered this on December the 12th, 2016.

4        Q.   And under incident information here, why don't

5    you go ahead and read where it says, "reported incident

6    description"?  Can you read that?  I can make it -- I can

7    try to make it larger.  There we go.

8        A.   Surgery related -- surgery related --

9        Q.   You can read it to yourself.

10       A.   Oh.  All right.

11       Q.   Tell us when you're done.  Yeah.

12       A.   Okay.

13       Q.   All right.  So in what you just read, in the

14   incident information section, it has a paragraph, a

15   narrative, in the incident description part of this

16   section.

17       With what you just read, was a witness identified?

18       A.   I didn't see a witness.  I might have overlooked

19   it.

20       Q.   Sure.  I'll draw your attention to this last full

21   line which is a little bit above it, right here where the -

22   - it starts with "subjected related".

23       A.   Yeah.  PO -- yeah.  The --

24       Q.   Yeah.

25       A.   Observed the incident.

Sheree Jones - July 25, 2023

1      Q.   Right.  So I'll spell that for the record.  PO

2  and then the initial J. and then the last name P-i-e-t-r-y-

3  l-a.  He's a witness to this.  Correct?

4      A.   Right.

5      Q.   Okay.  And it states that the incident was

6  captured on Ofc. Arroyo's BWC.  Correct?

7      A.   Yes.

8      Q.   What does BWC stand for?

9      A.   That's their body camera.

10      Q.   Okay.  So they had a recording of that.  Is that

11  correct to say?

12      A.   Yes.

13      Q.   All right.  So I'm going to go back to Exhibit 3

14  here.  And we go to the right page.  So taking a look at

15  this entry that you've looked at before, the December 16th,

16  2016 entry at 10:54 with the -- as the time, the first line

17  of the notes reads --

18      A.   It didn't come up.

19      Q.   It didn't?

20      A.   Nah-uh.

21      Q.   I'm going to stop sharing and try it again.

22  Thank you for letting me know.

23      Okay.  How about now?

24      A.   Yes.

25      Q.   Okay.  So we're looking at this entry for

Sheree Jones - July 25, 2023

209

1    December 16th, 2016 at 10:54 and looking at the notes here

2    that begin with the date 12 October '16, IOD denied per

3    CLF.

4         Did I read that correctly?

5         A.   That's correct.

6         Q.   All right.  And can you remind me what does COF

7    stand for again?

8         A.   Committee on Finance.

9         Q.   All right.  Thank you for the reminder.

10        And based on your experience, what -- when you're

11   reading this sentence, what is it saying to you?

12        A.   That COF denied that she was -- that she would

13   need to use the PMI for tx of left shoulder.

14        Q.   Ma'am, I'm referring to the first line.  The

15   first line --

16        A.   Oh.  I'm sorry.

17        Q.   -- that starts with October '16.

18        A.   CO -- 12 6 -- 12 of October '16, IOD denied per

19   COF.

20        Q.   Okay.  So does that mean COF denied her IOD?

21        A.   Yes.

22        Q.   Okay.  And how many days are there, would you

23   say, between the IOD report on December 12th and the date

24   of this entry December 16th?

25        A.   Two months.

Sheree Jones - July 25, 2023

210

1    Q.    December 12th to December 16th.  The IO --

2    A.    Oh.

3    Q.    Yeah.

4    A.    No.  October the 12th --

5    Q.    Do you want to look -- yeah.

6    A.    -- the IOD is October the 12th.

7    Q.    So here's the -- here's the IOD report.  Date

8    entered is 12/12/2016 on Exhibit 23.

9    A.    Right.  But you had the -- you had to look at the

10   IOD date.

11   Q.    I understand that.

12   A.    They entered it that -- okay.

13   Q.    So --

14   A.    The date was October.  They entered it in

15   December because she -- when she went to the doctor, when

16   she came in, they said it was not related to the previous

17   IOD that she claimed because when she went to that

18   relatedness, she told the doctor she hurt it on this date,

19   which was October, doing what she did was lifting the

20   hatchback and the backpack.  That's why the dates are

21   confusing to you because of the notes that's in there was

22   what she said.  But she came in to file a recurrence

23   because she thought it was through a different injury.  It

24   happens all the time.

25   Q.    Sure.  So this report is typed up.  Right?  And

Sheree Jones - July 25, 2023

211

1   it was typed up on December 12th, 2016.  Right?

2       A.   Right.

3       Q.   And is the COF made aware of these IOD reports

4   before the date that they are typed up and entered?

5       A.   It goes straight to the COF when the sergeant hit

6   the submit button.  It goes straight into their computers.

7       Q.   So this injury on duty report was sent to COF on

8   December 12th, 2016.  Is that correct?

9       A.   That's correct.

10      Q.   Okay.  And going back to Exhibit 3, with this

11  entry on December 16th, it says, COF denied the IOP.

