**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| REYNA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-1148 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Reyna Arroyo, a police officer, hurt her shoulder when putting bags into the trunk of her car when she was not at work. The Chicago Police Department determined that the injury did not occur on duty. That decision capped her eligibility for benefits.

Arroyo went on Medical Roll, which is akin to sick leave. Arroyo then went on light duty work – basically, a desk job – for 730 days, before she hit the limit. When those days ran out, Arroyo went back on Medical Roll, and then took an unpaid leave of absence.

Arroyo believes that she should have received more, so she filed suit against the City under the Americans with Disabilities Act and the Rehabilitation Act. She alleges that the City discriminated against her based on her disability by failing to give her reasonable accommodations. She believes that the CPD should have allowed her unlimited time on Limited Duty, or reassigned her to another position. She brings a retaliation claim, too, alleging that the City retaliated against her by denying her request for reasonable accommodations.

After discovery, the City moved for summary judgment. For the reasons stated below, Defendant's motion for summary judgment is granted.

## Background

Reyna Arroyo has worked for the Chicago Police Department since 1998. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 140). In 2016, Arroyo held the position of Police Officer and worked in the 10th District. *Id.* at ¶ 36.

Before telling the story, it helps to know a little something about the policies of the Chicago Police Department. This Court will give a short overview of the responsibilities of a Full Duty Police Officer. Then, the Court will summarize the process and possibilities that apply when an officer is injured, including the officer's potential options for reassignment or time off.

### *Full Duty Police Officer*

Police officers must wear a lot of hats while juggling full plates. The "Essential Duties" of a Police Officer cover the waterfront. A Full Duty Officer:

- responds to incidents either assigned or observed as required;

- seeks to apprehend suspected law violators through the use of physical arrest procedures or citation procedures;

- actively pursues suspected law violators using search and containment methods;

- enforces state and municipal traffic laws through the use of physical arrest procedures and citation procedures;

- uses hand signals to direct traffic as necessary around accidents, objects in road, or at intersections when traffic signals are not working; and

- protects citizens from life threatening situations by the use of movement or protective cover.

*Id.* at ¶ 6; Police Officer Job Description, Ex. C, at 90–91 of 196 (Dckt. No. 134-2).

There is no dispute about those core duties. Arroyo agrees that those responsibilities are "essential duties that all full duty officers are required to perform without restriction." *See* Pl.'s Resp., to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 140).

The job description also lists the "Physical Requirements" of the job. A Full Duty Officer must:

- use muscular force to lift, carry, drag, push or otherwise move objects using strength in one's arms, hands, back, shoulders and/or legs;

- perform physical activities with skill, speed and balance efficiently and with little wasted motion;

- use the necessary force to restrain a person when making an arrest;

- quickly bend, stretch, twist, or reach out with one's body, arms, and/or legs; and

- stand/sit/walk for extended or continuous periods of time.

*Id.* at ¶¶ 6, 8; Police Officer Job Description, Ex. C, at 90–91 of 196 (Dckt. No. 134-2).

As a Full Duty Officer, Arroyo carried out those essential duties. She "responded to incidents, both assigned and observed." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 140). She "gathered information as part of a preliminary investigation . . . [and] apprehended suspected law violators using physical arrest procedures . . . on a regular basis." *Id.* Arroyo did so as "part of her 'regular police duties' while in [Full Duty] status." *Id.*

The "essential dut[y]" of making arrests requires "muscular force to lift, carry, drag, push or otherwise move objects using strength in one's arms, hands, back, shoulders, or legs." *Id.* at ¶ 8. Arroyo used "those physical requirements . . . to effectuate arrests over the course of [her] career." *Id.* at ¶ 9; Arroyo Dep. Tr., at 35:17-20 (Dckt. No. 134-3). When arresting a suspect, Arroyo used her "physical strength to restrain or handcuff them." *See* Arroyo Dep. Tr., at 26:1-6; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 140).

### *CPD Injury Process*

Sometimes officers get hurt on duty, and sometimes officers suffer an injury when they are off the clock. It makes a big difference when it comes to eligibility for benefits.

3

When a Police Officer suffers an injury, the CPD decides whether the officer was injured on duty. CPD classifies injuries as either injured on duty ("IOD") or not injured on duty ("non-IOD").[1] *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 12 (Dckt. No. 140).

CPD's Medical Policy explains the meaning of the phrase "Injured on Duty." "Any incident, wherein a Department sworn member receives an injury or becomes disabled while in the discharge of police duties and by reason of, or as a consequence of, the performance of such duties, shall be considered an Injury on Duty." *Id.*

Whether an officer is classified as IOD or non-IOD makes a big difference. It can affect an officer's options for medical leave and work assignments. The City's Committee on Finance makes the final determination of whether an injury is IOD or non-IOD. *Id.*

When a CPD officer is injured, there are two possibilities: Medical Roll, or Limited Duty. The Court will offer some background on both.

***Medical Roll***

Medical Roll is akin to the CPD's paid sick leave. *Id.* at ¶ 31. Officers can accrue medical roll over time. "[A] member absent from duty because of illness or injury sustained off duty will be carried on the medical roll." *Id.*

Both IOD officers and non-IOD officers can receive "full pay and benefits for the period of absence" stemming from their injury or illness for up to 12 months. *Id.* at ¶¶ 13, 18.

For the most part, Medical Roll is the same whether an officer is IOD or non-IOD. Either way, officers receive their full salary on Medical Roll. *Id.* at ¶ 35.

---

[1] Not everyone loves acronyms. But at some point, you have to pick your poison. You could read a bunch of acronyms, or you could read "injured on duty" and "non-injured on duty" dozens of times. The parties embrace the lingo and speak Acronym, so this Court will too. After all, they're the most important audience.

But IOD officers can receive more paid medical leave than non-IOD officers. An IOD officer can receive 12 months of paid leave for *each* IOD injury. *Id.* at ¶ 13. So, for example, a broken shoulder, a torn elbow, and a busted ankle could lead to three 12-month periods of paid leave for an IOD officer, totaling 36 months. In contrast, a non-IOD officer can receive only 12 months of paid leave within each 24-month period, even if the officer suffers more than one injury. *Id.* at ¶ 18.

***Limited Duty Police Officer***

Injured people sometimes need limited duties. And that's where the CPD's Sworn Limited Duty Program comes in.

IOD officers and non-IOD officers are eligible for CPD's Sworn Limited Duty Program. *Id.* at ¶¶ 14, 18. Limited Duty is like desk work: Limited Duty officers are not deployed to the street except during civil unrest. *Id.* at ¶ 17.

There is a big difference between IOD officers and non-IOD officers when it comes to Limited Duty. Basically, there is a cap for non-IOD officers, but there is no cap for IOD officers.

IOD officers can remain on Limited Duty status until they have recovered and can perform Full Duty assignments. So, an IOD officer can be on Limited Duty indefinitely. *Id.* at ¶ 15 ("Eligible sworn [CPD] officers who are injured in the line of duty and certified by the Medical Services Section as being able to perform limited duty assignments shall be given available limited duty assignments *until they can perform full duty assignments* . . . .") (emphasis added).

But there is an important caveat. IOD officers do not get to remain on Limited Duty as of right. Each year, a doctor must certify that an IOD officer cannot return to Full Duty, and therefore must stay on Limited Duty. *See* Smith Dep. Tr., at 57:7-13 (Dckt. No. 134-4).

An IOD officer might remain on Limited Duty for only a short time, or for the rest of their career. The length of time depends on whether the officer has the physical ability to return to Full Duty. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 140).