12      Is that correct?

13      A.   That's correct.

14      Q.   And just -- I think I said IOP, not IOD, so

15  correcting myself.  Thank you.  IOD.

16      All right.  So there's four days between receiving the

17  report and their decision.  Is that correct?

18      A.   That is correct.

19      Q.   Okay.  And from your experience and observations,

20  is four days a typical turnaround time for COF to make

21  their determination when the IOD report identifies a

22  witness and the report also indicates there is a body

23  camera to download and view?

24      A.   Well, that's why it took four days.  They

25  probably review and seen what they seen and they made their

Sheree Jones - July 25, 2023

212

1  decision to deny it.

2      Q.   Okay.  So four days is a normal period of time?

3      A.   Yes.

4      Q.   Okay.  And during those four days, your testimony

5  is that they would have talked to the witness, and they

6  would have downloaded the body cam and reviewed it.

7      A.   That's what they tell us they do.

8      Q.   Okay.  What would you define as being a quick

9  turnaround that's kind of suspicious, based upon your

10 experience.

11          MR. SUHL:  Object to form.  Foundation.

12          THE WITNESS:  I can't say what's a quick

13 turnaround because I don't -- I didn't work for COF.

14          MS. HASHIM:  Okay.  But --

15          THE WITNESS:  So I can't say how long they take

16 because there's probably still some there waiting on review

17 and everything.  I can't say how their office function and

18 work, how many staff they have.

19          MS. HASHIM:  Uh-huh.

20          THE WITNESS:  We have waited weeks for the IOD

21 and had to call downtown to say, where's my IOD; we're

22 waiting on approval?  And then it goes to their supervisor.

23 So it depends on how fast their staff working.  I can't

24 speak for that.

25 BY MS. HASHIM:

Sheree Jones - July 25, 2023

213

1    Q.   Okay.  I'm only asking because earlier in your
2  testimony, you had said that you worked a lot with COF,
3  when I was asking you about --
4    A.   Yeah.  I did.
5    Q.   Yeah.  So your testimony is that four days is a
6  normal amount of time even though you just said it could be
7  weeks.
8    A.   It -- it -- it has.  It has.  It could be.  We
9  can't say how long it's going to take them.  We don't do
10  the work.  We work directly with them.  We used to have
11  tape from them.  Now, it's computer-generated.  Everything
12  changing in a years of time.
13    Q.   Okay.
14    A.   Working staff.
15    Q.   Sure.  This next paragraph in the note for
16  December 16th, go ahead and read that one to yourself.  I
17  just got a couple questions for you about that.
18    A.   Okay.
19    Q.   All right.  Now, in the second line, it says,
20  member ACK.
21    What does "ACK" stand for?
22    A.   Where do you see that?
23    Q.   In the middle of the second line.  I'll highlight
24  it there for you.
25    A.   Oh.  Asked and reply.

Sheree Jones - July 25, 2023

214

1     Q.   Could it be acknowledged?

2     A.   Acknowledged and reply.  That's what it is.

3     Q.   Okay.  All right.  So RN contacted her to tell

4 her that her IOD was denied per COF and then she

5 acknowledged -- Ofc. Arroyo acknowledged this and replied

6 that she will contact FOP to file a grievance.

7     Did I read that correctly?

8     A.   Right.  Yes.

9     Q.   All right.  So it's essentially visible to

10 anybody who comes on, you said, from -- within MSS to see

11 that she is -- her kneejerk reaction -- strike that -- her

12 reaction is that she is going to file a grievance in

13 response.

14     Is that a correct statement?

15     MR. SUHL:  Object to form.  Foundation.

16     THE WITNESS:  Yes.  Yes.  They -- that's all

17 their response, so we're used to it.

18 BY MS. HASHIM:

19     Q.   All right.  And can you read to yourself the

20 paragraph that begins with those two asterisks?

21     A.   Okay.

22     Hello?

23     Q.   Okay.  Yeah.  I'm sorry.  I was just focusing on

24 this.

25     All right.  So keep that in the back of your mind.

Sheree Jones - July 25, 2023

1    I'm going to go to page 422 here.  So I'm going to go down

2    to this entry dated December 6th, 2016 at 11:59.  And it

3    says here:

4                    MSS MD related -- this is the second

5              paragraph -- MSS MD related that shoulder injury

6              sounds new and because MD did not address

7              relatedness opinion, then member is to contact

8              sergeant -- district sergeant to see if they can

9              retro an IOD report.

10   Did I read that correctly?

11   A.   Yes.

12   Q.   And the MSS MD referred to here is Dr. Arjmand?

13   A.   Arjmand.

14   Q.   Arjmand.  I'm sorry.  Thank you.

15   And is it correct to say that Dr. Arjmand decided to

16   have the member contact the sergeant to have a retro IOD

17   report submitted?