The situation is much different for non-IOD officers. Non-IOD officers can remain on Limited Duty for a maximum of 730 days. *Id.* at ¶¶ 19–20. That's two years. And after two years, it's time's up.

That limitation applies even if a non-IOD officer is unable to return to Full Duty by the end of the 730 days. *Id.* And even then, a non-IOD officer's access to Limited Duty assignments is "subject to the needs of the [CPD]." *Id.* at ¶ 19. That policy appears in Employee Resource E03-01-03. *Id.*

There is another limitation, too. The 730-day limit is cumulative over the course of an officer's entire career. *Id.* at ¶ 20. In other words, officers get only 730 days of non-IOD Limited Duty during their entire time with the CPD.

Arroyo understood the policy. She understood that a 730-day cap applied to non-IOD officers on Limited Duty. *Id.* (quoting Arroyo Dep. Tr., at 51:6-18 (Dckt. No. 134-12)). She knew that no such cap applied to IOD officers. *Id.* Arroyo also knew that, when she went on Limited Duty, she "only returned to full duty after her treatment ended." *Id.* at ¶ 34.

Both IOD officers and non-IOD officers must meet certain requirements before entering Limited Duty. They must:

> 1. safely carry, handle, and use their Department approved, prescribed firearm, which includes possessing a current, valid

6

Firearm Owner's Identification (FOID) card;

2. maintain an independent and stable gait without the assistance of external ambulatory supporting devices (e.g., crutches, canes, walkers, wheelchairs, etc.). Subject to evaluation by the Medical Services Section, an eligible sworn Department member wearing a prosthesis or other orthopedic device (e.g., brace, cast, etc.) may be granted a limited duty assignment;

3. safely effectuate an arrest of an arrestee who is defined as an active resister in the Chicago Police Department Use of Force Model outlined in the Department directive entitled **"Use of Force Guidelines." NOTE:** This requirement will not apply to members seeking a limited duty assignment due to being injured in the line of duty; and

4. drive a motor vehicle, which includes possessing a current, valid driver's license.

*Id.* at ¶¶ 21–22 (cleaned up) (emphasis in original) (citing Employee Resource E03-1-03, Ex. I, at 121–24 of 196 (Dckt. No. 134-2)).

To ensure that Limited Duty officers can meet those requirements, a doctor must certify that a *non-IOD* Limited Duty candidate can fulfill the five "essential functions" of a Limited Duty officer. These essential functions closely mirror the requirements noted in the Employee Resource (summarized above). A non-IOD Limited Duty officer must have the "[1] physical ability 'to safely effectuate an arrest at the resister level,' [2] 'physical, psychological and emotional ability to safely carry, handle and use a . . . firearm,' [3] 'an independent and stable gait without assistance;' [4] 'the ability to drive;' and [5] 'a valid and current Firearms Owner's Identification Card.'" *Id.* at ¶ 23 (alterations in original).

Unlike non-IOD officers, IOD officers do not have to get their Limited Duty assignment approved by a doctor. And unlike non-IOD officers, IOD officers do not need to demonstrate the ability "to safely effectuate an arrest at the resister [sic] level." *Id.* at ¶¶ 23, 27; Smith Dep. Tr., at 19:6 – 20:3 (Dckt. No. 134-4).

These five essential functions appear on the aptly named "Essential Functions for Limited Duty Approval" form. The form advises the officer's doctor that "[y]our patient is a member of the Chicago Police Department whose job duties sometimes require the officer to engage in strenuous physical activities . . . [t]his information sheet is to assist you in determining whether your patient is able to return to work as a Chicago Police Officer." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 22 (Dckt. No. 140). The form also states that "[o]fficers must be able to perform all of the essential functions of the police officer position in order to be considered for a limited duty assignment." *Id.*

The form includes a second page, entitled "Medical Certification for Limited Duty Assignment," where the treating physician can describe any restrictions on specific activities that the officer cannot perform. *Id.* at ¶ 24. This page states that "[o]fficers will not be eligible for limited duty assignment if their restrictions prevent them from performing the essential functions of a police officer." *Id.*

After the physician completes the Essential Functions for Limited Duty Approval form, the CPD's Medical Services Section (which goes by "MSS," for those who can ingest acronyms) reviews it to determine if the officer meets the qualifications for limited duty. *Id.* at ¶ 25. Basically, "[s]o as long as the doctor fills the forms . . . and then lists [the officer's] limitations, as long as [the officer is] able to shoot their gun, lift, certain things like that, they can go back to work in a limited capacity." *Id.* (quoting Smith Dep. Tr., at 17:2-6 (Dckt. No. 134-4)).

If the Medical Services Section approves the officer for Limited Duty, CPD places the officer in a Limited Duty assignment where CPD has an operational need. *Id.* at ¶ 28.

When Arroyo was injured and was "not able to do the 'full duties of the police officer' provided in the job description, she [c]ould work in a limited duty capacity once cleared by her physician to do so." *Id.* at ¶ 7.

***Arroyo's Injury***

In October 2016, Arroyo injured her shoulder while lifting her backpack, briefcase, and raincoat into the trunk of a car. *Id.* at ¶ 37. The statement of facts doesn't offer a lot of details about how it happened.

Maybe she carried her backpack and her briefcase at the same time, in the same arm, but that seems unlikely. Most of us carry only one bag at a time if using only one arm. Or, maybe the backpack was heavy, or the briefcase was heavy, or maybe both. It's hard to see how a raincoat could injure a shoulder, unless it got in the way.

The statement of facts doesn't offer a lot of specifics about the precise injury, either. One wonders if she tore something, or broke something. If she did, she doesn't say. Maybe it was less serious. At one point, the statement of facts refers to a shoulder "strain," but that's about it.

However it happened, and whatever happened, Arroyo hurt her shoulder. And the injury was serious enough to make her eligible for medical leave.

Before the injury, Arroyo was doing Full Duty police work. *Id.* at ¶ 36. But after the injury, Arroyo went on the Medical Roll. *Id.* at ¶ 40.

Before getting into the weeds, the Court offers a high-level, Cliff Notes version of the entire timeline, in the spirit of a public service announcement. In the years that followed, Arroyo went on and off Medical Roll, and then on and off Limited Duty, and then on and off Medical Roll. Candidly, the record is a bit of a muddy track. Keeping everything straight can pose a bit of challenge.

As a gift to the reader, here is a thumbnail sketch of the timeline.

Basically, Arroyo bookended her time on Limited Duty with stints on Medical Roll. Arroyo injured her shoulder in October 2016, and went on Medical Roll. *Id.* at ¶ 40. Then, Arroyo went on Limited Duty status in September 2017. *Id.* at ¶ 41. She stayed on Limited Duty until it expired on March 31, 2019. *Id.* at ¶ 64. At that point, Arroyo went on Medical Roll a second time on April 1, 2019. *Id.* She stayed on Medical Roll until it expired in November 2019. *Id.* at ¶ 69.

Back to the story. Again, Arroyo hurt her shoulder in October 2016, and went on Medical Roll. The shoulder injury was not her first injury as a CPD officer. At some earlier time, Arroyo went on Limited Duty for an injury on duty. *Id.* at ¶ 32.

Arroyo's prior stint on Limited Duty was important, for at least two reasons. First, Arroyo was familiar with the IOD process and the function of Medical Roll. *Id.* at ¶¶ 30, 33. Second, Arroyo had used some of her allotted time on Limited Duty, because an officer gets only 730 days of Limited Duty time as a non-IOD officer in their career.

She knew the rules, and had already burned some time.