18              MR. SUHL:  Object to form.  Foundation.

19              THE WITNESS:  Yes.

20   BY MS. HASHIM:

21   Q.   And it wasn't the member who decided this.

22   Correct?

23              MR. SUHL:  Object to form.  Foundation.

24              THE WITNESS:  Correct.

25              MS. HASHIM:  And when you're comparing --

Sheree Jones - July 25, 2023

216

1          THE WITNESS:  Correct.

2   BY MS. HASHIM:

3       Q.   When you're comparing this entry to the one that

4   you read earlier, would you say that the December 16th

5   entry stating, member then had district sergeant retro a

6   referral for 12 October '16 incident is inaccurate?

7          MR. SUHL:  Object to form.  Foundation.

8          THE WITNESS:  No.  I wouldn't say it's

9   inaccurate.  It's correct.  The -- the member (audio

10  interference) retro IOD, the City Hall still denied that

11  IOD.  Why they denied it, I have no clue.

12  BY MS. HASHIM:

13      Q.   Right.  No.  My question is who had the district

14  sergeant retro it?  Was it the physician or was it the

15  member?

16          MR. SUHL:  Object to form.

17          MS. HASHIM:  This note --

18          THE WITNESS:  The physician --

19          MR. SUHL:  Foundation.

20          THE WITNESS:  -- recommend -- the physician

21  recommend that the member call her district sergeant who

22  was work with her to do the retro IOD.  We can't do an IOD

23  for her because we are not out there in the field.  So her

24  sergeant in the book has to do the IOD.

25  BY MS. HASHIM:

Sheree Jones - July 25, 2023

217

1      Q.   Right.  So on this December 6th entry, it says

2   that MSS MD -- okay -- related -- and then it continues --

3   member is to contact.

4      Is that a recommendation or is that more of an order?

5   She is to contact?

6            MR. SUHL:  Object to form.

7            THE WITNESS:  Well, she's giving her

8   recommendation.

9            MS. HASHIM:  Okay.

10            THE WITNESS:  That's not a direct order.

11            MS. HASHIM:  Okay.  All right.  I'm going to put

12   back Exhibit Number 7.  This is the medical absence report.

13   BY MS. HASHIM:

14      Q.   Do you remember seeing this from before?

15      A.   Yes.

16      Q.   All right.  Now, the row that begins with

17   "category".

18      I'm sorry.  This is just a one-pager.  There we go.

19      The row here at the bottom that begins with

20   "category", do you see that?

21      A.   Uh-huh.

22      Q.   Okay.  Going to direct your attention there.  So

23   reading to the right of that row where it says:

24      Last day of medical absence, what is the date to the

25   right of that?  I think we had already established it as

Sheree Jones - July 25, 2023

218

1    November 17th, 2019.  Right?

2         A.    Right.

3         Q.    Okay.  And to the right of that, release type,

4    LOA for disability application.  Did I read that correctly?

5         A.    Yes.

6         Q.    Okay.  And if I understand your testimony from

7    before -- I just want to make sure -- is the disability

8    application related to the pension board?

9         A.    Yes.

10        Q.    Okay.  And based on your experience, when you see

11   this line, what is your -- strike that.

12        You had testified earlier that your reading of this is

13   that she was released on LOA so that she can apply -- no,

14   strike that.

15        I can't remember what you testified to accurately, so

16   I'm just going to ask you again.  Can you tell me how you

17   understand what this line means?

18        A.    That she was taken off the medical roll for her -

19   - for her -- because she had to apply for LOA, a leave of

20   absence for disability.

21        Q.    All right.  And --

22        A.    She might not have met up with them.

23        Q.    Okay.  Thank you.  And the first line under the

24   section titled, "Nature of sickness or injury", what does

25   it read there?  Does it read, left shoulder?

Sheree Jones - July 25, 2023

219

1          A.   It say, other sickness or injury, left shoulder.

2               MS. HASHIM:  Okay.  And I just have a document

3     for you to authenticate.  We'll make this -- I think we're

4     at, what, 20- -- uh-oh.  We're at 24 now.  Okay.

5               (Exhibit No. 24 marked for identification)

6               MS. HASHIM:  I'm going to share this with you.

7               THE WITNESS:  All right.

8               MS. HASHIM:  This is, for the record,

9     Arroyo.def.3528.

10         And I'm going to go ahead and pull it up for you to

11    look at while I go ahead and share it.  Or put it in the

12    chat, rather.  Okay.  Just sent it through chat.