Arroyo reported her injury to her next-in-command as a recurrence of a previous IOD shoulder injury that she sustained in 2014. *Id.* at ¶ 37. So the CPD initially treated her injury as IOD "as part of standard operating procedure." *Id.*

In early December 2016, CPD's Medical Services Section determined that Arroyo's shoulder injury was a *new* injury, and not a recurrence of her old on-duty injury. *Id.* Before long, the Committee on Finance reached the same conclusion, finding that Arroyo's new injury

was non-IOD. *Id.* at ¶¶ 37, 38. The Medical Services Section certified that determination, so Arroyo's injury was classified as non-IOD. *Id.*[2]

That decision put Arroyo on a certain trajectory, and limited her eligibility for benefits. Again, the policies that apply to IOD officers are different than the policies that apply to non-IOD officers. A non-IOD officer can't stay on Limited Duty forever.

During this time, Arroyo was on the Medical Roll. She remained on the Medical Roll until at least March 21, 2017. *Id.* at ¶ 41. After March 21, it appears that Arroyo returned to Full Duty.[3]

On August 9, 2017, Arroyo was diagnosed with a rotator cuff strain. *Id.* The doctor prescribed four weeks of physical therapy. *Id.* Arroyo testified that the injury required surgery. *Id.* at ¶ 43 (quoting Arroyo Dep. Tr., at 83:14-16).

On September 8, 2017, a physician completed Arroyo's Essential Functions for Limited Duty Approval form. The doctor restricted her from doing the following tasks: pushing or pulling more than 10 pounds, wearing her police vest, lifting more than 10 pounds, and working above the shoulder level. *Id.* at ¶ 42.

Arroyo submitted her completed application for Limited Duty status on September 21. After passing her firearms qualification, she was cleared. *Id.* at ¶ 41.

---

[2] Arroyo later filed a grievance asserting that her October 2016 shoulder injury should have been classified as IOD. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 140). That grievance ultimately went to arbitration, where Arroyo's grievance was denied. *Id.* at ¶ 39. So her shoulder injury remains classified as non-IOD. *Id.*

[3] The date of Arroyo's return from the Medical Roll is not entirely clear. It appears that she was cleared to return to Full Duty status on March 21, 2017, but nothing in the record clearly indicates that she *did* return to work on Full Duty status. In contrast, Defendant believes that Arroyo was on the Medical Roll until she entered Limited Duty status on September 26, 2017. However, record indicates that Arroyo was listed on the Medical Roll for separate illnesses at other times between March 2017 and September 2017. So it appears she had returned from her should injury-based Medical Roll before entering Limited Duty on September 26, 2017. In any case, the date of her return is not material to the outcome of the case.

Arroyo went on Limited Duty status in September 2017. Specifically, she returned to work on non-IOD Limited Duty status by joining CPD's Finance Division on September 26, 2017. *Id.* At the Finance Division, she worked a desk job with the travel section. *Id.* at ¶ 52.

The doctor certified the same restrictions on the Essential Functions for Limited Duty Approval form several times, including on February 26, 2018, May 18, 2018, and March 1, 2019. *Id.* at ¶ 42.[4] The Medical Services Section approved Arroyo for Limited Duty status each time. *Id.*

Limited Duty officers, like Arroyo, were assigned to the Finance Division to "augment[] [its] operations until they either returned to full duty or they retired[.]" *See* James Dep. Tr., at 27:11-13 (Dckt. No. 134-6). But officers were to be replaced by non-officers after finishing their assignment in attempt to "civilianize" the Finance Division. *Id.* at 28:3-18.

Seventeen police officers were detailed to the Finance Division, and all of them were part of the Limited Duty program. *Id.* at 145:13-19; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 48 (Dckt. No. 140). The Assistant Director of Finance, Michele James, testified about those seventeen officers.

James stated that all seventeen officers were on Limited Duty, but also implied that some Full Duty officers worked in the Finance Division. *See* James Dep. Tr., at 91:3-8. And Arroyo understood that some Full Duty officers worked in the Finance Division. *See* Arroyo Dep. Tr., at 82:6-9 (Dckt. No. 134-3). It was also Arroyo's understanding that these Full Duty officers could be deployed elsewhere, like in the case of a protest, but the Limited Duty officers in the Finance

---

[4] In between May 2018 and March 2019, a doctor completed the Essential Functions for Limited Duty Approval form relating to a different medical issue. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 42 (Dckt. No. 140). On August 31, 2018 and October 1, 2018, the doctor noted that Arroyo could "grasp objects with moderation," and "drive with moderation," but could not twist, push, or pull. *Id.*

Division could not.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 49–50 (Dckt. No. 140)

(citing Arroyo Dep. Tr., at 82:3 – 83:8).

***Expiration of Limited Duty Time***

On January 8, 2019, the Medical Services Section sent Arroyo a letter, giving her notice

that her 730 days of allotted non-IOD Limited Duty time were close to running out.  *Id.* at ¶ 53.

The letter projected that she would exhaust her Limited Duty time on April 6, 2019.  *Id.*; Limited

Duty Notification Letter – A, Ex. T, at 157–58 of 196 (Dckt. No. 134-2).  The letter gave her five

options, stating:

- You may use any available Medical Roll days;

- You may retire or resign by submitting a Personal Action Request (PAR);

- You may apply for a leave of absence in order to apply for disability benefits;

- If applicable, you may request a Reasonable Accommodation as defined by the Americans with Disabilities Act; or

- If applicable, you may request leave under the Family Medical Leave Act.

*See* Limited Duty Notification Letter – A, Ex. T, at 157–58 of 196 (Dckt. No. 134-2).

A few weeks later, on January 24, 2019, Arroyo received a second notification letter.

This letter provided an updated estimate of when Arroyo would exhaust her Limited Duty time.

It fixed the last day at March 31, 2019.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 54, 57

(Dckt. No. 140); Limited Duty Notification Letter – B, Ex. U, at 159–60 of 196 (Dckt. No.

134-2).  The letter also reiterated Arroyo's five options.

Arroyo received this notification.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54

(Dckt. No. 140) (citing Arroyo Dep. Tr., at 73:7 (Dckt. No. 134-12)).

By that point, Arroyo had already filed a grievance about her shoulder injury getting

classified as non-IOD.  *Id.* at ¶ 38.  Arroyo thought she would prevail.  *Id.* at ¶ 55.  If she

prevailed in the grievance, and if her shoulder injury was re-classified as IOD, then she could stay in the Limited Duty role until her shoulder healed or until she retired. *Id.* at ¶ 15.

Arroyo assumed that she would prevail, so she began contacting her supervisors and higher-ups in the chain of command. She asked if they could "help her get a permanent position or extend the unlimited [sic] duty until her grievance was settled" or until her shoulder got better. *Id.* at ¶ 55 (cleaned up) (quoting Arroyo Dep., at 75:5-24 (Dckt. No. 134-12)).

But the grievance process "took forever." *See* Arroyo Dep., at 75:8-9. Arroyo's supervisors told her that she was getting close to exhausting her Limited Duty time, but gave her options such as going back to Full Duty, resigning, or taking a leave of absence. *Id.* at ¶ 56.

On January 29, 2019, Arroyo received an email saying that she needed to schedule a meeting with her supervisor to discuss her options for leave. *Id.* at ¶ 58. Arroyo met with her supervisor. *Id.* at ¶ 59.

The Chicago Police Department has a policy about reasonable accommodations. *Id.* at ¶¶ 60–61. The policy creates a process for requesting a reasonable accommodation, and the process includes a written request and medical documentation. *Id.* at ¶ 62. After submitting the forms, the CPD Disability Officer meets with the individual to discuss potential options and accommodations. *Id.* at ¶ 63.

Arroyo never met with the Disability Officer. *Id.* at ¶ 65. Arroyo did not apply for disability pension benefits, either. *Id.* at ¶ 64.