13    BY MS. HASHIM:

14         Q.   Okay.  Why don't you take a look at this?

15         A.   There's nothing in here.  Just a subject line.

16         Q.   Right.  I just got a couple questions.

17         A.   And a --

18         Q.   Yeah.  Just got a couple questions for you.  This

19    is an email from Michelle Bankson to you on October 27th,

20    2017.  Correct?

21         A.   Uh-huh.

22         Q.   Okay.

23         A.   Yes.

24         Q.   Now, who is Michelle Bankson?

25         A.   Michelle Bankson used to do what Bishop does.

Sheree Jones - July 25, 2023

220

1   She used to do the limited-duty reports to tell me who's

2   running out of time, who needs to come in, and et cetera.

3        Q.   Okay.

4        A.   So this is a status report.

5        Q.   Okay.  Because we didn't receive the attachment,

6   so I was just wondering what your thoughts are of what

7   these attachments -- what the substance of these

8   attachments would have been.

9        A.   The attachments would have been how many people

10  on IOD limited duty, how many on there for non, and their

11  status for IOD.  It's a status report that she had to do

12  and send to me.

13       Q.   Okay.  All right.

14            MS. HASHIM:  Counsel, I'm just going to ask for a

15  five-minute break.  I just want to review my notes and make

16  sure I'm done with everything and then I'll hand it over to

17  you.  Okay?

18            MR. SUHL:  Okay.

19            MS. HASHIM:  All right.  Should we resume at

20  3:50?  Give ourselves a couple of extra minutes there?

21            MR. SUHL:  Sure.  That'll work.

22            MS. HASHIM:  Okay.  Thank you.

23            REPORTER:  All right.  We're off the record at

24  3:43.

25            (Off the record 3:43 p.m. to 3:50 p.m.)

Sheree Jones - July 25, 2023

221

1        REPORTER:  All right.  We're back on the record.
2   The time is 3:50.
3        MS. HASHIM:  Okay.  I have nothing further.
4   Thank you so much.
5      I'll hand it over to counsel.
6        MR. SUHL:  We have no questions.
7        MS. HASHIM:  Okay.
8        REPORTER:  All right.  So Ms. Hashim -- I don't
9   know if I'm pronouncing that correctly.  You have the
10  original.  Yes?
11       MS. HASHIM:  Yes.  That's correct.
12     And we'll waive.
13     Well, actually, let me ask Ms. Jones.
14     Ms. Jones, would you like to take a look at the
15  transcript and make any corrections in terms -- not of
16  substance, but if something is, like, a misspelling or
17  something to clarify?  Would you like to take a look at it?
18  You would have 30 days to read it.
19       THE WITNESS:  No.
20       MS. HASHIM:  Okay.
21       REPORTER:  So she'll waive.
22       MS. HASHIM:  So can we --
23       REPORTER:  I'm sorry?
24       MS. HASHIM:  Yeah.  So can we go off the record?
25       REPORTER:  I need to finish the orders and then,

Sheree Jones - July 25, 2023

222

1    yes.  Sorry.

2              MS. HASHIM:  Okay.

3              REPORTER:  Mr. Suhl, copy of the transcript.

4              MR. SUHL:  We'll take a copy.

5              MS. HASHIM:  Yeah.  We'll take an e-copy as well.

6    E-tran.

7              REPORTER:  We're off the record at 3:52.

8               (Off the record 3:52 p.m. to 3:57 p.m.)

9              REPORTER:  We're back on the record.  The time is

10   3:57.

11        Counsel?

12             MS. HASHIM:  Okay.  Thank you very much.

13        We had realized after the testimony of the witness

14   that two of our exhibits were duplicated in exhibit

15   numbers.  And so just to be clear, in reference Bates

16   number Arroyo.def.4061 to 62, that will be Exhibit 19A and

17   in reference to what's Bates number Arroyo.def.2381 will be

18   referred to as Exhibit 19, dot -- strike that -- will be

19   referred to as Exhibit 19B.  That's it.

20             REPORTER:  I'm sorry.  I was wondering why you

21   didn't talk.  Mr. Suhl, are you in agreement with that?

22             MR. SUHL:  Oh, yes.  The City's in agreement with

23   that.

24             REPORTER:  We're off the record at 3:58.

25                   (Adjourning at 3:58 p.m.)

223

1                    C E R T I F I C A T I O N

2

3        I, Lisa Ann Lopez, CET/CER/CDR, do hereby certify that

4    the foregoing is a correct transcript from the official

5    audio-visual recording of proceedings in the above-entitled

6    matter.

7        I further certify that I am not related to nor an

8    employee of counsel or any of the parties to the action,

9    nor am I in any way financially interested in the outcome

10   of this case.

11       Dated this day, August 23, 2023.

12

13

14                              (Electronically signed)

15                              Lisa Ann Lopez, CET/CER/CDR

16

17

18

19

20

21

22

23

24

25