Instead, she selected the option of using her remaining Medical Roll time. *Id.* at ¶ 64. That was her second stint on the Medical Roll for the 2016 shoulder injury. *Id.*

When Arroyo's Medical Roll was set to expire, she received correspondence informing her that she was almost out of sick leave. *Id.* at ¶ 69. The letter informed her that "[i]f you do

14

not return to Duty before you exhaust these paid medical absence benefits, you will be removed from the Active Roll …. [y]our options at that time will include Retirement, Resignation or Leave of Absence, such as to apply for Disability Pension benefits." *Id.* (quoting September 3, 2019 Correspondence, Ex. W, at 163–64 of 196 (Dckt. No. 134-2)).

On March 20, 2020, Arroyo requested the forms to apply for disability. *Id.* at ¶ 70. She was informed that she was on an unpaid leave of absence while she waited for disability benefits, because she had exhausted all of her Medical Roll days. *Id.* at ¶ 71.

For leaves of absence lasting 30 days or more, CPD policy requires that an employee return all equipment, including their star and badge. *Id.* at ¶ 72.

Arroyo remains on a leave of absence. *Id.* at ¶ 73.

### *Aftermath*

Arroyo responded by filing suit against the Chicago Police Department. She later amended the complaint, dropped the CPD, and brought three claims against the City.

First, Arroyo brings a disability discrimination claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, alleging that the City failed to offer her reasonable accommodations. Second, Arroyo brings a retaliation claim under the ADA. Third, Arroyo brings a disability discrimination claim under the Rehabilitation Act, 29 U.S.C. § 794(a). *Id.* She brought a fourth claim, too, but the parties dropped it by agreement.

After discovery, the City moved for summary judgment.

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is

15

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322.

## Analysis

### I. The Failure-to-Accommodate Claim under the ADA (Count I)

Arroyo's first claim is a failure-to-accommodate claim under the ADA. The claim has three elements.

"Recovery under a failure to accommodate theory requires proof that (1) the plaintiff was a qualified individual with a disability; (2) the defendant was aware of the plaintiff's disability; and (3) the defendant failed to reasonably accommodate the plaintiff's disability." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1053 (7th Cir. 2024) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)).

A plaintiff "bears the burden to make a preliminary showing that [the] requested accommodation is reasonable on its face." *See EEOC v. Charter Commc'ns, LLC*, 75 F.4th 729, 740 (7th Cir. 2023) (citations omitted).

Even then, an employer can rebut that showing. "An employer may defend on the grounds that no accommodations would be reasonable and/or that the proposed accommodations would impose an undue hardship on its operations . . . ." *Id.* (citing 42 U.S.C. § 12112(b)(5)(A)).

This Court will briefly touch on the "qualified individual" prong, before turning to the main event. All of the action is on the third element, meaning whether the City failed to offer a reasonable accommodation.

### A. Qualified Individual

The parties devote a significant amount of attention to the first element of a failure-to-accommodate claim. Arroyo must present sufficient evidence that she is a "qualified individual with a disability." *See Bruno*, 93 F.4th at 1053.

A qualified individual with a disability is a person "'who, with or without reasonable accommodation, can perform the essential functions' of her job." *See McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 967 (7th Cir. 2020) (citations omitted); *see also* 42 U.S.C. § 1211(8).[5]

Simply put, "the ADA applies only to those who can do the job." *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017). If an employee can't do the job, even with reasonable accommodations, an employer doesn't have to keep that employee around.

---

[5] A "qualified individual" must also meet "basic qualifications" like "educational prerequisites, employment experience, skills, or licenses." *See Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021). The parties don't dispute this aspect, so the Court won't address it.

17

"Essential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Vargas v. DeJoy*, 980 F.3d 1184, 1188 (7th Cir. 2020) (citing 29 C.F.R. § 1630.2(n)(1)).

In their briefs, the parties dug in and battled hard over this terrain. The parties disagreed about whether Arroyo could perform the "essential functions" of a Police Officer, meaning her then-existing job.

The parties left an important stone unturned. Arroyo argued that reassignment to a vacant position was a possible reasonable accommodation. But the parties didn't discuss whether Arroyo was a "qualified individual" for any vacant position. So there is a gap in the record.

Even so, this Court does not need to get into it. This Court does not need to address the second element, either, meaning whether the City knew about her disability (although it doesn't seem like a tough question on this record).

Arroyo did not present enough evidence to satisfy the third element, meaning whether the City failed to offer her reasonable accommodations. So there is no need to decide whether Arroyo presented enough evidence on the first element, meaning whether she was a "qualified individual."

All of this is a long way of saying that this Court will skip over the first element, and hop over the second element, and will jump to the third element. The key question is whether the City failed to offer her reasonable accommodations.

### B. Reasonable Accommodations

To survive summary judgment, Arroyo needed to present evidence that the City failed to offer her reasonable accommodations. Arroyo points to two possibilities.

18

First, Arroyo contends that the City could have offered her more time on Limited Duty. Second, Arroyo argues that the City should have reassigned her to a different job. *See* Pl.'s Resp., at 15 (Dckt. No. 139).

This Court will take them up, one at a time.

### 1.     More Time on Limited Duty

The first possibility is more time on Limited Duty. That suggestion doesn't get very far. On this record, more time on Limited Duty was not a reasonable accommodation, and would have imposed an undue hardship on the City.

Again, when it comes to the reasonableness of an employee's accommodation, the plaintiff "bears the burden to make a preliminary showing that [her] requested accommodation is reasonable on its face." *See Charter Commc'ns*, 75 F.4th at 740 (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)).

An accommodation "seems reasonable on its face" if it would "ordinarily or in the run of cases" be reasonable. *See EEOC v. United Airlines, Inc.*, 693 F.3d 760, 762 (7th Cir. 2012) (quoting *Barnett*, 535 U.S. at 401).

An employer doesn't have to swallow anything the employee puts on the table and suggests as a potential accommodation. An employer has no liability if the proposed accommodation is unreasonable. *See Charter Commc'ns*, 75 F.4th at 740 ("An employer may defend on the grounds that no accommodations would be reasonable.").

An employer does not have to accept a proposal if the "proposed accommodations would impose an undue hardship on its operations." *Id.* Undue hardship means some "special (typically case-specific) circumstances . . . that render the proposed accommodation unreasonable in fact." *See Barnett*, 535 U.S. at 402. The employer bears the burden to establish

19

undue hardship. *See Charter Commc'ns*, 75 F.4th at 740. But an employer does not need to shoulder that burden until the plaintiff has first established that the accommodation is reasonable.

Here, Arroyo argues that the City should have given her extended or indefinite Limited Duty work as an accommodation. *See* Pl.'s Resp. in Opp'n to Def.'s Mtn. for Summ. J., at 11 (Dckt. No. 139) (discussing Plaintiff's requested "reasonable accommodation, namely, limited duty status").

That suggestion runs headfirst into a wall of case law.

"[A]n employer is not obligated to reassign an employee to a permanent light-duty position." *Newell v. Alden Vill. Health Facility for Child. & Young Adults*, 651 F. App'x 556, 559 (7th Cir. 2016); *see also Gratzl*, 601 F.3d at 680 ("Nor is there any duty to reassign an employee to a permanent light duty position."); *Delgado v. Certified Grocers Midwest, Inc.*, 282 F. App'x 457, 462 (7th Cir. 2008) ("The ADA does not require [an employer] to create a job for [plaintiff] or permanently assign him to light-duty work.").

Simply put, "the ADA does not require an employer that sets aside a pool of positions for recovering employees to make those positions available *indefinitely* to an employee whose recovery has run its course without restoring that worker to her original healthy state." *See Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) (emphasis added).

Lots of cases make the same point. *See, e.g.*, *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 750 (7th Cir. 2011) ("[W]e have previously held that the ADA does not impose an obligation on employers to create a new position, which contains a subset of the duties performed by those in an existing position, for individuals with permanent impairments."); *Malabarba v. Chicago Trib. Co.*, 149 F.3d 690, 697 (7th Cir. 1998) ("Although the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it

20

does not require that employers convert temporary 'light-duty' jobs into permanent ones.'");

*Corrales v. Westin Hotel Mgmt. LP*, 2019 WL 1762907, at *7 (N.D. Ill. 2019) ("[T]the ADA does not require employers to make temporary light duty work accommodations permanent.").

The City has a policy that limits non-IOD officers to 730 days of limited duty time. *See* Pl.'s Resp. to Def.'s State of Facts, at ¶ 20 (Dckt. No. 140). That's two full years.

The ADA does not require the City to convert those limited duty positions into permanent positions whenever an employee requests that accommodation. *See Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015) ("Moreover, even if 'light duty' would have been [plaintiff's] preferred accommodation, the ADA does not entitle a disabled employee to the accommodation of his choice. Rather, the law entitles him to a reasonable accommodation in view of his limitations and his employer's needs.").

In fact, "it would frustrate the ADA for permanently impaired employees to fill temporary light-duty assignments when those jobs have been set aside specifically for recuperating employees." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir. 1998); *see also Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 680 (7th Cir. 1998).

To be fair, Arroyo told the CPD that her injury was temporary. And Arroyo asked the City to provide her Limited Duty assignments for as long as she needed.

But her "need" was indefinite. The end game was up in the air.

CPD's policy did not allow an officer to receive indefinite Limited-Duty time for a non-IOD injury. The policy set a cap, and the CPD was free to set a policy. The ADA does not require an employer to offer indefinite Limited-Duty time in violation of its policies. *See Watson*, 304 F.3d at 752 ("[T]he ADA does not require an employer that sets aside a pool of positions for recovering employees to make those positions available *indefinitely*

21

. . . ."); *Razote v. Potter*, 833 F. Supp. 2d 913, 919 (N.D. Ill. 2011) ("[The] duty to reasonably accommodate an employee under the Rehabilitation Act does not require an employer to violate a collective bargaining agreement or its own legitimate transfer policies.") (citing *Nelson v. Potter,* 2007 WL 1052490, at *8 (N.D. Ill. 2007)).

Again, the CPD does not leave officers in a lurch if they suffer an injury when they're not at work. The City gives officers 730 days – two full years – of Limited Duty time if they are non-IOD Police Officers. The ADA does not obligate the City to provide indefinite time on Limited Duty simply because an injury is "temporary."

Arroyo makes one last-ditch pitch. She argues that the City has an official policy of a 730-day limit for non-IOD Limited Duty. But the *practice* is different. Arroyo points to other individuals who, in her view, received extra non-IOD Limited Duty time.

"Where some (or many) employees have been accommodated in the same manner that a disabled employee asks to be accommodated, this is relevant to whether the requested accommodation is reasonable." *See EEOC v. AutoZone, Inc.*, 2022 WL 4596755, at *14 (N.D. Ill. 2022) (Dow, J.) (citing *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 197–98 (7th Cir. 2011)).

If the City gave other employees a pass, and let them stay longer in the Limited Duty program, maybe Arroyo would have an argument for getting the same treatment. But the facts in the record don't back her up.

Arroyo says that two Police Officers – Gerrine Gniady and Sandra Thomas – were assigned to the Finance Division in non-IOD status for more than the 730-day limit. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 19 (Dckt No. 146); *see also* Pl.'s Resp. in Opp'n to Def.'s Mtn. for Summ. J., at 15 (Dckt. No. 139) ("While CPD policy limits a non-IOD

officer's time in LD status, CPD practice is different. Two non-IOD officers in LD status detailed to the Fin. Div. were afforded extensions beyond the policy time limit.").

Arroyo points to testimony from Michele James, the Assistant Director of the Finance Division. James testified about each of the two employees (Gniady and Thomas) at deposition.

James testified that Gniady (the first employee) was detailed to the Finance Division with "longevity," that is, "four years or more." *See* James Dep. Tr. Part 1, at 70:3-12 (Dckt. No. 134-6).

James also testified that Thomas (the second employee) was assigned to the Division for "almost three years. Maybe a little bit longer. But at least a good three years." *See* James Dep. Tr. Part 2, at 82:2-7 (Dckt. No. 134-7).

Arroyo takes those statements and runs with them (too far). She views that testimony as a concession that employees could stay on non-IOD Limited Duty status for more than 730 days. *See* Def.'s Pl.'s Statement of Additional Facts, at ¶ 20 (Dckt. No. 140) ("Asst. Dir. James testified that officers detailed to the Finance Division could be there through a combination of IOD, [Limited Duty] days, non-IOD [Limited Duty] days, and [Full Duty].").

Arroyo then draws a comparison between Gerrine Gniady and Sandra Thomas (on the one hand) and two other officers, Derek Moss and Helene Ward (on the other). *Id.* ("She [James] did not state that this was the situation with Ofcrs. Gniady or Thomas, as she had stated with Ofcrs. Derek Moss and Helene Ward.").

Derek Moss was an officer who spent almost all his career in the Finance Division as a Full Duty officer, before going into non-IOD status shortly before his retirement. *See* James Dep. Tr. Part 2, at 78:14 – 79:5 (Dckt. No. 134-7).

Helene Ward joined the Finance Division in a Limited Duty capacity before going back onto Full Duty, and then "back to finance in a limited duty capacity." *Id.* at 84:23 – 85:12.

Arroyo tries mightily to construct an inference based on the thinnest of reeds. Frankly, the reed is so thin that it's hard not to lose the thread.

The argument seems to rest on the fact that, at deposition, James made certain clarifications about the status of Gniady and Thomas. But James made no such clarifications about Moss and Ward.

That argument doesn't get her very far. Arroyo overstates the testimony.

James didn't testify that Gniady was in the Finance Division for four years *as a non-IOD Limited Duty officer*. Instead, James testified that Gniady was in the Finance Division for "four years or more," and that Gniady was a non-IOD Limited Duty officer "right before she retired." *See* James Dep. Tr. Part 1, at 69:19 – 70:2 (Dckt. No. 134-6).

Gniady mixes and mashes those statements together to create new composite testimony. By way of analogy, a football player could play in the NFL for 12 years, and could play quarterback for the Chicago Bears right before he retired. But that doesn't mean that the player was the quarterback for the Chicago Bears for 12 years.

The testimony from James about Thomas doesn't help, either. James testified that Thomas worked in the Finance Department for "at least a good three years." *See* James Dep. Tr. Part 2, at 81:25 – 82:7 (Dckt. No. 134-7). But that's different than saying that Thomas worked in the Finance Department *as a non-IOD Limited Duty officer* for three years.

When it comes to summary judgment, reasonable inferences count, but unreasonable inferences don't. And here, Arroyo's view of the evidence is a stretch, and then a long leap.

The fact that officers worked in the Finance Division doesn't necessarily mean that they had *non-IOD Limited Duty* status. Those officers could have had Limited Duty, Full Duty, IOD, and non-IOD status, or some combination thereof.

James didn't know which employees had what status. She "didn't keep track" of those details. *See* James Dep. Tr. Part 2, at 85:7-8 (Dckt. No. 134-7). After all, she was not responsible for determining eligibility for the Limited Duty program.

James simply received background information about officers already certified as Limited Duty. She would select people who seemed like a good fit for the Finance Division based on "what their background is" and whether they "had a math background." *See* James Dep. Tr. Part 1, at 26:8-23 (Dckt. No. 134-6).

That is, James had nothing to do with IOD or non-IOD status. As Arroyo herself points out, "it is MSS [*i.e.*, the Medical Services Section] that approves the limited duty status of an eligible officer," not the supervisors in the Finance Division. *See* Pl.'s Resp. to Def.'s SOF, at ¶ 21 (Dckt. No. 140).

Overall, Arroyo overreads the testimony. James testified that Gniady and Thomas were in the Finance Department for more than 730 days. James did not testify that Gniady and Thomas were in the Finance Department *on non-IOD Limited Duty status* for more than 730 days.

At summary judgment, Arroyo is entitled to all reasonable inferences. *See Chaib*, 819 F.3d at 341. But this inference crosses the line into speculation. And the Court cannot rely on speculation. *See Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) ("[W]e need not draw inferences that are supported by 'only speculation and conjecture.'").

Arroyo reads too much into snippets of testimony, and the snippets lack the strength to support the inference that Arroyo wants them to carry. If there was an opening, counsel could have explored it at deposition.

The City later cleared up any conceivable ambiguity. James submitted a declaration and confirmed that, to her knowledge, no officer stayed on non-IOD status for more than 730 days. "Since 2012, I am not aware of any limited duty police officers, including Officers Gniady and Thomas, that were allowed to remain in a non-IOD limited duty status longer than the prescribed amount of time set out in Employee Resource E03-01-03." *See* James Decl., at 1 (Dckt. No. 146-1).

Arroyo responded by moving to strike that declaration as a "sham." *See* Pl.'s Mtn. to Strike, at 3 (Dckt. No. 147). As she sees things, the declaration "[d]irectly [c]ontradicts" James's deposition testimony. *Id.* She asks the Court to disregard the declaration "because it attempts to put forth a specious denial and a sham defense . . . ." *Id.* at 7.

A party cannot support or oppose a motion for summary judgment based on a declaration or affidavit that squarely contradicts deposition testimony. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). "The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule 'to weed out unfounded claims, specious denials, and sham defenses.'" *Id.* (emphasis in original); *see also Craig v. Wrought Washer Mfg., Inc.*, 108 F.4th 537, 543–44 (7th Cir. 2024) (discussing exceptions).

Sometimes witnesses give "bad" answers at deposition, and when they do, the time for cleanup is the deposition itself. A party cannot wipe away something that a witness says at deposition by getting that person to sign a declaration or affidavit that says the opposite. A

26

declaration or affidavit is not a means to amend a deposition, get a do-over, and un-say what was said.

But the sham-affidavit rule has its limits. *See Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 956 (7th Cir. 2024) (noting that courts must apply the rule with "great care"). It does not apply simply because it fills a gap left open in a deposition. And it doesn't kick in because it clarifies something that went unsaid in prior testimony. It is not enough if there is arguable tension with prior testimony, either.

The sham-affidavit rule applies when the declaration or affidavit is perpendicular to prior testimony. In the end, it depends on the totality of the circumstances, and rests on the sound discretion of the district court. *See Craig*, 108 F.4th at 543.

Here, the sham-affidavit rule does not apply. The declaration of James does not squarely contradict the deposition testimony of James. So the motion to strike is denied.

If anything, Arroyo puts forward evidence in her motion to strike that undermines her position.

The exhibit shows that Gniady was on non-IOD Limited Duty status for 167 days. *See* Mtn. to Strike, Ex. 1, at 15 of 63 (Dckt. No. 147-1) (showing that Gniady was in non-IOD Limited Duty status from December 30, 2020, to June 15, 2021).

The exhibit also shows that Thomas was in non-IOD Limited Duty status for 510 days. *Id.* at 44 of 63 (showing that Thomas was in non-IOD Limited Duty status for six different periods: (1) September 17, 2015, to March 20, 2016; (2) March 26, 2016, to July 17, 2016; (3) July 22, 2016, to August 28, 2016; (4) September 1, 2016, to September 11, 2016; (5) September 28, 2016, to January 30, 2017; and (6) February 3, 2017, to March 16, 2017).

27

Tying it all together, Arroyo failed to show a genuine issue of material fact about more time on Limited Duty. The ADA did not require the City to abandon its policy. And Arroyo failed to come forward with evidence that, in practice, the City did not follow its policy.

In sum, the City is entitled to summary judgment on the failure-to-accommodate claim about more time on Limited Duty.

### 2.     Reassignment to a Vacant Position

Arroyo also argues that the City could have placed her in a vacant position as a reasonable accommodation.

"Reassigning disabled employees to vacant positions that they can perform is a reasonable accommodation." *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 820 (7th Cir 2017) (quoting *Emerson v. Northern States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001)).

In that vein, an employer is "obligated to 'identify the full range of alternative positions'" for which an employee might qualify. *See Gile v. United Airlines, Inc.*, 213 F.3d 365, 373–74 (7th Cir. 2000) (quoting *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)). Reassignment is "required if the employee cannot perform the essential functions of her position and there are no other available accommodations." *See Kirincich v. Illinois State Police*, 196 F. Supp. 3d 845, 853 (N.D. Ill. 2016).

Here, the City does not argue that reassignment was an unreasonable accommodation, or that reassigning Arroyo would have caused a hardship.

Instead, the City focuses on whether Arroyo adequately informed the City of her ADA request, and whether she engaged in the so-called interactive process ("IAP") of determining what accommodation would be reasonable.

28

Under the ADA, the employee has the "initial duty to inform the employer of a disability," which requires that the "employee indicate to the employer that she has a disability and desires an accommodation." *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005). After the employee requests an accommodation, "the ADA requires both parties to engage in an informal interactive process to identify an appropriate accommodation . . . ." *Youngman v. Peoria County*, 947 F.3d 1037, 1042 (7th Cir. 2020).

If you want something, say something. If you don't ask, you don't get.

The request for accommodation does not need to be formal. Simple words will do. "The employee need not use the word 'accommodation' or any other magic words . . . ." *EEOC v. AutoZone, Inc.*, 2022 WL 4596755, at *8 (N.D. Ill. 2022). "A request as straightforward as asking for continued employment is a sufficient request for accommodation." *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998). In fact, "[e]ven if an employee . . . just says to the employer, 'I want to keep working for you – do you have any suggestions?' the employer has a duty under the [ADA] to ascertain whether he has some job that the employee might be able to fill." *See Miller*, 107 F.3d at 486–87.

Here, Arroyo satisfies that standard. No one disputes that the City knew that she had a shoulder injury.

And Arroyo did ask to keep working (more or less). To be fair, her request would not have won a ribbon for clarity at the State Fair. As she explained at her deposition, she was looking for an extension of her Limited Duty time:

> I would tell them that if they can help me get a permanent position or extend the unlimited duty until my grievance was settled . . . . I was hoping they would assign me to a permanent limited position because of my other injuries. And even in the beginning when they said no, I said at least, you know, I'm looking for an extension until this whole situation

29

will resolve or I will get better or, you know, I would have surgery on my shoulder.

*See* Pl.'s Dep. Tr., at 75:5-18 (Dckt. No. 134-3).

Arroyo put her toe in the water, so the City needed to engage in the IAP. But that's where Arroyo's arguments break down.

Both parties must engage in the IAP in good faith. The "ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *See Sears, Roebuck & Co.*, 417 F.3d at 797. If the employer engages in the process, but the employee's disability ultimately "was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Id.* (quoting *Beck v. Univ. of Wisc. Bd. of Regents,* 75 F.3d 1130, 1137 (7th Cir. 1996))

To assess good faith participation in the IAP, courts "look for signs of . . . failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *See Beck*, 75 F.3d at 1135. "A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.* For example, "[i]f an employee 'does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee.'" *See Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019).

Here, Arroyo says that the City caused the IAP to break down. She says that "[n]o one from CPD or the City responded to Arroyo to determine what ADA accommodations were feasible." *See* Pl.'s Resp., at 17 (Dckt. No. 139).

But the undisputed facts contradict that narrative. The City sent Arroyo a series of letters informing her of various options in response to the impending expiration of her Limited Duty time. *See* Limited Duty Notification Letter – A, Ex. T, at 158 of 196 (Dckt. No. 134-2); Limited

30

Duty Notification Letter – B, Ex. U, at 160 of 196 (Dckt. No. 134-2). One of the options was to request a reasonable accommodation.

Arroyo's supervisor met with Arroyo to discuss her options. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 59 (Dckt. No. 140). Arroyo admits that she "chose" the option to go on Medical Roll "because it would give her time to get well and return to FD status, retire, or go on disability and because it seemed reasonable to Plaintiff given her medical situation." *Id.* at ¶ 64 (Dckt. No. 140). In other words, Arroyo could have gone through the reasonable accommodations process. But she "chose" not to. *Id.*

Arroyo never contacted the City's Disability Officer, the point person for ADA reasonable accommodation requests. *Id.* at ¶ 65. She never submitted any of the relevant forms to get the ADA reasonable accommodation moving. *Id.*

In short, Arroyo "fail[ed] to communicate, by way of initiation or response." *See Beck*, 75 F.3d at 1135. That's the quintessential failure to engage with the IAP process.

Simply put, Arroyo did not give the City the information it needed to provide an accommodation of reassignment to a different job. So the City "cannot be held liable for failing to accommodate [Arroyo]." *See Graham*, 930 F.3d at 929.

## II.  The Retaliation Claim under the ADA (Count II)

Arroyo's next claim is a retaliation claim, but it doesn't get very far.

The retaliation claim cannot survive because it simply repeats the substance of the failure-to-accommodate claim. To show retaliation, Arroyo must allege some retaliatory act other than a failure to accommodate. A retaliation claim is not an opportunity for piggybacking.

Courts analyze ADA retaliation claims using a three-part, burden-shifting framework.

First, the plaintiff must establish a prima facie case. That is, "a plaintiff must submit evidence that (1) she engaged in protected activity, (2) her employer took an adverse action against her, and (3) there was a 'but for causal connection between the two.'"[6] *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (internal quotation marks omitted) (quoting *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020)).

Second, if the plaintiff establishes a prima facie case, "the burden shifts to the [employer] 'to present a non-invidious reason for the adverse employment action.'" *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015).

Third, "[i]f the [employer] accomplishes this, then the burden shifts back to [the plaintiff] to demonstrate that the [employer's] explanation of the adverse employment action was pretextual."[7] *Id.*

Here, Arroyo's case falls short each step of the way.

### A.      A Prima Facie Case

Arroyo argues that she engaged in protected activity by asking for a reasonable accommodation. *See* Pl.'s Resp. in Opp'n to Def.'s Mtn. for Summ. J., at 19–20 (Dckt. No.

---

[6] A plaintiff can also establish the prima facie case through the so-called "indirect method." The indirect method requires a plaintiff show that "(1) he 'engaged in statutorily protected activity'; (2) he 'was performing his job satisfactorily'; and (3) he 'was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer.'" *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015). Arroyo makes one fleeting reference to "similarly situated" employees, but she does not develop an argument based on the indirect method. *See* Pl.'s Resp., at 20 (Dckt. No. 139). So the Court will not develop it for her. *See Moore v. Dart*, 2024 WL 361240, at *9 (N.D. Ill. 2024) ("It is well established in our precedents that skeletal arguments may be properly treated as waived.") (quoting *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011)). In any case, the lack of an independent adverse employment action would also preclude a prima facie case through the indirect method.

[7] If these last two elements look familiar, it's because they are adapted from the *McDonnell-Douglas* burden-shifting framework, which has been applied to a variety of discrimination claims. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 n.2 (7th Cir. 2004) (applying the framework to retaliation) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Germano v. International Profit Ass'n, Inc.*, 544 F.3d 798, 806 (7th Cir. 2008) (applying the framework to ADA claims).

139); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 140) ("[T]he cited record alleges that the protected activity [Arroyo] engaged [in] was 'exercising her rights under the Americans With Disabilities Act' and she 'requested a reasonable accommodation.'").

She gets that much right. Requesting a reasonable accommodation can be a protected activity. *See Preddie*, 799 F.3d at 814–15 (citing *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008)). An employer cannot retaliate because an employee asks for a reasonable accommodation. *See Zachary M. v. Bd. of Educ. of Evanston Tp. High Sch. Dist. No. 202*, 829 F.Supp.2d 649, 663 (N.D. Ill. 2011) ("The ADA proscribes retaliation for protected activities such as seeking accommodations.").

But Arroyo cannot show an adverse action. She says her "placement on mandatory [leave of absence] without pay was an adverse employment action." *See* Pl.'s Resp. in Opp'n to Def.'s Mtn. for Summ. J., at 20 (Dckt. No. 139); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (not disputing that "[Arroyo] alleges . . . that she suffered adverse action when her request to remain in a light duty position was denied and she was placed on a leave of absence and had to surrender her badge and star").

The problem with Arroyo's claim is that the alleged retaliation – the denial of her "request to remain in a light duty position" – is the same conduct underlying her claim that the City failed to accommodate her disability. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 140).

And that's not allowed under the case law. "[A] failure to accommodate cannot serve as an adverse action for an ADA retaliation claim because it merely restates an underlying failure to accommodate claim." *See Hassett v. United Airlines, Inc.*, 2024 WL 1556300, at *5 (N.D. Ill. 2024) (collecting cases); *see also Avet v. Dart*, 2016 WL 757961, at *6 (N.D. Ill. 2016)

33

("Evidence of non-accommodation . . . cannot do 'double duty' as evidence of an adverse employment action.") (citing *Pack v. Illinois Dep't of Healthcare and Family Servs.*, 2014 WL 3704917, at \*4 (N.D. Ill. 2014)).

The reason for that rule is straightforward. Retaliation claims based on a failure to accommodate are "'circular' because 'the denial of such requests can hardly be considered unlawful retaliation for the act of requesting them.'" *See Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1038 (N.D. Ill. 2016) (Dow, J.) (quoting *Sheahan v. Dart*, 2015 WL 1915246, at \*6 (N.D. Ill. 2015)).

That's double-dipping. Otherwise, "almost every failure to accommodate claim would be simultaneously a retaliation claim." *See Hassett*, 2024 WL 1556300, at \*5 (citation omitted). And "it was unlikely Congress' intent to provide plaintiffs redundant relief for the same conduct when it established the anti-retaliation provisions of the ADA." *See Moore-Fotso*, 211 F. Supp. 3d at 1038 (citation omitted).

Unfortunately for Arroyo, "merely restat[ing] the underlying failure to accommodate claim" is exactly what she does here. *See Hassett*, 2024 WL 1556300, at \*5. Arroyo alleges that when she asked the City for a reasonable accommodation, they retaliated by denying her request for a reasonable accommodation.

That adverse employment action is the same as her failure-to-accommodate claim. There is no retaliation if the failure-to-accommodate *is* the retaliation.

Arroyo also says that her placement on unpaid leave and removal of her star and badge are adverse actions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 140).

True, "placement on unpaid off-duty status" can sometimes be an adverse employment action. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012).

34

But unlike the situation in *Coleman*, no one affirmatively placed Arroyo on leave because she sought to invoke her ADA rights. *See Coleman*, 667 F.3d at 860 (describing the unpaid off-duty status as retaliation for "complain[ing] of race and sex discrimination to her supervisors").

Instead, Arroyo's unpaid leave flowed directly from the City's alleged failure to accommodate. She *ended up* on leave as a matter of policy because her disability (allegedly) was not accommodated. Similarly, the City took away her badge and star as a matter of policy when she went on that leave. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 72 (Dckt. No. 140).[8]

In other words, once the City denied her requested accommodation, the clock started ticking on her 730-day time period. It was only a matter of time before Arroyo would end up on unpaid leave. Once she used up her 730 days of Limited Duty and her Medical Roll days, unpaid leave was the necessary result. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 19–20 (Dckt. No. 140) (not denying that the Limited Duty program limits non-IOD officers to 730 days on Limited Duty time); Pl.'s Statement of Additional Facts, at ¶ 32 (Dckt. No. 140) ("CPD practice mandates leave of absence ('LOA') upon the exhaustion of an officer's Medical Roll time.").

So, the adverse action Arroyo claims in her retaliation claim is the City's failure to accommodate, which isn't good enough. And Arroyo's attempt to couch the adverse action as placement on unpaid leave, or the removal of her badge and star, does not change anything, because those results followed inevitably from the failure to accommodate. *See Hassett*, 2024 WL 1556300, at *5 (treating placement on unpaid leave as the same adverse action as a failure to accommodate).

---

[8]  Arroyo objects to a portion of Paragraph 72 quoting her own deposition testimony on hearsay grounds. But Arroyo's own statements do not fall within the definition of hearsay if introduced by the City of Chicago, because they are opposing-party statements. *See* Fed. R. Evid. 801(d)(2)(a).

The alleged retaliation was part of the alleged failure to accommodate. But a failure to accommodate cannot be retaliation for the very same failure to accommodate. *See Hassett*, 2024 WL 1556300, at *5. As a result, Arroyo's ADA retaliation claim fails, and the City is entitled to judgment as a matter of law.

### B.       Non-Invidious Reason

Arroyo trips over the second step, too. The City had a legitimate reason for what it did.

At step two of the burden-shifting framework, the City needed to offer a "legitimate, nondiscriminatory reason for its adverse employment action." *See Pennie v. United Parcel Serv., Inc.*, 2009 WL 855787, at *18 (N.D. Ill. 2009) (citing *Germano v. International Profit Ass'n, Inc.*, 544 F.3d 798, 806 (7th Cir. 2008)).

That is, the City "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255–56 (1981) (describing the balancing framework in a Title VII context); *see also Pennie*, 2009 WL 855787, at *18 (citing *Germano*, 544 F.3d at 806) ("Courts apply the *McDonnell–Douglas* burden-shifting framework to discrimination claims under the ADA."). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *See Burdine*, 450 U.S. at 255.

The City easily clears that bar. The City has a clear, "non-invidious" and "legitimate, non-discriminatory reason" for the alleged adverse employment action. *See Preddie*, 799 F.3d at 814; *Pennie*, 2009 WL 855787, at *18.

The City simply followed its policies that non-IOD officers are entitled to only 730 days of Limited Duty, and that officers on unpaid leave must surrender their badge. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 19–20 (Dckt. No. 140) (730-day limit); *id.* at ¶ 72 (Dckt. No.

36

140) (describing CPD Employee Resource E01-16 as requiring that "all [CPD] issued equipment, including stars . . . and badges will be taken from the employee going on a leave of absence").[9]

The Employee Resource E01-16 policy is a clear, non-discriminatory reason for putting Arroyo on leave. So the City carried its burden.

### C. Pretext

The third and final step requires a showing of pretext. The City gave a legitimate, non-discriminatory reason for placing Arroyo on leave. So the burden shifts back to Arroyo to establish, by a preponderance of the evidence, that this reason was "pretextual." *See Preddie*, 799 F.3d at 814; *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 n.2 (7th Cir. 2004) (applying the framework in a Title VII context).

Arroyo once again falls short. In fact, she failed to offer any argument that her placement on unpaid leave and the removal of her badge were pretextual. "Pretext" appears nowhere in her brief. *See generally* Pl.'s Resp. in Opp'n to Def.'s Mtn. for Summ. J. (Dckt. No. 139).

Without offering any evidence of pretext by the City, Arroyo has not identified a genuine dispute of material fact on the third step of the burden-shifting framework. So no reasonable jury could determine that she has met her burden of persuasion that the City's reasons were mere pretext. *See Burdine*, 450 U.S. at 256 ("The plaintiff retains the burden of persuasion.").

---

[9] Arroyo says that the Employee Resource document is hearsay because "it is being offered to prove the truth of the matter asserted (that when an officer is placed on a leave of absence, they lose their police powers and are no longer officers)." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 72 (Dckt. No. 140). It is not hearsay because it is not offered for its truth – that is, it is a policy, and it is enough that it was said. The City is not offering the statement to prove what *will* happen, but instead to prove what *should* happen, *i.e.*, what the policy is. *See* Fed. R. Evid. 801(c). Even if it were hearsay, it would likely fall under the business-records exception as a regularly conducted activity, *see* Fed. R. Evid. 803(6), or as a statement of intent (*i.e.*, what the City will do) that falls within the then-existing-mental-state exception, *see* Fed. R. Evid. 803(3).

In sum, the retaliation claim fails for two independent reasons. Arroyo can't bring a retaliation claim about the same conduct at issue in the failure-to-accommodate claim. The failure to accommodate can't be retaliation *for* the very same failure to accommodate. And even if the claims didn't overlap, the retaliation claim would fail. It falls short on each of the three steps of the burden-shifting framework.

## III. The Rehabilitation Act Claim (Count III)

The third claim falls under the Rehabilitation Act. The claim has a familiar ring. Arroyo basically repeats her failure-to-accommodate and retaliation claims, and repackages them under the Rehabilitation Act instead of the ADA. *See* Am. Cplt., at ¶ 39 (Dckt. No. 15) (failure to accommodate); *id.* at ¶ 40 (retaliation); *see also* Pl.'s Resp. in Opp'n to Def.'s Mtn. for Summ. J., at 5 (Dckt. No. 139) (Dckt. No. 139).

The claims under the ADA and Rehabilitation Act are tethered together, joined by the same set of facts and the same legal theory. They stand or fall together. And here, they fall together.

Courts analyze claims under the Rehabilitation Act using the same standard as ADA claims. *See Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013) ("[T]he Rehabilitation Act incorporates the standards applicable to Title I of the ADA."); *Gonzalez v. Dhillon*, 2022 WL 4448740, at *7 (N.D. Ill. 2022) (applying the ADA failure-to-accommodate standard to a Rehabilitation Act claim); *Powell v. Illinois Dep't of Corr.*, 2021 WL 1688175, at *3 (N.D. Ill. 2021) ("The ADA and Rehabilitation Act are coextensive and are analyzed under the same standards.").

38

Arroyo acknowledges that the same standard applies to her claims under the ADA and the Rehabilitation Act. *See* Am. Cplt., at ¶ 37 (Dckt. No. 15) ("Rehabilitation Act claims are analyzed under the same standards as those used for ADA claims . . . .").

Arroyo's claims did not pass muster under the ADA, and for the same reasons, her claims do not pass muster under the Rehabilitation Act.

### Conclusion

For the foregoing reasons, Defendant City of Chicago's motion for summary judgment (Dckt. No. 132) is hereby granted.

Date:   March 10, 2026

Steven C. Seeger
United States District Judge

39